**No. 23-30825**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

KENTRELL PARKER, on behalf of themselves and all others similarly situated; FARRELL SAMPIER, on behalf of themselves and all others similarly situated; REGINALD GEORGE; JOHN TONUBBEE, on behalf of themselves and all others similarly situated; OTTO BARRERA, on behalf of themselves and all others similarly situated; CLYDE CARTER, on behalf of themselves and all others
similarly situated; EDWARD GIOVANNI, on behalf of themselves and all others similarly situated; RICKY D. DAVIS, on behalf of themselves and all others similarly situated; LIONEL TOLBERT, on behalf of themselves and all others similarly situated; RUFUS WHITE, on behalf of themselves and all others similarly situated; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE; EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs-Appellees*

v.

TIM HOOPER, Warden, Louisiana State Penitentiary, in His Official Capacity; ASHLI OLIVEAUX, Assistant Warden for Health Services, in Her Official Capacity; JAMES M. LEBLANC, Secretary Of The Louisiana Department Of Public Safety And Corrections, in His Official Capacity; RANDY LAVESPERE, Medical Doctor; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS; CYNTHIA PARK, ACNP; THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Middle District of Louisiana

## BRIEF OF DEFENDANTS-APPELLANTS

Connell Archey
Randal J. Robert
Keith J. Fernandez
Allena W. McCain
Madaline King Rabalais
BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge, LA 70821-2997
Telephone:   (225) 325-8700
Facsimile:    (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Keith.Fernandez@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

Jeffrey K. Cody
Caroline M. Tomeny
John C. Conine, Jr.
SHOWS, CALI & WALSH, L.L.P.
Special Assistant Attorneys General
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, LA 70821
Telephone:   (225) 346-1461
Facsimile:    (225) 346-1467
jeffreyc@scwllp.com
caroline@scwllp.com
coninej@scwllp.com

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

No. 23-30825

TIM HOOPER, Warden, Louisiana State Penitentiary, in his official capacity; ASHLI OLIVEAUX, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; RANDY LAVESPERE, Medical Doctor; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS; CYNTHIA PARK, ACNP; JOHN MORRISON, Medical Doctor; THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

*Defendants-Appellants*

v.

KENTRELL PARKER, on behalf of themselves and all others similarly situated; FARRELL SAMPIER, on behalf of themselves and all others similarly situated; REGINALD GEORGE; JOHN TONUBBEE, on behalf of themselves and all others similarly situated; OTTO BARRERA, on behalf of themselves and all others similarly situated; CLYDE CARTER, on behalf of themselves and all others similarly situated; EDWARD GIOVANNI, on behalf of themselves and all others similarly situated; RICKY D. DAVIS, on behalf of themselves and all others similarly situated; LIONEL TOLBERT, on behalf of themselves and all others similarly situated; RUFUS WHITE, on behalf of themselves and all others similarly situated; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE; EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs-Appellees*

Under Fifth Circuit Rule 28.2.1, Defendants-Appellants, as a governmental party, need not furnish a certificate of interested persons.

*/s/ Connell L. Archey*
Connell L. Archey
*Counsel for Defendants-Appellants*

i

# REQUEST FOR ORAL ARGUMENT

No. 23-30825

TIM HOOPER, Warden, Louisiana State Penitentiary, in his official capacity; ASHLI OLIVEAUX, Assistant Warden for Health Services, in her official capacity; JAMES M. LEBLANC, Secretary of the Louisiana Department of Public Safety and Corrections, in his official capacity; RANDY LAVESPERE, Medical Doctor; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS; CYNTHIA PARK, ACNP; JOHN MORRISON, Medical Doctor; THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

*Defendants-Appellants*

v.

KENTRELL PARKER, on behalf of themselves and all others similarly situated; FARRELL SAMPIER, on behalf of themselves and all others similarly situated; REGINALD GEORGE; JOHN TONUBBEE, on behalf of themselves and all others similarly situated; OTTO BARRERA, on behalf of themselves and all others similarly situated; CLYDE CARTER, on behalf of themselves and all others similarly situated; EDWARD GIOVANNI, on behalf of themselves and all others similarly situated; RICKY D. DAVIS, on behalf of themselves and all others similarly situated; LIONEL TOLBERT, on behalf of themselves and all others similarly situated; RUFUS WHITE, on behalf of themselves and all others similarly situated; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE; EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs-Appellees*

Defendants-Appellants request oral argument and note that per Doc. 110-2, this matter has already been scheduled for oral argument on March 4, 2024, in the East Courtroom – New Orleans at 2:00 p.m.

*/s/ Connell L. Archey*
Connell L. Archey
*Counsel for Defendants-Appellants*

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES .............................................................................. vii

GLOSSARY OF TERMS AND EXHIBITS ........................................................xv

I. JURISDICTIONAL STATEMENT ...................................................................1

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................1

III. CONCISE STATEMENT OF THE CASE .......................................................2

    A.    Overview of Healthcare at LSP ...............................................2

    B.    Litigation Allegations and Class Certification .......................4

    C.    Discovery Prior to the Liability Trial .....................................5

    D.    The Liability Trial ..................................................................6

    E.    The Remedy Trial ...................................................................8

    F.    The Appeal ...........................................................................11

IV. SUMMARY OF THE ARGUMENT ..............................................................12

V. ARGUMENT .................................................................................................15

    A.    The district court's failure to consider current conditions is legal error. ...................................................................................15

        1.    A court must consider current conditions when issuing injunctive relief. ......................................................15

        2.    The State has been denied the right to present evidence of current conditions......................................................17

    B.    The Remedial Order must be reversed for failure to follow the mandates of the PLRA. .......................................................21

**1.** The PLRA recognizes important principles of federalism and curtails the authority of courts to enter judgments against state prisons. ...............................................21

**2.** The Remedial Order does not comply with the need-narrowness-intrusiveness test of the PLRA. ............................24

**3.** The Remedial Order violates the provisions of the PLRA relating to the appointment of a special master. .......................28

**C.** The procedure utilized by the district court was an abuse of discretion and caused legal error. .........................................31

**D.** The district court's finding that the State was deliberately indifferent is legally wrong and manifestly erroneous.......................35

**1.** The "deliberate indifference" standard is an extremely high standard. ..........................................................................35

**2.** LSP's system of medical care does not objectively expose prisoners to a substantive risk of serious harm. ........................39

   **a.** LSP's process of conducting sick call does not expose prisoners to a substantial risk of serious harm. ..............................................................................40

   **b.** b. LSP's system of providing clinical care does not expose prisoners to a substantial risk of serious harm. ..............................................................................42

   **c.** LSP's system of providing specialty care does not expose prisoners to a substantial risk of serious harm. ..............................................................................46

   **d.** LSP's system of providing infirmary/inpatient care does not expose prisoners to a substantial risk of serious harm. ...................................................................51

   **e.** LSP's ATU does not expose prisoners to a substantial risk of serious harm. ......................................57

   **f.** Medical Leadership does not expose prisoners to a substantial risk of serious harm. .....................................59

iv

**g.** LSP's overall system of medical care does not expose prisoners to a substantial risk of serious harm. ..............................................................64

**3.** The State is not deliberately indifferent, as it responded reasonably to the district court's Liability Opinion. ................65

**4.** Citation to individual cases which Plaintiffs contend were medically negligent (the vast majority of which are disputed) does not establish systematic issues or that the State is being deliberately indifferent to medical needs of the inmates. ..............................................................68

**a.** The district court incorrectly judged LSP by the community standard of care. ..........................................69

**b.** Individual cases do not show that the State is subjectively indifferent as to clinical care. .....................71

**c.** Individual cases do not show that the State is subjectively indifferent as to specialty care....................73

**d.** The individual cases do not show that the State is subjectively indifferent as to inpatient and infirmary care................................................................76

**e.** The individual cases do not show that the State is subjectively indifferent as to emergency care. ..............77

**E.** The district court erred in finding that the state violated the ADA/RA...........................................................................81

**1.** The district court erred in relying on Dr. Schriro's opinions to find the State in violation of the ADA/RA. ...........81

**2.** The district court erred in finding that Plaintiffs proved a systemic failure to comply with the ADA/RA. .......................86

**a.** Architectural Barriers .....................................87

i. Impact of ADA Settlement Agreement with the USDOJ..............................................87

ii.    The District Court erred in finding that LSP's inmate orderly program does not overcome structural barriers to access for disabled inmates....................................................89

**b.**    Failure to Accommodate .................................................92

**c.**    Methods of Administration.............................................95

VI. CONCLUSION.......................................................................100

CERTIFICATE OF SERVICE ..............................................................102

CERTIFICATE OF COMPLIANCE.....................................................102

# TABLE OF AUTHORITIES

*Cases*

*Acinelli v. Torres*,
   No. 13-1371, 2015 WL 4380772 (C.D. Cal. July 16, 2015) ........................ 36, 69

*Alberti v. Klevenhagen*,
   790 F.2d 1220 (5th Cir. 1986) ..................................................... 15, 40

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) .............................................................................16

*Amos v. Hall*,
   No. 4:20-cv-7-DMB-JMV, 2020 WL 6791516 (N.D. Miss. Jan. 24, 2020) .......27

*Anderson v. County of Kern*,
   45 F .3d 1310 (9th Cir. 1995) ..............................................................37

*Ball v. LeBlanc*,
   881 F.3d 346 (5th Cir. 2018) ................................................................39

*Barrow v. Shearing*,
   No. 14-800, 2017 WL 3866818 (S.D. Ill. Sept. 5, 2017) ...................... 36, 37, 69

*Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*,
   520 U.S. 397 (1997) .............................................................................35

*Bell v. Wolfish*,
   441 U.S. 520 (1979) .............................................................................21

*Berry v. Brady*,
   192 F.3d 504 (5th Cir. 1999) ...............................................................21

*Bianco v. Globus Med., Inc.*,
   30 F. Supp. 3d 565 (E.D. Tex. 2014) ....................................................94

*Brauner v. Coody*,
   793 F.3d 493 (5th Cir. 2015) ................................................. 36, 38, 73, 74, 75, 80

*Brewster v. Dretke*,
   587 F.3d 764 (5th Cir. 2009) ...............................................................35

*Broadus v. Chapdelaine*,
  No. 15-0182, 2018 WL 899254 (D. Colo. Feb. 15, 2018) ...................................37

*Brown v. Plata*,
  563 U.S. 493, 558 (2011) .............................................................................. 22, 32

*C.W. ex rel. Wood v. Textron, Inc.*,
  807 F.3d 827 (7th Cir. 2015) .............................................................................81

*Carlucci v. Chapa*,
  884 F.3d 534 (5th Cir. 2018) .............................................................................39

*Center v. Lampert*,
  726 F. App'x 672 (10th Cir. 2018) .....................................................................27

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1982)..............................................................................................16

*Daubert*,
  509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)....................................82

*Davis v. Sutley*,
  No. 07-1415, 2009 WL 773261 (C.D. Cal. Mar. 20, 2009) ......................... 36, 69

*Dockery v. Hall*,
  443 F. Supp. 3d 726 (S.D. Miss. 2019) ......................................... 12, 17, 24, 46

*Dockery*,
  7 F.4th .......................................................................................................... 17, 18

*Domino v. Texas Dep't of Crim. Justice*,
  239 F.3d 752 (5th Cir. 2001) ................................................ 35, 36, 37, 65, 68, 80

*Domino*,
  239 F.3d ..............................................................................................................36

*Dunn v. Dunn*,
  318 F.R.D. 652, (M.D. Ala. 2016)......................................................................96

*Easter v. Powell*,
  467 F.3d 459 (5th Cir. 2006) ......................................................................... 38, 74

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ........................................................ 35, 36, 37, 38, 68

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................ 12, 16, 17, 65

*Frame v. City of Arlington,*
    657 F.3d 215 (5th Cir. 2011) ...................................................................89

*Ga. Adv. Off. v. Jackson,*
    4 F.4th 1200 (11th Cir. 2021) .................................................................28

*Garrett v. Thaler,*
    650 F. Appx. 375 (5th Cir. 2014) ...........................................................90

*Garrett v. Wohler,*
    No. 10-0258, 2013 WL 12125743 (D. Ariz. April 30, 2013)..................... 36, 69

*Gates v. Cook,*
    376 F.3d 323 (5th Cir. 2004) ............................................................ 15, 40

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)................................ 81, 82

*Gobert v. Caldwell,*
    463 F.3d 339 (5th Cir. 2006) ................................................ 36, 37, 39, 65, 68, 80

*Greer v. Indep. Sch. Dist.,*
    472 F. App'x 287 (5th Cir. 2012).............................................................89

*Grogan v. Kumar,*
    873 F.3d 273 (5th Cir. 2017) ...................................................................35

*Grogan,*
    973 F.3d .............................................................................. 36, 37

*Gumns v. Edwards,*
    No. 20-231-SDD-RLP, 2020 WL 2510248 (M.D. La. May 15, 2020.)..............23

*Hacker v. Cain, No.,*
    14-063, 2016 WL 3167176 (5th Cir. June 6, 2016)............................................35

*Hale v. King*,
   642 F.3d 492 (5th Cir. 2011) ................................................................95

*Helling v. McKinney*,
   509 U.S. 25 (1993) ..............................................................................39

*Holmes v. Godinez*,
   311 F.R.D. 177 (N.D. Ill. 2015) ...........................................................95

*Horne v. Flores*,
   557 U.S. 433 (2009) .............................................................................24

*Houston v. Rio Consumnes Corr. Facility*,
   No. 15-2055, 2017 WL 2972609 (E.D. Cal. July 12, 2017) ........................ 36, 69

*Hudson v. McMillian*,
   503 U.S. 1 (1992) .................................................................................39

*Hyatt v. Thomas*,
   843 F.3d 172 (5th Cir. 2016) ................................................................65

*Johnson v. Treen*,
   759 F.2d 1236 (5th Cir. 1985) ..............................................................35

*Legate v. Livingston*,
   822 F.3d 207,210 (5th Cir. May 18, 2016) ...........................................39

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................... 21, 22, 27

*Madrid v. Gomez*,
   889 F.2d 1146 (N.D. Cal. 1995) ...........................................................25

*McCracken v. Jones*,
   562 F.2d 22 (10th Cir. 1977) ................................................................37

*McGuckin v. Smith*,
   974 F.2d 1050 (9th Cir. 1992) ..............................................................37

*Mendoza v. Lynaugh*,
   989 F.2d 191 (5th Cir. 1993) ..................................... 38, 73, 74, 75, 80

*Morales v. Turman*,
562 F.2d 993 (5th Cir. 1977) ........................................................ 22, 23

*Norton v. Dimazana*,
122 F.3d 286 (5th Cir. 1997) ........................................................ 36, 38

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ........................................................82

*Preiser v. Rodriguez*,
411 U.S. 475 (1973)........................................................22

*Presley v. Commercial Moving & Rigging, Inc.*,
25 A.3d 873 (D.C. 2011) ........................................................94

*Procunier v. Martinez*,
416 U.S. 396 (1974)........................................................21

*Ramirez v. Immigr.& Customs Enf't*,
*22-502,* 2022 WL 4280690 (D.C. Cir. Sept. 13, 2022) ........................................................23

*Ramirez v. U.S. Immigr. & Customs*,
Enf't, 568 F. Supp. 3d 10 (D.D.C. 2021)........................................................23

*Rasho v. Jeffreys*,
22 F.4th 703 (7th Cir. 2022) ........................................................65

*Rhodes v. Chapman*,
452 U.S. 337 (1981)........................................................22

*Rogers v. Boatright*,
709 F.3d 403 (5th Cir. 2013) ........................................................ 68, 80

*Rosa v. 600 Broadway Partners, LLC*,
175 F. Supp. 3d 191 (S.D.N.Y. 2016) ........................................................90

*Sama v. Hannigan*,
669 F.3d 585 (5th Cir. 2012) ........................................................ 68, 80

*Samnorwood Indep. Sch. Dist. v. Texas Educ. Agency*,
533 F.3d 258 (5th Cir. 2008) ........................................................ 15, 40

*Seatrax, Inc. v. Sonbeck Int'l, Inc.*,
   200 F.3d 358 (5th Cir. 2000) ..................................................82

*Shadrick v. Hopkins Cnty.*,
   805 F.3d 724 (6th Cir. 2015) ..................................................35

*Shaw v. Murphy*,
   532 U.S. 223 (2001) ..................................................... 21, 22

*Simons v. Clemens*,
   752 F.2d 1053 (5th Cir. 1985) ................................................72

*Sims v. Kia Motors of Am., Inc.*,
   839 F.3d 393 (5th Cir. 2016) ..................................................82

*Stewart v. Murphy*,
   174 F.3d 530 (5th Cir. 1999) ................................... 38, 74, 75, 80

*Tajonera v. Black Elk Energy Offshore Operations, LLC*,
   Civ. A. No. 13-0366, 2016 WL 3180776 (E.D. La. June 7, 2016).....................82

*Tasby v. Cain*,
   *16-0277-JJB-EWD*, 2017 WL 4295441 (M.D. La. Sept. 12, 2017)....................21

*Tennessee v. Lane*,
   541 U.S. 509 (2004)..............................................................89

*Tompkins v. Belt*,
   828 F.2d 298 (5th Cir. 1987) ..................................................68

*U.S. v. Hinds County, et al.*,
   No.16-489, 2023 WL 1116530 (S.D. Miss. Jan. 30, 2023)..........................63

*United States v. Ebron*,
   683 F.3d 105 (5th Cir. 2012) ..................................................82

*United States v. Fullwood*,
   342 F.3d 409 (5th Cir. 2003) ..................................................81

*United States v. Hinds County, et al.*,
   No. 16-489, 2022 WL 1112223 (S.D. Miss. 2022) ..................... 63, 68

*United States v. Valencia,*
    600 F.3d 389 (5th Cir. 2010) ................................................................82

*Valentine v. Collier,*
    993 F.3d 270 (5th Cir. 2021) ................................. 12, 16, 17, 23, 24, 31

*Webb v. Goord,*
    340 F.3d 105 (2d Cir. 2003)........................................................ 26, 27

*Wesson v. Oglesby,*
    910 F.2d 278 (5th Cir. 1990) ..................................................... 37, 72

*Williams v. Hampton,*
    797 F.3d 276 (5th Cir. 2015) ...............................................................65

*Wilson v. Seiter,*
    501 U.S. 294 (1991)...................................................... 35, 38, 39

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)................................................................31

### Statutes

18 U.S.C. § 3626(a)(1) ............................................................... 13, 24

18 U.S.C. § 3626(a)(1)(A) ..............................................................27

18 U.S.C. § 3626(f)(1)(B)................................................................32

18 U.S.C. § 3626(f)(2) ...................................................................29

18 U.S.C. § 3626(f)(4) ...................................................................29

18 U.S.C. § 3626(f)(6)(B) ...............................................................29

18 U.S.C. 3626(f)(1)(A).......................................................... 28, 29

18 U.S.C. 3626(g)(8)............................................................. 29, 30

28 U.S.C. § 1291 .............................................................................1

42 U.S.C. § 12131 .........................................................................87

La. R.S. 40:1133.14 ......................................................................59

*Rules*

Fed. R. App. P.  32(a)(7)(B) .................................................................102

Fed. R. App. P. 32(a)(5) .......................................................................102

Fed. R. App. P. 32(a)(6) .......................................................................102

Fed. R. App. P. 32(f); and (2) ..............................................................102

Fed. R. Civ. P. 53 ...................................................................................29

Fed. R. Evid. 706 ...................................................................................30

Federal Rule of Evidence 702......................................................... 81, 82

*Regulations*

28 C.F.R. § 35.130(b)(3).........................................................................95

28 C.F.R. § 35.150(a)..............................................................................89

## <u>GLOSSARY OF TERMS AND EXHIBITS</u>

### <u>TERMS</u>

1. ACA – American Correctional Association
2. ADA – Americans with Disabilities Act
3. ADAAA – Americans with Disabilities Act Amendments Act
4. ATU – Acute Treatment Unit or Assessment and Triage Unit
5. CLIA – Clinical Laboratory Improvement Amendments
6. CDC – Centers for Disease Control and Prevention
7. DOC – Department of Corrections
8. DPS&C – Department of Public Safety and Corrections
9. EHR – Electronic Health Records
10. EKL – Earl K. Long Hospital
11. eMAR – Electronic Medication Administration Record
12. EMT – Emergency Medical Technician
13. ER – Emergency Room
14. HQ – Headquarters
15. ITO – Individual Treatment Order
16. LPN – Licensed Practical Nurse
17. LSP – Louisiana State Penitentiary
18. NCCHC – National Commission on Correctional Health Care
19. NP – Nurse Practitioner
20. NU 1 – Nursing Unit 1
21. NU 2 – Nursing Unit 2
22. OLOL – Our Lady of the Lake Hospital
23. PCP – Primary Care Physician
24. PLRA – Prison Litigation Reform Act
25. QA/QI – Quality Assessment and Quality Improvement
26. RA – Rehabilitation Act
27. REBTC – R.E. Barrow Treatment Center
28. RN – Registered Nurse
29. SDE – Self-Declared Emergency
30. sMARt – Simple Medical Administration Record Technology
31. UMCNO or UMC – University Medical Center New Orleans

## **EXHIBITS**

All exhibits are cited to using the same naming convention as that provided on the disc of exhibits received from the Clerk of the United States District Court for the Middle District of Louisiana, as follows:

1. Def_# refers to Defendants-Appellants' exhibits
2. Joint_# refers to Joint exhibits
3. Pla_# refers to Plaintiffs'-Appellees' exhibits

# I. JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction over the Judgment and Remedial Order pursuant to 28 U.S.C. § 1291.

## II. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the district court's failure to consider current conditions violates established law regarding the issuance of injunctive relief, as well as closely related provisions of the Prison Litigation Reform Act ("PLRA").

2.    Whether the district court's appointment of three special masters to overhaul the medical care system at Louisiana State Penitentiary ("LSP") violates the PLRA because it fails to meet the "need-narrowness-intrusiveness test" and further violates the PLRA provisions regarding the appointment of special masters.

3.    Whether the district court's bifurcation of the matter into a liability and a remedy trial conducted over more than eight years without consideration of current conditions and without determining any appropriate remedy is a violation of the Defendants-Appellants' due process rights.

4.    Whether the district court's finding of deliberate indifference is legally wrong and manifestly erroneous considering that the Defendants-Appellants' reasonably responded to the findings from the Liability Opinion and there is no finding that any current medical issues are the result of a systematic failure.

5.    Whether the district court erred in finding that there was a systematic violation of the Americans with Disabilities ("ADA") and the Rehabilitation Act ("RA").

### III. CONCISE STATEMENT OF THE CASE

**A. <u>Overview of Healthcare at LSP</u>**

LSP is a maximum security prison in Angola, Louisiana.[1]  LSP provides a full spectrum of medical services to prisoners from initial intake through hospice care at the end of life. Medical care includes: (i) intake, (ii) infectious disease prevention, (iii) routine and emergency sick call, (iv) routine health maintenance, including annual physicals for patients over the age of 50, (v) vision care, (vi) dental care, (vii) mental health care, (viii) radiology on site, (ix) a full service pharmacy on site, (x) an ambulance service, (xi) an assessment and triage room ("ATU"), (xii) physician clinics for routine and chronic care, (xiii) a nursing unit for acute care patients, (xiv) another nursing unit for patients who need long-term skilled nursing care, (xv) numerous specialty clinics on site manned with contracted physicians, (xvi) tele-medicine clinics staffed by contracted physicians, (xvii) specialty and surgical services available off site, (xviii) contractual arrangements with outside hospitals for emergency services, and (xix) nationally recognized hospice services.

---

[1] ROA.22401.

LSP's medical facilities are primarily housed at the R.E. Barrow Treatment Center ("REBTC"), a centralized treatment center located within the LSP facility.[2] The REBTC includes the ATU which is open 24 hours a day, seven days a week, and sees patients needing urgent or emergency care.[3] The ATU is not an emergency room.[4] Patients with serious emergent needs are transferred to local hospital emergency rooms as needed.[5]

LSP maintains two large, open ward nursing units containing hospital beds along with lockable rooms (high security patients) around the exterior of each Nursing Unit.[6] Nursing Unit 1 ("NU1") houses acute care patients, and Nursing Unit 2 ("NU2") houses patients who need long-term care.[7]

LSP also maintains two assisted living dorms within the general population housing.[8] The assisted living dorms are provided to LSP patients that require assistance with activities of daily living.[9] LSP patients in the assisted living dorms receive assistance with meals, medicine, dressing, bathroom, showers, etc.[10]

---

[2] ROA.22403.
[3] ROA.22403.
[4] ROA.22429.
[5] ROA.22429.
[6] ROA.22419-20.
[7] ROA.22403.
[8] ROA.22445-46.
[9] ROA.22445-46.
[10] ROA.35330-32.

At all times through this protracted litigation, LSP has been and remains accredited by the American Correctional Association ("ACA").[11]   The ACA conducts an audit of LSP's healthcare facilities and its delivery of medical care every three years.[12]

**B.**   **Litigation Allegations and Class Certification**

On May 20, 2015, Plaintiffs filed this class action on behalf of themselves and other inmates housed at LSP against the Louisiana Department of Safety and Corrections and certain named defendants (collectively, the "State") asserting violations of the Eight Amendment prohibition of cruel and unusual punishment and systematic violations of the ADA and the RA.[13]   On November 1-2, 2017, a class certification hearing was held.[14]   On February 26, 2018, the Court issued a Ruling finding that Plaintiffs had exhausted the administrative remedies as required by the PLRA and certifying a class.[15]   The class and a subclass was defined as: "all inmates who now, or will be in the future, incarcerated at LSP" and "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP."[16]

---

[11] ROA.30270.
[12] *See* Def_11_1433.
[13] ROA.22399; ROA.144.
[14] ROA.17733-34
[15] ROA.17733.
[16] ROA.17762.

## C.    Discovery Prior to the Liability Trial

On September 11, 2015, the district court set the matter for a 15-day jury trial beginning on May 15, 2017.[17]  The Court set a discovery deadline of September 30, 2016[18], and the parties engaged in extensive discovery.

On May 22, 2018, Plaintiffs filed a Motion to Exclude Evidence of Post-Discovery Conditions or, in the Alternative, to Compel Additional Discovery in which the Plaintiffs argued that evidence should be limited to that produced prior to the discovery deadline of September 30, 2016.[19]  The State opposed the motion, arguing that the State was entitled to present evidence of current conditions.[20] The district court granted Plaintiffs' motion and ordered the trial to be bifurcated into separate liability and remedy phases.[21]  The district court ordered that a bench trial on liability would proceed on October 9, 2018, limited to evidence of conditions existing on or before September 30, 2016.[22]  The district court held that, "[i]f Plaintiffs prevail on their constitutional and ADA claims, evidence of subsequent conditions may be relevant at the remedy stage."[23]

---

[17] ROA.389.  The trial date was later continued to October 9, 2018.
[18] ROA.1465.
[19] ROA.18031.
[20] ROA.18101.
[21] ROA.18116.
[22] ROA.18118.
[23] ROA.18118.

D.    **The Liability Trial**

In October 2018, the "liability phase" of the trial was held over eleven days.[24] The State was unable to present evidence of conditions that had changed in the two-year period between when discovery ended and the trial.[25]

Not only was the State unable to present evidence of current conditions, but Plaintiffs were able to present evidence of medical episodes of care at LSP as far back as 2010.[26] The period of time reviewed was problematic because of the upheaval in the model of care that took place during the time period reviewed. LSP had traditionally relied upon Earl K. Long Hospital ("EKL") in Baton Rouge to provide emergency and specialty care to inmates.[27] However, in April 2013, EKL closed.[28] The State's plan was for LSP to utilize the services of University Medical Center New Orleans ("UMCNO").[29] However, UMCNO was not ready to receive patients from LSP at that time.[30] During 2013 and into 2014, LSP literally had no primary hospital to provide services to its inmates.[31] Local hospitals responded to emergencies, but a backlog of routine services ordinarily provided (such as hernia

---

[24] ROA.22400.
[25] ROA.18118.
[26] *See e.g.,* ROA.22406, 22437, 22444, 22475.
[27] ROA.33246-47; ROA.33475.
[28] Def_11_160.
[29] ROA.33477.
[30] ROA.33477.
[31] ROA.33477.

and cataract surgeries, for example) developed.[32]   UMCNO began to provide services to LSP by the end of 2014 and undertook to address the backlog that had developed at LSP.[33]

On March 31, 2021, two and one-half years after the liability trial concluded, the district court issued its Opinion (the "Liability Opinion").[34] It found that LSP's medical care was below the minimum standard allowed by the Eighth Amendment in six areas: (i) clinical care, (ii) specialty care services, (iii) infirmary/in-patient care, (iv) sick call, (v) emergency care/ATU, and (vi) medical leadership and organizational structure.[35]   It found no constitutional deficiencies regarding the following areas: (i) chronic care,[36] (ii) laboratory services,[37] and (iii) pain medical management.[38] The district court further found violations of the ADA/RA.[39]

On April 15, 2021, the State filed a Motion for Reconsideration or, in the Alternative, to Certify Ruling for Interlocutory Appeal.[40]   The State contended that the Liability Opinion was not based upon current conditions and asked the district

---

[32] ROA.33477.  UMCNO then set up a team that would prioritize patients that would receive services.  ROA.33478.
[33] ROA.33478.
[34] ROA.22399.
[35] ROA.22407-35.
[36] ROA.22434.
[37] ROA.22443.
[38] ROA.22443.
[39] ROA.2244-76.
[40] ROA.22562.

court to reconsider its ruling.[41]  On October 8, 2021, the district court denied the motion.[42]

The State filed a Petition for Mandamus with this Honorable Court, seeking to require the district court to consider current conditions.  On November 29, 2021, this Court denied the petition.[43]

### E.    <u>The Remedy Trial</u>

The district court thereafter set a "remedy phase" trial for June 2022, limited to evidence from January 1, 2019 through April 1, 2022.[44]  On May 16, 2022, the State filed a Motion in Limine to Admit Additional Evidence to present evidence relevant and probative to a determination that LSP is engaged in continuing violations justifying injunctive relief.[45]  On May 26, 2022, the district court ruled that that while courts are reluctant to permit the introduction of material and evidence that was not timely produced in discovery, this case is not an ordinary proceeding; it is instead an extraordinary proceeding seeking prospective injunctive relief.[46]  The district court allowed the State to present limited evidence as to six matters.[47]

---

[41] ROA.22562.
[42] ROA.26538.
[43] ROA.26547.
[44] ROA.30563.
[45] ROA.27294.
[46] ROA.30103.
[47] ROA.30103-04.

On May 31, 2022, the parties filed a Joint Pretrial Order which set forth the following changes to the State's medical practices made since the close of the liability discovery:

a. Since March 2018, Defendants have assigned a registered nurse or licensed practice nurse in the Assessment and Triage Unit ("ATU") at all times.

b. Since March 2018, Defendants have had a nurse practitioner assigned to the ATU from 7:30 to 4 pm Monday through Thursday, from 7:30 to midnight Friday, and all day on Saturday and Sunday. The nurse practitioner is expected to be in the Treatment Center, although not necessarily in the ATU at all times. When no nurse practitioner is assigned to the ATU, a nurse practitioner is on call for the ATU.

c. Since November 1, 2021, nurse practitioners conduct sick call visits as follows:

   i. Class members fill out sick call request forms. Depending on their housing unit, they either place them in a drop box, or give them to a security officer or EMT.

   ii. Defendants' current policy is that sick call request forms that are received by noon Sunday through Thursday result in a telemedicine visit with a nurse practitioner the following day. The patient is in a clinic room with an EMT.

   iii. Defendants' current policy is that Sick call request forms that are received after noon on Thursday, or on Friday or Saturday, result in a telemedicine visit with a nurse practitioner the following Monday.

   iv. Robert Bordelon is the primary nurse practitioner conducting sick call. When he is unavailable, Jeremy Dedeaux conducts sick call.

   v. Defendants' policy is that the medical record for each patient is provided to the nurse practitioner for the sick call visit.

d. [withdrawn]

e. LSP now requires patients to come to the Treatment Center to refuse appointments.[48]

The remedy trial took place over ten days in June 2022 and considered conditions primarily during the period of time when the COVID pandemic raged and hurricanes disrupted care in south Lousiana.[49]  The district court again took the matter under advisement for a lengthy period of time.

On November 17, 2022, the State filed a Motion to Supplement the Record and Admit Certain Specific Evidence of Current Conditions.[50]  The State sought to present evidence that after conclusion of the trial in June 2022: (i) LSP implemented electronic healthcare records ("EHR"), (ii) LSP was re-accredited by the ACA, and (iii) LSP hired an additional physician and an additional nurse practitioner ("NP").[51] The State argued that the law required the district court to consider current conditions and that these matters were certain, specific, and unassailable.[52]  The district court denied the motion and did not consider the changes made after the trial in June 2022.[53]

---

[48] ROA.30159-60.
[49] ROA.30563.
[50] ROA.30264.
[51] ROA.30270-71
[52] ROA.30270.
[53] ROA.30302.

On November 6, 2023, over seventeen months after the remedy trial was held, the district court entered its Opinion[54] and the Remedial Order[55] based upon its review of conditions up to the "remedy trial discovery cutoff date," i.e., conditions prior to May 2022.[56] The district court then entered judgment in favor of the plaintiffs and against the State.[57]

Despite engaging in a ten-day trial to determine appropriate relief, the district court did not identify the ultimate injunctive relief to be granted. The Opinion (the "Remedy Opinion") concluded that "the Court will enter Permanent Injunctive relief by separate order."[58] The Remedial Order issued by the district court does not identify the injunctive relief to be granted.[59] Instead, the Remedial Order requires the appointment of three special masters who will develop remedial plans.[60] The special masters will thereafter monitor and report on compliance.[61]

## F.    The Appeal

On November 20, 2023, the State filed a notice of appeal.[62] The State requested that the district court stay the Judgment[63] and requested expedited

---

[54] ROA.30557.
[55] ROA.30661.
[56] ROA.30563.
[57] ROA.30666.
[58] ROA.30660.
[59] ROA.30661.
[60] ROA.30661.
[61] ROA.30664.
[62] ROA.30669.
[63] ROA.30671.

consideration of same.[64]   On December 1, 2023, Plaintiffs filed a Motion for an

Indicative Ruling,[65] which the district court denied.[66]   After giving the district court

time to consider the request for a stay, the State then requested that this Court stay

the matter.[67]   On December 6, 2023, this Honorable Court granted an administrative

stay and ordered that the appeal be expedited.[68]

## IV. <u>SUMMARY OF THE ARGUMENT</u>

Defendants were entitled to present evidence of and be judged by current

conditions, including after trial until judgment.  *Farmer v. Brennan*, 511 U.S. 825,

845-46 (1994); *Valentine v. Collier*, 993 F.3d 270, 292 (5th Cir. 2021); *Dockery v.

Hall*, 443 F. Supp. 3d 726, 738 (S.D. Miss. 2019), aff'd sub nom. *Dockery v. Cain*,

7 F.4th 375 (5th Cir. 2021).  The Liability Opinion was based upon conditions that

existed four to ten years prior to the ruling.  The Remedy Opinion then failed to

consider current conditions.  One clear example of this error is that the district court

heavily criticized LSP's medical records management, yet refused to consider that

LSP had implemented EHR by the time the Remedy Opinion was issued.  The

district court's failure to consider current conditions is reversible error.

---

[64] ROA.30757.
[65] ROA.30779.
[66] ROA.30830.
[67] Doc. 9-1; *see also* ROA.30790.
[68] Doc. 44-2; *see also* ROA.31507-08.

The district court also failed to comply with the requirements of the PLRA. The PLRA provides that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). The district court issued its Remedial Order directing the appointment of three special masters to overhaul all aspects of LSP's medical care and ADA/RA programs without performing the need-narrowness-intrusiveness test required by the PLRA. The district court further compounded the error by ordering the appointment of three special masters without complying with the requirements for appointment of a special master under the PLRA. The district court's failure to comply with the PLRA is reversible error.

The overall procedure employed in this case violated the State's fundamental due process rights. An injunction proceeding should proceed quickly, and the PLRA was enacted to restrict federal court oversight of state prisons. Instead of proceeding quickly, the case languished for more than eight years. With little authority, the district court elected to bifurcate the case into liability and remedy phases. Both trials took place without consideration of current conductions. Even after two trials, Plaintiffs did not prove and the district court did not find a remedy for the alleged violations. In short, the defective procedure has resulted in more than eight years of

federal court intrusion into the State's prison operation in violation of sensitive federalism concerns and the PLRA.

As to the merits, the State has continuously improved its healthcare system during periods of upheaval of the closure of EKL and disruption caused by COVID and hurricanes in south Louisiana. The district court committed legal error by finding that the State was objectively deliberately indifferent without considering the reasonable steps taken by the State in response to the district court's criticisms in the Liability Opinion. The district court then committed further legal error by finding that the State was subjectively deliberately indifferent based upon a smattering of isolated patient cases without a finding that the errors were the result of systematic failures.

The district court erred in finding that Plaintiffs established a systemic violation of the ADA/RA. First, the district court improperly relied on the unsupported opinions of Plaintiffs' purported expert in ADA administration. Second, the Remedial Order regarding architectural barriers claims does not comply with the PLRA. Third, the district court erred in finding that Plaintiffs met their burden of proof on their remaining ADA discrimination claims. Specifically, Plaintiffs failed to establish that LSP discriminates against disabled inmates in connection with access to programs, services, and activities, as well as in connection with disciplinary procedures. Finally, given the absence of evidence of

discrimination, the district court erred in its findings as to Plaintiffs' methods of administration claims, which cannot constitute standalone violations of the ADA.

## V. <u>ARGUMENT</u>

Whether a constitutional right has been violated is a question of law that this Court reviews *de novo*. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004); *Samnorwood Indep. Sch. Dist. v. Texas Educ. Agency*, 533 F.3d 258, 267 (5th Cir. 2008). Factual findings are reviewed under a "clearly erroneous" standard. *Gates*, 376 F.3d at 333. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* "[O]nce the facts are established, the issue of whether these facts constitute a violation of constitutional rights is a question of law that may be assayed anew upon appeal." *Alberti v. Klevenhagen*, 790 F.2d 1220, 1225 (5th Cir. 1986). "Thus, the *existence* of the challenged conditions in the jails presents a question of fact to be reversed only if clearly erroneous; we bring our own judgment to bear on whether these conditions constitute cruel and unusual punishment." *Id.* (emphasis added).

### A.    <u>The district court's failure to consider current conditions is legal error.</u>

#### 1.    <u>A court must consider current conditions when issuing injunctive relief.</u>

Current conditions are critical in cases seeking prospective injunctive relief. Consideration of current conditions is vital to a determination of the threshold

issue of whether Plaintiffs have an actual case or controversy under Article III of the Constitution.  In determining whether a case or controversy exists in an action seeking prospective relief for allegedly unconstitutional practices, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1982).  As the Supreme Court has repeatedly held, an actual controversy "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013) (internal quotations omitted).

The Supreme Court has also held that current conditions are necessary to establish whether injunctive relief should be granted in prison cases like this one, saying that deliberate indifference "should be determined in light of the prison authorities' **current** attitudes and conduct, . . . ." *Farmer*, 511 U.S. at 845-46. (internal quotations omitted) (emphasis added).

In 2021, this Court affirmed the principle that current conditions must be considered at the time of an injunction issuing. *Valentine*, 993 F.3d at 282.  *Valentine* involved claims of deliberate indifference under the Eighth Amendment against a prison in Texas.  There, the district court found that the defendants violated the Eight Amendment and granted an injunction.  This Court reversed, concluding that given steps taken by the defendants, including post-trial reports to the district court, the

plaintiffs failed to prove entitlement to injunctive relief. In so holding, this Court stated that evidence up to the time that judgment is rendered should be considered because an inmate must demonstrate the continuance of harm through the remainder of the litigation and into the future. *Id*. at 282.

A few months later in 2021, this Court rendered its opinion on the plaintiffs' appeal of *Dockery*. 443 F. Supp. 3d 726. There, the district court specifically considered current conditions at the prison at the time of trial and post-trial. In affirming the district court ruling, this Court considered current conditions, noting that the district court found conditions had "changed dramatically" since the beginning of the case. *Dockery*, 7 F.4th at 377.

*Valentine* and *Dockery* establish that conditions at a prison must be considered prior to entry of judgment – not to determine whether constitutional violations have occurred but whether they continue to occur in a manner such that injunctive relief is appropriate. *Farmer*, 511 U.S. at 846.

### 2. The State has been denied the right to present evidence of current conditions.

The State was not allowed to present evidence of current conditions at LSP. The liability trial was based upon evidence more than two years old, and in some cases, the evidence was up to eight years old.[69]

---

[69] ROA.18118; *see e.g.,* ROA.22406, 22437, 22444, 22475.

At the remedy trial, saddled with the finding of liability from the Liability Opinion, the State was still not given full rein to offer complete evidence of current conditions existing as of the remedy trial.[70] The failure to allow evidence of current conditions was exacerbated by the fact that the period of review was primarily during the period of time when COVID and hurricanes adversely impacted health care throughout south Louisiana.

Further, the State was denied the opportunity to present evidence of important healthcare changes that occurred after trial and prior to entry of judgment.[71] The *Dockery* decision makes clear that the State should have been allowed to present evidence of current conditions prior to entry of judgment.

The district's court Remedy Opinion found that LSP lacked adequate medical records management.[72] The district court called LSP's medical records incoherent, disorganized, and untrustworthy.[73] While the State does not concede that LSP's medical records management was inadequate,[74] in October 2022, LSP implemented EHR and brought that fact to the district court's attention prior to ruling.[75] The fact that LSP had implemented EHR should not have been surprising as witnesses

---

[70] ROA.30103-04

[71] ROA.30302.

[72] ROA.30574.

[73] ROA.30575.

[74] Dr. Morrison testified that he appreciates paper records because that system does not go down when the power goes out. ROA.35853.

[75] ROA.30271, 46501.

testified at trial that the State had implemented the EHR system in other prisons and that LSP was close to doing the same.[76] The district court refused to consider such evidence.[77] By the time that the district court issued its Remedy Opinion in November 2023, the EHR system had been in place at LSP for a full year.[78] In connection with the Motion to Stay filed in this Court, the State submitted evidence that implementation of EHR transformed the delivery of health care at LSP.[79] The EHR has many templates to guide providers, a chart summary, the ability to schedule appointments, and the ability to produce reports, among other capabilities.[80]

Additionally, on May 23, 2022, LSP fully implemented the electronic medication administration records through the Simple Medical Administration Record Technology ("sMARt") software.[81] The district court's ruling pertaining to inadequate medical recordkeeping at LSP is no longer valid, as it is based on conditions that have changed. The portion of the Remedial Order directing the special masters to determine a remedial plan to address standards and procedures for medical records management, including electronic medical records, is moot. Moreover, the impact of the EHR will reverberate throughout the system. The district court's judgment entered in this case without consideration of the fact that

---

[76] ROA.35510-11.
[77] ROA.30302.
[78] ROA.30695, 30736-55.
[79] Doc. 9; *see also* ROA.30790.
[80] ROA.30695-99, 30736-55.
[81] ROA.30699.

the State had implemented EHR and the sMARt electronic medication administration recordkeeping was legal error.

Furthermore, one of the district court's criticisms was that the sick call request form provided no place for the time and date the request was submitted or received.[82] LSP updated its sick call form to rectify this criticism in June 2022.[83]

The district court further criticized the fact that LSP had only one physician on staff at the time of the remedy trial.[84]  As of January 2023, LSP hired a second physician and increased the number of NPs from seven to nine.[85]  Overall, nurse staffing has increased from 14 registered nurse ("RN") positions filled in 2019 to 27 RN positions filled in 2023.[86]  The increase in providers and nurses is made more significant by the fact that the number of inmates at LSP has declined from 6,400 prior to 2016 to 3,890 in 2023.[87]

Presented with this important evidence of significant changes in conditions, the district court should have done what was done in *Dockery* and considered these matters. Instead, the district court chose to ignore them.  The district court's failure to consider current conditions was legal error.

---

[82] ROA.30581.
[83] ROA.30700, 30756.
[84] ROA.30617.
[85] ROA.30694-95.  One the NPs is a mental health provider.
[86] ROA.30695.
[87] ROA.22401, 30695.

**B.**     **The Remedial Order must be reversed for failure to follow the mandates of the PLRA.**

The Remedial Order fails to meet the need-narrowness-intrusiveness test of the PLRA and violates those provisions of the PLRA which provide for the appointment of a special master.

**1.**     **The PLRA recognizes important principles of federalism and curtails the authority of courts to enter judgments against state prisons.**

States are given broad discretion to make the difficult judgments concerning institutional operations of their prisons. *Lewis v. Casey*, 518 U.S. 343, 361-63 (1996).  "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  "[P]rison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *Tasby v. Cain*, No. 16-0277-JJB-EWD, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted*, No. 16-277-JJB-EWD, 2017 WL 4322413 (M.D. La. Sept. 28, 2017) (citing *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).

Federalism concerns are particularly acute in the context of prison management.  *Shaw v. Murphy*, 532 U.S. 223, 228-30 (2001); *Lewis*, 518 U.S. at 386 (Thomas, J., concurring); *see also Procunier v. Martinez*, 416 U.S. 396, 405 (1974)

(emphasizing that federal courts are "ill-equipped to deal with the increasingly urgent problems of prison administration"), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989). The Supreme Court observed that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973).

Federal judges are ill-equipped to manage state prisons. As Justice Scalia stated in his dissenting opinion in *Brown v. Plata*, "[t]hree years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions." 563 U.S. 493, 558 (2011) (Scalia, J., dissenting). Justice Scalia opined that such injunctions over state prison operations invite district court judges to "indulge incompetent policy preferences." *Id.* (emphasis omitted); *see also Shaw*, 532 U.S. at 228-30; *Lewis*, 518 U.S. at 388 (Thomas, J., concurring); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("these considerations properly are weighed by the legislature and prison administration rather than a court"). As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d 993, 999 (5th Cir. 1977). Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate

governments have wide discretion." *Id.* at 996. Federal courts are to "eschew toward minimum intrusion into the affairs of state prison administration." *Gumns v. Edwards,* No. 20-231-SDD-RLP, 2020 WL 2510248, at *3 (M.D. La. May 15, 2020.).

Notwithstanding these principles, prior to enactment of the PLRA, federal courts routinely entered structural injunctions[88] against prison systems. *Valentine*, 993 F.3d at 292. These structural injunctions imposed massive federalism costs on the states who were required to pay the costs imposed by the injunctions. *Id*. Judge Oldham in his concurring opinion in *Valentine* explained the environment in which federal courts routinely entered structural injunctions against state prisons. *Id*. Incredibly, in 1984, 24% of the nation's state prisons were subject to structural injunctions. *Id.* at 293. The practice of routine issuance of structural injunctions created a significant backlash in both Congress and the courts and led to the passage of the PLRA in 1996. *Id*.

The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Id*. The PLRA greatly limits the ability of a court

---

[88] The term "structural injunction" is defined as an "injunction seeking to effect the reform of a social institution." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 23 (D.D.C. 2021), appeal dismissed sub nom. *Ramirez v. Immigr. & Customs Enf't*, No. 22-502, 2022 WL 4280690 (D.C. Cir. Sept. 13, 2022). Judge Oldham explained that the purpose of a structural injunction "is to alter broad social conditions by reforming the internal structural relationships of government agencies or public institutions." *Valentine,* 993 F.3d at 292 (J. Oldham, concurring).

to fashion injunctive relief. *Dockery*, 443 F. Supp. 3rd at 737. Today, courts generally recognize that structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Valentine,* 993 F.3d at 294 (citing *Horne v. Flores*, 557 U.S. 433, 448 (2009)). One of the aims of the PLRA is to protect states from massive federalism costs brought on by unwarranted intrusions into state affairs. *Id.*

### 2.    The Remedial Order does not comply with the need-narrowness-intrusiveness test of the PLRA.

The PLRA specifically requires that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[89] 18 U.S.C. § 3626(a)(1). Further, the court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1).

The district court did not perform the need-narrowness-intrusiveness test required by the PLRA. Plaintiffs acknowledge this fact in the Motion for an Indicative Ruling in which they argue that it was premature for the district court to

---

[89] This provision of the PLRA has been and will be referred to herein as the "need-narrowness-intrusiveness test."

have conducted the need-narrowness-intrusiveness test but ask the district court to modify the order to address the need-narrowness-intrusive test.[90]

Instead of conducting the need-narrowness-intrusiveness test required by the PLRA, the district court cited the case of *Madrid v. Gomez*, 889 F.2d 1146, 1281 (N.D. Cal. 1995) for the proposition that the State's current attitudes justified its actions, i.e., appointment of a special master, as was done in *Madrid*.[91]  The district court's decision to appoint three special masters fails all parts of the need-narrowness-intrusiveness test.

After two trials over 21 days, including a trial specifically to address remedy, there is no remedy.  The district court still has not found that any specific relief is necessary to address the alleged violation of a federal right.  The court abrogated its duty to determine the relief necessary in this case by choosing to appoint three special masters.[92]

The district court did not narrowly limit the powers of the special masters. Instead, the Remedial Order directs the special masters to develop remedial plans that address seven broad areas encompassing essentially all healthcare and ADA/RA compliance at LSP.[93]

---

[90] ROA.30785-86.
[91] ROA.30659.
[92] ROA.30661.
[93] ROA.30662-63.

Similarly, the Remedial Order did nothing to consider whether the appointment of the special masters is the least intrusive means necessary to correct the perceived violations or to limit the remedial plans proposed by the special masters to be the least intrusive means necessary to correct the perceived violations. The special masters will very likely impose best or preferred practices on LSP. Arguably, the appointment of three special masters as contemplated by the district court is the broadest and <u>most</u> intrusive possible relief that the district court could enter.

The district court's reliance on *Madrid* is misplaced and does not justify the appointment of three special masters. *Madrid*, decided in 1995, is no longer valid law after the passage of the PLRA in 1996. The PLRA, enacted after *Madrid* was decided, requires the district court to engage in the need-narrowness-intrusiveness test, which did not occur. The district court's decision to appoint three special masters is an abrogation of its clear duties and responsibilities under the PLRA. The district court's ability to simply allow special masters to craft the remedy as was done in *Madrid* is no longer an option under current, applicable law.

The Second Circuit addressed this exact situation and reversed a district court's attempt to appoint a special master. *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). The plaintiff in *Webb* argued, as here, that pursuant to the PLRA, a special master should be appointed to essentially administer the prison to ensure

26

compliance with the Eight Amendment.  The Court rejected plaintiff's position, stating:

> The PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment. This may or may not be a good thing, but "Congress's ability to take action of this sort demonstrates that the courts are not nearly so imperial, or unstoppable, as their critics have claimed, even when grounding their authority on the Constitution." *Id*. at 383.

> We hope it goes with[out] saying that we cannot disregard the requirements set forth in the PLRA. That statute provides that a federal court may not grant any prospective relief at all—let alone appoint a special master to administer a state prison system—unless the court finds that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The mere assertion that the appointment of a special master is appropriate obviously does not meet these strictures.

*Id* at 111.  *See also Center v. Lampert*, 726 F. App'x 672, 676 (10th Cir. 2018) (The PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions").  The district court in the Northern District of Mississippi cited *Webb* and *Lampert* and acknowledged that the PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment." *Amos v. Hall*, No. 4:20-cv-7-DMB-JMV, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020).

Eleventh Circuit precedent also confirms that the PLRA requires a need-narrowness-intrusiveness inquiry based upon consideration of current conditions and attitudes.  In *Ga. Adv. Off. v. Jackson*, 4 F.4th 1200, 1208-09 (11th Cir. 2021) (vacated as moot due to a settlement before mandate issued, 33 F.4th 1325 (11th Cir. 2022)), the Eleventh Circuit considered whether the need-narrowness-intrusiveness criteria must be applied when a district court converts a preliminary injunction to a permanent injunction.  The Court described how the PLRA interacts with a district court's traditional equity powers, noting that "[t]he PLRA only adds to the preexisting limits on injunctive relief; it does not subtract from them." *Id.* at 1208. The PLRA "supercharges" the requirements of "narrow tailoring" and "public interest considerations." *Id.* at 1209.  As to the consideration of current conditions, the Court held that "[b]ecause circumstances may change during the 90-day period in which the preliminary injunction is in place," a district court must make a second set of need-narrowness-intrusiveness findings when converting a preliminary injunction into a permanent injunction.  *Id*. at 1214.

The district court's appointment of three special masters without undertaking the need-narrowness-intrusiveness test is reversible error.

### 3.    <u>The Remedial Order violates the provisions of the PLRA relating to the appointment of a special master.</u>

The PLRA circumscribes the district court's ability to appoint a special master. 18 U.S.C. 3626(f)(1)(A).  The PLRA defines the term "special master" to

mean any person appointed by a federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court. 18 U.S.C. 3626(g)(8). Thus, the PLRA encompasses all appointments of a special master by a district court in prison litigation.

A special master appointed under the PLRA has the authority to "conduct hearings on the record and prepare proposed findings of fact." 18 U.S.C. § 3626(f)(1)(A). The special master shall not make any findings or communications *ex parte*. 18 U.S.C. § 3626(f)(6)(B).

The PLRA provides a specific process for selecting a special master. The defendant institution and the plaintiff each submit a list of not more than five persons to serve as a special master. Then each party shall have the opportunity to remove up to three persons from the opposing party's list. The court shall select the master from the persons remaining on the list. 18 U.S.C. § 3626(f)(2). The special master will be compensated at a determined rate and paid with funds appropriated to the Judiciary. 18 U.S.C. § 3626(f)(4).

The district court's appointment of three special masters violates these (and more) provisions of the PLRA. Initially, the PLRA authorizes the appointment of "a special master" (18 U.S.C. § 3626(f)(1)(A)), not three special masters, as set forth

in the Remedial Order.[94]  Further, the special master is to conduct a hearing on the record, not engage in *ex parte* communications as called for by the Remedial Order.[95]  Moreover, under the PLRA, the special master is to be paid from funds appropriated to the Judiciary at a set rate.  The Remedial Order requires the State to pay the fees of the three special masters with no reference to any limitation as required by PLRA.[96]

Plaintiffs acknowledge in the Motion for Indicative Ruling that the district court obviously did not comply with the PLRA provisions in appointing three special masters.[97]  Plaintiffs argue without basis that the district court intended to appoint three special masters under Federal Rule of Evidence 706.[98]  Rule 706 is a procedure to appoint an expert for trial and has no applicability here.  The PLRA envisioned and foreclosed such attempts to bypass the PLRA's prohibitions.  The PLRA broadly defined a special master as "any person" appointed, including pursuant to the court's inherent power "regardless of the title or description given by the court." 18 U.S.C. 3626(g)(8).

---

[94] ROA.30661.
[95] ROA.30663-64.
[96] ROA.30664-65.
[97] ROA.30786.
[98] ROA.30787.

The Remedial Order directing the appointment of not one, but three, special masters is not in compliance with the mandatory requirements of the PLRA and should be reversed.

**C.     The procedure utilized by the district court was an abuse of discretion and caused legal error.**

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Valentine*, 993 F.3d at 292. The procedure utilized by the district court was defective and resulted in essentially a denial of due process to the State.

By its very nature, an injunction is designed to be a quick procedure. The PLRA mandates that a preliminary injunction expires 90 days after issuance. The intent of the PLRA is that a state-run prison should not be saddled with prolonged litigation and the burdens associated therewith without compliance with the PLRA.

Instead of having a trial on the injunction in short order, the case proceeded with incredibly burdensome discovery. The extended delay in proceeding to a trial on the injunction harmed the State. Then, exacerbating the situation, after

31

discovery had closed almost three years into the litigation, the district court ordered the case bifurcated into a liability phase and a remedy phase.[99]

Plaintiffs argued that bifurcation was appropriate based upon little legal authority. Plaintiffs cited to *Plata*, 563 U.S. at 524, referencing a clean distinction between litigation of the merits and remedy.[100] However, in *Plata*, the defendants entered into a consent decree which implicated other provisions of the PLRA not at issue in this case. Plaintiffs then cited two unreported district court cases, one from Florida and one from Wisconsin, neither of which involved prison litigation.[101] The PLRA itself envisions a remedy phase when the case is sufficiently complex to warrant a special master. 18 U.S.C. § 3626(f)(1)(B). The district court relied solely upon its inherent authority, again citing no prison litigation case.[102]

The bifurcation of the case in this instance has denied the State due process and wasted judicial resources. The liability trial took place in October 2018 and was based upon conditions that existed prior to September 2016.[103] As set forth above, the State was entitled to present evidence of and be judged by current conditions. Worsening what was already an untenable situation, the district court kept the matter under advisement for two and a half years.[104] It was a denial of due process to find

---

[99] ROA.18118.
[100] ROA.18038.
[101] ROA.18038.
[102] ROA.18118.
[103] ROA.18118.
[104] ROA.22399.

the State liable based upon conditions that existed more than two years prior to the liability trial and more than four and a half years prior to the Liability Opinion.

After the liability trial, Plaintiffs filed a motion regarding the burden of proof.[105]  The district court correctly held that Plaintiffs had the burden of proving at the remedy trial that conditions that were found to have existed prior to September 2016 were likely to persist into the future.[106]  Yet, the district court ruled that the State had the burden of proving changes after the Liability Opinion.[107]  The State contends that it was error to place any burden upon the State to exonerate itself.

Moreover, the State filed a Motion to Limit the Scope of Testimony and Evidence to those matters found to be deficient in the Liability Opinion.[108]  The Court denied the motion, allowing evidence of such conditions to be presented at the remedy trial.[109]  Thus, the State was forced to participate in the remedy trial saddled with a  finding of liability without the benefit of showing current conditions and without the benefit of limiting evidence to only those areas found to be deficient. The district court then again kept the matter under advisement for a year and a half after the remedy trial.[110]

---

[105] ROA.27155.
[106] ROA.30102.
[107] ROA.30102.
[108] ROA.27339.
[109] ROA.30105.
[110] ROA.30557.

Finally, the remedy trial did not establish a remedy. Incredibly, after two separate trials and 21 days of testimony, the Plaintiffs failed to prove and the district court has not entered a remedy. The point of the remedy trial was purportedly to prove up the remedy to alleged constitutional deficiencies. The case should be dismissed because Plaintiffs failed to prove a remedy at the remedy trial.

Recognizing that Plaintiffs failed to prove a remedy, the district court then decided to appoint three special masters to develop remedial plans to address what is essentially all aspects of healthcare and ADA/RA compliance at LSP.[111] This procedure violates the mandates of the PLRA, as set forth above. The failure to prove a remedy that was needed, was most narrow, and was least restrictive requires dismissal of the suit for failure of proof.

In sum, the procedure employed was fatally flawed. One of the purposes of the PLRA is to limit district court oversight of state prisons. This almost nine-year litigation has burdened LSP with discovery demands, intrusion from expert witnesses, and caused LSP to take action under the threat of litigation. The defective procedure should end, and the case should be dismissed.

---

[111] ROA.30661.

**D.** **The district court's finding that the State was deliberately indifferent is legally wrong and manifestly erroneous.**

    **1.** **The "deliberate indifference" standard is an extremely high standard.**

"Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference is an 'extremely high' standard to meet." *Id*. at 770; *see also Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her or its] action.'" *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)); *see also Hacker v. Cain*, No. 14-063, 2016 WL 3167176, *10 (5th Cir. June 6, 2016).

To establish an Eighth Amendment violation for deliberate medical indifference, a prisoner-plaintiff must prove that appropriate medical care has been denied and that the denial constitutes "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017); *Brewster*, 587 F.3d at 769; *Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985). To meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him

incorrectly, or engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756. "Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]'" *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)). "[A]n inadvertent failure to provide adequate medical care" does not amount to a constitutional violation. *Estelle,* 429 U.S. at 104-06. Evidence which shows only that an offender disagrees with a diagnosis or the course of treatment for him is inherently not sufficient. *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006); *Grogan,* 973 F.3d at 278 (quoting *Domino,* 239 F.3d at 346).

The Eighth Amendment does not require optimal medical care or even medical care that comports with the community standard of care. *Acinelli v. Torres,* No. 13-1371, 2015 WL 4380772 at *4 (C.D. Cal. July 16, 2015); *Houston v. Rio Consumnes Corr. Facility,* No. 15-2055, 2017 WL 2972609, at *9 (E.D. Cal. July 12, 2017); *Garrett v. Wohler,* No. 10-0258, 2013 WL 12125743, at *8 (D. Ariz. April 30, 2013); *Barrow v. Shearing,* No. 14-800, 2017 WL 3866818, at *3 (S.D. Ill. Sept. 5, 2017). "Whether the treatment defendant provided comported with the community standard of care is not the issue before the Court. As the Supreme Court has held, 'a medical decision not to order an X-ray, or like measures, does not constitute cruel and unusual punishment.'" *Davis v. Sutley*, No. 07-1415, 2009 WL

773261, at *8 (C.D. Cal. Mar. 20, 2009) (citing *Estelle*, 429 U.S. at 107). "Prisoners are not entitled to demand specific care or even 'the best care possible;' rather, they are entitled only to 'adequate medical care.'" *Barrow*, 2017 WL 3866818, at *3.

Moreover, a disagreement between medical professionals about the appropriate treatment of a prisoner cannot be the basis of Eighth Amendment liability. *Gobert,* 463 F.3d at 346; *Grogan,* 973 F.3d at 278. *See also McCracken v. Jones,* 562 F.2d 22, 24 (10th Cir. 1977) ("defendants did not have to bear the risk arising from the variations in the views of the doctors"); *Broadus v. Chapdelaine,* No. 15-0182, 2018 WL 899254, at *5 (D. Colo. Feb. 15, 2018) (disagreement between an entity's procedure approval policies and the community standard of care cannot be the basis of Eighth Amendment liability).

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106; *see also Anderson v. County of Kern,* 45 F .3d 1310, 1316 (9th Cir. 1995); *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1992). "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino*, 239 F.3d at 756 (citing *Estelle,* 429 U.S. at 107); *see also Gobert*, 463 F.3d at 345-46. Mere delay in receiving care is not in and of itself a constitutional violation. *Wesson v. Oglesby,*

910 F.2d 278, 284 (5th Cir. 1990). Delay in medical care can constitute an Eighth Amendment violation but only "if there has been deliberate indifference [that] results in substantial harm." *Easter v. Powell,* 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir. 1993)). However, "an inadvertent failure to provide adequate medical care" does not amount to a constitutional violation." *Estelle,* 429 U.S. at 104-06.

Where providers are actively treating a prisoner's serious medical condition, there is no deliberate indifference, even where treatment was negligently administered and even if the treatment ultimately results in the prisoner's death. *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999). A showing of an extended history of examinations, diagnoses, and medications rebuts allegations of deliberate indifference. *Mendoza*, 989 F.2d at 193-95. "Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials[.]'" *Brauner*, 793 F.3d at 500 (quoting *Norton*, 122 F.3d at 292.

The Supreme Court has established a two-prong analysis that is used to analyze Eighth Amendment claims based upon conditions of confinement. *See Wilson*, 501 U.S. 294. To establish a violation of the Eighth Amendment, a plaintiff must establish both an objective component – "Was the deprivation sufficiently serious to merit constitutional protection?" and a subjective component – "Did the

officials act with a sufficiently culpable state of mind?" *Wilson*, 501 U.S. at 298. The Fifth Circuit has articulated this two-prong test as requiring the plaintiff to prove: (1) "objective exposure to a substantial risk of serious harm"; and (2) "that prison officials acted or failed to act with deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018) (citing *Gobert*, 463 F.3d at 345-46).

## 2.    LSP's system of medical care does not objectively expose prisoners to a substantive risk of serious harm.

To establish an objectively unreasonable risk of harm, the court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Further, the Fifth Circuit has confirmed that the Eighth Amendment does not protect against any and all risk of harm; rather it protects against "extreme" conditions that present an "unreasonable risk" of harm. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Helling*, 509 U.S. at 35; *Ball v. LeBlanc*, 881 F.3d 346, 356 (5th Cir. 2018) (Higginson, J., concurring in part and dissenting in part). In *Legate v. Livingston*, the Court emphasized that a district court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone unwillingly* to such a risk." 822 F.3d 207,210 (5th Cir. May 18, 2016) (citing *Helling*, 509 U.S. at 36).

The record is replete with evidence that the State has improved medical care at LSP over the more than eight years that this suit has been pending.  Specifically, the State responded to the district court's Liability Opinion by implementing many significant changes which addressed concerns raised by the district court in six identified areas.  Once the changes made by the State are considered, the finding of whether the State is objectively deliberately indifferent is a legal determination subject to *de novo* review.  *Gates*, 376 F.3d at 333; *Samnorwood Indep. Sch. Dist.*, 533 F.3d at 267; *Alberti*, 790 F.2d at 1225. LSP's current system of medical care does not objectively expose prisoners to a serious risk of harm.

### a.    LSP's process of conducting sick call does not expose prisoners to a substantial risk of serious harm.

The district court's Liability Opinion found that sick call was deficient because EMTs were performing sick call without the patient's medical records.[112]

In response, the State implemented a system whereby inmates are seen by a Nurse Practitioner via telemedicine the day after submitting a sick call slip.[113]  The sick call slip complies with the ACA.[114] A prisoner who submits a sick call slip on

---

[112] ROA.22423-28, 30580.

[113] Def_8aaa_2925.  Plaintiffs' expert agreed that telemedicine is an accepted practice in the medical field.  ROA.34381.  She attempted to criticize telemedicine as not "optimal." ROA.34386.  This is a clear example of Plaintiffs' expert attempting to hold the State to an unreasonable standard.  The standard is constitutional care, not optimal care.

[114] ROA.35159, 35400, 36132-34.

Sunday through Thursday is seen the next day by a NP.[115]  The inmate is in a private room[116] with an EMT who facilitates the telemedicine encounter, while the NP has the inmate's medical records.[117]  The NP sends the inmate to the ATU if the NP determines that he or she needs to see the inmate in person.[118]  On Friday and Saturday, inmates have the ability to utilize an emergency sick call request. Plaintiffs stipulated in the Pretrial Order submitted prior to the remedy trial that many of these changes were in fact in place and that LSP had changed its sick call process.[119]

The State's experts opined that LSP's revised sick call process exceeds the standard of care in prisons because in other facilities, RNs conduct sick call; at LSP, NPs, who can diagnose and treat, conduct sick call.[120]  Although one expert had to be impeached, Plaintiffs' experts agreed that NPs conducting sick call is above the standard of care.[121]  The improved sick call process has resulted in fewer emergent calls.[122]

---

[115] Plaintiffs' expert argued weakly that sick call should be seven days a week.  She acknowledged that conducting sick call five days a week met the National Commission on Correctional Health Care ("NCCHC") standard until 2018.  When confronted with the NCCHC website stating that sick call five days a week meets the standard, she responded (incredibly) that the NCCHC website was incorrect.  ROA.34392-95.  Sick call five days a week complies with the ACA standards.  Def_11_1433, p. 003.

[116] ROA.35161, 34379.

[117] ROA.34378, 35160, 35397.

[118] ROA.34386, 35407.

[119] ROA.30159-60.

[120] ROA.34375, 35496, 35555, 35696-97.

[121] ROA.34377, 35157.

[122] ROA.36140.

The State continued to improve sick call after the remedy trial by revising the sick call slip to provide for the date as demanded by Plaintiffs' experts.[123]  The fact that the State has improved sick call is critical because as the district court found, "[s]ick call is the principal means through which a clinical healthcare encounter is triggered."[124]  It is undisputed that access to sick call and medical care has improved.[125]

The revised sick call process does not violate contemporary standards of decency and does not expose prisoners to a substantial risk of harm.  The district court's finding otherwise is legally wrong and should be reversed upon *de novo* review.

### b.    b.  LSP's system of providing clinical care does not expose prisoners to a substantial risk of serious harm.

As to clinical care, the Liability Opinion found that the exam rooms lacked privacy and standard medical equipment, that medical records were often not available to providers and that hygiene and spacing issues abound.[126]  LSP has remedied all of these concerns.[127]

---

[123] ROA.30756.
[124] ROA.30700-01, 30580.
[125] ROA.34385.
[126] ROA.22483-84.
[127] ROA.30571.

The district court nevertheless found that the lack of adequate medical records management and the episodic treatment of complaints persisted.[128]  As to adequate medical records management, LSP has implemented EHR.[129]  LSP reasonably responded to the district court's criticism of its medical records management.  As to episodic treatment of complaints, there is no dispute that LSP hired additional NPs after the Liability Opinion.[130]  The NPs bring a wide range of experience and backgrounds to LSP, including correctional medicine, surgical background, orthopedic, intensive care, chronic care clinics, wound care, urgent care, emergency rooms, occupational health, and cardiology.[131]  Dr. McMunn opined that there is value in a nurse practitioner focused model as implemented at LSP; primary care outcomes are as good or even better than with physicians because NPs tend to interact more effectively with patients and write better orders.[132]  Dr. Mathis testified that he was pretty impressed by the NPs at LSP.[133]   NP Park was awarded the Dunbar Award for civil service.[134]   The district court found the State's hiring of additional NPs "laudable."[135]

---

[128] ROA.30571.
[129] ROA.30695-99, 30736-54.
[130] ROA.30572.
[131] ROA.35313-14.
[132] ROA.35747-48.
[133] ROA.35557.
[134] ROA.35352.
[135] ROA.30572.

LSP providers meet every morning on Monday through Friday to discuss patient care.[136] The providers discuss patients that came into the ATU overnight, patients in NU1, patients in NU2, and patients who are at outside hospitals.[137] Everyone agrees that the morning meetings where patient care is discussed among providers are good.[138]

Additionally, the State acquired access to an internet, web-based medical service called Up-To-Date.[139] Up-To-Date is a peer reviewed medical source that is updated regularly and is used by providers throughout the country.[140] LSP's NPs utilize Up-To-Date often.[141] This is a great resource that the State furnished to its providers at LSP.

With a sufficient number of qualified providers, adequate and clean space in which to practice, EHR, and access to the Up-To-Date medical source, the system to provide clinical care is in place such that prisoners are not exposed to a substantial risk of serious harm.

The section on clinical care in the Remedy Opinion concludes by addressing medication administration/security oversight.[142] The State contends that it was legal

---

[136] ROA.30505.
[137] ROA.30505, 34876.
[138] ROA.34831, 34876.
[139] ROA.35477, 34748, 35498; Def_35c_7266, p. 0062.
[140] ROA.35477, 34749, 35321.  Dr. Puisis and Dr. Mathis both utilized Up-To-Date. ROA.34748, 35478.
[141] ROA.35321.
[142] ROA.30578.

error for the district court to make findings as to medication administration in the Remedy Opinion considering that there are no such findings in the Liability Opinion. Consistent with the district court's bifurcation of the matter, the parties stipulated that the time period for evidence "for the Court to assess whether the constitutional deficiencies listed in the Court's March 31, 2021 opinion (R.Doc. 594) have been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[143] The district court's Liability Opinion did not find that medication administration was constitutionally deficient. The district court noted in the Liability Opinion that outside of the infirmary, correctional officers administer medications.[144] The district court's conclusion restating its findings says nothing about medication administration.[145]

The district court nevertheless rejected the State's contention that medication administration is not before the Court, citing to one passing reference to medication administration and four record reviews which mention medication administration.[146] Those passing references were not sufficient to place the State on notice that medication administration was constitutionally deficient where the district court never explicitly found medication administration constitutionally deficient.

---

[143] ROA.26598.
[144] ROA.22403.
[145] ROA.22520-22.
[146] ROA.30572.

Finally, the district court's finding that medication administration is unconstitutional is legally wrong, as there is no legal prohibition against correctional officers administering medications.[147]  The minimal errors identified do not justify a finding that medication administration is unconstitutional.  *Dockery*, 443 F. Supp. 3d 726. In *Dockery*, the plaintiffs, utilizing NP LaMarre, the same expert as Plaintiffs are using in this case, argued that the medication administration and the medication administration records were deficient, very similar to what is argued here. The Court held, "To the extent the missed doses or untimely administration of medications evidenced on the MARs reflect human error or poor record keeping, they do not amount to constitutional violations."  *Id.* at 740.  NP LaMarre used the same procedure in this case that was rejected in *Dockery*.[148] Further, the district court failed to take into account the State's recent implementation of the sMARt system to improve medication administration.[149]

<blockquote>

**c.    LSP's system of providing specialty care does not expose prisoners to a substantial risk of serious harm.**
</blockquote>

In the Liability Opinion, the district court found that inmates at LSP experienced unnecessary and harmful delays in receiving specialty care, harmful failure to follow specialty care recommendations, failure to coordinate specialty

---

[147] Def_11_1433, p. 024.
[148] ROA.34430-31.
[149] ROA.30699.

care, and failure to communicate between specialists and LSP providers.[150]  The State addressed these concerns and improved an already robust specialty care system.

The district court in the Remedy Opinion acknowledged improvement in specialty care.[151]  LSP provides specialty care to patients through three means: (i) on-site specialty clinics where specialists come to LSP, (ii) telemedicine visits with specialists, and (iii) off-site trips to specialists.[152]  The number of on-site specialty clinics increased from 2016 through 2022 to add on-site clinics for cardiology, urology, infectious disease and dietary.[153]  LSP now has total of twelve on-site clinics.[154]  In addition, the number of telemedicine clinics has expanded to include: neurology, infectious disease, hepatitis, ENT (ear, nose and throat), hematology and

---

[150] ROA.22520.
[151] ROA.30584.
[152] ROA.30584.
[153] ROA.30584.
[154] LSP has the following on-site clinics:
(1)   MRI, CT scan, and ultrasound,
(2)   dietary,
(3)   optometry,
(4)   neurology,
(5)   infectious disease (HIV),
(6)   gastroenterology, which includes both esophagogastroduodenoscopy and colonoscopy,
(7)   urology,
(8)   podiatry,
(9)   orthopedics,
(10)  general surgery,
(11)  cardiology, and
(12)  physical therapy services.
Def_35c_7266, pp. 0034-35.

oncology, dermatology, endocrinology, and gastroenterology.[155] LSP now has a total of thirteen telemedicine clinics.[156] The number of specialty care appointments has increased.[157] Further, the number of off-site trips had substantially increased since 2016 (for a smaller number of inmates housed at LSP), and the number of missed appointments decreased.[158] Finally, LSP added television monitors to the Ash dorms to notify inmates of their appointments, replacing the previous method of inmates reviewing paper print outs to determine if they had appointments.[159] The scope and breadth of specialty care provided at LSP is impressive.

---

[155] ROA.30584-85.

[156] LSP has the following telemedicine clinics:
(1)   cardiology,
(2)   neurosurgery,
(3)   rheumatology,
(4)   infectious disease,
(5)   hepatitis,
(6)   ophthalmology,
(7)   ENT,
(8)   Renal,
(9)   pulmonary,
(10)  hematology and oncology,
(11)  dermatology,
(12)  endocrinology, and
(13)  Gastrointestinal.
Def_35c_7266, p. 0035.  This list does not include general surgery and neurosurgery. Def_31_2661, p. 398.

[157] ROA.35875.

[158] ROA.30585.

[159] ROA.30585, 36162.

The main provider of specialty services, UMCNO, uses a medical records program called EPIC.[160]   LSP providers can access EPIC from LSP and view UMCNO notes.[161]

The process of arranging trips and follow up from specialty care using a program called Eceptionist has not changed but has improved.[162]   Further, the Eceptionist system, which was implemented in the 2013 time frame, developed and improved over time and has created a mature, smoothly operating system.[163]   DOC headquarters never denies a request for specialty care.[164]   Plaintiffs' specialty care expert testified that he has no problem with the manner in which specialty care appointments are scheduled.[165]   The district court seemed to acknowledge that the Eceptionist program is "robust."[166]

Dr. Morrison practices at UMCNO and provides general surgery specialty care for LSP.[167] Dr. Morrison testified that he treats LSP patients in the same manner as patients from the civilian population and that what he sees with LSP patients as to the length of time it takes to get them to surgery is similar to what he sees with

---

[160] ROA.35483.
[161] ROA.35483, 35852.
[162] ROA.35916.
[163] ROA.35916-17.  The State began using Eceptionist when EKL shut down in 2013.  The State and its hospital partners had to be trained on how to use Eceptionist.  ROA.33249-50.
[164] ROA.35913.
[165] ROA.34883.
[166] ROA.30584.
[167] ROA.35817, 35821.

non-incarcerated patients.[168]  Dr. Morrison confirmed that he has access to medical records from LSP when he treats LSP patients.[169]

Dr. McMunn found no systematic issues with delay in providing specialty care.[170]  He found no systematic issue with following up on specialist recommendations, though he testified that LSP would benefit from implementation of EHR.[171]  The State Director of Nursing, Stacye Rodriguez, testified that she was able to see continuity of care and timely appointments at LSP.[172]  Dr. McMunn was impressed with coordination of care between specialists and LSP providers; there certainly was no systematic issue with coordination of care.[173]

The district court found that these changes provide a framework for constitutionally adequate specialty care.[174]  Since this case is about systematic issues, a constitutional framework for providing specialty care is all that is needed. This Court should reverse the district court's finding of deliberate indifference as the breadth of specialty care provided to inmates at LSP does not violate contemporary standards of decency and is not objectively deliberately indifferent.

---

[168] ROA.35833.
[169] ROA.35851.
[170] ROA.35697.
[171] ROA.35698.  Of course, LSP now has an EHR system.
[172] ROA.35901.
[173] ROA.35698-99.
[174] ROA.30585.

### d. LSP's system of providing infirmary/inpatient care does not expose prisoners to a substantial risk of serious harm.

In the Liability Opinion, the district court found that LSP did not have an appropriate number of qualified, adequate staff in the infirmary, that patients were not within sight and sound of nurses, and that LSP inappropriately used inmate orderlies to provide care beyond the scope of the medically accepted use of orderlies.[175]    While the State disputes these findings, improvements to infirmary/inpatient care have removed any substantial risk of serious harm to prisoners in infirmary/inpatient care.

LSP improved the ratio of nurses to patients in NU1 and NU2.[176]  In NU1 (acute care), there is 1 RN for every 10 patients;[177] in NU2 (long-term care), there is 1 RN for every 15 patients.[178] The district court called the improved nursing ratio "commendable."[179]

The nursing units are clean and not in disarray.[180]  The units have televisions and geriatric chairs to allow the inmates to get out of their beds, watch television, interact with others, and have access to light from the window.[181] NP Cynthia Park

---

[175] ROA.22419-21.
[176] ROA.35171.
[177] ROA.35326.
[178] ROA.35326.
[179] ROA.30608-09.
[180] ROA.30609.
[181] ROA.35487.

rounds in NU1 on Friday and Saturday mornings, and she rounds in NU2 every other Saturday morning.[182]

After the Liability Opinion, LSP addressed the issue of patients not being within sight and sound by installing a red call light outside the door of each of the locked rooms.[183] The switch for the patient to activate the red call light is located immediately next to the bed.[184] NP Park, who works in the nursing units, has responded to the call light, and she has seen other nurses respond to the red call light.[185] Plaintiffs' expert agreed that installation of the call lights was an improvement.[186]

The district court found the installation of call lights to be insufficient for two reasons. One, the district court referenced lockers in the open bay area blocking access to the patients.[187] Two, citing to hearsay testimony from unidentified inmates contained in Plaintiffs' expert reports, the district court found that black paper covered the windows preventing the nurses from seeing the call lights.[188] This finding demonstrates the extreme lengths that the district court was willing to go to find a so-called constitutional violation. There is simply no evidence

---

[182] ROA.30609.

[183] ROA.30609.

[184] Def_46_8991, p. 130.

[185] ROA.35329.

[186] ROA.35171. NCCHC allows for patients to be within sight **or** sound of nurses. ROA.35171.

[187] ROA.30609.

[188] ROA.30609.

that nurses have ever, even once, failed to respond to a call light. The district court's finding that the patients in the infirmary are not within sight or sound of nursing care is manifestly erroneous.

LSP continues to use inmate orderlies in its two nursing units. Both the ACA and the NCCHC allow for the use of inmate orderlies.[189] There are three to four inmate orderlies on every shift.[190] The orderlies assist patients with activities of daily living such as handing out trays of food, feeding patients that cannot feed themselves, cleaning patients who are incontinent of bladder and bowel, turning patients every two hours to prevent skin breakdown, and bathing patients.[191] Inmate orderlies do not perform wound care, dispense medications, or administer insulin.[192] An inmate confirmed that orderlies do only activities of daily living and do not perform medical tasks.[193]

Nurse Jennifer Stickells ("RN Stickells") is responsible for training inmate orderlies.[194] The training of inmate orderlies has increased since 2019.[195] The training takes place over five days, and the orderlies are given lectures on ethics, neglect, abuse, transfer of patients, body mechanics, and communication with

---

[189] ROA.35171-72; *see also* Def_11_1433, p. 031.

[190] ROA.35326-27.

[191] ROA.35330-32; Def_8mmm_8498. This is all accomplished with the assistance and oversight of on-duty nursing staff. ROA.35332.

[192] ROA.35414.

[193] ROA.34700.

[194] ROA.30611.

[195] ROA.30612.

patients.[196]  The final day of training involves hands-on training where RN Stickells brings orderlies into the nursing unit and works with them throughout the day.[197] RN Stickells makes rounds to ensure that the orderlies are following the training.[198]

The district court acknowledged that this training procedure "appears robust."[199]  The district court then discounted the robust inmate orderly training because the program had been reimplemented shortly before trial.[200]  The district court's failure to consider evidence of current conditions was legal error and caused its conclusion to be legally incorrect.

The district court ignored important testimony by NP Park.  NP Park works in the nursing units; she monitors the inmate orderlies and believes that they do their job very well. In fact, she testified that "[i]f it was my family on the streets or even myself and they were my orderlies, I'd be very happy."[201]

The parties jointly submitted portions of the depositions of two inmate orderlies: Bruce Hines and Donald Murray.[202]  The district court again ignored the considerable testimony from the two orderlies that supports the State's position. Hines described attending the week-long training with classroom and hands-on

---

[196] ROA.30612; Def_47_5969.
[197] ROA.30612.
[198] ROA.30612.
[199] ROA.30612.
[200] ROA.30612.
[201] ROA.35332.
[202] Murray is an inmate orderly in the Ash dorm, not the infirmary.

training led by RN Stickells.[203]   At the conclusion of the training, Hines had

certificates for the Offender Healthcare Orderly Training Program, CPR, and Basic

Life Support.[204]   Hines, who had prior experience working as an inmate orderly,

found that training useful and informative.[205]

Hines, who works in NU1, described his typical day as follows:

> Well, when I start making my rounds, first thing I do when I come in, I make my rounds and some of them be asleep, some be awake. I make me a pot of coffee and I drink me a pot of coffee. I sit down and wait on breakfast to come. Once breakfast come, I feed them. Once I feed them and get that part out of the way, then I make sure the ones that can't shower themselves or bathe themselves, I start my day off with that first. Once I do that duty, then I go to cleaning up and making beds, and then I clean up the wardroom. And then I go and see what it is that the nurses need, any kind of assistance done as well.[206]

Murray testified, similar to Hines, that inmate orderlies clean patients, clean

the ward, and keep the patients company.[207]   Like Hines, Murray treats the patients

with respect.[208]

An inmate, Jean Paul Creppel, confirmed that the inmate orderlies do a good

job.  Creppel, who is a paraplegic, testified that inmate orderlies helped him with

activities of daily living such as eating and drinking, and he had no issues with how

---

[203] Joint_75a_1427, pp. 8-10 & 25-26 (He also testified that he took a test at the end of the training.).
[204] Joint_75b_9917.
[205] Joint_75a_1427, pp. 40-41.
[206] Joint_75a_1427, p. 11.
[207] Joint_76a_3805, pp. 7-8.
[208] Joint_76a_3805, p. 11.

the orderlies did their job of taking care of him.[209]  In fact, he testified that the inmate

orderlies had "kind hearts and did a good job."[210]

    The State's experts contend that LSP's inmate orderly program meets the

standard of care.[211]  Dr. Mathis concluded that the inmate orderly program is a good

program that he would like to see continue.[212]  Dr. McMunn personally observed the

inmate orderlies and concluded that the inmate orderly program meets the standard

of care.[213]  LSP's inmate orderly program does not offend contemporary standards

of decency and does not expose prisoners to a substantial risk of serious harm.

    In addition to the nursing units, LSP has four assisted living dorms, Ash

1 through Ash 4. The assisted living dorms provide the opportunity for patients to

try to live independently, away from the nursing units, to give the patients a sense of

normalcy.[214]  Patients in Ash 1 and Ash 2 generally need assistance with the

activities of daily living.[215]  Ash 3 and Ash 4 are handicap accessible and are

primarily for ADA patients, such as those with wheelchairs.[216]  The conditions in

the assisted living dorms have improved substantially since 2016.  Ash 1 and Ash 2

previously contained double bunk beds; all assisted living dorms now contain single

---

[209] ROA.34700.
[210] ROA.34700.
[211] ROA.35701; Def_35c_7266, p. 0216.
[212] ROA.35554.
[213] ROA.35701-02.
[214] ROA.36159
[215] ROA.36159.
[216] ROA.36160.

bunk beds.[217] In a substantial and consequential change, all assisted living dorms are now air conditioned.[218]

LSP reasonably responded to criticisms in the district court's Liability Opinion by improving staffing ratios in the nursing units, installing call lights to address sight or sound concerns, improving inmate orderly training, single bunking the medical dorms, and installing air conditioning in the medical dorms (the nursing units have always been air conditioned). Infirmary/inpatient care does not violate contemporary standards of decency and does not expose prisoners to a substantial risk of serious harm.

### e.     LSP's ATU does not expose prisoners to a substantial risk of serious harm.

The Liability Opinion was critical of the fact that EMTs manned the ATU.[219] Even prior to the Liability Opinion,[220] LSP had changed staffing in the ATU. As of March 2018, an NP is assigned to the ATU from 7:30 am to 4:00 pm Monday through Thursday, from 7:30 am to midnight on Friday, and 24 hours a day on Saturday and Sunday.[221]   Additionally, an NP is on call for the ATU during off

---

[217] ROA.35495.
[218] ROA.36161.
[219] ROA.22429.
[220] This is a clear example of the district court making findings not based upon current conditions as required by law.
[221] ROA.30159

hours.[222]  Plaintiffs stipulated to this staffing.[223]  In addition, the ATU is staffed at all times by a nurse and at least one EMT.[224]

The district court further found in the Liability Opinion that EMTs would manage the patients in the ATU and "make serial observations over many, many, many, many hours," which practice is not within the EMTs' training or scope of practice.[225]  This criticism is no longer valid because EMTs are no longer the primary provider in the ATU.  A nurse is in the ATU at all times, and an NP is either present or on-call.[226]

The district court was further critical of LSP's use of EMTs to respond to self-declared emergencies ("SDE").[227]  In response, Deputy Warden Ashli Oliveaux developed a new SDE policy.[228]  Under the new policy, EMTs respond to SDEs solely pursuant to Individual Treatment Orders ("ITO") that are pre-approved by medical providers.[229]  If an SDE is not covered by an ITO, the EMT must call an NP or take the patient to the ATU for further assessment.[230]  There is nothing

---

[222] LSP has a "call house" for NPs to stay in, which is located about 3-4 minutes from the ATU.  ROA.35413.

[223] ROA.30159.

[224] ROA.30595, 35315-16.

[225] ROA.22430.

[226] ROA.35315-16, 36144, 36147.

[227] As an aside, the SDE process allows inmates to access care at any time by merely declaring an emergency themselves.

[228] ROA.36070-71; Def_50_9725.

[229] ROA.36071.

[230] ROA.36071; Def_50_9725. As of December 2023, LSP now uses nurses as the primary responders to SDEs.

extraordinary about EMTs responding to emergencies and operating pursuant to pre-set orders.   In the civilian world, EMTs are authorized to operate pursuant to protocols.[231]   LSP's ITOs are the equivalent of protocols under the EMT scope of practice statute.

Considering improved staffing of the ATU and the revised SDE policy, LSP's system for providing emergency care to prisoners does not violate contemporary standards of decency and does not expose inmates to a substantial risk of serious harm.

> **f.     Medical Leadership does not expose prisoners to a substantial risk of serious harm.**

The Court previously found that the combination of inadequacies in the following areas of medical leadership and organization at LSP contributed to an unconstitutional system of healthcare: (i) lack of meaningful mortality review; (ii) use of correctional personnel to manage medical decisions; (iii) lack of peer review; (iv) lack of medical staff involvement in budgeting; (v) lack of medical supervision by the medical director (Dr. Lavespere and now, Dr. Toce); and (vi) failure to maintain proper credentialing records.[232]   While the State contends that these criticisms do not implicate constitutional issues, the State has made improvements.

---

[231] *See* La. R.S. 40:1133.14, which authorizes a licensed emergency medical practitioner to act pursuant to protocols.

[232] ROA.30615.

In October 2020, LSP hired Dr. Jacob Johnson as a long-term healthcare administrator.[233] The district court found that Dr. Johnson has the training and experience necessary for this position and that this hiring is a positive development for LSP.[234]

LSP also recently appointed Licensed Practical Nurse ("LPN") Oliveaux to Deputy Warden, and as part of her duties, she oversees medical operations at LSP.[235] Dr. Johnson currently reports directly to Deputy Warden Oliveaux, who ensures that he "has what he needs for our medical department to run."[236]  Deputy Warden Oliveaux and Dr. Johnson meet regularly to discuss how to "make sure [they] provide efficient healthcare for [LSP's] offender population."[237]  Deputy Warden Oliveaux answers directly to Warden Timothy Hooper.[238]  Dr. McMunn opined that the changes in organization reduced or eliminated the possibility of security making medical decisions and is within the standard of care.[239]

Dr. Toce has replaced Dr. Lavespere as the medical director at LSP.[240]  Dr. Toce oversees another physician and eight NPs.[241]

---

[233] ROA.36128.
[234] ROA.30615.
[235] ROA.30616. Deputy Warden Oliveaux previously worked in the clinic at LSP.
[236] ROA.30616.
[237] ROA.30616.
[238] ROA.36062.
[239] ROA.35704
[240] ROA.30616.
[241] The district court refused to consider evidence that LSP hired an additional physician and an additional NP.  ROA.46500.

The improvement in the medical leadership is exemplified in many respects. One, Dr. Johnson maintains a weekly back log tracker which allows him to identify any issues with potential delays in care and to respond immediately.[242]  Two, Dr. Johnson and Dr. Toce conduct morning meetings Monday through Friday.[243] The meetings are attended by Dr. Johnson, Dr. Toce (except on Fridays), the NPs on duty, and the heads of the various departments such as nursing, EMT, etc.[244] The group sits around a large conference table and discusses the status of every patient in NU1 and NU2, patients seen in the ATU that night, and patients who are in an outside hospital.[245]  This interactive collaborative process ensures that good care is being provided to the patients. Other than acknowledging that Dr. Johnson maintains the backlog tracker and that the morning meetings occur, the district court did not address the significance of these improvements.[246]

The State and LSP both conduct mortality reviews.[247]  Dr. Mathis concluded that LSP's mortality reviews were consistent with the standard of care in the United States.[248]  The district court found that the mortality reviews were not critical

---

[242] ROA.30616-17; Def_48a_3201.
[243] ROA.30674.
[244] ROA.36178.
[245] ROA.36074-75, 36178.
[246] ROA.30610.
[247] ROA.35510; Def_4_4683.
[248] ROA.35556.

enough.[249]  Even if accepted as true, the level of criticality of mortality reviews is not a basis for finding constitutionally deficient care.

The district court found inappropriate use of correctional personnel in medical decision making.[250]  The district court previously supported this finding by citing to the malingering policy.[251]  The district court ignored the fact that LSP no longer has a malingering policy.[252]

The district court was also critical of the use of black box restraints for medical transport.[253]  Dr. Toce testified that "unless they have a really good reason, you don't let them out of appropriate restraints."[254]  Of course, inmates from a maximum security prison should be secured during transport from the prison.  The district court's statement is naive at best and violates the dictates of the PLRA, which requires the court to consider security implications.

The district court found that LSP's peer review and quality assessment and quality improvement ("QA/QI") procedures are inadequate.[255]  The State conducts a peer review program using physicians from other facilities.  In 2019, Dr. Roundtree with Elayn Hunt Correctional Center reviewed 10 charts from LSP.[256]  The State

---

[249] ROA.30619-20.
[250] ROA.30620-21.
[251] ROA.30621.
[252] ROA.35197.
[253] ROA.30621.
[254] ROA.30621.
[255] ROA.30622-23.
[256] Def_18_8714.

Headquarters ("HQ") regularly audits LSP's medical system.[257] The audit takes two days and includes chart reviews.[258] LSP's QA/QI program is now directed by RN Stickells who collects data and prepares reports that are reviewed by the QA/QI team.[259] Plaintiffs' expert agreed that RN Stickells is an appropriate person to run the QA/QI program and that she is well-intentioned.[260] Dr. McMunn found that LSP's QA/QI program meets the standard of care.[261] The type of QA/QI program promoted by Plaintiffs' experts, while possibly helpful or advisable, goes "beyond the minimum standards required by the Constitution." *United States v. Hinds County, et al.*, No. 16-489, 2022 WL 1112223, at *55 (S.D. Miss. 2022) (striking elements of a consent decree addressing QA/QI requirements similar to those proposed by Plaintiffs herein).[262]

The district court remains critical of the lack of medical staff in the budgeting process at LSP.[263] Neither the Plaintiffs nor the district court presented any evidence that budget has negatively influenced any medical decision at LSP.

---

[257] ROA.35877-79.
[258] ROA.35878-79. The results of the audit were admitted into evidence. Def_22_2618.
[259] ROA.30642; Def_49_3232.
[260] ROA.35176-77.
[261] ROA.35707-08.
[262] This ruling was reconsidered in *U.S. v. Hinds County, et al.*, No.16-489, 2023 WL 1116530 (S.D. Miss. Jan. 30, 2023). The final consent decree also deleted the QA/QI requirements. *See* 2023 WL 1116350, at *10.
[263] ROA.30623-24.

Finally, the district court is critical of "credentialing" at LSP.[264]   The fact is

that all physicians and NPs at LSP are licensed and qualified.[265]   There is simply no

evidence to the contrary.   Medical leadership does not violate contemporary

standards of decency or expose prisoners to a substantial risk of serious harm.

> g.    **LSP's overall system of medical care does not expose prisoners to a substantial risk of serious harm.**

All aspects of LSP's medical system are above the constitutional standard.

Sick call, which provides prompt access to a provider, is above the standard of care.

Clinical care has clean spaces and appropriate equipment with a sufficient number

of providers.   Specialty care is provided in bulk both on-site, by telemedicine, and

off-site.   Infirmary and inpatient services are available.   The ATU is appropriately

staffed, and EMTs respond appropriately to emergencies pursuant to a revised SDE

policy.   This is all in addition to a chronic care system and pain management system,

both found to be constitutional.[266]   LSP's medical care system does not violate

contemporary standards of decency and does not expose prisoners to a substantial

risk of serious harm.

---

[264] ROA.30624-25.
[265] ROA.35313-14.
[266] ROA.22443.

**3.    The State is not deliberately indifferent, as it responded reasonably to the district court's Liability Opinion.**

A "prison official cannot be found liable under the Eighth Amendment for denying an inmate human conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015). To show subjective deliberate indifference, a plaintiff must show that the official is aware of facts from which a reasonable inference could be drawn that a substantial risk of harm exists and actually draw that inference. *Id.* at 287. Plaintiffs must show that defendants possessed a culpable state of mind. *Farmer*, 511 U.S. at 838.

Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference. *Farmer*, 511 U.S. at 844; *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022); *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016); *Gobert*, 463 F.3d at 346 (reversing district court; concluding record could not support a finding that physician was deliberately indifferent, even if he may have been negligent, because plaintiff failed to demonstrate physician subjectively "disregarded the substantial health risk about which he knew"); *Domino.*, 239 F.3d at 756 ("[A]n incorrect diagnosis does not amount to deliberate indifference.").

This case demonstrates the exact opposite of deliberate indifference. The State responded to all criticisms in the district court's Liability Opinion.

The district court criticized the fact that EMTs were conducting sick call cell side without medical records.[267]  LSP reasonably responded by creating a system where prisoners are seen by an NP promptly, and the NP has the prisoner's medical records at the time of treatment.[268]

The district court's primary findings as to clinical care were that the exam rooms lacked privacy and standard medical equipment, that medical records were often not available to providers, and that hygiene and spacing issues abound.[269] Privacy and space issues were addressed, and most importantly, LSP implemented EHR to ensure providers have access to records.[270]  Further, LSP has a "laudable" staff of NPs providing care under two physicians.[271]

In the Liability Opinion, the district court found that LSP did not have an appropriate number of qualified, adequate staff in the infirmary, that patients were not within sight and sound of nurses, and that LSP inappropriately used inmate orderlies to provide care beyond the scope of the medically accepted use of orderlies.[272]  LSP reasonably responded by improving staffing in the nursing units,[273] adding call lights to address sight or sound concerns,[274] and improving training and

---

[267] ROA.22423-28, 30580.
[268] Def_8aaa_2925.
[269] ROA.22483-84.
[270] ROA.30695-99, 30736-54.
[271] ROA.30572.
[272] ROA.22419-21.
[273] ROA.35171.
[274] ROA.30609.

oversight of inmate orderlies.[275]  In addition, LSP made the assisted living dorms single bunk[276] and installed air conditioning in them.[277]

The Liability Opinion was critical of the fact that EMTs manned the ATU.[278] LSP responded reasonably by providing adequate staffing in the ATU (nurse coverage 24/7 and an NP either onsite or on call).[279]  The district court was further critical of LSP's use of EMTs to respond to SDEs.  LSP reasonably responded by implementing a new SDE policy which mimics what EMTs do in the civilian world.[280]

The district court had a litany of medical leadership concerns (the vast majority of which are not required to comply with constitutional standards).[281]  The State reasonably responded by, among other things, hiring Dr. Johnson as the long-term healthcare administrator,[282] appointing LPN Oliveaux as the Deputy Warden over medical,[283] conducting mortality reviews,[284] and appointing RN Stickells to run the QA/QI program.[285]  All of these reasonable actions taken by the State negate the

---

[275] ROA.30612.
[276] ROA.35495.
[277] ROA.36161.
[278] ROA.22429.
[279] ROA.30595, 35315-16, 30159.
[280] ROA.36070-71; Def_50_9725.
[281] ROA.30615.
[282] ROA.36128.
[283] ROA.30616.
[284] ROA.35510; Def_4_4683.
[285] ROA.30642; Def_49_3232.

finding that the State is subjectively deliberately indifferent to the prisoners' substantial risk of serious harm.

LSP responded reasonably and made adjustments in response to the district court's Liability Opinion. The constitution requires no more. While many of the concerns promoted by the Plaintiffs and the district court may possibly be helpful or advisable, all of these things are "beyond the minimum standards required by the Constitution." *Hinds County,* 2022 WL 1112223 at *55.

> **4.** **Citation to individual cases which Plaintiffs contend were medically negligent (the vast majority of which are disputed) does not establish systematic issues or that the State is being deliberately indifferent to medical needs of the inmates.**

Courts have consistently held that inadvertent failure to provide adequate medical care, unsuccessful treatment, misdiagnosis, or negligence are insufficient to satisfy the subjective prong of the deliberate indifference standard. *See, e.g., Sama v. Hannigan,* 669 F.3d 585, 590 (5th Cir. 2012); *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013); *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756. Rather, "it is only deliberate indifference – 'an unnecessary and wanton infliction of pain' … [or acts] 'repugnant to the conscience of mankind,' that constitutes conduct proscribed by the Eighth Amendment." *Tompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (quoting *Estelle*, 429 U.S. at 105-06). With this standard in mind, when a medical error is identified, the next question is whether the error was the result of a systematic failure or merely unsuccessful treatment, misdiagnosis, or negligence.

Examples of unsuccessful treatment, misdiagnosis, or negligence, without a finding of a systematic failure, are irrelevant to a deliberate indifference analysis pertaining to an entire system of medical care.

>    **a.    The district court incorrectly judged LSP by the community standard of care.**

The Eighth Amendment does not require optimal medical care or even medical care that comports with the community standard of care. *Acinelli,* 2015 WL 4380772 at *4; *Rio Consumnes Corr. Facility,* 2017 WL 2972609, at *9; *Garrett,* 2013 WL 12125743, at *8; *Barrow,* 2017 WL 3866818, at *3; *Davis*, 2009 WL 773261, at *8.

Dr. Vassallo was designated as Plaintiffs' expert witness on emergency care. In conducting the chart reviews, Dr. Vassallo applied the community standard of care which she expects patients to receive.[286] Considering that Dr. Vassallo practices in a Level I trauma center (the highest level) in New York City, it is easy to understand how she applied a standard that is not applicable to providers at LSP. The district court committed legal error by relying upon opinions by Dr. Vassallo premised upon the community standard of care.

Correctional medicine is a field of practice different from emergency medicine. Comparisons with emergency room physicians who treat patients on the

---

[286] ROA.34023.

street (in non-correctional settings) are not appropriate comparisons. Opinions by experts who have never practiced in corrections set a standard of care that inherently exceeds the scope of practice in corrections.[287] A provider experienced in correctional medicine knows to account for things like security, inmate behavior, patients who live in widespread dormitories, transportation to and from referral hospitals, limitation of a prison formulary, pill call lines, limitations of delivering long-term care, and more.[288] However, Dr. Vassallo has never worked in corrections.[289] Dr. Vassallo's lack of experience in correctional medicine compounded her error of relying upon the community standard of care.

The district court, following Plaintiffs' experts' lead, found a smattering of problems in the most difficult cases selected for review. Nothing in the cases reviewed applies across the prison population as a whole. Notwithstanding the inapplicability to the entire prison population, the State will address some of the cases cited by the district court in connection with clinical care, specialty care, and emergency care.[290]

---

[287] While Dr. Mathis acknowledges that Dr. Vassallo is a highly qualified emergency room physician, she inappropriately compares the ATU to an emergency room. ROA.35501.

[288] ROA.35551-52; Def_35c_7266, p. 0213.

[289] ROA.34023.

[290] The district court cited no specific cases as to sick call and medical leadership.

**b.    Individual cases do not show that the State is subjectively indifferent as to clinical care.**

As to clinical care, the record shows that the State has hired qualified medical personnel in more than adequate numbers and provided appropriate space and medical records with which to operate.  The State contends that these facts establish that the system of clinical care meets the constitutional standard, and no further inquiry into clinical care is necessary.

As to Patient #13, the district court criticized the fact that he was given Toradol when the medical record indicated that he was not to receive Toradol.[291] Even if giving Toradol was a medical error, a single act of medical negligence on this medically complex patient does not support a finding that clinical care is unconstitutional.[292]

Amazingly, the district court ignored examples of exemplary care given to Patient #13.  Patient #13 returned from a visit to the outside cardiologist with the recommendation to return PRN, i.e., as needed.[293] The Trip Office nurse sent an email to the specialist which stated that the specialist:

> placed the offender as PRN which surprised myself and Dr. Lavespere. I know he noted for the PCP to titrate his meds and monitor

---

[291] ROA.30572.

[292] Plaintiffs' expert witness made two glaring errors as to Patient #13.  The patient indeed did have a urology consult and was treated for pneumonia, contrary to her initial opinions. ROA.34294-95, 34427.

[293] ROA.34433-34; Joint_13_8995, p. 01015.

him but we just want to make sure that Dr. Helmeke does NOT want to see offender again. Do you mind checking with him?[294]

The specialist replied that he wanted to see Patient #13 in six months.[295] Plaintiffs' experts admitted that this was good proactive care by LSP for Patient #13.[296]

The district court next cites to Patient #20, contending that he made four sick calls between February and August 2021 and that clinical care was non-existent for this Patient.[297]  This finding was wrong.  The only error in the record was that on August 31, 2021, Patient #20 submitted a sick call slip and was not seen by a provider.[298]  Three weeks later, he submitted another sick call slip, was referred to the ATU, and was then sent to UMCNO.[299]  This patient had, at most, a three week delay attributable to the prior sick call process that is no longer in use.  Under the improved sick call process, the delay would not have occurred.  Regardless, a mere three-week delay in receiving care is not a constitutional violation. *Wesson,* 910 F.2d at 284; *Simons v. Clemens,* 752 F.2d 1053, 1056 (5th Cir. 1985).

---

[294] ROA.34433-34; Joint_13_8995, p. 01015.
[295] Joint_13_8995, p. 01015.
[296] ROA.34434.
[297] ROA.30575.
[298] Joint_20_6936, p. 0112.
[299] Joint_20_6936, pp. 0115-16.

The district court criticizes two sets of encounters with Patient #42.[300] For a detailed response, the State respectfully refers to its post-trial brief.[301] The record reflects that the patient has an extended history of examinations, diagnoses, and medications, and was afforded extensive medical care.[302] There can be no subjective deliberate indifference in such circumstances. *Mendoza*, 989 F.2d at 193-95 (no deliberate indifference where plaintiff was receiving "ongoing medical treatment" for subject problems); *Brauner*, 793 F.3d at 500 (deliberate indifference not established when medical records show plaintiff was "afforded extensive medical care by prison officials").

### c.    Individual cases do not show that the State is subjectively indifferent as to specialty care.

Dr. Puisis was the only expert that gave any opinions on specialty care.[303]  Dr. Puisis addressed only five cases[304] in the specialty care section of his report.[305]  He was allowed to testify to other cases, over the State's objection.

Patient #7 is not a specialty care issue.  Patient #7 had three positive fecal occult blood tests[306] and should have had a colonoscopy.  Dr. Toce testified that

---

[300] ROA.30575-77.
[301] ROA.30331-32.
[302] *See generally* Joint_42_4200.
[303] Pla_01a_5053, p. 4.
[304] Patient numbers 1, 2, 4, 5, and 7.
[305] Pla_01a_5053, pp. 82-100.
[306] Joint_07_2338, pp. 0030, 0026, 0025.

Patient #7 refused the colonoscopy, as he had done previously.[307] While it was error to fail to note the refusal in the record, this inadvertent failure does not demonstrate systematic deliberate indifference.

The district court cited to Patient #10[308] even though he was not discussed in the specialty care section of Plaintiffs' experts' report. Patient #10 had a documented history of drug use with associated altered mental status and high blood pressure due to medication non-compliance.[309] He was never ignored and received a large amount of care.[310] A showing that a prisoner received a large amount of care negates deliberate indifference. *Stewart*, 174 F.3d at 537; *Mendoza*, 989 F.2d at 193-95; *Brauner*, 793 F.3d at 500.

Patient #4 was lost to follow up due to COVID-19.[311] Delay in medical care constitutes an Eighth Amendment violation only "if there has been deliberate indifference [that] results in substantial harm." *Easter,* 467 F.3d at 463. There is no such showing as to Patient #4.

Patient #1 was timely diagnosed with cancer after an abnormal chest x-ray.[312] He was prescribed 35 medications and advanced chemotherapy, radiation, multiple

---

[307] Joint_71a_2360, p. 142; ROA.34938-39.
[308] ROA.30587.
[309] ROA.35716-24; Joint_10_6656, pp. 00176, 00149, 00114, 00120, 00111, 00163, 00137.
[310] The State respectfully refers the Court to its post-trial brief for a detailed discussion. ROA.30346-48.
[311] Joint_04_5564, p. 00190.
[312] ROA.35712.

CAT scans, and MRIs.[313]  A showing that a prisoner received a large amount of care

negates deliberate indifference.  *Stewart*, 174 F.3d at 537; *Mendoza*, 989 F.2d at 193-

95; *Brauner*, 793 F.3d at 500.

The record actually shows examples of excellent coordination of specialty

care for Patient #1.[314]  On November 24, 2021, the infusion took too long at UMCNO

so that he was unable to make his appointment at Mary Bird Perkins.[315]  In response,

LSP's trip office called Mary Bird Perkins to re-schedule his appointment.[316]

Plaintiffs' expert had to agree that this was good coordination of specialty care.[317]

The district court nevertheless ignored this in its findings.

Dr. Puisis did not opine on Patient #48 in the expert report but was allowed to

testify about Patient #48 over objection.[318]  Regardless, the record shows that Patient

#48 received a large amount of care,[319] which negates deliberate indifference.

---

[313] ROA.35712.
[314] ROA.35716.
[315] ROA.35715.
[316] Joint_01_1067, p. 00581; ROA.35715-16.
[317] ROA.35716, 35200.
[318] ROA.34798-99.
[319] *See generally* Joint_48_8523.  See the State's post-trial discussion of Patient #48 for more detail.  ROA.30346.

> **d.    The individual cases do not show that the State is subjectively indifferent as to inpatient and infirmary care.**

The district court cited to Patient #50, finding that LSP required the patient to re-use catheters improperly.[320]  This purported information was a self-report by the patient to the experts during the site visit, not supported by any medical documents.[321]  Notes by outside providers in Patient #50's medical records indicate that the catheter was to remain in place for up to two weeks.[322]  Nursing records indicate that nurses assessed the catheter, among other systems.[323]  There are no indications that Patient #50 had urinary tract infections after 2019.  This questionable self-report by a single patient is an insufficient basis upon which to find that the State was subjectively deliberately indifferent.

The district court cited Patient #22 as a "most egregious example" of poor infirmary care.[324]  This patient had a swallow study performed during a hospitalization, which showed that his swallowing was mildly impaired.[325]  The discharge paperwork noted: "Diet-Adult Home Diet Type: Return to previous diet."[326]  Seven months later, on January 6, 2021, Patient #22 choked on a piece of

---

[320] ROA.30611.

[321] Pla_01c_5412, pp. 00319-20.

[322] Joint_50_9117, pp. 00088, 00089, 00100, 00101.

[323] *See e.g.* Joint_50_9117, p. 00388-89.

[324] ROA.30613.

[325] Joint_22_1780, p. 00684.

[326] Joint_22_1780, pp. 00686, 00687.

sausage and died while in NU 2.[327] Significantly, the autopsy found that his digestive tract contained "partially digested food consisting of approximately 10 fragments of partially masticated hot dog/sausage (measuring up to 6.5 cm in length by up to 2.5 cm in diameter)."[328] There was no breach of the standard of care; the patient just choked.[329]

These are the only two cases that the district court discussed which purported to establish deficient infirmary care. These two cases do not establish a systematic issue with infirmary care or that the State was deliberately indifferent.

### e.    The individual cases do not show that the State is subjectively indifferent as to emergency care.

The district court begins by citing three cases from early 2019 involving Dr. Bunch, a provider who is no longer at LSP.[330] As to Patient #38, Dr. Bunch treated the patient for influenza; the patient ultimately had pneumonia.[331] Dr. Mathis explained that the lab findings and the wheezing noted in the lungs were more consistent with influenza.[332] A difference in medical opinion or a misdiagnosis is not deliberate indifference.

---

[327] Joint_22_1780, p. 00547. NU 2 is the long term facility equivalent to a nursing home.
[328] Joint_22_1780, p. 00536.
[329] ROA.35739.
[330] The district court's statement that the State did not cite to any evidence that Dr. Bunch is no longer at LSP (ROA.30600) is astounding. The district court criticized LSP for having only one provider, Dr. Toce. ROA.30617. Thus, there was no question that Dr. Bunch was no longer at LSP.
[331] ROA.35530-31.
[332] ROA.35529-30.

Patient #35 is one where Dr. Bunch admittedly made a negligent medical decision by sending the patient with a fever of 103.2 degrees to the nursing unit for observation.[333]  This act of medical negligence by a provider who is no longer at LSP does not support a finding of deliberate indifference.

Patient #36 is another patient where reasonable medical providers disagree. Patient #36 suffered from COPD and had an exacerbation of symptoms on May 2, 2019.[334]  After the patient had a full medical work up, Dr. Bunch sent Patient #36 to the nursing unit to be monitored.[335]  Dr. Mathis explained that one of the advantages of the nursing unit is that you have a place to hold somebody for monitoring when you do not think that they need to be admitted to a higher level of care.[336]  Thirty minutes later, the patient deteriorated; he was transported back to the ATU and then to the Our Lady of the Lake Hospital ("OLOL") emergency room.[337]  Dr. Bunch's decision to monitor Patient #36 was either unsuccessful treatment, a difference in medical opinion, or, at most, medical negligence – none of which is deliberate indifference.

Patient #29 was found on March 27, 2020 with a temperature of 108.2 degrees.[338]  The SDE form stated that there was a burning aroma in his cell,

---

[333] ROA.35547.
[334] ROA.35536-37.
[335] Joint_36_1798, p. 00106.
[336] ROA.35539.
[337] Joint_36_1798, pp. 00107-08.
[338] ROA.30601-02.

suggesting illicit drug use.[339] The EMTs found the patient unresponsive.[340] According to Dr. Mathis, Patient #29 was essentially a dead man at that time.[341] Dr. Vassallo was critical of not using ice to cool patients in response to heat stroke.[342] However, LSP does indeed use ice when appropriate. Patient #51 presented to the ATU on August 29, 2019 with a temperature of 103.3 degrees.[343] LSP applied an ice pack to treat the patient.[344] For Patient #29, there was nothing that could be done. Even if Dr. Vassallo's opinion that ice should have been used is correct, this case would be at most a case of medical negligence, not deliberate indifference.

Patient #25 stood up, felt dizzy, sat down, and fainted on October 2, 2020.[345] EMTs found that his vital signs were good and that he had no other complaints, such as chest pain or shortness of breath.[346] He refused transport, and an appropriate refusal form was signed.[347] On October 27, 2020, he was seen in the general medicine clinic; after medical work up, the provider concluded that no further work

---

[339] Joint_29_7032, p. 00037. Dr. Vassallo contends that the SDE states that the patient was "bouncing around in cell." ROA.34498. Plaintiffs' experts refused to acknowledge or address the effect of widespread illicit substance use at LSP. Plaintiffs' experts' refusal to acknowledge illicit drug use can only be deliberate since up to 25% of prison populations use contraband. ROA.35706. Plaintiffs' expert report never addresses the effect of widespread illicit drug use. ROA.34415; ROA.35202. Even though knowing about illicit drug use is good information to have, that information was irrelevant to Plaintiffs' experts. ROA.35202.

[340] ROA.35531.

[341] ROA.35531.

[342] Pla_01a_5053, p. 00120.

[343] Joint_51_1392, p. 00157.

[344] Joint_51_1392, p. 00157.

[345] Joint_25_6075, p. 00033.

[346] ROA.35523.

[347] Joint_25_6075, p. 00034.

up was necessary.[348] On January 22, 2021, Patient #25 had a heart attack and died.[349] Dr. Vassallo opines that the patient should have been worked up after the single episode of syncope.[350] Supported by Up-to-Date, Dr. Mathis, however, opined that nothing further needed to be done.[351]  This case is, at most, a difference of medical opinion or a misdiagnosis after a full work up.  A medical misdiagnosis does not establish deliberate indifference.  *Sama,* 669 F.3d at 590; *Rogers*, 709 F.3d at 410; *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756.

Patient #55 had a history of strokes and transient ischemic attacks and received a large amount of regular care.[352] Since Patient #55 received a large amount of care, there is no deliberate indifference. *Stewart*, 174 F.3d at 537; *Mendoza*, 989 F.2d at 193-95; *Brauner*, 793 F.3d at 500.

The above chart reviews do not demonstrate any systematic failure or deliberate indifference with regard to LSP emergency care or the ATU.

---

[348] Joint_25_6075, p. 00032.
[349] Joint_25_6075, p. 00029-31.
[350] Pla_01a_5053, pp. 00120-21.
[351] ROA.35526.
[352] *See generally* Joint_55_7057.  See also the State's post-trial memorandum for a detailed discussion of Patient #55.  ROA.30364-65.

**E.** **The district court erred in finding that the state violated the ADA/RA.**

    **1.** **The district court erred in relying on Dr. Schriro's opinions to find the State in violation of the ADA/RA.**

The district court erred in admitting the report and testimony of Dr. Dora Schriro, Plaintiffs' purported expert in corrections administration, and in relying upon her unsupported opinions for the substance of many of its findings concerning Plaintiffs' ADA/RA claims. The abuse of discretion standard applies in reviewing the admission or exclusion of expert testimony. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 138, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); see also *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 832 (7th Cir. 2015). The district court abused its discretion by denying the State's motion to exclude Dr. Schriro and in ascribing unwarranted weight to her opinions at the remedy trial.

Federal Rule of Evidence 702 requires that:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 codifies the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which charges district courts to act as "gatekeepers" when determining the admissibility of expert testimony. *United States v. Fullwood*,

342 F.3d 409, 412 (5th Cir. 2003) (citing *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

"To be admissible under Rule 702, the court must find that the evidence is both relevant and reliable." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citing *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010)). Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid, while relevance depends on whether the reasoning or methodology underlying the testimony can be properly applied to the facts at issue. *Ebron*, 683 F.3d at 139 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). The purpose of the reliability requirement is to exclude expert testimony based merely on subjective belief or unsupported speculation. *Tajonera v. Black Elk Energy Offshore Operations, LLC*, Civ. A. No. 13-0366, 2016 WL 3180776 at *8 (E.D. La. June 7, 2016) (Brown, J.) (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795).

"The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Meanwhile, district courts have considerable discretion to admit or exclude expert testimony under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. at 138-39; *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

Despite being engaged "to provide [her] *expert opinion* on compliance with and administration of the Americans with Disabilities Act (ADA), the ADA Amendments Act (ADAAA), and the Rehabilitation Act (RA) at Louisiana State Penitentiary (LSP),"[353] significantly, Dr. Schriro admitted that she never received any ADA training nor had she ever administered ADA training to others.[354]  Further, she had never directly overseen ADA compliance in any of her prior corrections positions, and the most direct involvement she could identify was merely hiring someone else to handle that role.[355]  She had never been previously admitted as an expert regarding ADA/RA compliance, nor did Plaintiffs have an expert to address this topic at the liability trial.  Despite the shortcomings in her qualifications, the district court denied the State's motion to exclude Dr. Schriro.[356]

At the remedy trial, the State challenged the tender of Dr. Schriro, re-urging their objections.  The Court stated Dr. Schriro was only being utilized for the purpose of "connecting the dots between what the court found as deficiencies and what the current conditions are"[357] and to "give recommendations on systematic changes that can be made in order to advance the goal of ADA compliance."[358]  The district court agreed that "we don't need an expert to connect the dots" but appeared to justify

---

[353] ROA.29242 (emphasis added)
[354] ROA.34133.
[355] ROA.34123-25.
[356] ROA.30214-18.
[357] ROA.34135.
[358] ROA.34136.

utilizing Dr. Schriro as an "expert" to obviate the need of having multiple lay witnesses.[359]  The district court stated:

> As to ADA compliance, the court finds that Dr. Schriro is qualified to provide expert testimony in the field of corrections administration and she can certainly make recommendations of how corrections administration maybe should or be changed or not changed to address those compliance issues....[360]

The State maintained its objection to the admissibility of Dr. Schriro's testimony.[361]

The district court attributed considerable weight to the unfounded opinions of Dr. Schriro in several key aspects of its Remedy Opinion, finding that:

- "Dr. Schriro credibly explained why [22 pushers or walkers] is insufficient,"[362] even though she performed no analysis of the number of disabled inmates requiring pushers/walkers and also provided no insight into what minimal number was required. This "opinion" also exceeded the scope of Dr. Schriro's report.[363]

- "Dr. Schriro was critical of [orderly] training as it pertains to assisting disabled inmates in accordance with the ADA and RA,"[364] although she

---

[359] ROA.34139.

[360] ROA.34140.

[361] ROA.34140.

[362] ROA.30631.

[363] At paragraph 93 of her report, Dr. Schriro noted there were 22 health care orderlies assigned as pushers; however, she never opined on the adequacy of this number, noting merely that "sufficient data must be collected to ascertain the workload," a task that she never performed. ROA.29259.

[364] ROA.30633.

was not trained in ADA herself nor was the content of orderly training determined to be deficient in the Liability Opinion.[365]

- "Dr. Schriro expressed doubt as to Stickells' purported oversight [of orderlies] because, during her site visit, she observed orderlies routinely exceed the scope of their duties;"[366] however, Dr. Schriro is not a medical doctor and had no foundation for determining the proper scope of orderly care.

- "Dr. Schriro credibly concluded that there was no rationale to the orderly staffing levels;"[367] and yet, Dr. Schriro applied no analysis to determine what the optimal number of orderlies should be to meet LSP's needs nor did she have prior experience to form a foundation for this criticism.

- "Dr. Schriro reasonably concluded that LSP's [ADA] tracking system is undercounting accommodation requests, stating that the recorded accommodation requests per month 'really seems to be an exceptionally low number;'"[368] however, Dr. Schriro had no basis for assuming the number was "exceptionally low" given that she had no knowledge or background in handling accommodation requests and performed no analysis.

- "Disabled inmates reported to Dr. Schriro that, when they file accommodation requests via ARP, they receive no response;"[369] however, she could not identify any specific inmate who told her this nor did she review any ARPs to verify this information.[370]

Thus, rather than use this witness to merely connect the dots between

violations found in the Liability Opinion and the current conditions at the time of the

---

[365] The Court specifically found in its Liability Opinion that orderly training was adequate. ROA.22497.

[366] ROA.30635.

[367] ROA.30636.

[368] ROA.30642.

[369] ROA.30642.

[370] ROA.29364.

remedy trial, the district court accepted Dr. Schriro's unsupported opinions for several foundational components of its ruling respecting ADA/RA violations.

The district court committed legal error in accepting the testimony of Dr. Schriro over Defendants' objection. The findings based on this testimony should be reversed.

### 2.     The district court erred in finding that Plaintiffs proved a systemic failure to comply with the ADA/RA.

Plaintiffs alleged four categories of alleged ADA/RA violations at LSP: (i) architectural barriers to LSP's programs, services, and activities; (ii) methods of administration; (iii) failure to accommodate; and (iv) exclusionary policies related to hobby craft and duty status.

"Plaintiffs' burden is to demonstrate a systemic failure"[371] to comply with the ADA/RA.  Yet, the evidence does not support a finding of a systemic failure. Specifically, (i) in 2017, LSP voluntarily entered into a settlement agreement with the USDOJ to remedy alleged ADA violations;[372] (ii) there was insufficient evidence to support Plaintiffs' exclusionary policies claims;[373] (iii) LSP does not systemically fail to accommodate disabled inmates with auxiliary or assistive devices,[374] in work

---

[371] ROA.22492.
[372] Pla_04_3896, p. 00002.
[373] ROA.30645; *see also* ROA.22515-20. The State does not appeal the district court's findings with respect to Plaintiffs' exclusionary policies claims.
[374] ROA.22507.

assignments and duty statuses,[375] dietary restrictions,[376] transportation,[377] and in pill call, sick call, and headcount;[378] (iv) the existence of a healthcare orderly program at LSP "is a generally acceptable and lawful practice…to provide disability access;"[379] and (v) there was "no pervasive pattern of orderly abuse and/or neglect of disabled patients at LSP."[380]

Aside from Plaintiffs' methods of administration claims, the only claims remaining for this Court's consideration are whether LSP's orderly program is sufficient to provide disability access[381] and whether LSP accommodates disabled inmates in disciplinary procedures.  This does not constitute a systemic failure to comply with the ADA.

### a.    Architectural Barriers[382]

#### i.   Impact of ADA Settlement Agreement with the USDOJ

In May 2010, representatives from the USDOJ conducted a site visit at LSP to determine whether LSP complied with Title II of the ADA, 42 U.S.C. § 12131, *et*

---

[375] ROA.22509.

[376] ROA.22510.

[377] ROA.22511.

[378] ROA.22470.

[379] ROA.22496-97.

[380] ROA.30633.

[381] Assuming that the PLRA does not preclude Plaintiffs' architectural barrier claims in light of the United States Department of Justice ("USDOJ") settlement agreement, as discussed below.

[382] In the Liability Opinion, the district court found that "LSP unjustifiably segregates its disabled population as it relates to housing." ROA.22453. However, following the remedy trial, Plaintiffs stated in their post-trial brief that they "raised no claims of unjust segregation under the

*seq.,* and its implementing regulations, 28 CFR part 35.[383] USDOJ and LSP

ultimately entered into a settlement agreement on November 14, 2017.[384]

The district court found that "the DOJ conducted a far more expansive

assessment of LSP facilities than [Plaintiffs' architectural expert Mark Mazz], as the

DOJ reviewed the entire property for programmatic access."[385] Despite this finding,

however, the court adopted the findings of alleged violations outlined in Mazz's

expert report[386] and ordered that the proposed remedial plan from the Special Master

identify "architectural barriers to be remedied as set forth in Mark Mazz's expert

report."[387]

The remedy ordered by the district court is unnecessarily duplicative of the

USDOJ's efforts to ensure LSP's compliance with Title II of the ADA and its

implementing regulations and, thus, does not meet the need-narrowness-

intrusiveness test of the PLRA, as discussed above. As even the district court

acknowledged, the USDOJ's review was much more expansive than that of

Plaintiffs' architectural expert.[388] Furthermore, since the USDOJ created the

---

ADA." ROA.30550. Thus, the district court correctly considered this claim abandoned. ROA.30562.

[383] Pla_007_123, p. 0008.

[384] The State was prevented from introducing the executed settlement agreement at the liability trial, as it was outside of the discovery period. ROA.18118.

[385] ROA.22444.

[386] ROA.22444, 22447.

[387] ROA.30663, 30627.

[388] As Mazz admitted, the USDOJ reviewed more physical spaces than he did and also considered program access, unlike him. ROA.32521, 32537-32538.

implementing regulations for Title II, its review should be entitled to deference over the narrow review by Plaintiffs' expert. *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011). Therefore, in light of the USDOJ settlement agreement, the district court's remedy for alleged architectural barriers does not meet the need-narrowness-intrusiveness test of the PLRA and should be reversed.

> *ii.* *The District Court erred in finding that LSP's inmate orderly program does not overcome structural barriers to access for disabled inmates.*

The ADA requires public entities to make reasonable modifications to ensure that disabled persons can access the services, programs, and activities provided by the public entity. *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). Facilities constructed prior to January 26, 1992 are considered existing facilities under the ADA. "The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities." *Greer v. Indep. Sch. Dist.*, 472 F. App'x 287, 291 (5th Cir. 2012). A public entity is not required to make all of its existing facilities accessible to persons with disabilities nor is it required to take any action that would result in an undue burden on the public entity. 28 C.F.R. § 35.150(a). Rather, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." *Id.* (emphasis added). This is known as the program access requirement.

The district court correctly applied the program access requirement to LSP's facilities,[389] noting that "a public entity may comply with Title II by adopting a variety of less costly measures, including…assigning aides to assist persons with disabilities in accessing services."[390] However, the district court erred in finding that LSP's orderly program is "inadequate to overcome the structural barriers to access for disabled inmates."[391] The district court attributed its findings to "understaffing and the abuse/neglect/misconduct of the orderlies"[392] and found that "more oversight of the orderlies in this program is glaringly necessary to prevent the too-often instances of abuse, neglect, and misconduct."[393]

Following the remedy trial, the district court found "no pervasive pattern of orderly abuse and/or neglect of disabled patients at LSP."[394] Yet, the district court found "a serious lack of supervision or oversight of inmate orderlies," which "contributes to violations of the ADA and the RA at LSP."[395] This is inconsistent with the district court's liability ruling, which found that additional oversight of orderlies was necessary *only* to prevent abuse, neglect, and misconduct.

---

[389] Plaintiffs have the burden of proving an alteration. *Rosa v. 600 Broadway Partners, LLC,* 175 F. Supp. 3d 191, 206 (S.D.N.Y. 2016). Plaintiffs presented no evidence that LSP's facilities were constructed or altered after January 26, 1992.

[390] ROA.22496 (citing *Garrett v. Thaler,* 650 F. Appx. 375, 382 (5th Cir. 2014)).

[391] ROA.22498.

[392] ROA.22497.

[393] ROA.22497.

[394] ROA. 30630-30633.

[395] ROA.30634.

Similarly, in the Liability Opinion, the district court found the orderly training program "to be adequate in content."[396]  Yet, following the remedy trial, the court found that the very same training materials were "limited in usefulness."[397]  These inconsistent findings underscore the flawed procedure utilized by the district court – LSP reasonably responded to the Liability Opinion, only to have the target shift between the liability and the remedy trials.

Nevertheless, the State maintains that the orderly program is sufficient to provide alternative means of access to programs, services, and activities.  Following the liability trial, LSP converted Ash 1, 3, and 4 into handicapped accessible dormitories for disabled inmates.[398]  The Ash dorms, including Ash 2, are fully handicapped accessible and centrally located near the treatment center, pill call, the cafeteria, the law library, and the education building.[399] These dorms also provide the easiest means of access to two of LSP's chapels.[400]

The inmates housed in the Ash dorms are afforded access to the same programs, services, and activities as inmates housed in other units. Plaintiffs presented the testimony of three disabled class members housed in the Ash Dorms at the remedy trial.  Robert Lucas is housed in Ash 3 and reported no accessibility

---

[396] ROA.22497.
[397] ROA.30632.
[398] Joint_72a_6361, p. 00019.
[399] Joint_73a_3744, pp. 00099-100.
[400] Joint_73a_3744, p. 00101.

issues in the Ash Dorms.[401]  Dennis Mischler, who uses a wheelchair, is able to access the toilets and showers in Ash 1,[402] as well as the recreation yard with assistance.[403]  Jean Paul Creppel is able to navigate Ash 1 in his wheelchair.  While he is able to perform his activities of daily living without assistance,[404] orderlies are present to assist him and do, in fact, assist him.[405]  Therefore, the district court erred in finding that the orderly program does not overcome alleged structural barriers to access.

### b.    Failure to Accommodate

The district court found that LSP fails to accommodate disabled inmates in one respect only – disciplinary procedures.[406]  Following the remedy trial, the district court found that "Defendants fail to consider the need for appropriate accommodations when disciplining disabled inmates in violation of the ADA and RA" and that "LSP's discipline policies, as applied to disabled inmates, violate the ADA/RA."[407]  This finding is not supported by evidence.

There is no evidence that disabled inmates who are subject to disciplinary action are deprived of reasonable accommodations.[408]  Security is trained "to

---

[401] Joint_77c_6689, p. 00002.
[402] ROA.34086-88.
[403] ROA.34088-89.
[404] ROA.34704.
[405] ROA.34704.
[406] ROA.22513-14, 30643.
[407] ROA.30643.
[408] Joint_72a_6361, p. 00044.

identify when a person's disability is implicated in a behavior that leads to discipline" and "to contact the ADA coordinator when a person is being disciplined for a behavior that implicates their disability."[409]  "[T]he [Disciplinary] Board has the ability to defer to the ADA Coordinator and/or Medical to verify whatever may be the case dealing with the rule violation."[410]  The level of accommodation provided to a disabled inmate does not change as a result of a disciplinary writeup.[411]

In the Remedy Opinion, the district court found that "black box restraints are routinely used on disabled inmates regardless of their disabilities."[412]  However, "[t]he problem is not that LSP utilizes black boxes to transport disabled patients; rather, the problem is that there is no evidence that LSP is considering each accommodation request on a case-by-case basis as required by the ADA."[413]  The district court cited no evidence for this assertion.  In fact, the evidence indicated that restraint orders are often modified by medical for disabled inmates.[414]

Through two phases of trial, the district court found only three instances of inmates who allegedly were not accommodated in discipline.  The first alleged instance dates back to 2012.[415]  The second alleged instance was based on statements

---

[409] Joint_72a_6361, p. 00046-47.
[410] Joint_72a_6361, p. 00047.
[411] Joint_72a_6361, p. 00046-48.
[412] ROA.30645.
[413] ROA.30646.
[414] *See* e.g., Joint_01_1067, p. 0007; Joint_04_5564, p. 00007; Joint_05_1571, p. 00014; Joint_09_2064, p. 0002; Joint_11_3900, p. 0003; Joint_77c_6689, p. 00008.
[415] ROA.22471, citing Pla_085_651, pp.0002-3.

in the report of Plaintiffs' medical experts.  These statements are not substantive evidence that such an event occurred,[416] and the district court erred in overruling the State's hearsay objection to this evidence.[417]  The third alleged instance involved class member Derrick Martin, who is in a wheelchair and was held in a locked room on the nursing unit as discipline.[418]  Arrangements were made to ensure that he had access to a call light and a call bell to alert the nurses.[419]  He was also able to call out loud to the nurses if necessary.[420]  There is no evidence that Mr. Martin's limitations were not accommodated.

Three alleged instances over ten years does not amount to a systemic failure to accommodate disabled inmates in disciplinary procedures.  Thus, the district court erred in finding that LSP does not accommodate disabled inmates in disciplinary procedures.

---

[416] "Although expert witnesses are permitted to rely on hearsay to form their opinions, their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced." *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014) (citing *Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 893 (D.C. 2011)).

[417] ROA.22471.

[418] ROA.35340-41.

[419] ROA.35341. The district court afforded little weight to NP Park's testimony that she responded to Mr. Martin's call bell. *See* ROA.30644.

[420] ROA.30644.

### c.    Methods of Administration

Plaintiffs contend that Defendants have employed discriminatory methods of administration of the ADA by failure to follow Title II's implementing regulations, specifically 28 C.F.R. § 35.130(b)(3), and LSP's own policies and procedures.[421]

The district court found that LSP's methods of administration violate the ADA in the following respects: "(1) failure to maintain a qualified and adequately trained ADA Coordinator; (2) failure to maintain an ADA advisory committee as required by its own policies; (3) inadequate training of staff regarding the ADA; . . . (5) failure to appropriately process accommodation requests and disability-related grievances; [and]; (6) failure to identify and track patients' disabilities and accommodation requests."[422]

A claim for violation of the ADA requires Plaintiffs to prove, in part, that they are being excluded from participation in or "being denied the benefits of services, programs, or activities for which the public entity is responsible, or [are] otherwise discriminated against by the public entity." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).   In finding that LSP's methods of administration violated the ADA, the district court cited *Holmes v. Godinez,* 311 F.R.D. 177, 219 (N.D. Ill. 2015), which stated,

---

[421] ROA.1037.
[422] ROA.22499, 30655.

We reiterate that an ADA violation exists only if the defendant's action or inaction prevents the plaintiff from participating in a program, activity or service. Certain of Plaintiffs' complaints, <u>such as IDOC's alleged failure to properly train its employees and centrally track hearing impaired offenders, do not specifically target programs, activities, or services, and thus cannot alone sustain a claim under the ADA</u>.

(emphasis added). Similarly, here, the district court's finding, for example, that LSP "fails to maintain a qualified and adequately trained ADA coordinator,"[423] does not target a program, service, or activity from which Plaintiffs are prevented in participating. Therefore, the district court erred in finding that the above-listed methods of administration constitute standalone violations of the ADA for which Plaintiffs are entitled to a remedy.

"[A] know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, <u>at least when plaintiffs can show that it has the effect of discriminating</u>." *Dunn v. Dunn,* 318 F.R.D. 652, 665 n.12, (M.D. Ala. 2016), *modified,* 2020 WL 2395987 (M.D. Ala. 2020) (emphasis added). Here, not even Plaintiffs contend that LSP has a "know-nothing, do-nothing" ADA policy; nevertheless, the evidence was insufficient to show that LSP's methods of administration have the effect of discrimination.

---

[423] ROA.22499.

For example, the court found that LSP fails "to appropriately process accommodation requests and fail[s] to track inmates' disabilities and accommodation requests."[424]  Yet, aside from disciplinary procedures, the court found that Plaintiffs failed to prove that LSP does not accommodate disabled inmates.  It is inconsistent to find that LSP fails to appropriately process and track accommodation requests without sufficient evidence that LSP's procedure has resulted in a systemic failure to accommodate.  This is likewise true of LSP's alleged failure to maintain an adequately trained ADA Coordinator and advisory committee, as well as staff training.  Without evidence of a systemic failure to comply with the ADA resulting in discrimination, the district court erred in its finding as to Plaintiffs' methods of administration claims.

Nevertheless, after the liability trial, LSP and the DOC overhauled its ADA leadership and organizational structure.  The DOC implemented a department ADA Coordinator position, to which Deputy Assistant Secretary Sharita Spears, J.D. was appointed.[425]  Spears supervises the ADA coordinators at all the DOC facilities; reviews institutional policies and directives related to the ADA;[426] maintains the ADA database; creates and coordinates ADA training; and answers second-level

---

[424] ROA.22506.
[425] ROA.36093-94.
[426] Spears also considers any changes to the law and proposes revisions accordingly. ROA.36094-96.

administrative remedy procedure grievances related to the ADA.[427]    The implementation of an ADA Coordinator at the DOC has improved ADA administration at LSP and other DOC facilities.

Spears completed fifty hours of training through the ADA national symposium and is a certified ADA Coordinator.[428]    Spears received training materials for every presentation at the symposium, which she disseminated to the other ADA coordinators within the DOC.[429]

Spears has overhauled the ADA training program for staff at headquarters and LSP.[430]  In early 2022, Spears created and presented ADA training at the Leadership Academy for the DOC executive team, including LSP's ADA Coordinator.[431]  This was a newly implemented training.[432]  The annual in-service training offered to all correctional staff at DOC facilities will be enhanced and updated to include additional ADA topics.[433]

---

[427] ROA.36094-97, 36111.

[428] ROA.36101-03.

[429] ROA.36102.

[430] ROA.36096-97.

[431]  ROA.36097-99. Topics presented: reasonable accommodations; DOC's grievance process; Title 1; Title 2 (accessibility and physical barriers); working with offenders that have hearing impairments; and how to assess if an individual is a qualified person under the ADA. Def_52_2203.

[432] ROA.36098-99.

[433]  ROA.36100-01. Previously, the annual in-service training consisted primarily of communication with deaf and hearing-impaired inmates. *See* also Joint_12f_900.

Spears engaged the services of Accessology – an independent ADA consulting firm – to create a transition plan that will comprehensively analyze and evaluate the DOC's and LSP's practices, polices, and procedures, as well as programmatic and physical access issues.[434]

In March 2022, Deputy Warden Oliveaux was appointed as the ADA Coordinator at LSP.[435] Though the district court had previously found that LSP's ADA Coordinators lacked sufficient training and education to carry out their obligations under the ADA,[436] by June 2022, Oliveaux had completed 35 hours of ADA training with plans to complete the remaining 5 hours of training to become a certified ADA Coordinator.[437] She also attended the ADA training at the DOC Leadership Academy.

Between March and June 2022, Oliveaux had received and handled approximately seven requests for accommodation.[438] This frequency of requests (two requests per month) is consistent with the total of 84 requests for accommodation that were received by LSP for 2019 through 2021.[439] This workload does not necessitate a fulltime ADA Coordinator at LSP.

---

[434] ROA.36104-06.
[435] ROA.36060-61.
[436] ROA.22504.
[437] ROA.36077, 36081.
[438] ROA.36084.
[439] Pla_36_5664.

# VI. <u>CONCLUSION</u>

The district court throughout the proceeding has failed to recognize the sensitive federalism issues surrounding prison litigation as recognized in jurisprudence and under the PLRA. The district court rendered judgment without consideration of current conditions as required by this Court's precedent. The Remedial Order violated mandatory provisions of the PLRA. It is clear error for there to be no remedy at this time after a ten-day trial for the express purpose of establishing a remedy.

The finding of deliberate indifference is flawed for two primary reasons. One, the district court failed to acknowledge and consider the impact of changes to the medical system after the Liability Trial. Two, the district court decided the case upon review of specific instances of care in the most difficult medical cases encountered without considering whether the problem was the result of a difference in medical judgment or medical error as opposed to a systematic issue.

Accordingly, the State prays that this Honorable Court reverse the Judgment and Remedial Order of the district and dismiss the case with prejudice.

Dated: January 11, 2024.

Respectfully submitted,

BY: */s/ Connell L. Archey*
    Connell L. Archey (#20086)
    Randal J. Robert (#21840)
    Keith J. Fernandez (#33124)

Allena W. McCain (#38830)
Madaline King Rabalais (#38301)
BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge, LA 70821-2997
Telephone:    (225) 325-8700
Facsimile:    (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Keith.Fernandez@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

Jeffrey K. Cody (#28536)
Caroline M. Tomeny (#34120)
John C. Conine, Jr. (#36834)
SHOWS, CALI & WALSH, L.L.P.
Special Assistant Attorneys General
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, LA 70821
Telephone:    (225) 346-1461
Facsimile:    (225) 346-1467
jeffreyc@scwllp.com
caroline@scwllp.com
coninej@scwllp.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

On January 11, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Connell L. Archey*
Connell L. Archey

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 21,498 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Connell L. Archey*
Connell L. Archey

85192921.v1