**No. 23-30825**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

KENTRELL PARKER, on behalf of themselves and all others similarly situated;
FARRELL SAMPIER, on behalf of themselves and all others similarly situated;
REGINALD GEORGE; JOHN TONUBBEE, on behalf of themselves and all
others similarly situated; OTTO BARRERA, on behalf of themselves and all
others similarly situated; CLYDE CARTER, on behalf of themselves and all
others
similarly situated; EDWARD GIOVANNI, on behalf of themselves and all others
similarly situated; RICKY D. DAVIS, on behalf of themselves and all others
similarly situated; LIONEL TOLBERT, on behalf of themselves and all others
similarly situated; RUFUS WHITE, on behalf of themselves and all others
similarly situated; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE;
EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs-Appellees*

v.

TIM HOOPER, Warden, Louisiana State Penitentiary, in His Official Capacity;
ASHLI OLIVEAUX, Assistant Warden for Health Services, in Her Official
Capacity; JAMES M. LEBLANC, Secretary Of The Louisiana Department Of
Public Safety And Corrections, in His Official Capacity; RANDY LAVESPERE,
Medical Doctor; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS;
CYNTHIA PARK, ACNP; THE LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Middle District of Louisiana

## RECORD EXCERPTS OF APPELLANTS

Connell Archey
Randal J. Robert
Keith J. Fernandez
Allena W. McCain
Madaline King Rabalais
BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge, LA 70821-2997
Telephone:   (225) 325-8700
Facsimile:    (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Keith.Fernandez@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

Jeffrey K. Cody
Caroline M. Tomeny
John C. Conine, Jr.
SHOWS, CALI & WALSH, L.L.P.
Special Assistant Attorneys General
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, LA 70821
Telephone:   (225) 346-1461
Facsimile:    (225) 346-1467
jeffreyc@scwllp.com
caroline@scwllp.com
coninej@scwllp.com

# TABLE OF CONTENTS

**TAB#**                                                                                    **ROA**

1      Docket Sheet....................................................................... ROA.1

2      Notice of Appeal............................................................ ROA.30669

3      Opinion entered November 6, 2023 ........................................ ROA.30557

4      Remedial Order........................................................... ROA.30661

5      Judgment..................................................................... ROA.30666

6      Ruling Granting Motion for Class Certification ..................... ROA.17733

7      Opinion entered March 31, 2021............................................ ROA.22399

8      Optional Record Excerpts

# TAB 1

APPEAL,ATTENTION,CLOSED

# U.S. District Court
# Middle District of Louisiana (Baton Rouge)
# CIVIL DOCKET FOR CASE #: 3:15-cv-00318-SDD-RLB

Lewis et al v. Cain et al
Assigned to: Chief Judge Shelly D. Dick
Referred to: Magistrate Judge Richard L. Bourgeois, Jr.
 Related Case:  3:22-cv-00573-SDD-RLB
 Case in other court:  5th Circuit Court of Appeals, 23-30825
Cause: 42:1983 Civil Rights Act

Date Filed: 05/20/2015
Date Terminated: 11/06/2023
Jury Demand: None
Nature of Suit: 555 Prisoner Conditions
Jurisdiction: Federal Question

**Plaintiff**

**Joseph Lewis, Jr.**
*on behalf of themselves and all others
similarly situated*
*TERMINATED: 06/21/2016*

represented by

**Jamila Asha Johnson**
The Lawyering Project
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
504-312-2304
Email: jjohnson@lawyeringproject.org
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
3110 Canal St
New Orleans, LA 70119
504-233-3125
Email: mmontagnes@defendla.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
Promise of Justice Initiative
1024 Elysian Fields Ave
New Orleans, LA 70117
504-529-5955
Email: sbosalavage@defendla.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
Southern Poverty Law Center
Law
201 St. Charles Avenue
Suite 2000
New Orleans, LA 70170
504-486-8982
Email: bruce.hamilton@splcenter.org
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
2723 DAbadie Street
New Orleans, LA 70119
917-699-5405
Email: candice@smclattorneys.com
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Suite 500
Washington, DC 20005
202-408-4600
Fax: 202-406-4699
Email: dsmall@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
Advocacy Center of Louisiana
8325 Oak Street
New Orleans, LA 70118
(504) 522-2337
Email: dwarden@advocacyla.org
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
637 North Pierce Street
70119
New Orleans, LA 70117
484-892-9274
Email: elena.malik14@gmail.com
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
The Promise of Justice Initiative
636 Baronne St
New Orleans, LA 70113
(504) 529-5955
Email: bethc@thejusticecenter.org
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
The Protect Democracy Project
3014 Dauphine Street
Suite J
New Orleans, LA 70117
504-239-3987
Email: jared.davidson@protectdemocracy.org

*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
Democracy Forward
P.O. Box 34553
Washington, DC 20043
202-701-1773
Email: jdubner@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, LA 70156
504-522-0628
Email: harrison.justin.p@gmail.com
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
Innocence Project New Orleans
4051 Ulloa Street
New Orleans, LA 70119
917-443-7575
Email: mereditha@ip-no.org
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
Advocacy Center
600 Jefferson Street
Suite 812
Lafayette, La 70501
337-237-7380
Email: mtait@advocacyla.org
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
Southern Poverty Law Center
403 Washington Ave
Montgomery, AL 36104
504-535-9035
Email: rebecca.ramaswamy@splcenter.org
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Kentrell Parker**                    represented by  **Jamila Asha Johnson**
*on behalf of themselves and all others*                (See above for address)

*similarly situated*

TERMINATED: 12/05/2022
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
Law Office of Ronald Lospennato
650 Poydras St.
Suite 1400
New Orleans, LA 70130
504-407-7454
Email: rlospennato@disabilityrightsla.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
504-529-5955
Fax: 501-595-8006
Email: azarrow@thejusticecenter.org
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW
Fifth Floor
Washington, DC 20005
781-572-0456
Email: bschneiderman@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
Southern Poverty Law Center
201 St. Charles Avenue
Suite 2000
New Orleans, LA 70170
225-316-6709
Email: emily.lubin@splcenter.org
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
Promise of Justice Initiative
1024 Elysian Fields Avenue
70116
New Orleans, LA 70116
504-529-5955
Email: enavalance@defendla.org
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
Promise of Justice Initiative
1024 Elysian Fields Ave.
New Orleans, LA 70116

504-529-5955
Email: lwright@defendla.org
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
504-529-5955
Email: nkumar@defendla.org
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
American Civil Liberties Union Foundation
of Louisiana
1340 Poydras St
Suite 2160
New Orleans, LA 70112
917-842-3902
Email: nahmed@laaclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Farrell Sampier**                    represented by  **Jamila Asha Johnson**
*on behalf of themselves and all others*                (See above for address)
*similarly situated*                                     *TERMINATED: 12/05/2022*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                        **Jeffrey B. Dubner**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Reginald George**                     represented by   **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Tonubbee**
*on behalf of themselves and all others*
*similarly situated*

represented by **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Otto Barrera**
*on behalf of themselves and all others*
*similarly situated*

represented by    **Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)

*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clyde Carter**                    represented by    **Mercedes Hardy Montagnes**
*on behalf of themselves and all others*             (See above for address)
*similarly situated*                                 *TERMINATED: 03/30/2023*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Ronald Kenneth Lospennato**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Amanda Christine Zarrow**
                                                     (See above for address)
                                                     *TERMINATED: 08/21/2019*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Brendan R. Schneiderman**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Bruce Warfield Hamilton**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Candice Cheree Sirmon**
                                                     (See above for address)
                                                     *TERMINATED: 08/24/2016*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Daniel A, Small**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Derek Allen Warden**
                                                     (See above for address)
                                                     *TERMINATED: 08/09/2017*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Elena Malik**
                                                     (See above for address)
                                                     *TERMINATED: 07/25/2022*
                                                     *ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cedric Evans**                            represented by   **Jamila Asha Johnson**
*on behalf of themselves and all others*                    (See above for address)
*similarly situated*                                        *TERMINATED: 12/05/2022*
*TERMINATED: 06/21/2016*                                    *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)

*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edward Giovanni**                    represented by  **Jamila Asha Johnson**
*on behalf of themselves and all others*               (See above for address)
*similarly situated*                                   *TERMINATED: 12/05/2022*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Mercedes Hardy Montagnes**
                                                       (See above for address)
                                                       *TERMINATED: 03/30/2023*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Ronald Kenneth Lospennato**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)

*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ricky D. Davis**                          represented by    **Mercedes Hardy Montagnes**
*on behalf of themselves and all others*                    (See above for address)
*similarly situated*                                         *TERMINATED: 03/30/2023*
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**

(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Lionel Tolbert**
*on behalf of themselves and all others
similarly situated*

represented by **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rufus White**
*on behalf of themselves and all others*
*similarly situated*

represented by **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shannon Hurd**                     represented by   **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*

*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alton Adams**                    represented by    **Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)

*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ian Cazenave                    represented by    **Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**

(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)

*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edward Washington**                    represented by    **Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*
*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Alton Batiste                    represented by    **Mercedes Hardy Montagnes**
(See above for address)
*TERMINATED: 03/30/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald Kenneth Lospennato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda Christine Zarrow**
(See above for address)
*TERMINATED: 08/21/2019*
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bruce Warfield Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Candice Cheree Sirmon**
(See above for address)
*TERMINATED: 08/24/2016*

*ATTORNEY TO BE NOTICED*

**Daniel A, Small**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Derek Allen Warden**
(See above for address)
*TERMINATED: 08/09/2017*
*ATTORNEY TO BE NOTICED*

**Elena Malik**
(See above for address)
*TERMINATED: 07/25/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth Claire O'K Compa**
(See above for address)
*TERMINATED: 04/13/2017*
*ATTORNEY TO BE NOTICED*

**Emily Blythe Lubin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Lauren Navalance**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamila Asha Johnson**
(See above for address)
*TERMINATED: 12/05/2022*
*ATTORNEY TO BE NOTICED*

**Jared Fletcher Davidson**
(See above for address)
*TERMINATED: 09/24/2020*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Dubner**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin Paul Harrison**
(See above for address)
*TERMINATED: 11/07/2016*
*ATTORNEY TO BE NOTICED*

**Lydia Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Angelson**
(See above for address)
*TERMINATED: 02/03/2020*
*ATTORNEY TO BE NOTICED*

**Miranda Tait**
(See above for address)
*TERMINATED: 09/19/2019*
*ATTORNEY TO BE NOTICED*

**Nishi Lal Kumar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Rose Ramaswamy**
(See above for address)
*TERMINATED: 12/01/2022*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha Nicole Bosalavage**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Burl Cain**                              represented by  **Connell Lee Archey**
*Warde of the Louisiana State Pententiary,*                Butler Snow
*in his official capacity*                                 445 North Boulevard
*TERMINATED: 06/21/2016*                                   Ste 300
                                                           Baton Rouge, LA 70802
                                                           225-325-8700
                                                           Fax: 225-325-8800
                                                           Email: connell.archey@butlersnow.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Edmond Wade Shows**
                                                           Shows, Cali & Walsh, LLp
                                                           P. O. Drawer 4425
                                                           628 St. Louis Street
                                                           Baton Rouge, LA 70821
                                                           225-346-1461
                                                           Fax: 225-346-1467
                                                           Email: wade@scwllp.com

*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
Butler Snow
445 North Boulevard, Suite 300
Baton Rouge, LA 70802
225-325-8735
Fax: 225-325-8800
Email: Randy.Robert@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**
Butler Snow
445 North Blvd
Suite 300
Baton Rouge, LA 70802
225-325-8700
Email: allena.mccain@butlersnow.com
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
Pendley, Baudin & Coffin
24110 Eden Street
Plaquemine, LA 70765
225-975-0150
Email: abarient@pbclawfirm.com
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
Shows, Cali, & Walsh, LLP
628 St. Louis Street
Baton Rouge, LA 70802
(225) 346-1461
Fax: (225) 346-1467
Email: caroline@scwllp.com
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
United States Attorney's Office, Louisiana
Middle Distr
777 Florida Street
Suite 208
Baton Rouge, LA 70801
317-226-6333
Email: Colin.Clark@usdoj.gov
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
Office of the Attorney General, Louisiana

Department of Just
Civil Division
P.O. Box 94005
Baton Rouge, LA 70804
225-326-6766
Email: murrille@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
Grant Guillot, LLC
5028 River Meadow Drive
Baton Rouge, LA 70820
225-614-7838
Email: grant.guillot@arlaw.com
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
Erlingson Banks, PLLC
Litigation
One American Place
301 Main Street, Suite 2110
Baton Rouge, LA 70801
225-218-4446
Fax: 225-246-2876
Email: jhilburn@erlingsonbanks.com
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
Shows, Cali, Berthelot & Walsh, LLP
628 St. Louis Street
Baton Rouge, LA 70802
225-346-1461
Fax: 225-346-1467
Email: jeffreyc@scwllp.com
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
Shows, Cali & Walsh, L.L.P.
628 St. Louis St.
Baton Rouge, LA 70802
(225) 346-1461
Email: coninej@scwllp.com
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
Louisiana Court of Appeal, First Circuit
1600 N. Third Street
Baton Rouge, LA 70802
(225) 382-3110
Email: kdufrene@la-fcca.org
*TERMINATED: 10/04/2017*

*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
Roper Ligh, LLC
10935 Perkins Road
Suite B
Baton Rouge, LA 70810
225-338-9238
Email: mary@roperligh.com
*TERMINATED: 02/15/2019*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stephanie Lamartiniere**
*Assistant Warden for Health Services, in her official capacity*
*TERMINATED: 09/11/2018*

represented by

**Edmond Wade Shows**
(See above for address)
*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
Keogh, Cox & Wilson, LTD
P. O. Box 1151
701 Main Street
Baton Rouge, LA 70821-1151
225-383-3796
Fax: 225-343-9612
Email: ablanchfield@keoghcox.com
*ATTORNEY TO BE NOTICED*

**Angelique Duhon Freel**
Louisiana Department of Justice - B.R.
P.O. Box 94005
Baton Rouge, LA 70804-9005
225-326-6000

Fax: 225-326-6098
Email: duhona@ag.state.la.us
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
Keogh Cox & WIlson
701 Main Street
Baton Rouge, LA 70802
(225) 383-3796
Email: cpayne@keoghcox.com
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
Bulter Snow
445 North Blvd
Suite 300
Baton Rouge, LA 70802
225-383-4703
Email: george.holmes@butlersnow.com
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
Butler Snow
445 North Boulevard
Suite 300
Baton Rouge
Baton Rouge, LA 70802
225-325-8700
Email: keith.fernandez@butlersnow.com
*ATTORNEY TO BE NOTICED*

**Michelle Marney White**
Louisiana Department of Justice
PO Box 94005
Baton Rouge, LA 70804
225-326-6000
Email: whitemi@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Patricia Hill Wilton**
Louisiana State Board of Medical Examiners
630 Camp Street
New Orleans, LA 70130
504-568-1082
Email: pwilton@lsbme.la.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**James M. LeBlanc**
*Secretary of the Louisiana Department of*
*Public Safety and Corrections, in his*
*official capacity*

represented by **Edmond Wade Shows**
(See above for address)
*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Angelique Duhon Freel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michelle Marney White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patricia Hill Wilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Louisiana Department of Public Safety and Corrections**            represented by            **Edmond Wade Shows**
(See above for address)
*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Angelique Duhon Freel**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Michelle Marney White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patricia Hill Wilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Darrel Vannoy**                    represented by    **Edmond Wade Shows**
*Warden of Angola*                                     (See above for address)
                                                       *TERMINATED: 06/07/2017*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Mary E. Roper**
                                                       (See above for address)
                                                       *TERMINATED: 02/15/2019*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Randal J. Robert**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Allena Brooke McCain**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Andrea Leigh Barient**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Andrew Blanchfield**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Caroline M Tomeny**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Chelsea Acosta Payne**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Colin Andrew Clark**
                                                       (See above for address)
                                                       *TERMINATED: 10/10/2019*
                                                       *ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Raman Singh**                           represented by   **Edmond Wade Shows**
*MD*                                                        (See above for address)
*TERMINATED: 09/11/2018*                                    *TERMINATED: 06/07/2017*
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Stacye Falgout**                                    represented by   **Edmond Wade Shows**
(See above for address)
*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brendan R. Schneiderman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Randy Lavespere**
*MD*

represented by **Edmond Wade Shows**
(See above for address)
*TERMINATED: 06/07/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal J. Robert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allena Brooke McCain**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*

*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sherwood Poret**                    represented by    **Edmond Wade Shows**
*RN*                                                    (See above for address)
                                                        *TERMINATED: 06/07/2017*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Mary E. Roper**
                                                        (See above for address)
                                                        *TERMINATED: 02/15/2019*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Randal J. Robert**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Allena Brooke McCain**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrea Leigh Barient**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrew Blanchfield**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Caroline M Tomeny**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Chelsea Acosta Payne**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Colin Andrew Clark**
                                                        (See above for address)
                                                        *TERMINATED: 10/10/2019*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Connell Lee Archey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cynthia Park**                     represented by   **Edmond Wade Shows**
*ACNP*                                                (See above for address)
                                                      *TERMINATED: 06/07/2017*
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Mary E. Roper**
                                                      (See above for address)
                                                      *TERMINATED: 02/15/2019*
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Randal J. Robert**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Allena Brooke McCain**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Andrea Leigh Barient**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Blanchfield**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Caroline M Tomeny**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Chelsea Acosta Payne**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Colin Andrew Clark**
(See above for address)
*TERMINATED: 10/10/2019*
*ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Grant Joseph Guillot**
(See above for address)
*TERMINATED: 12/29/2016*
*ATTORNEY TO BE NOTICED*

**James L. Hilburn**
(See above for address)
*TERMINATED: 09/19/2016*
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Dufrene**
(See above for address)
*TERMINATED: 10/04/2017*
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Morrison**                            represented by    **Randal J. Robert**
*M. D.*                                                       (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Allena Brooke McCain**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Andrea Leigh Barient**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Andrew Blanchfield**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Angelique Duhon Freel**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Caroline M Tomeny**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Chelsea Acosta Payne**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Colin Andrew Clark**
                                                             (See above for address)
                                                             *TERMINATED: 10/10/2019*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Connell Lee Archey**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Elizabeth Baker Murrill**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **George Holmes**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Jeffrey K. Cody**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*ATTORNEY TO BE NOTICED*

**Michelle Marney White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tracy Falgout**                    represented by    **Randal J. Robert**
*R.N.*                                                  (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Allena Brooke McCain**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrea Leigh Barient**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrew Blanchfield**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Angelique Duhon Freel**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brendan R. Schneiderman**
                                                        (See above for address)
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Caroline M Tomeny**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Colin Andrew Clark**
                                                        (See above for address)
                                                        *TERMINATED: 10/10/2019*
                                                        *ATTORNEY TO BE NOTICED*

**Connell Lee Archey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Baker Murrill**
(See above for address)
*ATTORNEY TO BE NOTICED*

**George Holmes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey K. Cody**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Clifton Conine , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keith Fernandez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mary E. Roper**
(See above for address)
*TERMINATED: 02/15/2019*
*ATTORNEY TO BE NOTICED*

**Michelle Marney White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nora Ahmed**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/20/2015 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 053N-1236257.), filed by Lionel Tolbert, Clyde Carter, Kentrell Parker, Joseph Lewis, Jr, Otto Barrera, Farrell Sampier, Edward Giovanni, Rufus White, Cedric Evans, Reginald George, Ricky D. Davis, John Wayne Tonubbee. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Attachment Civil Cover Sheet, # 5 Attachment Summons (Cain), # 6 Attachment Summons (Lamartiniere), # 7 Attachment Summons (Leblanc), # 8 Attachment Summons (DOC))(Montagnes, Mercedes) Modified on 5/21/2015 to flatten summons and replace (LLH). (Entered: 05/20/2015) |
| 05/21/2015 | 2 | Summons Issued as to Burl Cain, Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections. (NOTICE: Counsel shall print and serve both the summons and all attachments in accordance with Federal Rule of Civil Procedure |

| | | |
|---|---|---|
| | | 4.) (LLH) (Entered: 05/21/2015) |
| 06/05/2015 | 3 | Ex-Parte MOTION for Admission to Appear Pro Hac Vice for Jeffrey B. Dubner (Filing fee $100.00, Receipt Number 053N-1243024) by All Plaintiffs. (Attachments: # 1 Exhibit Declaration of Jeffrey Dubner, # 2 Attachment Cert. of Good Standing NY, # 3 Attachment Cert. of Good Standing DC)(Compa, Elizabeth) Modified on 6/5/2015 to edit text(ELW). (Entered: 06/05/2015) |
| 06/05/2015 | | MOTION(S) REFERRED: 3 MOTION for Jeffrey B. Dubner to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-1243024). This motion is now pending before the USMJ. (ELW) (Entered: 06/05/2015) |
| 06/05/2015 | 4 | ORDER granting 3 Motion for Jeffrey Dubner to Appear Pro Hac Vice. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 6/5/2015. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SMG) (Entered: 06/05/2015) |
| 06/22/2015 | 5 | SUMMONS Returned Executed by Lionel Tolbert, Clyde Carter, Kentrell Parker, Joseph Lewis, Jr, Otto Barrera, Farrell Sampier, Edward Giovanni, Rufus White, Cedric Evans, Reginald George, Ricky D. Davis, John Tonubbee. All Defendants. (Compa, Elizabeth) (Entered: 06/22/2015) |
| 06/22/2015 | 6 | MOTION to Designate Additional Lead Counsel by All Plaintiffs. (Compa, Elizabeth) Modified to edit text on 6/23/2015 (BCL). Modified to substitute document per rec. doc. 9 on 6/26/2015 (BCL). (Entered: 06/22/2015) |
| 06/23/2015 | 7 | MOTION for Extension of Time Responsive Pleadings by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order)(Hilburn, James) Modified on 6/26/2015 to edit event(LLH). (Entered: 06/23/2015) |
| 06/23/2015 | | MOTION(S) REFERRED: 6 MOTION to Designate Additional Lead Counsel, 7 MOTION for Extension of Time Responsive Pleadings. This motion is now pending before the USMJ. (BCL) (Entered: 06/23/2015) |
| 06/24/2015 | 8 | MOTION Substitute Document 6 *To Address Typographical Errors* by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Corrected Motion to Designate Additional Lead Counsel)(Compa, Elizabeth) (Entered: 06/24/2015) |
| 06/25/2015 | | MOTION(S) REFERRED: 7 MOTION for Extension of Time Responsive Pleadings. This motion is now pending before the USMJ. (LLH) (Entered: 06/25/2015) |
| 06/25/2015 | | MOTION(S) REFERRED: 8 MOTION Substitute Document 6 *To Address Typographical Errors*. This motion is now pending before the USMJ. (LLH) (Entered: 06/25/2015) |
| 06/26/2015 | 9 | ORDER granting 8 Motion to Substitute Document 6. Plaintiffs may substitute the Attachment to the Motion (R. Doc. 8-1) for the previously filed Document 6. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 6/26/2015. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SMG) (Entered: 06/26/2015) |
| 06/26/2015 | 10 | ORDER granting 7 Motion for Extension of Time to Answer. Burl Cain, Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections answer due 7/8/2015. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 6/26/2015. (LLH) (Entered: 06/26/2015) |
| 06/26/2015 | 11 | ORDER denying 6 Motion to Designate Additional Lead Counsel. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 6/26/2015. (LLH) (Entered: 06/26/2015) |

| | | |
|---|---|---|
| 07/08/2015 | 12 | MOTION for Daniel A. Small to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-1257656) by All Plaintiffs. (Attachments: # 1 Attachment Declaration of Daniel Small, # 2 Attachment Cert. of Good Standing Maryland, # 3 Attachment Cert. of Good Standing DC)(Compa, Elizabeth) (Entered: 07/08/2015) |
| 07/08/2015 | 13 | ANSWER and Affirmative Defenses to 1 Complaint, with Jury Demand by Burl Cain, Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections.(Hilburn, James) Modified on 7/9/2015 to edit text (LLH). (Entered: 07/08/2015) |
| 07/09/2015 | 14 | 90 DAY CONFERENCE ORDER: Scheduling Conference set for 8/20/2015 at 01:30 PM in chambers before Magistrate Judge Richard L. Bourgeois Jr. Status Report due by 8/6/2015. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 7/9/2015. (JSL) (Entered: 07/09/2015) |
| 07/09/2015 | | MOTION(S) REFERRED: 12 MOTION for Daniel A. Small to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-1257656). This motion is now pending before the USMJ. (LLH) (Entered: 07/09/2015) |
| 07/09/2015 | 15 | ORDER granting 12 Motion for Daniel A. Small to Appear Pro Hac Vice. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 7/9/2015. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 07/09/2015) |
| 07/28/2015 | 16 | There is no # 16 Docket Entry, filed in error by Case Administrator. (LLH) (Entered: 07/28/2015) |
| 08/06/2015 | 17 | Joint STATUS REPORT by All Plaintiffs. (Dubner, Jeffrey) (Main Document 17 replaced on 8/17/2015 in accordance with record document 19) (NLT). (Entered: 08/06/2015) |
| 08/07/2015 | 18 | MOTION to Amend 17 Status Report by All Plaintiffs. (Attachments: # 1 Attachment Revised Joint Status Report, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 08/07/2015) |
| 08/10/2015 | | MOTION(S) REFERRED: 18 MOTION to Amend 17 Status Report . This motion is now pending before the USMJ. (JDL) (Entered: 08/10/2015) |
| 08/17/2015 | 19 | ORDER granting 18 Motion to Amend Pleading. Revised Status Report (R. Doc. 18-1) attached to Motion to Amend (R. Doc. 18) be substituted for the previously filed Joint Status Report (R. Doc. 17). Signed by Magistrate Judge Richard L. Bourgeois, Jr on 8/17/2015. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/17/2015) |
| 08/19/2015 | 20 | Notice to Counsel: The scheduling conference set for 8/20/2015 at 1:30 p.m. before United States Magistrate Judge Richard L. Bourgeois, Jr. is CANCELLED. A scheduling order will be issued as appropriate. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/19/2015) |
| 08/28/2015 | 21 | MOTION for Leave to File Supplemental and Amended Answer and Affirmative Defenses by Burl Cain, Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections. (Attachments: # 1 Proposed Pleading; Proposed Order, # 2 Proposed Pleading; Supplemental and Amending Answer and Affirmative Defenses)(Hilburn, James) (Entered: 08/28/2015) |
| 08/31/2015 | | MOTION(S) REFERRED: 21 MOTION for Leave to File Supplemental and Amended Answer and Affirmative Defenses . This motion is now pending before the USMJ. (LLH |

| | | (Entered: 08/31/2015) |
|---|---|---|
| 08/31/2015 | 22 | ORDER granting 21 MOTION for Leave to File Supplemental and Amended Answer and Affirmative Defenses. The Supplemental and Amended Answer and Affirmative Defenses (R. Doc. 21-2) shall be filed. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/31/2015. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/31/2015) |
| 08/31/2015 | 23 | SUPPLEMENTAL AND AMENDED ANSWER to 1 Complaint by Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections. (NLT) (Entered: 09/02/2015) |
| 09/11/2015 | 24 | SCHEDULING ORDER: In accordance with FRCP 16(b), the following discovery deadlines are established. Amended Pleadings due by 3/11/2016. F.R.C.P. 26(a)(1) disclosures due by 9/18/2015. Discovery due by 6/6/2016. Plaintiff`s Expert Witness List due by 3/18/2016. Filing motion for class certification: 7/6/2016. Defendant`s Expert Witness List due by 4/18/2016. Plaintiff`s Expert Reports due by 7/6/2016. Pltfs' Rebuttal: 9/6/2016. Defendant`s Expert Reports due by 8/5/2016. Discovery from Experts due by 10/7/2016. Motions shall be filed by 11/7/2016. Proposed Pretrial Order due by 2/27/2017. Pretrial Conference set for 3/16/2017 at 01:30 PM in chambers before Chief Judge Brian A. Jackson. Motions In Limine shall be filed by 3/27/2017. Responses to Motions In Limine shall be filed by 4/17/2017. Affidavit of Settlement Efforts due by 4/17/2017. Joint jury instructions, voir dire, verdict forms, and trial briefs due by 5/1/2017. Jury Trial set for 5/15/2017-6/5/2017 at 08:30 AM in Courtroom 2 before Chief Judge Brian A. Jackson. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/11/2015. (JSL) (Entered: 09/11/2015) |
| 12/14/2015 | 25 | Consent MOTION for Entry of Protective Order Governing Protected and Individually Identifiable Health Information by All Plaintiffs. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Order)(Sirmon, Candice) Modified on 12/14/2015 to edit text (LLH). (Entered: 12/14/2015) |
| 12/14/2015 | | MOTION(S) REFERRED: 25 Consent MOTION for Protective Order . This motion is now pending before the USMJ. (LLH) (Entered: 12/14/2015) |
| 12/16/2015 | 26 | ORDER granting 25 Consent Motion for Entry of Protective Order. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/16/2015. (JDL) (Entered: 12/16/2015) |
| 12/16/2015 | 27 | PROTECTIVE ORDER. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/16/2015. (JDL) (Entered: 12/16/2015) |
| 02/23/2016 | 28 | MOTION for Temporary Restraining Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Exhibit Exhibit 6, # 8 Exhibit Exhibit 7, # 9 Exhibit Exhibit 8, # 10 Exhibit Exhibit 9, # 11 Exhibit Exhibit 10, # 12 Exhibit Exhibit 11, # 13 Exhibit Exhibit 12, # 14 Exhibit Exhibit 13)(Montagnes, Mercedes) (Entered: 02/23/2016) |
| 02/23/2016 | 29 | Notice to Counsel: A Status Conference regarding the MOTION for Temporary Restraining Order filed by All Plaintiffs on February 23, 2016 [ doc. 28] is set for 2/24/2016 at 02:30 PM in Chambers before Chief Judge Brian A. Jackson. ( There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 02/23/2016) |
| 02/24/2016 | 30 | Notice to Counsel: Status Conference reset for 2/24/2016 at 02:15 PM in chambers before Chief Judge Brian A. Jackson. |

| | | |
|---|---|---|
| | | Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) THIS IS A TIME CHANGE ONLY!(PJH) (Entered: 02/24/2016) |
| 02/24/2016 | 31 | MEMORANDUM in Opposition to 28 MOTION for Temporary Restraining Order filed by Burl Cain, Stephanie Lamartiniere, James LeBlanc, The Louisiana Department of Public Safety and Corrections. (Attachments: # 1 Exhibit Exhibit A)(Hilburn, James) (Entered: 02/24/2016) |
| 02/24/2016 | 32 | MOTION to Withdraw 28 MOTION for Temporary Restraining Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) (Entered: 02/24/2016) |
| 02/24/2016 | 34 | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Status Conference held on 2/24/2016. Matter discussed. (Court Reporter C. Smith-Neely.) (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 03/02/2016) |
| 03/01/2016 | 33 | ORDER: In view of attached correspondence from counsel,Telephone Conference set for 3/2/2016 at 10:00 AM before Magistrate Judge Richard L. Bourgeois Jr. Pltfs' counsel shall initiate the conference call to chambers at 225-389-3602. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 3/1/2016. (JSL) (Entered: 03/01/2016) |
| 03/02/2016 | 35 | Minute Entry/ORDER for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Conference held on 3/2/2016. The parties discussed the status of this matter and the best way to proceed to request modification of the current deadlines. Specifically, the parties have yet to finalize an agreed upon protocol for the production of electronically stored information (ESI). The parties anticipated filing a motion seeking modification of the scheduling order within a week. (LLH) (Entered: 03/02/2016) |
| 03/04/2016 | 36 | Joint MOTION to Revise Scheduling Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Proposed Order)(Montagnes, Mercedes) (Entered: 03/04/2016) |
| 03/07/2016 | | MOTION(S) REFERRED: 36 Joint MOTION to Revise Scheduling Order . This motion is now pending before the USMJ. (LLH) (Entered: 03/07/2016) |
| 03/09/2016 | 37 | ORDER granting 32 Motion to Withdraw 28 Motion for Temporary Restraining Order. Signed by Chief Judge Brian A. Jackson on 3/8/2016. (LLH) (Entered: 03/09/2016) |
| 03/11/2016 | 38 | ORDER granting 36 Motion to Extend Discovery Deadlines. Amended Pleadings due by 6/10/2016. Discovery due by 9/6/2016. Plaintiff`s Expert Witness List due by 3/18/2016. Defendant`s Expert Witness List due by 4/18/2016. Plaintiff`s Expert Reports due by 9/9/2016. Defendant`s Expert Reports due by 9/30/2016. Discovery from Experts due by 11/4/2016. Motions shall be filed by 11/30/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 03/11/2016. (NLT) (Entered: 03/11/2016) |
| 03/11/2016 | 39 | NOTICE TO COUNSEL: A letter requesting a status conference is not the appropriate method to present this matter to the court. Plaintiff should file a motion, in accordance with the Federal Rules of Civil Procedure . Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 3/11/2016. (LLH) Modified on 3/11/2016 to edit text (LLH). (Entered: 03/11/2016) |
| 04/01/2016 | 40 | |

| | | |
|---|---|---|
| | | Joint STATUS REPORT *Regarding Production of ESI Discovery* by All Plaintiffs. (Compa, Elizabeth) (Entered: 04/01/2016) |
| 05/06/2016 | 41 | Joint STATUS REPORT by All Plaintiffs. (Dubner, Jeffrey) (Entered: 05/06/2016) |
| 06/08/2016 | 42 | RULE 37 MOTION to Compel Production, Amend Deadline, and Award Sanctions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F, # 8 Exhibit Exhibit G)(Montagnes, Mercedes) Modified on 6/9/2016 to add motions and edit text (LLH). Added MOTION for Extension of Discovery Deadlines, MOTION for Sanctions on 6/9/2016 (LLH). (Entered: 06/08/2016) |
| 06/09/2016 | | MOTION(S) REFERRED: 42 MOTION to Compel MOTION for Extension of Discovery Deadlines MOTION for Sanctions. This motion is now pending before the USMJ. (LLH) (Entered: 06/09/2016) |
| 06/10/2016 | 43 | ORDER: Defendants shall file any response to Plaintiffs' 42 Motion on or before 6/16/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/9/2016. (LLH) (Entered: 06/10/2016) |
| 06/10/2016 | 44 | AMENDED COMPLAINT against All Defendants, filed by Lionel Tolbert, Clyde Carter, Kentrell Parker, Joseph Lewis, Jr, Otto Barrera, Farrell Sampier, Edward Giovanni, Rufus White, Cedric Evans, Reginald George, Ricky D. Davis, John Tonubbee. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Compa, Elizabeth) (Entered: 06/10/2016) |
| 06/16/2016 | 45 | MEMORANDUM in Opposition to Rule 37 Motion to Compel Production, Amend Deadlines, and Award Sanctions filed by All Defendants. (Attachments: # 1 Exhibit A, # 2 Exhbit B, # 3 Affidavit)(Cody, Jeffrey) Modified on 6/24/2016 to edit text. (EDC). (Entered: 06/16/2016) |
| 06/17/2016 | 46 | NOTICE OF NON-COMPLIANCE with LR 7(g) as to 45 Memorandum in Opposition to Motion. REQUIRED CORRECTION: A combined Motion for Leave to Exceed the Page Limits and Motion to Strike the Incorrect Pleading must filed within 24 hours of this notice. Otherwise, the original filing may be stricken by the Court without further notice. (EDC) (Entered: 06/17/2016) |
| 06/17/2016 | 47 | MOTION to Withdraw *Request for Extension* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Compa, Elizabeth) (Entered: 06/17/2016) |
| 06/17/2016 | | MOTION(S) REFERRED: 47 MOTION to Withdraw *Request for Extension*. This motion is now pending before the USMJ. (EDC) (Entered: 06/17/2016) |
| 06/17/2016 | 48 | MOTION for Leave to File Excess Pages *and to Strike Rec. Doc. 45* by All Defendants. (Cody, Jeffrey) (Entered: 06/17/2016) |
| 06/17/2016 | 49 | MOTION to Enroll Elizabeth Baker Murrill, Colin Clark and Andrea Barient as Additional Attorney by All Defendants. (Cody, Jeffrey) (Entered: 06/17/2016) |
| 06/20/2016 | | MOTION(S) REFERRED: 49 MOTION to Enroll Elizabeth Baker Murrill, Colin Clark and Andrea Barient as Additional Attorney , 48 MOTION for Leave to File Excess Pages *and to Strike Rec. Doc. 45*. This motion is now pending before the USMJ. (EDC) (Entered: 06/20/2016) |
| 06/20/2016 | 50 | MOTION for Leave to File Reply to Defendants' Opposition *to Plaintiffs' Rule 37 Motion to Compel* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed |

| | | |
|---|---|---|
| | | Pleading; Reply, # 3 Attachment Proposed Order)(Compa, Elizabeth) (Entered: 06/20/2016) |
| 06/20/2016 | 51 | ORDER granting 49 Motion to Enroll Additional Counsel of Record. Added attorneys Elizabeth Baker Murrill, Colin Andrew Clark & Andrea Leigh Barient as additional counsel for Burl Cain/Darrel Vannoy in his official capacity as Warden of LSP, Stephanie Lamartiniere, James LeBlanc & The Louisiana Department of Public Safety and Corrections. Signed by Magistrate Judge Richard L. Bourgeois, Jr. 6/20/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 06/20/2016) |
| 06/21/2016 | | MOTION(S) REFERRED: 50 MOTION for Leave to File Reply to Defendants' Opposition *to Plaintiffs' Rule 37 Motion to Compel*. This motion is now pending before the USMJ. (EDC) (Entered: 06/21/2016) |
| 06/21/2016 | 52 | ORDER granting 47 Motion to Withdraw Request for Extension of Deadline to File an Amended Complaint. The request to extend the deadline contained in the Motion to Compel (R. Doc. 42) will be considered withdrawn. In all other respects, the motion remains pending. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/21/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 06/21/2016) |
| 06/21/2016 | 53 | ORDER granting 48 Motion for Leave to File Excess Pages. Defendants opposition [R. Doc. 45] will be considered by the court. Striking and refilling is unnecessary. In the future, leave of court should be sought prior to filing any brief in excess of the permissible page limits. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/21/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 06/21/2016) |
| 06/21/2016 | 54 | ORDER granting 50 MOTION for Leave to File Reply to Defendants' Opposition to Plaintiffs' Rule 37 Motion to Compel. The Reply [50-2] shall be filed. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/21/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 06/21/2016) |
| 06/21/2016 | 57 | REPLY in Support of 42 Rule 37 MOTION to Compel Production, Amend Deadlines, and Award Sanctions filed by All Plaintiffs. (LLH) (Entered: 06/23/2016) |
| 06/23/2016 | 55 | Notice to Counsel: Telephone Conference set for 6/17/2016 at 02:00 PM before Magistrate Judge Richard L. Bourgeois Jr. The purpose of the conference is to discuss the status of discovery. Plaintiffs' counsel shall initiate the conference call to chambers at (225) 389-3602. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(JSL) (Entered: 06/23/2016) |
| 06/23/2016 | 56 | Notice to Counsel of CORRECTED DATE: Telephone Conference set for 6/24/2016 at 02:00 PM before Magistrate Judge Richard L. Bourgeois Jr. The purpose of the conference is to discuss the status of discovery. Plaintiffs' counsel shall initiate the conference call to chambers at (225) 389-3602. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(JSL) (Entered: 06/23/2016) |
| 06/24/2016 | 58 | MOTION for Extension of Time to File Answer to 44 Amended Complaint, by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Hilburn, James) (Entered: 06/24/2016) |
| 06/24/2016 | 59 | ORDER/Minute Entry for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Conference held on 6/24/2016. During conference, parties |

| | | |
|---|---|---|
| | | discussed procedural posture of the case, including status of outstanding production at issue in Pltfs Motion to Compel (R. Doc. 42). IT IS ORDERED that Pltfs Motion to Compel (R. Doc. 42) is GRANTED in part to the extent Pltfs requested a deadline for production of the remaining documents, absent those documents undergoing further privilege review. In all other respects, the Motionremains pending. Deft ORDERED to produce remaining documents, absent those marked as potentially privileged & undergoing further privilege review, on or before 7/1/2016. Telephone Conference set for 7/1/2016 at 10:30 AM before Magistrate Judge Richard L. Bourgeois Jr. to discuss status of the production due by 7/1/2016. Additional Telephone Conference set for 7/12/2016 at 10:30 AM before Magistrate Judge Richard L. Bourgeois Jr. to follow-up on any remaining discovery related issues. (JSL) (Entered: 06/24/2016) |
| 06/27/2016 | | MOTION(S) REFERRED: 58 MOTION for Extension of Time to File Answer to 44 Amended Complaint, . This motion is now pending before the USMJ. (TNB) (Entered: 06/27/2016) |
| 07/01/2016 | 60 | Minute Entry/Order for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Status Conference held on 7/1/2016. The parties are ORDERED to submit a letter to the Court by 5:00 p.m. on 7/11/2016, summarizing the parties' discussions, the status of the 11,000 documents currently undergoing privilege review, and any proposed modification of any deadlines. The letter should note any productions that have already been made, the amount of documents that have been reviewed and any production (or anticipated production) of a privilege log. The telephone status conference on 7/12/2016 at 10:30 a.m. before Magistrate Judge Richard L. Bourgeois, Jr. will remain as scheduled. (SGO) (Entered: 07/01/2016) |
| 07/01/2016 | 61 | ORDER granting 58 Motion for Extension of Time to Answer. Responsive pleadings shall be filed on or before July 8, 2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/1/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 07/01/2016) |
| 07/08/2016 | 62 | ANSWER to 44 Amended Complaint and Affirmative Defenses by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy.(Hilburn, James) Modified on 7/11/2016 to edit the text (TNB). (Entered: 07/08/2016) |
| 07/12/2016 | 63 | ORDER: The Court's 38 Scheduling Order is modified as follows: Discovery due by 9/13/2016. Motion for Class Certification due 9/30/2016. Plaintiff`s Expert Reports due by 9/16/2016. Defendant`s Expert Reports due by 10/7/2016. Plaintiff's Rebuttal Reports due by 10/28/2016. Discovery from Experts due by 11/18/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/12/2016. (SGO) (Entered: 07/12/2016) |
| 07/12/2016 | 64 | Minute Entry for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr. Telephone Conference held on 7/12/2016. Mercedes Hardy Montagnes, Jefffrey Dubner and Elizabeth O'K Compa were present for Plaintiff. James Hilburn, Andrea Leigh Barient and Jeffrey K. Cody were present for Defendants. the parties are ORDERED to submit a letter to the Court by 5:00 p.m. Central Standard Time on July 25, 2016, summarizing the status of the privilege review and any related document production(s). The Court will hold a telephone status conference on July 26, 2016 at 10:30 a.m. By separate Order, the Court will modify certain existing deadlines as agreed upon by the parties and referenced in the attached letter.Telephone Conference set for 7/26/2016 at 10:30 AM before Magistrate Judge Richard L. Bourgeois Jr. (Attachments: # 1 Exhibit) (ELW) (Entered: 07/13/2016) |
| 07/19/2016 | 65 | MOTION to File Plaintiffs' Second Amended Complaint regarding 44 Amended Complaint by All Plaintiffs. (Attachments: # 1 Exhibit Exhibit 1, # 2 Proposed Pleading; |

| | | |
|---|---|---|
| | | Second Amended Complaint, # 3 Attachment Proposed Order)(Compa, Elizabeth) Modified on 7/19/2016 to edit text.(EDC). (Entered: 07/19/2016) |
| 07/19/2016 | | MOTION(S) REFERRED: 65 MOTION to Amend 44 Amended Complaint, . This motion is now pending before the USMJ. (EDC) (Entered: 07/19/2016) |
| 07/22/2016 | 66 | MOTION for Protective Order Pursuant to FRCP 26(c) by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibits A & B, # 3 Proposed Pleading; Proposed Protective Order)(Hilburn, James) Modified on 7/22/2016 to edit text. (EDC). (Entered: 07/22/2016) |
| 07/22/2016 | 67 | MOTION for Expedited Consideration of 66 MOTION for Protective Order Pursuant to FRCO 26(c) by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading; Proposed Order)(Hilburn, James) Modified on 7/22/2016 to edit text. (EDC). (Entered: 07/22/2016) |
| 07/22/2016 | | MOTION(S) REFERRED: 66 MOTION for Protective Order , 67 MOTION for Expedited Hearing on 66 MOTION for Protective Order . This motion is now pending before the USMJ. (EDC) (Entered: 07/22/2016) |
| 07/24/2016 | 68 | RESPONSE in Opposition to 66 MOTION for Protective Order filed by All Plaintiffs. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Montagnes, Mercedes) (Entered: 07/24/2016) |
| 07/25/2016 | 69 | ORDER granting 67 Motion for Expedited Hearing. The underlying motion has been briefed and the parties should be prepared to discuss potential resolution of the motion on the conference call set for 7/26/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/25/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 07/25/2016) |
| 07/25/2016 | 70 | ORDER granting 65 Motion to Amend. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 07/25/2016. (ELW) (Entered: 07/26/2016) |
| 07/25/2016 | 71 | AMENDED COMPLAINT against Burl Cain, Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, filed by Lionel Tolbert, Clyde Carter, Kentrell Parker, Joseph Lewis, Jr., Otto Barrera, Farrell Sampier, Edward Giovanni, Rufus White, Cedric Evans, Reginald George, Ricky D. Davis, John Tonubbee.(ELW) (Entered: 07/26/2016) |
| 07/26/2016 | 72 | MOTION for Leave to Depose by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Compa, Elizabeth) (Entered: 07/26/2016) |
| 07/26/2016 | 73 | MOTION for Expedited Hearing on 72 MOTION for Leave to Depose by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Compa, Elizabeth) (Entered: 07/26/2016) |
| 07/26/2016 | 75 | Minute Entry/Order for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Status Conference held on 7/26/2016. Defendants shall submit a letter to the Court by 5:00 p.m. on 8/5/2016, summarizing the status of the privilege log being prepared. Concerning Plaintiff's request for costs associated with their 42 Motion to Compel, Plaintiffs are ordered to file an affidavit of costs by 8/5/2016. Defendants may file their response, if any, on or before 8/12/2016. The Defendants' 66 Motion for Protective Order will be denied in a separate order providing reasons. (SGO) (Entered: |

| | | 07/27/2016) |
|---|---|---|
| 07/27/2016 | 74 | ORDER granting (R. Doc. 73) Motion for Expedited Consideration of MOTION for Leave to Depose by All Plaintiffs (R. Doc. 72). Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/27/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 07/27/2016) |
| 07/27/2016 | | MOTION(S) REFERRED: 72 MOTION for Leave to Depose . This motion is now pending before the USMJ. (SGO) (Entered: 07/27/2016) |
| 07/27/2016 | 76 | ORDER granting 72 MOTION for Leave to Depose. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/27/2016. (SGO) (Entered: 07/27/2016) |
| 07/27/2016 | 77 | ORDER denying 66 Motion for Protective Order. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 07/27/2016. (ELW) (Entered: 07/27/2016) |
| 07/27/2016 | 78 | Minute Entry for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr. Telephone Conference held on 7/27/2016. Mercedes Montagnes (Plaintiffs counsel) and James Hilburn (Defendants counsel) spoke with Judge Richard L. Bourgeois, Jr. about a dispute that arose between the parties. The Court heard the dispute and provided guidance. (ELW) (Entered: 07/28/2016) |
| 07/29/2016 | 79 | MOTION to Enroll Additional Counsel by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading; Proposed Order)(Hilburn, James) Modified on 8/1/2016 to edit text (ELW). (Entered: 07/29/2016) |
| 08/01/2016 | | MOTION(S) REFERRED: 79 MOTION to Enroll Grant J. Guillot as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 08/01/2016) |
| 08/03/2016 | 80 | Rule 37 MOTION to Compel Production of 67 Medical Records and Award Sanctions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Attachment)(Compa, Elizabeth) Modified on 8/3/2016 to edit text.(EDC). (Attachment 5 replaced on 8/3/2016) (EDC). Modified on 8/3/2016 to rotate pages. (EDC). (Entered: 08/03/2016) |
| 08/03/2016 | 81 | MOTION for Expedited Consideration on 80 MOTION to Compel *Production of 67 Medical Records* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Compa, Elizabeth) Modified on 8/3/2016 to edit text. (EDC). (Entered: 08/03/2016) |
| 08/03/2016 | | MOTION(S) REFERRED: 81 MOTION for Expedited Hearing on 80 MOTION to Compel *Production of 67 Medical Records* , 80 MOTION to Compel *Production of 67 Medical Records*. This motion is now pending before the USMJ. (EDC) (Entered: 08/03/2016) |
| 08/03/2016 | 82 | ORDER granting 79 Motion to Enroll Additional Attorney. Added attorney Grant Joseph Guillot Defendants, Darrel Vannoy, in his official capacity as Warden of the Louisiana State Penitentiary (LSP), Stephanie Lamartiniere, in her official capacity as Assistant Warden for Health Services, James M. LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, and the Louisiana Department of Public Safety and Corrections. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/3/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/03/2016) |

| 08/05/2016 | 83 | ORDER granting 81 Motion for Expedited Consideration on 80 Motion to Compel. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 08/05/2016. (ELW) (Entered: 08/05/2016) |
|---|---|---|
| 08/05/2016 | | Set Response Deadline as to 80 MOTION to Compel Production of 67 Medical Records must be filed by August 10, 2016. (ELW) (Entered: 08/05/2016) |
| 08/05/2016 | 84 | AFFIDAVIT in Support of 42 MOTION to Compel MOTION for Extension of Discovery Deadlines MOTION for Sanctions filed by All Plaintiffs. (Compa, Elizabeth) (Entered: 08/05/2016) |
| 08/05/2016 | 85 | MOTION for Leave to Depose Plaintiff Alton Adams by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 86 | MOTION for Leave to Depose Plaintiff Otto Barrera by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 87 | MOTION for Leave to Depose Plaintiff Alton Batiste by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 88 | MOTION for Leave to Depose Plaintiff Clyde Carter by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 89 | MOTION for Leave to Depose Plaintiff Ian Cazenave by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 90 | MOTION for Leave to Depose Plaintiff Ricky Davis by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 91 | MOTION for Leave to Depose Plaintiff Reginald George by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 92 | MOTION for Leave to Depose Plaintiff Kentrell Parker by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 93 | MOTION for Leave to Depose Plaintiff Farrell Sampier by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |

| 08/05/2016 | 94 | MOTION for Leave to Depose Plaintiff Lionel Tolbert by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
|---|---|---|
| 08/05/2016 | 95 | MOTION for Leave to Depose Plaintiff John Tonubbee by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 96 | MOTION for Leave to Depose Plaintiff Edward Washington by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/05/2016 | 97 | MOTION for Leave to Depose Plaintiff Rufus White by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Hilburn, James) (Entered: 08/05/2016) |
| 08/08/2016 | 98 | MOTION to Enroll Kathryn A. Dufrene as Additional Attorney by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading;)(Hilburn, James) (Entered: 08/08/2016) |
| 08/08/2016 | | MOTION(S) REFERRED: 90 MOTION for Leave to Depose Plaintiff Ricky Davis , 94 MOTION for Leave to Depose Plaintiff Lionel Tolbert , 88 MOTION for Leave to Depose Plaintiff Clyde Carter , 86 MOTION for Leave to Depose Plaintiff Otto Barrera , 97 MOTION for Leave to Depose Plaintiff Rufus White , 93 MOTION for Leave to Depose Plaintiff Farrell Sampier , 91 MOTION for Leave to Depose Plaintiff Reginald George , 85 MOTION for Leave to Depose Plaintiff Alton Adams , 95 MOTION for Leave to Depose Plaintiff John Tonubbee , 87 MOTION for Leave to Depose Plaintiff Alton Batiste , 92 MOTION for Leave to Depose Plaintiff Kentrell Parker , 96 MOTION for Leave to Depose Plaintiff Edward Washington , 98 MOTION to Enroll Kathryn A. Dufrene as Additional Attorney , 89 MOTION for Leave to Depose Plaintiff Ian Cazenave . This motion is now pending before the USMJ. (NLT) (Entered: 08/08/2016) |
| 08/08/2016 | | MOTION(S) REFERRED: 98 MOTION to Enroll Kathryn A. Dufrene as Additional Attorney . This motion is now pending before the USMJ. (EDC) (Entered: 08/08/2016) |
| 08/09/2016 | 99 | ANSWER to 71 Second Amended Complaint and Affirmative Defenses by Burl Cain, Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy.(Cody, Jeffrey) Modified on 8/10/2016 to edit text. (EDC). (Entered: 08/09/2016) |
| 08/10/2016 | 100 | ORDER granting 98 Motion to Enroll Additional Attorney. Added attorney Kathryn Dufrene as additional counsel for Darrell Vannoy, in his official capacity as Warden of the Louisiana State Penitentiary, Stephanie Lamartiniere, and James M LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/10/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/10/2016) |
| 08/10/2016 | 101 | MEMORANDUM in Opposition to 80 MOTION to Compel *Production of 67 Medical Records* filed by All Defendants. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit |

| | | |
|---|---|---|
| | | 3)(Cody, Jeffrey) (Attachment 3 replaced on 8/11/2016) (EDC). Modified on 8/11/2016 to rotate pages. (EDC). (Entered: 08/10/2016) |
| 08/11/2016 | 102 | ORDER granting 85 , 86 , 87 , 88 , 89 , 90 , 91 , 92 , 93 , 94 , 95 , 96 , and 97 MOTION for Leave to Depose Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/11/2016. (LLH) (Entered: 08/11/2016) |
| 08/11/2016 | 103 | MOTION for Leave to File Reply in Support of Rule 37 Motion to Compel Production (Rec. Doc. 80) by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Proposed Pleading;)(Montagnes, Mercedes) Modified on 8/11/2016 to edit the text (TNB). (Entered: 08/11/2016) |
| 08/11/2016 | | MOTION(S) REFERRED: 103 MOTION for Leave to File Reply . This motion is now pending before the USMJ. (TNB) (Entered: 08/11/2016) |
| 08/12/2016 | 104 | RESPONSE to 84 Affidavit in Support of Motion filed by All Defendants. (Cody, Jeffrey) (Entered: 08/12/2016) |
| 08/15/2016 | 105 | MOTION for Leave to File Reply to Defendants' Response to Affidavit of Jeff Dubner by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Reply re Affidavit, # 2 Attachment Proposed Order)(Compa, Elizabeth) (Entered: 08/15/2016) |
| 08/16/2016 | 106 | MOTION to Substitute Justin P. Harrison in place of Candice C. Sirmon as Attorney by All Plaintiffs. (Sirmon, Candice) (Entered: 08/16/2016) |
| 08/16/2016 | 107 | MOTION for Leave to Depose Inmates by Stephanie Lamartiniere, James M LeBlanc, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Attachment, # 4 Attachment, # 5 Attachment, # 6 Attachment, # 7 Attachment, # 8 Attachment, # 9 Attachment, # 10 Attachment, # 11 Attachment, # 12 Attachment, # 13 Attachment, # 14 Attachment, # 15 Attachment)(Hilburn, James) (Entered: 08/16/2016) |
| 08/17/2016 | 108 | ORDER granting 107 MOTION for Leave to Depose Plaintiffs. Pursuant to FRCP 30(a)(2)(B) and the agreement between the parties, the depositions may proceed as noticed. The parties may also reschedule any deposition, if necessary and upon agreement by the parties, without further seeking leave of court. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/17/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/17/2016) |
| 08/18/2016 | | MOTION(S) REFERRED: 106 MOTION to Substitute Justin P. Harrison in place of Candice C. Sirmon as Attorney , 105 MOTION for Leave to File Reply to Defendants' Response to Affidavit of Jeff Dubner . This motion is now pending before the USMJ. (NLT) (Entered: 08/18/2016) |
| 08/19/2016 | 109 | ORDER granting 103 MOTION for Leave to File Reply in Support of Rule 37 Motion to Compel Production (R. Doc. 103). Plaintiffs' Reply (R. Doc. 103-2) and its attached Exhibits (R. Docs. 103-3 to 103-7) shall be filed. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/19/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/19/2016) |
| 08/19/2016 | 110 | ORDER granting 105 MOTION for Leave to File Reply to Defendants' Response to Affidavit of Jeff Dubner. Plaintiffs' Reply (R. Doc. 105-1) shall be filed. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/19/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/19/2016) |

| | | |
|---|---|---|
| 08/19/2016 | 111 | REPLY to 101 Memorandum in Opposition to 80 MOTION to Compel *Production of 67 Medical Records* filed by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(SGO) (Entered: 08/22/2016) |
| 08/19/2016 | 112 | REPLY to 104 Response to 84 Affidavit in Support of 42 MOTION to Compel filed by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (SGO) (Entered: 08/22/2016) |
| 08/22/2016 | 113 | MOTION to Withdraw *Jury Demand* by All Defendants. (Attachments: # 1 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 08/22/2016) |
| 08/23/2016 | | MOTION(S) REFERRED: 113 MOTION to Withdraw *Jury Demand*. This motion is now pending before the USMJ. (TNB) (Entered: 08/23/2016) |
| 08/24/2016 | 114 | ORDER granting 106 Motion to Substitute Attorney. Justin Paul Harrison substituted as counsel for Plaintiffs in this matter, replacing Candice C. Sirmon. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/24/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/24/2016) |
| 08/24/2016 | 115 | ORDER granting 113 Motion to Withdraw Jury Demand. This matter will proceed as a bench trial. The deadline to file proposed jury instructions, voir dire and verdict forms are cancelled. The parties are advised of Chief Judge Jackson's Pretrial Order Instructions found on the Court's website requiring, among other things, the submission of Trial Briefs in non-jury trials. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 08/24/2016. (NLT) (Entered: 08/24/2016) |
| 08/24/2016 | 116 | MOTION to Withdraw 80 MOTION to Compel *Production of 67 Medical Records* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) (Entered: 08/24/2016) |
| 08/25/2016 | 117 | Joint MOTION to Revise Scheduling Order and Set Status Conference by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment)(Montagnes, Mercedes) Modified on 8/25/2016 to edit text. (EDC). Modified on 8/29/2016 to edit event (LLH). (Entered: 08/25/2016) |
| 08/25/2016 | | MOTION(S) REFERRED: 116 MOTION to Withdraw 80 MOTION to Compel *Production of 67 Medical Records* . This motion is now pending before the USMJ. (EDC) (Entered: 08/25/2016) |
| 08/25/2016 | | MOTION(S) REFERRED: 117 Joint MOTION Revise Scheduling Order . This motion is now pending before the USMJ. (EDC) (Entered: 08/25/2016) |
| 08/25/2016 | 118 | ORDER granting 116 Motion to Withdraw 80 MOTION to Compel *Production of 67 Medical Records*. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/25/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/25/2016) |
| 08/25/2016 | 119 | ORDER finding as moot 80 Motion to Compel. The Motion to Compel has been withdrawn [R. Doc. 118]. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/25/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 08/25/2016) |

| 08/29/2016 | 120 | ORDER granting 117 Joint Motion to Extend Discovery Deadlines. Discovery due by 9/30/2016. Motions for Class Certification due by 10/14/2016. Plaintiff`s Expert Reports due by 10/3/2016. Defendant`s Expert Reports due by 10/24/2016. Plaintiff's Rebuttal due by 11/14/2016. Discovery from Experts due by 12/9/2016. Dispositive and Daubert Motions shall be filed by 1/6/2017. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/29/2016. (LLH) (Entered: 08/29/2016) |
|---|---|---|
| 08/31/2016 | 121 | ORDER: Plaintiffs' Motion to Compel is DENIED to the extent it seeks an award for costs pursuant to Rule 37(a)(5). In all other respects, the Motion to Compel is denied as moot. Because the Motion to Compel was granted in part and denied in part, and because the Court finds that Defendants' failure to meet the parties agreed upon deadlines was substantially justified and that awarding expenses under the circumstances would be unjust, each party shall bear its own costs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 08/31/2016. (NLT) (Entered: 08/31/2016) |
| 09/12/2016 | 122 | Revised MOTION to Substitute MARY E. ROPER in place of JAMES L. HILBURN as Attorney *of Record* by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order)(Guillot, Grant) Modified on 9/16/2016 to replace documents as per Order #124 (LLH). (Entered: 09/12/2016) |
| 09/13/2016 | | MOTION(S) REFERRED: 122 MOTION to Substitute MARY E. ROPER in place of JAMES L. HILBURN as Attorney *of Record*. This motion is now pending before the USMJ. (EDC) (Entered: 09/13/2016) |
| 09/13/2016 | 123 | MOTION for Leave to Substitute Motion to Withdraw and Substitute Counsel of Record by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order_Motion for Leave, # 2 Proposed Pleading; Revised Motion to Withdraw and Substitute Counsel of Record, # 3 Proposed Pleading; Proposed Order_Motion to Withdraw and Substitute Counsel of Record)(Hilburn, James) Modified on 9/13/2016 to edit text.(EDC). (Entered: 09/13/2016) |
| 09/13/2016 | | MOTION(S) REFERRED: 123 MOTION for Leave to File Revised Motion to Withdraw and Substitute Counsel of Record . This motion is now pending before the USMJ. (EDC) (Entered: 09/13/2016) |
| 09/14/2016 | 124 | ORDER granting 123 MOTION for Leave to File Revised Motion to Withdraw and Substitute Counsel of Record filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. IT IS FURTHER ORDERED that the Revised Motion to Withdraw & Substitute Counsel of Record (R. Doc. 123-2) shall be substituted in the record in place of the motion to withdraw (R. Doc. 122). Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/14/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 09/14/2016) |
| 09/19/2016 | 125 | ORDER granting 122 Motion to Substitute Attorney. Mary E. Roper substituted as counsel of record for Defendants Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections and Darrel Vannoy replacing James L. Hilburn. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/19/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 09/19/2016) |
| 09/27/2016 | 126 | MOTION to Compel *Discovery Responses* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Ex. A, # 3 Exhibit Ex. B, # 4 Exhibit Ex. C, # 5 |

| | | |
|---|---|---|
| | | Exhibit Ex. D, # <u>6</u> Exhibit Ex. E, # <u>7</u> Exhibit Ex. F, # <u>8</u> Exhibit Ex. G, # <u>9</u> Exhibit Ex. H, # <u>10</u> Attachment Proposed Order)(Compa, Elizabeth) (Entered: 09/27/2016) |
| 09/28/2016 | <u>127</u> | Rule 37(a)(1) Certification for Motion to Compel in support of <u>126</u> MOTION to Compel Discovery Responses filed by All Plaintiffs. (Compa, Elizabeth) Modified on 9/28/2016 to edit text. (EDC). (Entered: 09/28/2016) |
| 09/28/2016 | | MOTION(S) REFERRED: <u>126</u> MOTION to Compel *Discovery Responses*. This motion is now pending before the USMJ. (EDC) (Entered: 09/28/2016) |
| 09/30/2016 | <u>128</u> | Joint MOTION for Extension of Discovery Deadlines by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Attachment Proposed Order)(Compa, Elizabeth) (Entered: 09/30/2016) |
| 10/03/2016 | | MOTION(S) REFERRED: <u>128</u> Joint MOTION for Extension of Discovery Deadlines . This motion is now pending before the USMJ. (TNB) (Entered: 10/03/2016) |
| 10/06/2016 | <u>129</u> | ORDER granting <u>128</u> Motion to Extend Discovery Deadlines. The parties are ORDERED to submit a joint status report on October 28, 2016 informing the Court as to the status of Item Nos. 1, 2, 4, 5, 6 and 9, and providing proposed deadlines for any Items that remain outstanding as of October 28, 2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/06/2016. (NLT) (Entered: 10/06/2016) |
| 10/07/2016 | <u>130</u> | Joint MOTION for Revision to Scheduling Order by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Attachment)(Montagnes, Mercedes) Modified on 10/7/2016 to edit the text (TNB). (Entered: 10/07/2016) |
| 10/12/2016 | <u>131</u> | Supplemental MEMORANDUM in Support of <u>126</u> MOTION to Compel *Discovery Responses* filed by All Plaintiffs. (Montagnes, Mercedes) Modified on 10/13/2016 to edit the text (TNB). (Entered: 10/12/2016) |
| 10/13/2016 | <u>132</u> | MEMORANDUM in Opposition to <u>126</u> MOTION to Compel *Discovery Responses* filed by All Defendants. (Attachments: # <u>1</u> Exhibit Exhibit A, # <u>2</u> Exhibit Exhibit B, # <u>3</u> Exhibit Exhibit C)(Guillot, Grant) (Entered: 10/13/2016) |
| 10/13/2016 | | MOTION(S) REFERRED: <u>130</u> Joint MOTION for Extension of Discovery Deadlines . This motion is now pending before the USMJ. (SGO) (Entered: 10/13/2016) |
| 10/14/2016 | <u>133</u> | MOTION for Class Certification by All Plaintiffs. (Attachments: # <span style="color:red">STRICKEN FROM THE RECORD</span> (1) Memorandum in Support, # <u>2</u> Exhibit 1, # <u>3</u> Exhibit 2, # <u>4</u> Exhibit 3, # <u>5</u> Exhibit 4, # <u>6</u> Exhibit 5, # <u>7</u> Exhibit 6, # <u>8</u> Exhibit 7, # <u>9</u> Exhibit 8, # <u>10</u> Exhibit 9, # <u>11</u> Exhibit 10, # <u>12</u> Exhibit 11, # <u>13</u> Exhibit 12, # <u>14</u> Exhibit 13, # <u>15</u> Exhibit 14, # <u>16</u> Exhibit 15, # <u>17</u> Exhibit 16, # <u>18</u> Exhibit 17, # <u>19</u> Exhibit 18, # <u>20</u> Exhibit 19, # <u>21</u> Exhibit 20, # <u>22</u> Exhibit 21, # <u>23</u> Exhibit 22, # <u>24</u> Exhibit 23, # <u>25</u> Exhibit 24, # <u>26</u> Exhibit 25, # <u>27</u> Exhibit 26, # <u>28</u> Exhibit 27, # <u>29</u> Exhibit 28, # <u>30</u> Exhibit 29, # <u>31</u> Exhibit 30, # <u>32</u> Exhibit 31, # <u>33</u> Exhibit 32, # <u>34</u> Exhibit 33, # <u>35</u> Exhibit 34, # <u>36</u> Exhibit 35, # <u>37</u> Exhibit 36, # <u>38</u> Exhibit 37, # <u>39</u> Exhibit 38, # <u>40</u> Exhibit 39, # <u>41</u> Exhibit 40, # <u>42</u> Exhibit 41, # <u>43</u> Exhibit 42, # <u>44</u> Exhibit 43, # <u>45</u> Exhibit 44, # <u>46</u> Exhibit 45, # <u>47</u> Exhibit 46)(Montagnes, Mercedes) Modified on 10/17/2016 to edit text. (EDC). (Attachments 4,41 & 42 replaced on 10/17/2016) (EDC). Modified on 10/17/2016 to rotate pages.(EDC). Modified on 10/21/2016 to remove memo as it has been stricken (LLH). Modified on 10/24/2016 (NLT). (Attachment 42 replaced on 5/16/2017 as per rec doc 257) (NLT). (Entered: 10/14/2016) |
| 10/17/2016 | 134 | NOTICE OF NON-COMPLIANCE with LR 7(g) as to <u>133</u> Motion to Certify Class,,,,. REQUIRED CORRECTION: A combined Motion for Leave to Exceed the Page Limits |

| | | |
|---|---|---|
| | | and Motion to Strike the Incorrect Pleading must filed within 24 hours of this notice. Otherwise, the original filing may be stricken by the Court without further notice. (EDC) (Entered: 10/17/2016) |
| 10/17/2016 | 135 | MOTION for Leave to Exceed the Page Limits and to Strike the Incorrect Pleading by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment)(Montagnes, Mercedes) Modified on 10/18/2016 to edit text. (EDC). Added MOTION to Strike on 10/18/2016 (EDC). (Entered: 10/17/2016) |
| 10/17/2016 | 136 | MOTION to Compel Production by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment Rule 37 Certificate, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Proposed Pleading;)(Dufrene, Kathryn) Modified on 10/18/2016 to edit text. (EDC). (Entered: 10/17/2016) |
| 10/18/2016 | | MOTION(S) REFERRED: 136 MOTION to Compel . This motion is now pending before the USMJ. (EDC) (Entered: 10/18/2016) |
| 10/18/2016 | 137 | ORDER: Any response to Defendants' 136 Motion to Compel Production must be filed by Plaintiffs on or before 11/2/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/18/2016. (LLH) (Entered: 10/18/2016) |
| 10/18/2016 | 138 | ORDER Granting 130 Joint MOTION for Extension of Discovery Deadlines. Status Report due by 10/28/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/18/2016. (ELW) (Entered: 10/18/2016) |
| 10/21/2016 | 139 | ORDER granting 135 Motion for Leave to File Excess Pages and Strike Incorrect Pleading. Signed by Chief Judge Brian A. Jackson on 10/20/2016. (LLH) (Entered: 10/21/2016) |
| 10/21/2016 | 140 | MEMORANDUM in Support of 133 MOTION to Certify Class filed by All Plaintiffs. (LLH) (Entered: 10/21/2016) |
| 10/24/2016 | 141 | MOTION for Extension of Time to Submit the Expert Report of Dr. Jacqueline Moore by All Defendants. (Attachments: # 1 Proposed Pleading;)(Dufrene, Kathryn) Modified on 10/25/2016 to edit event (LLH). (Entered: 10/24/2016) |
| 10/24/2016 | 142 | MOTION to Withdraw 126 MOTION to Compel *Discovery Responses* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) (Entered: 10/24/2016) |
| 10/25/2016 | | MOTION(S) REFERRED: 142 MOTION to Withdraw 126 MOTION to Compel *Discovery Responses* , 141 MOTION for Extension of Time to Submit the Expert Report of Dr. Jacqueline Moore. This motion is now pending before the USMJ. (EDC) (Entered: 10/25/2016) |
| 10/25/2016 | 143 | ORDER granting 142 Motion to Withdraw 126 MOTION to Compel *Discovery Responses*. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/25/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 10/25/2016) |
| 10/25/2016 | 144 | ORDER denying 126 Motion to Compel. The Motion has been withdrawn. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/25/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 10/25/2016) |
| 10/25/2016 | 145 | ORDER granting 141 Motion for Extension of Time to Submit the Expert Report of Dr. Jacqueline Moore. Defendant`s Expert Report of Dr. Jacqueline Moore due by |

| | | |
|---|---|---|
| | | 10/27/2016. Plaintiff's Rebuttal due by 11/17/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/25/2016. (LLH) (Entered: 10/25/2016) |
| 10/25/2016 | 146 | MOTION to Withdraw 136 MOTION to Compel *Production* by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 10/25/2016) |
| 10/26/2016 | | MOTION(S) REFERRED: 146 MOTION to Withdraw 136 MOTION to Compel *Production*. This motion is now pending before the USMJ. (ELW) (Entered: 10/26/2016) |
| 10/28/2016 | 147 | Joint STATUS REPORT by All Defendants. (Cody, Jeffrey) Modified on 11/7/2016 to replace document as per Order #151 (LLH). (Entered: 10/28/2016) |
| 10/31/2016 | 148 | ORDER granting 146 Motion to Withdraw 136 MOTION to Compel. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/31/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 10/31/2016) |
| 10/31/2016 | 149 | ORDER denying 136 Motion to Compel. The Motion has been withdrawn. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/31/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 10/31/2016) |
| 10/31/2016 | 150 | MOTION for Leave to Substitute Joint Status Report by All Defendants. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 10/31/2016) |
| 11/01/2016 | | MOTION(S) REFERRED: 150 MOTION for Leave to Substitute Joint Status Report . This motion is now pending before the USMJ. (EDC) (Entered: 11/01/2016) |
| 11/01/2016 | 151 | ORDER granting 150 MOTION for Leave to Substitute Corrected Status Report. R. Doc. 150-2 shall be substituted in the place of R. Doc. 147. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/1/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 11/01/2016) |
| 11/03/2016 | 152 | MOTION to Compel Production of Documents by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Rule 37 Certification, # 3 Exhibit)(Montagnes, Mercedes) Modified on 11/4/2016 to edit text (ELW). Modified on 11/10/2016 (ELW). (Entered: 11/03/2016) |
| 11/03/2016 | 153 | MOTION to Substitute Counsel by All Plaintiffs. (Harrison, Justin) Modified on 11/4/2016 to edit text (ELW). (Entered: 11/03/2016) |
| 11/03/2016 | 161 | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: At the request of Counsel, Status Conference held on 11/3/2016. The Court will withhold ruling on Motion to Certify Class at this time. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 11/16/2016) |
| 11/04/2016 | 154 | Joint MOTION for Extension of Time to File Opposing and Supplemental Memoranda in regards to Plaintiffs Motion for Class Certification by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order)(Guillot, Grant) (Entered: 11/04/2016) |
| 11/04/2016 | | MOTION(S) REFERRED: 152 MOTION to Compel . This motion is now pending before the USMJ. (ELW) (Entered: 11/04/2016) |
| 11/04/2016 | | MOTION(S) REFERRED: 154 Joint MOTION for Extension of Time to File Opposing and Supplemental Memoranda in regards to Plaintiffs Motion for Class Certification. This |

| | | |
|---|---|---|
| | | motion is now pending before the USMJ. (ELW) (Entered: 11/04/2016) |
| 11/07/2016 | | MOTION(S) REFERRED: 153 MOTION to Substitute Bruce W. Hamilton in place of Justin P. Harrison as Attorney . This motion is now pending before the USMJ. (NLT) (Entered: 11/07/2016) |
| 11/07/2016 | | Motions No Longer Referred: 154 Joint MOTION for Extension of Time to File Opposing and Supplemental Memoranda in regards to Plaintiffs Motion for Class Certification. This motion is now pending before the USDJ. (NLT) (Entered: 11/07/2016) |
| 11/07/2016 | 155 | ORDER as to 152 Motion to Compel. Any response to Plaintiffs Motion to Compel must be filed by Defendants on or before November 14, 2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/07/2016. (ELW) Modified on 11/10/2016 to edit text (ELW). (Entered: 11/07/2016) |
| 11/07/2016 | 156 | ORDER granting 153 Motion to Substitute Attorney. Bruce Warfield substituted as counsel for plaintiffs Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington and Rufus White replacing Justin P. Harrison as counsel for plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/7/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 11/07/2016) |
| 11/07/2016 | | Set Deadlines as to 152 MOTION to Compel . Replies due by 11/14/2016. (ELW) (Entered: 11/10/2016) |
| 11/11/2016 | 157 | Revised Second Joint STATUS REPORT by All Defendants. (Dufrene, Kathryn) Modified on 11/15/2016 to edit text. (EDC). Modified to substitute the document per rec. doc. 160 on 11/15/2016 (SGO). (Main Document 157 replaced as ordered by the court on 11/16/2016) (ELW). (Entered: 11/11/2016) |
| 11/14/2016 | 158 | MEMORANDUM in Opposition to 152 MOTION to Compel Production of Documents filed by All Defendants. (Attachments: # 1 Exhibit)(Dufrene, Kathryn) Modified on 11/15/2016 to edit text. (EDC). (Entered: 11/14/2016) |
| 11/15/2016 | 159 | MOTION for Leave to Substitute Second Joint Status Report by All Defendants. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 11/15/2016) |
| 11/15/2016 | | MOTION(S) REFERRED: 159 MOTION for Leave to Substitute Second Joint Status Report . This motion is now pending before the USMJ. (SGO) (Entered: 11/15/2016) |
| 11/15/2016 | 160 | ORDER granting 159 MOTION for Leave to Substitute Second Joint Status Report. The Clerk shall substitute the revised report [R. Doc. 159-2] in the place of the previously filed version [R. Doc. 157]. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/15/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 11/15/2016) |
| 11/16/2016 | 162 | MOTION for Leave to File Reply in Support of Rule 37 Motion to Compel Production (Rec. Doc. 152) by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit, # 4 Attachment)(Montagnes, Mercedes) Modified on 11/17/2016 to edit text.(EDC). (Entered: 11/16/2016) |
| 11/17/2016 | 163 | ORDER granting 162 MOTION for Leave to File Reply in Support of Rule 37 Motion to Compel Production. The Reply Memorandum [162-2] and attachment [162-3] shall be filed. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/17/2016. (This is a |

| | | |
|---|---|---|
| | | TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 11/17/2016) |
| 11/17/2016 | 164 | REPLY in Support of to 152 MOTION to Compel Production of Documents filed by Plaintiffs. (Attachments: # 1 Exhibit)(LLH) (Entered: 11/21/2016) |
| 11/21/2016 | 165 | Joint MOTION to Extend Expert Discovery Deadline by All Defendants. (Attachments: # 1 Proposed Pleading;)(Dufrene, Kathryn) Modified on 11/22/2016 to edit text.(EDC). (Entered: 11/21/2016) |
| 11/22/2016 | | MOTION(S) REFERRED: 165 Joint MOTION for Extension of Discovery Deadlines . This motion is now pending before the USMJ. (EDC) (Entered: 11/22/2016) |
| 11/28/2016 | 166 | ORDER granting 165 Motion to Extend Discovery Deadlines. Discovery from Experts shall be completed by 12/23/2016. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/28/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Bourgeois, Richard) (Entered: 11/28/2016) |
| 11/28/2016 | 167 | MOTION to Enroll Derek Warden as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 11/28/2016) |
| 11/29/2016 | 168 | ORDER granting 154 Joint MOTION for Extension of Time to File Opposing and Supplemental Memoranda in regards to Plaintiffs Motion for Class Certification. The deadline for Defendants' submission of their memorandum in opposition to Plaintiff's Motion for Class Certification is extended thirty days. Signed by Chief Judge Brian A. Jackson on 11/29/2016. (EDC) (Entered: 11/29/2016) |
| 11/29/2016 | 169 | ORDER granting 167 Motion to Enroll Additional Attorney. Added attorney Derek Allen Warden as additional counsel for Plaintiffs, Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington and Rufus White. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/29/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 11/29/2016) |
| 12/05/2016 | 170 | Joint MOTION for Extension of Time to File Response to 133 MOTION to Certify Class , 154 Joint MOTION for Extension of Time to File Opposing and Supplemental Memoranda in regards to Plaintiffs Motion for Class Certification by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order)(Guillot, Grant) (Entered: 12/05/2016) |
| 12/05/2016 | 171 | ORDER granting 170 Motion for Extension of Time to File Response. Signed by Chief Judge Brian A. Jackson on 12/05/2016. (ELW) (Entered: 12/05/2016) |
| 12/05/2016 | 172 | Joint MOTION for Clarification of 171 Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Montagnes, Mercedes) Modified on 12/7/2016 to edit text (LLH). (Entered: 12/05/2016) |
| 12/07/2016 | 173 | ORDER granting 152 Motion to Compel Production of Documents. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/7/2016. (LLH) (Entered: 12/07/2016) |
| 12/12/2016 | 174 | MEMORANDUM in Opposition to 133 MOTION to Certify Class filed by All Defendants. (Guillot, Grant) (Entered: 12/12/2016) |
| 12/12/2016 | 175 | ORDER denying as moot 172 Motion to Clarify Order on Second Joint Motion to Extend Deadlines for Submission of Opposing and Supplemental Memoranda in Regards to |

| | | |
|---|---|---|
| | | Plaintiffs Motion for Class Certification. Signed by Chief Judge Brian A. Jackson on 12/12/2016. (NLT) (Entered: 12/12/2016) |
| 12/12/2016 | 176 | MOTION for Relief From Order Denying Joint Motion to Clarify Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) Modified on 12/13/2016 to edit text (ELW). (Entered: 12/12/2016) |
| 12/16/2016 | 177 | ORDER granting 176 MOTION for Relief From Order Denying Joint Motion to Clarify Order. The Court's Order Denying as Moot the Joint Motion to Clarify Order on Second Joint Motion to Extend Deadlines for Submission of Opposing and Supplemental Memorandum in Regards to Plaintiff's Motion for Class Certification 175 is VACATED. The deadline for Plaintiff's submission of any supplemental memorandum in support of their Motion for Class Certification is extended to 12/19/2016. Signed by Chief Judge Brian A. Jackson on 12/15/2016. (EDC) (Entered: 12/16/2016) |
| 12/16/2016 | 178 | Unopposed MOTION for Leave to File Supplemental Memorandum in Opposition to Plaintiffs' Motion for Class Certification by All Defendants. (Attachments: # 1 Proposed Pleading; Supplemental Memorandum in Opposition to Plaintiffs' Motion for Class Certification, # 2 Proposed Pleading; Proposed Order)(Guillot, Grant) (Entered: 12/16/2016) |
| 12/19/2016 | 179 | MOTION for Leave to File Reply Memorandum by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment)(Montagnes, Mercedes) Modified on 12/21/2016 to edit text. (EDC). (Entered: 12/19/2016) |
| 12/19/2016 | 180 | Additional Exhibits to 179 MOTION for Leave to File Reply by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Montagnes, Mercedes) (Entered: 12/19/2016) |
| 12/19/2016 | 181 | MOTION to File Supplement to Memorandum in Support of Motion for Class Certification on ADA pursuant to this Courts' December 16, 2016 Order (Rec. Doc. 1770 by All Plaintiffs. (Attachments: # 1 Proposed Pleading;, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Attachment)(Montagnes, Mercedes) Modified on 12/21/2016 to edit text. (EDC). (Attachment 12 replaced on 12/21/2016) (EDC). Modified on 12/21/2016 to rotate pages.(EDC). (Attachment 6 replaced on 12/23/2016) (EDC). Modified on 12/23/2016 to rotate pages. (EDC). (Entered: 12/19/2016) |
| 12/23/2016 | 182 | ORDER granting 178 Unopposed MOTION for Leave to File Supplemental Memorandum in Opposition to Plaintiffs' Motion for Class Certification filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Signed by Chief Judge Brian A. Jackson on 12/22/2016. (EDC) (Entered: 12/23/2016) |
| 12/23/2016 | 183 | SUPPLEMENTAL MEMORANDUM in Opposition to 133 MOTION to Certify Class filed by Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (EDC) (Entered: 12/23/2016) |
| 12/23/2016 | 184 | ORDER granting 181 MOTION to File Supplement to Memorandum in Support of Motion for Class Certification on ADA pursuant to this Courts' December 16, 2016 Order filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward |

| | | |
|---|---|---|
| | | Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Chief Judge Brian A. Jackson on 12/22/2016. (EDC) (Entered: 12/23/2016) |
| 12/23/2016 | 185 | Supplemental MEMORANDUM in Support of 133 MOTION to Certify Class filed by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 exhibits, # 2 exhibits, # 3 exhibits, # 4 exhibits, # 5 exhibits, # 6 exhibits, # 7 exhibits, # 8 exhibits, # 9 exhibits, # 10 exhibits, # 11 exhibits)(EDC) (Entered: 12/23/2016) |
| 12/23/2016 | 186 | ORDER granting 179 MOTION for Leave to File Reply Memorandum filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Chief Judge Brian A. Jackson on 12/22/2016. (EDC) (Entered: 12/23/2016) |
| 12/23/2016 | 187 | REPLY in Support to 174 Memorandum in Opposition to Motion to Certify Class, 133 MOTION to Certify Class filed by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington. (Attachments: # 1 exhibits, # 2 exhibits, # 3 exhibits, # 4 exhibits, # 5 exhibits, # 6 exhibits, # 7 exhibits, # 8 exhibits, # 9 exhibits)(EDC) (Entered: 12/23/2016) |
| 12/29/2016 | 188 | MOTION for Grant J. Guillot to Withdraw as Attorney by All Defendants. (Attachments: # 1 Proposed Pleading; Proposed Order)(Guillot, Grant) (Entered: 12/29/2016) |
| 12/29/2016 | 189 | ORDER granting 188 Motion to Withdraw as Attorney. Attorney Grant J. Guillot is withdrawn as counsel for defendants. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/29/2016. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 12/29/2016) |
| 01/01/2017 | 190 | MOTION for Leave to File two Summary Judgment Motions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) (Entered: 01/01/2017) |
| 01/06/2017 | 191 | First MOTION to Strike *Expert Testimony* Jacqueline Moore by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Montagnes, Mercedes) Modified on 1/10/2017 to edit text (LLH). (Attachment 1 replaced on 5/16/2017 as per rec doc 256) (NLT). (Entered: 01/06/2017) |
| 01/06/2017 | 192 | Second MOTION to Exclude *Expert Testimony* of David Thomas by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N)(Montagnes, Mercedes) Modified on 1/10/2017 to edit text (LLH). (Entered: 01/06/2017) |
| 01/06/2017 | 193 | First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims* by All Plaintiffs. (Attachments: # 1 Statement of Undisputed Facts, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U)(Montagnes, Mercedes) . Modified on 1/10/2017 to rotate and replace exhibit D (LLH). Modified on 8/29/2018 to replace Exhibit D as per Order # 452 (LLH). (Entered: 01/06/2017) |

| 01/06/2017 | 194 | Second MOTION for Partial Summary Judgment *Plaintiffs' Eighth Amendment Claim* by All Plaintiffs. (Attachments: # 1 Statement of Undisputed Facts, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V, # 25 Exhibit W, # 26 Exhibit X, # 27 Exhibit Y, # 28 Exhibit Z, # 29 Exhibit AA, # 30 Exhibit AB, # 31 Exhibit AC, # 32 Exhibit AD, # 33 Exhibit AE, # 34 Exhibit AF, # 35 Exhibit AG, # 36 Exhibit AH, # 37 Exhibit AI, # 38 Exhibit AJ, # 39 Exhibit AK, # 40 Exhibit AL, # 41 Exhibit AM, # 42 Exhibit AN, # 43 Exhibit AO, # 44 Exhibit AP, # 45 Exhibit AQ, # 46 Exhibit AR, # 47 Exhibit AS, # 48 Exhibit AT, # 49 Exhibit AU, # 50 Exhibit AV, # 51 Exhibit AW, # 52 Exhibit AX, # 53 Exhibit AY, # 54 Exhibit AZ, # 55 Exhibit BA, # 56 Exhibit BB, # 57 Exhibit BC, # 58 Exhibit BD, # 59 Exhibit BE, # 60 Exhibit BF, # 61 Exhibit BG, # 62 Exhibit BH, # 63 Exhibit BI, # 64 Exhibit BJ, # 65 Exhibit BK, # 66 Exhibit BL, # 67 Exhibit BM, # 68 Exhibit BN)(Montagnes, Mercedes) (Entered: 01/06/2017) |
| 01/06/2017 | 195 | SEALED MOTION for Leave to File Exhibits Under Seal by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit T, # 3 Exhibit V, # 4 Exhibit Z, # 5 Exhibit AP, # 6 Exhibit AZ, # 7 Exhibit BH, # 8 Exhibit BN, # 9 Proposed Order)(Montagnes, Mercedes) Modified on 1/9/2017 to edit text (LLH). (Entered: 01/06/2017) |
| 01/06/2017 | 196 | SEALED MOTION for Leave to File Motion for Summary Judgment and Exhibits Under Seal by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment, # 4 Memorandum in Support, # 5 Proposed Pleading;, # 6 Attachment, # 7 Statement of Undisputed Facts, # 8 Memorandum in Support, # 9 Proposed Pleading;, # 10 Exhibit Exhibit 1, # 11 Exhibit Exhibit 1(a), # 12 Exhibit Exhibit 1(b) - Part 1, # 13 Exhibit Exhibit 1(b) - Part 2, # 14 Exhibit Exhibit 1(b) - Part 3a, # 15 Exhibit Exhibit 1(b) - Part 3b, # 16 Exhibit Exhibit 1(b) - Part 4, # 17 Exhibit Exhibit 1(b) - Part 5, # 18 Exhibit Exhibit 1(b) - Part 6, # 19 Exhibit Exhibit 1(b) - Part 7a, # 20 Exhibit Exhibit 1(b) - Part 7b, # 21 Exhibit Exhibit 1(b) - Part 8, # 22 Exhibit Exhibit 1(b) - Part 9, # 23 Exhibit Exhibit 1(b) - Part 10a, # 24 Exhibit Exhibit 1(b) - Part 10b, # 25 Exhibit Exhibit 1(b) - Part 11, # 26 Exhibit Exhibit 1(b) - Part 12, # 27 Exhibit Exhibit 1(b) - Part 13, # 28 Exhibit Exhibit 1(b) - Part 14, # 29 Exhibit Exhibit 1(b) - Part 15, # 30 Exhibit Exhibit 2, # 31 Exhibit Exhibit 3, # 32 Exhibit Exhibit 4, # 33 Exhibit Exhibit 5, # 34 Exhibit Exhibit 6, # 35 Exhibit Exhibit 7, # 36 Exhibit Exhibit 8, # 37 Exhibit Exhibit 9, # 38 Exhibit Exhibit 10, # 39 Exhibit Exhibit 11, # 40 Exhibit Exhibit 12, # 41 Exhibit Exhibit 13, # 42 Exhibit Exhibit 14)(Dufrene, Kathryn) Modified on 1/9/2017 to rotate and replace exhbits #12, 16 and 19 (LLH). Modified on 2/7/2017 to replace exhibit as per Order #212 (LLH). (Entered: 01/06/2017) |
| 01/09/2017 | 197 | OPPOSITION to 185 Supplemental Memorandum in Support of Motion for Class Certification filed by All Defendants. (Dufrene, Kathryn) Modified on 1/10/2017 (NLT). (Entered: 01/09/2017) |
| 01/10/2017 | 198 | MOTION for Leave to Substitute Exhibit by All Defendants. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 01/10/2017) |
| 01/18/2017 | 199 | ORDER granting 190 MOTION for Leave to to File two Summary Judgment Motions. Signed by Chief Judge Brian A. Jackson on 01/18/2017. (ELW) (Entered: 01/18/2017) |
| 01/20/2017 | 200 | Unopposed MOTION to Reset the Trial Date and Set a Scheduling Conference by All Plaintiffs. (Attachments: # 1 Attachment)(Montagnes, Mercedes) Modified on 1/23/2017 to edit text. (EDC). (Entered: 01/20/2017) |

| | | |
|---|---|---|
| 01/27/2017 | 201 | MOTION for Leave to File Excess Pages by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Proposed Pleading;, # 4 Statement of Undisputed Facts Response, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, # 10 Exhibit F, # 11 Exhibit G, # 12 Exhibit H, # 13 Exhibit I, # 14 Exhibit J, # 15 Exhibit K, # 16 Exhibit L, # 17 Exhibit M, # 18 Exhibit N, # 19 Exhibit O)(Montagnes, Mercedes) (Entered: 01/27/2017) |
| 01/27/2017 | 202 | MEMORANDUM in Opposition to 191 MOTION to Exclude Testimony of Jacqueline Moore filed by All Defendants. (Attachments: # 1 Exhibit)(Dufrene, Kathryn) Modified on 1/31/2017 to edit the text (KAH). (Entered: 01/27/2017) |
| 01/27/2017 | 203 | MOTION for Leave to Exceed Page Limits by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Statement of Undisputed Facts, # 4 Proposed Pleading;, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Dufrene, Kathryn) (Attachment 7 replaced on 1/31/2017) (KAH). (Entered: 01/27/2017) |
| 01/27/2017 | 204 | MEMORANDUM in Opposition to 194 MOTION for Partial Summary Judgment filed by All Defendants. (Attachments: # 1 Statement of Undisputed Facts, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Dufrene, Kathryn) Modified on 1/31/2017 to edit the text(KAH). (Additional attachment(s) added on 2/14/2017: # 7 Exhibit) (ELW). Modified on 2/14/2017 added exhibit as granted by the court (ELW). (Entered: 01/27/2017) |
| 01/27/2017 | 205 | MEMORANDUM in Opposition to 192 Second MOTION to Strike *Expert Testimony of David Thomas* filed by All Defendants. (Attachments: # 1 Exhibit)(Dufrene, Kathryn) (Entered: 01/27/2017) |
| 02/03/2017 | 206 | MOTION for Leave to Supplement Defendants' memorandum in Oppositon to Motion for partial Summary Judgment [Rec Doc 204] with additional exhibits by All Defendants. (Attachments: # 1 Exhibit Proposed Exhibit, # 2 Memorandum in Support, # 3 Attachment Proposed Order)(Roper, Mary) Modified on 2/6/2017 to edit text (ELW). (Entered: 02/03/2017) |
| 02/06/2017 | 207 | ORDER granting 200 Motion to Reset the Trial Date and Set a Scheduling Conference. The bench trial currently scheduled for 5/15/2017 - 6/2/2017 is CONTINUED and RESET for 7/31/2017 - 08/15/2017. Oral argument shall be held on 3/16/2017, at 1:30 p.m. on all pending motions for summary judgment. The Court will address any further deadlines that the parties wish to reschedule at the hearing on 03/16/2017. Signed by Chief Judge Brian A. Jackson on 02/06/2017. (EDC) Modified on 2/9/2017 to put deadline on report. (EDC). (Entered: 02/06/2017) |
| 02/06/2017 | | Set/Reset Trial and Related Deadlines:, Set/Reset Deadlines: Bench Trial set for 7/31/2017 - 08/15/2017 at 08:30 AM in Courtroom 2 before Chief Judge Brian A. Jackson. (EDC) (Entered: 02/06/2017) |
| 02/06/2017 | 208 | ORDER granting 201 and 203 Motion for Leave to File Excess Pages. Granting 206 Unopposed MOTION for Leave to Supplement Defendants' Memorandum in Opposition. Signed by Chief Judge Brian A. Jackson on 02/06/2017. (ELW) (Entered: 02/06/2017) |
| 02/07/2017 | 209 | MOTION to Reinstate Original Trial Date by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) (Entered: 02/07/2017) |
| 02/07/2017 | 210 | SEALED MOTION for Leave to File Declaration Under Seal by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Montagnes, Mercedes) (Entered: 02/07/2017) |

| 02/07/2017 | 211 | MOTION for Expedited Consideration on 209 MOTION to Reinstate Original Trial Date by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) Modified on 2/7/2017 to edit text (LLH). (Entered: 02/07/2017) |
| --- | --- | --- |
| 02/07/2017 | 212 | ORDER granting 198 MOTION for Leave to Substitute Exhibit. Signed by Chief Judge Brian A. Jackson on 02/06/2017. (EDC) (Entered: 02/07/2017) |
| 02/07/2017 | 213 | MOTION to Set Status Conference by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Proposed Pleading;)(Dufrene, Kathryn) Modified on 2/8/2017 to edit text (LLH). (Attachment 1 replaced on 5/16/2017 as per rec doc 252) (NLT). (Entered: 02/07/2017) |
| 02/07/2017 | 214 | MOTION for Leave to Withdraw and Substitute *Document 213-1* by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 02/07/2017) |
| 02/08/2017 | 215 | MOTION for Expedited Consideration of 213 MOTION for Status Conference by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Dufrene, Kathryn) Modified on 2/8/2017 to edit text(LLH). (Entered: 02/08/2017) |
| 02/08/2017 | 216 | ORDER granting 213 and 215 Motion to Set Status Conference and Motion for Expedited Consideration on Motion to Set Status Conference. Status Conference set for 2/14/2017 at 10:30 AM in chambers before Chief Judge Brian A. Jackson. Signed by Chief Judge Brian A. Jackson on 02/08/2017. (EDC) (Entered: 02/08/2017) |
| 02/13/2017 | 217 | Notice to Counsel: Due to an unforeseen scheduling conflict, the Status Conference scheduled in this matter on 2/14/2017 is RESET for 2/24/2017 at 10:30 AM in chambers before Chief Judge Brian A. Jackson.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(PJH) (Entered: 02/13/2017) |
| 02/13/2017 | 218 | ORDER Vacating 208 Order on Motion for Leave to File Excess Pages. Signed by Chief Judge Brian A. Jackson on 02/13/2017. (ELW) (Entered: 02/13/2017) |
| 02/13/2017 | 219 | ORDER granting 203 MOTION for Leave to to Exceed Page Limit Pursuant to Local Rule 7(g) AND 206 MOTION for Leave to Exceed Page Limits. Signed by Chief Judge Brian A. Jackson on 02/13/2017. (ELW) (Entered: 02/13/2017) |
| 02/13/2017 | 220 | MEMORANDUM in Opposition to 193 First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims filed by Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, Darrel Vannoy. (Attachments: # 1 Statement of Undisputed Facts, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(ELW) (Entered: 02/14/2017)* |
| 02/23/2017 | 221 | Notice to Counsel: The status conference scheduled for 2/24/2017 is CANCELLED. Plaintiffs' Motion to Continue and/or Reschedule the Trial of this matter will be discussed at the Hearing scheduled March 16, 2017 at 1:30 p.m. in Courtroom 2.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures. |

| | | |
|---|---|---|
| | | (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 02/23/2017) |
| 02/23/2017 | | Set/Reset Hearings: Hearing on all pending Motions for Summary Judgment set for 3/16/2017 at 01:30 PM in Courtroom 2 before Chief Judge Brian A. Jackson. (PJH) Modified on 2/23/2017 (PJH). (Entered: 02/23/2017) |
| 02/27/2017 | 222 | Joint Pretrial Order by All Plaintiffs (For your free look at document, enter your ECF login and pw to confirm your right to view). (Attachments: # 1 Attachment A, # 2 Attachment B1, # 3 Attachment B2, # 4 Attachment C, # 5 Attachment D, # 6 Attachment E, # 7 Attachment F)(Montagnes, Mercedes) Modified to edit text on 2/28/2017 (SGO). (Entered: 02/27/2017) |
| 02/28/2017 | 223 | MOTION to Disqualify Judge by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Attachment)(Roper, Mary) (Entered: 02/28/2017) |
| 03/01/2017 | 224 | MOTION for Expedited Hearing on 223 MOTION to Disqualify Judge by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Roper, Mary) (Entered: 03/01/2017) |
| 03/02/2017 | 225 | ORDER granting 224 MOTION for Expedited Hearing on 223 MOTION to Disqualify Judge. The oral argument on all pending motions for summary judgment scheduled for 3/16/2017, at 1:30 is CONVERTED to oral argument on 223 Motion to Disqualify. Opposition to 223 Motion to Disqualify due on or before 3/13/2017. Signed by Chief Judge Brian A. Jackson on 3/2/2017. (LLH) (Entered: 03/02/2017) |
| 03/06/2017 | 226 | MOTION for Leave to File Reply to Rec. Doc. 192 by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment)(Montagnes, Mercedes) (Entered: 03/06/2017) |
| 03/06/2017 | 227 | MOTION for Leave to File Reply to Rec. Doc. 194 by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit, # 4 Attachment)(Montagnes, Mercedes) (Entered: 03/06/2017) |
| 03/06/2017 | 228 | MOTION for Leave to File Reply to Rec. Doc. 193 by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit A, # 4 Exhibit B, # 5 Attachment)(Montagnes, Mercedes) (Entered: 03/06/2017) |
| 03/06/2017 | 229 | MOTION to Amend 191 First MOTION to Strike *Expert Testimony* by All Plaintiffs. (Attachments: # 1 Proposed Pleading;, # 2 Attachment)(Montagnes, Mercedes) (Entered: 03/06/2017) |
| 03/07/2017 | 230 | Notice to Counsel: The Pretrial Conference scheduled in this matter for 3/16/2017 is cancelled. Hearing on Motion to Disqualify scheduled for 3/16/2017 at 1:30 p.m. will go forward as scheduled.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 03/07/2017) |
| 03/09/2017 | 231 | Notice to Counsel: Motion Hearing on Defendants' Motion to Disqualify is RESET for 3/16/2017 at 08:30 AM in Courtroom 2 before Chief Judge Brian A. Jackson. ***THIS IS A TIME CHANGE ONLY! |

| | | |
|---|---|---|
| | | Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 03/09/2017) |
| 03/13/2017 | 232 | MEMORANDUM in Opposition to 223 MOTION to Disqualify Judge filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Montagnes, Mercedes) (Entered: 03/13/2017) |
| 03/15/2017 | 233 | MOTION for Leave to File Reply *Memorandum in Support of Motion to Disqualify* by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Attachment)(Roper, Mary) (Entered: 03/15/2017) |
| 03/16/2017 | 234 | Minute Entry for proceedings held before Chief Judge Brian A. Jackson: Motion Hearing held on 3/16/2017 223 MOTION to Disqualify Judge filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc. The Court grants 233 MOTION for Leave to File Reply *Memorandum in Support of Motion to Disqualify* filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Counsel presents oral argument to the Court. Matter is taken under advisement. As stated by the Court, the current deadline for filing of Motions In Limine is extended. Motions in Limine shall be filed by 4/28/2017. (Court Reporter N. Breaux.) (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (PJH) (Entered: 03/16/2017) |
| 03/28/2017 | 235 | TRANSCRIPT REQUEST by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White for proceedings held on March 16 2017 before Judge Brian A. Jackson.. (Montagnes, Mercedes) (Entered: 03/28/2017) |
| 04/12/2017 | 236 | MOTION for Elizabeth Compa to Withdraw as Attorney by All Plaintiffs. (Compa, Elizabeth) (Entered: 04/12/2017) |
| 04/13/2017 | | MOTION(S) REFERRED: 236 MOTION for Elizabeth Compa to Withdraw as Attorney . This motion is now pending before the USMJ. (KAH) (Entered: 04/13/2017) |
| 04/13/2017 | 237 | ORDER granting 236 Motion to Withdraw as Counsel of Record. Attorney Elizabeth Compa is withdrawn as counsel for Plaintiffs in this matter. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 4/13/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 04/13/2017) |
| 04/17/2017 | 238 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Motion to Disqualify hearing before Judge Chief Judge Brian A. Jackson held on March 16, 2017. Court Reporter: Natalie W. Breaux.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 5/5/2017. Redacted Transcript Deadline set for 5/15/2017. Release of Transcript Restriction set for 7/13/2017. (Breaux, Natalie) (Entered: 04/17/2017) |
| 04/17/2017 | 239 | AFFIDAVIT by All Plaintiffs. (Montagnes, Mercedes) Modified to edit text on 4/18/2017 (SGO). (Entered: 04/17/2017) |
| 04/19/2017 | 240 | MOTION Substitute Pleading by All Plaintiffs. (Attachments: # 1 Attachment, # 2 Order)(Montagnes, Mercedes) Modified on 4/20/2017 to edit text (ELW). (Entered: 04/19/2017) |
| 04/20/2017 | 241 | ORDER granting 223 Motion to Disqualify Judge. Signed by Chief Judge Brian A. Jackson on 4/20/2017. (EDC) (Entered: 04/20/2017) |
| 04/20/2017 | | Case Reassigned to Judge Shelly D. Dick. Chief Judge Brian A. Jackson no longer assigned to the case. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (EDC) (Entered: 04/20/2017) |
| 04/23/2017 | 242 | MOTION for Leave to File First Amended Joint Pretrial Order by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment A, # 4 Attachment B, # 5 Attachment B (Supp), # 6 Attachment C, # 7 Attachment D, # 8 Attachment E, # 9 Attachment F)(Montagnes, Mercedes) (Entered: 04/23/2017) |
| 04/24/2017 | 243 | MOTION for Status Conference by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Montagnes, Mercedes) (Entered: 04/24/2017) |
| 04/25/2017 | 244 | ORDER granting 195 SEALED MOTION for Leave to File Exhibits Under Seal. Signed by Judge Shelly D. Dick on 4/25/2017. (SGO) (Entered: 04/25/2017) |
| 04/25/2017 | 245 | SEALED DOCUMENT Plaintiff's Exhibits to Motion for Partial Summary Judgment on Plaintiffs' Eighth Amendment Claim (Attachments: # 1 Exhibit V, # 2 Exhibit Z, # 3 Exhibit AP, # 4 Exhibit AZ, # 5 Exhibit BH, # 6 Exhibit BN) (SGO) (Entered: 04/25/2017) |
| 04/28/2017 | 246 | MOTION in Limine by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Montagnes, Mercedes) (Entered: 04/28/2017) |
| 04/28/2017 | 247 | MOTION for Request of Judicial Notice by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1)(Montagnes, Mercedes) (Entered: 04/28/2017) |
| 04/28/2017 | 248 | MOTION in Limine to Exclude Evidence and Testimony by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Roper, Mary) Modified on 5/10/2017 to edit text (ELW). (Entered: 04/28/2017) |
| 05/12/2017 | 249 | ORDER granting 196 Sealed Motion for Leave to File Motion for Summary Judgment and Exhibits Under Seal. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 250 | ORDER granting 201 Motion for Leave to File Excess Pages. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 251 | |

| | | ORDER granting 210 Sealed Motion for Leave to File Declaration Under Seal. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
|---|---|---|
| 05/12/2017 | 252 | ORDER granting [214 ]MOTION for Leave to Withdraw and Substitute Document 213-1. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 253 | ORDER granting 226 MOTION for Leave to File Reply to Rec. Doc. 192 filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 254 | ORDER granting 227 MOTION for Leave to File Reply to Rec. Doc. 194 filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 255 | ORDER granting 228 MOTION for Leave to File Reply to Rec. Doc. 193 filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 256 | ORDER granting 229 Motion to Amend 191 First Motion to Strike Expert Testimony. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 257 | ORDER granting 240 Motion to Substitute Exhibit. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 258 | ORDER granting 242 MOTION for Leave to File First Amended Joint Pretrial Order filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 259 | ORDER denying 209 Motion to Reinstate Original Trial Date. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 260 | ORDER granting 243 Motion for Conference Status Conference set for 6/7/2017 at 02:00 PM in Courtroom 3 before Judge Shelly D. Dick. Signed by Judge Shelly D. Dick on 5/12/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (DCB) (Entered: 05/12/2017) |
| 05/12/2017 | 261 | SEALED MOTION Summary Judgment by All Defendants. (Attachments: # 1 Statement of Undisputed Facts, # 2 Memorandum in Support, # 3 Exhibit 1, # 4 Exhibit 1a, # 5 |

| | | |
|---|---|---|
| | | Exhibit 1b Part 1, # 6 Exhibit 1b Part 2, # 7 Exhibit 1b Part 3a, # 8 Exhibit 1b Part 3b, # 9 Exhibit 1b Part 4, # 10 Exhibit 1b Part 5, # 11 Exhibit 1b Part 6, # 12 Exhibit 1b Part 7a, # 13 Exhibit 1b Part 7b, # 14 Exhibit 1b Part 8, # 15 Exhibit 1b Part 9, # 16 Exhibit 1b Part 10a, # 17 Exhibit 1b Part 10b, # 18 Exhibit 1b Part 11, # 19 Exhibit 1b Part 12, # 20 Exhibit 1b Part 13, # 21 Exhibit 1b Part 14, # 22 Exhibit 1b Part 15, # 23 Exhibit 2-5, # 24 Exhibit 6, # 25 Exhibit 7, # 26 Exhibit 8, # 27 Exhibit 9, # 28 Exhibit 10, # 29 Exhibit 11, # 30 Exhibit 12, # 31 Exhibit 13, # 32 Exhibit 14)(NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 262 | MEMORANDUM in Opposition to 261 SEALED MOTION for Summary Judgment filed by All Plaintiffs. (Attachments: # 1 Statement of Undisputed Facts, # 2 Exhibit A to O)(NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 263 | SEALED DOCUMENT: Declaration by All Plaintiffs. (NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 264 | Reply MEMORANDUM in Support of 192 Second MOTION to Strike *Expert Testimony* filed by All Plaintiffs. (NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 265 | Reply MEMORANDUM in Support of 194 Second MOTION for Partial Summary Judgment *Plaintiffs' Eighth Amendment Claim* filed by All Plaintiffs. (Attachments: # 1 Exhibit)(NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 266 | Reply MEMORANDUM in Support of 193 First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims* filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(NLT) (Entered: 05/16/2017) |
| 05/12/2017 | 267 | First Amended Joint Pretrial Order by All Parties (For your free look at document, enter your ECF login and pw to confirm your right to view). (Attachments: # 1 Attachment A to F)(NLT) (Entered: 05/16/2017) |
| 05/16/2017 | 268 | NOTICE of Briefing Schedule on 261 SEALED MOTION Summary Judgment : Opposition to the motion shall be filed within 21 days from the filing of the motion and shall not exceed 10 pages excluding attachments. The mover may file a reply brief within 14 days of the filing of the opposition and shall be limited to a total of 5 pages. No motion for leave will be required.(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(DCB) (Entered: 05/16/2017) |
| 05/17/2017 | 269 | MOTION to Participate in Status Conference via Telephone by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Dufrene, Kathryn) (Entered: 05/17/2017) |
| 05/19/2017 | 270 | SEALED MOTION for Leave to File Response Under Seal by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Attachment)(Montagnes, Mercedes) (Entered: 05/19/2017) |
| 05/19/2017 | 271 | Unopposed MOTION for Leave to File Excess Pages by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) Modified on 5/24/2017 to edit text (SGO). (Entered: 05/19/2017) |
| 05/19/2017 | 272 | MEMORANDUM in Opposition to 247 MOTION for Request of Judicial Notice filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit)(Dufrene, Kathryn) (Entered: 05/19/2017) |
| 05/19/2017 | 273 | MEMORANDUM in Opposition to 246 MOTION in Limine filed by All Defendants. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Dufrene, Kathryn) (Entered: 05/19/2017) |
| 05/26/2017 | 274 | AMENDED MOTION *to File Exhibit Under Seal* by All Plaintiffs. (Attachments: # 1 Proposed Order, # 2 Proposed Pleading; Opposition to Defendants' Motion In Limine, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit)(Hamilton, Bruce) Modified on 5/30/2017 to edit text (LLH). (Entered: 05/26/2017) |
| 05/26/2017 | 275 | SEALED MOTION for Leave to File Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment Under Seal by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Proposed Pleading;, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit)(Dufrene, Kathryn) Modified on 5/31/2017 to rotate and replace exhibits 11, 13 and 14 (LLH). (Entered: 05/26/2017) |
| 05/26/2017 | 276 | MOTION for Leave to Exceed Page Limits by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Dufrene, Kathryn) (Entered: 05/26/2017) |
| 05/31/2017 | 277 | MOTION for Expedited Hearing on 269 MOTION to Participate in Status Conference via Telephone by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Dufrene, Kathryn) (Entered: 05/31/2017) |
| 05/31/2017 | 278 | MOTION to Withdraw and Substitute Counsel of Record by All Defendants. (Attachments: # 1 Attachment)(Dufrene, Kathryn) Modified on 6/1/2017 to edit the text (KAH). (Entered: 05/31/2017) |
| 06/01/2017 | | MOTION(S) REFERRED: 278 MOTION to Substitute John C. Conine, Jr. in place of E. Wade Shows as Attorney . This motion is now pending before the USMJ. (KAH) (Entered: 06/01/2017) |
| 06/02/2017 | 279 | Unopposed Motion for Leave to File Reply In Support Of Plaintiffs Request for Judicial Notice and Motions in Limine by All Plaintiffs. (Attachments: # 1 Memorandum in Support Memorandum in support of motion for leave to reply, # 2 Proposed Pleading; REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS MOTIONS IN LIMINE AND REQUEST FOR JUDICIAL NOTICE, # 3 Proposed order granting leave, # 4 Exhibit Exhibit A for Reply Memorandum)(Warden, Derek) Modified on 6/5/2017 to edit the text (KAH). (Attachment 2 replaced on 6/16/2017) (ELW). Modified on 6/16/2017 as ordered by the court (ELW). (Entered: 06/02/2017) |
| 06/02/2017 | 280 | ORDER granting 269 Motion to Participate in Status Conference via Telephone and denying as moot 277 Motion for Expedited Hearing. Signed by Judge Shelly D. Dick on 06/02/2017. (NLT) (Entered: 06/02/2017) |
| 06/06/2017 | 281 | ORDER granting 276 MOTION for Leave to Exceed Page Limit. Signed by Judge Shelly D. Dick on 6/5/2017. (EDC) (Entered: 06/06/2017) |
| 06/06/2017 | 282 | ORDER granting 271 Motion for Leave to File Excess Pages. Signed by Judge Shelly D. Dick on 6/5/2017. (EDC) (Entered: 06/06/2017) |
| 06/06/2017 | 283 | ORDER granting 274 Amended Motion for leave to file Memorandum in Opposition to 248 Motion in Limine. The motion and all attachments shall be filed into the record, exhibit 15 to be filed under seal. The 270 Sealed Motion for Leave is DENIED AS MOOT. Signed by Judge Shelly D. Dick on 6/6/2017. (LLH) (Entered: 06/06/2017) |

| 06/06/2017 | 284 | MEMORANDUM in Opposition to 248 MOTION in Limine filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(LLH) (Additional attachment(s) added on 6/6/2017: # 15 Exhibit) (LLH). (Entered: 06/06/2017) |
|---|---|---|
| 06/06/2017 | 285 | ORDER granting 279 Motion for Leave to File Reply In Support Of Plaintiffs' Request for Judicial Notice and Motions in Limine. Signed by Judge Shelly D. Dick on 6/5/2017. (EDC) (Entered: 06/06/2017) |
| 06/06/2017 | 286 | UNOPPOSED MOTION to Substitute Pleading by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Plaintiffs Reply Memorandum in Support of Plaintiffs Request for Judicial Notice and Motions in Limine, # 2 Proposed Order)(Warden, Derek) Modified on 6/7/2017 to edit text (ELW). (Entered: 06/06/2017) |
| 06/06/2017 | 287 | REPLY Memorandum in Support of MOTIONS in Limine and Request of Judicial Notice filed by all plaintiffs. (Attachments: # 1 exhibit)(EDC) Modified on 6/7/2017 to correct date.(EDC). (Entered: 06/06/2017) |
| 06/06/2017 | 288 | MOTION to Strike 275 SEALED MOTION for Leave to File Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment Under Seal, OR, In the Alternative, For Limited Discovery by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Warden, Derek). Added MOTION for Limited Discovery on 6/7/2017 (KAH). Modified on 6/7/2017 to edit the text (KAH). (Entered: 06/06/2017) |
| 06/07/2017 | 289 | ORDER granting 278 Motion to Withdraw and Substitute Attorney. John Clifton Conine, Jr. enrolled as additional counsel for defendants Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections and Darrel Vannoy replacing E. Wade Shows. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/7/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 06/07/2017) |
| 06/08/2017 | 290 | ORDER granting 275 SEALED MOTION for Leave to File Reply to Plaintiff's Opposition to Defendant's 261 Motion for Summary Judgment Under Seal. Signed by Judge Shelly D. Dick on 6/8/2017. (LLH) (Entered: 06/08/2017) |
| 06/08/2017 | 291 | SEALED REPLY Memorandum to 262 Opposition to 261 Motion for Summary Judgment filed by Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit) (LLH) (Entered: 06/08/2017) |
| 06/14/2017 | 292 | NOTICE of Change of Address by Bruce Warfield Hamilton (Hamilton, Bruce) (Entered: 06/14/2017) |
| 06/14/2017 | 293 | NOTICE of Briefing Schedule on 288 MOTION to Strike 275 SEALED MOTION for Leave to File Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment Under Seal MOTION for Limited Discovery : Opposition to the motion shall be filed within 21 days from the filing of the motion and shall not exceed 10 pages excluding attachments. The mover may file a reply brief within 14 days of the filing of the opposition and shall be limited to a total of 5 pages. No motion for leave will be required.(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(DCB) (Entered: 06/14/2017) |
| 06/14/2017 | 294 | ORDER granting 286 Motion to Substitute Pleading. Signed by Judge Shelly D. Dick on 6/14/17. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document |

| | | associated with this entry.) (DCB) (Entered: 06/14/2017) |
|---|---|---|
| 06/21/2017 | 295 | MOTION for Leave to File Reply Memorandum *in Support of Motion in Limine and to Exceed Page Limitation* by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Proposed Pleading;, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(Roper, Mary) (Attachment 1 replaced on 6/29/2017) (ELW). Modified on 6/29/2017 substituted as ordered. (ELW). (Entered: 06/21/2017) |
| 06/21/2017 | 296 | MOTION for Leave to Substitute 295 Memorandum in Support by All Defendants. (Attachments: # 1 Attachment, # 2 Proposed Pleading;)(Roper, Mary) Modified to edit the text on 6/22/2017 (KAH). (Entered: 06/21/2017) |
| 06/27/2017 | 297 | MEMORANDUM in Opposition to 288 MOTION to Strike Defendants' Reply Memorandum Which Was Filed in Support of Defendants' Motion for Summary Judgment filed by All Defendants. (Roper, Mary) Modified to edit text on 6/29/2017 (SGO). (Entered: 06/27/2017) |
| 06/29/2017 | 298 | ORDER granting 295 MOTION for Leave to File Reply Memorandum in Support of Motion in Limine and to Exceed Page Limitation. Signed by Judge Shelly D. Dick on 06/29/2017. (ELW) (Entered: 06/29/2017) |
| 06/29/2017 | 299 | MEMORANDUM IN REPLY to 284 Memorandum in Opposition to Motion; 248 MOTION in Limine filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(ELW) (Entered: 06/29/2017) |
| 06/29/2017 | 300 | ORDER granting 296 MOTION for Leave to File Corrected Memorandum in Support of Motion for Leave to File Reply Memorandum in Support of Motion in Limine and to Exceed Page Limits. Signed by Judge Shelly D. Dick on 6/29/2017. (ELW) (Entered: 06/29/2017) |
| 06/30/2017 | 301 | Notice to Counsel: As discussed at the 6/7/17 Status Conference, the Class Certification Hearing is set for 9/19/2017 at 09:30 AM in Courtroom 3 before Judge Shelly D. Dick. Any motions to continue that hearing shall be filed on or before July 14, 2017. Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(DCB) (Entered: 06/30/2017) |
| 07/11/2017 | 302 | REPLY to 288 MOTION to Strike 275 SEALED MOTION for Leave to File Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment Under Seal MOTION for Limited Discovery, 297 Memorandum in Opposition to Motion filed by All Plaintiffs. (Attachments: # 1 Exhibit A)(Warden, Derek) (Main Document 302 replaced on 7/20/2017) (EDC). Modified on 7/20/2017 in accordance with record document 306. (EDC). (Entered: 07/11/2017) |
| 07/13/2017 | 303 | NOTICE OF NON-COMPLIANCE with LR 7(g) as to 302 Reply to Response to Motion,. REQUIRED CORRECTION: A combined Motion for Leave to Exceed the Page Limits and Motion to Strike the Incorrect Pleading must filed within 24 hours of this notice. Otherwise, the original filing may be stricken by the Court without further notice. (ELW) (Entered: 07/13/2017) |
| 07/13/2017 | 304 | Combined Motion to Strike Incorrect Pleading and Substitute Amended Pleading by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Amended Reply Memorandum, # 3 Exhibit)(Warden, Derek) Modified to edit text on 7/20/2017 |

| | | (SGO). (Entered: 07/13/2017) |
|---|---|---|
| 07/14/2017 | 305 | MOTION to Continue Evidentiary Hearing on Motion for Class Certification by All Defendants. (Attachments: # 1 Attachment)(Dufrene, Kathryn) (Entered: 07/14/2017) |
| 07/20/2017 | 306 | ORDER granting 304 Motion to Strike Incorrect Pleading and Substitute Amended Pleading. Signed by Judge Shelly D. Dick on 7/20/2017. (EDC) (Entered: 07/20/2017) |
| 07/27/2017 | 307 | ORDER granting 305 Motion to Continue Evidentiary Hearing previously set for 9/19/2017 is hereby reset for 10/26/2017 at 09:30 AM in Courtroom 3 before Judge Shelly D. Dick.. Signed by Judge Shelly D. Dick on 7/27/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 07/27/2017) |
| 07/28/2017 | 308 | MOTION for Reconsideration of 307 Order on Motion to Continue, *and Motion to Expedite* by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Hamilton, Bruce). Added MOTION for Expedited Consideration on 7/28/2017 (LLH). (Entered: 07/28/2017) |
| 08/02/2017 | 309 | ORDER: Plaintiffs' 308 Motion for Reconsideration and Motion to Expedite will be treated as an opposition to the Defendant's 305 Motion to Continue. The Defendants shall have until Friday, August 11, 2017 to respond to this pleading. Signed by Judge Shelly D. Dick on 8/2/2017. (EDC) (Entered: 08/02/2017) |
| 08/02/2017 | | Set Deadlines: Defendants have until Friday, August 11, 2017 to respond to 305 Motion to Continue Evidentiary Hearing on Motion for Class Certification. (EDC) (Entered: 08/02/2017) |
| 08/07/2017 | 310 | MOTION for Derek Warden to Withdraw as Attorney by All Plaintiffs. (Attachments: # 1 Proposed Order)(Warden, Derek) (Entered: 08/07/2017) |
| 08/08/2017 | | MOTION(S) REFERRED: 310 MOTION for Derek Warden to Withdraw as Attorney . This motion is now pending before the USMJ. (SGO) (Entered: 08/08/2017) |
| 08/09/2017 | 311 | ORDER granting 310 Motion to Withdraw as Attorney. Attorney Derek Warden, Esq. is withdrawn as counsel for Plaintiffs in this matter. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/9/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 08/09/2017) |
| 08/09/2017 | 312 | REPLY to 308 MOTION for Reconsideration of 307 Order on Motion to Continue, MOTION for Expedited Hearing, 305 MOTION to Continue Evidentiary Hearing on Motion for Class Certification filed by All Defendants. (Dufrene, Kathryn) (Entered: 08/09/2017) |
| 08/15/2017 | 313 | ORDER: The Court has reconsidered its Ruling 307 granting the Defendants Motion to Continue Evidentiary Hearing on Motion for Class Certification 305 and declines reconsideration. The Court has considered the Plaintiff's opposition 308 and the Defendants Response 312 and denies reconsideration. The Class Certification hearing is hereby confirmed and will be conducted on 10/26/2017 at 09:30 AM in Courtroom 3. Signed by Judge Shelly D. Dick on 8/15/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(Dick, Shelly) (Entered: 08/15/2017) |
| 08/31/2017 | 314 | MOTION for Leave to File Supplemental Memorandum in Support of Defendants' 261 Motion for Summary Judgment by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment)(Dufrene, Kathryn) Modified to edit the text on 9/1/2017 (KAH). (Entered: 08/31/2017) |

| 09/01/2017 | 315 | Notice to Counsel Resetting Hearing: Due to an unforeseen scheduling conflict the Motion Hearing set for 10/26/2017 is hereby Reset for 11/1/2017 at 09:30 AM in Courtroom 3 before Judge Shelly D. Dick. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(BKA) (Entered: 09/01/2017) |
| --- | --- | --- |
| 09/11/2017 | 316 | NOTICE TO COUNSEL: PLEASE BE ADVISED that a Telephone Status Conference is set in this matter for 9/21/2017 at 2:30 pm. The Parties are to set up the call into the Chamber's main line with all Parties on the line. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2017) |
| 09/12/2017 | | Set/Reset Hearings: Telephone Status Conference set for 9/21/2017 at 02:30 PM before Judge Shelly D. Dick. This entry for docketing purposes only. (BKA) (Entered: 09/12/2017) |
| 09/21/2017 | 317 | ORDER: Because the class certification issue must be decided before dispositive motions, and the Court believes that resolution of this issue may (or may not) alter the facts and /or analysis regarding the dispositive motions filed in this case, the Court will deny the 193 Motion for Partial Summary Judgment on Plaintiffs ADA Claims, 194 Motion for Partial Summary Judgment on Plaintiffs Eighth Amendment Claims, and the Defendants 261 Motion for Summary Judgment without prejudice. Following the class certification hearing, the Parties are granted leave of Court to re-urge these motions by reference to record document numbers, without the necessity of re-filing same. Should supplemental briefing be required based on the class certification determination, such leave is granted to file supplemental briefs not to exceed 15 pages without leave of Court. Signed by Judge Shelly D. Dick on 9/21/2017. (LLH) (Entered: 09/21/2017) |
| 09/21/2017 | 318 | Minute Entry for proceedings held before Judge Shelly D. Dick: Telephone Conference held on 9/21/2017. (BKA) (Entered: 09/21/2017) |
| 09/22/2017 | 319 | ORDER denying without prejudice 314 MOTION for Leave to File Supplemental Memorandum in Support of Defendants' 261 Motion for Summary Judgment. Signed by Judge Shelly D. Dick on 9/22/2017. (LLH) (Entered: 09/22/2017) |
| 09/25/2017 | 320 | MOTION to Withdraw and Substitute Counsel of Record by All Defendants. (Conine, John) Modified on 9/25/2017 to edit text (ELW). (Entered: 09/25/2017) |
| 09/26/2017 | | MOTION(S) REFERRED: 320 MOTION to Substitute Caroline Tomeny Bond in place of Kathryn A. Dufrene as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 09/26/2017) |
| 09/27/2017 | 321 | RULING denying 191 Motion to Exclude Testimony of Jacqueline Moore. Signed by Judge Shelly D. Dick on 9/27/2017. (LLH) (Entered: 09/27/2017) |
| 09/29/2017 | 322 | RULING granting 192 MOTION to Exclude Testimony of David Thomas. Signed by Judge Shelly D. Dick on 9/29/2017. (SGO) (Entered: 09/29/2017) |
| 09/29/2017 | 323 | ORDER granting in part and denying in part 320 Motion to Substitute Attorney. Motion granted to enroll Caroline T. Bond as additional counsel for Louisiana Department of Public Safety and Corrections, Darrel Vannoy, Stephanie Lamartiniere, James M. LeBlanc, Raman Singh, MD, Stacye Falgout, Randy Lavespere, MD, Sherwood Poret, RN and Cynthia Park. Motion denied as to Kathryn Dufrene, as motion not signed by withdrawing attorney. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/29/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 09/29/2017) |

| 10/02/2017 | 324 | MOTION for Kathryn A. Dufrene to Withdraw as Attorney by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Dufrene, Kathryn) (Entered: 10/02/2017) |
|---|---|---|
| 10/03/2017 | | MOTION(S) REFERRED: 324 MOTION for Kathryn A. Dufrene to Withdraw as Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 10/03/2017) |
| 10/04/2017 | 325 | ORDER granting 324 Motion to Withdraw as Attorney. Attorney Kathryn A. Dufrene is withdrawn as counsel for defendants, Louisiana Department of Public Safety and Corrections, Darrel Vannoy, Stephanie Lamartiniere, James M. Leblanc, Raman Singh, MD, Stacye Falgout, Randy Lavespere, MD, Sherwood Poret, RN and Cynthia Park, ACNP in this matter. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/4/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 10/04/2017) |
| 10/06/2017 | 326 | MOTION for Clarification of and Relief From 322 Ruling on Motion to Exclude Testimony of David Thomas by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Attachment Proposed Order)(Cody, Jeffrey) Modified to edit the text on 10/10/2017 (KAH). (Entered: 10/06/2017) |
| 10/06/2017 | 327 | MOTION for Expedited Consideration on 326 MOTION for Clarification of and Relief From 322 Ruling on Motion to Exclude Testimony of David Thomas by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Cody, Jeffrey) Modified to edit the text on 10/10/2017 (KAH). (Entered: 10/06/2017) |
| 10/10/2017 | 328 | MOTION to Enroll Nishi Kumar as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 10/10/2017) |
| 10/10/2017 | 329 | MOTION for Amanda Boozer to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-1651623) by All Plaintiffs. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit A1, # 3 Exhibit Exhibit A2, # 4 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 10/10/2017) |
| 10/10/2017 | | MOTION(S) REFERRED: 329 MOTION for Amanda Boozer to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-1651623), 328 MOTION to Enroll Nishi Kumar as Additional Attorney . This motion is now pending before the USMJ. (EDC) (Entered: 10/10/2017) |
| 10/11/2017 | 330 | ORDER granting 328 Motion to Enroll Additional Attorney. Added attorney Nishi Lal Kumar as additional counsel for Plaintiffs Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington and Rufus White. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/11/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 10/11/2017) |
| 10/11/2017 | 331 | ORDER granting 329 Motion for Amanda Boozer to Appear Pro Hac Vice as co-counsel for Plaintiffs in this matter. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/11/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 10/11/2017) |
| 10/12/2017 | 332 | STRICKEN FROM THE RECORD MOTION in Limine *for Class Certification Hearing* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Montagnes, Mercedes) Modified on 10/26/2017 Stricken in accordance with rec doc 348 (ELW). (Entered: 10/12/2017) |

| 10/13/2017 | 333 | ORDER granting 327 Motion for Expedited Hearing on 326 Defendants Motion for Clarification of Court's Limine Order 322 . Oral arguments are not necessary. The Court will rule upon the Motion for Clarification expeditiously. Opposition or response, if any, shall be filed on or before October 17, 2017. Signed by Judge Shelly D. Dick on 10/13/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/13/2017) |
|---|---|---|
| 10/13/2017 | 334 | MOTION for Expedited Hearing on 332 MOTION in Limine *for Class Certification Hearing* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 10/13/2017) |
| 10/16/2017 | 335 | MOTION to Enroll Angelique Freel, Michelle White, and Patricia Wilton as Additional Attorney by All Defendants. (Barient, Andrea) (Entered: 10/16/2017) |
| 10/17/2017 | | MOTION(S) REFERRED: 335 MOTION to Enroll Angelique Freel, Michelle White, and Patricia Wilton as Additional Attorney . This motion is now pending before the USMJ. (KAH) (Entered: 10/17/2017) |
| 10/17/2017 | 336 | ORDER granting 334 Motion for Expedited Consideration of Plaintiffs' 332 Motion to Exclude the Declarations of Tiffany Bellue and Nyesha Kelly. Defendants shall file a response to the motion on before 10/23/2017. The Court does not need oral argument. Signed by Judge Shelly D. Dick on 10/17/2017. (SGO) (Entered: 10/17/2017) |
| 10/17/2017 | | Set/Reset Deadlines (Court Use Only) (SGO) (Entered: 10/17/2017) |
| 10/17/2017 | 337 | ORDER granting 335 Motion to Enroll Additional Attorney. Added attorneys Angelique Duhon Freel, Michelle Marney White and Patricia Hill Wilton as additional counsel of record for Stephanie Lamartiniere, James M LeBlanc and The Louisiana Department of Public Safety and Corrections. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/17/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 10/17/2017) |
| 10/17/2017 | 338 | STRICKEN FROM THE RECORD MEMORANDUM in Opposition to 326 MOTION for Clarification of and Relief From 322 Ruling on Motion to Exclude Testimony of David Thomas filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kumar, Nishi) Modified on 10/24/2017 Stricken as ordered (ELW). (Entered: 10/17/2017) |
| 10/18/2017 | 339 | NOTICE OF NON-COMPLIANCE with LR 7(g) as to 338 Memorandum in Opposition to Motion. REQUIRED CORRECTION: A combined Motion for Leave to Exceed the Page Limits and Motion to Strike the Incorrect Pleading must filed within 24 hours of this notice. Otherwise, the original filing may be stricken by the Court without further notice. (ELW) (Entered: 10/18/2017) |
| 10/18/2017 | 340 | MOTION for Leave to File Excess Pages , MOTION to Strike *the Incorrect Pleading* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Attachment Proposed Order)(Kumar, Nishi) (Entered: 10/18/2017) |
| 10/18/2017 | 341 | MOTION for Leave to File Reply Brief *in support of Motion for Clarification of and Relief from Order Granting Motion to Exclude Testimony of David Thomas* by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed order, # 3 Proposed Pleading; Reply Brief, # 4 Exhibit Redacted Report)(Cody, Jeffrey) (Entered: 10/18/2017) |
| 10/20/2017 | 342 | |

| | | |
|---|---|---|
| | | ORDER granting <u>341</u> MOTION for Leave to File Reply Brief *in support of Motion for Clarification of and Relief from Order Granting Motion to Exclude Testimony of David Thomas* filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Signed by Judge Shelly D. Dick on 10/20/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/20/2017) |
| 10/20/2017 | <u>352</u> | REPLY BRIEF in Support of <u>326</u> MOTION for Clarification of and Relief From <u>322</u> Ruling on Motion to Exclude Testimony of David Thomas filed by All Defendants. (Attachments: # <u>1</u> Exhibit)(ELW) (Entered: 10/25/2017) |
| 10/23/2017 | <u>343</u> | RULING granting <u>326</u> MOTION for Clarification of and Relief From <u>322</u> Ruling on <u>192</u> Motion to Exclude Testimony of David Thomas. The Courts' Prior <u>322</u> RULING is vacated in part . Plaintiff' s <u>192</u> Motion in Limine to exclude Dr. David Thomas' opinion testimony as relating to legal and security issues is GRANTED; the motion to exclude standard of care opinion testimony is DENIED, and all objections to admissibility are reserved. Defendants' request to vacate and amend the Scheduling Order and for leave to name a substitute expert is DENIED, as moot. Signed by Judge Shelly D. Dick on 10/23/2017. (LLH) (Entered: 10/23/2017) |
| 10/23/2017 | 344 | ORDER granting <u>340</u> Motion for Leave to File Excess Pages and granting <u>340</u> Motion to Strike. Signed by Judge Shelly D. Dick on 10/23/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 10/23/2017) |
| 10/23/2017 | <u>345</u> | MOTION for Status Conference by All Defendants. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Attachment Proposed Order)(Cody, Jeffrey) (Entered: 10/23/2017) |
| 10/23/2017 | <u>346</u> | MOTION to Strike 332 Plaintiffs Motion to Exclude the Declarations of Tiffany Bellue and Nyesha Kelly, or in the Alternative, Opposition to Plaintiffs Motion to Exclude the Declarations of Tiffany Bellue and Nyesha Kelly by All Defendants. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Exhibit A, # <u>3</u> Exhibit B, # <u>4</u> Exhibit C, # <u>5</u> Attachment Proposed Order)(Cody, Jeffrey) Modified to edit the text on 10/24/2017 (KAH). (Attachment 2 replaced on 10/24/2017) (KAH). (Entered: 10/23/2017) |
| 10/23/2017 | <u>350</u> | MEMORANDUM in Opposition to Defendant's <u>326</u> MOTION for Clarification filed by All Plaintiffs. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Exhibit, # <u>3</u> Exhibit)(ELW) (Entered: 10/24/2017) |
| 10/24/2017 | <u>347</u> | RULING : The <u>246</u> Motion in Limine is DENIED with full reservation of rights to urge objections at the time of trial. Signed by Judge Shelly D. Dick on 10/24/2017. (LLH) (Entered: 10/24/2017) |
| 10/24/2017 | 348 | ORDER granting <u>346</u> Motion to Strike 332 Plaintiffs Motion to Exclude the Declarations of Tiffany Bellue and Nyesha Kelly. The Motion is GRANTED for the reason that the Motion in Limine <u>322</u> was untimely filed. Signed by Judge Shelly D. Dick on 10/24/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/24/2017) |
| 10/24/2017 | 349 | ORDER granting <u>247</u> Plaintiffs Motion Request of Judicial Notice of the licensure status of physicians, without prejudice to the parties right to make evidentiary objections at the time of hearing or trial. Signed by Judge Shelly D. Dick on 10/24/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/24/2017) |

| 10/24/2017 | 351 | ORDER denying 345 Motion for Conference. The parties are hereby advised that each side will be permitted the time required to present their respective evidence at the Class Certification Hearing set for Nov. 1, 2017. In the event of the desire of either party to make a proffer, the Court will provide guidance on same at the time of the hearing. Signed by Judge Shelly D. Dick on 10/24/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 10/24/2017) |
|---|---|---|
| 10/25/2017 | 353 | RULING granting in part and denying in part Defendant's 248 Motion in Limine. Signed by Judge Shelly D. Dick on 10/25/2017. (LLH) (Entered: 10/25/2017) |
| 11/01/2017 | 375 | Minute Entry for proceedings held before Judge Shelly D. Dick: Motion Hearing held on 11/1/2017 re 133 MOTION to Certify Class filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr.. (Court Reporter Judy Francisco.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 12/01/2017) |
| 11/02/2017 | 354 | NOTICE of Hearing on Motion 133 MOTION to Certify Class :Motion Hearing continuation set for 11/2/2017 at 01:30 PM in Courtroom 3 before Judge Shelly D. Dick. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 11/02/2017) |
| 11/02/2017 | 355 | Minute Entry for proceedings held before Judge Shelly D. Dick: Motion Hearing concluded on 11/2/2017 re 133 MOTION to Certify Class filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. (Court Reporter Judy Francisco.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 11/02/2017) |
| 11/03/2017 | 356 | TRANSCRIPT REQUEST by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White for proceedings held on November 1, 2017 and November 2, 2017 before Judge Shelly D. Dick.. (Kumar, Nishi) (Entered: 11/03/2017) |
| 11/09/2017 | 357 | TRANSCRIPT REQUEST by Darrel Vannoy for proceedings held on 11/1/2017 - 11/2/2017 before Judge Shelly D. Dick. Fee $ 30, receipt number 053N-1672909. (Conine, John) Modified to flatten main document and edit the text on 11/9/2017 (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 358 | Exhibit(s) to 355 Motion Hearing,, by All Plaintiffs. (Attachments: # 1 Exhibit List (Joint), # 2 Exhibit 1-2, # 3 Exhibit 3-15, # 4 Exhibit 16-36, # 5 Exhibit 37-47, # 6 Exhibit 48-56)(Kumar, Nishi) Modified to rotate attachments 2, 3 and 6 on 11/13/2017 (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 359 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 62-67, # 2 Exhibit 68-78, # 3 Exhibit 79 part 1, # 4 Exhibit 79 part 2)(Kumar, Nishi) (Entered: 11/09/2017) |
| 11/09/2017 | 360 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 81, # 2 Exhibit 82-87, # 3 Exhibit 88-94, # 4 Exhibit 95 part 1)(Kumar, Nishi) (Main Document 360 replaced on 11/13/2017) (KAH). (Entered: |

| | | 11/09/2017) |
|---|---|---|
| 11/09/2017 | 361 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 96-97, # 2 Exhibit 98-99, # 3 Exhibit 100-104, # 4 Exhibit 105-107 part 1)(Kumar, Nishi) (Entered: 11/09/2017) |
| 11/09/2017 | 362 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 107 part 3, # 2 Exhibit 107 part 4, # 3 Exhibit 107 part 5, # 4 Exhibit 107 part 6)(Kumar, Nishi) Modified to rotate attachments 1-3 on 11/13/2017 (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 363 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 108-109, # 2 Exhibit 110 part 1, # 3 Exhibit 110 part 2, # 4 Exhibit 110 part 3)(Kumar, Nishi) (Entered: 11/09/2017) |
| 11/09/2017 | 364 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 110 part 5, # 2 Exhibit 110 part 6, # 3 Exhibit 110 part 7, # 4 Exhibit 110 part 8)(Kumar, Nishi) (Entered: 11/09/2017) |
| 11/09/2017 | 365 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 111 part 1, # 2 Exhibit 111 part 2, # 3 Exhibit 112-113, # 4 Exhibit 114 part 1)(Kumar, Nishi) Modified to rotate pages in main document and attachment 4 on 11/13/2017 (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 366 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 114 part 3, # 2 Exhibit 114 part 4, # 3 Exhibit 114 part 5, # 4 Exhibit 115-116 part 1)(Kumar, Nishi) Modified to rotate main document and attachments 1-3 on 11/13/2017 (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 367 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 116 part 3, # 2 Exhibit 117 part 1, # 3 Exhibit 117 part 2, # 4 Exhibit 118 part 1)(Kumar, Nishi) (Attachment 2 replaced on 11/13/2017) (ELW). (Attachment 4 replaced on 11/13/2017) (ELW). Modified on 11/13/2017 to correct page orientation(ELW). (Entered: 11/09/2017) |
| 11/09/2017 | 368 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 118 part 3, # 2 Exhibit 119-125, # 3 Exhibit 126 part 1, # 4 Exhibit 126 part 2-127)(Kumar, Nishi) (Main Document 368 replaced on 11/13/2017) (KAH). (Entered: 11/09/2017) |
| 11/09/2017 | 369 | Additional Exhibits to 358 Exhibit(s) by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit 136-145, # 2 Exhibit 146 part 1, # 3 Exhibit 146 part 2, # 4 Exhibit 146 part 3, # 5 Exhibit 146 part 4)(Kumar, Nishi) (Attachment 4 replaced on 11/13/2017) (KAH). (Attachment 5 replaced on 11/13/2017) (KAH). Modified to rotate attachments 4 & 5 on 11/13/2017 (KAH). (Attachment 2 replaced on 11/13/2017) (ELW). (Attachment 2 replaced on 12/13/2017) (SGO). (Entered: 11/09/2017) |
| 11/13/2017 | 370 | ORDER denying as moot 288 Motion to Strike ; denying as moot 288 Motion for Discovery. Signed by Judge Shelly D. Dick on 11/13/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 11/13/2017) |
| 11/13/2017 | 371 | TRANSCRIPT REQUEST by The Louisiana Department of Public Safety and Corrections for proceedings held on 11/1/2017 - 11/2/2017 before Judge Shelly D. Dick.. (Conine, John) (Main Document 371 replaced on 11/14/2017 to flatten the image) (NLT). (Entered: 11/13/2017) |

| 11/13/2017 | 372 | ORDER denying as moot 332 Motion in Limine. Signed by Judge Shelly D. Dick on 11/13/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 11/13/2017) |
|---|---|---|
| 11/15/2017 | 373 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Trancript of Class Certification Hearing before Judge Shelly D. Dick held on November 1, 2017. Court Reporter: Judy Y. Francisco, CCR. Phone Number: 225-389-3566.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 12/6/2017. Redacted Transcript Deadline set for 12/18/2017. Release of Transcript Restriction set for 2/13/2018. (Francisco, Judy) (Entered: 11/15/2017) |
| 11/15/2017 | 374 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Trancript of Class Certification Hearing before Judge Shelly D. Dick held on November 2, 2017. Court Reporter: Judy Y. Francisco, CCR. Phone Number: 225-389-3566.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 12/6/2017. Redacted Transcript Deadline set for 12/18/2017. Release of Transcript Restriction set for 2/13/2018. (Francisco, Judy) (Main Document 374 replaced on 11/16/2017 to include index as per court reporter) (DCB). Modified on 11/16/2017 (DCB). (Entered: 11/15/2017) |
| 12/04/2017 | 376 | MOTION for Evidentiary Sanctions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B)(Hamilton, Bruce) Modified to edit text on 12/5/2017 (SGO). (Entered: 12/04/2017) |
| 12/04/2017 | 377 | Post-Hearing Brief in Support of 133 MOTION to Certify Class filed by All Plaintiffs. (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C)(Montagnes, Mercedes) Modified on 12/5/2017 to edit text (LLH). (Entered: 12/04/2017) |
| 12/05/2017 | 378 | Post-Hearing Brief in Opposition to 133 MOTION to Certify Class by James M LeBlanc. (Roper, Mary) Modified on 12/5/2017 to edit text (LLH). (Entered: 12/05/2017) |
| 12/08/2017 | 379 | MOTION for Leave to Supplement Memo in Support of Motion for Evidentiary Sanctions by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Supplement to Memo, # 2 Exhibit Proposed Order)(Hamilton, Bruce) (Entered: 12/08/2017) |
| 12/11/2017 | 380 | ORDER granting 379 MOTION for Leave to Supplement Memo. Signed by Judge Shelly D. Dick on 12/11/2017. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF |

| | | document associated with this entry.) (BKA) (Entered: 12/11/2017) |
|---|---|---|
| 12/11/2017 | 381 | SUPPLEMENTAL to MEMORANDUM in Support of 376 MOTION for Sanctions filed by All Plaintiffs. (ELW) (Entered: 12/12/2017) |
| 12/26/2017 | 382 | MEMORANDUM in Opposition to 376 MOTION for Sanctions filed by All Defendants. (Cody, Jeffrey) (Entered: 12/26/2017) |
| 01/09/2018 | 383 | MOTION for Leave to File Reply by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Pleading;, # 5 Exhibit A, # 6 Exhibit B, # 7 Exhibit C, # 8 Exhibit D, # 9 Exhibit E, # 10 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 1/10/2018to rotate and replace Exhibit B, E(LLH). (Entered: 01/09/2018) |
| 01/10/2018 | 384 | Ex Parte MOTION to Enroll Randal J. Robert, Connell L. Archey, Keith J. Fernandez, and George P. Holmes as Additional Attorney by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Roper, Mary) Modified on 1/11/2018 to edit text (LLH). (Entered: 01/10/2018) |
| 01/11/2018 | | MOTION(S) REFERRED: 384 MOTION to Enroll Randal J. Robert, Connell L. Archey, Keith J. Fernandez, and George P. Holmes as Additional Attorney . This motion is now pending before the USMJ. (LLH) (Entered: 01/11/2018) |
| 01/11/2018 | 385 | ORDER granting 383 MOTION for Leave to File Reply filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr.. Signed by Judge Shelly D. Dick on 1/11/2018. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 01/11/2018) |
| 01/11/2018 | 387 | REPLY in Support of 376 MOTION for Sanctions filed by All Plaintiffs. (Attachments: # 1 Attachment, # 2 Attachment, # 3 Attachment, # 4 Attachment, # 5 Attachment)(ELW) (Entered: 01/12/2018) |
| 01/12/2018 | 386 | ORDER granting 384 Motion to Enroll Additional Counsel of Record for Defendants. Added attorneys Randal J. Robert, Connell Lee Archey, Keith Fernandez and George Holmes as additional counsel of record for defendants Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections and Darrel Vannoy, and designating Randal J. Robert as lead attorney for defendants. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 1/12/2018. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 01/12/2018) |
| 01/12/2018 | 388 | RULING granting 376 Motion for Evidentiary Sanctions. The Court will exclude any evidence or documents not produced in discovery unless such documents were attached to pleadings filed into the record prior to the class certification hearing. The Court declines to award any monetary sanctions. Signed by Judge Shelly D. Dick on 1/12/2018. (SGO) (Entered: 01/12/2018) |
| 01/17/2018 | 389 | MOTION for Scheduling Conference by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Kumar, Nishi) (Entered: 01/17/2018) |
| 01/18/2018 | 390 | RESPONSE to 389 MOTION for Scheduling Conference filed by All Defendants. (Robert, Randal) (Entered: 01/18/2018) |

| 01/19/2018 | | MOTION(S) REFERRED: 389 MOTION for Scheduling Conference . This motion is now pending before the USMJ. (SGO) (Entered: 01/19/2018) |
|---|---|---|
| 01/29/2018 | 391 | ORDER: Plaintiffs are ordered to submit supplemental brief advisingthe Court which Named Plaintiffs have fully exhausted their administrative remedies prior to 5/20/2015. Plaintiffs are ordered to submit this supplement to the Court on or before 2/6/2018. Signed by Judge Shelly D. Dick on 1/29/2018. (SGO) (Entered: 01/29/2018) |
| 02/06/2018 | 392 | SUPPLEMENTAL BRIEF on Exhaustion of Administrative Remedies filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Montagnes, Mercedes) Modified to edit text on 2/7/2018 (SGO). (Entered: 02/06/2018) |
| 02/09/2018 | 393 | MOTION for Leave to File Defendants' Reply to Plaintiffs' Supplemental Brief on Exhaustion of Administrative Remedies by All Defendants. (Attachments: # 1 Proposed Order, # 2 Exhibit A)(Robert, Randal) (Entered: 02/09/2018) |
| 02/21/2018 | | Motions No Longer Referred: 389 MOTION for Scheduling Conference . This motion is now pending before the USDJ. (DCB) (Entered: 02/21/2018) |
| 02/26/2018 | 394 | RULING granting 133 Motion for Class Certification. Signed by Judge Shelly D. Dick on 2/26/2018. (SGO) (Entered: 02/26/2018) |
| 03/12/2018 | 395 | ORDER granting 393 MOTION for Leave to File Defendants' Reply to Plaintiffs' Supplemental Brief on Exhaustion of Administrative Remedies filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Signed by Judge Shelly D. Dick on 3/12/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 03/12/2018) |
| 03/12/2018 | 396 | REPLY to 392 Supplemental Brief on Exhaustion of Administrative Remedies filed by Burl Cain, Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (SGO) (Entered: 03/13/2018) |
| 03/15/2018 | 397 | MOTION for Leave to substitute witnesses and take depositions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Attachment)(Montagnes, Mercedes) (Entered: 03/15/2018) |
| 03/22/2018 | 398 | ORDER granting 389 Motion for a Scheduling Conference. A Telephone Conference set for 4/19/2018 at 02:30 PM before Judge Shelly D. Dick. Counsel for Plaintiff shall arrange the call into chambers and have all Parties on the line. Signed by Judge Shelly D. Dick on 3/22/2018. (SGO) (Entered: 03/22/2018) |
| 03/27/2018 | 399 | MOTION for Leave to File Motion to Re-Urge Motions for Summary Judgment by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed, # 3 Attachment Motion to Re-Urge, # 4 Attachment Memorandum in Support of Motion to Re-Urge, # 5 Attachment Proposed Order for Motion to Re-Urge)(Montagnes, Mercedes) (Entered: 03/27/2018) |
| 04/05/2018 | 400 | MEMORANDUM in Opposition to 397 MOTION for Leave to substitute witnesses and take depositions filed by All Defendants. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Robert, Randal) (Entered: 04/05/2018) |

| 04/11/2018 | 401 | ORDER granting 399 MOTION for Leave to File Motion to Re-Urge Motions for Summary Judgment filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr.. Signed by Judge Shelly D. Dick on 4/11/2018. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 04/11/2018) |
|---|---|---|
| 04/11/2018 | 403 | MOTION to Re-Urge 193 First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims*, 194 Second MOTION for Partial Summary Judgment *Plaintiffs' Eighth Amendment Claim* by Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Order)(LLH) (Entered: 04/13/2018) |
| 04/12/2018 | 402 | MOTION for Leave to File Reply in Support of Plaintiffs' 397 Motion for Leave to Substitute Witnesses and Take Depositions by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Attachment Proposed Order)(Kumar, Nishi) Modified on 4/13/2018 to edit text (LLH). (Entered: 04/12/2018) |
| 04/18/2018 | 404 | ORDER granting 402 MOTION for Leave to File Reply in Support of Plaintiffs' Motion for Leave to Substitute Witnesses and Take Depositions filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr. Signed by Judge Shelly D. Dick on 4/18/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 04/18/2018) |
| 04/18/2018 | 407 | REPLY in Support of 397 MOTION for Leave to substitute witnesses and take depositions filed by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr., Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(EDC) (Entered: 04/23/2018) |
| 04/19/2018 | 405 | Minute Entry for proceedings held before Judge Shelly D. Dick: Telephone Status Conference held on 4/19/2018. (BKA) (Entered: 04/19/2018) |
| 04/19/2018 | 406 | Notice Setting Trial and Related Deadlines: Jury Trial set for 10/9/2018 at 09:00 AM in Courtroom 3 before Judge Shelly D. Dick. Pretrial Conference set for 9/25/2018 at 02:30 PM in chambers before Judge Shelly D. Dick. Affidavit of Settlement Efforts due by 8/28/2018. All other Trial deadlines are set as stated in the attached Notice. Signed by Judge Shelly D. Dick on 4/19/18. (BKA) (Entered: 04/19/2018) |
| 04/24/2018 | 408 | Notice to Counsel: The Jury Trial set for 10/9/2018 is hereby Canceled. A Bench Trial is hereby set for 10/9/2018 at 09:00 AM in Courtroom 3 before Judge Shelly D. Dick.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(BKA) (Entered: 04/24/2018) |
| 04/24/2018 | 409 | MOTION for Copy of Audio Recording of Conference by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Kumar, Nishi) (Entered: 04/24/2018) |

| 04/26/2018 | 410 | Witness List by Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (For your free look at document, enter your ECF login and pw to confirm your right to view). (Robert, Randal) (Entered: 04/26/2018) |
|---|---|---|
| 04/26/2018 | 411 | Witness List for Trial by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (For your free look at document, enter your ECF login and pw to confirm your right to view). (Attachments: # 1 Exhibit A Will Call List, # 2 Exhibit B May Call List)(Kumar, Nishi) Modified to edit text on 4/27/2018 (SGO). (Entered: 04/26/2018) |
| 05/15/2018 | 412 | ORDER denying 397 MOTION for Leave to Substitute Witnesses and Take Depositions. Signed by Judge Shelly D. Dick on 5/15/2018. (SGO) (Entered: 05/15/2018) |
| 05/15/2018 | 413 | MOTION to Enroll Jamila Johnson, Meredith Angelson, and Jared Davidson as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 05/15/2018) |
| 05/15/2018 | | MOTION(S) REFERRED: 413 MOTION to Enroll Jamila Johnson, Meredith Angelson, and Jared Davidson as Additional Attorney . This motion is now pending before the USMJ. (SGO) (Entered: 05/15/2018) |
| 05/17/2018 | 414 | Unopposed MOTION for Leave to File a Motion to Exclude Evidence of Post-Discovery Conditions or, in the Alternative, to Compel Additional Discovery by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment, # 3 Proposed Pleading;, # 4 Memorandum in Support, # 5 Attachment, # 6 Exhibit A, # 7 Exhibit B, # 8 Exhibit C, # 9 Exhibit D, # 10 Exhibit E, # 11 Exhibit F, # 12 Exhibit G, # 13 Exhibit H, # 14 Exhibit I, # 15 Exhibit J, # 16 Exhibit K)(Montagnes, Mercedes) Modified to edit text on 5/17/2018 (SGO). (Entered: 05/17/2018) |
| 05/18/2018 | 415 | ORDER granting 413 Motion to Enroll Additional Counsel for Plaintiffs. Added attorney Jamila Asha Johnson, Meredith Jane Angelson and Jared Fletcher Davidson for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 5/18/2018. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 05/18/2018) |
| 05/22/2018 | 416 | ORDER granting 414 Unopposed MOTION for Leave to File a Motion to Exclude Evidence of Post-Discovery Conditions or, in the Alternative, to Compel Additional Discovery filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr..Signed by Judge Shelly D. Dick on 5/22/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 05/22/2018) |
| 05/22/2018 | 417 | MOTION to Exclude Evidence of Post-Discovery Conditions or, in the Alternative, to Compel Additional Discovery by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K)(SGO). Added MOTION to Compel on 5/23/2018 (SGO). (Entered: 05/23/2018) |
| 06/11/2018 | 418 | MEMORANDUM in Opposition to 417 MOTION in Limine or in the Alternative MOTION to Compel *Additional Discovery* filed by All Defendants. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A)(Robert, Randal) Modified on 6/11/2018 to text (LLH). (Entered: 06/11/2018) |
| 06/21/2018 | 419 | ORDER: Plaintiff's 417 MOTION to Exclude Evidence of Post-DiscoveryConditions is hereby GRANTED, and the 417 MOTION to Compel Additional Discovery is hereby DENIED. A bench trial on liability only, limited to evidence of the conditions as they existed on or before 9/30/2016 will go forward commencing on 10/9/2018. Signed by Judge Shelly D. Dick on 6/20/2018. (LLH) (Entered: 06/21/2018) |
| 06/29/2018 | 420 | Joint MOTION for Extension of Discovery Deadlines *to Depose "Will Call" Witness Francis Brauner* by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Conine, John) (Entered: 06/29/2018) |
| 07/09/2018 | 421 | SEALED MOTION for Leave to File Supplemental Memorandum in Support of 261 Motion for Summary Judgment Under Seal by All Defendants. (Attachments: # 1 Proposed Pleading; Order, # 2 Proposed Pleading; Supplemental Memorandum)(Robert, Randal) Modified on 7/10/2018 to edit text (LLH). (Entered: 07/09/2018) |
| 07/09/2018 | 426 | SUPPLEMENTAL BRIEF TO 193 First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims*, 194 Second MOTION for Partial Summary Judgment *Plaintiffs' Eighth Amendment Claim* filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 07/09/2018) |
| 07/10/2018 | 427 | MOTION Seal Exhibits *in Documents Nos. 422, 423, 424 and 425* by All Defendants. (Attachments: # 1 Proposed Pleading; Order)(Robert, Randal) (Entered: 07/10/2018) |
| 07/11/2018 | 428 | MOTION to Re-Urge Motion for Summary Judgment by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Conine, John) (Entered: 07/11/2018) |
| 07/12/2018 | 429 | ORDER granting 421 Sealed Motion for Leave to File Supplemental Memorandum in Support of 261 Motion for Summary Judgment Under Seal. Signed by Judge Shelly D. Dick on 7/12/2018. (LLH) (Entered: 07/12/2018) |
| 07/12/2018 | 430 | SEALED ORDER granting 427 MOTION to Seal Exhibits *in Documents Nos. 422, 423, 424 and 425* filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Signed by Judge Shelly D. Dick on 7/12/2018. (LLH) (Entered: 07/12/2018) |
| 07/12/2018 | 431 | SEALED EXHIBITS to 261 SEALED MOTION Summary Judgment filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit)(LLH) (Entered: 07/12/2018) |
| 07/12/2018 | 432 | SEALED Supplemental Memorandum in Support of 261 SEALED MOTION Summary Judgment filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit)(LLH) (Entered: 07/12/2018) |
| 07/16/2018 | 433 | ORDER granting 428 Motion to Re-urge Motion for Summary Judgment. Signed by Judge Shelly D. Dick on 7/16/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 07/16/2018) |
| 07/23/2018 | 434 | Supplemental MEMORANDUM in Opposition to 193 First MOTION for Partial Summary Judgment *on Plaintiffs' ADA Claims*, 194 Second MOTION for Partial |

| | | |
|---|---|---|
| | | Summary Judgment *Plaintiffs' Eighth Amendment Claim* filed by All Defendants. (Attachments: # 1 Exhibit 6)(Robert, Randal) Modified on 7/24/2018 to rotate and replace exhibit (LLH). (Entered: 07/23/2018) |
| 07/23/2018 | 435 | Supplemental MEMORANDUM in Opposition to 421 SEALED MOTION for Leave to File Supplemental Memorandum in Support of Motion for Summary Judgment Under Seal filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Montagnes, Mercedes) (Entered: 07/23/2018) |
| 07/24/2018 | 436 | ORDER granting Joint MOTION for Extension of Discovery Deadlines to Depose "Will Call" Witness Francis Brauner. The remaining deposition will take place by 7/27/2018. Signed by Chief Judge Shelly D. Dick on 7/24/2018. (LLH) (Entered: 07/24/2018) |
| 07/24/2018 | 437 | ADDENDUM to 435 Plaintiffs' Opposition to Defendants' Supplemental Memorandum in Support of Motion for Summary Judgment filed by All Plaintiffs. (Attachments: # 1 Exhibit)(Montagnes, Mercedes) (Attachment 1 replaced on 7/25/2018) (EDC). Modified on 7/25/2018 to rotate pages and to edit text. (EDC). (Entered: 07/24/2018) |
| 08/10/2018 | 438 | MOTION for Leave to Motion for Judicial Notice *Out of Time.* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Order, # 3 Proposed Pleading;, # 4 Proposed Pleading; MIS, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12)(Montagnes, Mercedes) (Entered: 08/10/2018) |
| 08/10/2018 | 439 | MOTION for Permission for Secretary James M. LeBlanc to be Absent During a Portion of the Trial Due to Travel by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Attachment Proposed Order)(Roper, Mary) Modified on 8/13/2018 to edit text (LLH). (Entered: 08/10/2018) |
| 08/10/2018 | 440 | MOTION for Expedited Hearing on 439 MOTION for Permission for Secretary James M. LeBlanc to be Absent During a Portion of the Trial Due to Travel by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Roper, Mary) Modified on 8/13/2018 to edit text (LLH). (Entered: 08/10/2018) |
| 08/13/2018 | 441 | MOTION to Clarify Order by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Order)(Robert, Randal) Modified on 8/15/2018 to replace main doc. per R. Doc. 446 (SWE). (Entered: 08/13/2018) |
| 08/13/2018 | 442 | MOTION to Re-Urge Motion to Strike by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Order)(Montagnes, Mercedes) Modified on 8/14/2018 to edit the text (NLT). (Entered: 08/13/2018) |
| 08/13/2018 | 443 | ORDER granting 440 Motion for Expedited Hearing on 439 MOTION for Permission for Secretary James M. LeBlanc to be Absent During a Portion of the Trial Due to Travel. Signed by Chief Judge Shelly D. Dick on 8/13/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 08/13/2018) |
| 08/13/2018 | 444 | ORDER granting 439 MOTION for Permission for Secretary James M. LeBlanc to be Absent During a Portion of the Trial Due to Travel. The Parties are to cooperate on the presentation of evidence in light of this ruling. Signed by Chief Judge Shelly D. Dick on 8/13/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 08/13/2018) |
| 08/13/2018 | 445 | |

| | | MOTION to Substitute Defendants' Motion to Clarify Order by All Defendants. (Attachments: # 1 Attachment Correct Document to be Substituted, # 2 Proposed Pleading; Order)(Robert, Randal) (Entered: 08/13/2018) |
|---|---|---|
| 08/14/2018 | 446 | ORDER granting 445 MOTION to Substitute Defendants' Motion to Clarify Order filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, The Louisiana Department of Public Safety and Corrections, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. Signed by Chief Judge Shelly D. Dick on 8/14/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 08/14/2018) |
| 08/21/2018 | 447 | ORDER granting 441 Motion to Clarify Order. Signed by Chief Judge Shelly D. Dick on 8/21/2018. (SWE) (Entered: 08/21/2018) |
| 08/24/2018 | 448 | MOTION for Leave to Amend Witness Lists by All Plaintiffs. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Pleading;, # 3 Attachment)(Montagnes, Mercedes) (Entered: 08/24/2018) |
| 08/27/2018 | 449 | MOTION to Substitute Party *Under RULE 25(D)* by All Defendants. (Attachments: # 1 Proposed order)(Cody, Jeffrey) Modified on 8/28/2018 to edit text (LLH). (Entered: 08/27/2018) |
| 08/27/2018 | 450 | MOTION to Substitute Exhibit as to *193 MOTION for Partial Summary Judgment on Plaintiffs' ADA Claims* by All Plaintiffs. (Attachments: # 1 Exhibit D1, # 2 Exhibit D2, # 3 Attachment)(Montagnes, Mercedes) Modified on 8/28/2018 to edit text (LLH). (Entered: 08/27/2018) |
| 08/28/2018 | 451 | AFFIDAVIT *of Settlement* by All Plaintiffs. (Montagnes, Mercedes) (Entered: 08/28/2018) |
| 08/28/2018 | 452 | ORDER granting 450 MOTION to Substitute Exhibit as to *193 MOTION for Partial Summary Judgment on Plaintiffs' ADA Claims* filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr.. Signed by Chief Judge Shelly D. Dick on 8/28/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 08/28/2018) |
| 09/04/2018 | 453 | MOTION to Re-Urge Defendants' Opposition to Plaintiffs' Motion to Strike by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Order)(Robert, Randal) (Entered: 09/04/2018) |
| 09/11/2018 | 454 | ORDER granting 438 MOTION for Leave to Motion for Judicial Notice Out of Time. Signed by Chief Judge Shelly D. Dick on 9/11/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2018) |
| 09/11/2018 | 455 | ORDER granting 448 MOTION for Leave to Amend Witness Lists. Signed by Chief Judge Shelly D. Dick on 9/11/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2018) |
| 09/11/2018 | 456 | ORDER granting 453 Motion to Re-Urge Defendants' Opposition to Plaintiffs' Motion to Strike. Signed by Chief Judge Shelly D. Dick on 9/11/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2018) |

| 09/11/2018 | 457 | ORDER denying 409 Motion for Copy of Audio Recording of Conference. Signed by Chief Judge Shelly D. Dick on 9/11/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2018) |
| --- | --- | --- |
| 09/11/2018 | 458 | ORDER granting 442 Motion to Re-Urge Motion to Strike. Signed by Chief Judge Shelly D. Dick on 9/11/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/11/2018) |
| 09/11/2018 | 459 | MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 9/12/2018 to edit the text (NLT). (Entered: 09/11/2018) |
| 09/11/2018 | 460 | ORDER granting 449 Motion to Substitute Party Under RULE 25(D). John Morrison, M.D. and Tracy Falgout, R.N., added in place of Raman Singh, M.D. and Stephanie Lamartiniere. Signed by Chief Judge Shelly D. Dick on 9/11/2018. (LLH) (Entered: 09/11/2018) |
| 09/11/2018 | 461 | MOTION for Site Visit by Judge by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Order)(Robert, Randal) (Entered: 09/11/2018) |
| 09/11/2018 | 465 | AMENDED Witness List Filed by Plaintiffs'. (LLH) (Entered: 09/13/2018) |
| 09/11/2018 | 466 | Second Motion Requesting Judicial Notice by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit)(EDC) (Entered: 09/13/2018) |
| 09/12/2018 | 462 | ORDER: The 403 Motion for Reconsideration of 193 First MOTION for Partial Summary Judgment on Plaintiffs' ADA Claims, 194 Second MOTION for Partial Summary Judgment Plaintiffs' Eighth Amendment Claim is DENIED except as to exhaustion of administrative remedies. Plaintiff's Re-Urged 288 Motion to Strike is DENIED as moot. Signed by Chief Judge Shelly D. Dick on 9/12/2018. (LLH) (Entered: 09/12/2018) |
| 09/12/2018 | 463 | MEMORANDUM in Opposition to 459 MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial filed by All Defendants. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Robert, Randal) Modified on 9/12/2018 to edit the text (NLT). (Entered: 09/12/2018) |
| 09/12/2018 | 464 | MOTION for Leave to File Excess Pages *for deposition designations* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) (Entered: 09/12/2018) |
| 09/14/2018 | 467 | MOTION to Enroll Amanda Zarrow as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment)(Montagnes, Mercedes) (Entered: 09/14/2018) |
| 09/17/2018 | 468 | MOTION for Leave to File Reply in Support of 459 MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;, # 3 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 9/18/2018 to edit text(LLH). (Entered: 09/17/2018) |
| 09/19/2018 | 469 | ORDER granting 468 Motion for Leave to File Reply in Support of 459 MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial. Signed by Chief Judge Shelly D. Dick on 9/19/2018. (LLH) (Entered: 09/19/2018) |

| 09/19/2018 | 470 | REPLY Memorandum in Support of 459 MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial filed by Alton Adams. (LLH) (Entered: 09/19/2018) |
|---|---|---|
| 09/19/2018 | 471 | ORDER granting 467 Motion to Enroll Amanda Zarrow as Additional Attorney for Plaintiffs. Signed by Chief Judge Shelly D. Dick on 9/19/2018. (LLH) (Entered: 09/19/2018) |
| 09/19/2018 | 472 | MOTION for Leave to File Surreply Memorandum in Opposition to Plaintiffs' Motion for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial by All Defendants. (Attachments: # 1 Proposed Pleading; Surreply in Opposition to Plaintiffs' Motion for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial, # 2 Proposed Pleading; Order)(Robert, Randal) (Entered: 09/19/2018) |
| 09/23/2018 | 473 | RESPONSE to 461 MOTION for Site Visit by Judge filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 09/23/2018) |
| 09/24/2018 | 474 | MEMORANDUM in Opposition to 466 MOTION Second Motion Requesting Judicial Notice filed by All Defendants. (Robert, Randal) (Entered: 09/24/2018) |
| 09/25/2018 | 475 | ORDER: The Parties are hereby ordered to submit Proposed Findings of Fact and Conclusions of Law to the Court on or before Wednesday, 10/3/2018. Signed by Chief Judge Shelly D. Dick on 9/24/2018. (KAH) (Entered: 09/25/2018) |
| 09/25/2018 | 476 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Pretrial Conference held on 9/25/2018. (BKA) (Entered: 09/25/2018) |
| 09/26/2018 | 477 | ORDER granting 472 MOTION for Leave to File Surreply Memorandum in Opposition filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, Tracy Falgout, The Louisiana Department of Public Safety and Corrections, John Morrison, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere, Stephanie Lamartiniere. There will be no further replies permitted. Signed by Chief Judge Shelly D. Dick on 9/26/18. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 09/26/2018) |
| 09/26/2018 | 478 | Defendants' SUR-REPLY to 459 MOTION for Leave to Permit Dr. Jane Andrews to Testify Remotely at Trial filed by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (SWE) (Entered: 09/27/2018) |
| 09/28/2018 | 479 | MOTION to Enroll Erica Navalance as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) (Entered: 09/28/2018) |
| 10/02/2018 | 480 | ORDER: Considering the length of the bench trial, in addition to the one laptop per counsel, Plaintiffs and Defendants are allowed up to three (3) additional laptops per side, without asking for leave. Signed by Chief Judge Shelly D. Dick on 10/2/2018. (LLH) (Entered: 10/02/2018) |
| 10/02/2018 | 481 | MOTION for Writ of Habeas Corpus ad testificandum by Alton Adams. (Attachments: # 1 Attachment Order)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 482 | MOTION for Writ of Habeas Corpus ad testificandum by Otto Barrera. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 483 | MOTION for Writ of Habeas Corpus ad testificandum for Charles Butler by All Plaintiffs. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |

| 10/02/2018 | 484 | MOTION for Writ of Habeas Corpus ad testificandum by Clyde Carter. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 485 | MOTION for Writ of Habeas Corpus ad testificandum by Ian Cazenave. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 486 | MOTION for Writ of Habeas Corpus ad testificandum by Ricky D. Davis. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 487 | MOTION for Writ of Habeas Corpus ad testificandum by Reginald George. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 488 | MOTION for Writ of Habeas Corpus ad testificandum *Lawrence Jenkins* by All Plaintiffs. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 489 | MOTION for Writ of Habeas Corpus ad testificandum by All Plaintiffs. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 490 | MOTION for Writ of Habeas Corpus ad testificandum by Kentrell Parker. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 491 | MOTION for Writ of Habeas Corpus ad testificandum by All Plaintiffs. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 492 | MOTION for Writ of Habeas Corpus ad testificandum by Farrell Sampier. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 493 | MOTION for Writ of Habeas Corpus ad testificandum by Lionel Tolbert. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 494 | MOTION for Writ of Habeas Corpus ad testificandum by John Tonubbee. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 495 | MOTION for Writ of Habeas Corpus ad testificandum by Edward Washington. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/02/2018 | 496 | MOTION for Writ of Habeas Corpus ad testificandum by Rufus White. (Attachments: # 1 Attachment)(Montagnes, Mercedes) (Entered: 10/02/2018) |
| 10/03/2018 | 497 | Proposed Findings of Fact by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Robert, Randal) (Entered: 10/03/2018) |
| 10/03/2018 | 498 | Proposed Findings of Fact by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Montagnes, Mercedes) (Entered: 10/03/2018) |
| 10/04/2018 | 499 | ORDER granting 479 Motion to Enroll Additional Attorney. Added attorney Erica Lauren Navalance for Plaintiffs. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 500 | ORDER granting 481 Motion for Writ of Habeas Corpus ad testificandum as to Alton Adams. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 501 | |

| | | ORDER granting 482 Motion for Writ of Habeas Corpus ad testificandum as to Otto Barrera. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) Modified on 10/4/2018 to rotate page (SWE). (Entered: 10/04/2018) |
|---|---|---|
| 10/04/2018 | 502 | ORDER granting 483 Motion for Writ of Habeas Corpus ad testificandum as to Charles Butler. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 503 | ORDER granting 484 Motion for Writ of Habeas Corpus ad testificandum as to Clyde Carter. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 504 | ORDER granting 485 Motion for Writ of Habeas Corpus ad testificandum as to Ian Cazenave. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 505 | ORDER granting 486 Motion for Writ of Habeas Corpus ad testificandum Ricky Davis. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 506 | ORDER granting 487 Motion for Writ of Habeas Corpus ad testificandum as to Reginald George. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 507 | ORDER granting 488 Motion for Writ of Habeas Corpus ad testificandum as to Lawrence Jenkins. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 508 | ORDER granting 490 Motion for Writ of Habeas Corpus ad testificandum as to Kentrell Parker. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 509 | ORDER granting 489 Motion for Writ of Habeas Corpus ad testificandum as to Anthony Mandigo. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 510 | ORDER granting 491 Motion for Writ of Habeas Corpus ad testificandum as to Daniel Price. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 511 | ORDER granting 492 Motion for Writ of Habeas Corpus ad testificandum as to Farrell Sampier. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 512 | ORDER granting 493 Motion for Writ of Habeas Corpus ad testificandum as to Lionel Tolbert. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 513 | ORDER granting 494 Motion for Writ of Habeas Corpus ad testificandum as to John Tonubbee. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 514 | ORDER granting 495 Motion for Writ of Habeas Corpus ad testificandum as to Edward Washington. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/04/2018 | 515 | ORDER granting 496 Motion for Writ of Habeas Corpus ad testificandum as to Rufus White. Signed by Chief Judge Shelly D. Dick on 10/4/2018. (SWE) (Entered: 10/04/2018) |
| 10/05/2018 | 516 | Return on ORDER. ACCEPTED BY RHONDA WELDON - DOC PARALEGAL ON 10/04/2018. (US Marshal, ) (Entered: 10/05/2018) |

| | | |
|---|---|---|
| 10/05/2018 | 517 | SUPPLEMENTAL Information Offered Pursuant to Ruling on 438 Second MOTION for Leave to Motion for Judicial Notice *Out of Time.* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Montanges, Mercedes) Modified on 10/9/2018 to edit the text (NLT). (Entered: 10/05/2018) |
| 10/09/2018 | 518 | Exhibit List *for Plaintiffs* by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White.. (Montanges, Mercedes) (Entered: 10/09/2018) |
| 10/09/2018 | 519 | Exhibit List *for Joint Exhibits* by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White.. (Montanges, Mercedes) (Entered: 10/09/2018) |
| 10/09/2018 | 520 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/9/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/10/2018) |
| 10/09/2018 | 555 | ELECTRONIC EXHIBITS for Bench Trial dated 10/9/2018 - Submitted to the court conventionally due to the voluminous nature . (SWE) (Entered: 04/04/2019) |
| 10/10/2018 | 521 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/10/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/10/2018) |
| 10/11/2018 | 522 | Exhibit List by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy.. (Bond, Caroline) (Entered: 10/11/2018) |
| 10/11/2018 | 523 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/11/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/12/2018) |
| 10/12/2018 | 524 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/12/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/12/2018) |
| 10/15/2018 | 525 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/15/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/15/2018) |
| 10/16/2018 | 526 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/16/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/17/2018) |
| 10/17/2018 | 527 | ORDER: The Bench Trial of this matter is currently proceeding. However, due to a scheduling conflict, the Court has canceled the Bench Trial on 10/19/2018. Accordingly, any previous Orders requiring the Warden of the LSP to produce inmate parties or witnesses for 10/19/2018, are hereby vacated, and no LSP inmate parties or witnesses should be produced on this date. The Bench Trial is scheduled to resume on 10/22/2018, and any Orders requiring the Warden of LSP to produce inmate parties or witnesses during the week of October 22, 2018 remain in effect. Signed by Chief Judge Shelly D. Dick on 10/17/2018. (NLT) (Entered: 10/17/2018) |

| 10/17/2018 | 529 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/17/2018. (Court Reporter Shannon Thompson.) (BKA) (Entered: 10/18/2018) |
|---|---|---|
| 10/18/2018 | 528 | Return on ORDER. ACCEPTED BY RHONDA WELDON, DOC PARALEGAL ON 10/17/2018. (US Marshal, ) (Entered: 10/18/2018) |
| 10/22/2018 | 530 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/22/2018. (Court Reporter Shannon Thompson.) (BKA) (Entered: 10/23/2018) |
| 10/23/2018 | 531 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/23/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/24/2018) |
| 10/24/2018 | 532 | AMENDED ORDER: The Bench Trial of this matter, which began on October 9, 2018, is currently proceeding. Due to a change in scheduling, the Warden of the Louisiana State Penitentiary at Angola, Louisiana, Darell Vannoy, is hereby ORDERED to transport and produce Plaintiff, KENTRELL PARKER, DOC# 371212, for the trial before Chief Judge Dick scheduled to be held at 9:00 a.m. on October 25, 2018. Signed by Chief Judge Shelly D. Dick on 10/24/2018. (NLT) (Entered: 10/24/2018) |
| 10/24/2018 | 533 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 10/24/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) Modified on 10/25/2018 (BKA). (Entered: 10/25/2018) |
| 10/25/2018 | 534 | ORDER: The Bench Trial of this matter, which began on10/9/2018, is currently proceeding. However, due to a scheduling conflict, the Court has canceled the Bench Trial on 10/26/2018. Accordingly, any previous Orders requiring the Warden of LSP to produce inmate parties or witnesses for 10/26/2018, are hereby vacated, and no LSP inmate parties or witnesses should be produced on this date. Signed by Chief Judge Shelly D. Dick on 10/25/2018. (NLT) Modified on 10/26/2018 to edit text (LLH). (Entered: 10/25/2018) |
| 10/25/2018 | 535 | Return on ORDER. ACCEPTED BY RHONDA WELDON - DOC PARALEGAL. (US Marshal, ) (Entered: 10/25/2018) |
| 10/25/2018 | 536 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial completed on 10/25/2018. (Court Reporter Shannon Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(BKA) (Entered: 10/25/2018) |
| 11/05/2018 | 537 | TRANSCRIPT REQUEST by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White for proceedings held on October 9, 2018 through October 25, 2018 before Judge Shelly D. Dick.. (Kumar, Nishi) (Entered: 11/05/2018) |
| 11/06/2018 | 538 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy for proceedings held on 10/9/2018 before Judge Shelly D. Dick. (Robert, Randal) Modified on 11/7/2018 to flatten and replace doc (LLH). (Entered: 11/06/2018) |
| 11/06/2018 | 539 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and |

| | | |
|---|---|---|
| | | Corrections, Darrel Vannoy for proceedings held on 10/9/2018-10/25/2018 before Judge Shelly D. Dick.. (Robert, Randal) (Entered: 11/06/2018) |
| 11/06/2018 | 540 | ORDER: A Telephone Conference is set for 11/15/2018 at 01:30 PM in chambers before Magistrate Judge Richard L. Bourgeois Jr. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 11/6/2018. (Attachments: # 1 Attachment)(KAH) (Entered: 11/06/2018) |
| 11/15/2018 | 541 | Minute Entry for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Conference held on 11/15/2018. The parties discussed the scheduling of a settlement conference in this matter. Upon the completion and filing of the trial transcripts, the parties are to confer with one another and contact the undersigneds chambers with proposed dates for a settlement conference. The Court's order setting the settlement conference will provide additional instructions regarding the required submissions in advance of the conference. (SGO) (Entered: 11/16/2018) |
| 02/13/2019 | 542 | MOTION for Mary E. Roper to Withdraw as Attorney by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Roper, Mary) (Entered: 02/13/2019) |
| 02/14/2019 | | MOTION(S) REFERRED: 542 MOTION for Mary E. Roper to Withdraw as Attorney . This motion is now pending before the USMJ. (SWE) (Entered: 02/14/2019) |
| 02/15/2019 | 543 | ORDER granting 542 Motion to Withdraw Attorney Mary E. Roper as Attorney for Defendants in this matter. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 2/15/2019. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (JSL) (Entered: 02/15/2019) |
| 03/18/2019 | 544 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Bench Trial before Judge Shelly D. Dick held on 10/09/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567. NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 545 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Bench Trial before Judge Shelly D. Dick held on 10/10/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567. NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | <u>546</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/12/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | <u>547</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/15/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | <u>548</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/16/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br><span style="color:red">NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.</span><br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | <u>549</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/17/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567. |

| | | |
|---|---|---|
| | | NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 550 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/11/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 551 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/22/2018. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 552 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/23/18. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 553 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Bench Trial before Judge Shelly D. Dick held on 10/24/18. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 03/18/2019 | 554 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 10/25/18. Court Reporter: Shannon Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/8/2019. Redacted Transcript Deadline set for 4/18/2019. Release of Transcript Restriction set for 6/17/2019. (Thompson, Shannon) (Entered: 03/18/2019) |
| 04/17/2019 | 556 | Post-Trial Memorandum by All Defendants. (Robert, Randal) (Entered: 04/17/2019) |
| 04/17/2019 | 557 | ATTENTION: To view the corrected version of this document, please see rec. doc. 573....Proposed Findings of Fact by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 Attachment Appendix A)(Montagnes, Mercedes) (Main Document 557 and Attachment 1 replaced on 5/2/2019 in accordance with RD 559) (SWE). Modified on 10/21/2019 to substitute document as per Order # 571 (LLH). This entry was modified on 1/7/2020 to notate that rec. doc. 573 replaces rec. doc. 557 and shall be considered the operative document and replaces any and all previously filed documents (DCB). (Entered: 04/17/2019) |
| 04/17/2019 | 558 | MOTION to Substitute Plaintiffs' FFCL by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Revised FFCL, # 3 Attachment Appendix, # 4 Attachment Proposed Order)(Montagnes, Mercedes) (Attachment 2 replaced on |

| | | 10/17/2019 in accordance with RD 571) (SWE). (Entered: 04/17/2019) |
|---|---|---|
| 04/17/2019 | 573 | Corrected Plaintiffs' Proposed Findings of Fact and Conclusions of Law . by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White (Attachments: # 1 Attachment Appendix A)(Kumar, Nishi). As per rec. doc. no. 572 this entry was modified to reflect that this corrected pleading replaces rec. doc. 557 and shall be considered the operative document and replaces any and all previously filed documents(DCB). (Entered: 01/07/2020) |
| 04/29/2019 | 559 | ORDER granting 558 MOTION to Substitute Plaintiffs' FFCL filed by Clyde Carter, Kentrell Parker, Shannon Hurd, Cedric Evans, Lionel Tolbert, Reginald George, Rufus White, Alton Adams, Ian Cazenave, John Tonubbee, Edward Giovanni, Farrell Sampier, Alton Batiste, Ricky D. Davis, Edward Washington, Otto Barrera, Joseph Lewis, Jr.. Signed by Chief Judge Shelly D. Dick on 4/29/19. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 04/29/2019) |
| 05/07/2019 | 560 | Post-Trial Memorandum by All Defendants. (Robert, Randal) (Entered: 05/07/2019) |
| 05/07/2019 | 561 | Reply to 556 Post-Trial Memorandum filed by All Plaintiffs. (Attachments: # 1 Exhibit A)(Montagnes, Mercedes) Modified on 5/8/2019 to edit to the docket text to match the document (KMW). (Entered: 05/07/2019) |
| 05/16/2019 | 562 | ORDER: Settlement Conference set for 7/24/2019 at 09:30 AM in chambers before Magistrate Judge Richard L. Bourgeois Jr. The parties shall submit confidential settlement position papers by noon on July 17, 2019 to the judge's chambers either via facsimile transmission to (225) 389-3603 or hand delivery. The statement shall be succinct and not exceed twenty pages. Before arriving at the settlement conference the parties are to negotiate and make a good faith effort to settle the case without the involvement of the Court. A specific settlement offer, in writing, must be submitted by the plaintiff by June 28, 2019, with a brief explanation of why settlement is appropriate on any particular issue. If unacceptable to the defendant, a specific counteroffer, in writing, must be submitted by the defendant by July 12, 2019. If settlement is not achieved, plaintiff's counsel shall deliver or fax copies of all letters to Judge Bourgeois no later than noon on July 19, 2019. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 5/16/2019. (JSL) (Entered: 05/16/2019) |
| 07/24/2019 | 563 | Order/Minute Entry for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Settlement Conference held on 7/24/2019. The parties were unable to reach a resolution. The parties will continue negotiations themselves and will contact the Court again should a follow-up settlement conference be desired. (KAH) (Entered: 07/26/2019) |
| 08/09/2019 | 564 | MOTION to Substitute Plaintiffs' Proposed Remedy by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Proposed Remedy, # 3 Attachment Proposed Order)(Kumar, Nishi) (Entered: 08/09/2019) |
| 08/15/2019 | 565 | MOTION to Withdraw as Counsel of Record by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Zarrow, Amanda) Modified on 8/15/2019 to edit the docket text (KMW). (Entered: 08/15/2019) |
| 08/15/2019 | | MOTION(S) REFERRED: 565 MOTION to Withdraw as Counsel of Record . This motion is now pending before the USMJ. (KMW) (Entered: 08/15/2019) |
| 08/21/2019 | 566 | |

| | | |
|---|---|---|
| | | ORDER granting 565 Motion to Withdraw as Counsel of Record. Attorney Amanda Zarrow is withdrawn as co-counsel of record for plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 8/21/2019. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 08/21/2019) |
| 09/09/2019 | 567 | MOTION to Substitute Ronald K. Lospennato in place of Miranda Tait as Attorney by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 09/09/2019) |
| 09/19/2019 | 568 | ORDER granting 567 Motion to Substitute Attorney. Ronald Kenneth Lospennato for all plaintiffs replacing Miranda Tait. Signed by Chief Judge Shelly D. Dick on 09/18/2019. (ELW) (Entered: 09/19/2019) |
| 10/09/2019 | 569 | MOTION for Colin Clark to Withdraw as Attorney by All Defendants. (Attachments: # 1 Proposed Order)(Clark, Colin) (Entered: 10/09/2019) |
| 10/10/2019 | | MOTION(S) REFERRED: 569 MOTION for Colin Clark to Withdraw as Attorney . This motion is now pending before the USMJ. (LT) (Entered: 10/10/2019) |
| 10/10/2019 | 570 | ORDER granting 569 Motion to Withdraw Counsel of Record. Attorney Colin Clark is withdrawn as co-counsel for defendants. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 10/10/2019. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 10/10/2019) |
| 10/17/2019 | 571 | ORDER granting 564 MOTION to Substitute Plaintiffs' Proposed Remedy . Signed by Chief Judge Shelly D. Dick on 10/17/2019. (SWE) (Entered: 10/17/2019) |
| 01/06/2020 | 572 | ORDER: This matter is before the Court on Plaintiffs' Motion to Substitute Plaintiffs Proposed Remedy, which the Court granted. However, rather than substitute only the remedy portion of Plaintiffs' memorandum, Plaintiffs' Post-Trial memorandum, originally 298 pages, was substituted entirely by Plaintiffs' substituted remedy. Thus, the current record does not contain Plaintiffs' Post-Trial Memorandum. Counsel for Plaintiffs are hereby ordered to confer with the Clerk of Court's Office to correct the docket by close of business Wednesday, January 8, 2020. Signed by Chief Judge Shelly D. Dick on 1/6/2020. (EDC) (Entered: 01/06/2020) |
| 01/31/2020 | 574 | MOTION for Meredith Angelson to Withdraw as Attorney *for Plaintiffs* by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Order)(Angelson, Meredith) (Entered: 01/31/2020) |
| 01/31/2020 | | MOTION(S) REFERRED: 574 MOTION for Meredith Angelson to Withdraw as Attorney *for Plaintiffs*. This motion is now pending before the USMJ. (EDC) (Entered: 01/31/2020) |
| 02/03/2020 | 575 | ORDER granting 574 Motion to Withdraw as Co-Counsel of Record. Attorney Meredith Angelson is withdrawn as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 2/3/2020. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 02/03/2020) |
| 02/04/2020 | 576 | ORDER: Upon request of all parties the Court will conduct a site visit of Louisiana State Penitentiary on Wednesday February 5th commencing at 10 am. The Court's site visit shall include the following: R.E.Barrow Treatment Center, The Acute Treatment Center, Nursing Unit 1, Nursing Unit 2, and the Ash 2 Medical Dormitory. Counsel for the parties may be present and are invited to attend and accompany the Court as their interests may require. Counsel for LSP is Ordered to coordinate the necessary arrangements and security clearances for the Court's site visit. Counsel is instructed to contact the Louisiana Middle District Marshal Service (225-389-0359) and coordinate with Deputy Marshal |

| | | |
|---|---|---|
| | | Clayton McDonough, who will accompany the Court to the site. Signed by Chief Judge Shelly D. Dick on 2/4/2020. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(Dick, Shelly) (Entered: 02/04/2020) |
| 02/04/2020 | 577 | ORDER: The Parties are hereby advised that, for tomorrow's Angola site visit, there is a limit of two counsel for Plaintiffs and two counsel for Defendants. Additionally, the Parties are hereby ordered to advise the Court and the U.S. Marshal of the identity of the attorneys attending by 4:00 p.m. CST today. Signed by Chief Judge Shelly D. Dick on 2/4/2020. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(BKA) (Entered: 02/04/2020) |
| 02/21/2020 | 578 | ORDER: The Court has taken under advisement the parties claims and defenses and is preparing to issue a Ruling on the merits. The Court will find that the medical care at Angola State Penitentiary is unconstitutional in some respects and is prepared to Order injunctive relief addressing conditions which the Court finds unconstitutional. The Court considers it to be in the best interests of the litigants to attempt to reach an amicable resolution on some or all of the claims. It is ORDERED that Randal Robert, only,for the Defendants and Mercedes Montagnes,only,for the Plaintiffs, meet and confer in person for the purposes of reaching resolution on some or all claims. It is FURTHER ORDERED that Secretary LeBlanc attend the in person meeting of counsel Robert and Montagnes. Mr. Robert and Ms. Montagnes are hereby ORDERED to contact United States Magistrate Judge Richard Bourgeois to schedule a date and time to meet and confer under the the direction and assistance of Magistrate Judge. Signed by Chief Judge Shelly D. Dick on 2/21/2020. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(Dick, Shelly) (Entered: 02/21/2020) |
| 03/03/2020 | 579 | SETTLEMENT CONFERENCE ORDER: Settlement Conference set for 4/14/2020 at 09:30 AM in chambers before Magistrate Judge Richard L. Bourgeois Jr.. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 3/3/2020. (EDC) (Entered: 03/03/2020) |
| 03/28/2020 | 580 | Emergency MOTION to Re-open Discovery Regarding COVID-19 by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Declaration of Dr. Puisis, # 3 Attachment Declaration of Jeff Dubner, # 4 Attachment Email Correspondence, # 5 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 3/30/2020 to edit the docket text (KMW). (Entered: 03/28/2020) |
| 03/28/2020 | 581 | MOTION for Expedited Consideration on 580 Emergency MOTION for Discovery by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 3/30/2020 to edit the docket text (KMW). (Entered: 03/28/2020) |
| 03/30/2020 | | MOTION(S) REFERRED: 580 Emergency MOTION to Re-open Discovery Regarding COVID-19. This motion is now pending before the USMJ. (KMW) (Entered: 03/30/2020) |
| 03/30/2020 | | MOTION(S) REFERRED: 581 MOTION for Expedited Consideration on 580 Emergency MOTION for Discovery . This motion is now pending before the USMJ. (KMW) (Entered: 03/30/2020) |
| 03/31/2020 | 582 | Plaintiff's Emergency MOTION to Restrain Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Declaration of Dr. Puisis, # 3 Attachment Declaration of Jeff Dubner, # 4 Attachment Email Correspondence, # 5 Attachment Proposed Order)(Montagnes, Mercedes) Modified on 3/31/2020 to edit text (LT). (Entered: 03/31/2020) |
| 03/31/2020 | 583 | |

| | | |
|---|---|---|
| | | MOTION to Continue Post-Trial Settlement Conference by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support Memorandum in Support, # 2 Proposed Pleading; Proposed Order)(Tomeny, Caroline) (Entered: 03/31/2020) |
| 03/31/2020 | | MOTION(S) REFERRED: 583 MOTION to Continue Post-Trial Settlement Conference . This motion is now pending before the USMJ. (KMW) (Entered: 03/31/2020) |
| 03/31/2020 | 584 | RESPONSE to 583 MOTION to Continue Post-Trial Settlement Conference filed by All Plaintiffs. (Montagnes, Mercedes) (Entered: 03/31/2020) |
| 04/01/2020 | | Motions No Longer Referred: 581 MOTION for Expedited Consideration on 580 Emergency MOTION for Discovery , 580 Emergency MOTION to Re-open Discovery Regarding COVID-19. This motion is now pending before the USDJ. (KMW) (Entered: 04/01/2020) |
| 04/01/2020 | 585 | MEMORANDUM in Opposition to 582 Plaintiff's Emergency MOTION to Restrain Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary by All Plaintiffs filed by Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Exhibit Affidavit of James M. LeBlanc, # 2 Exhibit Affidavit of Tracy Falgout, # 3 Exhibit Affidavit of Dr. John E. Morrison, # 4 Exhibit 4, # 5 Exhibit 5)(Robert, Randal) (Entered: 04/01/2020) |
| 04/02/2020 | 586 | ORDER granting 583 Motion to Continue. The settlement conference set for 4/14/2020 is CANCELLED. A telephone conference is set for 4/21/2020 at 11:00 a.m. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 4/1/2020. (EDC) (Entered: 04/02/2020) |
| 04/02/2020 | | Set/Reset Deadlines/Hearings: (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry) Telephone Conference before the Magistrate Judge set for 4/21/2020 at 11:00 AM in chambers before Magistrate Judge Richard L. Bourgeois Jr.. (EDC) (Entered: 04/02/2020) |
| 04/02/2020 | 587 | RULING granting 581 Motion for Expedited Hearing on 580 Emergency Motion to Re-Open Discovery Regarding COVID-19. Plaintiffs' 580 Emergency Motion to Re-Open Discovery Regarding COVID-19 and 582 Emergency Motion to Restrain Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary are DENIED. Signed by Chief Judge Shelly D. Dick on 4/2/2020. (SWE) (Entered: 04/02/2020) |
| 04/20/2020 | 588 | Considering the current national emergency relating to COVID-19, the telephone conference set April 21, 2020 at 11:00 a.m. remains premature. Accordingly, it is CANCELLED and RESET for 5/19/2020 at 10:30 AM. Attorney Randal J. Robert, counsel for defendants, and attorney Mercedes Montagnes, counsel for plaintiff, shall participate in the telephone conference. Attorney Randal J. Robert shall initiate the call to all parties then contact the Court at (225) 389-3602 once both attorneys are on the line. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(Bourgeois, Richard) (Entered: 04/20/2020) |
| 05/19/2020 | 589 | Minute Entry/Order for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Telephone Conference held on 5/19/2020. (LT) Modified on 5/21/2020 to edit text (LT). (Entered: 05/19/2020) |
| 05/28/2020 | 590 | Notice to Counsel: A Settlement Conference with Randal J. Robert and Secretary LeBlanc is set for 6/4/2020 at 03:00 PM in by video before Magistrate Judge Richard L. Bourgeois Jr. Participant instructions shall be sent to Mr. Robert and Secretary LeBlanc via separate |

| | | e-mail by the courtroom deputy. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SGO) (Entered: 05/28/2020) |
|---|---|---|
| 06/04/2020 | 591 | Minute Entry/Order for proceedings held before Magistrate Judge Richard L. Bourgeois, Jr.: Video Settlement Conference held on 6/4/2020. (LT) Modified on 6/8/2020 to edit text (LT). Modified on 6/9/2020 to edit title (LT). (Entered: 06/05/2020) |
| 09/22/2020 | 592 | MOTION to Withdraw *as Co-Counsel of Record* by All Plaintiffs. (Davidson, Jared) (Entered: 09/22/2020) |
| 09/22/2020 | | MOTION(S) REFERRED: 592 MOTION to Withdraw *as Co-Counsel of Record*. This motion is now pending before the USMJ. (KMW) (Entered: 09/22/2020) |
| 09/24/2020 | 593 | ORDER granting 592 Motion to Withdraw as Co-Counsel of Record. Attorney Jared Davidson is withdrawn as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/24/2020. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 09/24/2020) |
| 03/31/2021 | 594 | OPINION: For the reasons stated, the Court holds that the Defendants, in their official capacities, are violating the Eighth Amendment rights of the Plaintiff Class and the ADA and RA rights of the Plaintiff Subclass. Based on the overwhelming evidence presented at trial, judgment shall be entered in favor of Plaintiffs following the remedy phase. The Court shall order injunctive relief as stated herein. By separate notice, the Court will set a State Conference to discuss proceeding to the remedy phase of this matter. Signed by Chief Judge Shelly D. Dick on 3/31/2021. (SWE) (Entered: 03/31/2021) |
| 03/31/2021 | 595 | ORDER: This matter is hereby temporarily STAYED and ADMINISTRATIVELY CLOSED pending a docket review and preparation for the remedy phase. This matter shall be re-opened upon the setting of a Status Conference to discuss how the remedial phase will proceed. Signed by Chief Judge Shelly D. Dick on 3/31/2021. (EDC) (Entered: 03/31/2021) |
| 03/31/2021 | 596 | GENERAL ORDER: All pleadings and other papers filed under seal in civil and criminal actions shall be maintained under seal for thirty days following final disposition of the action. After that time, all sealed pleadings and other papers shall be placed in the case record unless a District Judge or Magistrate Judge, upon motion and for good cause shown, orders that the pleading or other paper be maintained under seal.<br><br>The deadline for filing any motions regarding the unsealing of any document shall be within thirty days of the final disposition of any action and shall contain a concise statement of reasons for maintaining the pleading or other paper under seal.<br><br>ATTENTION: If a motion to retain documents under seal is NOT filed, all documents shall be placed in the public case record, unless specifically identified in the attached General Order<br><br>Signed by Chief Judge Shelly D. Dick on 7/8/2019. (EDC) (Entered: 03/31/2021) |
| 04/12/2021 | 597 | MOTION to Lift Stay to Allow Filing of a Motion for Reconsideration or, in the Alternative, MOTION to Certify Ruling for Interlocutory Appeal by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Order, # 3 Exhibit A - Defendants' Motion for Reconsideration, # 4 Exhibit B - Defendants' Memorandum in Support of Motion for Reconsideration)(Robert, Randal). (Entered: 04/12/2021) |

| 04/13/2021 | 598 | ORDER granting 597 Motion to Lift Stay and this case is hereby REOPENED. Signed by Chief Judge Shelly D. Dick on 4/13/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 04/13/2021) |
| --- | --- | --- |
| 04/13/2021 | 599 | Unopposed MOTION for Extension of Time file Motion for Attorneys' Fees and Costs by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 04/13/2021) |
| 04/13/2021 | 600 | MOTION to Enroll Rebecca Rose Ramaswamy as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Kumar, Nishi) (Entered: 04/13/2021) |
| 04/13/2021 | | MOTION(S) REFERRED: 600 MOTION to Enroll Rebecca Rose Ramaswamy as Additional Attorney . This motion is now pending before the USMJ. (EDC) (Entered: 04/13/2021) |
| 04/14/2021 | 601 | ORDER granting 599 Motion for Extension of Time of 90 (ninety) days. Signed by Chief Judge Shelly D. Dick on 4/14/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 04/14/2021) |
| 04/15/2021 | 602 | ORDER granting 600 Motion to Enroll Additional Counsel for Plaintiffs. Attorney Rebecca Rose Ramaswamy is enrolled as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 4/15/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 04/15/2021) |
| 04/15/2021 | 603 | MOTION for Reconsideration of 594 Opinion,, or, in the Alternative, to Certify Ruling for Interlocutory Appeal by Burl Cain, Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support)(Robert, Randal). Added MOTION on 4/15/2021 (EDC). Modified on 7/6/2021 to add motion text (NLT). (Entered: 04/15/2021) |
| 05/03/2021 | 604 | MEMORANDUM in Opposition to 603 MOTION for Reconsideration of 594 Opinion,, or, in the Alternative, to Certify Ruling for Interlocutory Appeal filed by All Plaintiffs. (Attachments: # 1 Exhibit Email Exchange)(Ramaswamy, Rebecca) (Entered: 05/03/2021) |
| 05/03/2021 | 605 | MOTION for Status Conference by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Attachment Proposed Order)(Kumar, Nishi) (Entered: 05/03/2021) |
| 05/26/2021 | 606 | MOTION for Bruce Hamilton to Withdraw as Attorney by All Plaintiffs. (Hamilton, Bruce) (Entered: 05/26/2021) |
| 05/26/2021 | 607 | MOTION for Nora Ahmed to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2292000) by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Attachment Certificate, # 3 Attachment Proposed Order)(Kumar, Nishi) (Entered: 05/26/2021) |
| 05/27/2021 | | MOTION(S) REFERRED: 606 MOTION for Bruce Hamilton to Withdraw as Attorney , 607 MOTION for Nora Ahmed to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2292000). This motion is now pending before the USMJ. (ELW) (Entered: 05/27/2021) |
| 05/27/2021 | 608 | ORDER granting 607 Motion for Nora Ahmed to Appear Pro Hac Vice on behalf of plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 5/27/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this |

| | | |
|---|---|---|
| | | entry.) (SGO)<br><br><span style="color:red">ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.</span><br><br>(Entered: 05/27/2021) |
| 06/02/2021 | 609 | ORDER granting 606 Motion to Withdraw. Attorney Bruce Hamilton is withdrawn as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 6/2/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 06/02/2021) |
| 07/02/2021 | 610 | Unopposed MOTION for Extension of Time to File Motion for Attorneys' Fees and Costs by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Ramaswamy, Rebecca) (Entered: 07/02/2021) |
| 07/12/2021 | 611 | ORDER granting 610 Motion for Extension of Time. Signed by Chief Judge Shelly D. Dick on 7/12/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 07/12/2021) |
| 08/04/2021 | 612 | MOTION to Enroll Bruce Hamilton as Additional Attorney by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 08/04/2021) |
| 08/05/2021 | | MOTION(S) REFERRED: 612 MOTION to Enroll Bruce Hamilton as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 08/05/2021) |
| 08/05/2021 | 613 | ORDER granting 612 Motion to Enroll Attorney adding Bruce Warfield Hamilton as additional counsel for all plaintiffs. Signed by Chief Judge Shelly D. Dick on 8/5/2021. (DCB) (Entered: 08/05/2021) |
| 08/24/2021 | 614 | Consent MOTION for Leave to File Excess Pages *for Motion for Fees and Costs* by All Plaintiffs. (Attachments: # 1 Memorandum in Support Memo in Support of Motion to Exceed Page Limit, # 2 Attachment Proposed Order Granting Motion to File Excess Pages, # 3 Proposed Pleading; Motion for Fees, # 4 Exhibit Memo in Support of Motion for Fees, # 5 Exhibit (1) Montagnes Decl, # 6 Exhibit (1-L) PJI Costs 1 of 2, # 7 Exhibit (1-L) PJI Costs 2 of 2, # 8 Exhibit (2) Zarrow Decl, # 9 Exhibit (3) Navalance Decl, # 10 Exhibit (4) Farris Decl, # 11 Exhibit (5) Compa Decl, # 12 Exhibit (6) Glass Decl, # 13 Exhibit (7) Kumar Decl, # 14 Exhibit (8) Ramaswamy Decl, # 15 Exhibit (9) Dubner Decl, # 16 Exhibit (10) Hamilton Decl, # 17 Exhibit (11) Sirmon Decl, # 18 Exhibit (12) Harrison Decl, # 19 Exhibit (13) ACLU Costs, # 20 Exhibit (14) Lospennato Decl, # 21 Exhibit (15) Small Decl, # 22 Exhibit (16) J. Johnson Decl, # 23 Exhibit (17) Davidson Decl, # 24 Exhibit (18) Angelson Decl, # 25 Exhibit (19) Clark Decl, # 26 Exhibit (20) Gaffney Decl, # 27 Exhibit (21) Kendell Decl, # 28 Exhibit (22) Graybill Decl, # 29 Exhibit (23) SPLC Costs 1 of 3, # 30 Exhibit (23) SPLC Costs 2 of 3, # 31 Exhibit (23) SPLC Costs 3 of 3, # 32 Exhibit (24) Master Fees Spreadsheet)(Ramaswamy, Rebecca) (Attacements 6,7, 29, 30 and 31 replaced on 8/25/2021) (EDC). Modified on 8/25/2021 to rotate pages.(EDC). (Entered: 08/24/2021) |
| 08/25/2021 | 615 | ORDER granting 614 Motion for Leave to File Excess Pages. Signed by Chief Judge Shelly D. Dick on 8/25/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 08/25/2021) |
| 08/27/2021 | 616 | MOTION for Attorney Fees and Costs by Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 1-L-1, # 4 Exhibit 1-L-2, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # |

| | | |
|---|---|---|
| | | 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 23-2, # 28 Exhibit 23-3, # 29 Exhibit 24)(LLH) (Entered: 08/27/2021) |
| 09/13/2021 | 617 | JOINT MOTION to Enroll Andrew Blanchfield and Chelsea A. Payne as Additional Attorney by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading; Order)(Robert, Randal) Modified on 9/14/2021 to edit text (LLH). (Main Document 617 replaced on 9/16/2021 in accordance with RD 619) (SWE). (Entered: 09/13/2021) |
| 09/14/2021 | | MOTION(S) REFERRED: 617 MOTION to Enroll Andrew Blanchfield and Chelsea A. Payne as Additional Attorney . This motion is now pending before the USMJ. (LLH) (Entered: 09/14/2021) |
| 09/14/2021 | 618 | MOTION to Substitute Joint Motion to Enroll Additional Counsel of Record by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading;, # 2 Proposed Pleading; Order)(Robert, Randal) (Entered: 09/14/2021) |
| 09/14/2021 | | MOTION(S) REFERRED: 618 MOTION to Substitute Joint Motion to Enroll Additional Counsel of Record . This motion is now pending before the USMJ. (LLH) (Entered: 09/14/2021) |
| 09/16/2021 | 619 | ORDER granting 618 MOTION to Substitute Joint Motion to Enroll Additional Counsel of Record filed by Sherwood Poret, Cynthia Park, Tracy Falgout, The Louisiana Department of Public Safety and Corrections, John Morrison, Stacye Falgout, Darrel Vannoy, James M LeBlanc, Randy Lavespere. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/16/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 09/16/2021) |
| 09/16/2021 | 620 | ORDER granting 617 Motion to Enroll Additional Attorney. Added attorney Andrew Blanchfield,Chelsea Acosta Payne for Stacye Falgout,Andrew Blanchfield,Chelsea Acosta Payne for Stephanie Lamartiniere,Andrew Blanchfield,Chelsea Acosta Payne for Randy Lavespere,Andrew Blanchfield,Chelsea Acosta Payne for James M LeBlanc,Andrew Blanchfield,Chelsea Acosta Payne for John Morrison,Andrew Blanchfield,Chelsea Acosta Payne for Cynthia Park,Andrew Blanchfield,Chelsea Acosta Payne for Sherwood Poret,Andrew Blanchfield,Chelsea Acosta Payne for The Louisiana Department of Public Safety and Corrections,Andrew Blanchfield,Chelsea Acosta Payne for Darrel Vannoy. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 9/16/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 09/16/2021) |
| 09/16/2021 | 621 | Unopposed MOTION for Extension of Time to File Response to 616 MOTION for Attorney Fees by Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret. (Attachments: # 1 Attachment Proposed Order)(Blanchfield, Andrew) (Entered: 09/16/2021) |
| 09/30/2021 | 622 | ORDER granting 621 Motion for Extension of Time to File Response to 616 MOTION for Attorney Fees. Defendants be and they are hereby granted a ninety-day extension from the original deadline to file an opposition to Plaintiffs Motion for Attorneys Fees and Costs. Opposition due by 12/16/2021. Signed by Chief Judge Shelly D. Dick on |

| | | 09/30/2021. (ELW) (Entered: 09/30/2021) |
|---|---|---|
| 10/08/2021 | 623 | RULING denying 603 Motion for Reconsideration or, in the Alternative, to Certify Ruling for Interlocutory Appeal and granting 605 Motion for Status Conference to discuss the remedy phase in this matter. A status conference is set for 12/15/2021 at 2:00 p.m. in Courtroom 3. Signed by Chief Judge Shelly D. Dick on 10/08/2021. (NLT) (Entered: 10/08/2021) |
| 11/29/2021 | 624 | ORDER of USCA - Action Taken at the Circuit: COURT ORDER denying Petition for writ of mandamus filed by Petitioners Mr. James M. LeBlanc, Secretary, Department of Public Safety and Corrections, Louisiana Department of Public Safety and Corrections, Ms. Stephanie Lamartiniere and Mr. Darrel Vannoy, Warden, Louisiana State Penitentiary. (SWE) (Entered: 11/29/2021) |
| 12/08/2021 | 625 | MOTION to Stay *and/or Deny Plaintiffs' Motion for Attorneys' Fees and Costs (R. Doc. 616) on Grounds of Prematurity* by Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading;)(Blanchfield, Andrew). Added MOTION to Deny Plaintiffs' Motion for Attorneys' Fees and Costs on 12/9/2021 (SWE). (Entered: 12/08/2021) |
| 12/08/2021 | 626 | Ex Parte MOTION for Expedited Hearing on 625 MOTION to Stay *and/or Deny Plaintiffs' Motion for Attorneys' Fees and Costs (R. Doc. 616) on Grounds of Prematurity* by Stacye Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Attachments: # 1 Proposed Pleading;)(Blanchfield, Andrew) (Entered: 12/08/2021) |
| 12/10/2021 | 627 | MOTION to Enroll Samantha Bosalavage and Elena Malik as Additional Attorney by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Kumar, Nishi) (Entered: 12/10/2021) |
| 12/10/2021 | | MOTION(S) REFERRED: 627 MOTION to Enroll Samantha Bosalavage and Elena Malik as Additional Attorney . This motion is now pending before the USMJ. (SWE) (Entered: 12/10/2021) |
| 12/13/2021 | 628 | ORDER granting 627 Motion to Enroll Additional Counsel for Plaintiffs. Attorneys Elena Malik and Samantha Nicole Bosalavage are enrolled as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/13/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 12/13/2021) |
| 12/15/2021 | 629 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Status Conference held on 12/15/2021. (Court Reporter Shannon Thompson.) (BKA) (Entered: 12/15/2021) |
| 12/15/2021 | 630 | Notice to Counsel: Evidentiary (Remedy) Hearing set for 6/6/2022 through 6/17/2022 at 09:30 AM in Courtroom 3 before Chief Judge Shelly D. Dick. Pre-Hearing Conference set for 5/24/2022 at 10:00 AM in Courtroom 3 before Chief Judge Shelly D. Dick.<br><br>Evidence, in electronic format, shall be provided in accordance with Local Rule 79 and Administrative Procedures.<br><br>(This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 12/15/2021) |

| 12/15/2021 | 631 | ORDER granting 625 Motion to Stay the Motion at Record Document 616. Signed by Chief Judge Shelly D. Dick on 12/15/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 12/15/2021) |
| --- | --- | --- |
| 12/15/2021 | 632 | ORDER finding as moot 626 Motion for Expedited Hearing on Motion at Rec. Doc. 625. Signed by Chief Judge Shelly D. Dick on 12/15/2021. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (BKA) (Entered: 12/15/2021) |
| 12/22/2021 | 633 | Joint MOTION for Extension of Time exchange exhibit and witness lists by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/22/2021) |
| 01/05/2022 | 634 | ORDER granting 633 Joint MOTION for Extension of Time exchange exhibit and witness lists.. Signed by Chief Judge Shelly D. Dick on 1/5/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 01/05/2022) |
| 01/05/2022 | 635 | ORDER: Witness Lists are due 2/18/2022. Exhibit Lists are due 3/18/2022. Signed by Chief Judge Shelly D. Dick on 1/5/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(BKA) (Entered: 01/05/2022) |
| 01/31/2022 | 636 | MOTION for Protective Order by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Proposed Pleading; Proposed Order)(Cody, Jeffrey) (Entered: 01/31/2022) |
| 02/01/2022 | 637 | MOTION for Expedited Hearing on 636 MOTION for Protective Order by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Proposed Order)(Cody, Jeffrey) (Entered: 02/01/2022) |
| 02/02/2022 | | MOTION(S) REFERRED: 636 MOTION for Protective Order , 637 MOTION for Expedited Hearing on 636 MOTION for Protective Order . This motion is now pending before the USMJ. (NLT) (Entered: 02/02/2022) |
| 02/02/2022 | 638 | ORDER: as to 637 MOTION for Expedited Hearing on 636 MOTION for Protective Order. Plaintiffs shall give notice to the Court on or before noon Friday 2/4/2022 if they will oppose Defendants' 636 Motion. Signed by Chief Judge Shelly D. Dick on 2/2/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 02/02/2022) |
| 02/02/2022 | | Motions No Longer Referred: 636 MOTION for Protective Order , 637 MOTION for Expedited Hearing on 636 MOTION for Protective Order . This motion is now pending before the USDJ. (SGO) (Entered: 02/02/2022) |
| 02/03/2022 | 639 | NOTICE OF Opposition to 636 MOTION for Protective Order by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White (Malik, Elena) Modified on 2/4/2022 to edit the text (NLT). (Entered: 02/03/2022) |
| 02/08/2022 | 640 | RESPONSE in Opposition to 636 MOTION for Protective Order filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Kumar, Nishi) (Entered: 02/08/2022) |
| 02/11/2022 | 641 | MOTION for Leave to File Reply Brief in support of 636 Motion for Protective Order by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; |

| | | |
|---|---|---|
| | | Reply Brief, # 3 Proposed Pleading; Proposed Order)(Cody, Jeffrey) Modified on 2/14/2022 to edit text (ELW) (Entered: 02/11/2022) |
| 02/14/2022 | | MOTION(S) REFERRED: 641 MOTION for Leave to File Reply Brief . This motion is now pending before the USMJ. (NLT) (Entered: 02/14/2022) |
| 02/15/2022 | | Motions No Longer Referred: 641 MOTION for Leave to File Reply Brief . This motion is now pending before the USDJ. (SWE) (Entered: 02/15/2022) |
| 02/15/2022 | 642 | ORDER granting 641 MOTION for Leave to File Reply Brief in support of Motion for Protective Order. Signed by Chief Judge Shelly D. Dick on 2/15/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 02/15/2022) |
| 02/15/2022 | 643 | REPLY BRIEF in Support of 636 MOTION for Protective Order filed by All Defendants. (SWE) (Entered: 02/15/2022) |
| 02/16/2022 | 644 | NOTICE OF Joinder in Motion for Expedited Consideration by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White (Attachments: # 1 Exhibit A)(Kumar, Nishi) (Entered: 02/16/2022) |
| 02/17/2022 | 645 | RULING denying 636 Motion for Protective Order. However, the Court limits the beginning of remedy phase discovery to January 1, 2019, unless such requests seek policies, directives, protocols, guidelines, or forms relative to the said constitutional deficiencies but created or revised since September 30, 2016. Considering the date of this Ruling, the Court will extend the deadline to fulfill Plaintiffs' discovery requests to Friday, February 25, 2022. The Court urges the Parties to continue to meet and confer in good faith before filing any future discovery motions. Signed by Chief Judge Shelly D. Dick on 2/17/2022. (EDC) (Entered: 02/17/2022) |
| 02/18/2022 | 646 | MOTION to Compel *Production of Documents* by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Ex. A, Defs' Responses to Pls' 2nd Set of Remedy RFPs, # 3 Exhibit Ex. B, Email Exchange Feb 11-16, # 4 Exhibit Ex. C, Vassallo Dec.)(Ramaswamy, Rebecca) (Entered: 02/18/2022) |
| 02/18/2022 | | MOTION(S) REFERRED: 646 MOTION to Compel *Production of Documents*. This motion is now pending before the USMJ. (NLT) (Entered: 02/18/2022) |
| 02/18/2022 | 647 | Joint MOTION for Extension of Time fact deposition deadline by All Plaintiffs. (Attachments: # 1 Proposed Pleading;)(Malik, Elena) (Entered: 02/18/2022) |
| 02/18/2022 | | Motions No Longer Referred: 646 MOTION to Compel *Production of Documents*. This motion is now pending before the USDJ. (SGO) (Entered: 02/18/2022) |
| 02/21/2022 | 648 | MOTION to Enroll Emily Blythe Lubin as Additional Attorney by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Draft order)(Hamilton, Bruce) (Entered: 02/21/2022) |
| 02/22/2022 | | MOTION(S) REFERRED: 648 MOTION to Enroll Emily Blythe Lubin as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 02/22/2022) |
| 02/22/2022 | 649 | |

| | | |
|---|---|---|
| | | Consent MOTION to Withdraw <u>646</u> MOTION to Compel *Production of Documents* by All Plaintiffs. (Attachments: # <u>1</u> Exhibit Defs' Email, # <u>2</u> Attachment Proposed Order)(Ramaswamy, Rebecca) (Entered: 02/22/2022) |
| 02/23/2022 | 650 | ORDER granting <u>648</u> Motion to Enroll Additional Counsel. Attorney Emily Blythe Lubin is enrolled as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 2/23/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 02/23/2022) |
| 02/23/2022 | 651 | ORDER granting <u>649</u> Consent Motion to Withdraw <u>646</u> MOTION to Compel *Production of Documents*. The <u>646</u> MOTION to Compel *Production of Documents* is DENIED AS MOOT. Signed by Chief Judge Shelly D. Dick on 2/23/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 02/23/2022) |
| 03/04/2022 | 652 | ORDER granting <u>647</u> Joint Motion to Extend Fact Depositions Deadline. The parties' deadline to complete fact depositions is 4/1/2022. Signed by Chief Judge Shelly D. Dick on 3/4/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/04/2022) |
| 03/14/2022 | <u>653</u> | MOTION for Brendan R. Schneiderman to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2405565) by All Plaintiffs. (Attachments: # <u>1</u> Exhibit Declaration of Brendan Schneiderman, # <u>2</u> Attachment Cert. of Good Standing DC, # <u>3</u> Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 03/14/2022) |
| 03/14/2022 | | MOTION(S) REFERRED: <u>653</u> MOTION for Brendan R. Schneiderman to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number ALAMDC-2405565). This motion is now pending before the USMJ. (LLH) (Entered: 03/14/2022) |
| 03/15/2022 | 654 | ORDER granting <u>653</u> Motion for Brendan R. Schneiderman to Appear Pro Hac Vice on behalf of Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 3/15/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO)<br><br><span style="color:red">ATTENTION: Local counsel shall provide the following link to those attorneys granted leave to proceed pro hac vice in the Middle District of Louisiana who choose to register for e-file access www.lamd.uscourts.gov/pro-hac-vice-e-filing-registration.</span><br><br>(Entered: 03/15/2022) |
| 03/15/2022 | <u>655</u> | Joint MOTION for Extension of Time Exchange Exhibit Lists by All Plaintiffs. (Attachments: # <u>1</u> Proposed Pleading;)(Malik, Elena) (Entered: 03/15/2022) |
| 03/15/2022 | 656 | ORDER granting <u>655</u> Motion for Extension of Time. The Parties deadline to exchange exhibit lists is 4/8/2022. Signed by Chief Judge Shelly D. Dick on 3/15/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/15/2022) |
| 03/17/2022 | <u>657</u> | Joint MOTION for Preliminary Approval of Partial Class Action Settlement, Setting of Fairness Hearing by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Affidavit, # <u>3</u> Proposed Pleading;)(Bosalavage, Samantha) Modified on 3/18/2022 to edit text (ELW). (Entered: 03/17/2022) |
| 03/17/2022 | <u>658</u> | Joint MOTION for Final Approval of Partial Class Action Settlement by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Affidavit, # <u>3</u> Proposed Pleading;)(Bosalavage, Samantha) Modified on 3/18/2022 (ELW). (Entered: 03/17/2022) |

| | | |
|---|---|---|
| 03/18/2022 | 659 | MOTION to Withdraw 657 Joint MOTION for Settlement *Preliminary Approval, Notice, and Fairness Hearing*, 658 Joint MOTION for Settlement *Final Approval (Partial)* by All Defendants. (Attachments: # 1 Memorandum in Support Memorandum in Support, # 2 Attachment Proposed Order)(Tomeny, Caroline) (Entered: 03/18/2022) |
| 03/21/2022 | 660 | ORDER granting 659 Motion to Withdraw 657 Joint MOTION for Settlement *Preliminary Approval, Notice, and Fairness Hearing*, 658 Joint MOTION for Settlement *Final Approval (Partial)* . Signed by Chief Judge Shelly D. Dick on 3/21/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/21/2022) |
| 03/22/2022 | 661 | MOTION for Sanctions *Discovery* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Ex. A, # 3 Exhibit Ex. B, # 4 Exhibit Ex. C, # 5 Exhibit Ex. D, # 6 Exhibit Ex. E)(Bosalavage, Samantha) (Entered: 03/22/2022) |
| 03/22/2022 | 662 | MOTION for Expedited Hearing on 661 MOTION for Sanctions *Discovery* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 03/22/2022) |
| 03/23/2022 | 663 | ORDER granting 662 Motion for Expedited Hearing on 662 MOTION for Expedited Hearing on 661 MOTION for Sanctions *Discovery*. Defendants shall file a response by close of business 3/28/2022. Signed by Chief Judge Shelly D. Dick on 3/23/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/23/2022) |
| 03/25/2022 | 664 | MOTION to Exclude Defendants' Expert Witness List in Part by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Bosalavage, Samantha) (Entered: 03/25/2022) |
| 03/25/2022 | 665 | Additional Exhibits to 664 MOTION to Exclude Defendants' Expert Witness List in Part by All Plaintiffs. filed by All Plaintiffs. (Attachments: # 1 Exhibit B, # 2 Exhibit C, # 3 Exhibit D)(Bosalavage, Samantha) (Entered: 03/25/2022) |
| 03/25/2022 | 666 | MOTION for Expedited Hearing on 664 MOTION to Exclude Defendants' Expert Witness List in Part by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 03/25/2022) |
| 03/28/2022 | 667 | Joint MOTION for Status Conference by All Plaintiffs. (Bosalavage, Samantha) (Entered: 03/28/2022) |
| 03/28/2022 | 668 | MEMORANDUM in Opposition to 661 MOTION for Sanctions *Discovery* filed by All Defendants. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Cody, Jeffrey) (Entered: 03/28/2022) |
| 03/29/2022 | 669 | ORDER granting 667 Motion for Conference. Status Conference set for 4/11/2022 at 10:00 AM in Courtroom 3 before Chief Judge Shelly D. Dick. Signed by Chief Judge Shelly D. Dick on 3/29/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/29/2022) |
| 03/30/2022 | 670 | ORDER: (TIME CHANGE ONLY) Status Conference re-set for 4/11/2022 at 02:00 PM in Courtroom 3. Signed by Chief Judge Shelly D. Dick on 3/30/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 03/30/2022) |
| 03/30/2022 | 671 | ORDER granting 666 Motion for Expedited Hearing on 666 MOTION for Expedited Hearing on 664 MOTION to Exclude Defendants' Expert Witness List in Part. Defendants |

| | | shall file a response on or before close of business on 3/31/2022. Signed by Chief Judge Shelly D. Dick on 3/30/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 03/30/2022) |
|---|---|---|
| 03/30/2022 | 672 | MOTION for Leave to File Reply by All Plaintiffs. (Attachments: # 1 Proposed Order, # 2 Proposed Pleading; Reply Memo, # 3 Exhibit Ex. A, # 4 Exhibit Ex. B, # 5 Exhibit Ex. C, # 6 Exhibit Ex. D)(Malik, Elena) (Entered: 03/30/2022) |
| 03/31/2022 | 673 | MEMORANDUM in Opposition to 664 MOTION to Exclude Defendants' Expert Witness List in Part filed by All Defendants. (Archey, Connell) (Entered: 03/31/2022) |
| 04/01/2022 | 674 | MOTION for Leave to File Sur-Reply by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Proposed Pleading; Sur-Reply, # 3 Proposed Pleading; Order)(Tomeny, Caroline) (Entered: 04/01/2022) |
| 04/01/2022 | 675 | ORDER granting Defendants' 674 MOTION for Leave to File Sur-Reply in Support of Opposition to Plaintiffs' Motion for Discovery Sanctions. Signed by Chief Judge Shelly D. Dick on 4/1/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 04/01/2022) |
| 04/01/2022 | 676 | SUR-REPLY in support of 668 Memorandum in Opposition to 661 MOTION for *Discovery* Sanctions filed by All Defendants. (SWE) (Entered: 04/01/2022) |
| 04/01/2022 | 677 | ORDER granting Plaintiffs' 672 MOTION for Leave to File Reply in Support of Plaintiffs' Motion for Discovery Sanctions. Signed by Chief Judge Shelly D. Dick on 4/1/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 04/01/2022) |
| 04/01/2022 | 678 | REPLY MEMORANDUM in Support of 661 MOTION for *Discovery* Sanctions filed by All Plaintiffs. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(SWE) (Entered: 04/01/2022) |
| 04/04/2022 | 679 | RULING: Granting in part and denying in part 661 Motion for Sanctions. To the extent the motion calls for procedural sanctions, Plaintiffs motionfor an extension of time to produce expert reports in and through May 3, 2022 is GRANTED. Plaintiffs motion that the Court order the Defendants to cover the costs of Plaintiffs experts review of the supplemental eMARs is DENIED. Signed by Chief Judge Shelly D. Dick on 4/4/2022. (ELW) (Entered: 04/04/2022) |
| 04/11/2022 | 680 | Notice to Counsel: The Status Conference set for 4/11/2022 at 02:00 PM is converted to a video conference. Zoom instructions will be sent by separate email. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(SWE) (Entered: 04/11/2022) |
| 04/11/2022 | 681 | ORDER denying 664 Motion to Exclude Defendants' Expert Witness List in Part. Defendants will be permitted to call LSP nurse practitioners who were employed by LSP as 0f 1/14/2022 as fact witnesses. Plaintiffs concede that they know the identities of the nurse practitioners and thus there is no prejudice owing to surprise. Accordingly the Motion is DENIED.. Signed by Chief Judge Shelly D. Dick on 4/11/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Dick, Shelly) (Entered: 04/11/2022) |
| 04/11/2022 | 682 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Video Status Conference held on 4/11/2022. The parties discussed procedures for the upcoming evidentiary hearing set for 6/6/2022. The parties shall file Findings of Fact and Conclusions of Law which shall be limited to 10 pages by the close of business on or |

| | | before 5/13/2022. All deadlines have been set and will not be extended. (SWE) (Entered: 04/13/2022) |
|---|---|---|
| 05/04/2022 | 683 | MOTION to Enroll Allena W. McCain as Additional Attorney by All Defendants. (Attachments: # 1 Attachment Proposed Order)(Robert, Randal) (Entered: 05/04/2022) |
| 05/04/2022 | | MOTION(S) REFERRED: 683 MOTION to Enroll Allena W. McCain as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 05/04/2022) |
| 05/05/2022 | 684 | ORDER granting 683 Motion to Enroll Additional Counsel of Record for Defendants. Attorney Allena Brooke McCain is enrolled as co-counsel for Defendants. Signed by Magistrate Judge Richard L. Bourgeois, Jr on 5/5/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 05/05/2022) |
| 05/10/2022 | 685 | Unopposed MOTION for Extension of Time to file Pretrial Order by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 05/10/2022) |
| 05/10/2022 | 686 | Unopposed MOTION for Expedited Hearing on 685 Unopposed MOTION for Extension of Time to file Pretrial Order by All Plaintiffs. (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 05/10/2022) |
| 05/10/2022 | 687 | ORDER granting 686 Motion for Expedited Hearing on 685 Unopposed MOTION for Extension of Time to file Pretrial Order .. Signed by Chief Judge Shelly D. Dick on 5/10/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 05/10/2022) |
| 05/10/2022 | 688 | ORDER granting 685 Unopposed Motion for Extension of Time to File Pretrial Order. The Parties' deadline to file the pretrial order is 5/13/2022. Signed by Chief Judge Shelly D. Dick on 5/10/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 05/10/2022) |
| 05/13/2022 | 689 | Proposed Findings of Fact by Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Kentrell Parker, Lionel Tolbert, John Tonubbee, Edward Washington. (Ramaswamy, Rebecca) (Entered: 05/13/2022) |
| 05/13/2022 | 690 | Proposed Findings of Fact by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (McCain, Allena) (Entered: 05/13/2022) |
| 05/13/2022 | 691 | Proposed Pretrial Order by All Plaintiffs (For your free look at document, enter your Individual PACER login and pw to confirm your right to view). (Attachments: # 1 Attachment Plaintiffs' Exhibit List, # 2 Attachment Defendants' Exhibit List, # 3 Attachment Plaintiffs' Witness List, # 4 Attachment Defendants' Witness List)(Kumar, Nishi) (Entered: 05/13/2022) |
| 05/16/2022 | 692 | MOTION in Limine *re Burden of Proof* by All Plaintiffs. (Attachments: # 1 Memorandum in Support)(Ramaswamy, Rebecca) (Entered: 05/16/2022) |
| 05/16/2022 | 693 | MOTION in Limine *re Evidentiary Issues* by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 Email Conine, # 3 Exhibit 2 Email Supp Disc, # 4 Exhibit 3 Resp 1st Rogs, # 5 Exhibit 4 Lavespere Dep, # 6 Exhibit 5 Resp 2nd Rogs, # 7 Exhibit 6 Resp 2nd RFPs, # 8 Exhibit 7 Resp 3rd RFPs, # 9 Exhibit 8 1st RFPs)(Ramaswamy, Rebecca) (Entered: 05/16/2022) |
| 05/16/2022 | 694 | MOTION in Limine to Admit Additional Evidence by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Email from Dubner, # 3 Exhibit B - Email from |

| | | |
|---|---|---|
| | | Ramaswamy, # 4 Exhibit C - Dockery v. Hall District Court Order, # 5 Exhibit D - Memo re Self-Declared Emergency Sick Call, # 6 Exhibit E - Email from Conine, # 7 Exhibit F - Inmate Orderly Training Records)(Robert, Randal) Modified on 5/18/2022 to edit the text (NLT). (Entered: 05/16/2022) |
| 05/16/2022 | 695 | MOTION to Limit Scope of Testimony and Evidence by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A - Plaintiffs Medical Expert Report, # 3 Exhibit B - Report of Mazz)(Robert, Randal) Modified on 5/18/2022 to edit the text (NLT). (Entered: 05/16/2022) |
| 05/16/2022 | 696 | MOTION to Exclude Expert Testimony of John Morrison by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Kumar, Nishi) (Entered: 05/16/2022) |
| 05/16/2022 | 697 | MOTION to Exclude Expert Testimony of Michael McMunn by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Bosalavage, Samantha) (Entered: 05/16/2022) |
| 05/16/2022 | 698 | MOTION to Exclude Expert Testimony of David M. Mathis in Part by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8)(Bosalavage, Samantha) (Entered: 05/16/2022) |
| 05/16/2022 | 699 | MOTION to Exclude Expert Testimony of Dr. Dora B. Schriro by All Defendants. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Proposed Order)(Cody, Jeffrey) Modified text to remove duplicate text on 5/17/2022 (JEG). (Entered: 05/16/2022) |
| 05/23/2022 | 700 | SEALED MOTION for Leave to File Exhibits 5 and 6 to Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Testimony of Dr. Dora B. Schriro Under Seal by All Plaintiffs. (Attachments: # 1 Proposed Pleading; Ex 5, Schriro Notes, # 2 Proposed Pleading; Ex 6, Class Member ID List, # 3 Attachment Proposed Order)(Ramaswamy, Rebecca) (Entered: 05/23/2022) |
| 05/23/2022 | 701 | MEMORANDUM in Opposition to 699 MOTION to Exclude Expert Testimony of Dr. Dora B. Schriro filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, Falgout Dep, # 2 Exhibit 2, Oliveaux Dep, # 3 Exhibit 3, Req for Accommodation, # 4 Exhibit 4, Spears Dep, # 5 Exhibit 5, Schriro Notes (Sealed), # 6 Exhibit 6, Class Member ID List (Sealed), # 7 Exhibit 7, List of Orderlies)(Ramaswamy, Rebecca) (Additional attachment(s) added on 5/23/2022: # 8 Sealed Exhibit 5, # 9 Sealed Exhibit 6) (JEG). (Entered: 05/23/2022) |
| 05/23/2022 | 702 | MEMORANDUM in Opposition to 694 MOTION in Limine to Admit Additional Evidence filed by All Plaintiffs. (Attachments: # 1 Exhibit Ex. A - Stipulation, # 2 Exhibit Ex. B - Email, # 3 Exhibit Ex. C - Email, # 4 Exhibit Ex. D - Email, # 5 Exhibit Ex. E - Pls Med Expert Report, # 6 Exhibit Ex. F - Mathis Dep., # 7 Exhibit Ex. G - Hawkins Dep., # 8 Exhibit Ex. H - Lavespere 30b6 Dep., # 9 Exhibit Ex. I - Lavespere Indiv. Dep., # 10 Exhibit Ex. J - Resp to First Interrog., # 11 Exhibit Ex. K - Email, # 12 Exhibit Ex. L - Falgout 30b6 Dep., # 13 Exhibit Ex. M - Spears Dep., # 14 Exhibit Ex. N - Email, # 15 Exhibit Ex. O - Email, # 16 Exhibit Ex. P - Resp to Second Interrog., # 17 Exhibit Ex. Q - Stickells Dep., # 18 Exhibit Ex. R - Johnson Dep., # 19 Exhibit Ex. S - Rodriguez Trial Test., # 20 Exhibit Ex. T - Rodriguez Dep.)(Malik, Elena) (Entered: 05/23/2022) |
| 05/23/2022 | 703 | MEMORANDUM in Opposition to 695 MOTION to Limit Scope of Testimony and Evidence filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Bosalavage, Samantha) |

| | | |
|---|---|---|
| | | (Entered: 05/23/2022) |
| 05/23/2022 | 704 | MEMORANDUM in Opposition to 696 MOTION to Exclude Expert Testimony of John Morrison filed by All Defendants. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Robert, Randal) (Entered: 05/23/2022) |
| 05/23/2022 | 705 | MEMORANDUM in Opposition to 692 MOTION in Limine *re Burden of Proof* filed by All Defendants. (Robert, Randal) (Entered: 05/23/2022) |
| 05/23/2022 | 706 | MEMORANDUM in Opposition to 693 MOTION in Limine *re Evidentiary Issues* filed by All Defendants. (Robert, Randal) (Entered: 05/23/2022) |
| 05/23/2022 | 707 | MEMORANDUM in Opposition to 698 MOTION to Exclude Expert Testimony of David M. Mathis in Part filed by All Defendants. (Attachments: # 1 Exhibit 1 - Dr. Mathis's CV, # 2 Exhibit 2 - Mathis deposition, # 3 Exhibit 3 - LaMarre deposition, # 4 Exhibit 4 - Goehring deposition, # 5 Exhibit 5 - Puisis deposition, # 6 Exhibit 6 - Mathis review of Patient #14, # 7 Exhibit 7 - Mathis review of Patient #16, # 8 Exhibit 8 - Mathis review of Patient #34, # 9 Exhibit 9 - Mathis review of Patient #36, # 10 Exhibit 10 - Mathis review of Patient #54, # 11 Exhibit 11 - Vassallo Review of Patient #54, # 12 Exhibit 12 - Vassallo deposition, # 13 Exhibit 13 - Mathis review of Patient #57)(Robert, Randal) (Entered: 05/23/2022) |
| 05/23/2022 | 708 | MEMORANDUM in Opposition to 697 MOTION to Exclude Expert Testimony of Michael McMunn filed by All Defendants. (Attachments: # 1 Exhibit 1 - McMunn CV, # 2 Exhibit 2 - McMunn Report)(Robert, Randal) (Entered: 05/23/2022) |
| 05/23/2022 | 709 | ORDER: The Evidentiary Hearing set for 6/6/2022 will begin at 01:00 PM in Courtroom 3 before Chief Judge Shelly D. Dick. Signed by Chief Judge Shelly D. Dick on 5/23/2022. (SWE) (Entered: 05/23/2022) |
| 05/23/2022 | 710 | ORDER granting 700 SEALED Motion for Leave to File Documents Under Seal. Signed by Chief Judge Shelly D. Dick on 5/23/2022. (JEG) Modified text on 5/23/2022 to remove duplicate text (JEG). (Entered: 05/23/2022) |
| 05/24/2022 | 711 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Pretrial Conference held on 5/24/2022. The pending Motions were discussed. Court will issue written ruling shortly. Court encouraged parties to meet and confer to agree upon submission of testimony by deposition and remote testimony by video of witnesses. (SWE) (Entered: 05/24/2022) |
| 05/25/2022 | 712 | RULING denying Plaintiffs' 696 Motion Exclude Expert Testimony of John Morrison. Signed by Chief Judge Shelly D. Dick on 5/25/2022. (SWE) (Entered: 05/25/2022) |
| 05/26/2022 | 713 | RULING: For the written reasons assigned herein: Plaintiffs' 692 Motion in Limine Regarding Burden of Proof is DENIED; Plaintiffs' 693 Motion in Limine Regarding Evidentiary Issues is DENIED without prejudice; Defendants' 694 Motion in Limine to Admit Additional Evidence is GRANTED without prejudice to objections at the time of trial; Defendants' 695 Motion to Limit Scope of Testimony and Evidence as to items 1-7 is DENIED, without prejudice to the right of the Defendants to urge objections at trial. Defendants' 695 Motion to exclude opinion as to Treatment Unit Cell Block #28 is DENIED as stated. The 695 Motion as to Mazz's evaluation and opinions of the Visiting Areas is DENIED. Signed by Chief Judge Shelly D. Dick on 5/26/2022. (SWE) (Entered: 05/26/2022) |
| 05/30/2022 | 714 | Pre-Hearing MOTION to Reopen Depositions and Admit Expert Reports with Attachments by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, |

| | | |
|---|---|---|
| | | Oliveaux Dep, # <u>3</u> Exhibit 2, ADA 30(b)(6) Dep, # <u>4</u> Exhibit 3, Email re Oliveaux Witness List, # <u>5</u> Exhibit 4, Spears Dep, # <u>6</u> Exhibit 5, Email re Additional ADA Changes, # <u>7</u> Exhibit 6, Email re Additional Evidence, # <u>8</u> Exhibit 7, Cashio Dep, # <u>9</u> Attachment Proposed Order)(Ramaswamy, Rebecca) Modified on 5/31/2022 to edit text (LLH). (Entered: 05/30/2022) |
| 05/31/2022 | <u>715</u> | MOTION to Amend <u>691</u> Proposed Pretrial Order, by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support Memo in Support, # <u>2</u> Proposed Pleading; Amended Joint Pretrial Order)(Malik, Elena) (Entered: 05/31/2022) |
| 05/31/2022 | 716 | ORDER granting <u>715</u> Motion to Amend Proposed Pretrial Order. Signed by Chief Judge Shelly D. Dick on 5/31/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 05/31/2022) |
| 05/31/2022 | <u>717</u> | AMENDED Pretrial Order by All Plaintiffs (For your free look at document, enter your Individual PACER login and pw to confirm your right to view). (LLH) (Entered: 05/31/2022) |
| 05/31/2022 | <u>718</u> | MOTION for Expedited Hearing on <u>714</u> MOTION Reopen Depositions and Admit Expert Reports with Attachments by All Plaintiffs. (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 05/31/2022) |
| 06/01/2022 | <u>719</u> | MEMORANDUM in Opposition to <u>714</u> MOTION Reopen Depositions and Admit Expert Reports with Attachments filed by All Defendants. (Robert, Randal) (Entered: 06/01/2022) |
| 06/01/2022 | <u>720</u> | RULING denying in part and granting in part <u>697</u> Motion in Limine to Exclude Expert Testimony of Michael McMunn. Signed by Chief Judge Shelly D. Dick on 6/1/2022. (SWE) (Entered: 06/01/2022) |
| 06/01/2022 | <u>721</u> | RULING granting <u>714</u> Motion to Reopen Depositions and Admit Expert Reports with Attachments and <u>718</u> Motion for Expedited Hearing, subject to the limitations as written. Signed by Chief Judge Shelly D. Dick on 6/1/2022. (SWE) (Entered: 06/01/2022) |
| 06/01/2022 | <u>722</u> | Unopposed MOTION for Writ of Habeas Corpus ad testificandum *for Dennis Mischler* by All Plaintiffs. (Attachments: # <u>1</u> Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 06/01/2022) |
| 06/02/2022 | <u>723</u> | RULING denying in part and granting in part <u>698</u> Motion in Limine to Exclude Expert Testimony of David M. Mathis in Part. Signed by Chief Judge Shelly D. Dick on 6/1/2022. (SWE) (Entered: 06/02/2022) |
| 06/02/2022 | <u>724</u> | Unopposed MOTION for Writ of Habeas Corpus ad testificandum *JeanPaul Creppel* by All Plaintiffs. (Attachments: # <u>1</u> Proposed Pleading; Proposed Order)(Malik, Elena) (Entered: 06/02/2022) |
| 06/02/2022 | <u>725</u> | Unopposed MOTION for Writ of Habeas Corpus ad testificandum *Charles Butler* by All Plaintiffs. (Attachments: # <u>1</u> Proposed Pleading; Proposed Order)(Malik, Elena) (Entered: 06/02/2022) |
| 06/03/2022 | <u>726</u> | ORDER granting <u>722</u> Unopposed MOTION for Writ of Habeas Corpus ad testificandum for Dennis Mischler. The Warden of the Louisiana State Penitentiary at Angola, Louisiana, Timothy Hooper, transport and produce class member, DENNIS MISCHLER, DOC #731698, as written. Signed by Chief Judge Shelly D. Dick on 6/2/2022. (LLH) (Entered: 06/03/2022) |
| 06/03/2022 | <u>727</u> | |

| | | RULING denying 699 Motion in Limine to Exclude Expert Testimony of Dr. Dora B. Schriro, Ed.D., J.D. Signed by Chief Judge Shelly D. Dick on 6/3/2022. (SWE) (Entered: 06/03/2022) |
|---|---|---|
| 06/03/2022 | 728 | Return on 726 Order on Motion for Writ of Habeas Corpus ad testificandum,. (US Marshal, ) (Entered: 06/03/2022) |
| 06/03/2022 | 729 | ORDER granting 724 Motion for Writ of Habeas Corpus ad testificandum for JeanPaul Creppel. The Warden of the Louisiana State Penitentiary at Angola, Louisiana, Timothy Hooper,transport (using side restraints) and produce class member, JEANPAUL CREPPEL, DOC #501207, as written. Signed by Chief Judge Shelly D. Dick on 6/3/2022. (ELW) (Entered: 06/03/2022) |
| 06/03/2022 | 730 | ORDER granting 725 Motion for Writ of Habeas Corpus ad testificandum for Charles Butler. The Warden of the Louisiana State Penitentiary at Angola, Louisiana, Timothy Hooper, transport and produce class member, CHARLES BUTLER, # 209995, as written. Signed by Chief Judge Shelly D. Dick on 6/3/2022. (ELW) (Entered: 06/03/2022) |
| 06/06/2022 | 731 | Return on 730 Order on Motion for Writ of Habeas Corpus ad testificandum,. (US Marshal, ) (Entered: 06/06/2022) |
| 06/06/2022 | 732 | Return on 729 Order on Motion for Writ of Habeas Corpus ad testificandum,. (US Marshal, ) (Entered: 06/06/2022) |
| 06/06/2022 | 733 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/6/2022. Exhibits filed. Parties present opening statements. Witnesses sworn and testify. Court recesses until 6/7/2022 at 9:00 a.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/09/2022) |
| 06/06/2022 | 791 | ELECTRONIC EXHIBIT List for hearing dated 6/6/2022 - Submitted to the Court Conventionally due to voluminous nature. (SWE) (Entered: 11/28/2023) |
| 06/06/2022 | 792 | SEALED ELECTRONIC EXHIBITS for hearing dated 06/06/2022 - Submitted to the court conventionally due to the voluminous nature .(NLT) (Entered: 11/28/2023) |
| 06/07/2022 | 734 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/7/2022. Witnesses sworn and testify. Exhibits filed. Court recesses until 6/8/2022 at 9:00 a.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/09/2022) |
| 06/08/2022 | 735 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/8/2022. Witnesses sworn and testify. Exhibits filed. Court recesses until 6/9/2022, at 9:00 a.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/09/2022) |
| 06/09/2022 | 736 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/9/2022. Witness sworn and testify. Exhibits filed. Court recesses until 6/10/2022 at 9:00 a.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) Modified on 6/10/2022 to edit file date (SWE). (Entered: 06/10/2022) |
| 06/10/2022 | 737 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/10/2022. Witnesses testify and exhibits filed. Court recesses until 6/13/2022 at 12:00 p.m. (Court Reporter S. Thompson.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/13/2022) |

| 06/13/2022 | 738 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/13/2022. Witnesses sworn and testify. Plaintiffs rest. Court recesses until Tuesday, 6/14/2022 at 9:00 a.m. (Court Reporter N. Breaux.) (SWE) (Main Document 738 replaced on 6/14/2022 to correct text) (SWE). (Entered: 06/14/2022) |
| --- | --- | --- |
| 06/14/2022 | 739 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/14/2022. Witnesses testified and exhibits filed. Court recesses until 6/15/2022 at 9:00 a.m. (Court Reporter G. Delatte-Richard.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/15/2022) |
| 06/15/2022 | 740 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/15/2022. Witnesses testify and exhibits filed. Court recesses until 6/16/2022 at 10:30 a.m. (Court Reporter G. Delatte-Richard (am) Natalie Breaux (pm).) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Main Document 740 replaced on 6/16/2022 to edit text) (SWE). (Entered: 06/16/2022) |
| 06/16/2022 | 741 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial held on 6/16/2022. Witnesses testify and exhibits filed. Court recesses until 6/27/2022 at 9:00 a.m. (Court Reporter G. Delatte-Richard.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 06/17/2022) |
| 06/17/2022 | 744 | Minute Entry for proceedings held before Chief Judge Shelly D. Dick: Bench Trial completed on 6/17/2022. Witnesses testify, exhibits filed. Case is submitted. The Court will issue a briefing schedule at a later date. (Court Reporter N. Breaux.) Pursuant to Local Rules, offering parties shall retain custody of exhibits..(SWE) (Entered: 07/11/2022) |
| 06/22/2022 | 742 | TRANSCRIPT REQUEST by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr., Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White for proceedings held on 6/6/22 - 6/17/22 before Judge Shelly D. Dick.. (Malik, Elena) (Main Document 742 replaced on 6/22/2022) (ELW). Modified on 6/22/2022 to flatten document (ELW). (Entered: 06/22/2022) |
| 06/22/2022 | 743 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy for proceedings held on 6/6/2022 to 6/17/2022 before Judge Shelly D. Dick.. (McCain, Allena) (Entered: 06/22/2022) |
| 07/21/2022 | 745 | MOTION for Elena Malik to Withdraw as Attorney by All Plaintiffs (Attachments: # 1 Proposed Order)(Malik, Elena) (Entered: 07/21/2022) |
| 07/25/2022 | | MOTION(S) REFERRED: 745 MOTION for Elena Malik to Withdraw as Attorney . This motion is now pending before the USMJ. (NLT) (Entered: 07/25/2022) |
| 07/25/2022 | 746 | ORDER granting 745 Motion to Withdraw as Counsel of Record. Attorney Elena Malik is withdrawn as counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 7/25/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 07/25/2022) |
| 11/04/2022 | 747 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 06/06/2022. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567. |

| | | |
|---|---|---|
| | | NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Thompson, Shannon) (Entered: 11/04/2022) |
| 11/04/2022 | 748 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 06/07/2022. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Thompson, Shannon) (Entered: 11/04/2022) |
| 11/04/2022 | 749 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 06/08/2022. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Thompson, Shannon) (Entered: 11/04/2022) |
| 11/04/2022 | 750 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 06/09/2022. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. |

| | | |
|---|---|---|
| | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Thompson, Shannon) (Entered: 11/04/2022) |
| 11/04/2022 | 751 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT: Bench Trial before Judge Shelly D. Dick held on 06/10/2022. Court Reporter: Shannon L. Thompson, CCR. Phone Number: 225-389-3567.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Thompson, Shannon) (Entered: 11/04/2022) |
| 11/04/2022 | 752 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Day 7 of the bench trial before the Honorable Shelly D. Dick held on June 14, 2022. Court Reporter: Gina Delatte-Richard. Phone Number: 225-389-3564.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Delatte-Richard, Gina) (Entered: 11/04/2022) |
| 11/04/2022 | 753 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Day 8 of the bench trial before Judge the Honorable Shelly D. Dick held on June 15, 2022. Court Reporter: Gina Delatte-Richard. Phone Number: 225-389-3564.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Delatte-Richard, Gina) (Entered: 11/04/2022) |

| 11/04/2022 | <u>754</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Day 9 of the Bench Trial before the Honorable Shelly D. Dick held on June 16, 2022. Court Reporter: Gina Delatte-Richard. Phone Number: 225-389-3564. <br><br> NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/25/2022. Redacted Transcript Deadline set for 12/5/2022. Release of Transcript Restriction set for 2/2/2023. (Delatte-Richard, Gina) (Entered: 11/04/2022) |
| 11/05/2022 | <u>755</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 6, before Chief Judge Shelly D. Dick held on June 13, 2022. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565. <br><br> NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/6/2022. Release of Transcript Restriction set for 2/3/2023. (Breaux, Natalie) (Entered: 11/05/2022) |
| 11/05/2022 | <u>756</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 8 before Chief Judge Shelly D. Dick held on June 15, 2022. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565. <br><br> NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/6/2022. Release of Transcript Restriction set for 2/3/2023. (Breaux, Natalie) (Entered: 11/05/2022) |
| 11/05/2022 | <u>757</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Day 10 before Chief Judge Shelly D. Dick held on June 17, 2022. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565. <br><br> NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no |

| | | |
|---|---|---|
| | | such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/6/2022. Release of Transcript Restriction set for 2/3/2023. (Breaux, Natalie) (Entered: 11/05/2022) |
| 11/05/2022 | 758 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings: Bench Trial Excerpt of Defense Proffer Day 10 before Chief Judge Shelly D. Dick held on June 17, 2022. Court Reporter: Natalie W. Breaux. Phone Number: 225-389-3565.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.lamd.uscourts.gov.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 11/28/2022. Redacted Transcript Deadline set for 12/6/2022. Release of Transcript Restriction set for 2/3/2023. (Breaux, Natalie) (Entered: 11/05/2022) |
| 11/08/2022 | 759 | Joint MOTION To Set Deadline for Parties' Findings of Fact and Conclusions of Law by All Plaintiffs (Attachments: # 1 Attachment Proposed Order)(Kumar, Nishi) (Entered: 11/08/2022) |
| 11/10/2022 | 760 | ORDER: The 759 MOTION To Set Deadline for Parties' Findings of Fact and Conclusions of Law is GRANTED. Proposed Findings of Facts and Conclusions of Law due by 12/9/2022, limited to 75 pages. Responses due by 1/13/2023, limited to 25 pages. Signed by Chief Judge Shelly D. Dick on 11/10/2022. (SWE) (Entered: 11/10/2022) |
| 11/16/2022 | 761 | MOTION for Rebecca R. Ramaswamy to Withdraw as Attorney by All Plaintiffs (Attachments: # 1 Attachment Proposed Order)(Ramaswamy, Rebecca) (Entered: 11/16/2022) |
| 11/17/2022 | 762 | MOTION to Supplement the Record and Admit certain Specific Evidence of Current Conditions by Burl Cain (Attachments: # 1 Exhibit Jacob Johnson's declaration, # 2 Exhibit Warden Hooper and Govenor Edwards; advising of re-accreditation, # 3 Exhibit Justin Dillard's resume, # 4 Exhibit Rebecca Cranford's resume, # 5 Exhibit Dr. Robert Cleveland's resume, # 6 Attachment Proposed Order, # 7 Attachment Memorandum in Support of Motion to Supplement the Records and Admit Specific Evidence of Current Conditions)(Archey, Connell) Modified on 11/18/2022 to edit text (ELW). Modified on 11/21/2022 to edit text (LLH). (Entered: 11/17/2022) |
| 11/17/2022 | 763 | MOTION for Expedited Consideration of 762 Motion to Supplement the Record and Admit Certain Specific Evidence of Current Conditions by Burl Cain (Attachments: # 1 Attachment Memorandum in Support of Ex Parte Motion for Expedited Consideration of Def's Motion to Supplement the Records and Admit Certian Specific Evidence of Current Conditions (R.Doc.762), # 2 Attachment Proposed Order)(Archey, Connell) Modified on 11/29/2022 to edit the docket and motion text(NLT). (Entered: 11/17/2022) |

| 11/18/2022 | 764 | ORDER granting 763 Motion for Expedited Consideration of Defendants 762 Motion to Supplement the Record and Admit Certain Evidence of Current Conditions. Plaintiffs shall file a response to RD 762 by close of business on Wednesday, 11/23/2022. Signed by Chief Judge Shelly D. Dick on 11/18/202. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 11/18/2022) |
|---|---|---|
| 11/23/2022 | 765 | MEMORANDUM in Opposition to 762 MOTION Supplement the Record and Admit Certain Evidence of Current Conditions filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Mathis Deposition Transcript)(Kumar, Nishi) (Entered: 11/23/2022) |
| 11/30/2022 | | MOTION(S) REFERRED: 761 MOTION for Rebecca R. Ramaswamy to Withdraw as Attorney . This motion is now pending before the USMJ. (NLT) (Entered: 11/30/2022) |
| 12/01/2022 | 766 | ORDER granting 761 Motion to Withdraw as Counsel of Record. Attorney Rebecca Ramaswamy is withdrawn as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/1/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 12/01/2022) |
| 12/01/2022 | 767 | MOTION for Jamila Johnson to Withdraw as Attorney by All Plaintiffs (Attachments: # 1 Proposed Order)(Johnson, Jamila) (Entered: 12/01/2022) |
| 12/02/2022 | | MOTION(S) REFERRED: 767 MOTION for Jamila Johnson to Withdraw as Attorney . This motion is now pending before the USMJ. (LLH) (Entered: 12/02/2022) |
| 12/05/2022 | 768 | ORDER granting 767 Motion to Withdraw as Counsel of Record. Attorney Jamila Johnson is withdrawn as counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 12/5/2022. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 12/05/2022) |
| 12/07/2022 | 769 | RULING denying 762 Motion Supplement the Record and Admit Certain Specific Evidence of Current Conditions. Signed by Chief Judge Shelly D. Dick on 12/07/2022. (SWE) (Entered: 12/07/2022) |
| 12/09/2022 | 770 | Proposed Findings of Fact by Stacye Falgout, Tracy Falgout, Randy Lavespere, James M LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. (Robert, Randal) (Entered: 12/09/2022) |
| 12/09/2022 | 771 | Proposed Findings of Fact by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Reginald George, Edward Giovanni, Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White. (Attachments: # 1 Attachment Proposed Remedial Order)(Bosalavage, Samantha) (Entered: 12/09/2022) |
| 01/04/2023 | 772 | MOTION to Enroll Lydia Wright as Additional Attorney by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 01/04/2023) |
| 01/05/2023 | | MOTION(S) REFERRED: 772 MOTION to Enroll Lydia Wright as Additional Attorney . This motion is now pending before the USMJ. (ELW) (Entered: 01/05/2023) |
| 01/09/2023 | 773 | ORDER granting 772 Motion to Enroll Additional Counsel. Attorney Lydia Wright is enrolled as co-counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 1/9/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 01/09/2023) |
| 01/13/2023 | 774 | RESPONSE to 771 Proposed Findings of Fact, filed by All Defendants. (Robert, Randal) (Entered: 01/13/2023) |

| 01/13/2023 | 775 | RESPONSE to 770 Proposed Findings of Fact filed by All Plaintiffs. (Bosalavage, Samantha) (Entered: 01/13/2023) |
|---|---|---|
| 03/29/2023 | 776 | MOTION for Mercedes Montagnes to Withdraw as Attorney by All Plaintiffs (Attachments: # 1 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 03/29/2023) |
| 03/30/2023 | | MOTION(S) REFERRED: 776 MOTION for Mercedes Montagnes to Withdraw as Attorney . This motion is now pending before the USMJ. (JEG) (Entered: 03/30/2023) |
| 03/30/2023 | 777 | ORDER granting 776 Motion to Withdraw as Counsel of Record. Attorney Mercedes Montagnes is withdrawn as counsel for Plaintiffs. Signed by Magistrate Judge Richard L. Bourgeois, Jr. on 3/30/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SGO) (Entered: 03/30/2023) |
| 11/06/2023 | 778 | OPINION : For the reasons set forth above, The Court finds that Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence. The Court will enter judgment in favor of Plaintiffs and against Defendants. Signed by Chief Judge Shelly D. Dick on 11/6/2023. (SWE) (Entered: 11/06/2023) |
| 11/06/2023 | 779 | REMEDIAL ORDER: For the reasons set forth in the Courts Rulings, dated March 31, 2021 (Liability Ruling) and November 6, 2023, (Remedial Ruling): the parties shall comply with the order, as stated. Signed by Chief Judge Shelly D. Dick on 11/6/2023. (SWE) (Entered: 11/06/2023) |
| 11/06/2023 | 780 | JUDGMENT: For the written reasons assigned: Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against Defendants, the current Warden of the Louisiana State Penitentiary, et al. This matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Courts Remedial Order and any issues pertaining thereto. IT IS SO ORDERED. Signed by Chief Judge Shelly D. Dick on 11/6/2023. (SWE) (Entered: 11/06/2023) |
| 11/07/2023 | 781 | GENERAL ORDER: All pleadings and other papers filed under seal in civil and criminal actions shall be maintained under seal for thirty days following final disposition of the action. After that time, all sealed pleadings and other papers shall be placed in the case record unless a District Judge or Magistrate Judge, upon motion and for good cause shown, orders that the pleading or other paper be maintained under seal. <br><br> The deadline for filing any motions regarding the unsealing of any document shall be within thirty days of the final disposition of any action and shall contain a concise statement of reasons for maintaining the pleading or other paper under seal. <br><br> ATTENTION: If a motion to retain documents under seal is NOT filed, all documents shall be placed in the public case record, unless specifically identified in the attached General Order <br><br> Signed by Chief Judge Shelly D. Dick on 7/8/2019. (LLH) (Entered: 11/07/2023) |
| 11/20/2023 | 782 | NOTICE OF APPEAL to the USCA for the 5th Circuit of 778 Opinion, 394 Order on Motion to Certify Class, 780 Judgment, 594 Opinion,, 779 Order, by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy. Filing fee $ 505, receipt number ALAMDC-2672118. The transcript request form for appeal cases is located at www.lamd.uscourts.gov/local-forms/all-local-forms. (Archey, Connell) (Entered: |

| | | |
|---|---|---|
| | | 11/20/2023) |
| 11/20/2023 | 783 | MOTION to Stay *Remedial Order and Judgment Pending Appeal* by All Defendants (Attachments: # 1 Attachment Memorandum in Support of Motion to Stay Remedial Order and Judgment Pending Appeal, # 2 Attachment Declaration of Paul Toce, MD, # 3 Attachment A-1: Letter from Warden to Governor Edwards advising of re-accreditation and memo to staff re. the ACA audit closing, # 4 Attachment A-2: Employment Application and Resume for Justin Dillard, Nurse Practitioner, # 5 Attachment A-3: Employment Application and Associated Documents for Rebecca Cranford, NP, # 6 Attachment A-4: Resume of Robert Lyle Cleveland, MD, # 7 Attachment A-5: Sample Chart Summary, # 8 Attachment A-6: Sample EHR template for Sick Call Encounters, # 9 Attachment A-7: Sample EHR template for Chronic Care Encounters, # 10 Attachment A-8: Sample EHR template for Diabetes Chronic Care Encounters, # 11 Attachment A-9: Sample EHR template for Anticoagulation/Coumadin, Asthma, Cancer, CHF, CAD, COPD, HIV, HLD, HTN, # 12 Attachment A-10: Sample EHR forum used for an ATU encounter, # 13 Attachment A-11: Sample of the LabCorp Requisition Manager used to order labs, # 14 Attachment A-12: Screenshot of the sMARt Report Page, # 15 Attachment A-13: Updated Sick Call Form)(Archey, Connell) (Entered: 11/20/2023) |
| 11/20/2023 | 784 | Ex Parte MOTION to Expedite *Consideration of Defendants' Motion to Stay Remedial Order and Judgment Pending Appeal* by All Defendants (Attachments: # 1 Proposed Pleading; Proposed Order on Defendant's Ex Parte Motion for Expedited Consideration of Defendants' Motion to Stay Remedial Order and Judgment Pending Appeal)(Archey, Connell) (Entered: 11/20/2023) |
| 11/20/2023 | 785 | MOTION for Leave to File Excess Pages by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 11/20/2023) |
| 11/21/2023 | 786 | RESPONSE in Opposition to 784 Ex Parte MOTION to Expedite *Consideration of Defendants' Motion to Stay Remedial Order and Judgment Pending Appeal* filed by All Plaintiffs. (Bosalavage, Samantha) (Entered: 11/21/2023) |
| 11/27/2023 | 787 | ORDER granting 785 Motion for Leave to File Excess Pages. Signed by Chief Judge Shelly D. Dick on 11/27/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 11/27/2023) |
| 11/27/2023 | 788 | ORDER denying 784 Ex Parte Motion to Expedite Consideration of Defendants' Motion to Stay Remedial Order and Judgment Pending Appeal. Defendants have failed to demonstrate an emergency that justifies denying Plaintiffs a full opportunity to respond to the Motion to Stay. Plaintiffs shall file a response on or before December 11, 2023. Signed by Chief Judge Shelly D. Dick on 11/27/2023. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (SWE) (Entered: 11/27/2023) |
| 11/27/2023 | 789 | MOTION to Substitute Melanie A. Bray in place of Ronald K. Lospennato as Attorney by All Plaintiffs (Attachments: # 1 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 11/27/2023) |
| 11/28/2023 | 790 | USCA Case Number 23-30825 for 782 Notice of Appeal to the USCA for the 5th Circuit,, filed by Sherwood Poret, Burl Cain, Cynthia Park, Raman Singh, Tracy Falgout, The Louisiana Department of Public Safety and Corrections, John Morrison, Stacye Falgout, James M. LeBlanc, Darrel Vannoy, Randy Lavespere, Stephanie Lamartiniere. (NLT) (Entered: 11/28/2023) |
| 12/01/2023 | 793 | |

| | | |
|---|---|---|
| | | MOTION for an Indicative Ruling by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Exhibit Ex. 1 Defs. Motion to Stay in the 5th Circuit, # 3 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/01/2023) |
| 12/01/2023 | 794 | MOTION for Expedited Hearing on 793 MOTION for an Indicative Ruling by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/01/2023) |
| 12/04/2023 | 795 | RULING granting 794 Motion for Expedited Hearing and denying 793 MOTION for an Indicative Ruling . Signed by Chief Judge Shelly D. Dick on 12/4/2023. (SWE) (Entered: 12/04/2023) |
| 12/04/2023 | 796 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy for proceedings held on 6/6/22, 6/7/22, 6/8/22, 6/9/22, 6/10/22 before Judge Shelly D. Dick, re 782 Notice of Appeal to the USCA for the 5th Circuit,, (Archey, Connell) (Entered: 12/04/2023) |
| 12/04/2023 | 797 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy for proceedings held on 6/13/22, 6/15/22, 6/17/22 before Judge Shelly D. Dick, re 782 Notice of Appeal to the USCA for the 5th Circuit,, (Archey, Connell) (Entered: 12/04/2023) |
| 12/04/2023 | 798 | TRANSCRIPT REQUEST by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy for proceedings held on 6/14/22, 6/15/22, 6/16/22 before Judge Shelly D. Dick, re 782 Notice of Appeal to the USCA for the 5th Circuit,, (Archey, Connell) (Entered: 12/04/2023) |
| 12/06/2023 | 799 | MOTION for Attorney Fees , *Costs, and Service Awards* by All Plaintiffs (Attachments: # 1 Attachment Memorandum in Support, # 2 Exhibit List Exhibit List, # 3 Exhibit 1 Master Lodestar Spreadsheet, # 4 Exhibit 2 L. Wright Declaration, # 5 Exhibit 3 S. Bosalavage Declaration, # 6 Exhibit 4 J. Dubner Declaration, # 7 Exhibit 5 T. Harper Declaration, # 8 Exhibit 6 D. Small Declaration, # 9 Exhibit 7 B. Schneiderman Declaration, # 10 Exhibit 8 W. Most Declaration, # 11 Exhibit 9 C. Denson Declaration, # 12 Exhibit 10 K. Schwartzmann Declaration, # 13 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/06/2023) |
| 12/06/2023 | 800 | NOTICE of Defendants' List of Candidates to Serve as Special Masters/Monitors *per* 779 Order, by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy (Attachments: # 1 Exhibit A- CV of Dr. Chad Zewitz, # 2 Exhibit B- CV of Dr. Carl Keldie, # 3 Exhibit C- CV of Randall Stoltz, # 4 Exhibit D- Resume of Becky Pinney, # 5 Exhibit E- Resume of Ruth Naglich, # 6 Exhibit F- Resume of Erica Upzen, # 7 Exhibit G- CV of Randal Atlas, # 8 Exhibit H- Resume of Kristi Avalos, # 9 Exhibit I- Sabot Consulting- Resume of Julian Martinez, # 10 Exhibit J- Sabot Consulting- Resume of Robert Wahl)(Robert, Randal) (Entered: 12/06/2023) |
| 12/06/2023 | 801 | NOTICE of Plaintiffs' List of Special Master/Monitor Candidates by Alton Adams, Otto Barrera, Alton Batiste, Clyde Carter, Ian Cazenave, Ricky D. Davis, Cedric Evans, |

| | | |
|---|---|---|
| | | Reginald George, Edward Giovanni, Shannon Hurd, Joseph Lewis, Jr., Kentrell Parker, Farrell Sampier, Lionel Tolbert, John Tonubbee, Edward Washington, Rufus White (Attachments: # 1 Exhibit A - Dr. Benjamin Springgate CV, # 2 Exhibit B - Dr. Michele DiTomas CV, # 3 Exhibit C - Dr. Lisa Pratt CV, # 4 Exhibit D - Jackie Clark, # 5 Exhibit E - Johnnie Lambert, # 6 Exhibit F - Aaron Fischer, # 7 Exhibit G - William Van Der Pol)(Kumar, Nishi) (Entered: 12/06/2023) |
| 12/06/2023 | 802 | Unopposed MOTION to Maintain Filings Under Seal by All Plaintiffs (Attachments: # 1 Memorandum in Support, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/06/2023) |
| 12/07/2023 | 803 | ORDER granting 802 Unopposed MOTION to Maintain Filings Under Seal, as written. Signed by Chief Judge Shelly D. Dick on 12/7/2023. (LLH) (Entered: 12/07/2023) |
| 12/07/2023 | 804 | NOTICE of Administrative Stay by Burl Cain, Stacye Falgout, Tracy Falgout, Stephanie Lamartiniere, Randy Lavespere, James M. LeBlanc, John Morrison, Cynthia Park, Sherwood Poret, Raman Singh, The Louisiana Department of Public Safety and Corrections, Darrel Vannoy (Attachments: # 1 Exhibit A- Fifth Circuit Order dated December 6, 2023)(Archey, Connell) (Entered: 12/07/2023) |
| 12/07/2023 | 805 | MOTION to Substitute Pleading by All Plaintiffs (Attachments: # 1 Proposed Pleading; Motion to Withdraw and Substitute Counsel, # 2 Attachment Proposed Order)(Bosalavage, Samantha) (Entered: 12/07/2023) |

**Case #: 3:15-cv-00318-SDD-RLB**

# TAB 2

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA


JOSEPH LEWIS, ET AL.                                    CIVIL DOCKET

VERSUS                                                  15-318-SDD-RLB

BURL CAIN, ET AL.

## **NOTICE OF APPEAL**

Notice is given that all Defendants, the Louisiana Department of Public Safety and Corrections ("DOC"); James LeBlanc, Secretary of the DOC; Timothy Hooper, Warden of Louisiana State Penitentiary ("LSP"); Ashli Oliveaux, Assistant Warden for Health Services and ADA Coordinator for LSP; Randy Lavespere, M.D., Medical Director of the DOC; Stacye Rodriguez, Chief Nursing Officer of the DOC; Paul Toce, M.D., Medical Director for LSP; Bill Hawkins, Director of Nursing for LSP; and Cynthia Park, Nurse Practitioner at LSP in the above-referenced case, appeal the following orders to the United States Court of Appeals for the Fifth Circuit:

1. Ruling granting [R.Doc. 394] granting Plaintiffs' Motion for Class Certification [R.Doc. 133], entered on February 26, 2018;

2. Opinion [R.Doc. 594] entered on March 31, 2021;

3. Opinion [R.Doc. 778] entered on November 6, 2023;

4. Remedial Order [R.Doc. 779] entered on November 6, 2023; and

5. Judgment [R.Doc. 780] entered on November 6, 2023.

Dated: November 20, 2023.

Respectfully submitted,

BY:   */s/ Connell L. Archey*
      Connell Archey (#20086)
      Randal J. Robert (#21840)
      Allena McCain (#38830)
      Madaline King Rabalais (#38301)
      BUTLER SNOW LLP
      445 North Boulevard, Suite 300 (70802)
      P.O. Box 2997
      Baton Rouge LA  70821-2997
      Telephone:    (225) 325-8700
      Facsimile:    (225) 325-8800
      Connell.Archey@butlersnow.com
      Randy.Robert@butlersnow.com
      Allena.McCain@butlersnow.com
      Madaline.Rabalais@butlersnow.com

      **SHOWS, CALI & WALSH, L.L.P.**
      Jeffrey K. Cody, La. Bar Roll No. 28536
      Caroline T. Bond, La. Bar Roll No. 34120
      John C. Conine, Jr., La. Bar Roll No. 36834
      *Special Assistant Attorneys General*
      628 St. Louis Street (70802)
      P.O. Drawer 4425
      Baton Rouge, Louisiana 70821
      Telephone: (225) 346-1461
      Facsimile: (225) 346-1467
      Email: jeffreyc@scwllp.com
           caroline@scwllp.com
           coninej@scwllp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has this day been filed electronically with the Clerk of Court using the CM/ECF system, which will deliver notice of this filing to all counsel of record.

Baton Rouge, Louisiana this 20th day of November, 2023.

      */s/ Connell L. Archey*
      Connell Archey

84559087.v1

# TAB 3

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JOSEPH LEWIS, JR., ET AL.                           CIVIL DOCKET

VERSUS                                              15-318-SDD-RLB

BURL CAIN, ET AL.


<u>OPINION</u>

## I.   INTRODUCTION

In 1989, the United States Department of Justice opened an investigation into the conditions of confinement at the Louisiana State Penitentiary ("LSP") at Angola ("Angola"). The Justice Department found that multiple conditions at Angola deprived inmates of their constitutional rights, among them the failure to provide adequate medical and psychiatric care.[1]

In 1992, a class action lawsuit was filed, alleging that the healthcare at Angola was so deficient that it violated the United States Constitution's Eighth Amendment prohibition against cruel and unusual punishment. The United States Department of Justice intervened in the lawsuit and joined in the allegations against Angola.

In 2009, the Louisiana Department of Corrections engaged Wexford, a third-party consultant, to assess the medical care at Angola and report its findings to the Department. Wexford found multiple medical care deficiencies, which Angola disputes. Whether Wexford's findings were substantiated was not an issue in this case, but LSP and the

---

[1] Liability Trial PX 239.

Department of Corrections were aware as early as 2009 that Wexford had identified persistent health care deficiencies at Angola.

All this to say that the healthcare of inmates at Angola has been the subject of consternation and criticism *since 1989*. In 2015, this Class Action suit was filed.  After years of discovery,[2] 21 days of trial,[3] and two site visits to Angola by the Court, the Plaintiffs proved that, rather than receiving medical "care," the inmates are instead subjected to cruel and unusual punishment by medical mistreatment. The human cost of these 26 YEARS is unspeakable.

In the following pages, the Court will make detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola. The finding is that the "care" is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution.  These are but a few examples:

- After a 3-month delay in getting a CT scan that was ordered when a chest x-ray revealed a suspected malignancy, the CT confirmed the suspicious lesion, and the patient was referred to a pulmonologist. Yet the patient did not see a pulmonologist for another 4 months. After finally seeing the pulmonologist, twice the pulmonologist ordered a biopsy which the patient never received. The pulmonologist charted his frustration:

  > "the biopsy didn't occur, what gives?"

  > \* \* \*

  > "strongly suggest immediate IR [interventional radiology], FNA [fine needle aspiration] of left upper lobe nodule."[4]

---

[2] Both pretrial liability and remedy phase.
[3] 11 days on liability dates October 9-25, 2018, and 10 days on remedy June 6-17, 2022.
[4] Rec. Doc. 544, Puisis Testimony at 162:19-163:3.

23-30825.30558

Yet a biopsy was never completed. More than a year after the initial suspicious x-ray findings, the patient was hospitalized for a partial lung removal due to cancer, after which the patient was ordered to begin chemotherapy. Commencement of chemotherapy was also inexplicably delayed. The patient died.[5]

- A 50-year-old inmate made seven requests for medical attention for escalating back pain that went unanswered. The man became incontinent and bed ridden. When medics finally evaluated him, he was found lying on the floor. He was finally seen by a doctor but died within hours. His autopsy revealed a large liver abscess and resulting spinal cord compression.[6]

- An inmate underwent a colectomy due to untreated Chron's disease. Angola failed to refer him to gastroenterologist, failed to provide indicated immunosuppressive therapy, and failed perform to adequate physical examinations.  The patient died.[7]

- An inmate complained of chest pain for more than 16 months. When he was finally referred to a thoracic surgeon, a biopsy of a pulmonary nodule was ordered. When finally performed, the biopsy revealed adenocarcinoma of the lung. The patient died a week later.[8]

- An inmate complained for nearly three years of symptoms consistent with laryngeal cancer, yet he saw an Angola physician only a few times. After 33 months of constant complaints, he was diagnosed with laryngeal cancer from which he subsequently died.[9]

- A 65-year-old man with a history of diabetes, severe coronary artery disease and heart failure presented seven times in a single month with fevers as high as 103.6 degrees, altered mental state, and complaints of chest tightness. At one point, while exhibiting an altered mental state and a fever of 103.6 degrees, he was confined to a "locked room" in the infirmary with the "hatch up," after which he was not seen by physician for three days. Two days after being discharged from the

---

[5] Patient #7.
[6] Patient #6.
[7] Patient #11.
[8] Patient #17.
[9] Plaintiff Joseph Lewis.

23-30825.30559

infirmary, he was found vomiting in his cell. Angola doctors ordered EMTs not to transport the sick man to the hospital. He died in his cell the next day.[10]

- An inmate made an emergency sick call for severe flank pain. An x-ray and physical exam yielded no diagnosis. The pain progressed to the point that the man could not get out of bed, yet Angola's medical director refused EMT requests to transfer him to a hospital. Three days later he was found unresponsive in his cell. He died the following day.[11]

- An inmate with a tracheotomy presented with a progressively worsening cold and made repeated emergency sick calls. The inmate was seen in Angola's Acute Treatment Unit ("ATU") multiple times but each time he was simply returned to his dormitory where he finally died.[12]

- An inmate experienced two years of abdominal pain and weight loss that was unheeded and untreated leading to hospitalization and a diagnosis of advanced stage colon cancer, resulting in a preventable death.[13]

- An inmate suffered repeated and extensive delays in getting a colonoscopy that was ordered which resulted in emergency treatment, two hospital stays, and five surgical interventions - all avoidable.[14]

- The failure to administer ordered Statin drugs to an inmate resulted in a heart attack and stroke requiring the inmate's repeated avoidable hospitalizations.[15]

## II.    BACKGROUND[16]

Before the Court is a class action case alleging unconstitutional medical care provided at Louisiana State Penitentiary ("LSP") as well as violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") at the prison. The Court

---

[10] Patient #39.
[11] Patient #34.
[12] Rec. Doc. 547, Prince Testimony at 101:14-102:5.
[13] Patient #5.
[14] Patient #11.
[15] Patient #13.
[16] The Court adopts by reference, and in full, its prior Opinion following the bench trial on liability. Rec. Doc. 594.  All previous findings of fact and legal conclusions set forth therein are incorporated by reference in this Opinion.

bifurcated the case into separate liability and remedial phases. Following a trial on liability,[17] the Court found that LSP violated the Eighth Amendment and found violations of the ADA and RA in the following ways:

1. Failing to provide constitutionally adequate **clinical care** in the following particulars:

    a. privacy in examinations;

    b. lack of routine medical equipment in exam rooms;

    c. lack of adequate medical records management;

    d. lack of clinical hygiene and spacing;

    e. episodic treatment of complaints;

2. Failing to provide constitutionally adequate medical care w/ qualified providers at **sick call**;

3. Failing to provide constitutionally adequate access to medically necessary **specialty care**:

    a. in a timely manner;

    b. failure to schedule and track specialty appointments;

    c. failure to comply with testing and diagnostic requirements;

    d. failure to execute appropriate follow-up care ordered by specialty care providers;

    e. and failure to coordinate care;

4. Failing to provide constitutionally adequate **emergency** care in the evaluation and assessment of emergencies by qualified providers and failing to timely treat and/or transport to hospital for emergent care;

5. Failing to provide constitutionally adequate, qualified staff in **infirmary/inpatient care**;

6. Failing to provide constitutionally adequate **medical leadership and organization** in the following particulars:

    a. lack of meaningful mortality review;

    b. use of correctional personnel to manage medical decisions;

---

[17] The liability trial took place from October 9, 2018 through October 25, 2018.

23-30825.30561

  c. lack of peer review;

  d. lack of medical staff involvement in budgeting;

  e. lack of medical supervision by Dr. Lavespere; and

  f. failure to maintain proper credentialing records;

7. Failing to comply with the **ADA and RA** in providing disabled inmates access to programs and services due to physical and architectural barriers;

8. Failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications have not been made to provide access; failure to provide proper oversight of health care orderlies;

9. Failing to comply with LSP's ADA Directives in maintaining a qualified ADA Coordinator and advisory committee to handle ADA issues;

10. Failing to make efforts to integrate disabled inmates within the spirit of the ADA implementing regulations; [18]

11. Failing to adequately train medical staff regarding ADA compliance;

12. Failing to appropriately evaluate and address ADA accommodation requests and disability-related grievances;

13. Failing to identify and track disabilities and accommodation requests in a meaningful way;

14. Failing to accommodate disabled inmates in applying discipline;

15. Maintaining blanket exclusionary policies for disabled inmates regarding access to various services, activities, and programs in violation of the ADA.[19]

  It should be noted that, after the trial on the liability phase had concluded,[20] but before the Court issued its Ruling, the Court telegraphed to the parties that:

> The Court has taken under advisement the parties claims and defenses and is preparing to issue a Ruling on the merits. The Court will find that the medical care at Angola State Penitentiary is unconstitutional in some respects and is prepared to Order injunctive relief addressing conditions which the Court finds unconstitutional. The Court considers it to be in the

---

[18] Plaintiffs state that they "raise no claims of unjust segregation under the ADA;" therefore, the Court will consider this claim abandoned and it will not be addressed herein.  Rec. Doc. 775, p. 26 (citation omitted).
[19] Rec. Doc. 594, pp. 122-124.
[20] Trial concluded on October 25, 2018.

best interests of the litigants to attempt to reach an amicable resolution on some or all of the claims.[21]

The record reflects that the parties engaged in settlement negotiations with the assistance of the Magistrate Judge.[22] When resolution appeared futile, in March 2021, the Court issued its 124-page Opinion finding the Constitutional and statutory violations noted above. The Court set the matter for a remedy trial. The Parties stipulated and agreed that "for the remedy phase of trial, January 1, 2019 begins the relevant and appropriate time period ("Relevant Period") for the Court to assess whether the constitutional deficiencies listed in the Court's March 31, 2021 opinion have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[23] The remedy trial was scheduled for June 2022, permitting LSP 15 months to address and rectify the constitutional and statutory violations identified above.

The Court held a two-week remedy phase trial in this matter and admitted evidence of current conditions[24] to allow LSP to demonstrate, through proof, steps taken to address and/or cure these constitutional and statutory violations.[25] While LSP made some changes during the pendency of this litigation, LSP steadfastly defends its healthcare system and denies that it was constitutionally deficient at any time.

As the Court held previously in this case,

> [T]he Fifth Circuit instructs that in a "prison injunction case.... The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction,

---

[21] Rec. Doc. 578.
[22] Rec. Doc. 579.
[23] Rec. Doc. 636-3.
[24] Up to the date of the remedy trial discovery cut-off date.
[25] *See* Rec. Docs. 733, 744.

**the inmate must demonstrate the continuance** of that disregard during the remainder of the litigation and into the future."[26]

While the burden of proof remains with Plaintiffs to establish entitlement to injunctive relief, in circumstances like these, if Plaintiffs offer evidence that nothing has changed since the liability phase, the burden shifts to the Defendants to demonstrate that the constitutional deficiencies have been remedied. Because deliberate indifference may be shown by a risk of harm that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,"[27] a "defendant's past conduct" is a relevant factor to consider in determining "that there is a reasonable likelihood of further violations in the future."[28] Hence, the evidence underpinning the Court's liability conclusions remain relevant for purposes of crafting injunctive relief, unless LSP can demonstrate that current conditions ameliorate the "likelihood of future transgressions."[29]

Following the remedy phase trial, the Court permitted the Parties to submit Post Trial Findings of Fact and Conclusions of Law and a Reply.[30]  Additionally, the Court encouraged the Parties to find common ground and settle or stipulate on any issues possible, and the Court provided the Parties significant time to reach an agreement themselves, which proved fruitless.  The Court has considered the Parties' arguments, the record and trial evidence, and the applicable law in reaching the conclusion that injunctive relief is required in this case. The Court's credibility findings, findings of fact,

---

[26] Rec. Doc. 713, pp. 2-3 (quoting *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1993))(emphasis added)).
[27] *Farmer*, 511 U.S. at 842.
[28] *CAE Integrated, L.L.C. v. Moov Technologies, Incorp.*, 44 F. 4th 257, 263 (5th Cir. 2022)(citation omitted).
[29] *Valentine*, 993 F.3d at 280.
[30] Rec. Docs. 770, 771, 774, 775.

23-30825.30564

and conclusions of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### III.    GLOSSARY

| | |
|---|---|
| ACA | American Correctional Association |
| ATU | Acute Treatment Unit |
| DOC | Department of Corrections |
| eMARs | Electronic Medical Administration Records |
| EMT | Emergency Medical Technician |
| ITO | Individual Treatment Order |
| LPN | Licensed Practical Nurse |
| LSP | Louisiana State Penitentiary |
| NCCHC | National Commission on Correctional Health Care |
| NP | Nurse Practitioner |
| NU | Nursing Unit |
| OLOL | Our Lady of the Lake Hospital |
| PLRA | Prison Litigation Reform Act |
| RN | Registered Nurse |
| SDE | Self-declared Emergency |
| UMC or UMCNO | University Medical Center (at New Orleans) |

## IV.    FINDINGS OF FACT

The following findings of fact are supported by the evidence in the record.  Where a particular fact was controverted, the Court weighed the evidence and evaluated the credibility of the testifying witnesses to make a finding.

## <u>EIGHTH AMENDMENT VIOLATIONS</u>

### A.  Expert Witnesses - Credibility[31]

1.    Plaintiffs' expert Madeleine LaMarre ("LaMarre") is a nurse practitioner with over 30 years of experience in corrections, including serving as the Nursing Director and Clinical Services Manager in the Georgia Department of Corrections and 15 years of experience monitoring correctional facilities. The Court accepted LaMarre as an expert in correctional health and found her testimony credible.[32]

2.    Plaintiffs' expert Dr. Susi Vassallo ("Dr. Vassallo") is a board-certified physician in emergency medicine and medical toxicology. Dr. Vassallo was accepted by the Court as an expert in emergency medicine, toxicology, and correctional medicine, and the Court found her testimony credible.[33]

3.    Plaintiffs' expert Dr. Mike Puisis ("Dr. Puisis") is a board-certified physician in internal medicine with over 30 years of experience in correctional settings. Dr. Puisis was

---

[31] The credibility of fact witnesses is discussed specifically when referenced.

[32] PX 1-a, p.5; Rec. Doc. 748, LaMarre Testimony at 86:6-9, 87:3-14, 90:24-91:2.   LaMarre currently consults with the Department of Homeland Security and previously consulted with the Centers for Disease Control and Prevention. She served as an associate editor of the textbook Clinical Practice in Correctional Medicine, Second Edition. *See id.*

[33] Dr. Vassallo treats patients from correctional facilities, including the New York penal institution Rykers Island, at Bellevue Hospital in New York City. She also consults with the Department of Homeland Security, Division of Civil Rights and Civil Liberties regarding medical care in Immigration and Customs Enforcement Detention Centers. PX 1-a, p. 6; Rec. Doc. 749, Vassallo Testimony at 11:5-7; 14:8-12.

accepted by the Court as an expert in internal medicine and correctional medicine, and the Court found his testimony credible.[34]

4.    Plaintiffs' expert Angela Goehring ("Goehring") is a registered nurse with over 25 years of experience in correctional health care, including serving as Chief Nursing Officer for a private correctional health care company. Goehring was accepted by the Court as an expert "in the field of correctional medicine with an emphasis on nursing care and administration," and the Court found her testimony credible.[35]

5.    Plaintiffs' experts reviewed a sample of 60 inmate patients who died or required hospitalization after January 1, 2019, the start of the "relevant and appropriate time period for the Court to assess whether the constitutional deficiencies listed in the [Liability Opinion] have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial."[36] LaMarre, Dr. Vassallo, and Goehring visited LSP on April 6, 7, and 8, 2022.[37] Plaintiffs' experts reviewed numerous policies, minutes, reports, and other documents from LSP and DOC in preparation for formulating their opinions and preparing their joint expert report.[38]

---

[34] He was Assistant Medical Director, Medical Director, and Chief Operating Officer for the Cook County Jail, served as Regional Medical Director with Correctional Medical Services for New Mexico, and served as Medical Director of correctional facilities with Addus Health Care. He has been retained by the United States Department of Justice, the District Court for the Northern District of California, and numerous state/local jurisdictions, and he has served as a court-appointed expert or monitor in several cases. He is the author of the leading textbook on correctional medicine and has helped revise or establish standards of care for the American Diabetes Association, the National Commission on Correctional Health Care, and the American Public Health Association. PX 1-a at 5; Rec. Doc. 750, Puisis Testimony at 7:10-15; 9:1-6; 15:23-25.

[35] She served on the American Correctional Association's Commission for Accreditation, has worked with court-appointed monitors, and has served as an expert and consultant. PX 1-a, p. 6; Rec. Doc. 751, Goehring Testimony at 35:13-16; 58:9-12.

[36] PX 1-a, p. 4; see generally PX 1-c (full chart review for all 60 patients), JX 77-a (stipulation).

[37] PX 1-a, p. 3.

[38] Id. at 7-8.

23-30825.30567

6.      Plaintiffs' experts submitted a 136-page joint report, including a 443-page appendix of detailed chart reviews.[39]  A supplemental report was submitted jointly by LaMarre and Goehring after they evaluated LSP's electronic medical administration records ("eMAR").[40]

7.      Generally, Plaintiffs' experts opined that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths."[41] Furthermore, "the vast majority of medical records from the remedy period contained multiple examples–typically pervasive–of often grossly substandard medical care."[42]

8.      Defendants' expert Dr. David Mathis ("Dr. Mathis") is a physician board-certified in family medicine who serves as a medical consultant for the Office of Legal Affairs for California Correctional Health Care Services.[43]  The Court accepted Dr. Mathis as an expert in the field of correctional medicine.[44] Nevertheless, while the Court does not discount Dr. Mathis' opinions in full, the Court finds that, in several instances, Dr. Mathis' medical opinions were entitled to less weight than those offered by Plaintiffs' experts. Outside of the Maryland prison, Dr. Mathis has never been tasked with evaluating the overall delivery of medical care at a prison; he has evaluated one jail.[45] In his expert report, almost half of Dr. Mathis' chart review section (approximately 50 pages) is a verbatim copy of LSP's mortality reviews with no independent analysis or comment by

---

[39] *See id*.; PX 1-c.
[40] *See* PX 5-a; PX 5-b (amended chart reviews incorporating eMARs).
[41] PX 1-a, p. 8.
[42] *Id.*
[43] Rec. Doc. 752, Mathis Testimony at 139:22-140:23. Dr. Mathis is also a Certified Correctional Health Professional.  Dr. Mathis previously worked at a California prison and served as the medical director at a Maryland prison. *Id.* at 141:14-22; 143:17-144:4, 145:23-146:11.
[44] *Id.* at 154:11-12.
[45] Rec. Doc. 753, Mathis Testimony at 9:1-3; 9:22-10:5.

23-30825.30568

Dr. Mathis.[46]  Although Dr. Mathis opined in his report that he found less than five standard of care violations by LSP, at trial he testified that he found ten instances of care that fell below the standard of care.[47]  During the course of his testimony, he acknowledged additional standard of care deficiencies.[48]  Further, although Dr. Mathis criticized Plaintiffs' experts' sampling methodology in both his report and deposition, stating that accreditation bodies review records randomly, when presented with contradictory testimony from members of such bodies at trial, he admitted he could not refute that testimony.[49]  Notably, Dr. Mathis did not opine on several critical issues before the Court regarding the systemwide delivery of medical care at LSP, including: (a) whether providers treat complaints episodically;[50] (b) whether providers routinely fail to obtain adequate medical histories upon evaluation;[51] (c) whether  providers routinely perform physician examinations;[52] (d) whether providers read and monitor testing,[53] (e) whether providers monitor or manage medications;[54] (f) whether patients are timely and correctly sent out for emergency care;[55] or (g) whether LSP's "new" method of responding

---

[46] *Id.* at 29:24-30:4; 24:15-30:4 (comparing Dr. Mathis' expert report to LSP mortality reviews); *see* DX 35-c at 94-211.

[47] *Compare* DX 35-c at 212 *with* Rec. Doc. 753, Mathis Testimony at 12:10-15:14.

[48] *See, e.g.*, Rec. Doc. 753, Mathis Testimony at 30:7-31:14 (nurses in an infirmary should note the time they take vital signs, which did not occur at LSP); *id.* at 31:17-32:15 (trained personnel should use an AED for a pulseless person not breathing, which did not happen for Patient #25); *id.* at 34:6-9, 42:11-44:11 (patient who is incontinent and cannot get out of bed due to back pain should be presented to provider, which did not happen for Patient #6); *id.* at 47:17-51:5 (patient with acute hepatic failure should go to emergency room, which did not happen for Patient #33).

[49] *See id.* at 8:11-9:21; *see also* DX 35-c at 206-07; Rec. Doc. 698-1 at 11.

[50] Rec. Doc. 753, Mathis Testimony at 65:21-23.

[51] *Id.* at 65:4-8.

[52] *Id.* at 65:9-12.

[53] *Id.* at 65:13-16.

[54] *Id.* at 65:17-20.

[55] *Id.* at 59:11-17.

23-30825.30569

to emergency sick call was adequate.[56]  The Court found Dr. Mathis' opinions ill-supported and unpersuasive.

9.     Defendants' expert Michael McMunn ("McMunn") is a nurse practitioner with a Ph.D. in Nursing, and he is a Certified Correctional Healthcare Professional.[57] McMunn currently works for Southern Health Partners as a contractor in seven jails and one prison work camp.[58] The Court accepted McMunn as an expert in the field of correctional medicine.[59] For the remedy phase of this case, McMunn conducted a two-day site visit to LSP during which he reviewed 22 charts, conducted 63 interviews, observed 50 "medical encounters" involving inmate patients – five of which were sick calls.  McMunn took no notes during this site visit, admitted he performed no calculations to support his conclusion that LSP is complaint with 95% of the National Commission on Correctional Health Care ("NCCHC") regulations, and admitted he relied solely on his memory in reaching his conclusions.[60]  For more detailed reasons set forth *infra*, the Court finds that McMunn's testimony and conclusions are entitled to little weight.

10.    Defendants' expert Dr. John Morrison ("Dr. Morrison") is a general surgeon who previously served as the DOC Medical Director from April 2018 until April 2020.[61]  He currently serves as the Section Chief of General Surgery for Louisiana State University's section of University Medical Center New Orleans ("UMCNO" or "UMC").[62]  In this role, Dr. Morrison performs procedures on LSP inmate patients at LSP and UMC.[63]  The Court

---

[56] *Id.* at 61:23-63:15.
[57] Rec. Doc. 756, McMunn Testimony at 4:25-5:2; 5:6-7.
[58] *Id.* at 6:9-12; 8:12-22.
[59] *Id.* at 17:16-18.
[60] *Id.* at 22:25-23:2; 85:23-86:3; 88:12-14.
[61] Rec. Doc. 754, Morrison Testimony at 5:18-21; 10:6-9.
[62] *Id.* at 7:4-6.
[63] *Id.* at 9:16-10:5.

accepted Dr. Morrison as an expert in the field of general surgery with an emphasis in surgical administration.[64] The Court found Dr. Morrison's testimony credible but largely irrelevant to the majority of the constitutional violations at issue during the remedy trial.

### B. Clinical Care

11.     Based on the testimony and a review of evidence discussed below, the Court finds that the delivery of clinical care at LSP remains constitutionally deficient.  Because sick call is a part of clinical care, some records discussed below will include references to sick call encounters.

The Court previously found clinical care constitutionally inadequate in the following ways: (a) privacy in examinations; (b) lack of routine medical equipment in exam rooms; (c) lack of adequate medical records management; (d) lack of clinical hygiene and spacing; and (e) episodic treatment of complaints.  Considering the evidence presented at trial, the Court finds that LSP has properly remedied (a) privacy in examinations;[65] (b) lack of routine medical equipment in exam rooms;[66] and (d) lack of clinical hygiene and spacing.[67]  Plaintiffs concede these improvements.[68]  However, the lack of adequate medical records management and the episodic treatment of complaints persist in LSP's delivery of clinical care.  Clean rooms and the availability of medical equipment do not solve the constitutionally substandard care.

---

[64] *Id.* at 14:3-5.
[65] Rec. Doc. 752 at 100:10-18; Rec. Doc. 755 at 74:1-3, 81:6-12; Rec. Doc. 757 at 131:4-6.
[66] Rec. Doc. 748 at 198:2-13; Rec. Doc. 752 at 100:15-18; DX46.0013; DX46.0152; DX46.0188.
[67] Rec. Doc. 748 at 196:22-197:8; Rec. Doc. 755 at 76:15-24; DX46.0013; DX46.0152; DX46.0188;
[68] Rec. Doc. 771, p. 27 (citing PX 1-a, p. 37; PX 44-c, p. 4, Response to ROG 1; Rec. Doc. 748, LaMarre Testimony at 146:16-22; *see also* PX 1-a at 36-37).

Laudably, LSP hired additional nurse practitioners and utilizes them in clinical care.[69] However, this fact alone does not establish that clinical care at LSP is now constitutionally adequate.

The Court rejects Defendants' contention that medication administration is not an issue before the Court "because it was not addressed in the Liability Ruling."[70] This contention is demonstrably false as the Court explicitly held that LSP's failure to monitor and manage medications contributed to constitutionally inadequate clinical care.[71]

### Patient # 13

Patient #13, 61 years old, had numerous health problems, including HIV and chronic kidney disease.[72] This patient's record documents multiple medical errors, the most egregious being the administration of Toradol for an infection known to be resistant to this medication. LSP providers repeatedly failed to administer his HIV medication, provided erroneous information to specialists regarding his medication dosage, and disregarded the prescriptions ordered by specialists, reverting instead to prior, ineffective medications.[73]

Specialists repeatedly instructed that Patient #13 was not to be given Toradol or other NSAIDs because they worsened his kidney function. The cover of his medical record indicated in bold letters "NO TORADOL IS TO BE GIVEN."[74] Yet, during the last week of Patient #13's life, he was given Toradol by a LSP provider.[75] Hours later, Patient

---

[69] Rec. Doc. 756, McMunn Testimony, at 74; *see also* PX1-a, p. 16.
[70] Rec. Doc. 770, p. 16.
[71] Rec. Doc. 594, p. 10. The Court specifically discussed the failure of medication administration with respect to Patient #13, *id.* at 11, Patient #6, *id.* at 17, Patient #53, *id.* at 19, and Patient #18, *id.* at 24.
[72] Rec. Doc. 748, LaMarre Testimony at 110:23-111:2; PX 1-a, pp. 66-67; JX 13.
[73] Rec. Doc. 748, LaMarre Testimony at 112:11-116:12, 123:14-127:13; JX 13, pp. 58, 158, 755, 883, 919, 1080-82, 1152; JX 68, pp. 2222, 2252, 2321.
[74] Rec. Doc. 748, LaMarre Testimony at 127:14-132:17; JX 13, pp. 1, 402, 404, 405, 1074, 1035, 1085.
[75] *Id.*

#13 made a self-declared emergency ("SDE") request, advising that he was unable to urinate since receiving the shot of Toradol.[76] In response, LSP providers treated him for a urinary tract infection with an ineffective medication, discharged him to his room, and set up a follow-up for the next week.[77] Patient #13 never made the follow-up as he died within the week due to sepsis, which "may very well have come from an improperly treated urinary tract infection."[78]

Defendants' attempt to invalidate LaMarre's "initial opinions" about Patient #13 for her purported admission that they were "mistaken and inaccurate," falls flat.[79] Defendants inflate the impact of these errors and claim that "Plaintiffs offered no explanation for NP LaMarre's errors,"[80] which is demonstrably false. LaMarre acknowledged that she had erroneously concluded that this patient had not had a urology consult and had not been treated for pneumonia.[81] However, LaMarre explained the reason for her errors:

> What I'd like to report is that in preparing for trial, I realized that there were two medical record volumes for this patient, but I had only reviewed one medical record volume because they were produced at different times.
>
> In reviewing the second volume -- or both volumes, I realized that each -- that both volumes were basically for the same chronological period. Both volumes contained documents from the same time period, except that one volume contained some documents that were not in the other volume. There were some duplicate documents. They were not in chronological order; and therefore, there are some -- while my overall opinions remained the same, there are a few factual statements made in my report that I would like to correct. So I'd just like to mention that before I testify about this case.[82]

LaMarre further testified that the two volumes of medical records for Patient #13 was

---

[76] *Id.* at 129:23-130:4; JX 13, p. 405.
[77] *Id.* at 130:5-131:4; 131:14-132:9; JX 13, pp. 404-05.
[78] *Id.* at 132:10-17.
[79] Rec. Doc. 770, p. 18.
[80] Rec. Doc. 774, p. 9.
[81] Rec. Doc. 748, LaMarre Testimony, at 109-110.
[82] *Id.* at 109:7-21.

an illustration of the systematic issues involving the medical records. When you have two separate medical volumes that are covering the -- you know, that are not chronological and complete, then the providers don't know what's happening with the patient, either. So their ability to be up to date and current and know the latest -- have a copy of the latest documents and consults and hospital reports is impaired by the lack of a complete and chronological record, and it leads to errors in treatment.[83]

These benign errors, caused by LSP's egregious medical records management, do not render LaMarre's otherwise supported conclusions about Patient #13's care invalid.[84] The Court finds that LSP's medical records remain in shambles. They are disorganized and incoherent. Medical records are the most important repository of healthcare information and a critical source of historical complaints and treatment. The utter and complete disarray of the medical records is emblematic of indifference.

Defendants rely on Dr. Mathis' opinion that using an antibiotic "long enough" could "still work" even where an infection has been historically resistant.[85]  That LSP's hired expert advocates for the prolonged use medication known to be ineffective, in the hopes that it might work, is deliberately indifferent to the patient's medical needs. In any event, Defendants failed to rebut Plaintiffs' evidence regarding Patient #13's HIV medication lapses, providing specialists with incorrect information, or disregarding specialists' prescription orders without explanation.

The treatment of Patient #13 is unrebutted evidence of LSP's failure to follow specialists' orders, callous indifference to medication efficacy, indifference to treatment

---

[83] *Id.* at 110:10-18.
[84] Defendants' suggestion that LaMarre's criticism of giving Patient #13 Toradol is a "newly developed opinion" raised somehow as a last resort and "provided only after her other opinions were refuted," is completely without merit. Rec. Doc. 774, p. 9. It is undisputed that the cover of Patient #13's chart contained, in bold letters, "NO TORADOL IS TO BE GIVEN."
[85] Rec. Doc. 753, Mathis Testimony, at 108:4-11.

plans and protocols, and incoherent, disorganized, untrustworthy medical records, all of which contribute to abysmal, unconstitutional medical care.

### Patient #20

Patient #20 was 52 years old and had suffered from hepatitis C since 2021.[86]  He made four sick calls between February and August 2021 complaining of a wide range of symptoms, from lower abdominal pain to yellow eyes and an inability to lie on his left side; he also complained he was not receiving his hepatitis C medication.[87] The EMT referrals of the patient for "M.D. review" were disregarded.[88] Defendants admit that Patient #20 was not seen by a provider until he was referred to the hospital three weeks later.[89] Defendants' expert Dr. Mathis agreed that the three week failure to see Patient #20 between August 31, 2021 and September 21, 2021 fell below the standard of care.[90] Clinical care was non-existent for this Patient. The neglect and apathy shown rise to the level of callous disregard.

### Patient #42

Patient #42 is 25 years old with a history of asthma and cavitary pneumonia who was also under mental health treatment.[91]  This patient made numerous sick call requests for several symptoms, including spitting up blood, with no subsequent physical evaluation

---

[86] JX 20, pp. 5, 123.
[87] Rec. Doc. 755, Goehring Testimony at 13:8-17:11; JX 20, pp. 112, 116, 123-24.
[88] *Id.*
[89] Rec. Doc. 774, p. 10.
[90] Rec. Doc. 753, Mathis Testimony at 13:16-20. Goehring admitted that she was incorrect about the breadth of the alleged delay in treatment for Patient #20.  She acknowledged that she did not see the hospital record demonstrating that Patient #20 was in the hospital from September 22, 2021 until October 31, 2021, and LSP could not have responded to this patient's needs or refill medications during that time. *See* Rec. Doc. 755, Goehring Testimony at 118:21-119:22. Nevertheless, even Dr. Mathis still found that delays in treating this patient attributable to LSP were below the standard of care.
[91] Rec. Doc. 748, LaMarre Testimony at 133:1-2.

by a provider.[92]  On April 3, 2020, the patient reported a SDE after spitting up blood.

LaMarre testified that spitting up blood is a "red flag symptom" of potentially serious

medical issues, and this should have prompted a physician examination "right away."[93]

Although the patient was "seen" on April 4, 2020, because of the utter disarray of LSP's

medical records, the record for this patient is indecipherable.

> A physician doesn't document any action or acknowledgement of the [April 3rd SDE] form until April 6th.  And it appears that the initial response of the physical was sick call, as needed, or medical provider."
>
> That may be – we actually don't know who that is.  We don't know if it's a physician.  We don't know if it's a nurse practitioner.  Because one of the medical record issues is that the providers do not legibly date, time, sign, and you don't know their credentials.  So you don't know who is seeing the patient.  But at any rate, they – the plan is clinical follow-up in eight weeks.[94]
>
> After a third SDE on April 6, 2020, the patient was sent to the ATU and ultimately

to the hospital where he was diagnosed with cavitary pneumonia.[95]

Defendants' new sick call policy, whereby sick call was conducted via telemedicine

by a nurse practitioner, did not improve the quality of care for this patient.   After

implementation of the new sick call policy, on January 14, 2022, Patient #42 made a SDE

complaining that he was suffering chest pain for two days; the EMT provided no treatment

and referred the request to a provider, who noted only "S/C PRN [sick call as needed]"

four days later without ever seeing the patient.[96]

---

[92] *Id.* at 132:24-137:4, 139:13-144:24; PX 1-a, pp. 53, 55-56, 58-59; JX 42, pp. 38-39, 41-42, 74-76.

[93] *Id.* at 134-135.  Defendants criticize LaMarre's evaluation of Patient #42's treatment, claiming that, for the April 2020 incident, the patient was experiencing an adverse reaction to the use of "Mojo."  Rec. Doc. 770, p. 19, n. 106.  However, this is irrelevant to the question of whether this patient was adequately assessed and treated for the reported symptoms.

[94] *Id.* at 135:11-21.

[95] *Id.* at 136:8-14.

[96] *Id.* at 139:13-140:9; JX 42 at 42. Again, the state of LSP's medical records made it difficult to discern who provided the patient with care: "so initially when I reviewed this I thought that the patient was seen by an EMT because there's no legible signature.  But I came to appreciate that a nurse practitioner saw this patient on the 19th."  *Id.* at 140:24-141:2.

Five days later, he made another sick call request and was seen via telemedicine by Nurse Practitioner Ronald Bordelon ("Bordelon"), who failed to take an adequate history, failed to physically examine the patient, and failed to chart or acknowledge awareness of the patient's previous cavitary pneumonia and the risk of reoccurrence.[97]

Defendants note that this patient had three encounters with providers over a two-week period. However, a mere encounter with a health care provider is not evidence of medical care or treatment, and frequency does not establish constitutionally adequate care. Defendants did not address why no physical examination of this patient was performed, why he was not seen by a doctor after three days of spitting up blood, or why a medical provider did not review his sick call form for seven days although he was ill enough to be sent to OLOL in the meantime.[98]

Patient #42's care, particularly subsequent to LSP's purportedly improved sick call procedure, is disturbing. It suggests a level of apathy and indifference impervious to changes.

<u>Other Patients, Generally</u>

Dr. Puisis documented numerous additional patient charts that revealed systemic, recurring problems with clinical care.[99] Dr. Mathis also acknowledged the following

---

[97] *Id.* at 140:17-142:18; JX 42, p. 41. ("Now in telemedicine the patient is not with the nurse practitioner, so I'm not sure exactly how that got documented. But it's an inadequate history for heart pain: 'When did it start? What is the heart pain like? Do you have any associated symptoms? Do you have cough? Do you have palpitations?' there does not appear – even though the medical record should be with the nurse practitioner, it doesn't appear that the nurse practitioner looked back and saw what had happened with the patient to know that in the past he's had cavitary pneumonia … the nurse practitioner doesn't make a diagnosis. What is this patient – he just says he got intermittent pain when laying down. Not a particularly relevant medical evaluation.").

[98] *See* PX 1-a, p. 59.

[99] *See* PX 1-a, pp. 68-69 (Patient #15, whose condition of COPD was left off the "problem list" in his medical records and therefore was not addressed in the "woefully inadequate" medical evaluations in his clinical visits; even after a test showed severe obstruction, Dr. Toce did not document a follow-up plan or see the patient before his death from COPD); *id.* at 120 (Patient #29, who was given NSAIDs despite hypertension

23-30825.30577

standard of care violations in LSP's clinical care: Patient #2 was not given thyroid function

tests for hypothyroidism; Patient #47 had hematuria that was assessed as stable without

urinalysis; Patient #32 did not receive an EKG ordered to diagnose chest pain; Patient

#28 was not put on insulin despite elevated hemoglobin A1-C and the failure of oral

diabetic medications;[100] and Patient #33 had autoimmune hepatitis and developed signs

of acute hepatic failure but was discharged to quarters instead of being sent to the

hospital.[101]

### Medication Administration/Security Oversight

Medication administration, a critical part of clinical care, is abysmal at LSP, and

like the general medical records, the medication administration records remain unreliable

and disorganized.[102] The state of these records directly contributes to the failure of health

---

and kidney damage and whose hypertension was not treated); *id.* at 121 (Patient #30, who made sick call requests or ATU visits five times in a month without being examined by a provider, delaying the diagnosis of metastatic colon cancer); *id.* at 121-23 (Patient #17, who was incorrectly diagnosed with venous insufficiency instead of deep vein thrombosis); *id.* at 123-24 (Patient #18, who did not receive physical examination, monitoring, or a history in clinical encounters); *id.* at 124 (Patient #19, who submitted multiple health services requests related to a degenerative joint disease without a timely and appropriate evaluation); *id.* at 53-54, 65 (identifying problems in health care encounters in January 2022 in Patients #42, #49, #48, & #47); PX 1-c at 87 (noting inadequate assessments for Patient #46 in January and February 2022); *id.* at 91, 349 (noting problems in records for Patient #47 in January 2022); *id.* at 99-100 (same for Patient #48); *id.* at 106-107 (same for Patient #49); *id.* at 193 (noting problems in the MARs between December 2021 to March 2022 for Patient #39); *id.* at 194 (noting problems in the February 2022 MARs for Patient #40); *id.* at 215 (noting inadequate assessment in January 2022 for Patient #41); *id.* at 219-220 (identifying multiple issues in the records from January 2022 for Patient #42); Rec. Doc. 748, LaMarre Testimony at 155:22-160:5 (describing inadequate sick call from January 2022 for Patient #49); JX 49, p. 288.

[100] Rec. Doc. 753, Mathis Testimony at 12:10-15:3.

[101] *Id.* at 48:17-51:4

[102] PX 1-a, pp. 10-11; 38-40; 72-79; PX 2; *see, e.g.*, Rec. Doc. 748, LaMarre Testimony at 179:6-180:21 (testifying about the unreliability of the MARs in Patient #14, and how it this error was not isolated to this patient); *see also* Rec. Doc. 755 Goehring Testimony at 6:18-7:13 (describing how Dr. Johnson and the Director of Nursing continued to give Plaintiffs' medical experts the wrong information about the timing of pill call, indicating that they did not even know when pill call took place); Rec. Doc. 749, Creppel Testimony at 241:21-242:24 (describing gaps in receiving necessary medication, and issues with the correctional officers administering the medications).

care providers to adequately monitor and evaluate patients' medical regimens.[103]

Defendants admit no changes have been made to medication management, other than the reduction in the frequency of administration,[104] and they continue to improperly allow "correctional officers [to] supervise the delivery of medications by other correctional officers," as criticized by the Court in the Liability Ruling.[105]

The change in the time of medication dispensation is particularly dangerous for insulin-dependent patients, who are not receiving sufficient or timely insulin medication or testing strips to determine the amount of insulin they need.[106]

LaMarre credibly opined that the "medication management system is completely broken, from ordering the meds, to getting them to the pharmacy, to timely dispensing the meds, to administering the meds, to documenting the meds in the medication administration record."[107]

Considering the evidence submitted at trial relating to clinical care at LSP, the Court finds that the delivery of clinical care remains constitutionally inadequate. While the physical space and equipment in the treatment rooms has improved, the quality of clinic

---

[103] Rec. Doc. 748, LaMarre Testimony at 98:19-25; *see, e.g.*, Rec. Doc. 749, Vassallo Testimony at 54:4-15 (describing how Patient #55's MARs did not include the information for the provider treating him in the emergency room to know the accurate information regarding his blood pressure medication).

[104] PX 1-a at 73; *see* Rec. Doc. 748, LaMarre Testimony at 175:18-178:8 (describing how the reduced frequency results in therapeutically inappropriate time between doses, especially for insulin administration); *id.* at 178:4-8; 178:19-21 (describing the reduction in frequency of pill call as illustrative of the fact that "medication administration has been turned completely over to custody. It is a security operation with no oversight by the medical team.").

[105] Rec. Doc. 594, ¶ 99; *see also* PX 1-a, p. 72; JX 78, T. Hooper Depo. at 62:1-4; JX 69-a, R. Lavespere Depo. at 124:1-4, 20-23; *see also* Rec. Doc. 748, LaMarre Testimony at 174:16-175:17 (describing how the training for correctional officers at LSP is inadequate and how their use in pill call contravenes national standards based on the prison's size).

[106] PX 1-a at 10-11; 38-40; 72-79; *see* Rec. Doc. 594 at ¶ 33; *see, e.g.*, Rec. Doc. 747 Mischler Testimony at 49:4-50:23; 68:1-9 (describing the process for receiving his sliding-scale insulin twice a day from correctional officers and how LSP, as often as once a week, including the day prior to his testimony, does not have the test tabs for him to test his levels preventing him from knowing how much insulin to give himself); Rec. Doc. 748, LaMarre Testimony at 151:1-152:7 (testifying on how LSP does not record how much insulin patients receive twice-daily in their medical records).

[107] Rec. Doc. 748, LaMarre Testimony at 97:4-8, 115:14-19.

care provided is unchanged.  The evidence demonstrates that patients continue to be treated episodically, and medical records management and medication administration are still seriously flawed. The medical records remain a significant impairment to delivering minimally adequate clinical care.

### C. Sick Call

12.    Sick call is an integral part of clinical care. Sick call is the principal means through which a clinical healthcare encounter is triggered. The Court previously made the specific finding that LSP's sick call policy was constitutionally inadequate because it failed to provide patients with medical care by qualified providers. While the Court is encouraged by some changes made to sick call, LSP's sick call process remains a constitutionally inadequate component of clinical care.

It is undisputed that LSP made changes to its sick call policy and procedures between the liability trial[108] and the remedy trial.[109]  Pursuant to LSP's new sick call policy, effective approximately November 1, 2021, inmates who submit a sick call request received by noon Sunday through Thursday are seen by a nurse practitioner via telemedicine on the following day.[110] NP Bordelon is responsible for sick call at LSP.[111] LSP secured telemedicine equipment and acquired portable buildings so patients could be seen via telemed by nurse practitioners from their dorms or cell blocks.[112]

Bordelon described the new sick call process as follows: inmates submit routine sick call slips before noon Sunday through Thursday, and the slips are taken to the ATU

---

[108] The Liability Trial began on October 9, 2018.
[109] The Remedy Trial began on June 6, 2022.
[110] Rec. Doc. 752, Bordelon Testimony at 90; DX8-aaa; PX 44-c, p. 9, Response to ROG No. 12; Rec. Doc. 717, pp. 4-5; PX 21-ssss, LSP Directive 13.061 (Mar. 3, 2022).
[111] Rec. Doc. 752, Bordelon Testimony at 90.
[112] *Id.* at 91-92.

23-30825.30580

where a nurse or a NP performs a paper triage of the slips;[113] any sick call slip stating an urgent condition can be seen immediately.[114] The remainder are seen the next morning on Monday through Friday by a NP via telemed.[115] The NP has in their possession the sick call slip and the patient's medical record.[116] The NP also has electronic access to the patient's list of medications, lab reports, duty status, and upcoming appointments.[117] The patient is in a private room during the sick call visit,[118] and an EMT is with the patient to take vital signs and facilitate the sick call visit.[119]

While the Court is encouraged by the improvements made to the sick call process, Plaintiffs presented evidence which demonstrates that these improvements have not transformed the level of care.[120]

NCCHC standards require daily sick call triage.[121] LSP's sick call policy has complaints reviewed the next day; further, sick call requests are only reviewed five days of the week at LSP.[122] Additionally, the sick call request form provides no place for the patient to time and date their request; there is likewise no place to time and date when the request was received. Thus, there is no documentation of policy compliance, i.e., that triage actually occurs within the timeline set forth in the policy.[123]

---

[113] *Id.* at 107-108.  The ACA provides for paper triage, meaning that the nurse triages the sick call slips without a face-to-face encounter.  Rec. Doc. 755, Goehring Testimony at 72:7-13.

[114] Rec. Doc. 752, Bordelon Testimony at 108.

[115] *Id.* at 92–93, 96.

[116] *Id.* at 93, 95-96.

[117] *Id.* at 94:10-14.

[118] *Id.* at 100; *see also* Rec. Doc. 755, Goehring Testimony at 74:1-3; Rec. Doc. 757, Johnson Testimony at 131–132.

[119] Rec. Doc. 752, Bordelon Testimony at 99:13-19, 196:5-16; *see also* Rec. Doc. 757, Johnson Testimony at 131–132.

[120] PX 1-a, pp. 49-58.

[121] Rec. Doc 748, LaMarre Testimony at 156:17-157:2.

[122] *Id.*

[123] PX 1-a, p. 50; Rec. Doc 748, LaMarre Testimony at 156:17-157:2.

23-30825.30581

While LSP's sick call policy defines triage as "[t]he review or screening of offender health concerns by health care personnel to determine the priority of need and the appropriate level of intervention[,]" the triage process is not explained and triage is not noted in patient charts.[124] Additionally, patient charts are replete with examples of sick calls where vitals were not taken, physical examinations were not performed, documentation of symptoms/medical history did not occur, and patients were charged a co-pay despite receiving no examination, diagnosis, or treatment.[125]

The lack of physical examinations during sick call encounters is highly problematic. The encounters appear to be "driven and controlled by the EMT who was with the patient [rather] than by the Nurse Practitioner who should be guiding the encounter as the provider."[126] The telemedicine equipment contributes to the lack of an adequate physical exam since the camera used to assess the patients has a poor resolution quality. Defendants and Dr. Mathis acknowledged that this equipment was not always available or properly functional.[127] Additionally, performing a physical examination is beyond the skill training of an EMT. The NP should be directing the hands-on examination. As implemented, LSP's telemedicine sick call policy amounts to a band-aid on a gaping wound.

---

[124] DX 8-aaa; *see* Rec. Doc. 757, Johnson Testimony at 199:18-200:1 (admitting that the updated policy does not describe the nurse or nurse practitioners conducting a triage step); Rec. Doc. 752, Bordelon Testimony at 123:2-125:6 (testifying that there is no documentation of the "triage" on the sick call form, nor is it mentioned in the LSP directive for sick call or Defendants' interrogatory response describing the new sick call procedure); JX 71-d; Rec. Doc. 752, Bordelon Testimony at 108:9-11 (admitting that he has never found some patients that had an emergent issue when conducting the "triage" of the forms the day before); Rec. Doc 748, LaMarre Testimony at 202:16-203:1.

[125] *See* PX 1-a, pp. 52-55.

[126] *Id.* at 52.

[127] Rec. Doc. 752, Bordelon Testimony at 101:20-102:6; JX 69-a, Lavespere Depo. at 128:15-21; Rec. Doc. 753, Mathis Testimony at 75:13-16. This problem is exacerbated by the fact that EMTs do not receive training before assisting in telemedicine sick calls. JX 69-a, Lavespere Depo. at 225:7-18.

23-30825.30582

The Court agrees that:

> The use of telemedicine is a helpful adjunct option when the patient is unable to be transported, such as after clinic hours when the provider is not physically on-site, and during times such as severe weather, etc. The use of telemedicine as the only mechanism to conduct patient sick call encounters is not optimal. Given the limited optics, poor resolution, and placing the responsibility of the physical exam on an EMT is not the same as an in person patient-physician/nurse practitioner encounter. Many physical findings such as heart tones, lung sounds, abdominal examination, and close examination of many skin issues can be easily lost when done via camera. Every effort should be made to conduct the sick call encounters in person, unless extenuating circumstances place a burden on the patient to travel to the clinic location.[128]

The access to a patient's medical record during sick call is certainly an improvement; however, the evidence demonstrates that the medical records are not necessarily being reviewed during sick call, rendering this ostensible improvement meaningless. Plaintiffs' experts observed a sick call encounter with Patient #42 where NP Bordelon did not attempt to access eMARs. Bordelon testified that, although he reviewed the patient's medical list–which does not show whether the patient received the medications–he was unable to access the medical record via eMARs because he did not know his login.[129]

Evidence that sick call is still essentially performed by EMTs even though there is a NP on the other end of the screen went unrefuted. Patient #42, discussed previously, is one example of the persistent incompetence of the sick call process at Angola. As a matter of their discipline, EMT's are not qualified to medically manage sick call. To alleviate this scope of practice dilemma, LSP added a layer of medical oversight by a

---

[128] PX 1-a, pp. 51-52.
[129] Rec. Doc. 752, Bordelon Testimony at 128:9-129:9. Plaintiffs claim that Bordelon does not know how to "access medical administration records" is not exactly supported by this testimony. Nevertheless, Bordelon's testimony demonstrates that there is no point to having access if providers are not using eMARs during sick call visits, whether it is because they forget their logins or for any other reason.

nurse practitioner, but the qualitative nature of the medical care is unchanged, and it is exacerbated by the physician's avoidance of clinical care.

Sick call is the most important component to the delivery of health care because it is the access point to meaningful and early diagnosis and treatment; it should minimize the risk of (or worsening of) an acute disease process becoming chronic and the attendant human and economic impacts of a worsening illness or disease. An ounce of prevention is worth a pound of cure.

### C. Specialty Care

13.    While there has been some improvement in this area, the Court finds that specialty care at LSP continues to be constitutionally inadequate in the following ways: (a) timeliness; (b) failure to schedule and track specialty appointments; (c) failure to comply with testing and diagnostic requirements; (d) failure to execute appropriate follow-up care; and (e) failure to coordinate care. The Eceptionist program utilized to schedule specialty appointments may be robust, but its use has not resolved failures in timely scheduling and tracking adherence to specialty provider orders and follow-up.

LSP provides specialty care in three ways: (a) on-site specialty clinics where specialists come to LSP, (b) telemedicine visits with specialists, and (c) off-site visits to specialists.[130] Specialty care appointments (trips and follow-up) are scheduled and tracked by DOC headquarters using the Eceptionist program.[131]

Since 2016, LSP has added the following on-site specialty clinics: cardiology, urology, infectious disease, and dietary.[132] Since 2016, LSP has expanded the number

---

[130] DX 35-c, p. 31.
[131] Rec. Doc. 754, Benedict Testimony at 104-105.
[132] Rec. Doc. 750, Lavespere Testimony at 164:2-10.

23-30825.30584

and scope of specialists available via telemedicine to include: neurology, infectious disease, hepatitis, ENT (ear, nose and throat), hematology and oncology, dermatology, endocrinology, and gastrointerology.[133]

By 2021, the number of specialty referrals and appointments had substantially increased since 2015/2016.[134] The amount of missed specialty appointments since 2016 has also decreased.[135] Further, since the liability trial, LSP has installed monitors in the Ash dorms to notify inmates of their appointments, replacing the previous method of inmates reviewing paper print outs to determine if they had appointments.[136]

These changes provide a framework for constitutionally adequate health care, but the evidence demonstrates that these changes have not resolved the constitutional deficiencies in the delivery of specialty care. Dr. Lavespere testified that LSP's policies and practices regarding specialty care are essentially unchanged.[137] Further, the policies in place are not necessarily followed. LSP Directive 13.001 provides: "All recommendations by non-departmental health care practitioners concerning an offender's treatment shall be reviewed by the offender's primary care provider. If the decision is made not to carry out any or all recommendations, justification **shall be** documented in the offender's medical record."[138] However, Dr. Lavespere's testimony

---

[133] *Id.* at 164:19-24.

[134] Rec. Doc. 754, Benedict Testimony at 64:9-20, 110:2-3, 154:2-4; PX 1-a, p. 83.

[135] Rec. Doc. 750, Lavespere Testimony at 173:8-12.

[136] PX1-a, p. 83.

[137] JX 69-a, Lavespere Depo. at 111:17-113:1, 122:23-123:8; *see also* Rec. Doc. 717, p. 5 (stipulating that "LSP's polices or practices have not changed regarding recommending, authorizing, and scheduling specialty health care services; getting people to appointments or making sure patients have all necessary tests, paperwork, and fasting; or ensuring that specialists' recommendations are implemented or the decision not to implement them is documented."); Rec. Doc. 750, Puisis Testimony at 28:10-16 (opining that the stipulation is consistent with Dr. Puisis' review of the depositions, interrogatory responses, and chart reviews).

[138] PX 21-t, p. 3 (emphasis added).

reveals that LSP's medical leadership is either unaware of or knowingly disregards this policy requiring documentation of such decisions.[139] Dr. Johnson admitted LSP does not track this information,[140] and Dr. Toce, LSP's current medical director, denied that it would improve care to track specialist recommendations to completion.[141]

A review of patient charts shows that specialty care remains constitutionally deficient.  And while Dr. Mathis ultimately concluded that the specialty care LSP provides meets the standard of care, even he acknowledged instances where LSP medical personnel ignored specialist's warnings, changed prescriptions without explanation, and failed to contact specialists when patients' conditions deteriorated.[142]   The following patients exemplify the persisting problems in LSP's delivery of specialty care.

<u>Patient #7</u>

Patient #7, 65 years old, had three positive fecal occult blood tests in 2019 and a history of constipation.[143]   Dr. Puisis concluded that this called for an immediate colonoscopy, but the patient's chart contains no indication that any provider considered or noted the need for a colonoscopy or that colonoscopy was discussed with the patient.[144] He was not sent to the hospital until July 2021, when it was discovered he had

---

[139]  JX 70-a, Lavespere Depo. at 44:15-45:1, 48:4-10; PX 21-t, p. 3, LSP Directive 13.001 (requiring documentation). *See also* JX 70-a, Lavespere Depo. at 43:24-44:1 ("There are certain things that we don't follow the recommendation of specialists on . . . ."); JX 69-a, Lavespere Depo. at 111:17-112:12, 122:21-123:20, 212:11-15.

[140] Rec. Doc. 757, Johnson Testimony at 198:2-10.

[141] JX 71-b, P. Toce Depo. at 54:24-55:21.

[142] Rec. Doc. 753, Mathis Testimony at 12:21-13:11 (discussing Patients #5 & 7), 103:14-18, 104:19-109:9 (discussing Patients #13 & 33).

[143] Rec. Doc. 750, Puisis Testimony at 70:16-73:25; PX 1-a, pp. 97-98; JX 7, pp. 44, 103.

[144] Rec. Doc. 750, Puisis Testimony at 71:12-24, 245:8-22; PX 1-a, pp. 97-98.

metastatic colon cancer, resulting in a fatal pulmonary embolism.[145] Dr. Puisis credibly concluded that Patient #7's death was preventable.[146]

By deposition, Dr. Toce testified that Patient #7 refused the colonoscopy.[147] Defendants admit they failed to obtain a written refusal by this patient, which Dr. Mathis agreed was below the standard of care.[148]  Defendants could not refute the fact that this patient's medical record was devoid of any references to the three bloody stool tests or the need for a colonoscopy.[149]  The Court finds Dr. Toce's testimony of this patient's undocumented colonoscopy refusal incredible in light of the medical records.

<u>Patient #10</u>

Patient #10 is a perfect example of LSP's failure to timely recognize his need to be referred to a neurologist. Patient #10 was sixty years old and suffering from hypertension and high blood lipids, placing him at risk for a stroke.[150]  His medical records reveal that he had eight episodes of elevated blood pressure, inability to speak clearly, altered gait, and/or left-sided symptoms, and symptoms consistent with transient ischemic attacks, which can indicate stroke and require higher-level diagnostic testing.[151]  His records also show that he was sporadically treated for high blood pressure but that he also presented on several occasions as possibly intoxicated or having used illicit drugs.[152]  On numerous occasions, it appears that this patient's high blood pressure was blamed on illicit drug use and dismissed, without treatment.   While Defendants contend Patient #10's blood

---

[145] *Id.* at 73:4-25; PX 1-a, p. 98; JX 7, p. 44.
[146] PX 1-a, p. 98.
[147] JX71-a, p. 142:8-14.
[148] DX 35-c, p. 189.
[149] JX 71-a at 142:8-14.
[150] Rec. Doc. 750, Puisis Testimony at 76:13-81:1; PX 1-a, pp. 61-63; JX 10, pp. 113, 122, 125, 172.
[151] Rec. Doc. 750, Puisis Testimony at 77:1-15, 245:23-248:20; PX 1-a, pp. 62-63.
[152] JX 10, pp. 187, 180, 176, 172, 163, 164, 154, 153, 149, 147, 144, 141, 137, 136, 129, 125, 114, 113, 120, 105, 106.

pressure "was generally controlled except when he presented with altered mental status,"[153] the records show multiple occasions of high blood pressure without any notation of an altered mental state.[154]

On another occasion, Patient #10 advised a physical therapist that he believed he had a stroke, but he was not evaluated by LSP providers or referred to a neurologist, and there is no documentation that any provider addressed this at all.[155] Patient #10 ultimately suffered a fatal stroke.[156] It is indeterminate whether the fatal stroke was due to lack of care or drug use, but the vagueness of this patient's cause of death does not change the fact that Defendants were indifferent to Patient #10's diagnosis and treatment.

### Patient #4

Patient #4 was 63 years old and suffering from seizure disorder, renal cancer, pulmonary hypertension and interstitial lung disease, all conditions warranting pulmonology follow-up.[157] Defendants point to UMCNO records which note that, as of May 2019, this patient was "lost to follow-up" due to the COVID-19 pandemic.[158] He did not see a pulmonologist until December 2020.[159] While delays caused by the pandemic were unavoidable and not caused by LSP, about half of the delay of this patient's care occurred before the pandemic began. Further, before and after the pandemic delay, this patient presented on several occasions with oxygen levels which required hospitalization;

---

[153] Rec. Doc. 770, p. 34.
[154] *Id.* at pp. 34-35 (noting blood pressures above 140/90 with no evidence of drug use on 7/23/20, 9/4/20, 10/2/20, 12/9/20); *see also* JX 10, pp. 153, 144, 141, 129, 125 (same); *see generally* Rec. Doc. 750, Puisis Testimony, at 245:23-248:20 (responding to Defendants' analysis). As stated previously, an inmate-patient's illicit substance use is not a justification not to provide medical treatment that meets the standard of care; Defendants have not submitted any authority to the contrary.
[155] Rec. Doc. 750, Puisis Testimony at 79:14-81:1; JX 10, pp. 112, 113.
[156] PX 1-a, p. 63.
[157] Rec. Doc. 750, Puisis Testimony at 89:16-106:11; PX 1-a, pp. 89-92; JX 4.
[158] JX 04, p. 190.
[159] Rec. Doc. 750, Puisis Testimony at 89:14-90:21; PX 1-a, p. 90.

however, a pulmonologist was not consulted and the patient was not hospitalized.[160] When this patient finally did see a pulmonologist, LSP failed to provide the patient with tests the pulmonologist ordered, delayed filling prescriptions for weeks, and failed to "integrate the specialty care into the primary care of the patient."[161]

The initial failure to timely refer this patient to a specialist was exacerbated by LSP's failure to follow the specialist's orders, which failures persisted from early 2021 until his death from respiratory failure in October 2021.[162]  Patient #4 suffered an egregious lack of care that cannot be justified by a "pandemic defense."  It is evidence of deliberate indifference wholly unexplained or justified by the pandemic.

<u>Patient #48</u>

Patient #48, 51 years old, suffers from supraventricular tachycardia ("SVT"), other cardiac issues, and significant gastrointestinal problems.[163]  Defendants submitted evidence of sporadic treatment this patient received for his cardiac problems;[164] however, Dr. Puisis credibly opined about this patient's significant symptoms that were largely ignored.[165]

For example, this patient was noted as having seizure disorder, schizophrenia, and major depression, but his records show that he was on no medication, and no explanation was provided as to why he was not being treated for these conditions. There was also no provider evaluation.[166]  At one point, this patient was referred to a physician for an

---

[160] Rec. Doc. 750, Puisis Testimony at 95:1-24; 99:1-106:11; PX 1-a, pp. 90-92; JX 4, pp. 165, 194, 240, 272-73, 279, 292, 295, 342.
[161] Rec. Doc. 750, Puisis Testimony at 97:9-98:25; PX 1-a, pp. 90-92; JX 4, pp. 25, 172, 194.
[162] Rec. Doc. 750, Puisis Testimony at 102:15-106:11; PX 1-a, pp. 90-92; JX 4, pp. 165, 272-73, 279, 292.
[163] PX 1-a, pp. 63-65.
[164] JX 48, pp. 116, 111, 110; DX 35-c, pp. 194–195; JX 48, p. 94; DX 35-c, p. 195; JX 48, p. 49.
[165] PX 1-a, pp. 63-65.
[166] *Id.* at 63.

23-30825.30589

elevated blood pressure, but this appointment never occurred, without explanation.[167]  On August 18, 2021, an EMT sent this patient to the ATU for evaluation; no ATU evaluation ever occurred.[168]  On September 15, 2021, this patient was seen in the ATU by an EMT after he had been vomiting for three days and had not had a bowel movement in a month. These symptoms should have prompted an immediate examination by a provider.  After evaluation in the ATU, the patient was sent to the hospital emergency department.[169]

After his hospital visit, this patient was prescribed beta blockers; however, there is no record that he was consistently given this medication.  Further, this patient was referred for a cardiology work-up, but there was no cardiology referral in Eceptionist.[170] This is one of many instances that Defendants were deliberately indifferent to the need for specialty care follow-up.

Dr. Puisus ultimately credibly opined that:

[Patient #48] had persistent tachycardia diagnosed at the hospital as supraventricular tachycardia (SVT) needing cardiology evaluation. The SVT was never specifically acknowledged as a problem at the facility and there was no evidence of referral to a cardiologist. The patient also had severe constipation causing a rare disease of the colon, likely due to inattention to the patient's chronic constipation. Referral for colonoscopy was made but was significantly delayed. The results of the colonoscopy are unknown.

The episodic nature of this patient's care resulted in the patient failing to have his serious ongoing conditions (SVT, constipation, and colitis) properly or timely evaluated causing potential risk of harm to the patient and delayed diagnosis and treatment. This patient had abnormal vital signs (blood pressure or tachycardia) on seven occasions over a year which were not acknowledged by a medic or a provider and not addressed.[171]

---

[167] *Id.*
[168] *Id.*
[169] *Id.* at 64.
[170] *Id.*
[171] *Id.* at 65.

23-30825.30590

<u>Patient #1[172]</u>

Patient #1 was 55 years old with a history of smoking, hypertension, peripheral vascular disease, and high blood lipids.[173] He developed metastatic lung cancer, discovered on October 28, 2020, and "underwent intensive follow up for radiation therapy, chemotherapy, diagnostic testing, and oncology follow ups."[174] Between February 2020 and October 2020, this patient had an unintentional weight loss of 81 pounds that went undocumented and unaddressed by LSP medical personnel.[175] Due to this patient's age, smoking history, severe unexplained weight loss, and other symptoms like spitting up blood, he should have been more closely monitored and his cancer discovered earlier.[176]

Eceptionist proved worthless in tracking this patient's oncology appointments. For example, it did not list all of the patient's consultation or offsite appointments; it failed to include almost all radiation and chemotherapy appointments; and it included oncology appointments but failed to document whether they occurred. Verification that all appointments were scheduled and actually occurred could not be gleaned from Eceptionist.[177]

Further problematic, "providers at LSP [were] disengaged from monitoring th[is] patient's progress based on recommendations and findings of consultants and reports of diagnostic testing."[178] For example, Patient #1's "complex arrangement for radiation therapy and chemotherapy" was not monitored by a LSP doctor or mid-level provider.

---

[172] The Court offers a summary of the problems in providing this patient with appropriate specialty care for his metastatic lung cancer. A full recitation of the problems Dr. Puisis identified for this patient's treatment is found at PX 1-a, pp. 84-89.
[173] *Id.* at 84.
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.* at 84-85.
[178] *Id.* at 85.

23-30825.30591

Trip nurses managed all follow-up and clinical scheduling.  After this patient's hospital discharge with a cancer diagnosis on November 6, 2020, he was not scheduled for a provider appointment until January 8, 2021, and he developed complications during this delay.[179]

This patient's white blood cell count was life-threateningly low, and he was prescribed a medication to raise his white blood cell count.  However, the medication records fail to document if or when the patient received the medication. Furthermore, there is no evidence that the patient was seen or followed by a health care provider while being treated for the seriously low white blood cell condition."[180]   There is no record that providers were monitoring the patient's complications or that he was receiving this necessary white count medication.[181]

Further, Patient #1's medical records are devoid of evaluations for headaches and infection, and the oncologist's recommendation for a CT of the head, chest, abdomen, and pelvis was not performed in accordance with the specialist's orders.[182]

> The provider did not document that the patient had a recent oncology visit and update the therapeutic plan. The assessment was tension headache despite the known brain metastases. The provider did not check when the CT scan would be done. The provider did not evaluate the facial edema more thoroughly for SVC syndrome. The provider did not document awareness of the oncology plan which called for an earlier evaluation if problems occurred. The CT scan should have been promptly performed. A 3-month follow up was ordered and ibuprofen prescribed for the tension headache.[183]

---

[179] *Id.*
[180] *Id.*
[181] *Id.*
[182] *Id.* at 86.
[183] *Id.*

On June 21, 2021, this patient arrived for chemotherapy without recent lab testing that had been ordered but not performed; thus, this chemotherapy appointment had to be cancelled and rescheduled.[184] Countless problems like this continued to occur throughout this patient's cancer treatment.[185]

Pandemic/Natural Disasters/UMCNO Providers

LSP refers its sickest inmates to UMCNO. Defendants justify a record replete with treatment and referral delays, citing the COVID-19 pandemic and natural disasters which befell the State.[186] While the delays attributed to these events are understandable and not the fault of LSP, the record establishes that the problems identified with specialty care were evident from 2019 through March 2020, and they persisted after the pandemic and natural disaster issues subsided.[187] This is confirmed by the credible testimony of the UMCNO providers.

The improved communication LSP boasts between its medical staff and specialty providers was undermined by the testimony of the UMC doctors who testified in this case. Dr. Helen Pope, Dr. Daniel Brady, and Dr. Marcia Glass credibly testified about their experiences treating LSP patients at UMC. They each testified that patients from LSP often arrived with late-stage, undiagnosed diseases despite extended periods of symptoms;[188] they explained the difficulties obtaining follow-up appointments for patients

---

[184] *Id.*
[185] *Id. at* 86-89.
[186] *See* Rec. Doc. 754, Morrison Testimony at 18-22, 26-28; DX 35-a, pp. 33–45.
[187] Rec. Doc. 750, Puisis Testimony at 25:23-26:15; Rec. Doc. 748, LaMarre Testimony at 93:4-7.
[188] *See* Rec. Doc. 751, Pope Testimony at 8:8-18, 11:16-22 ("[T]he biggest [issue] is a patient presenting later in the course of an illness than I would expect someone from the community."); *id.* at 12:3-17:5 (providing additional details); Rec. Doc. 755, Brady Testimony at 134:19-137:10 (describing patients who received delayed diagnoses); Rec. Doc. 755, Glass Testimony at 162:12-164:21 (comparing patients from LSP population with others in the community).

from LSP or ensuring that follow-up care occurs;[189] and they expressed lack of access to LSP patients' full medical records.[190]  The testimony of the UMC providers is unrebutted, and the Court finds the UMC physicians' testimony particularly persuasive and credible because they are neutral intermediaries.

### D. Emergency Care

14.    The Court previously held that LSP failed to provide constitutionally adequate emergency care in the evaluation and assessment of emergencies by qualified providers and failed to timely treat and/or transport patients to the hospital for emergency care. Although LSP has improved staffing in the ATU, the constitutional deficiencies identified by the Court persist.

Regarding SDEs, until early 2022, EMTs responded to all SDEs and made assessments, at times without input from a provider, which both Deputy Warden LPN Ashli Oliveaux ("Oliveaux") and Defendants' expert Dr. Mathis identified as practicing medicine without a license.[191] LSP contends it has remedied the SDE process and utilizes a new policy for responding to SDEs developed by Oliveaux.[192]  Under this policy, EMTs respond to SDEs solely pursuant to Individual Treatment Orders ("ITO") that are pre-

---

[189] *See* Rec. Doc. 751, Pope Testimony at 11:6-15 ("After the patient leaves the hospital, I have no assurance that appointments will be taking place."); Rec. Doc. 755, Glass Testimony at 165:21-166:7 ("We put [orders for follow up care] in our discharge orders, but we have no way of telling whether that's going to happen or not . . . [I] see patients who were referred for follow-up appointments by other doctors that did not get those appointments."), 166:8-19 (describing the impact on patient prognosis); Rec. Doc. 755, Brady Testimony at 137:22-140:6 ("Q: Is lack of follow-up is a common problem with patients from Angola? A: I think so, yes.").

[190] *See* Rec. Doc. 755, Glass Testimony at 171:11-16 ("[T]hey should have an electronic medical record that doctors like me … should be able to access easily so we have some way of knowing what's been going on with these patients."); Rec. Doc. 751, Pope Testimony at 10:24-11:5, 21:4-22:2 (describing how patients are not able to give full medical histories); Rec. Doc. 755, Brady Testimony at 140:7-141:8.

[191] Rec. Doc. 757, Oliveaux Testimony at 63:11-16; Rec. Doc. 752, Mathis Testimony at 194:11-17.

[192] Rec. Doc. 757, Oliveaux Testimony at 64-65.

approved by medical providers.[193]  If a SDE is not covered by an ITO, the EMT must call a NP or take the patient to the ATU for further assessment.[194]

Plaintiffs point out that LSP's EMT Director, Darren Cashio ("Cashio") testified that this "new" policy is simply "trying to streamline" the SDE process and "doesn't change, really, the process," except EMTs may now contact a provider via FaceTime rather than by phone.[195]

Dr. Vassallo was critical of this purportedly new policy, concluding that it made "really no difference" to the quality of emergency care.[196]  As to ITOs, Dr. Vassallo pointed out that they are not specific to an individual patient,[197] and they still require EMTs to make diagnoses, which is outside their scope of practice.[198]  Dr. Mathis agreed that "some of the ITOs need to be reworked."[199]

Defendants are correct that the ATU is not an emergency room ("ER"); however, the ATU must be sufficiently staffed with providers capable of properly assessing emergent situations for which transport to an ER may be warranted, and emergency transport should not be delayed.

LSP has improved staffing in the ATU by having a RN and an EMT present twenty-four hours a day, seven days a week.[200]  A NP is now present in the ATU from 7:30 am until 4:00 pm Monday through Friday and 24 hours a day from Friday night through

---

[193] *Id.*
[194] DX 50.
[195] PX 79, Cashio Depo at 8:13-9:9, 10:4-11:2, 12:7-14:21.
[196] Rec. Doc. 749, Vassallo at 86:9-11, 87:1-6, 88:14-89:21.
[197] *Id.* at 84:23-85:4, 87:1-19.
[198] *Id.* at 87:20-88:21.
[199] Rec. Doc. 753, Mathis Testimony at 64:12-15.
[200] Rec. Doc. 752, Park Testimony at 11-12; Rec. Doc. 757, Johnson Testimony at 139-141.

23-30825.30595

Monday morning.[201] A NP is on call and stationed on the prison grounds to address any ATU patients in the evenings Monday through Thursday.[202]

The Parties' experts performed chart reviews of the same 60 patients in evaluating emergency care at LSP.[203]   Defendants urge the Court to credit the opinions of their medical experts, Dr. Mathis and McMunn, over Plaintiffs' expert, Dr. Susi Vassallo, in considering whether the deficiencies in emergency care have been remedied.[204] Defendants claim that, because Dr. Vassallo has never worked in a correctional setting, she applied the inapplicable "community standard of care," consistent with her own Level I Trauma practice, rather than the lesser standard of care applicable to correctional settings; thus, her opinions are flawed.[205] The Court disagrees.

First, this Court has already found Dr. Vassallo's opinion highly credible in the liability portion of this case.[206] Second, the Fifth Circuit and a number of courts within the Fifth Circuit have accepted Dr. Vassallo's expertise in medical care in prison systems.[207] Finally, there is no evidence in the current record that Dr. Vassallo applied "community standards of care" when performing chart reviews for the remedy phase trial.[208] The Court

---

[201] Rec. Doc. 752, Park Testimony at 12-23; Rec. Doc. 757, Johnson Testimony at 139-140. Park explained that she could also be in the nursing unit or doing paperwork, both of which are seconds away from the ATU.  Rec. Dc. 752, Park Testimony at 12.

[202] Rec. Doc. 752, Park Testimony at 13; Rec. Doc. 757, Johnson Testimony at 139-140.

[203] Rec. Doc. 770, pp. 29, 38, 42.

[204] *Id.*

[205] *Id.*

[206] Rec. Doc. 594, p. 7.

[207] *See Yates v. Collier*, 868 F.3d 354, 363-64 (5th Cir. 2017)("Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony. *See Ball*, 792 F.3d at 593–94; *Gates*, 376 F.3d at 339–40)); *see also Cole v. Collier*, 2017 WL 3049540, *9 (S.D. Tex. 2017); *Cole v. Livingston*, 2016 WL 3258345, *3 (S.D. Tex. 2016); *McCollum v. Livingston*, 2017 WL 608665, *22 (S.D. Tex. 2017).

[208] Defendants' reliance on *Gumns v. Edwards*, No. 20-231, 2020 WL 2510248 at * 11 (M.D. La. May 15, 2020) is inapplicable here. In *Gumns*, a case challenging LSP's emergency response to the COVID-19 pandemic, the Court noted that Dr. Vassallo's testimony that certain care was "medically unreasonable," was not evidence of deliberate indifference.  Defendants point to no similar testimony in the present case.

finds that Dr. Vassallo credibly concluded that the emergency care provided by LSP remains constitutionally deficient as a review of the patient charts discussed below demonstrates.

Patient #38

Patient #38 was 58 years old and suffered from diabetes, hypertension, COPD, and had an artificial heart valve.[209] In preparation for cataract removal,[210] he was admitted to the nursing unit to transition from his regular anticoagulant to a shorter-acting anticoagulant drug to address the increased risk of blood clots due to his artificial heart valve.[211] Uncoagulated patients with an artificial heart valve are at significant risk for serious infection.[212]

While in the nursing unit, this patient developed wheezing, a fever, and an elevated respiratory rate, suggesting a potentially life-threatening infection.[213] LSP medical staff responded by placing this patient in a locked isolation room and prescribed him Tylenol and an anti-viral drug.[214] This patient's symptoms quickly worsened over the next three days when he developed bloody sputum, which is cause for concern in an anticoagulated patient, and his oxygen saturation rates declined to abnormal levels.[215]

On his third day in the nursing unit, this patient's lab results indicated signs of sepsis, kidney failure, and bacterial infection.[216] Recounting the evidence in the medical

---

[209] PX 1-a, pp. 115-16; JX 38.
[210] JX 38, p. 54. Dr. Vassallo erroneously stated that this patient was preparing for a dental procedure rather than cataract surgery. Rec. Doc. 749, Vassallo Testimony at 152. This error has no impact on the deliberate indifference displayed by LSP to this patient's need for emergency care.
[211] Rec. Doc. 749, Vassallo Testimony at 23.
[212] *Id.*
[213] *Id.* at 23-24; JX 38, p. 94.
[214] *Id.* at 24-25; PX 1-a, p. 115.
[215] *Id.* at 25:8-26:16; PX 1-a, p. 115; JX 38, pp. 71, 86, 90.
[216] *Id.* at 26:21-28:13; PX 1-a, p. 115; JX 38, pp. 22-23.

records, Dr. Vassallo testified that, at 6:20 am, "the patient's blood pressure was 65/40 mm Hg and the oxygen saturation was 79%. This was reported to Dr. Toce, but there is no record of Dr. Toce conducting any assessment or providing any care. The patient's blood pressure and oxygen saturation were both extremely low, indicating that the patient was in shock and should have been sent to a hospital. Instead, he received no care."[217]

At 7:20 am, the patient was found on the floor of his isolation room; CPR was started, and he was transferred to the ATU where resuscitation efforts continued. An ambulance was called at 8 am. As the patient continued to struggle in the ambulance, the destination was diverted from Our Lady of the Lake Hospital ("OLOL") in Baton Rouge, Louisiana to the West Feliciana Hospital just minutes from Angola.[218] Patient #38 was later pronounced dead at the hospital after he suffered a fatal cardiorespiratory arrest secondary to pneumonia.[219]

Shockingly, Dr. Mathis concluded that the care provided to this patient met the constitutional standard of care.[220] Dr. Mathis testified that the patient's bloody sputum was "not a danger signal" in a patient with COPD,[221] and he found the patient's labs to be "nonsignificant."[222] Further, based on the patient's white blood cell count, Dr. Mathis found it reasonable for the LSP provider to treat the patient for the flu rather than pneumonia.[223] Defendants maintain this patient's chart shows a simple difference in medical opinions rather than deliberate indifference. The Court finds Dr. Mathis' opinions uncredible.

---

[217] PX 1-a, p. 115.
[218] *Id.*
[219] Rec. Doc. 749, Vassallo Testimony at 30:16-31:19; JX 38, p. 82.
[220] Rec. Doc. 752, Mathis Testimony at 227:6-8.
[221] *Id.* at 225:5-8.
[222] *Id.* at 225:15-16.
[223] *Id.* at 225:23-226:2, 226:16-22.

The failure to order an x-ray or the failure to prescribe antibiotics could possibly be argued to reflect what Dr. Mathis calls a difference of medical opinion as to the appropriate diagnostics, care, or treatment. But the failure to have a health care provider examine this patient to substantiate a proper course of action is not mere neglect, it is callous disregard.[224] Dr. Vassallo credibly concluded that "[t]his was an egregious example of delayed care, and this lack of care caused this patient's death."[225]

The Court is dumbfounded to understand how treating these symptoms as flu can be justified without so much as a physical examination. No health care provider saw this seriously ill patient in the days preceding his death. The failure to see and examine this patient constitutes deliberate indifference at best and more aptly, callous disregard.

<u>Patient #35</u>

Patient #35 was 56 years old and presented to the ATU with a temperature of 103.2 degrees and confusion.[226] Dr. Vassallo opined that this was an emergent situation indicating a brain infection or severe urinary tract infection.[227] Instead of treating this situation like an emergency, ATU staff transferred this patient to the nursing unit for observation.[228] Although this patient presented to the ATU on a Saturday when a NP was available, nothing was done for this patient until the following Monday.[229]

Dr. Mathis agreed that this patient should have been transferred to the infirmary, and LSP's treatment for this patient was below the standard of care.[230] When the patient

---

[224] PX 1-a, p. 116.
[225] *Id.*
[226] *Id.* at 118; JX 35, p. 121.
[227] Rec. Doc. 749, Vassallo Testimony at 35:6-16.
[228] *Id.* at 33:24-25; JX 35, p. 121.
[229] *Id.* at 33:14-34:13.
[230] Rec. Doc. 753, Mathis Testimony at 13:12-15.

finally got to a hospital, he was diagnosed with meningitis.[231]  Without citation to any evidence, LSP claims the medical provider that handled this situation with Patient #35 is no longer with LSP.  Contrary to its own expert, LSP further claims this incident does not constitute deliberate indifference. The Court disagrees.

Patient #35 was a "high-risk patient with an aortic valve replacement, a high fever, and an altered mental state."[232]  The delay in treating this patient with emergent care demonstrates deliberate indifference.

<u>Patient #36</u>

Patient #36 was 65 years old with a history of chronic obstructive pulmonary disease ("COPD"), which had previously required hospitalization.[233]  He presented to the ATU gasping, with a significantly elevated respiratory rate and blood pressure, and complaining of shortness of breath for two days.[234]  ATU staff appropriately treated him with a nebulizer and monitoring; however, his conditioned worsened over the next two hours.[235]  The patient did not see a provider in the ATU for over two hours; by the time he was seen, he was unstable and in respiratory distress with poor oxygen levels.[236]  He was prescribed a Beta blocker, which increased his respiratory distress.[237]  Instead of sending this patient to the hospital, he was sent to the nursing unit where he died from a heart attack within 30 minutes.[238]

---

[231] Rec. Doc. 749, Vassallo Testimony at 35:1-25; JX 35 at 111.
[232] PX 1-a, p. 118.
[233] Rec. Doc. 749, Vassallo Testimony at 36:1-41:21; PX 1-a, p. 116; JX 36, pp. 106-07.
[234] *Id.* at 36:1-21; PX 1-a, p. 116; JX 36, p. 106.
[235] *Id.* at 36:22-41:21; PX 1-a, p. 116; JX 36, p. 106.
[236] *Id.*
[237] Rec. Doc. 749, Vassallo Testimony at 39:19-40:13; JX 36, p. 106.
[238] *Id.* at 40:13-41:21; PX 1-a, p. 116; JX 36, pp. 106-07.

23-30825.30600

Again, Defendants chalk this incident up to a difference in medical opinions.[239] Dr. Mathis testified that it was advantageous to send this patient to the nursing unit because it is "a place to hold somebody where you don't think they really need to be admitted but they need to be at a higher level of care as possible rather than in their housing unit."[240] Given the speed with which this patient expired, Dr. Vassullo's opinion that this patient should have received emergency care after the nebulizer treatment failed is more credible than that of Dr. Mathis.

The Court finds that Patient #38's treatment was below the constitutional standard of care. The patient was treated in the ATU. The patient worsened despite the treatment. He was not monitored in the ATU as his condition deteriorated and then, in this deteriorating state, with a history of ineffective treatment, he was stepped down to the nursing unit where he died within (30) minutes. The care of this patient constitutes deliberate indifference to his history of failed treatment and a worsening condition.

<u>Patient #29</u>

Patient #29 was 28 years old and housed in a segregation unit.[241] The records for this patient showed that he made repeated sick calls but was never given a physical exam or assessed by a provider.[242] On March 27, 2020, he made a SDE request complaining of stomach and back pain.[243] The patient was evaluated by an EMT at 6:40 am and charged $6.00 with no indication of any treatment.[244] That afternoon, approximately eight hours later, the patient was found collapsed on the floor, foaming at the mouth, with a

---

[239] Rec. Doc. 770, p. 42.
[240] Rec. Doc. 752, Puisis Testimony at 235:9-13.
[241] Rec. Doc. 749, Vassallo Testimony at 41:23-47:18; PX 1-a, p. 120; JX 29, p. 39.
[242] PX 1-a, p. 120.
[243] *Id.*
[244] *Id.*

temperature of 108.2 degrees.[245]   Dr. Vassallo testified this was "obviously a heat stroke."[246] No attempt was made to cool the patient with ice.  Instead, he was catheterized in an apparent attempt at urine toxicology in the ATU. He died in the ATU at 2:34pm.[247]

Defendants do not address the eight hours between the patient's self-declared emergency and his demise. They do not explain why this patient was given no physical exam and did not see a provider.  Rather, Defendants ostensibly suggest illicit drug use, arguing that the patient's SDE form contains a note, pictured below, that there was a "burning aroma in his cell."[248]  Dr. Vassallo interprets this note as saying "bouncing around in cell."[249]



Neither the observing security officer nor the nurse who made the note testified to this matter.  In any event, treatment of this patient should not have been dismissed based on an assumption of drug use.

Relying on Dr. Mathis' opinion, Defendants maintain that, by the time EMTs arrived in the patient's cell, he "was essentially a dead man at that time."[250]  Thus, there was no reason to administer ice to this patient because "there was nothing that could be done."[251] The Court disagrees.  The failure to administer ice in an attempt to save a 28-year-old's life is the least of the failures.  The fact that the persistent complaints of a 28-year-old went unanswered constitutes deliberate indifference.  Moreover, the cavalier response

---

[245] *Id.*
[246] Rec. Doc. 749, Vassallo Testimony at 43:10.
[247] PX 1-a, p. 120.
[248] JX 29, p. 37.
[249] Rec. Doc. 749, Vassallo Testimony at 43:8.
[250] Rec. Doc. 770, p. 44; Rec. Doc. 752, Mathis Testimony at 227-228.
[251] Rec. Doc. 770, p. 49.

23-30825.30602

that this patient "was a dead man" is evidence of apathy and further evidence of an attitude of general indifference. Sadly, Patient #29 is yet another example of LSP medical staff dismissing a SDE.

Patient #25

Patient #25 was 52 years old suffering with aortic stenosis who, after a fainting episode, went into cardiac arrest, causing him to fall and hit his head.[252]  Security staff failed to use the automatic external defibrillator ("AED"), which the EMT noted on the ambulance run report.[253] When the EMTs arrived, they applied the AED and began CPR; however, six to ten minutes had passed without defibrillation, and this patient died.[254] Although Dr. Mathis declined to agree that a minimum four minute response was required to meet the standard of care,[255] he was presented with both LSP policy and American Correctional Association ("ACA") standards, *mandating* a four-minute response to such an event.[256] The ACA standards state: "(MANDATORY) All health care staff in the facility are trained in the implementation of the facility's emergency plans. Health care staff are included in facility's emergency drills, as applicable."[257]  Likewise, LSP Directive 13.007 requires that "All employees of Louisiana State Penitentiary shall be trained to respond to health-related situations within a four-minute response time."[258]

Dr. Vassallo credibly concluded that this patient's death was preventable had AED been applied within four minutes, as required by LSP and the ACA. Defendants offered

---

[252] Rec. Doc. 749, Vassallo Testimony at 47:20-50:20; PX 1-a, pp. 120-21; JX 25, pp. 31-34.
[253] Rec. Doc. 749, Vassallo Testimony at 50:21-52:8 ("It's very unusual to write when something was not done that should have been done, so somebody was a little mad about it."); PX 1-a, p. 120; JX 25, p. 31.
[254] Rec. Doc. 749, Vassallo Testimony at 50:21-51:20, 113:9-16.
[255] Rec. Doc. 753, Mathis Testimony at 60:1-61:17.
[256] *See* DX 11, p. 29; PX 21-y, p. 2.  LSP contends the ACA standards are the relevant national standards as opposed to the more rigorous NCCHC standards advocated by Plaintiffs.
[257] *Id.*
[258] PX 21-y, p. 2.

no response to the failure to administer the AED within four minutes. The emergency response to Patient #25 was below the standard of care and evidence of deliberate indifference. LSP's cavalier dismissal of a four-minute response time mandated by its own policy underscores a pervasive ethic of indifference and callous disregard.

<u>Patient #55</u>

Patient #55 is 54 years old and suffers from a history of strokes who, on February 3, 2021, presented to the ATU with hypertension. The assessment was noncompliance with medications.[259] On February 4, 2021, an ambulance was called to this patient's housing unit because he "just started drooling and slumped to the side."[260] Dr. Vassallo testified that these symptoms are indicative of stroke.[261] Although he should have been taken to a hospital, he was not even examined by a provider; rather, he was kept in the ATU for four hours with only telephone orders from Dr. Lavespere. He was discharged to his room although his status was unchanged.[262] The patient was sent to West Feliciana Hospital the next morning for a CT scan, some 17 hours after symptom onset, by which time he was unable to walk and was having focal seizures.[263] Dr. Vassallo explained that sending this patient to West Feliciana Hospital for a CT scan was below the standard of care because this test cannot exclude an ischemic stroke.[264] The hospital radiologist advised LSP that this patient needed an MRI, but he was never referred for one, and there is no record that any follow-up of this patient ever took place.[265]

---

[259] PX 1-a, p. 113.
[260] *Id.*; JX 55, p. 63.
[261] Rec. Doc. 749, Vassallo Testimony at 58:24-25.
[262] *Id.* at 59:1-60:11; PX 1-a, p. 113; JX 55, p. 64.
[263] *Id.* at 60:16-61:21; PX 1-a, p. 113; JX 55, pp. 57, 61.
[264] *Id.* at 62:2-21; PX 1-a, p. 113; JX 55, p. 60.
[265] *Id.* at 63:15-64:15; 67:8-68:15; PX 1-a, p. 113; JX 55, pp. 56, 59.

On March 17, 2021, this patient presented with an inability to walk and urinary incontinence.[266] Despite these symptoms, NP Bordelon erroneously noted that there were no "signs and symptoms of a new stroke."[267]  Rather than refer this patient for an MRI, Bordelon issued a telephone order and sent him back to his quarters with instructions for a follow-up appointment.[268]

On April 26, 2021, an ambulance was called for this patient after he presented with slurred speech and a numb mouth.[269]  The patient was taken to the ATU and, based on suspicion of a stroke, he was sent to OLOL about an hour later.[270]  At the hospital, it was determined that this patient was a level one stroke alert, and his MRI showed an acute stroke; the patient was ultimately left "with a devastating inability to speak properly" and "dysphasia, difficulty swallowing."[271]

McMunn determined that the response treatment for this patient's symptoms met the standard of care.[272]  However, there is no explanation by Defendants why the radiologist's recommendation for an MRI was not followed.  Defendants claim that the CT scan performed at West Feliciana Hospital indicated "no acute intracranial abnormality,"[273] but they ignore that LSP was told that a CT was diagnostically useless for an ischemic stroke.  McMunn admitted he was not qualified to opine on this issue:

> Q    Let me go back to the CT scan. There was some criticism by Dr. Vassallo -- JX_55.0060 -- that this should have been a different type of CT scan.  All right? Do you have any opinions on that?

---

[266] PX 1-a, p. 113; JX 55, p. 54.
[267] Rec. Doc. 749, Vassallo Testimony at 64:16-67:7; PX 1-a, p. 113; JX 55, p. 54.
[268] *Id.* at 64:16-67:7; PX 1-a, p. 113; JX 55, p. 54.
[269] JX 55, p. 450.
[270] PX 1-a, p. 113.
[271] Rec. Doc. 749, Vassallo Testimony at 68:19-70:5; PX 1-a, pp. 113-14; JX 55, p. 450.
[272] Rec. Doc. 756, McMunn Testimony at 64; DX 35-b, p. 99.
[273] JX 55, p. 60.

23-30825.30605

A        I -- I'd say as a non-neurologist that I probably shouldn't have an opinion one way or the other, other than he ordered what he felt like was helpful.[274]

Dr. Vassallo's opinion regarding Patient #55 was not credibly rebutted.  Moreover, it is not as simple as whether Patient #55 was timely transported to the hospital on April 26, 2021; rather, the question is whether LSP appropriately responded to multiple presentations of stroke symptoms by this patient.  Bordelon's note of "no new signs or symptoms of a stroke," when this patient presented with an inability to walk and urinary incontinence, was egregious.  Dr. Vassallo credibly concluded that "the provider either did not examine the patient or doesn't know anything about how to recognize a stroke. That's absurd."[275]  The emergency response to this patient was below the constitutional standard of care and evidence of deliberate indifference.

## Patient #6

Patient #6 was 50 years old at the time of his death on May 3, 2021.[276]  In the last two weeks of his life, he made at least seven separate requests for medical attention for escalating back pain, yet no provider ever examined his back.[277] By his last request, he was incontinent and unable to get out of bed, which Dr. Mathis acknowledged could be a red-flag for cord compression, requiring evaluation by a doctor.[278]  On five occasions during his last two weeks, providers ordered no transport to the ATU and declined to see him.[279]  Plaintiffs' experts credibly concluded that Patient #6 "should have been

---

[274] Rec. Doc. 756, McMunn Testimony at 64:15-22.
[275] Rec. Doc. 749, Vassallo Testimony at 151:13-15.
[276] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:4-47:16; JX 6.
[277] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6, pp. 35-37, 54-59, 61.
[278] Rec. Doc. 753, Mathis Testimony at 34:6-12.
[279] PX 1-a, pp. 60-61; Rec. Doc. 753, Mathis Testimony at 35:18-44:18; JX 6, pp. 35-37, 54-59, 61.

transported to a hospital or had immediate higher-level imaging studies . . . Instead, the patient was managed by medics and treated indifferently by providers."[280]

On May 3, 2021, at 5:11 pm, medics evaluated the patient as he was unable to get up and had urinated on himself.[281] The patient did not have wheelchair access to a shower, so he was lying on a mattress near the shower; when medics moved him, he yelled out in pain.[282] At this point, a doctor was called in to see the patient, and he prescribed a pain injection and steroids.[283] At 7:43 pm, the patient was found unresponsive and moved to the ATU, where he was pronounced dead at 8:25 pm.[284]

The patient's autopsy showed that his cause of death was a large liver abscess with bloodstream spread of the infection to the spinal cord which resulted in cord compression.[285] Dr. Mathis concluded that LSP was not at fault for this patient's death because he had recently resumed self-cutting.[286]

Plaintiffs' experts concluded that:

Care of this patient was incompetent and indifferent to his serious medical needs. The patient had escalating symptoms all of which should have included provider evaluation and imaging. Symptoms progressed to red-flag symptoms by 4/27/21 or 4/30/21 and the patient should have been transported to a hospital or had immediate higher-level imaging studies as these studies were unavailable onsite … The infection could have been recognized earlier with higher-level diagnostic testing and his death may have been prevented with earlier treatment.[287]

Dr. Toce's caustic response to this patient's care highlights the underlying indifference to all patients' medical needs at LSP. He testified in a deposition that: "you

---

[280] PX 1-a, p. 61.
[281] *Id.*
[282] *Id.*
[283] *Id.*
[284] *Id.*
[285] *Id.*
[286] Rec. Doc. 753, Mathis Testimony at 45:9-13.
[287] PX 1-a, p. 61 (quoting JX 71-b, Paul Toce Dep. at 23).

know, this is entirely consistent with manipulative behavior that we see so frequently."[288] Later, he added, "but with this ongoing picture and him unable to really get to the bathroom, I'm concerned that it's a bit more serious. Might need to take lab or x-rays or something on him."[289]

The care and treatment provided to Patient #6 was woefully deficient, and Dr. Toce's testimony demonstrates a callous disregard of medical symptoms. The predisposition to attribute serious medical conditions to malingering or manipulation is unacceptable, and the Court finds that the lack of emergency care provided to this patient fell far below the constitutional standard of care.

### E. Infirmary/Inpatient Care

15.     The Court previously held that infirmary and inpatient care at LSP was below the constitutional standard of care because LSP failed to provide adequate, qualified staff in infirmary/inpatient care.[290] The evidence at the remedy trial established that an appropriate number of qualified, adequate staff remains lacking in the infirmary, and inmate orderlies are still utilized to provide care beyond the scope of the medically accepted use of orderlies.

LSP claims to have increased the ratio of nurses to patients in the nursing units with one registered nurse for every ten patients in acute care (NU1) and one registered nurse for every 15 patients in long-term care (NU2);[291] Dr. Lavespere testified in March 2022 that this ratio "depends on the census" and "there's a very strong effort" to achieve

---

[288] *Id.*
[289] *Id.*
[290] Rec. Doc. 594, p. 120.
[291] Rec. Doc. 752, Park Testimony at 22:16-21; Rec. Doc. 757, Johnson Testimony at 147, 150-51.

23-30825.30608

these ratios."[292]  Dr. Toce testified of these staffing ratios, "Look, that's a goal okay.  That change is how we would really like to run the units, and most of the time, we can put that together. It does happen like that. It is still a bit of a struggle, because people call-in last-minute sick, and people get sick, and I think we still have an issue with understaffing."[293] While the Court commends efforts to improve staffing levels, the evidence discussed below shows that constitutional inadequacies in infirmary care persist.

LSP presented evidence that it addressed the issue of patients being in locked rooms by installing a red call light outside the door of these rooms with an activation switch located at the patient's bedside.[294] Paralyzed patients are still inexplicably placed in locked rooms, but now appear to be positioned within reach of the call light switch.[295] Evidence shows that the nursing units are clean and not in disarray.[296]  NP Cynthia Park ("Park") testified that she rounds in NU1 on Friday and Saturday mornings, and she rounds in NU2 every other Saturday morning.[297]

Despite the call lights installed outside of locked rooms, evidence shows that patients continue to be outside of sight or sound of nurses due to the positioning of nurses and black coverings over windows.[298]  In NU2, lockers placed in the open bay area block the line of sight between patients and the nursing station, and patients in the open bay

---

[292] JX 69-a, Lavespere Depo. at 141:12-25.

[293] JX 71-a, Toce Depo at 86:5-12.

[294] Rec. Doc. 752, Park Testimony at 21-25; Rec. Doc. 756, McMunn Testimony at 26; DX 46, pp. 173, 175; DX 46, p. 130.

[295] Rec. Doc. 752, Park Testimony at 24.

[296] DX 35-c, pp. 34–44.

[297] Rec. Doc. 752, Park Testimony at 10-11.

[298] PX 1-a, p. 100: "The nursing station in Nursing Unit 1 has black coverings over the windows prohibiting nursing staff from visualizing the patients without standing up. Although there are call light mounted above the locked cells, patients in open bay area cannot be seen by the staff when they are sitting, nor do they have a call light to summon the nurse."  Additionally, "[i]nmates reported that a few days before the team toured the facility on April 6-8, 2022, the paper was removed, and it was placed back up after the tour of the facility concluded."  *Id.* Plaintiffs' experts detailed specific examples of this problem.  *Id.* at 101.

area have no way to summon a nurse.  Patients in this area reported they must get the attention of an orderly and ask for a nurse.[299]

During the three days Plaintiffs' experts toured LSP, multiple team members observed NU1 and NU2 on multiple occasions, and they reported that they never observed a nurse rounding patients even though infirmary nurses document that rounds are done every two hours, whether the patient is sleeping or awake.[300] Multiple inmates reported to Plaintiffs' expert team that nurses remained seated in the nurses' station and relied on inmate orderlies to provide care.[301]

No "head-to-toe" physical assessment of a patient by nursing staff, as required by LSP policies, was observed during this tour. Nurses were primarily observed sitting in the nurses' station or administering medications.[302]  Infirmary forms are inadequate as they fail to provide a space for date and time, and vital sign flowsheets do not allow for documentation of the time vitals were taken.[303]  "Pre-printed nursing care plans are not specific to correctional health care space and include interventions more in line with community nursing, *e.g.*, contact the home health nurse."[304]

Additionally, the LSP infirmary fails to provide adequate equipment and supplies for effective patient care.  Plaintiffs' experts observed several instances where patients were not timely provided crutches, walkers, or bedside commodes until after patient injury had occurred.[305]  A particularly cruel and egregious example of this problem involves

---

[299] *Id.*
[300] PX 1-a, p. 104.
[301] *Id.*
[302] *Id.* at 106.
[303] *Id.* at 107.
[304] *Id.*
[305] *Id.*

23-30825.30610

Patient #50, a 35-year-old paraplegic who requires a catheter to empty his bladder.[306]  He was forced to reuse single-use catheters for weeks at a time, leading to repeated urinary tract infections.[307]  This patient reported to Goehring that he sought more catheters from Nurse Parks, but she advised him they were not budgeted to use clean catheters each time so he must re-use.[308]  Goehring credibly concluded that "[r]euse of single use medical supplies is dangerous and does not meet minimal standards of care."[309]

Inmate Orderlies

While LSP maintains its inmate orderly program is improved, evidence demonstrates that "[o]rderlies are utilized the same today as they were at the close of liability discovery."[310] Currently, LSP utilizes three to four inmate orderlies on every shift in the infirmary.[311]  LSP claims these orderlies assist patients with activities of daily living like handing out food trays, feeding patients who cannot feed themselves, cleaning incontinent patients, turning patients to prevent skin breakdown, and bathing patients.[312]  NP Parks testified that inmate orderlies do not perform wound care, dispense medications, or administer insulin.[313]

Nurse Jennifer Stickells ("Stickells") is responsible for training inmate orderlies.[314]  She testified that inmate orderlies are supervised by both security staff and nurses; Park testified that nurses monitor orderlies and guide and direct them as necessary.[315]

---

[306] Rec. Doc. 755, Goehring Testimony at 42:19-52:9; PX 1-a, pp. 102, 104-06; JX 50.
[307] Rec. Doc. 755, Goehring Testimony at 51:6-22; PX 1-c, p. 320; PX 1-a, p.106.
[308] Rec. Doc. 755, Goehring Testimony at 52:4-9.
[309] PX 1-a, p. 106.
[310] PX 44-d at 04, Response to ROG No. 16.
[311] Rec. Doc. 752, Park Testimony at 23:2.
[312] Rec. Doc. 752, Park Testimony at 26-28, 110, 187; Rec. Doc. 756, McMunn Testimony at 29:12-14.
[313] Rec. Doc. 752, Park Testimony at 29-30, 110.
[314] Rec. Doc. 757, Stickells Testimony at 20.
[315] *Id.* at 29:20-22; Rec. Doc. 752, Park Testimony at 29.

23-30825.30611

Candidates for the inmate orderly job are screened for disciplinary issues and vetted for eligibility.[316] The training of inmate orderlies has increased since 2019, and Stickells testified that this training takes place over five days, and the orderlies are given lectures on ethics, neglect, abuse, transfer of patients, body mechanics, and communication with patients.[317] The final day of training involves hands-on training where Stickells brings orderlies into the nursing unit and works with them throughout the day.[318] Stickells makes rounds to ensures that the orderlies are following the training.[319]

At first glance, this training procedure appears robust; however, Defendants' own witnesses testified that LSP's training practices have not changed since the liability phase and acknowledged that this training had not occurred for at least three years, until right before trial.[320] The following evidence reflects the inadequacy of orderly training.

Trial evidence demonstrates that inmate orderlies continue to perform tasks outside the scope of their appropriate use. Defendants' own inmate orderly witnesses testified to this. Bruce Hines testified that, although he has worked as a health care orderly for the past three years, he completed his first training class at LSP "three or four" days before he was deposed on March 30, 2022, mere weeks before the discovery cutoff.[321] He testified that the orderlies "are the ones that are going to be more hands-on than the nurses[,]" and "it seems like I'm doing their job as well."[322] He also testified that nurses often fail to follow up with patients he has flagged as having an issue, like a bloody

---

[316] Rec. Doc. 752, Park Testimony at 29.
[317] *Id.* at 23; DX, p. 47.
[318] *Id.* at 23-24, 27.
[319] *Id.* at 27.
[320] JX 72-a, Falgout Depo. at 24:9-12; Rec. Doc. 757, Stickells Testimony at 41:22-42:24, 43:14-17.
[321] JX 75-a, Hines Depo. at 6:10-11, 7:24-9:12, 34:25-35:4. Jennifer Stickells admitted that she had orderlies working that did not have proof of their certification. Rec. Doc. 757, Stickells Testimony at 44:9-12.
[322] JX 75-a, Hines Depo. at 10:9-11:2, 18:2-10.

stool.[323]  Similarly, Donald Murray testified that the orderlies "fill the gaps in" for the nurses and are very important because "by it being a shortage of nurses, they couldn't do all that work that needs to be done."[324]

Further, Plaintiffs' experts observed inmate orderlies in the infirmary provide direct patient care, including routinely performing wound care, handling patient lab reports, and taking x-rays.[325]  Orderlies were also observed emptying catheters, clearing catheter supplies, and changing oxygen tanks.[326]  Patient #50 and Patient #67 reported that inmate orderlies sometimes performed wound care: Patient #50 stated that he prefers the orderlies do it because he believes they do it better than nurses.[327] As the Court held previously, inmate orderlies can assist with activities of daily living, but the evidence shows far more being handled by orderlies than appropriate under either NCCHC or ACA standards.  In many instances, the orderlies are performing tasks that should only be performed by medical staff.[328]

The most egregious example of both substandard infirmary care and inmate orderlies providing direct medical care to patients is Patient #22. Patient # 22 was 60 years old and suffered with left-sided weakness due to a traumatic brain injury.[329]  After being assaulted by a cellmate in May 2020, this patient suffered head and leg injuries that affected his ability to walk and eat; his ankle was surgically repaired, and a hospital

---

[323] *Id.* at 33:14-34:11.
[324] JX 76-a, Murray Depo. at 5:18-21, 17:14-22, 23:23-25.
[325] PX 1-a, pp. 11-12, 101-04; PX 1-d, p. 19; Rec. Doc. 751, Goehring Testimony at 75:7-76:7; Rec. Doc. 755, Goehring Testimony at 58:24-59:6, 62:13-63:21; Rec. Doc 748, LaMarre Testimony at 176:17-177:1; *see also* Rec. Doc. 594, p. 90.
[326] PX 1-a, p. 101.
[327] *Id.* at 102.
[328] *See generally* PX 1-a, pp. 100-104.
[329] Rec. Doc. 755, Goehring Testimony at 26:16-42:18; PX 1-a, pp. 11, 103; PX 1-c, pp. 258-286; JX 22.

speech pathologist recommended a mechanical soft diet and that he be fed upright, both because he had no teeth and because he was unable to use utensils with his left hand.[330]

After his discharge from the hospital, Patient #22 was placed in NU1, where he was not immediately assessed, and he was not placed on the recommended diet.[331] Over the next two and a half months, he suffered at least nine falls, yet, instead of moving him to a room where he could be more closely monitored and/or safety measures like bed rails could be utilized, this patient was placed in a locked room with nothing but a mattress on the floor.[332] A doctor ordered a bedside toilet so he did not have to ambulate to the restroom; however, he was not provided a bucket to catch waste for three days.[333]

The failure to provide the patient with the mechanical soft diet and feeding assistance led to this patient's death; he was forced to feed himself regular food in a locked room in the infirmary.[334] On January 6, 2021, this patient choked on a piece of sausage and died when the airway obstruction resulted in cardiopulmonary arrest.[335] An inmate orderly administered CPR until EMS arrived.[336]

McMunn flippantly explains away Patient #22's death by choking and inexplicably concludes that the care provided to this patient met the standard of care.[337] Defendants utterly ignore the fact that an inmate orderly administered CPR to this patient, not infirmary staff, and no AED was applied.

---

[330] Rec. Doc. 755, Goehring Testimony at 27:10-29:11; JX 22, p. 674.
[331] Rec. Doc. 755, Goehring Testimony at 29:13-17.
[332] *Id.* at 34:4-35:13; JX 22, p. 954.
[333] *Id.* at 35:23-36:23.
[334] *Id.* at 38:18-39:10, 41:13-42:14.
[335] *Id.* at 41:13-42:14; JX 22, pp. 900-01.
[336] *Id.*; JX 22, p. 547.
[337] Rec. Doc. 756, McMunn Testimony at 66:4-13.

23-30825.30614

Considering the evidence discussed above, the Court finds the barriers to sight and sound between patients and nurses, coupled with admitted staffing shortages and the resulting improper use of inmate orderlies, demonstrates unconstitutionally deficient infirmary care.

### F. Medical Leadership and Organization

16.     The Court previously found that the combination of inadequacies in the following areas of medical leadership and organization at LSP contributed to an unconstitutional system of healthcare: (a) lack of meaningful mortality review; (b) use of correctional personnel to manage medical decisions; (c) lack of peer review; (d) lack of medical staff involvement in budgeting; (e) lack of medical supervision by the medical director (Dr. Lavespere and now Dr. Toce); and (f) failure to maintain proper credentialing records.[338] Based on the evidence presented at the remedy trial, the Court finds that none of these inadequacies have been remedied.  This is unsurprising since, although the Court found in its liability ruling that, "[t]he buck stopped with Dr. Lavespere, and his medical supervision and quality review was woefully inadequate," he was promoted by Defendants and given even greater oversight and responsibility for all DOC medical.[339]

<u>Medical Leadership and Supervision</u>

In August 2020, LSP hired Dr. Jacob Johnson ("Dr. Johnson") as long-term healthcare administrator; the Court finds that Dr. Johnson has the training and experience necessary for this position, and that this hiring is a positive development for LSP.[340]

---

[338] For ease of discussion, the Court will address these issues in a slightly different order than as held in the liability ruling.
[339] Rec. Doc. 594, p. 40.
[340] Rec. Doc. 750, Puisis Testimony at 145:4-10.

Without citation to supporting evidence, Defendants contend that "[t]he hiring of Dr. Johnson has significantly improved the medical leadership and organization."[341]

LSP also recently appointed LPN Oliveaux to Deputy Warden, and as part of her duties, she oversees medical operations at LSP.[342] Oliveaux previously worked in the clinic at LSP; Dr. Johnson currently reports directly to Oliveaux.[343] She testified that she ensures that Dr. Johnson "has what he needs for our medical department to run."[344] Oliveaux and Dr. Johnson meet regularly to discuss how to "make sure [they] provide efficient healthcare for [LSP's] offender population."[345] Again, Defendants claim that the promotion of Oliveaux "has improved operations and provides a protective barrier between security and medical staff."[346] Notably, as an LPN, Oliveaux has less medical training than her predecessor Tracy Falgout, an RN.[347]

Dr. Lavespere, of whom the Court was very critical in its liability ruling, was promoted to statewide Medical Director, and Dr. Toce, a physician at LSP during the liability period, was promoted to LSP's Medical Director.[348] Neither Dr. Lavespere nor Dr. Toce testified at the remedy trial, but both gave trial depositions. NP Park, who believes the medical staff culture at LSP is "great," testified that the work culture has not changed since Dr. Toce took over, and no real changes have taken place."[349]

Defendants offered evidence of purported improvement in medical leadership. Dr. Johnson maintains a weekly backlog tracker, which allows him to identify any health care

---

[341] Rec. Doc. 770, p. 56.
[342] Rec. Doc. 757, Oliveaux Testimony at 55.
[343] *Id.* at 55:14-19.
[344] *Id.* at 55:22-24.
[345] *Id.* at 55:24-56:5.
[346] Rec. Doc. 770, p. 56.
[347] Rec. Doc. 757, Oliveaux Testimony at 53:11-12; Rec. Doc. 757, Johnson Testimony 186:19-21.
[348] PX 44-c, p. 8, Response to ROG No. 10; PX 1-a, p. 15.
[349] Rec. Doc. 752, Park Testimony at 66:8-22.

issues and develop a quick response.[350] Dr. Johnson and Dr. Toce conduct morning meetings on Monday through Friday with medical staff to discuss the status of patients in NU1 and NU2, patients in the ATU, and patients in outside hospitals.[351]

However, the overwhelming evidence demonstrates that these improvements have not remedied the constitutional deficiencies identified by the Court. The form has not improved the function. Dr. Toce testified that he wishes he had more time to spend with the LSP nursing staff, but his administrative duties are overwhelming.[352] Dr. Puisis credibly concuded that:

> Dr. Toce is the only full-time physician at the facility with two physician vacancies. There is no Assistant Medical Director position and no one to assist him with supervisory responsibilities. In our opinion, due to physician understaffing, Dr. Toce is not able to meet all his supervisory duties, especially with respect to the quality of clinical care. Nurse practitioners are providing almost all clinical care with no evidence of supervision or collaboration with a physician.[353]

While the Court finds that Dr. Johnson is a good addition to LSP's leadership team, the evidence shows that his presence has had little impact on the delivery of medical care at LSP. In fact, there is no evidence that either Oliveaux or Dr. Johnson have significantly impacted the medical care provided by LSP.

Dr. Johnson acknowledged difficulties in changing the LSP culture to be more patient centered.[354] However, in his deposition, he "appeared unaware that he frequently received nearly blank monthly management reports from several departments—which he

---

[350] DX 48-a; Rec. Doc. 757, Johnson Testimony at 159:7-17.
[351] Rec. Doc. 757, Oliveaux Testimony at 68:16-70:10.
[352] JX 71-a, Toce Depo. at 46:1-12.
[353] PX 1-a, p. 15 (quoting JX 71-a, Toce Depo. at 46:4-10: "I don't think I'm involved enough with them. I want to spend more time in the trenches with them, and the administrative duties just keep coming. I could stay locked in my office all day long doing just administrative work and never even see them, but that would not be – that would not work.").
[354] Rec. Doc. 757, Johnson Testimony at 180:14-181:5.

admitted reflects a 'lack of oversight and a lack of leadership' in the departments he supervises."[355] This was confirmed during Dr. Johnson's trial testimony.[356]

Evidence also suggests the medical leadership at LSP has dismissed the Court's liability findings. Dr. Toce disagreed with several of the Court's liability findings,[357] and Dr. Johnson had no memory of having read the Court's liability ruling.[358]

Dr. Lavespere identified very few changes to LSP policy since the liability ruling:

> Dr. Lavespere acknowledged that DOC and LSP largely had not updated its policies in ways that impacted the overall delivery of care. Asked about 11 DOC policies and 19 LSP directives, the only changes that he identified as potentially impacting patient care were changes to the sick call policy; the peer review policy (which has not yet been implemented at LSP); the infirmary care policy (where the change was only to the amount of time and documentation required for some patients, and didn't "change[] a whole lot of health care"); and the replacement of standing orders with "individual treatment orders" in the ATU. He also noted that changes to ATU staffing were not reflected in the policy.[359]

Accordingly, the Court finds that the medical leadership and organization at LSP has not been significantly remedied such that constitutional deficiencies no longer exist. The lack of leadership, supervision, and organization, discussed further below, is the sin qua non to the unconstitutional care.

---

[355] PX 1-a, pp. 114-15 (quoting DX 37-k, Johnson Dep.).
[356] Rec. Doc. 757, Johnson Testimony at 210:24-215:24, 216:23-225:19; *see, e.g.*, 222:2-20 (blank reports from the nursing units); 224:7-10 (respiratory care); 224:11-13 (laboratory); 224:14-16 (central supply); 224:17-20 (health information management); 224:21-24 (quality improvement and ADA); *compare, e.g.*, PX 29-a, p. 617 with Liability Trial JX 2-a, p. 222; *see generally* PX 29-a; PX 29-b.
[357] JX 71-a, Toce Depo. at 9-26.
[358] DX 37-k, Johnson Depo at 7.
[359] PX 1-a, p. 13 (quoting JX 69-a, Lavespere Depo. at 51:11-19).

<u>Mortality Review/Quality Improvement ("QI")</u>[360]

Without reference to supporting evidence, Defendants claim that LSP began conducting mortality reviews in late 2021;[361] the trial evidence undermines this claim and, rather, reveals that LSP's mortality review process is essentially unchanged from 2016.[362] Dr. Lavespere testified that mortality reviews had improved from quarterly meetings to monthly meetings and that more medical staff is "at the table" during mortality reviews, but LSP still has no specific mortality review policy.[363] Although LSP Policy HCP6 makes cursory reference to "[a] review of all in-custody deaths," the policy is devoid of review criteria.[364]

Dr. Puisis credibly testified that mortality review must "be a critical review to identify deficiencies, and then, from those deficiencies, to identify opportunities to improve them."[365] However, LSP's mortality reviews contain "no critical analysis, so there's no critical review; there's no identification of the deficiencies."[366] Not a single review contains identification of anything in the patient's care that could have been improved, even where fatal errors occurred.[367]

At the time of the remedy trial, LSP had conducted four mortality review meetings since January 2021; these meetings occurred on October 2021, November 2021,

---

[360] Tellingly, Defendants failed to respond in their *Reply* to any evidence identified by Plaintiffs regarding deficient mortality review.
[361] Rec. Doc. 770, p. 57. Defendants also state, without citation to evidence, that DOC headquarters also perform mortality reviews. *Id.*
[362] PX 1-a, pp. 14, 25-26; Rec. Doc. 750, Puisis Testimony at 127:18-130:24, 134:17-135:5.
[363] JX 69-a, Lavespere Depo. at 203-204.
[364] PX 1-a, p. 26 (quoting Health Care Staffing and Staff Development, Peer Review, Internal Review, and Quality Assurance dated 12 July 2020).
[365] Rec. Doc. 750, Puisis Testimony at 127:20-22.
[366] *Id.* at 128:19-21; *see generally* PX 1-a, pp. 25-31.
[367] Rec. Doc. 750, Puisis Testimony at 66:8-68:19, 74:9-23, 78:7-22, 107:1-14 (describing mortality reviews for Patients #5 & 8); Rec. Doc. 749, Vassallo Testimony at 31:20-24 (Patient #38); PX 1-a, pp. 27-30 (Patients #1 & #5).

February 2022, and March 2022. These meetings included Dr. Toce, Dr. Johnson, the Warden, EMS, nursing, medical, and security staff. Minutes from these meetings were provided to Plaintiffs' experts.[368] Plaintiffs' experts observed: "The minutes do not discuss the deaths critically. Neither do those meeting minutes identify any opportunities for improvement or corrective actions that might be taken to improve. In the four monthly mortality meeting minutes that were provided, twenty-six deaths were discussed. Not a single opportunity for improvement was identified."[369] Dr. Lavespere was asked in his trial deposition if he was aware of any corrective actions taken as a result of mortality reviews; he testified that he was aware of none.[370]

Even Dr. Mathis criticized LSP's mortality review. He agreed that LSP's mortality reviews were not "particularly critical," did not document any problems in patient care that should be corrected, did not document standard of care violations that Dr. Mathis himself identified, and were generally inadequate.[371]

Based on the trial evidence, the Court finds that no significant changes have been made to LSP's mortality review process, and the process persists in failing to identify and correct necessary issues. LSP offered no countervailing evidence. Meaningful mortality review is a tool for improving medical care. It is an opportunity which is being squandered by the medical leadership. The Court finds that inadequate mortality review at LSP contributes to an unconstitutional system of healthcare.

<u>Inappropriate Use of Correctional Personnel</u>

The Court previously held:

---

[368] PX 1-a, pp. 26-27 (citation omitted).
[369] *Id.* at 27.
[370] JX 69-a, Lavespere Depo. at 204:8-18.
[371] Rec. Doc. 753, Mathis Testimony at 78:9-79:6.

As evidenced by the malingering policy, the medical department at LSP is controlled by LSP security rather than medical care providers. Both Plaintiffs' and Defendants' experts agreed that this organizational hierarchy, under which the medical department reports to security, is not working. Moreover, orderlies and EMTS also report to the security chain of command for supervision, and correctional officers supervise the delivery of medications by other correctional officers. Dr. Lavespere admitted that security personnel - not medical personnel - are tasked with the initial assessment of whether an inmate is "really sick" when they purport to have a medical emergency. Additionally, the Assistant Warden makes resource-allocation decisions such as when nurses are required for pill call. The Court finds that this system where health care decisions are largely made by security rather than qualified health care providers is unconstitutional.[372]

Defendants' only statement regarding security's role in medical decisions at LSP is that promoting Deputy Warden Oliveaux, who reports directly to Warden Timothy Hooper, "provides a protective barrier between security and medical staff at LSP."[373] Notably, Dr. Johnson reports directly to Oliveaux, who is in the custody chain of command.[374]

Although now a shared duty with nurses, security staff continues to supervise inmate orderlies.[375] Additionally, it appears that Dr. Toce still defers to security's opinion regarding the need for restraints. Although Dr. Toce testified that he has "the last say" on the use of black box restraints for medical transport, he also admitted that "unless they have a really good reason, you don't let them out of appropriate restraints."[376] There remains an inappropriate deference to and reliance upon security opinions in medical decisions.

---

[372] Rec. Doc. 594, p. 30 (footnotes omitted).
[373] Rec. Doc. 770, p. 51.
[374] Rec. Doc. 750, Puisis Testimony at 145:18-149:21.
[375] Rec. Doc. 757, Stickells Testimony at 29:22.
[376] JX 71-a, Toce Depo. at 134:18-20.

<u>Peer Review/Quality Control</u>

The Court previously held there was a lack of necessary peer review at LSP.[377] As of the date of remedy trial, Dr. Puisis concluded that LSP's peer review failed to: (a) evaluate individual providers' clinical work,[378] (b) consider a sufficient sample of records, and (c) address whether patients who need specialty care are actually referred.[379] These failures caused repeated errors that contributed to the risk of serious harm to patients.[380] And, although the DOC changed its department-wide peer review policy in 2020 to increase the number of records reviewed, LSP did not follow suit.[381] Dr. Mathis provided no opinions regarding LSP's peer review.[382]

Defendants made no of mention of peer review in any post-trial briefing to the Court.[383] Dr. Toce testified in his trial deposition that he believed the Court's finding that LSP lacked an adequate peer review process was "no longer true;" however he failed to specifically address how LSP's peer review process has been corrected.[384] Defendants presented no evidence regarding peer review to rebut the evidence presented by Plaintiffs. Thus, the Court finds that LSP's inadequate peer review process persists.

LSP's quality assurance/quality improvement program ("QA/QI") is now directed by Stickells, who collects data and prepares reports reviewed by the QA/QI team.[385]

---

[377] Rec. Doc. 594, p. 37.
[378] Rec. Doc. 750, Puisis Testimony at 118:16-22, 121:6-11.
[379] PX 1-a, pp. 21-25. In 2020, a total of 9 records were reviewed using the same methodology as in 2016. *Id*. at 23 (citation omitted).
[380] Rec. Doc. 750, Puisis Testimony at 120:2-6, 122:5-8.
[381] *Id*. at 115:14-116:25; *compare* PX 19-I, p. 5 (as of July 12, 2020, requiring review of either ten charts or 1% of the prison's population) *with* PX 1-a, pp. 22-24 (reviewing nine charts in October 2020).
[382] Dr. McMunn's opinions regarding LSP's peer review practices was excluded for the reasons set for in Rec. Doc. 720, pp. 7-8.
[383] *See* Rec. Docs. 770, 774.
[384] JX 71-a, Toce Depo. at 11-12.
[385] Rec. Doc. 757, Stickells Testimony at 10; Rec. Doc. 757, Oliveaux Testimony at 68.

However, Defendants presented no empirical evidence that this program has been effective in remedying constitutional deficiencies. Dr. Toce testified that he disagreed with the Court's liability finding that this area was lacking: "We have plenty of space, and quality control, I've been doing [adequate] quality assessment and quality QA and QI for years."[386]

Despite now being in charge of LSP's QA/QI program, Stickells has never read this Court's liability ruling, and the issues identified by this Court have never been discussed with her.[387]

Critical of the purportedly new QA/QI process, Plaintiffs' experts opined that ""[s]imply counting events does not measure the effectiveness of the services delivered nor measure outcomes of healthcare."[388] Defendants offered no evidence to rebut these opinions; indeed, Defendants remain unpersuaded that anything was ever lacking in this regard. The Court disagrees and finds that LSP continues to lack an adequate quality improvement program aimed at critical analysis and corrective efforts.

<u>Lack of Medical Staff Involvement in Budgeting</u>

Although the Court previously held that the lack of medical staff involvement in budgeting contributed to a constitutionally deficient healthcare system at LSP, Dr. Lavespere testified that the process of developing the budget has not changed since 2016.[389] Despite evidence to the contrary, Dr. Lavespere testified that, "the budget has no impact on the delivery of healthcare at LSP. There's a standard of care that we're

---

[386] JX 71-a, Toce Depo. at 12:2-8.
[387] Rec. Doc. 757, Stickells Testimony at 48:20-49:4.
[388] PX 1-a, p. 41.
[389] JX 69-a, Lavespere Depo. at 11:3-18.

going to deliver, regardless of what the budget it."[390]  Dr. Lavespere did not know an exact number for the current budget to provide medical care for inmates at LSP,[391] but he is "not really concerned with it, because it doesn't impact the way that we deliver care."[392]

Evidence establishes that LSP's medical budget is determined at a departmental and legislative level and is fixed based on the prior year's spending.[393]  Because this budget is fixed, the budget is not amended to meet potential increasing demands in health services.  Further problematic, "[n]either Stacye Rodriguez, the Director Nursing for the Department of Corrections, nor Dr. Lavespere, the Medical Director for the Department of Corrections, has an appreciable role in setting the budget, which is 'handed to [them]'"[394] If funding cannot be obtain to meet these changing needs, LSP leadership should prioritize the allocation of funding to meet the most critical patient needs at the prison.[395]

The Court finds that the lack of medical leadership involvement in LSP's budgeting process continues to negatively impact the adequacy of medical care received by inmates at LSP.

<u>Credentialing</u>

Finally, the Court found previously that LSP's failure to maintain proper credentialing records contributed to the constitutionally inadequate medical leadership and organization at LSP.[396]

---

[390] *Id.* at 13:1-4.
[391] *Id.* at 15:15-17.
[392] *Id.* at 17:12-14.
[393] PX 1-a at 15 (citation omitted).
[394] *Id.*
[395] *Id.* at 16.
[396] Rec. Doc. 594, pp. 39-40.

23-30825.30624

Defendants made no of mention of credentialing in any post-trial briefing to the Court,[397] and the evidence shows no changes have been made in this area. Dr. Lavespere testified that "credentialing is the same. There wasn't anything wrong with our credentialing."[398] Unsurprisingly, the evidence demonstrates that the lack of proper credentialing at LSP persists.

Plaintiffs' experts identified a host of examples of improper credentialing records and certifications demonstrating LSP's failure to follow its own personnel directives and showing how this failure impacts the delivery of healthcare to inmates.[399]  The Court finds this evidence and Plaintiffs' experts' findings to be credible, and both went unrebutted by countervailing evidence.

Accordingly, the failure to maintain proper credentialing records at LSP persists and contributes to the overall constitutionally deficient medical leadership and organization at LSP. The systemic leadership and management failures perpetuates the deliberate indifference and callous disregard that permeates the delivery of medical care at LSP.

---

[397] *See* Rec. Docs. 770, 774.
[398] JX 69-a, Lavespere Depo. at 213:8-10.
[399] PX 1-a, pp. 12-14, 18-21, 110-111.

### ADA/RA VIOLATIONS

### A. Expert Witnesses - Credibility

17.     Plaintiff's expert Mark Mazz ("Mazz") is a highly experienced expert in architectural compliance with the ADA.[400] Mazz was accepted by the Court as an expert under the ADA in the field of architectural barriers in both the liability and remedy phases of trial.[401]

Mazz conducted a site visit of LSP on April 6, 2022, during which he toured those parts of LSP identified by Defendants as accessible spaces.  This included the spaces Mazz surveyed in 2016 that are still deemed necessary for access, and any spaces that had been deemed substitute spaces for those surveyed in 2016.[402]  Mazz toured Ash dorms 1-4, segregation cellblock 28, NU 1 and NU2, the Visitor's Center, and the walkways leading to and from these areas.[403]   In surveying these areas, he applied the same methodology utilized during his liability phase visit–measuring spaces to ensure programmatic access required for new construction, altered spaces, and unaltered areas.[404]  Mazz testified credibly at the remedy phase trial, and his testimony and findings went unrebutted, just as they did at the liability phase trial.[405]

18.     Plaintiff's expert Dr. Dora Schriro was accepted by the Court as an expert in the field of corrections administration.[406]

---

[400] Mazz has over 40 years of experience in this field, having worked with private and public entities to identify and remedy architectural barriers to the disabled, including for the Architect of the Capitol, federal agencies, Montgomery County, Maryland, the Department of Justice's Housing and Civil Enforcement and Disability Rights sections, and the Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity. For over ten years, Mazz has served as a member of the ACA. PX 4, pp. 5–9.

[401] Rec. Doc. 748, Mazz Testimony at 47:24-48:1.

[402] PX 4, p. 2; Rec. Doc. 748, Mazz Testimony at 46:17-24.

[403] Rec. Doc. 748, Mazz Testimony at 49:9-51:6.

[404] *Id.* at 48:11-21.

[405] *See* Rec. Doc. 594, pp. 8, 97-98.

[406] PX 3, pp. 1-2; Rec. Doc. 747, Schriro Testimony at 114:3-17. Dr. Schriro has served as Director of the Missouri and Arizona correctional systems; Commissioner of the St. Louis and New York City jail systems; warden of the St. Louis city jail; Assistant Commissioner for Program Services in New York City. She also

19.     LSP did not remedy the ADA violations found by the Court following the liability trial. The Court finds the ADA violations persist and a remedy is required based on the following.

Dr. Schriro toured LSP on April 6, 7, and 8, 2022, during which time she interviewed approximately 40 Class members, including an estimated 30 members of the ADA Subclass and around ten healthcare orderlies.[407] At the remedy trial, Dr. Schriro testified about the inadequacies of LSP's ADA administration, opining that the ADA violations found by the Court identified at LSP persist, including problems with the ADA coordinator, the ADA advisory committee, staff training, orderly assistance, accommodation requests, the ADA tracking system, and disciplinary accommodations.[408] The Court found Dr. Schriro's testimony credible and credits her opinions.

LSP offered no evidence and no expert testimony that the violations previously found under the ADA and RA have been addressed or remedied.

### B. Architectural Barriers[409]

20.     On the following record evidence, the Court finds that architectural barriers which violate the ADA and the RA persist at LSP.

At the time of the liability trial, Mazz identified 190 architectural barriers at LSP that required remediation to be ADA compliant.[410] Mazz inspected LSP on April 6, 2022 in

---

served as Commissioner of the Connecticut Department of Emergency Services and Public Protection and as Connecticut's Homeland Security Advisor. She was also the first Director of the ICE Office of Detention Policy and Planning. In all of these positions, Dr. Schriro was responsible for implementing and ensuring compliance with state and federal law, including the ADA and RA.

[407] PX 3, p. 4; Rec. Doc. 747, Schriro Testimony at 131:3-4, 131:17-21, 133:5-10.

[408] Rec. Doc. 747, Schriro Testimony at 133:25-135:16.

[409] Defendants claim they have remedied all architectural barriers required by LSP's settlement with the DOJ.  First, they offer no evidence from the DOJ affirming this claim.  Second, as the Court previously held, LSP's settlement with the DOJ is irrelevant to the ADA violations established in this case.

[410] Rec. Doc. 594, p. 49 (citations omitted).

connection with the remedy trial and issued a report connecting each barrier found to the specific ADA provision it violates.[411]  By Mazz's estimation, only 19–20% of the barriers identified in his 2016 report have been remediated by LSP.[412]

Mazz credibly showed several barriers that had not been remedied since his 2016 report, including *inter alia*, abrupt changes in walkway levels impacting wheelchair bound inmates; cell windows difficult to open and close; doors that cannot be opened independently by wheelchair bound inmates; and inaccessible drinking fountains.[413]

Defendants claim that they have remedied 141 of the 190 barriers identified in Mazz's 2016 report;[414] however, the evidence does not bear this out. and Defendants did not offer evidence to support this claim.

Defendants presented evidence that they converted Ash 1, 3 & 4 dormitories ("dorms") into handicapped accessible dorms for disabled inmates, replacing Cypress 2 and Hickory 4 as disabled dorms.[415]  This move has placed disabled inmates closer to the treatment center, pill call, cafeteria, law library, education building, and the easiest point of access for LSP's two chapels[416]–a welcome improvement allowing greater program access to these services.  However, evidence does not support Defendants' claim that the Ash dorms are fully handicapped accessible or that all disabled inmates have been moved to the Ash dorms. The Court finds that this change did not rectify the barriers to access.

---

[411] PX 4.
[412] Rec. Doc. 748, Mazz Testimony at 61:23-62:2; *see also id.* at 58:3-5, 59:14-15, 61:3-11.
[413] *Id.* at 60:2-61:11.
[414] Rec. Doc. 770, p. 54.
[415] JX 72-a, pp. 19–20.
[416] JX 73-a, pp. 99–101.

23-30825.30628

Although Defendants characterized the testimony of three disabled inmates currently housed in the Ash dorms as essentially having no accessibility issues in the Ash dorms,[417] the actual testimony from these inmates reveals otherwise.  Dennis Mischler ("Mischler"), currently housed in Ash 1, testified that he is able to access the toilets and showers in Ash 1; however, he also testified that "it's very difficult" to move around in Ash 1 in his wheelchair,[418]  and this access is "with difficulty because they have a ramp there . . . the width of the wheelchair" with "two cement lips on both sides.  And if you don't manipulate that . . . you can hit those and tip over."[419] Mischler "almost fell a couple of times but was caught by inmates," and "other people had the same problem."[420]  He further testified that, because there are sixty (60) inmates in Ash 1, "it's become very – real problematic and dangerous because when – if one person in a wheelchair is coming one way and the other person in a wheelchair is going the other way, somebody has to give.  And where the problem comes in is that if you have an emergency, it could really cause a hazard really bad."[421]

Jean Paul Creppel ("Creppel") also housed in Ash 1, is a wheelchair-bound inmate, who testified that wheelchair access to the shower is "limited,"[422] and because of the width of the makeshift ramp, "if you don't hit it the right angle, you could hit the sharp curb and it could tip you over."[423]  Creppel also testified that, "right before they moved us to Ash 1, they did like a – kind of a quick upgrade of the dorm and it was like a – kind of a real fast fix and they overlooked a lot of things, and they kind of shortchanged a lot of things …

---

[417] Rec. Doc. 770, p. 56 (citations omitted).
[418] Rec. Doc. 747, Mischler Testimony at 54:21-23.
[419] *Id.* at 55:9-13.
[420] *Id.* at 55:13-15.
[421] *Id.* at 55:2-7.
[422] Rec. Doc. 749, Creppel Testimony at 238:2.
[423] *Id.* at 238:16-18.

."[424]  Creppel further testified that, even from Ash 1, he had issues getting around the prison complex:  "there's long distances between callouts; like, say, the chapel or the visiting shed or library, all these places that are well over 300 yards to get to.  So you usually have a pusher, unless you're physically able to push yourself."[425]

Additionally, although Defendants claim they have moved all disabled inmates into what they call "fully handicapped accessible" Ash dorms, Warden Falgout admitted just weeks before the remedy trial that there were still wheelchair-bound inmates housed in Hickory 4.[426]

21.    The Court finds the orderly assistance program does not overcome the structural barriers to access.

Defendants point to Creppel's testimony that he is assisted by orderlies with various tasks, including making his bed.[427] Creppel testified that the inmate orderlies did everything that he needed help with and that they "had kind hearts and did a good job."[428] However, Creppel also testified that there were not enough inmate orderlies to "keep up with" the needs of the disabled inmates: "well, you have a lot of old, irritable sick men. You have people with conditions like mine, some worse, some less.  It's not very sanitary. The orderlies try to keep up with it.  But you got so much -- you have a lot of urine and defecation.  Usually in the shower area.  The access is limited."[429]

Mischler described an instance when the orderlies locked the inmates out of an Ash dorm to clean the dorm.  In an effort to get out of the sun due to his history of skin

---

[424] *Id.* at 238:4-7.
[425] *Id.* at 239:21-24.
[426] JX 73-a., Falgout Depo. at 116:22-23 (testifying on March 8, 2022, that "[w]e have some offenders [in wheelchairs] right now that are on Hickory 4").
[427] Rec. Doc. 749, Creppel Testimony at 249:21-25.
[428] *Id.* at 245:5-7, 17-19.
[429] *Id.* at 237:23-238:2.

cancer, and after he knocked on the door of the dorm but no one answered, Mischler attempted to wheel himself into a shaded area; however, he flipped over and landed on his back after trying to use an incomplete ramp with no guardrails.[430]  Mischler testified that he was in a great deal of pain after this fall, but "there was only one orderly, health care orderly, out there.  And he was with another patient at the end of the -- on the other side of the dorm."[431]  Other inmates had to assist Mischler because there not was an orderly available; the inmates "pounded on the door" for assistance, but the "orderlies wouldn't open the door."[432]

Dr. Shriro testified that, of the 80 inmate orderlies assigned to assist disabled inmates, 58 were assigned to the Ash dorms, leaving only 22 to serve as "pushers" or "walkers," i.e. "the folks who either push those wheelchairs around or assist in the, you know, walking of the wheelchair, I guess."[433]  Dr. Shriro credibly explained why this number is insufficient: "And the campus is so big, and it's of so many different kinds of terrains, and the configuration of housing units are such, I just can't imagine that 22 is sufficient for a facility as large as that is with the demographics of the population that, you know, I described to you a couple of minutes ago."[434]

22.     The Court finds that numerous architectural barriers remain at LSP that are not sufficiently ameliorated by orderlies.   The Court finds that the physical barriers to program access necessitate injunctive relief to bring LSP's facilities into compliance with the ADA and RA, where legally applicable.[435]

---

[430] Rec. Doc. 747, Mischler Testimony at 52:17-53:9.
[431] *Id.* at 53:13-15.
[432] *Id.* at 53:17-18.
[433] Rec. Doc. 747, Schriro Testimony at 144:24-145:8.
[434] *Id.* at 145:9-14.
[435] The Court intends to appoint a monitor to assist in determining the specifics of remediation of structural barriers.

## C. Inmate Orderly Assistance Program

23.     The Court previously held that LSP violated the ADA and RA by failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications were not made and by failing to provide proper oversight of health care orderlies.  The Court finds that inmate orderlies continue to be utilized beyond the scope of their duties and training.  The Court further finds that inmate orderlies are tasked beyond their training and knowledge to compensate for the serious lack of medical staff that should be assessing and assisting the medical needs of the disabled.[436]

Defendants concede that "The training materials or practices for inmate orderlies have not changed since the close of liability discovery," and "Orderlies are used the same today as they were at the close of liability discovery."[437]

<u>Training</u>

The Defendants failed to prove that inmate orderlies are trained before they are assigned to work with disabled inmates.[438]   Some orderlies observed by Dr. Shriro reported that they had no training while others said they were not trained until after they had already started working on the assisted living wards.[439]

The training materials, when provided to the orderlies, are limited in usefulness considering the breadth of needs facing disabled inmates.  While LSP's PowerPoint training teaches wheelchair safety, a narration of body systems, and how to change a bed and rotate a patient, this training is extremely limited and fails to address myriad other

---

[436] *See* PX 3, p. 12.
[437] PX 44-d, p. 4.
[438] As discussed *supra*, healthcare orderly Bruce Hines testified that, although he had been working as an orderly for three years, he did not receive training until March of 2022, just weeks before the remedy phase discovery deadline.
[439] PX 3, p. 12.

disabilities, such as blindness, respiratory problems, diabetes, or dementia/mental illness, to name a few.[440]

Defendants advance Stickells' testimony regarding the inmate orderly training,[441] as evidence that LSP's orderly inmate training is improved, Dr. Schriro was critical of this training as it pertains to assisting disabled inmates in accordance with the ADA and RA. Stickells testified that the inmate orderly training has been updated to include a wheelchair safety tip,[442] but she admitted that "the substance" of the training "is the same," she "just changed the way it looks."[443] On cross, Stickells admitted that the "new" training Power Point slides did not add new content; she simply "changed its appearance for easier reading."[444]

Stickells testified that orderly training is done "as needed" and generally when "brought to [her] attention by Dr. Jacobs". Stickells further that she advised Dr. Jacob that this training "needs to be done at least quarterly," but there is no evidence before the Court that this recommendation by LSP's ADA compliance official was followed.

<u>Abuse/Neglect</u>

The Court finds no pervasive pattern of orderly abuse and/or neglect of disabled patients at LSP. Plaintiffs contend that their evidence "showed multiple examples of orderly abuse,"[445] and they point to three instances–two where an orderly allegedly punched a patient in the head and one where an orderly choked a patient.[446] However,

---

[440] *Id.*
[441] Rec. Doc. 757, Stickells Testimony at 23-28.
[442] *Id.* at 27:7-18; DX 47, p. 33.
[443] *Id.* at 42:22-24.
[444] *Id.* at 43:14-17.
[445] Rec. Doc. 771, p. 62.
[446] PX 1-a, p. 102 (Patient #18, who was punched in the head by an orderly); *id.* at 103 (Patient #69, who was choked by an orderly; Patient #22, who was punched in the head by an orderly).

23-30825.30633

Defendants presented evidence that the orderly who choked a patient was immediately disciplined and removed from the program.[447] Defendants also presented evidence that one of the instances of abuse claimed by Plaintiffs could not have occurred because that particular patient was deceased at the time of the alleged abuse.[448]

Evidence also establishes that LSP screens applicants for the inmate orderly program. Stickells testified that applicants are screened for "any disciplinary action, you know, if they have a history of any type of, you know, something -- they have to meet that criteria."[449] Stickells highlighted that LSP does not want orderlies that, for example, have "multiple disciplinary actions for theft or strong-arming somebody or something like that. We like to keep the patients safe."[450]

After Dr. Shriro's site visit, she credibly concluded that "[m]ost Healthcare Orderlies work hard and are deeply affect by the severity of patients' afflictions … most Healthcare Orderlies take a lot of pride in their work."[451] The Court concludes that there is no pervasive problem of orderly abuse of disabled patients at LSP.

<u>Supervision of Orderlies</u>

While there is insufficient evidence of orderly abuse/neglect, the Court finds that there is a serious lack of supervision or oversight of inmate orderlies by both medical staff and security personnel. This lack of supervision necessarily contributes to violations of the ADA and RA at LSP.

---

[447] NP Park testified that this orderly "was disciplined and written up and he no longer works there." Rec. Doc. 752, Park Testimony at 30:22-23.

[448] According to Plaintiffs' expert report, Patient #18 "was housed in a locked infirmary room and reported an orderly punched him in his head" on August 6, 2020. *See* PX1-a, p. 102. However, Patient #18 died on May 6, 2020. *See* DX 2 at 653 (confirming that Patient 18 died May 6, 2020, not on January 6, 2021, as stated in Plaintiffs' expert report).

[449] Rec. Doc. 757, Stickells Testimony at 29:13-16.

[450] *Id.* at 29:17-19.

[451] PX 3, p. 13.

23-30825.30634

Preliminarily, the Court rejects any assertion that that security should have no role in supervising inmate orderlies. Some overlap in supervision is necessary considering the position of trust inmate orderlies are placed in. It is appropriate for security to supervise the conduct of orderlies, which the Court finds is a prophylactic against potential abuse of an inmate patient by an inmate orderly. However, security is not qualified to supervise whether inmate orderlies are complying with their duties to assist inmates with health care needs and/or disabilities. Qualified medical staff must supervise this aspect of the orderly program.

Stickells, who oversees the orderly program, testified that she knows that orderlies are following their training because "the nurses will let [her] know if they're not."[452] She further testified that she also makes rounds and "check[s] on [the orderlies] [herself]."[453] In her deposition, she testified that she conducts surprise visits approximately once a month, and the orderlies "know where to find" her if they need her.[454] Dr. Shriro expressed doubt as to Stickells' purported oversight because, during her site visit, she observed the orderlies routinely exceed the scope of their duties and did not see any nurses on the floor with patients; in fact, no nurses or medical personnel visited the Ash dorms during her three-day site visit.[455]

The evidence shows that nurses and medical personnel are not rounding the Ash dorms where the disabled patients are housed; thus, Stickells' reliance on nurses to report problems of abuse/neglect/failure to adhere to training is pointless. Further, given the number of disabled inmates at LSP, the Court finds that monthly surprise visits are

---

[452] Rec. Doc. 757, Stickells Testimony at 30:12-18.
[453] *Id.* at 30:18-19.
[454] PX 3, p. 13 (quoting Stickells Deposition at 60:24 – 61:18).
[455] *Id.* at 12.

woefully insufficient to determine if orderlies are properly performing appropriately assigned tasks. For example, Stickells testified in her deposition that LSP did not have many problems with falls on the nursing unites; at trial, she was "surprised" to learn that, between March 2020 and December 2021, there were "at least 87 documented falls in the medical occurrence reports."[456]

The evidence shows that orderlies, rather than nursing staff or corrections officers, determine their work assignments.[457]   Orderlies do not have the training or skill to determine what assistance they are qualified to offer disabled inmates or what assistance requires medical staff.  Dr. Schriro credibly concluded that there was no rationale to the orderly staffing levels, nor did she observe any supervision of orderlies by either medical staff or security personnel.[458]

### D.   LSP ADA Directives/Qualified ADA Coordinator

24.   The Court finds that LSP continues to fail to meaningfully comply with its own ADA Policy Directives, which contributes to violating the ADA and RA rights of disabled inmates.

Specifically, "LSP Directive 01.016 requires LSP to maintain an ADA Advisory Committee consisting of the ADA Coordinator, the Deputy Warden for Operations, a staff attorney, the Safety Director, and the Health Information Management Supervisor.  The purpose of this committee is to review ADA compliance on a monthly basis and recommend corrective action to the warden where appropriate."[459]  The Court found that: "Despite this Directive, neither LSP's ADA Coordinator, nor its past or present wardens,

---

[456] Rec. Doc. 757, Stickells Testimony at 45:4-17.
[457] PX 3 at 12.
[458] *Id.*
[459] Rec. Doc. 594, p. 59 (footnotes omitted).

were aware of the existence of such a committee, and Defendants have admitted that '[n]o such committee existed during the pendency of this lawsuit.'"[460]

Rather than address policy compliance, LSP simply removed several of the Directive's requirements. In 2018, after the Court issued its findings, Directive 01.016 was amended to remove any mention of an ADA Advisory Committee, any reference to training, and the qualification requirements for the ADA Coordinator.[461] Dr. Schriro credibly testified that the original Policy created "good expectations," but the removal of these requirements is "a significant step backwards."[462] The Court agrees. The Court finds that the ADA Coordinator is untrained and lacks the experience to manage a compliant ADA program.

The Court also finds that LSP's new ADA Coordinator, Warden Oliveaux, is perhaps less qualified than her predecessor, Warden Falgout, to oversee and administrate LSP's ADA compliance. Specifically, the Court found that "Asst. Warden Falgout is juggling far too many competing responsibilities to adequately fulfill his obligations as ADA Coordinator for the LSP," and that "LSP failed to provide adequate training and resources to any of its ADA Coordinators, and none of the ADA Coordinators during the relevant time period possessed the knowledge or experience necessary to oversee and ensure ADA compliance."[463]

The evidence establishes that Oliveaux is juggling just as many responsibilities at LSP as Falgout did, she has less experience in general than Falgout, and the ADA training

---

[460] *Id.* (citations omitted).
[461] PX 21-d. The only language related to ADA Coordinator qualifications in the updated version reads "For the purpose of this directive, an appropriately trained and qualified individual is one who has been designated by the Warden to coordinate efforts to comply with and carry out responsibilities defined by the ADA." *Id.* at 1.
[462] Rec. Doc. 747, Schriro Testimony at 125:15-18.
[463] Rec. Doc. 594, p. 58 (citations omitted).

she has received is just as lacking.  Aside from managing ADA administration at LSP, Oliveaux is also tasked with the oversight of LSP's medical care, mental health care, emergency medical services, fire, legal program, and training academy.[464]  She testified that at least four department heads report directly to her.[465] She further testified that medical, mental health, EMS, and fire duties account for 50% of her time while other duties make up the remaining 50%.[466]

Revealingly, when Oliveaux interviewed for her current position of deputy warden in February 2022, she testified that the role of ADA Coordinator was never discussed during the interview.[467]  Oliveaux also testified that she was not aware that the role ADA Coordinator was within her job duties until after she started the job.[468]  At the time Oliveaux took over as deputy warden and became the ADA coordinator, she had no knowledge of the specifics of this lawsuit, the findings of the Court relevant to the ADA/RA after the liability trial, and no knowledge of what the ADA/RA requires for prisons.[469]  In her pre-trial deposition, Oliveaux testified that she intended to take the same ADA training that Falgout had received–training this Court found insufficient.[470]  At the remedy trial, Oliveaux testified that she had obtained additional ADA training during an "ADA Symposium," however, she also testified that this training pertained primarily to physical barriers, an area over which she has little involvement.[471]

---

[464] Rec. Doc. 757, Oliveaux Testimony at 54:13-17, 57:5-13.
[465] *Id.* at 56:9-20.
[466] *Id.* at 58:1-5.
[467] *Id.* at 80:7-17.
[468] *Id.* at 80:18-21.
[469] *Id.* at 81:1-24.
[470] *Id.* at 82:25-83:3; *see* Rec. Doc. 594, p. 58.
[471] *Id.* at 83:4-8, 83:17-19; 79:1-3.

23-30825.30638

LSP's hiring of a new DOC ADA Coordinator, Sharita Spears ("Spears") does not affect the Court's finding.[472]   Although Spears has been an attorney since December 2020,[473] her background is in family law; she has no experience with disability law or the ADA/RA.[474]   Spears' duties include supervising all ADA coordinators within the DOC; reviewing institutional policies and directives related to the ADA; maintaining the ADA database; creating and coordinating ADA training; and answering "second-level" ARPs related to the ADA.[475]   Defendants claim Spears has "overhauled" the ADA training program for staff at headquarters and all DOC facilities, including LSP.[476]  Spears intends to enhance the annual in-serving training of DOC staff to include more ADA topics.[477]  While Spears appears committed to and invested in her role, some aspects of her training and administration of ADA matters are flawed and directly against LSP policy, which provides that "[t]he ADA does not require that a request for accommodation be provided in any particular manner."[478]

While Spears testified that an inmate could make an ADA accommodation request verbally or by filling out a "request for accommodation form,"[479] and that the ADA Coordinator could grant such a request, she also testified several times that, according to the ADA training slides, accommodation requests were made using the ARP process.[480]  The Court cannot discern from Spears' testimony or the training slides if the ADA accommodation request policy is being followed per the Policy Directive or forced

---

[472] Rec. Doc. 757, Spears Testimony at 88:3-7.
[473] *Id*. at 88:11-14.
[474] *Id*. at 107:14-19.
[475] Rec. Doc. 770, p. 64 (citing Rec. Doc. 757, Spears Testimony at 88-91, 105).
[476] *Id.* (citing Rec. Doc. 757, Spears Testimony at 90-91).
[477] Rec. Doc. 757, Spears Testimony at 94-95; *see also* DX43.
[478] JX 73-c, p. 4.
[479] Rec. Doc. 757, Spears Testimony at 111:3-15.
[480] *Id*. at 111:24-112:4; 114:15-25.

through the ARP process. However, the evidence makes clear that this leadership training Power Point is confusing and could lead LSP leadership and employees to apply the policy incorrectly.

Spears testified that the DOC intends to engage Accessology, an independent ADA consulting firm, to create a transition plan to comprehensively analyze and evaluate DOC's (including LSP's) ADA practices, policies, procedures, program access, and physical access.[481]   While this is very encouraging, the Court must determine appropriate injunctive relief for those deficiencies that remain at LSP as of the remedy trial; the Court cannot make findings based on the promise of future remedies.

### E. ADA Training of Medical/Correctional Staff

25.    The Court finds that LSP fails to adequately train medical and correctional staff in ADA compliance. The Court finds that ADA training for medical and correction staff is essentially unchanged since the liability ruling and, thus, remains unlawful.

LSP admitted that training has not changed.[482]  Even more troubling, LSP removed from Directive 01.016 the requirement that all employees receive: "comprehensive annual training . . . relevant to access to programs, and activities available to individuals with disabilities."[483]  Spears testified that the annual in-service training for all correctional staff occurs annually, and these trainings are "geared toward deaf and hard-of-hearing offenders" and how to effectively communicate with them.[484]  Spears testified that this training would be updated even though, "there is not anything that [LSP] need[s] to update

---

[481] *Id.* at 98:2-25.
[482] PX 44-d, p. 3, Response to ROG 15 ("[T]he training materials [and] practices related to ADA accommodations have not changed.").
[483] *Compare* JX 73-b (2012 version), p.  8 *with* JX 73-c (2020 version).
[484] Rec. Doc. 757, Spears Testimony at 94:12-18.

so far as content," to "kind of add a little bit more information to it to better help the security staff know how to deal with these offenders."[485]  However, Spears also testified at the remedy trial that, "right now the content has not been decided upon."[486]  References to purported non-specific, future changes cannot mitigate the need for injunctive relief.

**F. Identifying and Tracking Accommodation Requests/Disability Grievances**

26.   The Court finds that LSP continues to fail to identify and track disabilities and accommodations. The Court further finds that LSP's tracking system does not provide meaningful identification and tracking of disability grievances or ADA accommodation requests. The evidence before the Court demonstrates that nothing has changed to remedy this tracking procedure since the liability ruling. The Defendants admit that "there have been no changes in the way documents and/or databases are compiled, collected, or maintained with respect to … the ADA Tracking Database."[487]

While Spears testified that she checks ADA database "probably two to three times a week" and finds it searchable by year, institution, inmate DOC number, inmate name, and accommodations granted,[488] she did not testify that the database had been changed in any way since the liability ruling.  Indeed, Defendants ostensibly acknowledge this deficiency as part of the need to engage Accessology to review all ADA policies procedures.

Evidence demonstrates that the tracking database information routinely conflicts with the QA/QI program, showing conflicting numbers of accommodations for most

---

[485] *Id.* at 95:1-9.
[486] *Id.* at 95:12-13.
[487] PX 44-c, p. 6.
[488] Rec. Doc. 757, Spears Testimony at 100:22-101:23.

23-30825.30641

quarters.[489]   When asked about this discrepancy, Stickells, as QA/QI Coordinator, testified that this conflict was because accommodation requests had not been submitted to her, not necessarily because none were made.[490]   Warden Falgout was questioned about the discrepancy between the reports, and he could not explain why the QA/QI study did not document all ADA requests.[491]   Based on her experience in other correctional facilities, the reports of Subclass members, the size of LSP, and the number of disabled and aging inmates at LSP, Dr. Schriro reasonably concluded that LSP's tracking system is undercounting accommodation requests, stating that the recorded accommodation requests per month "really seems to be an exceptionally low number."[492]

### G. Evaluation/Resolution of Accommodation Requests/Disability Grievances

27.   The Court finds that the evaluation and resolution of accommodation requests and/or disability grievances remain unchanged and violate the ADA and RA. There has been no effective remedial changes made to LSP's training of medical and correctional staff or inmate orderlies, no changes to the tracking system, and there remains confusion about whether disabled inmates are required to file accommodation requests as ARPs.

Evidence shows that individualized response plans, required under LSP Directive 01.016, are not created for disabled patients.[493]   Disabled inmates reported to Dr. Shriro that, when they file accommodation requests via ARP, they receive no response.[494] There is also evidence of the inexplicable removal of an accommodation.  For example, although he has used a wheelchair for over 20 years, Class Member John Price testified

---

[489] *Compare* PX 34-b *and* PX 34-a (QA/QI reports) *with* PX 36 (ADA accommodation requests).
[490] Rec. Doc. 757, Stickells Testimony at 38:3-18.
[491] JX 72-a, Falgout Depo at 41-43:10-12.
[492] Rec. Doc. 748, Schriro Testimony at 44:20-24, 135:2-6.
[493] PX 3, p. 14.
[494] *Id.*

(via stipulation) that LSP has tried to take away his wheelchair. This allegation was uncontroverted.[495]

### H. Identifying and Tracking Accommodation Requests/Disability Grievances

28. The Court finds that LSP fails to accommodate disabled inmates when applying discipline. The Court finds that Defendants fail to consider the need for appropriate accommodations when disciplining disabled inmates in violation of the ADA and RA. The Court concludes that LSP's discipline policies, as applied to disabled inmates, violate the ADA/RA.

Testifying on behalf of LSP, Warden Falgout testified that LSP had no plans "at this time" to change any LSP's practices, policies, or procedures regarding discipline of disabled inmates.[496] Falgout was asked when an inmate's disability under the ADA would become relevant in making disciplinary decisions, and he responded, "They wouldn't … A rule violation is a rule violation."[497] Although security is purportedly trained to seek counsel from the ADA Coordinator and/or medical staff when an inmate's conduct could be related to an infraction, and the matter should be referred to the Disciplinary Board, Falgout could not recall any specific instances when he was asked to make this determination.[498] He recalled one instance where a disabled inmate was "written up" for not placing his locker box away properly, and it was determined after consulting with medical and the inmate's duty status that he could not physically move the locker box,

---

[495] JX77-c, pp. 8-9.
[496] JX 72-a, Falgout Dep. at 44:1-4.
[497] *Id.* at 46:6-12.
[498] *Id.* at 46-48.

and stated "so that was taken into consideration in the infraction."[499]  However, Falgout could not recall whether or not the inmate was still disciplined for the infraction.[500]

Rather than preemptively ensure that an inmate's disability is considered when creating proper discipline, if a disabled inmate wishes to appeal a disciplinary decision based on his disability, he must endure the discipline and seek an appeal.[501]  Falgout could not recall a single time when a disabled inmate appealed discipline.[502]

Oliveaux testified that she has received no training regarding ADA accommodations for disabled inmates when applying discipline.[503]

The evidence established that a quadriplegic inmate was disciplined by means of solitary condiment in a cell.  When placed in disciplinary segregation in a locked cell, Class Member Derrick Martin, who is a quadriplegic confined to a wheelchair with limited use of one arm, could not reach the call button to activate the call light.  While Parks testified that she responded to Martin's call bell on one occasion when he was in a locked cell, there is ample evidence before the Court that causes the Court to question whether nurses always or routinely respond to call lights, given the sight and sound barriers, observations by Plaintiffs' experts, and testimony of inmate orderlies.  The Court does not question the truthfulness of Park's testimony; however, the fact that she recalls responding once to a call light does not establish that disabled patients in disciplinary segregation are accommodated.

---

[499] *Id.* at 49:2-11.
[500] *Id.* at 49:24-25.
[501] *Id.* at 51-52.
[502] *Id.* at 52:8*12.
[503] Rec. Doc. 757, Oliveaux Testimony at 83:20-22.

Evidence shows that black box restraints are routinely used on disabled inmates regardless of their disabilities, and a sign on the Trip Office in the Treatment Center reads: "WE DO NOT MODIFY RESTRAINTS IN THIS OFFICE. THANK YOU FOR NOT ASKING!!!"[504] This violates LSP's policy that allows any disabled inmate to request an accommodation of any LSP employee at any time.[505]

The Court does not discount the need for security in a prison setting, and not every disability accommodation request should be granted when balanced against security needs.  However, in practice, the evidence established that LSP has no process for considering the propriety of accommodation requests. LSP's blanket practices, such as the black box restraint practice o disregard a disabled inmate's disability in applying discipline. The law requires the accommodation requests of disabled inmates to be balanced against the security needs of the prison, but these determinations are to be made on a case-by-case basis.[506]  This is not occurring at LSP, and the Court finds that LSP persists in failing to consider and/or make accommodations where appropriate in administering discipline.

### I. Exclusionary Policies

29.    The Court finds that Plaintiffs have failed to carry their burden of demonstrating that LSP continues to violate the ADA/RA by uniformly excluding disabled inmates form certain duty statuses, work assignments, or hobby craft.

---

[504] PX 1-d, p. 6.
[505] JX 73-c.
[506] Determining "whether a modification or accommodation is reasonable always requires a fact-specific, context-specific inquiry."  *Pierce v. Cnty. of Orange*, 526 F.3d 1190 (9th Cir. 2008)(citing *Zukle*, 166 F.3d at 1048)).

The only evidence offered by Plaintiffs regarding blanket exclusionary policies is the expert report of Dr. Schriro, who concluded, based on Defendants' general response that "there have been no changes to the practices, procedures, or policies related to ADA accommodations."[507] Dr. Schriro's conclusion is unfounded and speculative.

While Falgout testified that there was no specific, written change to LSP's duty status policy, he testified that "the practice has changed to afford more specificity for all staff to be able to understand and be able to provide the offender with abilities to do things based on limitations."[508] Following 2019, Falgout explained that "the emphasis got to be more specific on what an offender was able to do and not just blanket, no duty or no hobby craft or no rodeo … there was a general consensus to transition to providing them with the ability to do things were within -- within their ability, to be able to paint or draw or do other things as far as, like, hobby craft."[509] When asked whether all blind inmates at LSP are on no-duty status, Falgout responded that he was unaware specifically if that was the case but that it would "not necessarily" be so because medical would determine the appropriate duty for a blind inmate.[510] Falgout explained that the severity of the blindness would impact an inmate's duty status:

> If he was blind completely blind, both bilaterally, then, if he felt comfortable in doing any work, we would do our best to provide him with something that would be safe for him, safe in the environment that he's in. If we have someone who has unilateral sight loss, then, if they wanted to have a job, we'd have to look at their safety. They would have to wear safety glasses. We don't want to put them in anything that would increase their potential to lose the sight in the unaffected eye. So that's what we would look at. Specific job, I don't -- again, it depends.[511]

---

[507] PX 3, p. 17.
[508] JX 72-a, Falgout Depo at 55:3-7.
[509] *Id.* at 55:21-56:17.
[510] *Id.* at 57:9-22.
[511] JX 73-a, Falgout Dep. at 95:24-96:12.

23-30825.30646

Falgout testified similarly when asked about elderly inmates, inmates with chronic pain issues, and inmates with mental health challenges; in each case, he responded that work assignments would be based on the inmate's limitations and abilities.[512]

## V.   CONCLUSIONS OF LAW

### A.   Eighth Amendment Standard

In a "prison injunction case . . . The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally **to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future**."[513]  "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[514]

Deliberate indifference to "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[515] This inquiry consists of both an objective and a subjective test. The objective test requires showing that the prisoner has "serious medical needs,"[516] and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm.'"[517]  To prove an Eighth Amendment violation, Plaintiffs must prove that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a

---

[512] *Id.* at 97-99.

[513] *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1993))(emphasis added)(internal quotation marks omitted).

[514] *Brown v. Plata*, 563 U.S. 493, 511 (2011).

[515] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)(citations omitted); *see also Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989).

[516] *Estelle*, 429 U.S. at 104.

[517] *Braggs v. Dunn*, 257 F. Supp.3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

substantial risk of serious harm to the inmate."[518] An official is not liable for deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[519] To meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[520]

Whether or not officials knew of the risk is considered the subjective component of the deliberate indifference standard,[521] which requires a state of mind amounting to recklessness as used in criminal law.[522] The subjective test requires a showing that prison officials had requisite knowledge of the risk of harm and either (1) disregarded it or (2) failed to act reasonably to abate it.[523] Willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claim.[524]

Systemic deficiencies in a prison's health-care system can provide the basis for a finding of deliberate indifference at an institutional level.[525] The cumulative effect of

---

[518] *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 833-34).

[519] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[520] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

[521] *Farmer*, 511 U.S. at 848.

[522] *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 839–40); *see also Hacker v. Cain,* No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ("An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown."); *Hall v. Johnson*, No. 12-00099-BAJ-RLB, 2013 WL 870230, at *3 (M.D. La. Mar. 7, 2013).

[523] *Farmer*, 511 U.S. at 844-45; *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1250 (M.D. Ala. 2017)("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.").

[524] *See Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

[525] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").

different deficiencies can demonstrate the subjective component of deliberate indifference, as the Supreme Court acknowledged in *Wilson v. Seiter*.[526] In class actions challenging systemic health care deficiencies, deliberate indifference to inmates' health needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[527]

The fact that a risk is obvious is sufficient to allow a fact finder to conclude that prison officials knew of the risk.[528] Plaintiffs may also demonstrate knowledge through inference from circumstantial evidence.[529] If there is proof of a problem that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[530]

For purposes of the remedy trial, Plaintiffs have demonstrated that "systemwide deficiencies in the provision of medical . . . care . . . taken as a whole, subject sick prisoners in [LSP] to 'substantial risk of serious harm' and cause the delivery of care in

---

[526] 501 U.S. 294, 300 (1991) (rejecting a distinction between "one-time" or "short-term" conditions of confinement and "continuing" or "systemic" conditions.

[527] *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000); *see, e.g.*, *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977).

[528] *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates*, 376 F.3d at 333; *Robinson v. Babin*, No. 12-00629-BAJ-RLB, 2014 WL 2769099, at *4 (M.D. La. June 18, 2014).

[529] *Farmer*, 511 U.S. at 842.

[530] *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted).

[LSP] to fall below the evolving standards of decency that mark the progress of a maturing society,"[531] and that, in large part, these deficiencies persist.

Turning to the objective test, the Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[532] To establish a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources."[533] "[M]ultiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as [medical care], can support a finding of Eighth Amendment liability."[534] Moreover, the Fifth Circuit has long recognized that "the totality of circumstances concerning medical care" may violate the Eighth Amendment.[535] The "seriousness" of an inmate's medical need may also be determined by reference to the effects of a delay in treatment.[536] "Serious medical needs" also include conditions that threaten to cause health problems in the future.[537] Plaintiffs have carried this burden at the remedy trial.

As for the subjective test, Plaintiffs must demonstrate that Defendants have the same "sufficiently culpable state of mind" as found by the Court in the liability ruling.[538] "In prison-conditions cases that state of mind is one of deliberate indifference to inmate

---

[531] Rec. Doc. 573, p. 247 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)).

[532] *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[533] *Farmer*, 511 U.S. at 843; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish a Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise[.]" (emphasis in original)).

[534] *Braggs*, 257 F. Supp. 3d at 1192 (quoting *Gates v. Cook*, 376 F.3d at 333).

[535] *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

[536] *Hill*, 40 F.3d at 1188.

[537] *See Farmer*, 511 U.S. at 843.

[538] *Id.* at 834 (internal citation and quotation marks omitted).

health or safety."[539]  Even in situations where awareness is shown, prison officials will not be liable "if they responded reasonably to the risk."[540]  However, prison officials cannot escape liability simply by demonstrating that they eventually took some form of "corrective action" in response to a risk of harm.[541]  Efforts to correct systemic deficiencies that "simply do not go far enough," when weighed against the risk of harm, also constitute deliberate indifference[542] because such insufficient efforts are not "reasonable measures to abate" the identified substantial risk of serious harm.[543]  Further, "[i]nsisting upon a course of action that has already proven futile is not an objectively reasonable response under the deliberate-indifference standard" and would support a finding of liability under the Eighth Amendment.[544]

In this case, deliberate indifference may also be established "by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[545]  "In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference."[546] "As an evidentiary matter, these systemic deficiencies may be identified by a 'series of incidents closely related in time' or '[r]epeated examples of delayed or denied medical care.'"[547]  "[A]lthough one-off negligent treatment is not actionable, . . . frequent negligence, just like a single instance of truly egregious recklessness, may allow the court

---

[539] *Id.* (internal citation and quotation marks omitted).
[540] *Id.* at 844.
[541] *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998).
[542] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).
[543] *Farmer*, 511 U.S. at 847.
[544] *Braggs*, 257 F. Supp. 3d at 1260.
[545] *Id.* at 1251 (internal citation and quotation marks omitted).
[546] *Id.* (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).
[547] *Id.* at 1251-52 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986)).

to infer subjective deliberate indifference."[548] Deliberate indifference may also be "demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them."[549]

The "long duration" of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm.[550] Thus, if Plaintiffs show that a substantial risk of unreasonable harm was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and that "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk . . . , then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[551]

Applying the law to the findings of fact set forth above, and considering only evidence during the remedy phase period, the Court concludes as a matter of law that Plaintiffs have carried their burden of demonstrating that most of the systemic unconstitutional and/or discriminatory practices at LSP persist such that injunctive relief is necessary. The Court finds that Defendants have been continuously deliberately indifferent to the serious medical needs of Plaintiffs in failing to address and/or correct known deficiencies; Defendants have continuously acted with deliberate indifference toward the standards of care "within modern and prudent professional standards" by delaying or denying access to medical attention to serious and urgent medical needs of inmates.[552] As discussed at length above, the record is replete with instances showing

---

[548] *Dunn v. Dunn*, 219 F. Supp.3d 1100, 1129 (M.D. Ala. 2016).
[549] *Id.*
[550] *Alberti v. Sheriff of Harris Cty.*, 937 F.2d 984, 998 (5th Cir. 1991).
[551] *Farmer*, 511 U.S. at 842-43; *see also Williams*, 547 F.2d at 1216 (concluding that the Eighth Amendment may be violated on a showing of "evidence of rampant and not isolated deficiencies").
[552] *Morales Feliciano v. Rossello Gonzales*, 13 F.Supp.2d 151, 208 (D. P.R. 1998).

failure by Defendants to take the necessary steps to provide access or avoid delay in access to medical and health care.

Specifically, the trial testimony and evidence demonstrate constitutionally inadequate care and/or access to care as it relates to the following: providing timely and adequate access to clinical care (including sick call and medication management), inpatient/infirmary care, emergency care, and specialty care. The continued deficient medical leadership, administration, and organizational structure underpins the constitutionally deficient system of healthcare. As set forth in the Court's Findings of Fact, the remedy trial evidence satisfies both the objective and subjective standards for deliberate indifference.

**B.      ADA/RA**

Although "the ADA 'does not require prisons to provide *new* services or programs for disabled prisoners,' these same entities 'do have an affirmative obligation to make reasonable modifications . . .  so that a disabled prisoner can have meaningful access to *existing* public services or programs.'"[553]   Further, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA."[554]

A public entity may fulfill this programmatic access mandate by constructing new facilities or altering its existing facilities to bring them into compliance with the accessibility

---

[553] *George v. Louisiana Department of Public Safety and Corrections*, No. 3:14-00338-JWD-EWD, 2016 WL 3568109 at *9 (M.D. La. June 23, 2016)(quoting *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015)).
[554] *Id.* (citing *e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)).

requirements of Section 35.151 or through alternative methods such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, [or] delivery of services at alternate accessible sites."[555] It is true that "a public entity may comply with Title II by adopting a variety of less costly measures, including . . . assigning aides to assist persons with disabilities in accessing services. Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes."[556] And further, courts must be "sensitive to the fact that prisons are unique environments with heightened security and safety concerns."[557] However, where there is no evidence to conclude that such methods are shown to ameliorate barriers presented by structural deficiencies, alterations must be made.[558]

The evidence in this case demonstrates that, even after moving most disabled inmates to the Ash dorms, there remain structural barriers both within the dorms and on the campus of LSP that are not entirely ameliorated by the use of "walkers" or orderlies. Part of the Court's injunctive relief will include the appointment of a monitor to determine what structural barriers have not been effectively ameliorated by alternate means of access. Further, although efforts have been made to increase staffing in the infirmary/nursing units, evidence shows that inmate orderlies continue to do far more than is within the scope of their duties and knowledge, and they continue to "fill the gap" due to medical staff shortages. The regularity and sufficiency of the ADA training provided to

---

[555] 28 C.F.R. § 35.150(b)(1).
[556] *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014)(internal citations and quotations omitted).
[557] *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 75 (2d Cir. 2016)(citing *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1216–17 (9th Cir. 2008)).
[558] *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008).

inmate orderlies were not established, and a serious lack of supervision of the inmate orderlies by medical staff persists.

Based on the Court's factual findings above, LSP's methods of administration violate continue to violate the ADA and RA by failing to provide adequate access and accommodations to its disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and some of LSP's own ADA Directives. "A public entity may not . . . utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."[559] "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities."[560] While some of the faces of leadership at LSP have changed, the evidence demonstrates, and Defendants often concede, that none of their ADA policies and procedures have been changed since the liability ruling. LSP's ADA compliance leadership has not been equipped to address the systemic ADA/RA deficiencies.[561]

More troubling, in response to the liability ruling, LSP watered down its ADA training policies for staff and, rather than comply, it removed altogether certain LSP ADA directives. The ADA tracking database is unchanged; there remain conflicts between QA/QI and the ADA database regarding the number of, and resolution of, accommodation requests; training slides are confusing in training LSP leadership and employees regarding how a disabled inmate must request an accommodation; evidence shows that accommodations continue to be denied without reason or analysis; and disabled inmates

---

[559] 28 C.F.R. § 35.130(b)(3)(ii).
[560] *Van Velzor v. City of Burleson*, 43 F.Supp.3d 746, 752 (N.D. Tex. 2014).
[561] *See* Finding of Fact No. 24.

are still inexplicably forced to perform tasks of which they are physically incapable or left to fend for themselves when medical assistance is clearly warranted.

As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."[562] In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," **not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim**.[563]

The law does not require, nor is the Court suggesting, that LSP must accommodate every request of a disabled inmate.  Additionally, it is well-established that "[t]he ADA provides for reasonable accommodation, not preferred accommodation. The accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective. Further, a correctional facility is afforded deference in its determination of an appropriate accommodation."[564]  Nevertheless, "the ADA invariably requires 'a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of . . . [a possible] modification in light of the nature of the disability in question.'[565] As another appellate court said, an ADA or RA case frequently rides upon

---

[562] *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006); *see also United States v. Georgia*, 546 U.S. 151, 157 (2006).
[563] *Greer v. Richardson Indep. Sch. Dist.*, 472 F.App'x 287, 296 (5th Cir. 2012); *see also Borum v. Swisher Cty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).
[564] *Arce v. Louisiana*, 226 F. Supp. 3d 643, 651 (E.D. La. 2016)(internal citations and quotation marks omitted).
[565] *Mealey v. Gautreaux*, No. 16-716-JWD-RLB, 2020 WL 515853, *9 (M.D. La. Jan. 3, 2020)(quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995); *e.g., cf., Henderson v. Ford Motor Co.*, 403 F.3d 1026 (8th Cir. 2005) (employment discrimination under the ADA).

'resolution of . . . complicated, fact-intensive inquiries.'"[566]

Certainly, LSP has the authority to determine whether an accommodation is appropriate at all and, if so, what accommodation is reasonable when balanced against the security and other interests of the prison. However, the evidence shows that LSP generally denies accommodation requests without serious investigation, particularly regarding black box restraints. The problem is not that LSP utilizes black boxes to transport disabled patients; rather, the problem is that there is no evidence that LSP is considering each accommodation request on a case-by-case basis as required by the ADA.

Evidence also establishes that LSP continuously fails to consider the need for accommodations in applying discipline to disabled inmates. While "[m]aintenance of prison security is a legitimate function of prison officials, who must be accorded broad discretion in that function,"[567] a prison must evaluate a disabled inmate's needs and the accommodations necessary to ensure reasonable access to prison services, and failure to do so violates the ADA and RA as a matter of law.[568] This obligation to provide accommodations applies to the discipline of disabled inmates, as well: "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with

---

[566] *Id.* (quoting *R.K. ex rel J.K. v. Bd. of Educ. of Scott Cnty., Ky.*, 494 F. App'x 589, 597 (6th Cir. 2012)).
[567] *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761, at *12 (E.D. La. July 15, 2019)(citing *Waganfeald v. Gusman*, 674 F.3d 475, 485 (5th Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3064 (U.S. July 18, 2012) (No. 12-85) (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986); *Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979))("[S]ecurity considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quotation omitted)).
[568] *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 271–72 (D.D.C. 2015).

respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA."[569]

Actions like assigning wheelchair-bound disabled inmates to top bunks while in disciplinary segregation is unquestionably a failure to accommodate in applying discipline, yet Falgout made clear that there is no intention at LSP to change its policies, procedures or practices in disciplining disabled inmates. Although there is an appeal process to challenge particular disciplinary actions, it appears broken or unutilized.

With the exception of exclusionary policies in duty status/work assignments, the Court finds that all of the ADA violations identified by the Court in the liability ruling persist at LSP with no indication, except for the purported future partnership with Accessology, that changes are planned or thought to be necessary.

## C. Remedy

The Prison Litigation Reform Act (PLRA) allows a federal court to order injunctive relief to remedy a constitutional violation "with respect to prison conditions," but the injunctive relief fashioned "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."[570] Additionally, the Court must find that the injunctive relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."[571] Further, the Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief,"[572] but "[c]ourts may not allow constitutional violations to continue simply

---

[569] *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).
[570] 18 U.S.C. § 3626(a)(1)(A).
[571] *Id.*
[572] *Id.*

because a remedy would involve intrusion into the realm of prison administration."[573] Although "plaintiffs are not entitled to the most effective available remedy[,] they are entitled to a remedy that eliminates the constitutional injury."[574]

The attitudes of those in medical leadership at the DOC and LSP easily demonstrate that injunctive relief is required in this case. The court in *Madrid v. Gomez* found a need for injunctive relief in a prison setting based in large part on the attitudes and conduct of prison leadership:

> Our assessment of defendants' current attitudes and conduct only reinforces our view that injunctive relief is not only appropriate in this case, but perhaps "indispensable, if constitutional dictates—not to mention considerations of basic humanity—are to be observed in the prison [ ]." *Stone*, 968 F.2d at 861. Throughout this litigation, defendants have shown no indication that they are committed to finding permanent solutions to problems of serious constitutional dimension. On the contrary, defendants have expended most of their energies attempting to deny or explain away the evidence of such problems. Even when defendants modify certain policies (as they have done in the use-of-force area), they do not argue that such changes evidence an intent to address the problems raised by this complaint; rather, defendants typically assert that they were precipitated by unrelated matters.[575]

The same could be said of the LSP Defendants. The Court's liability ruling appears to have been dismissed out of hand by Dr. Lavespere and Dr. Toce. They claim of many unconstitutional aspects of healthcare that nothing is wrong with their policies and procedures. Several new leaders at LSP have never seen the liability ruling, nor do they have any idea what specific aspects of healthcare at LSP must be remedied. In the rare instances that Defendants concede necessary changes, evidence suggests that they have taken a "band-aid" approach to remedies. Such changes do not prevent the Court

---

[573] *Brown v. Plata*, 563 U.S. at 511.
[574] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015)(citing *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir.2012)).
[575] 889 F.Supp. 1146, 1281 (N.D. Cal. 1995)(footnotes omitted).

from ordering injunctive relief because "[c]hanges made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended."[576] Moreover, a defendant's assurance that it is "already on the path towards compliance is insufficient to moot the issue."[577]

    Accordingly, the Court will enter Permanent Injunctive relief by separate order.

## VI.   CONCLUSION

    For the reasons set forth above, The Court finds that Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence. The Court will enter judgment in favor of Plaintiffs and against Defendants.

    **IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[576] *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974).
[577] *Gates v. Cook*, 376 F.3d at 342–43.

# TAB 4

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOSEPH LEWIS, JR., *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br><br>JUDGE SDD<br><br><br>MAGISTRATE RLB |

## REMEDIAL ORDER

For the reasons set forth in the Court's Rulings, dated March 31, 2021,[1] ("Liability Ruling") and November 6, 2023,[2] ("Remedial Ruling"):

**IT IS HEREBY ORDERED**:

I.      **SPECIAL MASTERS**

A.  The Court hereby Orders the appointment of 3 Special Masters to develop proposed remedial plans, make recommendations regarding implementation and monitor implementation of remedial plans ("Remedial Plans") to cure and eliminate the violations found in the Court's Liability Ruling and Remedial Ruling.

B.  The Court will appoint one physician and one nurse or nurse practitioner to develop, make recommendations regarding implementation, and monitor implementation of a medical care remedial plan and one Special Master with knowledge and expertise in handicap and disability access and accommodations to develop, make recommendations regarding implementation and monitor implementation of a remedial plan to address and rectify the ADA and RA violations found by the Court.

---

[1] Rec. Doc. 594.
[2] Rec. Doc. 778.

1

C. The parties are hereby Ordered to meet and confer within 14 days of this Order to identify and discuss potential Special Masters with the qualifications set forth herein. Within 30 days of this Order, the parties shall submit names of proposed Special Masters for each position. If the parties are unable to agree on proposed Special Masters, each party will submit up to three proposed names for each position.

D. The Court will appoint three Special Masters to prepare proposed Remedial Plans and monitor and report on implementation and compliance.

## II.   REMEDIAL PLANS

### A. Medical Care Remedial Plan

A proposed Remedial Plan addressing the following shall be submitted to the Court within 120 days after the appointment of the Special Master.

1. Standards and Procedures for Sick Call, including but not limited to, the sick call request process, evaluation by a provider, and documentation and/or charting and follow-up.

2. Standards and Procedures for Clinical Care, including but not limited to, protocols pertaining to obtaining and documenting patient history, medical charting, examination and diagnostic protocols, treatment protocols, including review and recommendations of existing "Individual Treatment Orders," medication administration, documentation protocols, and medication charting and follow-up.

3. Standards and Procedures for Specialty Care, including but not limited to, protocols pertaining to referrals, tracking, follow-up, review, and implementation of specialists' orders and charting.

4. Standards and Procedures for Infirmary and In-Patient Care, including but not limited to, protocols pertaining to admission, level of care determinations, rounding and assessments, care planning, medication administration and documentation, charting, and the protocols for the appropriate use and training of inmate orderlies.

5. Standards and Procedures for Emergency Care, including but not limited to, staffing numbers and disciplines in the ATU, standards and protocols for transfer to outside hospitals, and protocols for the appropriate use and training of EMTs.

6. Standards and Procedures for medical records management, including electronic medical records and protocols for providing real time or contemporaneous access to medical records by outside providers, specialists, and related disciplines.

7. Standards and Procedures for medical management and administration, including but not limited to, recommendations for medical management policies and procedures, recommendations regarding medical

administrative organization, staffing levels, credentialing, performance reviews, peer reviews, mortality reviews, quality control and quality improvement.

## B. ADA REMEDIAL PLAN

A proposed Remedial Plan addressing the following shall be submitted to the Court within 120 days after the appointment of the Special Master.

1. Identification of architectural barriers to be remedied as set forth in Mark Mazz's expert report, a determination of the appropriate remedies, and a schedule for such remediation.

2. Standards and procedures for Methods of Administration, including but not limited to, the appointment of a qualified, properly trained ADA Coordinator and a determination regarding the necessity of an ADA Advisory Committee as previously contemplated by Directive 1.016.

3. Standards and procedures for receiving, tracking, and appropriately responding to accommodation requests.

4. Standards and procedures pertaining to the appropriate ADA training for LSP staff and inmate orderlies.

5. Standards and Procedures for the appropriate consideration of disabled status when imposing discipline and training related thereto.

## III.   COOPERATION AND ACCESS

A. No later than 30 days after their appointment, the Special Masters shall have access to Louisiana State Penitentiary ("LSP") to conduct reviews of the facility, the health care and ADA operations.

B. The Special Masters shall have access to any and all records and documents appropriate and necessary for their tasks and the Department of Corrections shall provide any records and documents requested without delay and in no event later than 14 days following the request. Oral requests for records and documents should be confirmed by electronic mail.

C. The Department of Corrections shall designate, in writing, employees to whom records requests should be directed by the Special Masters.

D. The Department of Corrections shall designate, in writing, one headquarters employee, one or more Wardens and one or more security employee(s) to coordinate and facilitate the work of the Special Masters.

E. Special Masters' visits to LSP shall be facilitated by the DOC on 24 hours written notice by the Special Master(s). The Special Masters shall be given reasonable access to class members.

23-30825.30663

F.  The Special Masters shall be provided electronic access to the record of these proceedings and the Court shall designate a Clerk to assist the Special Masters in retrieval of documents from the record if necessary.

## IV.  REPORTING

A.  Within 90 days of appointment, the Special Masters shall submit a proposed Medical Care Remedial Plan and a proposed ADA/RA Remedial Plan to the Court and the parties.

B.  The Remedial Plans should include recommended steps for implementation and proposed timelines for completion and compliance.

C.  Within 30 days of the Special Masters' submission of the proposed Remedial Plans, either party may submit proposed amendments to the proposed Remedial Plans. If either party intends to submit proposed amendments, the parties shall meet and confer no less than 14 days after the Monitors' submission in an effort to agree upon proposed amendments. The parties shall discuss any proposed amendments with the Special Masters no less than 7 days before submission of proposed amendments to the Court.

D.  The Court will review the proposed Remedial Plans and any requests for amendment and will enter Orders necessary and appropriate to effect remedies.

## V.  MONITORING IMPLEMENTATION OF REMEDIAL PLANS AND PERIODIC REPORTS TO COURT

A.  Beginning six months after the Court enters Orders effectuating the Remedial Plans, and at recurring intervals every six months thereafter, the Special Masters shall submit a comprehensive report advising the Court of the implementation status of each component of the Plan and any non-compliance or concerns regarding whether completion deadlines will be met. The parties shall have 14 days to comment on any periodic report and the Court will schedule a conference to review progress and impediments to completion and compliance if needed.

B.  Monitoring of progress and compliance with Court's Remedial Order(s) shall continue until further Order of this Court.

C.  The Special masters shall continue to have access to LSP, class members, and records and documents during the monitoring period under the terms set forth above.

## VI.  FEES AND COSTS

All costs associated with the work and reporting of the Special Masters shall be paid by the Defendants.

4

As the prevailing parties, Plaintiffs are directed to file a Motion to Award Attorneys' Fees and Costs within 30 days of this Order. Oppositions, if any shall be filed by the Defendants within 14 days thereafter.

Plaintiffs may file Supplemental Motions for Attorneys' Fees and Costs during the implementation and monitoring period, but in any event, no more frequently than 90-day intervals. Oppositions, if any, to Motions for Supplemental fees and Costs shall be filed within 14 days of the filing of the Motion.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

23-30825.30665

# TAB 5

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., ET AL.                        CIVIL DOCKET

VERSUS                                           15-318-SDD-RLB

BURL CAIN, ET AL.

### JUDGMENT

For the written reasons assigned:

Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against Defendants, the current Warden of the Louisiana State Penitentiary, et al. This matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

# TAB 6

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., ET AL.                                    CIVIL ACTION

VERSUS                                                        15-318-SDD-RLB

BURL CAIN, ET AL.

## **RULING**

This matter is before the Court on the *Motion for Class Certification*[1] filed Plaintiffs,

Joseph Lewis, Jr., Kentrell Parker, Farrell Sampier, Reginald George, John Tonubbee,

Otto Barrera, Clyde Carter, Edward Giovanni, Ricky D. Davis, Lionel Tolbert, and Rufus

White ("Plaintiffs").[2]  Defendants, Louisiana Department of Public Safety and Corrections

("DOC"), Darrel Vannoy, in his official capacity as Warden of the Louisiana State

Penitentiary ("LSP" or "Angola"), Stephanie LaMartiniere, in her official capacity as

Assistant Warden of LSP, James M. Leblanc, in  his official capacity as Secretary of DOC,

Raman Singh, M.D., in his official capacity as Medical Director for DOC, Stacye Falgout,

in her official capacity as the Chief Nursing Officer for DOC, Randy Lavespere, M.D., in

his official capacity as the Medical Director for LSP, Sherwood Poret, RN, in his official

capacity as the Director of Nursing for the LSP, and Cynthia Park, ACNP, in her official

capacity as an Acute Care Nurse Practitioner at LSP (jointly "Defendants"), have filed an

*Opposition*[3] to this motion, to which Plaintiffs filed a *Reply*.[4]   The Court held a class

---

[1] Rec. Doc. No. 133; *Supporting Memorandum*, Rec. Doc. No. 140.
[2] Plaintiff Cedric Evans was terminated on June 21, 2016.
[3] Rec. Doc. No. 174.
[4] Rec. Doc. No. 187.
43681

23-30825.17733

certification hearing on November 2, 2017, where the Parties presented argument and evidence regarding class certification.[5]  Subsequently, the Parties were allowed to submit post-hearing briefs for the Court's consideration.[6]  For the following reasons, Plaintiffs' motion shall be granted.

## I.      BACKGROUND AND PARTIES' ARGUMENTS

This suit is brought by several inmates incarcerated at the Louisiana State Penitentiary ("LSP").  Plaintiffs claim that the medical care provided at LSP violates the Eighth Amendment prohibition of cruel and unusual punishment.  Plaintiffs also claim that the medical treatment of disabled inmates at LSP violates the Americans with Disabilities Act ("ADA")[7] and the Rehabilitation Act ("RA").[8]

Plaintiffs seek to represent a class of all prisoners who are now, or will in the future, be confined at LSP (the "Class"), as well as an ADA Subclass of inmates with disabilities who are now, or will in the future, be confined at LSP (the "ADA Subclass").[9]  Plaintiffs request injunctive relief to abate the alleged systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.[10]

The Defendants oppose Plaintiffs' *Motion for Class Certification* arguing that both the proposed Class and ADA Subclass are not entitled to class-wide injunctive relief under Rule 23(b)(2) because: (1) the class members have not "been harmed in essentially

---

[5] Rec. Doc. No. 375.
[6] *See* Rec. Doc. Nos. 377 & 378.
[7] 42 U.S.C. § 12101, *et seq.*
[8] 29 U.S.C. § 701.
[9] Rec. Doc. No. 140 at 2.
[10] *Id.*
43681

23-30825.17734

the same way," and (2) a single injunction could not "provide relief to each member of the class."[11]

In addition, Defendants assert that, even if the ADA Subclass meets the requirements of FRCP 23(a) and (b)(2), the ADA Subclass of individuals have failed to meet the Prison Litigation Reform Act's ("PLRA")[12] exhaustion requirement. Thus, Defendants argue that the ADA Subclass - regardless of meeting the class certification requirements - cannot bring legal action until administrative remedies are exhausted.

## II.    STANDING AND THE PLRA EXHAUSTION REQUIREMENT

Only after the Court has determined if the Named Plaintiffs have standing may it consider whether they have representative capacity to assert the rights of others.  Indeed, the Fifth Circuit holds that "[s]tanding is an inherent prerequisite to the class certification inquiry."[13]  Defendants contend that several Named Plaintiffs lack standing to represent a class because their claims are moot for various reasons.  Named Plaintiffs Joseph Lewis, Jr., Edward Giovanni, Shannon Hurd, and Alton Batiste are now deceased.  Cedric Evans has been released from DOC custody, and Alton Adams is no longer at LSP.[14] Defendants also argue that Named Plaintiffs Kentrell Parker ("Parker") and Farrell Sampier ("Sampier") have failed to exhaust administrative remedies prior to filing suit as required by the PLRA.

---

[11] Rec. Doc. No. 174.
[12] 42 U.S.C. § 1997e(a).
[13] *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).
[14] Plaintiffs dispute whether Alton Adams is still a Named Plaintiff:  "Plaintiffs dispute whether Defendants' decision to transfer Mr. Adams to a different prison, transfer him back to LSP, and transfer him out again moots his claim." Rec. Doc. No. 222, p. 2 (citing Rec. Doc. 201-3 at 2-3).  Nevertheless, the Court cannot consider his ARP as it was filed after the filing of the *Complaint* on May 20, 2015.
43681

23-30825.17735

The PLRA mandates that "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted."[15]  The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes."[16]  The Supreme Court made clear that exhaustion is now mandatory.[17]  The Fifth Circuit has held that the available administrative remedy must be pursued to its conclusion.[18]  In *Gates v. Cook*, the Fifth Circuit held that exhaustion of remedies by one named representative plaintiff is sufficient to satisfy the requirement for the class.[19]

Defendants contend that, as of May 20, 2015, the date suit was filed, no Named Plaintiff had exhausted his administrative remedies as to the following claims:  (1) the use of a co-pay system; (2) malingering; (3) adequacy of the medical records; and (4) ADA facilities.[20]  Defendants argue that two of these do not relate to current Named Plaintiffs and are therefore irrelevant, and the remaining two do not raise ADA facilities claims. Defendants maintain that the grievances of Parker and Sampier do not raise a complaint regarding the inadequacy of the facility structures themselves or any structural barriers preventing them from accessing medical care or other LSP programs.

---

[15] *Supra* n. 12.

[16] *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

[17] *Id.* at 524, 122 S.Ct. 983.

[18] *Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir. 2001).

[19] 376 F.3d 323, 330 (5th Cir. 2004)(citing *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498–99 (5th Cir.1968) (exhaustion of remedies requirement satisfied for class action if named plaintiff representing class exhausted remedies); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1776 (2d ed. 1986) ("[W]hen prospective relief is the primary remedy being sought, a representative who has exhausted his administrative remedies may bring a class suit on behalf of those who have not done so.").

[20] Rec. Doc. No. 378, p. 4.

43681

23-30825.17736

Plaintiffs claim that, before filing suit, Named Plaintiffs filed and exhausted at least twenty-eight (28) Administrative Remedy Procedure grievances ("ARPs") regarding medical care and at least eight (8) specifically relating to an individual's disability. Plaintiffs contend that the burden of establishing failure to exhaust administrative remedies is on the Defendants. Indeed, the Fifth Circuit has held that, "[f]ailure to exhaust is an affirmative defense, such that the defendants have the burden of demonstrating that [plaintiff] failed to exhaust administrative remedies."[21] Plaintiffs further contend that the Defendants have failed to carry this burden as to the General Class and ADA Subclass based at least on the allegations set forth in the ARPs submitted by Parker, Sampier, and Davis.

As to the General Class, Defendants argue that no claims have been exhausted regarding the issue of co-pays or malingering.[22] This is incorrect. In the ARPs filed by Clyde Carter ("Carter"), he clearly complains about being charged a $6.00 co-pay although he allegedly received no medical treatment.[23] Further, in the same ARP, Carter complains that he was "locked up" "just for trying to get some kind of medical assistance"[24] and requests relief that "no kind of retaliation be taken against me for the fling of this Administrative Remedy."[25] This ARP was exhausted on June 30, 2014, well before the filing of this action. This establishes that administrative remedies have been exhausted as to claims of malingering and co-pays.

---

[21] *Wilson v. Epps*, 776 F.3d 296, 299, 5th Cir. 2015)(citing *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)).
[22] Defendants do not appear to challenge the exhaustion of other complaints of the General Glass.
[23] Rec. Doc. No. 261-6, p. 6, 9-10.
[24] *Id.* at p. 9.
[25] *Id.* at p. 10.
43681

23-30825.17737

As to the ADA Subclass, Parker's ARP includes the following summarization of his complaint: "COMPLAINS THAT THE TREATMENT CENTER IS NOT SUITABLE [sic] STAFFED OR EQUIPPED TO ACCOMMODATE QUADRIPLEGIC PATIENTS SUCH AS HIMSELF."[26]  Sampier's ARP complains of several inadequacies in medical care and ultimately requests the following relief:  "Complainant seek [sic] to be released to a medical facility that is equipped to adequately handle the basic and serious medical needs required for a quadriplegic."[27]  The record reflects that both grievances were investigated, denied, appealed, and denied again.  Carter also exhausted an ARP complaining about not being able to walk on "the uneven grounds" at LSP due to his knee disability.[28]  The ARP of Ricky Davis complains of the failure of LSP to transfer him to the hospital for surgery in a handicap accessible transport vehicle.[29]  It is undisputed that this claim was exhausted on April 1, 2015, prior to filing suit.

Plaintiffs cite to this Court's recent decision in *Hacker v. Cain*,[30] which involved an inmate's Eighth Amendment and ADA/RA claims regarding treatment of his cataracts. Much like the present case, the defendants claimed the plaintiff's administrative remedies were not exhausted because he failed to specifically request a particular accommodation. The Court denied the defendants' argument, finding as follows:

> Defendants' second argument in favor of summary judgment as to this claim—Plaintiff failed to properly exhaust his remedies, as the PLRA requires, by not specifically requesting an accommodation (beyond cataracts surgery) pursuant to the ADA/RA in his ARP—is oversold. Per the

---

[26] Rec. Doc. No. 359, p. 26.
[27] Rec. Doc. No. 359-1, pp. 1-2.
[28] Rec. Doc. No. 187-8, p. 3.
[29] Rec. Doc. No. 359 at 42-53.
[30] No. 3:14-00063-JWD-EWD, 2016 WL 3167176 (M.D. La. June 6, 2016).
43681

PLRA, "a grievance complaint must provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." It need not "give adequate notice of all claims or potential defendants." Rather, an ARP must do no more than "address the same inappropriate behavior by ... [Defendants] that is addressed in the" later filed suit. Plaintiff's ARP, as well as his medical record, leave no doubt as to the nature of his complaint: his worsening eyesight and approaching blindness. While he may have specifically asked for surgery, no reasonable reader could be confused about the underlying medical problem; indeed, LSP and LDPSC specifically define "cataracts surgery" as "medically necessary." With enough evidence available to validate this inference, a reasonable jury could readily reach the pivotal subsidiary conclusion that Defendants **were on notice of Plaintiff's need for an accommodation**, as his declining vision necessarily rendered him unable to perform the work of an inmate whose vision was unimpaired. **The PLRA requires no more than such holistic and general notice, one which Plaintiff's ARP sufficiently provided**.[31]

Relying on *Hacker*, Plaintiffs maintain that, at least Parker's, Sampier's, and Davis' ARPs "provided Defendants with both specific and 'holistic and general' notice that LSP's facilities were not equipped to accommodate inmates with disabilities."[32]

Plaintiffs also cite the Fifth Circuit's decision in *Johnson v. Johnson*,[33] holding that:

In deciding how much detail is required in a given case, we believe that a court must interpret the exhaustion requirement in light of its purposes, which include the goal of giving officials "time and opportunity to address complaints internally," *Porter v. Nussle*, 534 U.S. 516, 525, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Thus, a grievance should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit.[34]

The *Johnson* court also quoted a federal rules decision from the Northern District of Illinois holding that "inmates complaining about various aspects of the conditions in their housing

---

[31] *Id.* at *18 (internal citations omitted)(emphasis added).
[32] Rec. Doc. No. 377, p. 12, quoting *Hacker* at *19. Plaintiff contend that a number of other Plaintiffs exhausted claims on these issues; however, many of these were not filed or exhausted until after May 20, 2015.
[33] 385 F.3d 503 (5th Cir. 2004).
[34] *Id.* at 516-17.
43681

unit need only grieve their placement in that unit, not each of the various alleged unconstitutional conditions present in the unit; '[o]therwise the defendants could obstruct legal remedies to unconstitutional actions by subdividing the grievances....')."[35]

Additionally, the Supreme Court has held that "extra-statutory limitations on a prisoner's capacity to sue" generally excuse any lack of detail in named plaintiffs' grievances.[36]  In this context, it is important to note that Defendants do not allow multiple complaints in a single grievance.[37]  Plaintiffs contend the Defendants exhaustion requirements necessitate little specificity, multiple complaints are not allowed in a single grievance, and inmates are barred from filing more than one grievance at a time.[38]  Thus, following Supreme Court precedent, Plaintiffs argue that any lack of detail in the Named Plaintiffs' grievances is excused due to these extra-statutory limitations on [Plaintiffs'] capacity to sue.

Plaintiffs also argue that Defendants read the PLRA's exhaustion requirement too broadly as Defendants appear to argue that each of the subdivided claims must be individually exhausted by one of the Named Plaintiffs.  Plaintiffs maintain that many of these subdivided claims may be exhausted by a single grievance.  Thus, Plaintiffs contend that violations of the ADA/RA for non-compliance by the facilities housing and treating inmates and violations of the ADA/RA relating to the medical care and treatment provided (or not provided) to inmates with disabilities may both be exhausted by a single grievance claiming any violation of the ADA/RA with sufficient facts to place LSP on notice

---

[35] *Id.* at 521 (quoting *Lewis v. Washington*, 197 F.R.D. 611, 614 (N.D.Ill.2000)).
[36] *Ross v. Blake*, 136 S.Ct. 1850, 1857 n. 1 (2016).
[37] Rec. Doc. No. 187, Exhibit B at 6.
[38] Rec. Doc. No. 180, p. 5.
43681

of the problem(s).  Further, because Defendants' procedure requires little specificity and prohibits inmates from including multiple complaints in a single grievance, the standard for a sufficient ARP is low.

Considering the above, the Court finds that Parker's, Sampier's, and Davis' ARPs put the Defendants on notice that they were complaining about LSP's failure to accommodate inmates with disabilities in treatment, medical care, and access to handicap accessible transportation, facilities, and medical equipment.  The grievances provided Defendants with a fair opportunity to address the problems that would later form the basis of the lawsuit, and it is meritless to argue that these ARPs failed to provide notice to Defendants that violations of the ADA/RA were implicated.

Moreover, the Court finds it disingenuous to now argue an exhaustion defense when the Defendants' Rule 30(b)(6) designated representative Trish Foster testified, under oath and on the record, that the claims of the Named Plaintiffs, at that time, were exhausted:

> Q:  She can have it in front of her or she can answer maybe if there are any unresolved ARPs of any of the plaintiffs outstanding.
>
> A:  I know there is none that – I know everybody has went through both steps.  I did check that.  Everybody has completed and exhausted their ARPs.
>
>          * * *
>
> Q:  Was there any grievance in the plaintiffs that had not been exhausted that you recall?
>
> A:  No.  They have all went through the first and second step.[39]

---

[39] Rec. Doc. No. 180-1, p. 27, lines 9-16, 23-25 through p. 28, line 1.
43681

This testimony was given before the *Complaint* was amended, but Plaintiffs Parker, Sampier, and Davis were Named Plaintiffs at the time of this testimony.  Parker later submitted a *Declaration* stating that "though she testified in her deposition that all of the Plaintiffs had exhausted the ARPs for their claims in the Complaint, she has come to the realization sometime after giving her deposition that this statement is not true."[40] Nevertheless, the Fifth Circuit has held that a party cannot defeat a summary judgment motion "using an affidavit that impeaches, without explanation, sworn testimony."[41] Considering that Defendants have an obligation "to prepare [their] designee to give binding answers" and "cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition,"[42] the Court finds that Defendants are bound by this sworn statement as to the Named Plaintiffs at the time of the deposition.

Accordingly, the Court finds that at least one Named Plaintiff has exhausted administrative remedies and has standing to represent the ADA Subclass.  Further, at least one Named Plaintiff has standing to represent the General Class for the Eighth Amendment claim on the theories advanced.

## III.    CLASS CERTIFICATION UNDER RULE 23

Class action is the exception to the usual rule that litigation is conducted by and on behalf of individual named parties only.[43]  The requirements for class certification are

---

[40] Rec. Doc. No. 198-2.
[41] *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).  The Court acknowledges that this is not a motion for summary judgment but finds that the principle applies equally under the circumstances.
[42] *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, No. 06-cv-271, 2007 WL 4410370, at *8 (N.D. Tex. Dec. 14, 2007).
[43] *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (internal citation omitted).
43681

23-30825.17742

governed by Rule 23 of Federal Rules of Civil Procedure.  To obtain class certification, parties must satisfy Rule 23(a)'s four prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of that class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Assuming the proposed class satisfies the requirements of Rule 23(a), Plaintiffs must also establish the requirements of Rule 23(b)(1), (2), or (3).[44]  Plaintiffs seek class certification under Rule 23(b)(2), which permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole."[45]  Plaintiffs, as the party seeking class certification, bear the burden of demonstrating that the requirements of Rule 23 have been met.[46]  "Rule 23 does not set forth a mere pleading standard."[47]

It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class."[48]  Generally, "a district court has broad discretion when deciding a motion for class certification."[49]  Before concluding that a class has satisfied the requirements of Rule 23(a), an analysis will "[f]requently … entail some overlap with the merits of the plaintiff's underlying claim."[50]   The Fifth Circuit has

---

[44] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).
[45] Fed. R. Civ. P. 23(b)(2).
[46] *Ibe*, 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F. 3d 732, 737-38 (5th Cir. 2003)).
[47] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 2551 (2011).
[48] *Perry*, 675 F.3d at 837 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).
[49] *Dockery v. Fischer*, No. 13-cv-326, 2015 WL 5737608 at *7 (S.D. Miss. Sept. 29, 2015) (citing *Allison v. Citgo Petroluem Corp.*, 151 F.3d 402, 408 (5th Cir.1998)).
[50] *Wal-Mart*, 564 U.S. at 351.

43681

traditionally construed this directive to require a district court to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."[51]

However, Rule 23 does not require Plaintiffs to show that questions common to the class "will be answered, on the merits, in favor of the class."[52] "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[53]

### Class Certification of the Class and ADA Subclass

#### *Numerosity*

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." The numerosity requirement "requires examination of the specific facts of each case and imposes no absolute limitations."[54] However, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable."[55] In addition, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim."[56] Relevance of the numerosity requirement to class certification may in

---

[51] *Perry*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc.*, 320 F.3d 545, 548 (5th Cir. 2007)(internal quotations omitted)).

[52] *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459, 133 S. Ct. 1184, 1191 (2013)).

[53] *Amgen*, 568 U.S. at 466, 133 S. Ct. at 1194-95.

[54] *Dockery*, 2015 WL 5737608 at *8 (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 329, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)).

[55] *Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013)).

[56] *Dockery*, 2015 WL 5737608 at *8 (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).

43681

appropriate cases be less significant where classwide discrimination has been alleged. In addition, the fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members.  Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification.[57]

Plaintiffs' proposed Class consists of approximately 6400 incarcerated individuals.[58]  While the number of members in Plaintiffs' proposed ADA Subclass is not exact, Plaintiffs estimate that hundreds of inmates at LSP have mobility, visual, cognitive, or other medical impairments.[59]  To further support that the ADA Subclass satisfies the numerosity requirement, Plaintiffs cite a 2014 statistic demonstrating that 14.4% of non-institutionalized males in Louisiana reported a disability.[60]  Applying this rate to LSP's amount of inmates, Plaintiffs estimate that the ADA Subclass would consist of 900 members with disabilities.[61]  Defendants have conceded that numerosity is established in this case:  "Defendants do not contest that Plaintiffs have satisfied the numerosity required in order for them to establish the purported Class and purported ADA Subclass *as that class and subclass have been identified by Plaintiffs*."[62]  Therefore, the Court finds that the numerosity requirement is satisfied.

---

[57] *Braggs v. Dunn*, 318 F.R.D. 653, 661 (M.D. Ala. 2017).
[58] Doc. 140 at 15.
[59] *Id.*
[60] *Id.* (discussing Doc. 133-42).
[61] *Id.*
[62] Rec. Doc. No. 174, p. 8 (emphasis original).
43681

*Commonality & Typicality*[63]

The Supreme Court, in *Wal-Mart Stores, Inc. v. Dukes*, further defined the contours of the "rigorous analysis" required by Rule 23.[64]  Under *Wal-Mart*, "[w]hat matters to class certification…is not the raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."[65]

The *Wal-Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2) demanding more than the presentation of questions that are common to the class "because any competently crafted class complaint literally raises common questions."[66] Furthermore, members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant.[67]  Thus, as evident in *Perry*, the commonality test requires more than establishing that there is "at least one issue whose resolution *will affect all or a significant number* of the putative class members."[68]

In order to satisfy commonality under *Wal-Mart*, the claims of every class member must "depend upon a common contention … that is capable of class wide resolution," meaning that the contention is "of such a nature … that determination of its truth or falsity

---

[63] The Parties agreed at the hearing that the same evidence supports the requirements of commonality and typicality, and the Court need not consider them separately.
[64] *Perry*, 675 F.3d at 837 (citing *Wal-Mart*, 131 S.Ct. at 2551-52).
[65] 131 S.Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.REV. 97, 132 (2009)) (emphasis original).
[66] 131 S.Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L.REV. at 131-32).
[67] *Id.*
[68] 675 F.3d at 840 (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993)) (original emphasis) (internal quotation marks and citation omitted).
43681

23-30825.17746

will resolve an issue that is central to the validity of each of the claims in one stroke."[69] Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury."[70] Yet, the Fifth Circuit has clarified that "this contention need not relate specifically to the damages component of the class members' claims. Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'"[71]

As to typicality, "Rule 23(a) requires that the named representatives' claims be typical of those of the class."[72] Prior to *Wal-Mart*, the typicality test was "not demanding."[73] The extent to which *Wal-Mart* changed the threshold for typicality in unclear. The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."[74] As the Fifth Circuit has described it, "typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim....Typicality requires showing that, in fact, the proposed representatives have that claim."[75] The claims of all class members need not be identical.[76] However, typicality demands that claims "arise from a similar course of conduct and share the same legal theory."[77]

---

[69] 131 S.Ct. at 2551.
[70] *Id.* (quoting *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364).
[71] *Cole v. Livingston*, No. 14-698, 2016 WL3258345 (S.D. Tex. June 14, 2016).
[72] *Lanbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).
[73] *Cole*, 2016 WL 3258345 at *8, (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).
[74] 131 S.Ct. at 2551 n.5.
[75] *M.D. v. Perry*, 297 F.R.D. 7, 29 (S.D. Tex. 2013).
[76] *Cole*, 2016 WL3258345 at *8 (citing *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001)).
[77] *Id.*
43681

Plaintiffs claim that Defendants have failed in their constitutional obligations by subjecting the Class and ADA Subclass members to unreasonable risks of harm.[78] Failure to act can also constitute a policy or practice.[79] To prove an Eighth Amendment violation, Plaintiffs will need to prove that Defendants were deliberately indifferent to the risk posed to LSP's inmates.[80]

The conceptual gap between an individual person's Eighth Amendment claim and "the existence of a class of persons who have suffered the same injury," must be abridged by significant proof that Defendants operated under a general policy that subjected all inmates to unreasonable risks of serious harm.[81] Such proof appears to be present here. Defendants admit that "policies and procedures regarding medical care apply across the board to all prisoners."[82] Additionally, Plaintiffs have offered a wide variety of evidence alleging systemic deficiencies within Defendants' medical healthcare policies and procedures. Such allegations, if found to be true, subject all inmates to unreasonable risks of serious harm.

To determine whether Plaintiffs present "common questions of law and fact, a court must trace the class claims and conclude that the common questions, and answers, will resolve them without the need for additional extensive individualized inquiry."[83] Plaintiffs' common questions regarding the General Class include:

(a) whether the medical system at Angola increases inmates' risk of serious harm; (b) whether Defendants were aware that their system at Angola

---

[78] Doc. 140 at 2.
[79] *Dockery v. Fischer*, 2015 WL 5737608 at *8-13.
[80] *Cole*, 2016 WL3258345 at *7.
[81] *Wal-Mart*, 131 S.Ct at 2553-2554 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740).
[82] Doc. 140 at 14.
[83] *Dockery*, 2015 WL 5737608 at *11.
43681

increases inmates' risk of serious harm; (c) whether the staffing levels at Angola are adequate to provide constitutionally sufficient medical care; (d) whether correctional staff perform medical functions that are inappropriate given their limited training and lack of licensure; (e) whether the DOC applies its "medically necessary" policy in a way that impedes Class members' ability to receive timely diagnosis and treatment; (f) whether Defendants' malingering and co-pay policies impede Class members' ability to receive timely diagnosis and treatment; and (g) what remedial measures are appropriate to mitigate the deficiencies in Defendants' practices.[84]

Similarly, the Named Plaintiffs of the ADA Subclass claim Defendants have failed in their obligations to inmates with disabilities to comply with the RA, the Uniform Federal Accessibility Standards, and the ADA and its implementing regulations.[85] Plaintiffs' common questions as to whether LSP meets its obligations under the ADA and RA include:

(a) whether LSP has architectural barriers that make its programs, services, and activities inaccessible to inmates with disabilities; (b) whether Defendants' policies discriminate against individuals with disabilities; (c) whether Defendants ensure that every program, service, or activity offered to inmates is readily accessible to and usable by individuals with disabilities; (d) whether Defendants adequately take disabilities into account in the disciplinary process; (e) whether Defendants adequately provide access to jobs for inmates with disabilities; (f) whether Defendants adequately identify, track, and provide the accommodations that inmates with disabilities require; (g) whether Defendants provide accessible transportation to transport inmates with disabilities within the prison and outside the prison; and (h) hat remedial measures are appropriate to mitigate the deficiencies in Defendants' practices.[86]

Defendants argue that Plaintiffs fail to meet the commonality and typicality requirements because the Class and ADA Subclass members have not suffered the same injury.[87] However, the existence of factual variations within a proposed class does not

---

[84] Doc. 140 at 16.
[85] Doc. 140 at 10.
[86] *Id.* at 17.
[87] Doc. 174 at 8.
43681

necessarily destroy commonality.[88] The commonality requirement is satisfied, as long as the Class's common questions are "dispositive of their claim and the claim arises out of a single course of conduct and on a single theory of liability."[89]

The Named Plaintiffs of the Class claim that Defendants violated their Eighth Amendment rights.  The claim arises out of Defendants' alleged failure to provide a minimally adequate medical system that does not subject prisoners to a "substantial risk of serious harm," by knowingly providing care that falls below the constitutional minimum.[90]  Thus, the Class's common questions of law and fact establish commonality.

While Defendants assert that the individually Named Plaintiffs' disabilities and alleged denied accommodations are different, the basis of liability Plaintiffs assert is not the denial of the accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners are appropriately accommodated.  Furthermore, "[c]ourts regularly certify classes of inmates who are disabled, even if they do not have the same disability."[91]

In addition, the Defendants fail to negate the injury at the center of the Class's claims:  the exposure to an unreasonable risk of serious harm.  It seems unlikely that any two inmates would have the exact same exposure to a substantial risk of serious harm, but this should not destroy commonality.  The evidence presented by Plaintiffs calls into serious question the adequacy of LSP's healthcare and medical policies, as applied in practice, in reducing the health risk of inmates, and particularly for those inmates that are

---

[88] *Dockery*, 2015 WL 5737608 at *11.
[89] *Id.* (internal citations omitted).
[90] Doc. 140 at 2.
[91] *Cole*, 2016 WL 3258345 at *6 (citing *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015)).
43681

disabled.  Plaintiffs offer common complaints that Defendants' policies pose a substantial risk of serious harm to the health of all inmates and argue Defendants have been deliberately indifferent to this risk.

At the certification hearing, Plaintiffs' expert, Dr. Michael Puisis, was accepted by the Court as an expert in correctional medicine without opposition from the Defendants.[92] In their post-hearing brief, Defendants make much of the fact that nurse practitioner Madeleine LaMarre ("LaMarre") and Dr. Suzi Vassallo ("Vassallo") contributed to the report submitted by Dr. Puisis, arguing that, to the extent Dr. Puisis relied on findings by LaMarre and Vassallo, those opinions or findings should be "discarded."[93]  However, Dr. Puisis' hearing testimony clearly undermines any suggestion that he adopted the opinions of others without being personally involved with the investigation of LSP and his ultimate findings.  Dr. Puisis testified as follows:

> I worked with two colleagues, Maddy Lamar, who is a nurse practitioner, and Suzie Vassallo, who is an emergency room physician.  We reviewed multiple documents.  And I should add that each of us looked at a particular area of specialty.  We did some things in common.  We took a tour of the facility, and we also made individual observations of certain practices.  I believe both Maddy and I, maybe Suzie did as well, watched medication administration of one of the units.  We got up at four in the morning and went to sick call, accompanied the medics on sick call so we could actually see how they do it.  I toured all the units, all the clinics on campus, and Suzie went to the ATU and observed directly the process of the delivery of care in that emergency area.

> Maddy went to the pharmacy and observed the inside of the pharmacy, and she observed nursing medication as well.  So we did a fair amount of observation that supported our findings.  And in addition to that, we interviewed a number of key staff.  We talked to multiple inmates.  And we reviewed multiple records.  And in the review of the records, it's important to note that we reviewed a large span of time for each record. So while we may have reviewed 40-some records, and actually we reviewed more than

---

[92] *See* Transcript, Rec. Doc. No. 373, p. 37
[93] Rec. Doc. No. 378, p. 11.
43681

that if you include the named plaintiffs and other chronic care records that were reviewed that are not included in the report, we reviewed multiple episodes of care. So if we reviewed 40 records, we may have reviewed thousands of episodes of care within the span of that grouping. And the evidence for that is in our report, which is included as appendices. So the combination of that resulted in our report.[94]

It is clear to the Court that Dr. Puisis was a substantial participant in the investigation which yielded his conclusions. Further, nothing prohibits an expert relying on a research team to collect data and conduct research upon which the expert can base his ultimate findings and conclusions.[95]

Next, Defendants argue that very few LSP policies and procedures were actually considered, and no LSP Healthcare Directives were discussed in Plaintiffs' expert report, although evidence established that the Healthcare Manual reviewed by Plaintiffs' experts contained LSP's Directives. The Court finds this a curious argument considering that the Defendants were recently sanctioned[96] for failing to disclose several LSP Directives that were responsive to Plaintiffs' discovery requests. Further, Plaintiffs obtained a copy of the LSP Healthcare Manual - not from the Defendants as requested - but from a public records request, and the Manual did not include all of LSP's current Directives.[97]

The Court finds that sufficient evidence has been presented to establish that the commonality and typicality requirements are met. Warden Darrel Vannoy testified that the prison's policies and procedures regarding medical care apply across the board to all

---

[94] Transcript, Rec. Doc. No. 373, p. 37, lines 18-25 through p. 38, lines 1-21.
[95] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 578, 591 (1993)("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation."
[96] *See* Rec. Doc. No. 388.
[97] *See* Rec. Doc. No. 387, p. 3.
43681

prisoners.[98]  A great deal of evidence was introduced to suggest that understaffing at LSP increases the risk of harm to inmates.  The Fifth Circuit has held that "class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—'with respect to the class,' so long as declaratory or injunctive relief 'settling the legality of the [State's] behavior with respect to the class as a whole is appropriate.'"[99]  Dr. Puisis testified that, "what is eminently evident in Angola is that they lack staffing for sure in nursing and in physicians, and the EMT's are misplaced. In other words, I think they're doing the wrong assignments."[100]  Dr. Puisis also testified that this understaffing was demonstrated by several non-nurses performing nursing duties.  Dr. Puisis stated that inmates were performing nursing duties in the infirmary, inmate orderlies advised that they assist officers in administering medications, and a large number of officers are administering medications to a large number of seriously ill patients.[101]  Thus, in Dr. Puisis' opinion:  "you don't have enough staff if you have to use officers to administer medication."[102]   Additionally, Dr. Puisis was critical of his observation that "diabetics seldom get, diabetics who are taking insulin seldom get the number of blood sugar checks that I think is typical of a diabetic.  And that's a result of lack of access to nurses, I believe."[103]

Dr. Puisis also testified, based on his thirty years of experience and management

---

[98] Rec. Doc. No. 358-3, p. 32.
[99] *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012)(quoting Fed.R.Civ.P. 23(b)(2) 1966 Amendment advisory committee note).
[100] Rec. Doc. No. 373, p. 45, lines 8-11.
[101] *Id.* at p. 45, lines 12-20.
[102] *Id.*
[103] *Id.* at p. 45, lines 21-25 through p. 46, lines 1-2.
43681

of prisons and jails, that "the number of inmates per physician is extremely high at Angola."[104]  Dr. Puisis testified:

> If you look at the numbers and you say one doctor is seeing --responsible for 1600 people, and you review records and you note that when medics are seeing people, both in the ATU and in sick call, there is seldom a physician related evaluation. And you also note that the physicians seldom write histories and physical examinations.  In part, I believe that is due to staffing. In part, I believe it is due to practice, inter-credential. But it became clear to us that under any scenario we could think of, both nursing and physicians midlevels and doctors were deficient.[105]

Dr. Puisis was also critical of the credentialing and training of the Angola physicians.  Dr. Puisis explained that, in a typical practice, physicians are credentialed, meaning that the hiring authority reviews a physician's experience and training and then gives the physician privileges based on the credentials.  Dr. Puisis testified that, in a prison setting, the need for physicians is typically primary care medicine, so physicians should be trained and privileged in either family practice or internal medicine, which typically includes emergency room training.[106]  Yet, at Angola, Dr. Puisis testified that "there really is no credentialing at all that I could tell."[107]  Further problematic, in Dr. Puisis' opinion, "the organization goes out of its way to just hire any physician they can get, because they're desperate for physicians."[108]  Thus, the practice is "that the system approaches the state licensing board to solicit physicians who have problems with their license who are not permitted by the state to otherwise see civilian patients.  But they are permitted to see prisoners."[109]  Dr. Puisis testified that, "the character issues of all five of

---

[104] *Id.* at p. 46, lines 5-6.
[105] *Id.* at p. 46, lines 6-16.
[106] *Id.* at p. 47.
[107] *Id.* at p. 48, lines 6-7.
[108] *Id.*, lines 10-12.  Dr. Puisis testified about a comment in a newspaper article by Dr. Singh, who said the prison just needed to get any doctors because they were desperate.  *Id.*
[109] *Id.*, lines 15-19.
43681

Page 22 of 30

23-30825.17754

the physicians that we looked at [at Angola] had prior state sanctions. And at one point were not permitted to work in the civilian community for a variety of reasons."[110]  Also problematic for Dr. Puisis is that one of the five doctors is an orthopedic doctor who would not be appropriate to provide general medical care in a prison based on the general kinds of conditions presented.  Dr. Puisis posed the question:  "People have diabetes, what is an orthopedic doctor going to do to manage the diabetes?"[111]

Dr. Puisis testified that there is a problem with Angola hiring doctors with insufficient training and potential character issues because those doctors need to be monitored and managed; however, "because everyone is in the same boat, the monitoring will probably not occur, and we did not see evidence of it.  So that's my concern with the credentialing at LSP."[112]

Dr. Puisis was also critical of the use of emergency medical technicians ("EMTs") to provide care for sick calls.  He explained that state regulations typically require EMTs to work under direct supervision of a physician under a set of clearly defined protocols. However, at LSP:

> The way medics are used … is extremely different.  So it's out of the ordinary with respect to their training. So you would not have medics in the community going house to house, for example, when people have complaints about shortness of breath, or a rash, and then making a decision and giving them medication based on an evaluation without a communication with a provider.  And what we noticed on multiple chart reviews was there was no documented communication to a provider, none. And we noticed that repeatedly on hundreds and hundreds of episodes of care.
>
> And so basically the emergency medical technicians are working independently it appears based on the documentation.  And we believe that

---

[110] *Id.* at p. 49, lines 5-8.
[111] *Id.*, lines 13-14.
[112] *Id.* at p. 49, lines 24-25 through p. 50, lines 1-2.

43681

it is out of the scope of their license, and we believe it's a direct impediment to access to care, because the patient in access to care is seeking a professional opinion with respect to their condition, and they're not receiving it. Very few medic evaluations result in a physician evaluation.[113]

This was particularly troubling to Dr. Puisis because:

some of the deaths that we saw were inmates who were repeatedly trying to access care and were being seen by a medic and basically managed by a medic without physician intervention over multiple episodes of care even when they had extremely serious conditions such as shock, or they were about to die, literally, and some of them did within a matter of days.[114]

Plaintiffs also offered evidence that several policies and practices at LSP restrict inmate access to diagnosis and treatment. Dr. Puisis testified about several systemic practices that, in his opinion, contribute to the risk of inadequate medical care and serious harm. In addition to his criticism of understaffing, lack of credentials and proper training, use of EMTs to handle sick calls, and use of inmate orderlies and officers to administer medication, Dr. Puisis also took issue with LSP's policy regarding malingering. Dr. Puisis testified that Angola is one of the only correctional programs in which he has seen this policy. He explains:

Aggravated malingering is actually displayed on the sick call form. It warns the person filling out the form that if you complain and do not have the condition that you state you have, you can be punished. Well, imagine if you're a civilian, and I go to an emergency room with chest pains. I really don't know what I have when I go to the emergency room. I don't know if I have an ulcer, or if I have a heart attack. That's why I go to an emergency room. And yet to expect an inmate to know in advance that they will have or not have a condition, is so beyond the concept of, to me, fairness that it struck me as you could only have this if the leadership agree to it. And, but because any leadership that I'm familiar with would oppose that and get rid of that immediately.

---

[113] *Id.* at pp. 55, lines 9-25 through p. 56, line 1.
[114] *Id.* at p. 56, lines 4-10. Dr. Puisis also testified that the barrier to access was further demonstrated by the fact that, although at a typical correctional facility, approximately 80% of the sick calls would result in a physician or physician assistant consultation, at Angola, his team found "virtually no physician evaluations based on sick call requests." *Id.* at p. 57, lines 2-4.
43681

Another policy troubling to Dr. Puisis is the restriction of access to specialty care. Dr. Puisis testified that, "[w]hen the seriousness of a patient's condition exceeds the ability of a physician at the site to care for the patient, the patient should be referred to a consultant who can properly care for the patient.  That's the kind of backdrop of what specialty care is in a prison."[115]  However, Dr. Puisis testified that Angola utilizes a facility in New Orleans, nearly two hours away, and the system of managing specialty care "makes it extremely difficult to track whether people actually have received their care."[116] Dr. Puisis further testified that there are also numerous problems with the system utilized to refer a patient for offsite care, including timely scheduling, getting "lost" in the system, and timely appointments.[117]  Another problematic discovery regarding specialty care is that patient inmates would report to the specialist without the appropriate relevant testing done beforehand to provide to the specialist.[118]  Dr. Puisis also ascertained that there was "hardly ever"[119] a follow-up with a primary care doctor to discuss what treatment the specialist had recommended.  Dr. Puisis described one incident demonstrating this problem:

> And tragically, in one circumstance a patient was admitted to a hospital and was diagnosed with atrial fibrillation and started on a blood thinner. Because, as you know, blood thinners prevent atrial fibrillation from causing emboli.  And the patient, the patient was not evaluated post-hospitalization with respect to what the recommendations were, so the anti-coagulant was never ordered.  And within ten days the patient died of multiple pulmonary emboli in a cardiac thrombus.[120]

---

[115] *Id.* at pp. 64, lines 23-23 through p. 65, lines 1-2.
[116] *Id.* at p. 65, lines 7-9.
[117] *Id.* at pp. 65-66.
[118] *Id.* at p. 66.
[119] *Id.* at p. 67, lines 8-9.
[120] *Id.*, lines 9-18.

43681

Finally, with respect to specialty care, Dr. Puisis testified that there were many cases of delayed referral for patients who needed referral.  He explained:  "Many of the preventable deaths were people who for months or years had a complaint that required an evaluation which did not occur timely, and result[ed] in either morbidity or mortality."[121]

The Court finds that the evidence clearly satisfies commonality and typicality as the challenged policies and practices pose several common question of fact and law as set forth above.  Because Defendants admit that these policies and practices apply to all inmates, and all inmates will at some point will need some type of medical care while incarcerated, the alleged exposure of the entire Class to these policies is capable of classwide resolution under Rule 23.  Further, the Court finds that there are common resolutions that would answer these common questions across the board.

<u>ADA SubClass</u>

Turning to the ADA Subclass, Plaintiff claim that the policies and practices at LSP present common questions capable of classwide resolution.  Plaintiffs contend that the policies and practices subject to the ADA claims fall into two broad categories:  (1) denial of the benefit of services, programs, or activities on the basis of a disability, and (2) Defendants' use of methods of administration that effect discrimination.[122]

The Supreme Court has held that Title II of the ADA applies to state prison facilities and state prison services.[123] The Supreme Court has also recognized that, "insofar as

---

[121] *Id.*, lines 20-25.
[122] *See* Rec. Doc. No. 377, p. 7.
[123] *See Pennsylvania Dep't of Corrections v. Yeskey*, <u>524 U.S. 206, 210</u>, <u>118 S.Ct. 1952</u>, <u>141 L.Ed.2d 215</u> (1998) (noting that state prisons "fall squarely within the statutory definition of 'public entity'" because the ADA, <u>42 U.S.C. § 12131(1)(B)</u>, defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government").
43681

23-30825.17758

Title II creates a private cause of action against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."[124] The RA applies to recipients of federal funding.[125] Furthermore, when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees as specifically provided by the ADA.[126]

Title II of the ADA, which governs access to "Public Services," states in part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[127]  The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability ... shall solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance .... "[128]  The ADA states that "[t]he remedies, procedures and rights" available under the Rehabilitation Act are also accessible under the ADA.[129]  The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both,"[130] and that "[t]he RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."[131]

---

[124] *United States v. Georgia*, 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006).
[125] *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).
[126] *Id.* at 574–75.
[127] 42 U.S.C. § 12132.
[128] 29 U.S.C. § 794(a).
[129] *Delano–Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting 42 U.S.C. § 12133).
[130] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).
[131] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).
43681

23-30825.17759

Considering the claim regarding access to programs, benefits, and services, Plaintiffs have presented sufficient evidence to certify an ADA Subclass on this issue. Inmate Davis testified about the lack of a handicap accessible van to transport him back to LSP from a hospital following his back surgery and the fact that he was laid face down across the front seat in a rodeo van with staples in his back.[132]  A plethora of physical barriers and inappropriately equipped facilities were found and documented in the Evaluation by Plaintiffs' architectural expert Mark Mazz.[133]  Evidence was presented showing that disabled inmates with a duty status[134] were prohibited from certain programs and activities,[135] were not provided reasonable accommodations, modifications, and medical aids,[136] and were not considered in LSP's evacuation plans or emergency planning.[137]

With regard to methods of administration, Plaintiffs submitted evidence regarding, *inter alia*, the inadequacy of the current LSP ADA Coordinator as required by 28 C.F.R. 35.107(a),[138] the failure to adequately train employees on the implementation of disability policies,[139] placing disabled inmates in "medical dormitories" not equipped for the

---

[132] Rec. Doc. No. 358-5 at 14-16.

[133] Rec. Doc. No. 358-2 at 294-296.

[134] A "duty status" is a written designation assigned by a prison medical doctor indicating an inmate's physical or mental ability to perform hard labor in accordance with his sentence.  Duty statuses are generally assigned by physicians following a medical evaluation, and they are subject to change depending on changes in the medical condition of a particular inmate.  Duty statuses may range from no duty (indicating a need for bed rest), to light duty or regular duty with restrictions, and finally to regular duty without restrictions (indicating the inmate is capable of performing any and all hard labor).  *Armant v. Stalder*, 287 Fed. Appx. 351, 352 n. 1 (5th Cir. 2008).

[135] Rec. Doc. No. 358-4 at 152; Rec. Doc. No. 358-5 at 132, 134; Rec. Doc. No. 358-2 at 294-96; Rec. Doc. No. 358-3 at 2.

[136] Rec. Doc. No. 358-5 at 4-11.

[137] *Id.* at 17-30; Rec. Doc. No. 358-4 at 167-68.

[138] Rec. Doc. No. 358-3 at 2; Rec. Doc. No. 358-5 at 122-23, 127, 130; Rec. Doc. No. 358-6 at 94, 101, 103-104; Rec. Doc. No. 359 at 1.

[139] Rec. Doc. No. 358-4 at 164.

43681

23-30825.17760

disabled,[140] and LSP's alleged failure to provide adequate procedures for requesting accommodations and appealing denials.[141]

Because all of the ADA policies and procedures pose multiple common questions of fact and law and apply across the board to all disabled inmates, the Court finds that certification of the ADA Subclass is appropriate.  Whether Defendants had knowledge of insufficient accommodations for persons with disabilities can be evaluated in "one stroke" for this entire Subclass.[142]  As the District Court for the Northern District of California succinctly stated:  "No individualized inquiry into the experiences of any particular inmate or Plaintiff is necessary. The claims of the inmates with disabilities sub-class also satisfy the commonality requirement: either the Plaintiffs are housed in a facility that comports with the ADA or they are not."[143]

---

[140] *Id.* at 139-140, 142.
[141] Rec. Doc. No. 385-6 at 96-97.
[142] *See Hernandez*, 305 F.R.D. at 157.
[143] *Id.*
43681

Page 29 of 30

## IV.    CONCLUSION[144]

For the reasons set forth above, the Court GRANTS Plaintiffs' *Motion for Class Certification*[145] and appoints all Named Plaintiffs who are still living and currently housed at LSP, and have fully exhausted administrative remedies at the time of the filing of this lawsuit, as class representatives.   The Court designates Plaintiffs' counsel as Class Counsel under Rule 23(g).   The Class and Subclass are defined as follows:  "all inmates who now, or will be in the future, incarcerated at LSP" and "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP."

The Court will set a Scheduling Conference by separate notice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>February 26, 2018</u>.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**


---

[144] The Court notes that the findings herein regarding exhaustion under the PLRA are final and are the "law of the case"; however, the Court makes no definitive findings on the merits, and Plaintiffs will be required to prove the merits of their case at trial.
[145] Rec. Doc. No. 133.
43681

# TAB 7

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA


| | |
|---|---|
| JOSEPH LEWIS, JR., ET AL. | CIVIL DOCKET NO.: 3:15-CV-318 |
| VERSUS | JUDGE: SHELLY DICK |
| BURL CAIN, ET AL. | MAGISTRATE: RICHARD BOURGEOIS |


## <u>OPINION</u>

## I.    GENERAL ALLEGATIONS AND PROCEDURAL BACKGROUND

This suit was originally brought by several inmates incarcerated at the Louisiana State Penitentiary ("LSP").  The LSP at Angola (sometimes referred to as "Angola") is a maximum-security men's prison in Angola, Louisiana that housed between 6200-6400 men throughout the discovery period.[1]  Plaintiffs claim that the medical care provided at LSP violates the Eighth Amendment prohibition of cruel and unusual punishment. Plaintiffs also claim that, through various general practices and policies, LSP systemically violates the rights of disabled inmates covered by the Americans with Disabilities Act ("ADA")[2] and the Rehabilitation Act ("RA").[3]

The Plaintiffs sought to represent a class of all prisoners who are now, or will in the future, be confined at LSP (the "Class"), as well as an ADA Subclass of inmates with

---

[1] Undisputed Facts ("UF") ¶ 1, First Amended Joint Pretrial Order ("JPTO"), Rec. Doc. No. 242-2; PX 6 at 0017; DX 14 at 02876.  The relevant time period in this matter was confined to May 20, 2015 (the date of filing) and September 30, 2016 (the close of the discovery period).
[2] 42 U.S.C. § 12101, *et seq.*
[3] 29 U.S.C. § 701.
Document Number: 52892

disabilities who are now, or will in the future, be confined at LSP (the "ADA Subclass").[4] Plaintiffs seek injunctive relief to abate the alleged systemic deficiencies in Defendants' policies and practices that subject all inmates to unreasonable risks of serious harm.[5]

On February 26, 2018, following a class certification hearing and subsequent briefing by the Parties, the Court certified a class consisting of "all inmates who [are] now, or will be in the future, incarcerated at LSP," and a Subclass of "all qualified individuals with a disability, as defined by the [Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA")], who are now, or will be in the future, incarcerated at LSP."[6] The Class and Subclass are represented by Otto Barrera, Clyde Carter, Ian Cazenave, Ricky Davis, Reginald George, Kentrell Parker, Lionel Tolbert, John Tonubbee and Edward Washington.[7]

This matter came before the Court for an eleven-day non-jury trial on the merits beginning October 9, 2018. The undersigned also made a site visit to LSP on February 5, 2020.[8] The Court has considered the Parties' pre-trial and post-trial submissions, the evidence admitted at trial, and the arguments presented, and the Court finds that Plaintiffs have satisfied their burden of proving that Defendants have been deliberately indifferent to the inmates' serious medical needs in the means and manner of the delivery of health care, in violation of the Eighth Amendment to the United States Constitution. The Court also finds that Plaintiffs have met their burden of establishing, in part, that Defendants

---

[4] Rec. Doc. No. 140 at 2.
[5] *Id.*
[6] Rec. Doc. No. 394.
[7] *Id.* at 1, 30. Farrell Sampier testified at trial, but he passed away in March 2019 after a stroke. Rufus White was released from custody in March 2019.
[8] The Court issued an electronic notice that it found constitutional violations in the delivery of medical care at LSP. At the Parties' request, the Court delayed the issuance of these written reasons to permit the Parties to explore an amicable resolution, which was unsuccessful.

Document Number: 52892

23-30825.22400

violated the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendment Act, and Section 504 of the Rehabilitation Act of 1973.

The Court's credibility findings, findings of fact, and conclusion of law are set forth below pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II.    FINDINGS OF FACT

### A.  Stipulated Facts

The Parties stipulated to the following facts by written submission prior to trial. Stipulated facts that had changed as of the time of trial are noted.

<u>Facts Related to Medical Care</u>

1.    Louisiana State Penitentiary at Angola ("Angola" or "LSP") is a maximum security prison in Angola, Louisiana that currently houses approximately 6400 inmates.

2.    Defendant Louisiana Department of Public Safety and Corrections ("DOC") is a division of the State of Louisiana charged with overseeing the custody and care of inmates in state prisons, including LSP.

3.    Defendant Burl Cain was the Warden of Angola from February 1, 1995 through December 31, 2015. He was succeeded by Defendant Darrel Vannoy, who is currently the Warden of Angola. The Warden's duties include, among other things, assigning people to manage the medical care and then being sure that they do what the policies and procedures say.

4.    Defendant Raman Singh was the Chief Medical and Mental Health Director of the DOC since November 2007, which included managing several departments such as

Document Number: 52892

23-30825.22401

nursing, dental and mental health.[9] Before November 2007, he served as Medical Director of Angola, where his duty was to manage offender healthcare for LSP inmates.[10]

5.  Defendant James LeBlanc is the Secretary of the DOC. In that capacity, he supervises Dr. Singh as well as the rest of the employees of the Department. Although he has authority over the entire Department in a supervisory capacity, he has delegated authority for certain tasks and responsibilities to subordinate employees.

6.  Defendant Stephanie Lamartiniere was the Assistant Warden for Health Services at Angola from June 2013 until sometime in 2016. She was succeeded by Defendant Tracy Falgout, who was the Assistant Warden at the time of trial. The Assistant Warden has operational control over the medical unit at LSP. This includes, among other responsibilities, budgeting, hiring of certain classes of employees, medical records, and any kind of staffing issues.

7.  Defendant Randy Lavespere is the current Medical Director of Angola. This position is responsible for managing, among other things, Angola's doctors, nurses, patients, relationship with headquarters, and relationships with administration.

8.  Defendant Stacye Falgout has been the Chief Nursing Officer for the DOC since October 2011. Prior to that time, she was Assistant Director of Nurses at Angola. She reported to Dr. Singh and is the number two medical employee at DOC headquarters.

9.  Defendant Sherwood Poret has been the Director of Nursing at Angola since January 2013 and was the infection control supervisor before that. He supervises all nurses working at LSP.

---

[9] JX 4-bbb, R. Singh Depo at 9.
[10] As of the date of trial, Dr. Singh had been terminated from this position.
Document Number: 52892

10. LSP's medical staff currently includes five doctors and one nurse practitioner. Each of the doctors on LSP's staff was disciplined by the Louisiana State Board of Medical Examiners prior to being employed at LSP. Each of the doctors on LSP's staff had a restricted license or was restricted to practicing in institutional settings at the time they were hired by LSP. Some LSP medical staff have completed requirements imposed by the Medical Board and are no longer under restriction.

11. LSP mainly provides medical care at R.E. Barrow Treatment Center (often called "REBTC" or the "Treatment Center"), which comprises the Acute Treatment Unit ("ATU"), an infirmary, and seven examination rooms.

12. The infirmary has two units: "Unit 1," which treats acute care patients, and "Unit 2," which treats patients requiring long-term nursing home care and hospice patients.

13. Outside of the infirmary, medication is administered cell side by correctional officers.

14. Outside of the infirmary, inmates can request to see a doctor by submitting "sick call" requests, which are triaged cell side by Emergency Medical Technicians ("EMTs").

<u>Facts Related to ADA Claims</u>

15. At the time this lawsuit was filed, Warden Peabody was the ADA Coordinator at LSP. Warden Peabody became ill sometime before January 1, 2016 and was replaced by Warden Barr in July 2016. Defendant Tracy Falgout succeeded Warden Barr and has been the ADA Coordinator at LSP since September 2016.

16. ADA Coordinators do not receive any formal ADA training upon taking office or on a regular or recurring basis.

17. LSP does not provide braille versions of forms such as sick call requests, Administrative Remedy Procedure forms, or forms to request accommodations.

Document Number: 52892

18. DOC Directive No. 01.016(B) requires LSP to maintain an "ADA Advisory Committee." No such committee existed during the pendency of this lawsuit.

19. LSP Directive 07.004 provides that all "[s]everely handicapped inmates requiring medical care and/or assistance with basic life functions shall be housed at" REBTC or Medical Dorms.

20. LSP Directive # 09.036 prohibits any inmate "requiring a duty status" from utilizing the hobbyshop until such time as the inmate is returned to regular duty without restrictions.

21. Louisiana State Penitentiary and DOC receive some federal funding.

## B.    Court's Findings of Fact

The following findings of fact are supported by the evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

22.    Prior to the trial of this matter, Plaintiffs' medical experts, Dr. Michael Puisis, D.O. (Dr. Puisis) and Nurse Practitioner Madeleine LaMarre, ("NP LaMarre"), conducted a four-day in-person site visit at LSP, and Dr. Susi Vassallo, M.D. ("Dr. Vassallo") conducted a two-day site visit.[11]  NP LaMarre and Dr. Vassallo observed Angola's facilities, interviewed numerous Angola staff members and patients, observed medical care in practice, and reviewed the medical records of 47 patients, in addition to the medical records of the ten named Plaintiffs.[12]

23.    Dr. Puisis was principally responsible for evaluating LSP's chronic care, specialty care, infirmary care, organizational structure, staffing, budget, healthcare operations,

---

[11] Rec Doc. 573 at 16, #29.
[12] *Id.* at
Document Number: 52892

medical records, laboratory, mortality review, and quality improvement.[13] Dr. Vassallo was principally responsible for evaluating emergency care and the work performed by EMTs.[14] NP LaMarre was principally responsible for evaluating access to care, chronic disease management, pharmacy, medication administration, policies and procedures, clinical spaces and sanitation, and health information management.[15]

24.    The Court had the opportunity to evaluate the credibility of Plaintiffs' experts and finds them to be credible.  All three experts testified at trial. Dr. Puisis testified for the better part of three days, and Dr. Vassallo and NP LaMarre each testified for approximately a day.  Dr. Vassallo also provided brief rebuttal testimony after Defendants' case. The Court also had the opportunity to observe and evaluate Dr. Puisis's testimony at the November 2017 class certification hearing.

25.    Prior to the trial of this matter, Plaintiff's architectural accessibility expert Mark Mazz ("Mazz") conducted a site visit to LSP on July 6, 2016 to assess ADA accessibility in specific areas at LSP used by disabled inmates in accessing  programs, services, and activities, as those areas would be subject to Title II and Section 504's programmatic access requirement, without respect to the dates of construction or alteration.[16]  Mazz issued a report of his findings, which was admitted into evidence without objection.[17]

---

[13] Rec. Doc. No. 544, Testimony of Puisis at 101:8-13.
[14] Rec. Doc. No. 547, Testimony of Vassallo at 138:21-25.
[15] Rec. Doc. No. 548, Testimony of LaMarre at 152:12-153:3.
[16] Rec. Doc. No. 546, Testimony of Mark Mazz, at 11:13-19 12:5-15, 14:15-15:22; *see also*, P Exh. 7 at 0009 & 0005.  Mazz was not advised which areas of LSP's facilities were constructed or altered after the Uniform Federal Accessibility Standards went into effect on March 7, 1988, or after the 1991 ADA Standards for Accessible Design went into effect on January 26, 1992.  Rec. Doc. No. 546 at 15:1-7; PX 7 at 0008.
[17] PX 7.
Document Number: 52892

26.    The Court found Mazz's testimony credible, and Defendants' expert Brian Nolan ("Nolan"), who reviewed Mazz's report setting forth the ADA violations findings and photographs, did not controvert or contradict Mazz's report; rather, Nolan opined he could "substantiate the items recorded" in the Mazz report "as being violations of the 1991 and 2010 ADA Standards for Accessible Design."[18]

27.    The Court rejects Defendants' attack on Mazz's methodology and analysis because he applied the 1991 standards to his findings; Mazz reviewed a letter from the DOJ regarding its investigation results and noted that the DOJ's analysis applied the same methodology.[19]   Defendants offered no evidence or testimony to rebut this.

Facts Relating to Medical Care

28.    Generally, the Court concludes that LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs.  This includes a lack of adequate organizational structure, credentialing and peer review processes, health care policies and procedures, clinic space, and a quality control program.  Further, the Court finds the following aspects of inmate access to health care is constitutionally inadequate in the following ways: clinical care, specialty care, infirmary care, and emergency care.  The Court further finds that overwhelming deficiencies in the medical leadership and administration of health care at LSP contributes to these constitutional violations.

---

[18] PX 18.
[19] Rec. Doc. No. 546 at 24:23-25:22; 25:21-26:4; PX 7 at 0008 & 0009.
Document Number: 52892

23-30825.22406

1.    <u>Clinical Care</u>

29.    At LSP, emergency medical technicians ("EMTs") and paramedics are front line staff for screening and treatment of patients with routine (sick call) and urgent health care needs. EMTs conduct sick calls in inmate housing units **without** the patient's medical record, adequate medical equipment, or supplies.  Pursuant to both LSP Policy and applicable Standards of Care, physicians are required to clinically supervise EMTs; yet, this does not meaningfully or consistently occur at LSP.

30.    Clinic exam rooms lack privacy and standardized, typically required, equipment, *i.e.* blood pressure cuffs and glucometers.[20]  Dr. Puisis testified, and the Court observed on its site visit, that the outlying camps at LSP likewise lack standardized supplies.[21]

31.    Medics who see patients cell side lack access to medical records.[22]

32.    There are serious hygiene deficiencies in clinic spaces.  The condition of the clinic exam rooms indicates that the exam rooms are not used for patient examinations. For example, the exam tables are covered with medical records and cannot possibly accommodate a patient exam.[23] Clinic spaces are also cluttered with microwaves, refrigerators, and food items.[24]  Further, there is a lack of usable handwashing facilities in clinic rooms[25]  and a lack of paper covering on exam tables.[26]

33.    LSP physicians routinely fail to identify patient diseases and are focused on episodic complaints rather than the underlying state of disease.[27]  Physicians routinely

---

[20] Rec. <u>Doc. No. 544 at 111</u>:23–112:16; 114:10-24; observed by the Court during its site visit.
[21] *Id.* at 117:8-25.
[22] *Id.*at 116:5-8.
[23] *Id.* at 116:9-22
[24] *Id.* at 118:1-6.
[25] *Id.* at 119:18-120:2; PX 6 at 278.
[26] Rec. <u>Doc. No. 544 at 120</u>:12-18; PX 6 at 274.
[27] Rec. <u>Doc. No. 544 at 126</u>:2-9.
Document Number: 52892

23-30825.22407

fail to adequately obtain information regarding a patient's medical history upon evaluation.[28]  Physicians routinely fail to perform a meaningful physical examination, read and monitor testing, and monitor and manage medications, including educate patients regarding medications.[29]  Further, physicians inappropriately allow medics to triage patients and evaluate health requests.[30]

34.    Dr. Puisis concluded that the consequence of the inadequacy of the clinical care results in an inadequate therapeutic plan, and the associated risk of harm includes increased morbidity, unnecessary hospitalization, and deterioration of disease.[31]

<u>Patient #11</u>[32]

35.    Patient #11 suffers from Crohn's disease and was referred for a colonoscopy. A diagnostic colonoscopy was not performed until six months after the referral.  The colonoscopy findings resulted in a referral to a gastroenterologist, and the specialty consultation was not completed for another three months.

36.    The gastroenterologist recommended additional testing of the intestines which later revealed an abscess, resulting in inpatient emergency treatment to drain the abscess.  Ultimately, this patient required five subsequent surgical interventions and two hospitalizations.

37.    Dr. Pusis concluded that the delay in treatment and the failure to coordinate specialty care resulted in the patient requiring a higher level of treatment.  The failure of

---

[28] *Id.*at 126:21 – 127:9; 153:1-2.
[29] *Id.* at 153:2-10.
[30] Rec. <u>Doc. No. 545 at 108</u>:10-13.
[31] Rec. <u>Doc. No. 544 at 127</u>:10-15.
[32] *Id.* at 133:6-139:9.
Document Number: 52892

23-30825.22408

the coordination of care is evidenced by the fact that the patient was treated by surgeons for almost two years without being managed by a gastroenterologist.

38.     Following stabilization of Patient #11's acute conditions, LSP physicians prescribed Humira, but the patient was started on the wrong dose.  Dr. Puisis concluded that "it is likely that the patient had more episodes of fistula than necessary."[33]

Patient #13[34]

39.     Patient #13 suffers with high blood lipids and peripheral vascular disease and is at risk for stroke.  This patient required Statin drugs to prevent heart disease, yet the stroke review of the patient's record showed no evidence of statin medication administration other than a four-month duration.

40.     On December 17, 2014, Patient #13 had a heart attack, which according to Dr. Puisis was "likely that was preventable."[35]   Plaintiff's heart attack resulted in his hospitalization, and he was followed by a cardiologist who recommended an echocardiogram, which was completed on February 8, 2015. However, there is no evidence in the chart that any LSP provider referred to the echocardiogram and no evidence that the test results were provided to the outside cardiologist.  Thus, lacking any report from the first echocardiogram, the cardiologist ordered a second echocardiogram; meanwhile, Patient #13 had two additional hospitalizations for heart failure.

41.     On March 17, 2015, Patient #13 presented with slurred speech and aphasia (inability to speak), and he was seen by EMTs and sent to the ATU. The only notation by

---

[33] *Id.* at 138:14-15.
[34] *Id.* at 139:10-152:19; JX 10-JJJ.
[35] *Id.* at 141:21.
Document Number: 52892

an LSP provider is: "patient brought in for brief episode of slurred speech and expressive aphasia." No neurological exam was charted.[36] Dr. Puisis testified that:

> Strokes express themselves in terms of a neurological exam. So you have to see if the patient has any motor problem with their arms, legs, whether they have facial paralysis, whether they still have that, whether they can hear, whether their cranial nerves are intact. And that requires a neurological exam, which was not done."[37]

A LSP physician ordered the patient to be seen "this week and [he] needs a CT."[38] However, a CT scan was not completed until 3 months later, revealing that the patient had suffered a stroke.

### 2.  Specialty Care Services

42.    Specialty care is provided at LSP in one of two ways: either a panel of specialists who come to LSP or outside specialists to whom LSP refers patients. Based on the following, the Court finds that inmates at LSP experience unnecessary and harmful delays in the assessment for and receiving of specialty medical care; harmful failure to follow specialty care recommendation; and failure to coordinate care. Referrals of patients for specialty care is untimely. There are systematic and recurring failures by LSP providers to follow-up on specialty care recommendations. There are repeated breakdowns in communication between the specialty care providers and the LSP medical providers. In sum, the timeliness of referrals to specialists, and the coordination of care between specialists and LSP physicians, is seriously flawed and constitutionally inadequate.

---

[36] Rec. Doc. 544 at 145:15-25.
[37] *Id.* at 145:18-23.
[38] *Id.* at 146:4.
Document Number: 52892

23-30825.22410

<u>Patient #5</u>

43.    Patient #5 complained for two years of weight loss and abdominal pain. This patient's abdominal pain worsened to the point that he could not walk, and he developed diarrhea and vomiting. After a two-year delay, he was finally hospitalized, and diagnosed with advanced colon cancer. Surgery was performed after which the patient developed complications and died. Plaintiffs' experts concluded that, "His death was preventable as an earlier diagnosis would have most likely prolonged his life."[39]  Further, this patient was seen on 10/25/14 for a bowel obstruction, a potentially life-threatening issue. The provider who saw this patient did not evaluate the x-ray. This patient required an immediate transfer to the hospital but was not sent, which constitutes a "significant departure from standard of care and placed the patient at risk of harm."[40]  Plaintiffs' experts concluded that this patient medically required hospitalization on 10/27/14, 10/30/14, and 11/1/14, but he was never sent, further delaying his diagnosis.[41]

<u>Patient #17</u>

44.    Patient 17 was a 46- year old man who arrived at LSP in 2006 and died on February 1, 2014 due to pneumonia, lung adenocarcinoma, respiratory failure, and septic shock.

45.    After undergoing chemotherapy for leukemia, this patient developed a suspicious lung nodule identified on a CT scan in May 2012. Two specialists, an oncologist and a pulmonologist, noted possible malignancy and recommended that follow-up diagnostics be performed. However, no follow-up diagnostics were ever received. Patient 17's

---

[39] PX 6 at 0075-76; 0112-117.
[40] *Id.* at 0116, #7.
[41] *Id.* at 0016.
Document Number: 52892

condition worsened through November 2013 at which time he could no longer walk and became wheelchair-bound.[42]

46.     By the time Patient #17 was finally diagnosed in November 2013, he had metastasized cancer.  He died three months later.[43]

Patient #13

47.     Patient #13 was seen by a vascular specialist on November 20, 2013, who recommended a CT angiogram, but the test was not done for ten months.[44]  During this ten months, the patient was not being followed by a vascular surgeon although he was at risk for peripheral vascular disease and had been identified as having the disease.[45]

48.     Patient #13 was hospitalized after having a heart attack on December 17, 2014, and on January 29, 2015, he was seen by an outside cardiologist who recommended an echocardiogram.[46]  The echocardiogram was completed on February 8, but the LSP doctor failed to document that the echocardiogram had been done and failed to chart the findings.   When this patient returned to the cardiologist, the cardiologist did not have the echocardiogram to review or any chart notes of findings, which impaired the cardiologist's ability to provide proper medical care and advice.  The failure to coordinate and document was not an isolated incident. Patient #13 had three follow-up cardiology appointments in which the cardiologist was not provided the echocardiogram to review.[47]

---

[42] PX 6 at 0078, 0086-87, 0193-199.
[43] *Id.*
[44] Rec. Doc. No. 544 at 141:9-11.
[45] *Id.* at 141:12-16.
[46] *Id.* at 141:18-24.
[47] *Id.* at 142:13-23; 157:16-24.
Document Number: 52892

23-30825.22412

<u>Patient #7</u>

49.     The care and treatment of Patient #7 is further evidence of a failure to chart and make appropriate medical notes and demonstrates repeated failures to coordinate care that resulted in harm. Patient #7 was a 58-year old male who had an x-ray in February 2013 which revealed a potential malignancy for which the patient was not referred for a CT scan for three months.[48]  When a CT scan was performed, it revealed a suspicious lesion, and the patient was referred to a pulmonologist.  However, this patient did not see a pulmonologist for approximately four months, which was seven or eight months from the initial abnormal x-ray.  Upon seeing Patient #7, the pulmonologist recommended a biopsy.[49]

50.     At trial, Dr. Puisis emphasized the difference between the pulmonologist's exam notes and those of LSP with respect to this patient:

> So this is a note of the specialist.  Now it's a pulmonologist's note, but I would draw attention to just the presentation of the note itself as an example of how someone should write a note, recognizing that this is a specialist, I grant that, but he's an internist who also is a pulmonologist.  And to a certain extent, the notes at LSP should look more like that than not, and you'll note that there's a history, that there's a physical exam section, and that there's an assessment and recommendations.[50]

When referring to the LSP physician notes on the same patient, Dr. Puisis explained:

> Okay. So this is the [LSP] physician's note after the specialty visit, and this occurred, I believe, a month after the visit, approximately. So that already is a little tardy for a post-specialty visit. Nevertheless, the doctor -- there's no specific history, there's no examination, there's no assessment, but the doctor does write the conditions one, two, three, hypertension, chronic vertigo, and left upper lobe mass. But on the left upper lobe mass, the doctor writes: pulmonary plan equals CT-guided biopsy, question mark, bronc,

---

[48] *Id.* at 158:19-21; JX 10-b.
[49] JX 10-b at 02651-52.
[50] Rec. <u>Doc. No. 544 at 160</u>:25-161:8.
Document Number: 52892

23-30825.22413

question mark. the specialist was not questioning whether the test needed to be done. He had specific recommendations.

My interpretation of this note is that the doctor wasn't sure what the pulmonologist recommended. What should have occurred on this note is the doctor should have documented, reviewed pulmonogist's [sic] note, recommendation for biopsy. And it appears that the doctor wasn't sure what was recommended, and that just verifies to us that the coordination between the specialist and the primary care doctor was poor and, in our opinion, resulted in the delays that occurred.[51]

51. The trial evidence established that Patient #7 was recommended for a biopsy on February 19, 2013, he was seen by a LSP physician in March 2013, and on August 28, 2013 – seven months from the recommendation and one year after the initial x-ray – the patient was seen by the pulmonologist who noted: "the biopsy didn't occur, what gives?", and he recommended another biopsy.[52]  The pulmonologist also noted on that date, "strongly suggest immediate IR [interventional radiology], FNA [fine needle aspiration] of left upper lobe nodule."[53]

52. On September 25, 2013, a biopsy had still not been completed.  The pulmonologist again recommended a biopsy.  Eventually, having never undergone a biopsy, this patient underwent a lobectomy to remove a "portion of the lung that was infested with cancer."[54]

53. This patient was returned to LSP on October 14, 2013 and was first referred to oncology to begin chemotherapy on November 19, 2013; however, records show that chemotherapy was delayed and not scheduled to begin until January 8, 2014.[55]

54. After his return to LSP, the patient made a health care request on November 21

---

[51] *Id.* at 161:19-162:12 (explaining JX 10-b at 02656).
[52] *Id.* at 162:13-21.
[53] JX 10-b at 02601.
[54] Rec. Doc. No. 544 at 164:2-3.
[55] *Id.* at 164:20-24.
Document Number: 52892

23-30825.22414

complaining of tongue and mouth swelling and vomiting. An EMT evaluated and treated these complaints with coal tablets and cough syrup.  Dr. Puisis testified that, given the patient's medical history and return from a lobectomy with chemotherapy to follow, a physician should have seen and evaluated these complaints.[56]  Before Patient #7 began chemotherapy, he died.[57]

Patient #6

55.    Patient #6 was evaluated by an outside cardiologist for hypertension and significant cardiac arrhythmia.  In 2013, the cardiologist ordered an echocardiogram and an event recorder test.[58] The echocardiogram was performed, but the event recorder was not.    As a result, the patient's atrial fibrillation was not treated with necessary anticoagulation.

56.    Two years later, in April 2015, the patient was hospitalized after he developed another episode of atrial fibrillation.   During this hospitalization, the patient was anticoagulated at the hospital.  When the patient returned to LSP, the patient was not evaluated and did not receive recommended anticoagulation for approximately 10 days. Within four days of his return to LSP, this patient developed critical symptoms. Rather than send the patient to a hospital, Defendants ordered a next day follow-up. This patient soon developed signs of serious heart failure. Instead of hospitalizing the patient, he was treated in the infirmary without any diagnostic testing. It took four days in the infirmary

---

[56] *Id.* at 165:7-21.
[57] *Id.* at 159:7-166:3.
[58] Rec. Doc. No. 133-2 at 76; PX 6 at 0076.
Document Number: 52892

before anticoagulation was finally begun, but this patient failed to improve and subsequently died.[59]

57.    Plaintiffs' experts found Patient #6's death was preventable, and it "was caused by lack of recognition of the need for anticoagulation over a two-year period and, finally, a lack of providing ordered anticoagulation medication for 10 days due to lack of review and acting on consultant recommendations."[60]

<u>Patient #10</u>

58.    Lab results for this patient revealed obstructive jaundice that was potentially life-threatening.  A CT scan revealed a mass in the patient's pancreas.  Rather than being sent to the hospital for a biopsy, this patient was kept in the infirmary where he developed a fever.  The patient was ultimately sent to the hospital where he was diagnosed with pancreatic cancer.[61]

59.    Following this diagnosis, Patient #10 was returned to the infirmary where LSP providers "seldom took a history or performed a physical examination, did not coordinate a follow up with an oncologist, and failed to monitor the patient's bilirubin."[62]  LSP providers also failed to review the hospital care or the therapeutic plan established at the hospital, and the patient was discharged from the infirmary and placed back in general population.  LSP subsequently made no effort to coordinate oncology care.[63]

60.    Although this patient was eventually evaluated by an oncologist, the patient had developed an altered mental status and hypotension and refused the ATU doctors'

---

[59] *Id.*
[60] *Id.*
[61] Rec. <u>Doc. No. 133-2 at 77</u>;PX 6 at 0077.
[62] *Id.*
[63] *Id.*

Document Number: 52892

23-30825.22416

recommendations that he seek care. The patient refused care and was transferred to the hospital where he died in the emergency room.[64]

61.     Plaintiffs' experts opined that the LSP providers "showed a lack of concern for this patient and appeared to promote a terminal diagnosis and delay care before the patient had an adequate chance at treatment."[65]

<u>Patient #53</u>

62.     Patient #53, who had previously had a heart valve replacement and chronically sub-therapeutic levels of anticoagulants, was prescribed Tegretol, an anticonvulsant medication. A cardiologist noted the lack of indication for this drug in 2016, but this was never reviewed by LSP physicians, and the patient remained on Tegretol for at least three more months.[66]

<u>Patient #54</u>

63.     Patient #54 experienced numerous delays in receiving specialist care/recommendations between 2013 and 2016.[67] Specifically, ablation of this patient's atrial fibrillation was delayed by over a year due to failures to schedule the patient for procedures, failure to provide echocardiogram results to the cardiologist, and failure to address the cardiologist's recommendations.[68] Following the ablation, LSP providers failed to document the cardiologist's recommendations; thus, this patient was erroneously

---

[64] *Id.*
[65] Rec. <u>Doc. No. 133-2 at 77-78</u>; PX 6 at 0077-78.
[66] PX 410 at 3-4; JX 10-y-1 at 21012; JX 10-y-3 at 21377.
[67] PX 410 at 1-2.
[68] *Id.*
Document Number: 52892

continued on a blood thinner for a year, placing him at significant risk of stroke, hemorrhage, and other side effects.[69]

### Otto Barrera

64.    Otto Barrera testified at the bench trial about significant delays he experienced, since his incarceration at LSP in 2013, in obtaining necessary reconstructive surgeries to repair his jaw, tongue, and teeth, which would require numerous surgeries over five years altogether.[70]   At that time, Barrera was feeding himself through a pec tube and barely able to speak or take his medication due to his injuries.[71]

65.    For the next two years, Barrera was housed on the hospital ward where he had some teeth pulled by the on-site dentist and LSU dental providers.[72]  The LSU maxillofacial providers reiterated their recommendation again in 2015 that he needed reconstructive surgery, but he testified that he was told by the LSP doctor that the surgery would not be approved because it was considered a cosmetic surgery.[73]

66.    In January 2016, LSP Nurse Practitioner Cindy Park admitted that Barrera had been "lost to follow-up" since early 2014.[74]   In September 2016, Barrera had still not received any surgery.[75]

### Joe Lewis

67.    Over a period of 33 months beginning in April 2012, Joe Lewis made numerous sick calls complaining of cough, hoarseness, and losing his voice.  He reported on a

---

[69] *Id.*
[70] Rec. Doc. No. 546, Testimony of Otto Barrera at 207:7-14; *see also* PX 245-b (photographs of Barrera's injuries).
[71] Rec. Doc. No. 546 at 206:1-207:22, 225:5-18, 229:5-19.
[72] *Id.* at 216:18-217:5.
[73] *Id.* at 217:3-219:22; Rec. Doc. No. 547 at 31:10-25.
[74] JX 10-d-2 at 04063.
[75] Rec. Doc. No. 547 at 21:9-11.
Document Number: 52892

February 2014 sick call that he had a family history of cancer; however, he was not referred by LSP to an ENT until November 2014, and he did not see an ENT until January 2015.[76]

<u>Shannon Hurd</u>

68.     Shannon Hurd made several sick call requests for symptoms of renal cell carcinoma between September 2013 and September 2015; yet, he did not receive a CT scan until December 2015, which revealed a large renal mass with multiple nodules. Despite this, LSP physicians failed to follow-up for nearly a month.[77]

3.     <u>Infirmary/In-Patient Care</u>

69.     LSP has two infirmaries, Infirmary 1 and Infirmary 2.  Infirmary 1 is the acute care infirmary for the treatment of patients with urgent or episodic conditions.  Infirmary 2 is the chronic care infirmary for patients with chronic disabilities or conditions that require long-term housing.[78]

70.     Nursing Unit (Infirmary) 2 is managed by a nurse practitioner who also oversees more than 1000 other patients.[79]

71.     Dr. Puisis opined that the infirmary/in-patient care provided by LSP is severely inadequate.[80]

72.     Dr. Puisis testified that, according to the National Commission on Correctional Health Care ("NCCHC") standards, every inmate patient should be within the sight and

---

[76] PX 28 at 0017-18.
[77] *Id.* at 0018-22.
[78] Rec. <u>Doc. No. 544 at 172</u>:25-173:13.
[79] *Id.* at 173:14-20.
[80] *Id.* at 123:20-124:10.
Document Number: 52892

23-30825.22419

sound of a nurse.[81]

73.    LSP infirmaries have individual rooms with steel doors which are separated from nursing staff by solid locking doors and no call system to reach nurses.   Dr. Puisis testified that there should be a way for the patient to communicate with the nursing staff, and the steel doors render adequate communication an impossibility.[82]   For example, Kentrell Parker was a quadriplegic whose breathing required a tracheotomy, and he was locked in an isolation room facing away from the door with no means to summon assistance.[83]

74.    Dr. Puisis testified that, in the general population, inmates may serve as orderlies and assist patients with activities of daily living; however, inmate orderly service is medically inappropriate in the infirmary setting.[84]

75.    LSP utilizes inmates as nursing assistants which is beyond the scope of the medically accepted use of orderlies. According to NCCH, inmates may assist with activities of daily living, but not in the inpatient environment because:  (1) inmates lack training, and (2) there is a potential for undue leverage, *i.e.*, an inmate declining to provide assistance unless receiving some gratuity from the patient.[85]

76.    The infirmaries at LSP are significantly understaffed, requiring inmate orderlies to clean, bathe, dress, feed, and position patients - all activities of daily living as acknowledged by LSP physician Dr. David Thomas.[86]

---

[81] *Id.* at 170:16-171:5 (citing PX 243 at 0130).
[82] Rec. Doc. No. 544 at 177:14-178:11.
[83] PX 6 at 0081-82.
[84] Rec. Doc. No. 544 at 174:25-175:22.
[85] *Id.* at 175:11-176:9.
[86] Rec. Doc. No. 552, Testimony of David Thomas at 29:6-7: 87:2-7.
Document Number: 52892

23-30825.22420

77.     It was established that inmate orderlies are not supervised by registered nurses; rather, they are supervised by security staff who lack medical training. Dr.Puisis testified at length about health care standards that strongly counsel against the use of inmate orderlies to assist inpatient inmates with activities of daily living.[87]

78.     Further, even if the use of inmate orderlies to assist with activities of daily living conforms to the minimum standards of the Eighth Amendment, the trial evidence showed that LSP failed to follow its own training policies with respect to inmate orderlies.[88]

### Patient #3

79.     This patient has underlying diabetes and peripheral vascular disease. Ulcers and disease to both legs required amputation above-the-knee. The patient subsequently developed serious infections to the stump in 2008, and he was sent to the hospital where he underwent emergency surgery to remove the dead tissue.  Doctors had to extend upward to the perineum to find live tissue. All tissue in this patient's penis and entire perineum was dead. He was returned to LSP and placed in hospice care.[89]

80.     Dr. Puisis credibly testified that this type of infirmary care is representative of the care he observed during the relevant time period; however, the Court finds that the facts surrounding Patient 3 which occurred in 2008 are not probative of the health care conditions at issue during the relevant time period of this lawsuit.

### Patient #39

81.     Patient #39 was immunosuppressed with a history of congestive heart failure and diabetes. He was admitted into the infirmary on July 20, 2011, presenting with a fever of

---

[87] Rec. Doc. No. 544, Testimony of Mike Puisis at 175:4-176:11.
[88] JX 6-eee at 6 (annual training).
[89] JX 10-AAA.
Document Number: 52892

103.6 degrees and altered status. He was placed in a "locked room" with the "hatch up" after a nurse reported that the patient was masturbating on July 21, 2011. LSP physicians ceased visiting the patient altogether for 3 days. He was discharged back to his housing unit on the fourth day. Two days after his discharge, this patient was found vomiting in his cell. Both Dr. Lavespere and Dr. McMurdo ordered EMTs not to transport the patient to the hospital, and this patient died the next morning.[90]

### Patient #18

82. Following multiple positive tests for HIV, Patient #18 was admitted to the infirmary on December 2, 2013, presenting with pneumocystic pneumonia and life-threatening abnormal vital signs. Despite his condition, antiretrovirals therapy was not started for four days. Less than one week after starting antiretrovirals therapy, this patient developed a fever of 101 degrees, and he was transferred to an outside hospital on December 13, 2013, where he died one month later. While Patient #18 was in the infirmary at LSP, his vital signs were monitored only once daily, and his medications were, at best, irregularly administered.[91]

### Patient #11

83. Patient #11 suffered from Chron's Disease, which Dr. Puisis testified requires chronic disease monitoring.[92] This patient was admitted to the infirmary following a partial colectomy. This surgery was necessary due to the failure of LSP physicians to timely and properly monitor and treat his Crohn's disease. The Court finds that the evidence

---

[90] PX 6 at 0063; JX 10-ii-1 at 34748-49; PX 233 at 0112.
[91] PX 6 at 0039 – 40, 0083-84; Rec. Doc. No. 548, Testimony of Madeleine LeMarre at 172:11-22; 181:20-21.
[92] Rec. Doc. No. 544 at 133:6-15.
Document Number: 52892

23-30825.22422

demonstrating LSP's failures to take Patient #11's history, perform adequate physical examinations, document a treatment plan, provide indicated immunosuppressive therapy, and failure to refer him to gastroenterologist resulted in a preventive death.[93]

####    4.    Sick Call

84.    Sick call is the main process by which patients access the medical system at Angola, and it is conducted cell side by EMTs.  EMTs do not commonly consult doctors during sick call visits, and the evidence shows that fewer than half of all sick call visits from April to June 2016 were referred for provider review.[94]

85.    Expert testimony at trial established that inmate patients submitted repeated Health Service Requests ("HSR") for the same complaint.[95]

86.    Evidence also demonstrated that EMTs routinely did not have access to the patient's health record when conducting sick calls, resulting in patients being treated repeatedly with the same medication regimen even if such regimens had failed in the past.  This was demonstrated by the following evidence at trial:

87.    Patient #17 complained of chest pain at sick call for over 16 months. Prior to these complaints, the patient's medical records indicated that he had a pulmonary nodule and had been referred to a thoracic surgeon for a biopsy. This patient was seen repeatedly by EMTs at sick call for complaints of chest pain for 16 months from 2102 to 2014. A biopsy of the pulmonary nodule was finally performed in 2014, and this patient was diagnosed with adenocarcinoma of the lung. He died a little over one week later.[96]

---

[93] PX 6 at 0044-45, 146; Rec. Doc. No. 544, Testimony of Mike Puisis at 133:6 – 139:9; JX 10-R.
[94] PX 41 at 0039-41.
[95] Rec. Doc. No. 548 at 185:15-186:10.
[96] PX 6 at 0193-99.
Document Number: 52892

23-30825.22423

88.     Patient #20 was seen by EMTs at sick call for over four months with repeated complaints of significant abdominal pain. More than once, EMTs failed to refer the patient to a physician despite his severe symptoms. After months of complaining of "burning" pain, weight loss, and vomiting blood, the patient was admitted to a nursing unit. He died the following day.[97]

89.     Patient #29 was seen 10 times by EMTs for sick calls in a one-month period. This patient presented with symptoms consistent with exacerbation of congestive heart failure; however, it took over a month for this patient to be hospitalized despite acute worsening of symptoms.[98]

90.     Patient #18 was seen on multiple occasions by EMTs with complaints of chest pain, shortness of breath, and a 55-pound weight loss. There is no documentation that EMTs notified physicians of the patient's abnormal vital signs, precipitous weight loss, or the progressive worsening of his symptoms. The patient did not receive a timely or meaningful clinical evaluation for his symptoms by a physician. Ultimately, Patient #18 was diagnosed with HIV, and he died a little over one month after this diagnosis. According to the medical experts, a timely diagnosis of this patient's HIV status and corresponding anti-retroviral intervention could have prevented his death.[99]

91.     Plaintiff Shannon Hurd (deceased) repeatedly complained of substantial weight loss and testicular swelling. After 2 years of presenting to EMTs with consistent and worsening complaints, diagnostic testing revealed renal cancer. From the time that this patient began complaining of symptoms until his ultimate diagnosis two years later, Hurd

---

[97] PX 6 at 0216-27.
[98] PX 6 at 0256-57.
[99] PX 6 at 0200-08.
Document Number: 52892

23-30825.22424

lost 61 pounds. During this period, Hurd saw doctors and EMTs on numerous occasions, but they routinely failed to conduct meaningful testing or scrutinize his symptoms and medical history. Even when tests did occur, doctors failed to provide the necessary follow up.[100]

92.    Plaintiff Joseph Lewis (deceased) repeatedly complained for 33 months—nearly three years—of symptoms consistent with laryngeal cancer. Lewis was mostly evaluated cell side by EMTs at sick call who referred him to a physician on only a few occasions. After 33 months of constant complaints, diagnostic testing was obtained which revealed laryngeal cancer. Again, according to medical experts, timely diagnostics would likely have prolonged Lewis' life.[101]

93.    Regarding transport orders, the evidence showed that, when EMTs consulted LSP physicians to request increased care or for additional patient assessment, the physicians routinely gave "no transport" orders resulting in further diagnostic and treatment delays. According to the undisputed expert opinions presented, these "verbal orders given to the medics over the radio … advising that the patient not be transported from his cell,"[102] "result[ed] in delay in care, lack of evaluation by a physician and in some cases death."[103] Record examples of the consequences of these "no transport" orders are as follows:

94.    Patient # 39 was a 65-year-old man with "a history of diabetes, [and] severe coronary artery disease and heart failure."[104] In July of 2011, the patient was seen by EMTs seven times with symptoms including a "temperature of 103.6," "an altered mental

---

[100] PX 28 at 0018-22; *see also* Rec. Doc. No. 552, Testimony of David Thomas at 99:9-116:4.
[101] PX 28 at 0017-18.
[102] PX 6 at 0063.
[103] *Id.*; S*ee also* Rec. Doc. No. 547, Testimony of Susi Vassallo at 150:24-151:9, 174:24-178:7.
[104] PX 6 at 0063
Document Number: 52892

status," "chest tightness," and "breathing but unresponsive." On one occasion, Patient 39 was observed lying on the floor of his cell "'vomiting and won't move [sic].'"[105] Nevertheless, no-transport orders were given three times. After the third no transport order in July 2011, this patient died in his cell. The medical records do not explain or describe the reason for, or circumstances of, the death.[106]

95.      Patient # 34 made an emergency sick call for flank pain. LSP physician Dr. Toce ordered an x-ray without seeing the patient,[107] but he was subsequently seen by Dr. Collins in the ATU the next day. Dr Collins noted that there was no bruising or injury that could explain the patient's pain.[108] Three days later, Dr. Lavespere gave a no transport order when the patient could not get out of bed. Three days after this no transport order, the patient was found non-responsive in his cell. He died the following day.[109]

96.      Plaintiffs not only challenge the constitutionality of the medical response to sick calls at LSP but also the constitutionality of the sick call policies, generally. Pursuant to the DOC's Access to Care and Clinical Services Policy,[110] inmate patients are to have daily access to routine and urgent services, with sick call requests triaged every day. Sick Call carries a $3 co-pay, self-declared medical emergencies carry a $6 co-pay, and a new medication (OTC or RX) carries a $2 co-pay regardless of the number of doses.[111]

---

[105] *Id.*

[106] *Id.* at 0063-64.

[107] PX 6 at 0267; Rec. Doc. No. 548, Testimony of Susi Vassallo at 57:5-58:16; JX 10-ee at 28686. It is unclear when the patient suffered the broken ribs, and whether the rib fracture was related to his death; the autopsy reports a "remote" fracture, suggesting that the rib injury may have been distant in time and unrelated. *See* Rec. Doc. No. 548 at 57:5-58:16.

[108] JX 10-ee at 28685.

[109] *Id.* at 28678-81; *see* Rec. Doc. No. 548, Testimony of Susi Vassallo at 112:9-114:1; *see also, e.g.*, PX 6 at 0201, 0236, 0238, 0254, 0257 (noting additional no transport orders).

[110] JX 5-A at 00020 ( HC-01).

[111] *Id.* at 00023.

Document Number: 52892

23-30825.22426

Plaintiffs argue that this co-pay system presents an unconstitutional barrier to care. Based on the trial evidence submitted, the Court does not to find that these policies, in and of themselves, create an unconstitutional (cruel and unusual) barrier to health care. However, it is one factor that contributes to a delivery system that is, in this Court's view, woefully inadequate. Sick call policies requiring co-pays is not unconstitutionally cruel and unusual. Even though the malingering policy is unenforced, the fact that it is on the books arguably creates a disincentive for inmates to sick call. There was no evidence that the policy creates access hesitance. Inasmuch as the policy is disfavored and not used, in the Court's view, LSP should amend its written policy to conform to its practice.

97.     In requesting a "sick call," an inmate is required to acknowledge in writing: "I am aware that if I declare myself a medical emergency and health care staff determine that an emergency does not exist, I may be subject to disciplinary action for malingering."[112] In short, if an inmate is determined not to be "emergency" sick after complaining of symptoms, the inmate can be sanctioned for "malingering." Defendants contend the actual use of malingering write-ups is rare. However, even the Defendants' medical expert, Dr. Thomas, agreed that the malingering policy at LSP should be discontinued.[113] Plaintiffs' medical expert opined that a policy which permits medical providers to punish inmates for seeking access to care creates a conflict of interest and is a practice not seen in other correctional facilities.[114]

98.     After weighing all evidence regarding this policy, the Court finds that, although LSP's malingering policy exists on paper, it is not enforced in practice. Accordingly, the

---

[112] PX 53.
[113] DX 14 at 02943.
[114] Rec. Doc. No. 545, Testimony of Puisis at 14:16-16:4.
Document Number: 52892

Court finds that Plaintiffs have failed to carry their burden of proving harm regarding this policy.

99.    Nevertheless, although the Court finds that the unenforced malingering policy is not unconstitutional, it is evidence of systemic health care structures that the Court does find results in constitutionally infirm health care delivery.  As evidenced by the malingering policy, the medical department at LSP is controlled by LSP security rather than medical care providers. Both Plaintiffs' and Defendants' experts agreed that this organizational hierarchy, under which the medical department reports to security, is not working.[115] Moreover, orderlies and EMTS also report to the security chain of command for supervision,[116] and correctional officers supervise the delivery of medications by other correctional officers.[117]  Dr. Lavespere admitted that security personnel - not medical personnel -  are tasked with the initial assessment of whether an inmate is "really sick" when they purport to have a medical emergency.[118]  Additionally, the Assistant Warden makes resource-allocation decisions such as when nurses are required for pill call.[119] The Court finds that this system where health care decisions are largely made  by security rather than qualified health care providers is unconstitutional.

---

[115] *See e.g.*, DX 13 at 02845-46 (Dr. Moore describing the leadership as "most unusual" and creating "difficulties," including making the "success of the program [] primarily dependent upon the good will of the wardens."). She further explained that Wardens are not capable of assessing the quality of medical care delivery. *See also* PX 6 at 0011-12.

[116] JX 4-gg, A. Cowan Depo. at 9:20-25, 10:16-20; JX 4-dd, D. Cashio Depo. at 73:18-74:18 PX 6 at 0015; JX 4-ii, T. Falgout Depo. at 17:23-25 (Warden Falgout testifying that security deals with staffing and assigning orderlies).

[117] Rec. Doc. No. 553,Testimony of Tammi Willis at 96:4-8; *see also* JX 4-ddd.

[118] JX 4-rr at 26:24-27:4.

[119] Rec. Doc. No. 551, Testimony of Randy Lavespere at 193:9-18.

Document Number: 52892

23-30825.22428

5.    Emergency Care – Acute Treatment Unit ("ATU")

100.    The ATU is not an emergency room ("ER") and is, therefore, not equipped with some of the equipment necessary to diagnose and treat serious medical conditions.[120] Further, because the ATU does not operate as an ER, referral to outside hospitals becomes necessary in emergency situations.  However, the trial evidence demonstrates that LSP often fails to refer patients to an outside ER when necessary.  Addtionally, as with sick calls, LSP employs EMTs as primary care providers in the ATU.

101.    In addition to sick call assessments, EMTs "perform all emergency response."[121] Plaintiffs agree that it is an "appropriate use of EMTs to respond to medical emergencies on-site, such as in a cell or dorm."[122] However, Plaintiffs challenge the policy allowing EMTs to deliver care and serve as the "primary providers" for patients in the ATU.[123] It is admitted that only serious medical conditions are seen in the ATU, and according to Dr. Lavespere, as many as 76 patients may be seen in a day in the ATU.[124]

102.    Although a physician is assigned to provide on-call coverage to the ATU, the Court finds from the trial evidence that physicians do not regularly or consistently staff the ATU, and, as a result, patients in the ATU are not being consistently evaluated or treated by physicians. The Court finds as a matter of fact that it is EMTs who are routinely delivering patient care in the ATU, which "differs dramatically" from how prison EMTs are used in emergencies in the rest of the country, according to Plaintiffs' expert.[125]

---

[120] PX 6 at 0066.
[121] *Id.* at 0061.
[122] Rec. Doc. No. 573 at 110.
[123] Rec. Doc. No. 547, Testimony of Susi Vassallo at 141:25-142:4; Rec. Doc. No. 548 at 14:3-13.
[124] JX 4-rr, R. Lavespere Depo at 44:4-7.
[125] Rec. Doc. No. 548, Testimony of Susi Vassallo at 22:1-3.
Document Number: 52892

23-30825.22429

103.   The Court further finds that, regarding patients in the ATU, EMTs "continue to manage the patient" and "make serial observations over many, many, many, many hours," which is not within their training or scope of practice.[126] EMTs are simply not trained "to render ongoing care for a number of hours."[127] The following examples demonstrate the improper use of EMTs in the ATU.

104.   Patient #1 was managed by EMTs in the ATU for more than 24 hours for an episode of diabetic ketoacidosis and acute renal failure - conditions which led to his death one day later.[128]

105.   Patient #15 was managed by EMTs in the ATU overnight despite suffering from acute coronary syndrome, and then discharged to his housing unit at 3:45 in the morning; he returned to the ATU later that morning and then died en route to the hospital.[129]

106.   Patient #20 was managed by EMTs in the ATU overnight, despite a physician's telephone order that he be admitted to the nursing unit, because the nursing unit was full. The patient's symptoms suggested he was "internally bleeding and at risk of death," and he, in fact, died the following day.[130]

107.   Patients #38 and #42 were managed in the ATU for at least eight hours by EMTs, despite both having symptoms suggestive of a stroke.  Patient #38, who had a medical history of strokes, died the following day.  Patient #42 lived following this ATU stay but

---

[126] Rec. Doc. No. 547 at 160:13-161:1; *see also, e.g., id.* at 151:20-152:4 ("The problem at Angola is that the EMTs continue to manage the patient. Now, there are exceptions to that, but most commonly the EMTs will manage patients with calling to the doctors. They will be given verbal orders or telephone orders, and so the doctor is relying on the information they are given by someone who is observing something but not trained to make serial observations over many, many, many hours and to know what that means.").

[127] Rec. Doc. No. 547, Testimony of Susi Vassallo at 142:5-12; *see also* PX 6 at 0041, 60-71.

[128] *See* PX 6 at 0069, 0091-94; JX 10-w at 51299-307.

[129] *See* PX 6 at 0069-71, 0187-90; JX 10-v at 18943-48.

[130] PX 6 at 0034-35, 0056, 0085, 0225-27.

Document Number: 52892

was left with long-term deficits due to lack of proper treatment.[131]

108.    The trial evidence also demonstrated several examples of the consequences of delayed or failed emergency referrals.  For example, Anthony Mandingo presented with pneumonia.  EMTs in the ATU administered two breathing treatments and returned him to his dormitory. Several days later he was admitted to UMC New Orleans.[132]

109.    Danny Prince, who worked as a health care orderly on Ash 2 dormitory (an assisted living/recovery dorm) during the relevant time period, testified at trial and described an inmate with a tracheotomy in his throat who presented with a progressively worsening cold and made repeated emergency sick calls.  The inmate was seen in the ATU and returned to his dormitory multiple times and ultimately died.[133]

110.    Regarding stroke patients, in August 2014, LSP was put on notice by Interim LSU Hospital ("ILH") that that they were not receiving stroke patients within the 4.5-hour treatment window.   Three Angola inmates within 45 days prior had arrived at outside treatment facilities "with obvious stroke symptoms [but did not receive] emergen[cy] care within the 4.5 [hour] window to attempt [to] prevent serious disability."[134]   For example, Lionell Parks presented to the infirmary on 3 consecutive days with stroke symptoms before he was referred for emergency care.[135] While the remote location of LSP accounts for transportation delays, it is less than a one-hour drive to Baton Rouge, and the

---

[131] PX 6 at 0270-71 (Patient #38); PX 233 at 0095 (Patient #38); Rec. <u>Doc. No. 547</u>, Testimony of Susi Vassallo at 153:6-164:24 (Patient #42); PX 6 at 0272-73 (Patient #42); JX 10-p at 15142, 15161-62, 15236-39 (Patient #42).
[132] Rec. <u>Doc. No. 551</u>, Testimony of Mandingo at 89:2 – 91:13.
[133] Rec. <u>Doc. No. 547</u>, Testimony of Danny Prince at 101:14 – 102:5.
[134] PX 12 at 0002.
[135] PX 12 at 0001 – 02.
Document Number: 52892

23-30825.22431

transportation delay does not account for multi-day delays such as those experienced by Parks.

111.    Patient #42 was found unresponsive in July 2015 at 11:18 p.m. He was brought to the ATU, where he was managed for more than 10 hours by EMTs without a physician consult. While in the ATU this patient was treated with four liters of intravenous saline without having received any prior diagnosis.  Patient #42 had suffered a stroke which caused brain swelling, which may have been exacerbated by the intravenous saline administered by EMTs.[136]

112.    Patient 44 attempted to hang himself in his cell. He was transported to the ATU with "abnormal posturing," which Dr. Vassallo testified is indicative of brain injury and bruising of the cervical spine. EMTs managed this patient's care in the ATU even though a physician, Dr. Toce, was present in the ATU. EMTs failed to ensure proper ventilation by failing to "bag" the patient. After about 15 minutes, Dr. Lavespere entered and started "bagging" this patient.  According to Dr. Vassallo, who witnessed this incident, this level of inadequate ventilation most likely caused harm to the patient and exacerbated his brain injury.[137]

113.    Trial evidence also established that some protocols repeatedly utilized in the ATU are inappropriate under national standards.[138]  For example, inmates who present with an altered mental status are routinely treated based on a presumption that they have

---

[136] Rec. Doc. No. 547, Testimony of Susi Vassallo at 164: 12-23.
[137] *Id.* at 165:19-173:9.
[138] Rec. Doc. No. 548, Testimony of Susi Vassallo at 22:8-17.
Document Number: 52892

ingested narcotics.[139] The evidence established that the following treatments are routinely administered without clinical indicators suggestive of illegal drug use: (1) routine treatment of patients presenting with altered mental status with Narcan; (2) routine subjecting patients who present with altered mental status to urine toxicology testing, often by catheterization; and (3) common use of "lavage," *i.e*., stomach pumping, on patients presenting with altered mental status.[140]   The following patient studies demonstrate this problem.

114.   Patient #42 presented to the ATU unconscious but with a normal respiratory rate. Although there were negative indications for an opiate overdose, the patient was treated with Narcan and catheterized to perform urine toxicology. In fact, the patient had suffered a stroke and went 10 hours without appropriate treatment.[141]

115.   Patient #37 presented to the ATU with seizures and was treated with gastrointestinal lavage (stomach pumping) and Naloxone. During this treatment, the patient developed decerebrate posturing and other symptoms indicative of brain damage. A subsequent CT scan revealed intracerebral bleeding, and this patient ultimately died. As Plaintiffs' medical experts explain, "[l]avage for drugs and administration of naloxone for new onset of seizures shows a gross lack of knowledge of emergency care. Lavage of a patient with new onset seizures represents medical care with no basis in modern

---

[139] PX 6 at 0064; *see also* Rec. Doc. No. 548 at 8:13-15 ("When the patient had an altered mental status, it was in my review of the records more than half the time. I don't want to say universally, but it was extremely common.").

[140] PX 6 at 0064; *compare* JX 8-a at 00087, 00145 (EMT Drug Overdose Treatment Protocols, which does not involve urine toxicology); *see also* Rec. Doc. No. 548 at 8:13-15 ("When the patient had an altered mental status, it was in my review of the records more than half the time. I don't want to say universally, but it was extremely common.").

[141] Rec. Doc. No. 547 at 155:9-157:6; *see also* JX 10-p at 15237-38; PX 6 at 0069.

Document Number: 52892

23-30825.22433

practice and delays transport to the hospital."[142]

116.    Patient #30 presented to the ATU with focal motor seizures of the arm and face. He was given naloxone with a plan for gastrointestinal lavage, despite having no symptoms of opioid or any other overdose. As Plaintiffs' medical experts concluded, "this plan does not meet standard care" and was simply "incoherent."[143]

117.    Plaintiffs also maintain that Defendants improperly attempt to obtain Do Not Resuscitate ("DNR") orders and offered Patients # 31 and #10 as proof of this.  The Court finds no constitutional violation as it relates to DNR orders in the ATU.

### 6.    Chronic Care

118.    Plaintiffs complain that LSP's chronic disease program is "woefully inadequate," arguing that Angola's chronic care policy[144] is vague and overly generic[145] and that LSP lacks a "true chronic disease tracking system." Plaintiffs argue there is a "lack of chronic care" attributed to "physician manpower shortages." [146]

119.    Notwithstanding the Court findings as to the unconstitutionality of care in Infirmary 2,[147] and the Court's findings with respect to particular patients with chronic conditions,[148] the Court does not find constitutional deficiencies in the chronic care. The principal evidence offered in support of the Plaintiff's contention that LSP's chronic care violates the Eighth Amendment is LSP's alleged failure to manage and treat patients with hepatitis

---

[142] PX 6 at 0064.
[143] *Id.* at 0065.
[144] JX 5-A at 00102-03 (HC – 11).
[145] Plaintiffs argue that LSP's chronic care manual (JX 8-L) contains guidelines for only 8 diseases and omits guidelines for significant chronic diseases such as kidney disease, thyroid disease, sickle-cell disease and lupus.
[146] DX 13 at 02865.
[147] *See supra.* pp. 20-24 of this Ruling.
[148] *See e.g, supra.* pp. 10-11 of this Ruling.
Document Number: 52892

C. The Court has previously reviewed numerous individual inmates' Eighth Amendment claims with respect to the care and management of Hep C at LSP. The Court declines to revisit or reverse its prior holdings in those cases.[149]

### 7. Medical Leadership and Organizational Structure

120.    The Court also finds that Plaintiffs have demonstrated organizational and structural deficiencies in the LSP health care system which underpin and contribute to Eighth Amendment violations. The Court finds that the cumulative effect of leadership and organizational deficiencies demonstrate the subjective component of deliberate indifference.

121.    Regarding medical leadership, the Court finds that there is a lack of meaningful mortality review.  A mortality review entails reviewing the death of a patient to determine if any of the problems arose in the course of the patient's care that can be corrected in order to prevent future deaths.[150]  The trial evidence established that LSP does not conduct mortality reviews; rather, the physician who cared for the patient provides a short narrative summary of the circumstances surrounding the death.  There is no critical review of the death or the care which preceded the death.[151]  Plaintiffs' experts reviewed and evaluated 28 death charts and they describe LSP's review of death reports to be a "noncritical evaluation."  Dr. Puisis testified that LSP does not look for problems and, thus, finds none, which results in no process for continual improvement.[152]

---

[149] *See*, *inter alia*, *Cormier v. Edwards*, No. 17-241-SDD-EWD, 2019 WL 2438784 (M.D. La. June 11, 2019); *Henderson v. Tanner*, No. 15-804-SDD-EWD, 2019 WL 885914 (M.D. La. Feb. 22, 2019); *Peters v. Singh*, No. 16-842-SDD-RLB, 2020 WL 853517 (M.D. La. Feb. 20, 2020).
[150] Rec. Doc. No. 547 at 179:4-9.
[151] Rec. Doc. No. 545 at 30:19-24.
[152] *Id.* at 34:10-25.
Document Number: 52892

23-30825.22435

122.　In Louisiana, the inmate death rate nearly doubled from 361 deaths in 2001 to nearly 600 deaths in 2008.[153] The Court does not consider this statistic alone probative of the quality of care; however, the Court finds that LSP's failure to conduct meaningful mortality reviews, coupled with its failure to engage in a meaningful quality improvement program and analysis, in light of this statistic, is evidence of deliberate indifference.

123.　The Court finds that, while the failure to conduct meaningful and informative mortality reviews is not unconstitutional care, the reticence of LSP medical providers to conduct meaningful review as a means of quality control and improving care provides fertile ground for the constitutional deficiencies in health care delivery found by the Court and is demonstrative of wanton disregard.

124.　As discussed in previous sections of this opinion, the Court also finds that medical management by corrections, rather than physicians, is inappropriate and also contributes to the unconstitutional care provided. The Medical Department at LSP is managed by an assistant Warden; the Deputy Warden, a layperson with no medical training, is the health authority.[154]

125.　There is also a lack of peer review in the medical department at LSP. Dr. Puisis explained that "peer review is groups of peers who evaluate the care of another peer or colleague based on the clinical process that a certain individual has provided."[155] Further, "there are two kinds of peer reviews. One is called professional evaluation program, or PEP, by which, a physician's practice is evaluated typically on an annual basis."[156] This

---

[153] Rec. Doc. No. 573 at 82-83 (citing PX 466 at 26).
[154] PX 6 at 0012; Rec. Doc. No. 545 at 14:18.
[155] Rec. Doc. No. 545 at 25:8-10.
[156] *Id.* at 25:14-17.
Document Number: 52892

23-30825.22436

type of review evaluates the records of a physician's care to determine whether the treatment was appropriate. "A second type of peer review is when there has been a sentinel event such as a death or an unusual morbid event that is unexpected and suggests that there may have been problems; that type of peer review is a -- more of a quasi-legal procedure where the physician may be reported for clinical actions that were inappropriate, and a group of senior physicians would review that care to determine if a reduction of privileges is necessary."[157] Dr. Puisis explained that the peer review at LSP consists of the medical director coming in one time per year to review 15 records. The director does not review the delivery of health care by any single physician; rather, it is more akin to a facility review. Also troubling, "[a]t LSP, since 2010, peer review of physician care has been performed only three times."[158]

126.   The Court finds that the repeated failure of any meaningful or systematic review of the medical care at LSP is evidence of wanton disregard and directly contributes to conditions which cause harm to patients.

127.   LSP also lacks a quality improvement ("QI") program. Plaintiffs' experts reviewed minutes of QI meetings from 2010 to 2015 which revealed the following: (1) the medical director, Dr. Lavespere, did not participate in QI meetings;[159] (2) nursing supervisors participated in QI meetings;[160] (3) there was no physician participation in QI meetings and no clinical evaluation.[161]

---

[157] *Id.* at 25:25-26:7.
[158] *Id.* at 27:17-18.
[159] *Id.* at 36:21-25.
[160] *Id.* at 37:5-6
[161] *Id.* at 37:14-16.
Document Number: 52892

23-30825.22437

128.    Evidence also established that there is an absence of medical personnel involvement in the development and allocations of the medical budget at LSP.[162]

129.    Finally, the Court finds that the LSP medical director, Dr. Lavespere, directly contributed to constitutionally infirm health care at LSP in the following ways: (1) failure to supervise; (2)  failure to perform peer review; (3) failure to be aware of the credentialing of physicians who worked for him; (4)  failure to review and analyze sentinel events (a serious episode that proceeded an adverse event); and (5) failure to conduct mortality review.[163]  Additionally, there was no evidence of medical supervision by the DOC central office.[164]  The buck stopped with Dr. Lavespere, and his medical supervision and quality review was woefully inadequate.

130.    Regarding staffing levels, the Court finds that Plaintiffs failed to carry their burden on this claim.  Plaintiffs maintain that the per-physician caseload at LSP is excessive, but this assertion was not supported by referencing documentation or other record evidence to establish the caseload per LSP physician.  Dr. Puisis testified that a reasonable staffing level is 800 patients per provider[165] and that staffing budgets at LSP are low compared to other states.[166]  The fact that LSP may have spent less money on staffing is not probative of constitutional care.

131.    As to credentialing, the Court finds that LSP fails to maintain provider credentialing documentation.  NCCHC standard number 4 requires that "the HRA maintains verification of current credentials for all qualified health care professionals at a readily accessible

---

[162] PX 6 at 0012, 16, 27, 88; JX 4-rr, R. Lavespere Depo. at 97:12-14.
[163] Rec. Doc. No. 544 at 202:24-217:5.
[164] *Id.* at 218:18-219:10.
[165] *Id.* at 208:12-23.
[166] Rec. Doc. No. 545 at 21:15-22:13.
Document Number: 52892

23-30825.22438

location."[167]  Pusis testified that he could not ascertain if providers were practicing within their proper credentials because "there were no credential files so I couldn't know what credentials people had."[168]

### 8.    Defendants' Subjective Knowledge

132. Considering the evidence discussed above, the Court finds that Defendants' knowledge of the constitutionally inadequate practices set forth herein is established.  The evidence demonstrates that Defendants have been put on notice regarding the serious risks of harm presented herein and have failed to take reasonable steps to address same.

133. On August 8, 1989, the Civil Rights Division of the United States Department of Justice ("DOJ") began an investigation into conditions of confinement at Angola, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.[169]

134. On May 13, 1991, the DOJ issued a findings letter that concluded that several conditions at LSP deprived inmates of their constitutional rights, including the failure to provide adequate medical and psychiatric care.[170]  The DOJ concluded that "serious flaws in the provision of medical care" existed system-wide at LSP such that "inmates who need medical care and attention are not receiving it," and identified deficiencies regarding, *inter alia*, staffing, sick call procedures, delays in treatment, and safeguards to ensure receipt of proper medication and treatment. [171]

135.  A class action lawsuit was filed against LSP in January 1992 alleging that the medical care provided by LSP was constitutionally deficient.  The DOJ intervened as a

---

[167] Rec. Doc. No. 544 at 215:19-21.
[168] *Id.* at 216:2-3.
[169] PX 239.
[170] *Id.* at 0002.
[171] *Id.* at 0002-04.
Document Number: 52892

plaintiff, and the case was tried in September 1994.[172]  In connection with this lawsuit, Dr. Puisis, acting as an expert for the DOJ, made investigatory visits to LSP and identified several deficiencies in the delivery of medical care that have been alleged in the current lawsuit, and the trial evidence established continue to persist.[173]

136.  The DOJ prepared a report of its findings, which included:  significant delays in treatment because security decided the manner and time of patients' transportation; inmates forced to wait for excessive and unacceptable periods for elective and radiological services; and delays in treatment caused by the practice of placing patients in the infirmary who should have been sent to the hospital.[174]  The report also criticized the use of EMTs, finding: EMTs were "not adequately trained nor sufficiently experienced to recognize serious medical illness or triage sick call," and they could not differentiate "between acute, chronic, and minor illnesses."[175]  The report concluded that LSP had "no policies or procedures specifically designed to guide health care practitioners in managing care on the infirmary unit;"[176] there was "no quality assurance"[177] and no peer review system to monitor the quality of medical care.[178]

137.  In 1998, a settlement was reached resolving the 1992 lawsuit.  The agreement required specific improvements be made to the system of medical care at LSP, including: sick call reviews; implementing contemporary standards of care; establishing mortality review and an effective quality assurance program; automatic referrals to external

---

[172] PX 17.
[173] *See* PX 19.
[174] PX 20 at 0006, 0009, & 0014.
[175] *Id.* at 0002.
[176] *Id.* at 0007.
[177] *Id.* at 0012.
[178] *Id.* at 0016.
Document Number: 52892

23-30825.22440

physicians; documentation of deviations from outside provider orders and communication of those deviations to the outside provider; removing discipline of inmates for malingering without an evaluation by an outside physician, and the provision of "adequate medical leadership."[179]

138.   Given the fact that many of the complaints in this lawsuit – and the deficiencies proven at trial - are the same as those "settled" in 1998, the Court finds that Defendants have been aware of these deficiencies in the delivery of medical care at LSP for decades.

139.  Defendants were also on notice of the very deficiencies shown at trial, as evidenced by a report of findings issued by the Wexford Consulting Group in 2009, an entity retained by LSP to assess the medical care provided by the DOC at LSP and other prisons.[180]

140. On numerous occasions, outside providers also provided notice to LSP of medical care deficiencies.  In January 2014, Defendants were notified that outside providers had to cancel several procedures and surgery dates "due to inadequate preparation and/or following of instructions," in a wide variety of settings, including cardiac catheterization labs, endoscopy, and surgical procedures.[181]  Defendant Stacye Falgout was specifically advised of the need for staff to "be aware of instructions and follow through with the specific time frames for preps, stopping [anticoagulants], adding [m]edications, etc.…"[182]

141. In August 2014, Defendant Singh received notice from the Director of the Louisiana Emergency Response Network and the Stroke Program Coordinator at ILH LSP patients were arriving at ILH with "obvious stroke symptoms" based on LSP staff failing to

---

[179] PX 17 at 0003-05.
[180] PX 265. The Court ruled during trial that the Wexford report was admitted only for the Defendants' knowledge, not for the truth of its contents. *See* Rec. Doc. No. 546 at 181:16-183:17.
[181] PX 142 at 0001.
[182] *Id.*

Document Number: 52892

determine or realize that inmates were having strokes.[183]  Defendants were advised that stroke patients "need to get emergent care within [4.5 hours] to attempt [to] prevent severe disability," and that the patients arriving at ILH all suffered "pretty significant deficits" due to the lack of recognition and transport.[184]

142.  Also in 2014, LSUP received notice via written communication from LSU's Chairman of Oral Surgery to Dr. Singh and Stacye Falgout that LSP had sent a number of inmates "with 3 week old fractures that are already infected and thus use a lot of resources to fix something that could have been treated easily if diagnosed sooner."[185]

143.  Dr. Catherine Jones, a doctor at University Medical Center in New Orleans, who frequently treats patients from LSP, testified at trial about multiple attempts to contact Dr. Lavespere to discuss the delayed diagnoses of LSP inmate patients, but those calls are often unanswered.[186]

144.  Current and former LSP medical personnel also documented and/or testified regarding treatment backlogs and other deficiencies.[187]  Former Assistant Warden for Healthcare Services Kenneth Norris testified that patients "did not get the timely treatment" because Defendants refused to authorize hernia surgery "until, you know, it becomes a life-threatening deal."[188]

---

[183] PX 12 at 0001-02.
[184] *Id*. at 0002.
[185] PX 13 at 0001-0002.
[186] Rec. Doc. No. 550, Testimony of Dr. Catherine Jones at 145:6-16.
[187] PX 36; PX 37; PX 42 (Dr. Singh on 12/13/13: "Some of the offenders at LSP were waiting for CT scan and MRI or cancer care since late 2011. … As far as I know no [colonoscopies] were done at LSP for 2 years or longer. Once access has been restored, even then we can not [sic] get all 600 colonoscopies done immediately.") *id*.at 0001; PX 26 (Ms. Lamartiniere: "[W]e will temporarily suspend the entering of screening referrals [for colonoscopies] until notified by [headquarters] to resume." *Id*. at 0001); PX 32 (summary of the cataract backlog).
[188] JX 4-tt, Norris Depo at 37:22-38:4.
Document Number: 52892

23-30825.22442

145. The lack of meaningful, in-depth mortality review is further evidence of deliberate indifference by Defendants; by failing to critically review causes of death, Defendants avoid documenting existing deficiencies within the health care system that need to be addressed and corrected.  Indeed, not a single Medical Summary Report reviewed by Plaintiffs' experts noted a problem with patients' care, despite the serious errors and delays in treatment discovered in nearly every death these experts reviewed.[189]  This inference is supported by Dr. Singh's recommendation to Secretary LeBlanc that the DOC not "dig too deep" in investigating a death because "liability is still ours."[190]  Dr. Vassallo credibly testified at trial regarding the frequency of death summaries that "misrepresented the facts of the patient's death."[191]

### 9.    Laboratory Services

146.   The Court finds that Plaintiffs failed to carry their burden of demonstrating constitutional violations regarding the laboratory services provided at LSP.  According to Dr. Puisis, the laboratory is CLIA certified, and both the laboratory and radiology departments functioned properly during the relevant time period.[192]

### 10.    Pain Medication Management

147.   The Court also finds that Plaintiffs failed to carry their burden of demonstrating constitutional violations in the management of pain medicine provided at LSP.  The trial evidence demonstrated that narcotic pain management is not available to patients in the general population due to LSP's policy prohibiting the dispensation of narcotics in general

---

[189] PX 6 at 0084-87.
[190] PX 66 at 0001.
[191] Rec. Doc. No. 547 at 178:19.
[192] Rec. Doc. No. 544, Testimony of Puisis at 196:4-13.
Document Number: 52892

23-30825.22443

population.  However, LSP policy does allow for the availability of narcotics to hospice care patients.[193]

Facts Relating to ADA Claims

      1.   Effect of DOJ ADA Investigation and Settlement with LSP

148.   In May 2010, the United States Department of Justice ("DOJ") conducted a site visit at LSP to assess whether LSP complied with Title II of the ADA and its implementing regulations.[194]  Although no settlement between the DOJ and LSP had been reached at the close of discovery in this matter, evidence was admitted at trial demonstrating that LSP had been working since the DOJ's 2010 site visit to address compliance issues identified by the DOJ.[195]

149.   Plaintiffs' architectural expert Mazz admitted that the DOJ conducted a far more expansive assessment of LSP facilities than he, as the DOJ reviewed the entire property for programmatic access.[196]  However, the Court rejects Defendants' argument that the DOJ's investigation renders Mazz's investigation and findings moot or that any facts found by this Court would be necessarily duplicative of the DOJ's investigation and findings.

150.   The Court limited the trial of this matter to the discovery period, and any post-discovery remedial measures are more appropriately addressed at the remedy phase; such measures do not inform the Court regarding liability in this matter.[197]  Furthermore, Defendants' architectural expert Nolan conducted a review of both the DOJ's findings and

---

[193] Rec. Doc. No. 545 at 20:15-17; 131:2-3.
[194] PX 7 at 0008.
[195] See JX 12-e.  The Court notes that, at the remedy phase of this matter, any remedial measures undertaken by LSP will certainly be recognized and credited where appropriate.
[196] Rec. Doc. No. 546 at 60:18-25; 76:25-77:4.
[197] Rec. Doc. No. 419 at 3.
Document Number: 52892

23-30825.22444

Mazz's findings and concluded there is little overlap – at most, 11 items out of 190.[198] Additionally, Defendants presented no evidence at trial to dispute or controvert Mazz's findings.

2.  Architectural Barriers to LSP's Programs, Services, and Activities

a.  *Facilities*

151.  Trial evidence demonstrated that certain areas of the buildings Mazz surveyed have been altered since the 1991 ADA Standards took effect.  In 2016, LSP's facilities maintenance staff compiled a list of renovations completed at Main Prison and the outcamps between 2010 and May 2016.[199]  Odis Ratcliff, an Assistant Facilities Maintenance Manager designated by the DOC to testify regarding the compliance of LSP's facilities with the ADA,[200] confirmed that the list includes alterations made since 2010 to attempt to bring the facilities into compliance with the ADA and fire marshal regulations.[201]  Notably, the bathrooms and JPay Stations in Ash 2 and Cypress 2 dormitories were modified after the 1991 Standards took effect.[202]

152.  Mazz surveyed Dormitories Ash 2 and Cypress 2, focusing on sleeping areas and shower and bathroom areas, as well as the accessible routes from those dormitories to the public check-in desk, associated recreation yards, van transit parking, law library, and visiting area.[203] He also surveyed portions of the visiting area and law library used by residents of those dormitories.[204]  Ash 2 and Cypress 2 are two of three dormitories

---

[198] Rec. Doc. No. 546 at 80:15-81:5.
[199] JX 12-e.
[200] JX 4-aaa, O. Ratcliff Depo. at 6:23-25.
[201] *Id.* at 10:16-11:18.
[202] JX 12-e.
[203] PX 7 at 0009; Rec. Doc. No. 546 at 18:7-19:15.
[204] *Id.*; Rec. Doc. No. 546 at 20:13-21:1.
Document Number: 52892

23-30825.22445

designated as "medical dormitories" or "offender assistance dormitories" and house inmates with mobility impairments and other disabilities.[205] Of the three dormitories, Ash 2 is reserved for patients who require the most assistance with the activities of daily living.[206] Mazz also surveyed Dormitory 1 at Camp F, a trustee dorm that has been used to house blind and otherwise vulnerable individuals.[207] Mazz also reviewed various cells and showers in LSP's Transition Unit ("TU"),[208] including in the Protection Tier and Mental Health Tier.[209] The TU operates as transitional housing for inmates with severe mental illness or developmental disabilities,[210] and it frequently houses inmates with physical and mental disabilities, including blind patients[211] and patients in wheelchairs, like Plaintiff Reginald George.[212] Mazz surveyed Wards I and II on the Nursing Unit at the R.E. Barrow Treatment Center.[213] Ward I operates as LSP's infirmary, while Ward II houses patients requiring long-term nursing care and assistance with basic life functions, including LSP's hospice patients.[214]

---

[205] Rec. Doc. No. 547, Testimony of Danny Prince at 95:1-4; JX 4-c, A. Brent Depo. at 75:17-76:23 (identifying Ash 2 and Cypress 2 as the dormitories housing disabled individuals receiving care from inmate health care orderlies); JX 6-eee (LSP Directive 13.088) at 00269 (establishing offender assistance dormitories to provide housing "for offenders who require assistance with activities of daily living").

[206] Rec. Doc. No. 547 at 95:5-8.

[207] PX 7 at 0009; Rec. Doc. No. 546 at 22:5-23:1; id. at 139:4-5, 152:3-154:5 (Tonubbee describing his experience assisting former Named Plaintiff Alton Batiste around Camp F after he went blind).

[208] In his report, Mr. Mazz identified the TU as the "Treatment Unit," consistent with the floor plans that were provided to him. See JX 7 at 0009.

[209] PX 7 at 0009; Rec. Doc. No. 546 at 20:7-10.

[210] See JX 6-y (LSP Directive 13.037) at 00140 (designating the TU as a housing area for "offenders with severe mental illness or developmental disabilities").

[211] PX 85 at 0003.

[212] PX 231 at 1354 (ARP paperwork reflecting that Mr. George was housed in the TU).

[213] PX 7 at 0009; Rec. Doc. No. 546 at 19:24-20:5.

[214] JX 6-v (LSP Directive 13.033) at 00130-32 (describing the purpose and admission criteria for Wards I and II); JX 7-b (LSP Directive 07.004) at 00002 (stating that "severely handicapped inmates" will be housed at the Treatment Center). See also Rec. Doc. No. 546, Testimony of Francis Brauner, at 97:22-25 (explaining that Ward II houses "some of the worst cases of, you know, illnesses, stroke victims, cancer victims, heart problems, you name it, me, paralyzed, wounds.").

Document Number: 52892

23-30825.22446

153.   Mazz testified that, in the correctional setting, he typically looks at access to services, programs, and activities ranging from toilets and showers to law libraries, visiting areas, and classrooms.[215] At LSP, he specifically considered housing at various security levels, including toilets, showers, bathtubs and sinks; water fountains; mail services; meal services; medication administration; medical services; telephones; JPay stations;[216] recreation areas; transportation services; the law library; and the visiting area.[217]

154.   As detailed in Attachment 2 to his report,[218] Mazz identified 190 architectural barriers impeding independent access to a range of programs, services, and activities, including housing, toilets, showers, phones, JPay stations, common areas, drinking fountains, recreation areas, transportation, the law library, visiting areas, medication administration, meals, medical services, and mail services.[219] Photographs documenting each violation are included in his report as Attachment 3.[220]  Because Mazz's findings were uncontroverted by Defendants' expert Nolan and any other evidence presented by Defendants at trial, the Court adopts the findings of violations as detailed in Mazz's report.

155.  Anecdotal evidence in the form of the testimony of Named Plaintiffs and Subclass Members generally confirmed Mazz's findings.  Aaron Brent, a former LSP health care orderly, testified that the showers in Ash 2 were not usable for patients with disabilities because there were "showers you couldn't reach."[221]  Farrell Sampier testified at trial about the difficulty he experienced navigating the paved walkways between the medical

---

[215] Rec. Doc. No. 546 at 12:16-13:4.
[216] *Id.* at 34:14-23.
[217] *See* PX 7.
[218] *Id.* at 0018-39.
[219] *Id.*; Rec. Doc. No. 546 at 23:2-10.
[220] PX 7 at 0040-112; Rec. Doc. No. 546 at 27:8-14.
[221] JX 4-c, A. Brent Depo. at 32:10-33:10.
Document Number: 52892

23-30825.22447

wards and other areas while in his wheelchair, stating that he had to perform "wheelies" to maneuver over various humps and obstacles to get across the sidewalk such that Sampier usually had to ask for someone to push him to get around the property.[222] Former inmate Francis Brauner, who uses a wheelchair, described problems regarding the accessibility of Ward II; for example, he was unable to access the shower or bathtub, which caused him to give himself bed baths and shave and wash his hair in the sink. However, the sinks were positioned above chest level for those in wheelchairs, making them difficult to use. Sampier also testified that he could not reach the mirrors or the water fountains.[223]

156.   Testimony from Subclass members also demonstrated that the physical barriers at LSP deny them access to a variety of programs.  At trial, Sampier testified that, while living on the medical wards, he was not allowed to attend any classes offered at the prison, including programs such as anger management, victim awareness, and substance abuse classes.[224]  Brauner testified that he and other patients living on the ward could not attend church services or sporting events available to other inmates.[225] Barrera, who was housed on Ward II until December 2015, also testified that he was not permitted to leave the ward to attend classes or church services.  Further, he was required to take anger management and substance abuse courses to be eligible for release; however, LSP would not come to the ward to teach the class because there were not enough patients on the ward who needed the courses to warrant the accommodation.[226]

---

[222] Rec. Doc. No. 544, Testimony of Farrell Sampier at 63:11-19; 82:15-24.
[223] Rec. Doc. No. 546 at 100:22-102:25.
[224] Rec. Doc. No. 544, Testimony of Sampier at 48:13-16; 62:13-24.
[225] Rec. Doc. No. 546, Testimony of Francis Brauner at 108:5-19.
[226] *Id.*, Testimony of Otto Barrera at 213:8-214:23.
Document Number: 52892

23-30825.22448

157.    Current and former officials at LSP also confirmed ADA noncompliance issues. LSP Warden Darryl Vannoy admitted that "Angola has a lot of work to do on a physical plant to be ADA, to meet the ADA requirements."[227]  Former LSP ADA Coordinator Donald Barr testified that there were "access problems for wheelchairs within the main prison" at the time the DOJ reviewed LSP's facilities.[228] Although LSP's own policies require the medical dormitories to be "handicap accessible,"[229] Defendants acknowledged that LSP is "operating Medical Dorms in dormitories designed for general, unimpaired population."[230]

> b.    *Use of Inmate Orderlies as Alternative Means to Access*

158.    LSP assigns inmate health care orderlies to the medical dorms and Wards I and II to assist sick and disabled patients with the activities of daily living.[231] Health care orderlies are not assigned to all areas Mazz surveyed, such as the Camp F dormitories and the TU.

159.    LSP's health care orderly program trains inmates to assist sick and disabled inmates with activities of daily living, such as bathing, toileting, transfers, feeding, and personal hygiene.[232]  This training program was modeled after a Certified Nursing Assistant ("CNA") course.[233]  Training topics include:  Abuse and Neglect, Negligence,

---

[227] JX 4-ccc, D. Vannoy Depo. at 71:18-20.
[228] JX 4-z, D. Barr Depo. at 39:5-9.
[229] JX 6-eee (LSP Directive 13.088) at 00269.
[230] PX 15 at 0002 (Proposal to Open EHCC Building Four).
[231] JX 6-eee (LSP Directive 13.088 – Offender Assistance Dorm) at 00269-70; JX 6-vv (LSP Directive 13.076 – Use of Offenders in Health Care) at 0236-37.
[232] Rec. Doc. No. 553, Testimony of Falgout at 192:8-193:18; 205:11-19; *see also* JX 4-ii at 10:9-22.
[233] *Id.* at 193:4-8.
Document Number: 52892

Activities of Daily Living, Patient Safety, Ambulation, Bathing the Patient, and Feeding a Patient.[234]

160.    The orderly program is severely understaffed.   Aaron Brent, a former health care orderly in Ash 2, testified that he and three other orderlies were responsible for 43 patients requiring assistance, including 29 or 30 in wheelchairs, and others who used walkers.[235] Brent and the other orderlies were responsible for distributing meals; changing bed linens; counseling patients regarding their medication; providing emotional support to patients; delivering patients to religious services, scheduled medical appointments, and unscheduled emergency visits to the ATU; and actually attending appointments with patients.[236]  Disabled inmates suffer neglect because orderlies are shorthanded.[237] Evidence demonstrated inmates filed ARPs complaining about being unable to access LSP facilities without orderlies assisting by pushing their wheelchairs, to no avail.[238]

161.    Trial evidence and testimony also revealed that orderlies are often "overwhelmed" and spread too thin to provide proper assistance to disabled inmates.   Trial evidence showed that orderlies would sometimes leave inmates sitting in their own feces and

---

[234] JX 15 at 5, 10, 104, 107, 158, 164, 182.

[235] JX 4-c, A. Brent Depo. at 75:18-76:23. Danny Prince, another former Ash 2 health care orderly, also testified at trial that the dorm housed 43 patients and 43 non-patients. Rec. Doc. No. 547, Testimony of Danny Prince, at 95:11-12. He explained that two orderlies would cover the night shift, and during the day there could be anywhere from three to five orderlies, depending on whether the positions were fully staffed at the time. *Id.* at 96:19-24.

[236] JX 4-c, A. Brent Depo. at 34:7-19; 35:16-36:10; 42:2-14; 68:7-70:8; 75:17-76:4; 76:24-77:15. *See also* Rec. Doc. No. 547, Testimony of Danny Prince, at 116:3-13 (explaining that as an Ash 2 health care orderly, he would  transport patients in wheelchairs to medical callouts and other areas of the prison, help patients in and out of their wheelchairs from the bed or shower, and clean up after patients who urinate or defecate in bed or on themselves, among other tasks).

[237] Prince testified that that accompanying patients to their appointments often would require the full attention of two orderlies, leaving just one orderly in the dorm to look after the remaining patients.  Rec. Doc. No. 547 at 98:6-19.

[238] PX 231 at 1936-1940 (ARP of L.L.); *id.* at 1995-1996 (ARP of T.P.); Rec. Doc. No. 547 at 102:14-17. Document Number: 52892

urine;[239] it was common for orderlies to be called to respond to another emergency before properly completing assistance in changing disabled inmates, resulting in disposing of dirty diapers or pads on the floor of Ward I.[240] Disabled inmates observed orderlies cursing at patients, becoming aggressive, and in some instances, nearly dropping patients they were assisting.[241] Disabled inmates often had to transfer themselves from their beds to wheelchairs because the orderlies were assisting others and unavailable; disabled inmates often relied on other, untrained inmates for assistance.[242]

162.  Trial evidence also established that disabled inmates are often subjected to neglect and abuse by some orderlies.  Prince testified that he had observed verbal and physical altercations between orderlies and patients.[243] Brauner testified that he and others in Ward II regularly heard an elderly inmate attempt to defend himself from an orderly who molested him in the shower,[244] and Brauner personally witnessed the same orderly fondling the inmate in his bed.[245]  Brauner also testified that he witnessed an orderly pour a bucket of bleach on a mentally impaired inmate who had defecated on himself.[246]

163.  Some orderlies tasked with assisting sick and disabled inmates appear unwilling to perform their duties.  Subclass member Benny Prine testified that most of the orderlies demand a bribe to assist him in pushing him from his dorm to other locations.[247]

---

[239] *See* Rec. Doc. No. 544, Testimony of Farrell Sampier, at 46:9-12.
[240] *Id*. at 46:12-16.
[241] *Id*. at 65:5-8.
[242] *See* Rec. Doc. No. 546, Testimony of Francis Brauner, at 101:6-25; Rec. Doc. No. 544, Testimony of Farrell Sampier at 65:21-66:2 (explaining that he and other patients on the ward would assist each other with feeding, covering up, and other tasks when the orderlies were not available).
[243] Rec. Doc. No. 547 at 97:15-23.
[244] Rec. Doc. No. 546 at 99:17-25.
[245] *Id*. at 100:1-8.
[246] *Id*. at 100:9-21.
[247] JX 4-q, B. Prine Depo. at 71:25-72:5, 74:10-14.
Document Number: 52892

Deceased Named Plaintiff Shannon Hurd testified via video deposition that many orderlies on Ward II did not fulfill their responsibilities and were in the program only for the air conditioning available on the ward.[248] Brent testified that he had to report orderlies who did not perform their jobs and needed to be removed from the program.[249] Prince, testified at trial that, while some orderlies go above and beyond their assigned duties, others seem to be looking for an easy job and are unwilling to assist patients.[250]

164.    Trial testimony and evidence established that Tracy Falgout, who runs the health care orderly training program and testified on behalf of the DOC regarding the training and qualifications of orderlies, is aware of the deficiencies within this program.  He acknowledged that orderlies may have "different angles" when joining the program and may try to "strong-arm" vulnerable patients;[251] there is a prison culture of "not being a rat," and there may be consequences for inmates or orderlies who report misconduct.[252] Warden Falgout advises patients and orderlies to "figure out a way to get it to somebody who can take care of it," but he admitted that "sometimes it just is going to be what it is," if "somebody out there is not doing what they are supposed to be doing."[253] Although Warden Falgout did not know the percentage of orderlies who are removed from the position for infractions,[254] he acknowledged that he is "continually training" new orderlies

---

[248] JX 4-u, S. Hurd Depo. at 60:25-61:4. Brauner also testified that some orderlies take the job for the access to air conditioning and are unwilling to assist patients. Rec. Doc. No. 546 at 99:11-16.
[249] JX 4-c, A. Brent Depo. at 46:5-22.
[250] Rec. Doc. No. 547 at 97:3-14.
[251] JX 4-ii, T. Falgout Depo. at 27:25-28:7; *see also* Rec. Doc. No. 554, Testimony of Tracy Falgout, at 41:8-14.
[252] *Id.* at 28:12-15; Rec. Doc. No. 554 at 42:18-43:4.
[253] *Id.* at 28:17-25; Rec. Doc. No. 554 at 43:5-7.
[254] Rec. Doc. No. 554 at 43:8-19 (explaining that he only becomes aware that orderlies have left the program when security gives him a new list of candidates to train).
Document Number: 52892

because "we do have that percentage of guys who don't play by the rules."[255] Warden Falgout knew that at least one orderly has been accused by a patient of sexual assault but admitted there could be other allegations of which he is unaware as such complaints generally go to security.[256]

165.   Trial evidence clearly demonstrated that the architectural barriers at LSP puts disabled inmates at risk of injury, notwithstanding health care orderly assistance. Evidence demonstrated falls from wheelchairs caused by gaps and/or other problems in walkways and ramps occur often, as do slips and falls in the showers and bathrooms of dorms.[257]

166.   The Court finds that LSP uses inmate orderlies to attempt to accommodate or work around the access barriers, but the orderly program creates an unnecessary risk of harm to disabled and vulnerable inmates.

### c.   Segregation without Justification

167.   Trial evidence also demonstrated that LSP unjustifiably segregates its disabled population as it relates to housing.   Inmates with long-term physical disabilities are typically housed in the medical dormitories or on Ward II.[258] As set forth above, this excludes inmates on nursing wards from participating in a host of activities and programs at LSP.

---

[255] JX 4-ii, T. Falgout Depo. at 34:2-4.
[256] *Id.* at 41:4-14; 33:12-18; 34:16-24; 42:1-13.
[257] JX 4-q, B. Prine Depo. at 64:12-65:2; PX 231 at 2263-65 (ARP of J.W.); JX 4–c, A. Brent Depo. at 78:4-80:21; Rec. Doc. No. 547, Testimony of Danny Prince, at 104:10-19; PX 231 at 2358-64, 2437-39 (ARP of J.W.); PX 231 at 1794-1809 (ARP of C.H.); PX 231 at 1609-13 (ARP of S.G.); PX 231 at 1846-55 (ARP of E.J.); PX 231 at 1887 (ARP of T.K.).
[258] JX 7-b (LSP Directive 07.004) at 00002; JX 6-eee (LSP Directive 13.088) at 0269-70; see also JX 4-z, D. Barr Depo. at 49:10-18 (deaf inmates housed in medical dorms); JX 4-ii, T. Falgout Depo. at 119:3-7 (blind inmates housed in medical dorms).
Document Number: 52892

23-30825.22453

168. Disabled or impaired inmates housed in the medical dorms do not receive many of the services that are used to justify this segregation. Defendants claim placing disabled inmates in the medical dorms is justified because these dorms are handicap accessible and allow for assistance with personal care, meals, and medication administration. Also, the medical dorms are close in proximity to LSP's treatment center.[259] Despite these claims, the trial evidence demonstrated that inmates are still transported to the ATU for services,[260] and neither doctors nor nurses make rounds in the medical dorms.[261] That inmate orderlies are available to assist in the medical dorms is a justification that is not substantiated based on the Court's findings regarding the inmate orderly program.[262]

### 3. Methods of Administration

169. LSP has systemically failed to provide access and accommodations to disabled inmates by failing to follow both Title II's implementing regulations and its own policies and procedures relating to ADA compliance.

### a. ADA Coordinator

170. LSP had a designated ADA Coordinator during the relevant time periods; however, evidence established that these Coordinators all lacked sufficient education, training, and qualifications to carry out the obligations with which the ADA Coordinator is charged. Defendants concede that ""[t]here are no specific qualifications of LSP's ADA Coordinator

---

[259] JX 6-eee at 00269.

[260] JX 4-c, A. Brent Depo. at 75:14-76:4; *see also* Rec. Doc. No. 551, Testimony of Randy Lavespere at 205:17- 20, 208:17-21.

[261] JX 4-c at 73:25-76:4. *See also* Rec. Doc. No. 547, Testimony of Danny Prince at 98:20-24 (explaining that no doctors or nurses come to Ash 2 dormitory "unless there's like a tour or something coming through"). EMTs only visit the dormitories to conduct regular sick call. JX 4-c, A. Brent Depo. at 74:8-12.

[262] The Court does not conclude that no justifiable reasons could exist for segregation; however, based on the evidence at trial, the Court finds that the offered justifications are unsubstantiated. The Court is confident that the segregation issues will be addressed during the remedial phase.

Document Number: 52892

or interim ADA coordinator,"[263] and the ADA Coordinator "do[es] not receive any formal ADA training upon taking office or on a regular basis."[264]

171. As ADA Coordinator from 2015-2016, Deputy Warden Peabody identified only a basic four-hour training course he received;[265] he did not attend trainings regarding disability law and acknowledged that he was not "kept in some sort of loop" on updates in disability law.[266] Peabody showed a general lack of familiarity with assessment forms he was responsible for evaluating and approving, and often concluded that inmates' disabilities were purely medical conditions not in need of accommodations.[267] The Court finds that Warden Peabody had an overall lack of knowledge and understanding of the ADA and its requirements, particularly regarding accommodations.

172. Warden Barr, who followed Peabody as ADA Coordinator, was likewise insufficiently trained for this position. Barr received no ADA training other than the standard annual hour that all staff receives;[268] received no training manual;[269] testified that "[t]he Warden came to me and told me that he appointed me to that position and pretty much that was it";[270] and, when he took on this role, his workload was unaffected as he viewed this position as simply an "extra assignment."[271] The Court finds that

---

[263] PX 403 at 0004. However, LSP Directive 01.016 states: "The ADA coordinator shall possess the educational background, experience and skills necessary to carry out all of the duties and responsibilities of the position, and have knowledge and experience in dealing with the legal rights of persons with disabilities and the obligations of public entities under Federal and State disability laws." JX 7-a at 1.
[264] Rec. Doc. No. 242-2 at ¶ 16.
[265] JX 4-ww, R. Peabody Depo. at 12:23-13:11.
[266] *Id.* at 13:16-23.
[267] JX 4-vv, R. Peabody Depo. at 19:25-20:12; 21:4-7; 22:6-24.
[268] JX 4-z, D. Barr Depo. at 10:23-11:2, 16:13-17:3.
[269] *Id.* at 11:7-9.
[270] *Id.* at 11:15-17.
[271] *Id.* at 12:20-23. Barr was unaware of basic information such as the availability of materials in Braille, including books and the RFA form. *Id.* at 43:14-24. He could not say how a blind inmate would file an ARP, *Id.* at 45:19-23, and was unsure whether deaf inmates were permitted to work. *Id.* at 49:5-9.
Document Number: 52892

23-30825.22455

Warden Barr was likewise ill-informed and ill-equipped on matters of ADA compliance.

173. Current ADA Coordinator Asst. Warden Falgout took on this role in September 2016. At his October 2016 deposition, Falgout testified that he received no training or manual when he took office and did not discuss the role with Warden Barr.[272] He was unfamiliar with the ADA Amendments Act and the Rehabilitation Act;[273] as well as the individualized response plans he was required to create for disabled patients pursuant to LSP Directive 01.016;[274] and the need for an ADA transition plan as defined in 28 C.F.R. § 35.150(d).[275]

174. The Court finds that Asst. Warden Falgout is juggling far too many competing responsibilities to adequately fulfill his obligations as ADA Coordinator for the LSP.[276] The Court also finds that LSP failed to provide adequate training and resources to any of its ADA Coordinators, and none of the ADA Coordinators during the relevant time period possessed the knowledge or experience necessary to oversee and ensure ADA compliance.

---

[272] JX 4-jj, T. Falgout Depo. at 8:2-19.
[273] *Id*. at 11:15-12:3.
[274] *Id*. at 58:12-14.
[275] *Id*. at 37:1-16; 28 C.F.R. § 35.150(d).
[276] Rec. Doc. No. 554, Testimony of Tracy Falgout at 12:10-14:1, 32:15-36:16. During the relevant time period, Falgout was responsible for: supervising a mental health nurse; overseeing LSP's Quality Improvement program, which involved formulating studies, collecting data for as many as six studies at a time, preparing reports, and leading quarterly meetings; preparing and maintaining files to demonstrate compliance with the ACA's medical standards, both for annual internal audits and the triennial ACA audit; making level of care determinations for individuals being transferred from LSP to other facilities, which required thousands of record reviews every year; providing nursing staff training and continuing education; running the health care orderly and hospice volunteer training programs; leading re-entry classes; performing patient histories and assessments as part the intake process for transfers to LSP, at times on a weekly basis; teaching basic and advanced life support classes; processing and evaluating accommodation requests, and conducting as many as 50 or more hearing tests per month in connection with many of those requests.
Document Number: 52892

b.    *ADA Advisory Committee*

175.    Although not required by ADA regulations, LSP Directive 01.016 requires LSP to maintain an ADA Advisory Committee consisting of the ADA Coordinator, the Deputy Warden for Operations, a staff attorney, the Safety Director, and the Health Information Management Supervisor.[277] The purpose of this committee is to review ADA compliance on a monthly basis and recommend corrective action to the warden where appropriate.[278] Despite this Directive, neither LSP's ADA Coordinator[279] nor its past or present wardens,[280] were aware of the existence of such a committee, and Defendants have admitted that "[n]o such committee existed during the pendency of this lawsuit."[281]

c.    *Inadequate Training*

176.    LSP staff are inadequately trained to assist with disabled inmates.  Falgout testified that both security and medical staff receive an hour of training, annually, on "special needs offenders,"[282] which is based upon the same 13-page handout that includes three pages of instructions relating to illegal drug use.[283]  The handout places far more emphasis on handling security concerns than evaluating and assisting with the accommodations and care necessary for disabled inmates.

177.    Several LSP representatives confirmed this lack of ADA training.  At his August 2016 deposition, Falgout testified that he was unaware of any formal ADA training for staff, stating simply: "[a]ll staff have the ability to review the policy."[284]  Assistant Facilities

---

[277] JX 7-a (LSP Directive 1.016) at 4.
[278] *Id.*
[279] JX 4-ii, T. Falgout Depo. at 93:23-25; JX 4-jj, T. Falgout Depo. at 36:1-9.
[280] JX 4-ccc, D. Vannoy Depo. at 72:17-20; JX 4-bb, B. Cain Depo. at 48:24-49:1.
[281] Rec. Doc. No. 242-2 at ¶ 18; *see also* PX 403 at 0003.
[282] Rec. Doc. No. 554, Testimony of Tracy Falgout at 6:13-7:1; 8:18-24.
[283] *See* DX 103 at 03275-77.
[284] JX 4-ii, T. Falgout Depo. at 93:16-22.
Document Number: 52892

23-30825.22457

Maintenance Manager Odis Ratcliff, who testified as the DOC's 30(b)(6) witness regarding the accessibility of LSP's facilities, admitted that no one in his department receives training on the ADA's architectural accessibility requirements.[285]  The DOC's orientation training materials focus almost entirely on hearing-impaired inmates.[286]

> ### d.    Failure to Inform Disabled Inmates of ADA Rights/Procedures

178.    Plaintiffs failed to carry their burden of demonstrating that LSP systemically fails to inform patients of their ADA rights and procedures.  Falgout testified at trial that, in accordance with LSP policy,[287] every new inmate is asked at intake if he has a physical limitation or need for accommodation:[288]

> We ask the questions on everyone coming in, do you have any physical limitations, do you have any issues as far as being able to ambulate.  Some of it is quite evident.  If they come in with a wheelchair or a cane or walker, we know that.  We'll take that into consideration.  We also, like I said, we'll ask them questions if they have any physical limitation.[289]

If the inmate is cognitively impaired or cannot read or write, the procedures are explained verbally.[290]  Falgout testified:

> If in the process of doing medical intake, there appears to be that there is some type of cognitive deficit as far as this offender's ability to understand, we will take our time and slow things down, read it for them.  If there's still that issue, we bring mental health in on that … to help him as much as possible comprehend what's going on with the intake process and make sure he gets the information.[291]

---

[285] JX 4-aaa, O. Ratcliff Depo. at 9:4-11.
[286] JX 12-f.
[287] *See* JX 7-a (LSP Directive 1.016).
[288] JX 4-jj at 19:2-17; *see also* JX 4-ii at 94:20-95:20.
[289] Rec. Doc. No. 553, Testimony of Falgout, 163:19-25.
[290] JX 4-ii at 98:20-99:3.
[291] Rec. Doc. No. 553, Testimony of Falgout, at 169:11-21.
Document Number: 52892

23-30825.22458

179.   During intake, an inmate is provided a Request for Accommodation form and advised that he may request an accommodation at that time or later, if necessary.[292] Class member Otto Barrera testified at trial that he received this form at intake, although he also testified he did not understand it.[293]

180.   While Request for Accommodation forms are available in all housing areas, Falgout testified that the form itself "is not a necessity for access."[294]  Rather, an inmate can request an accommodation verbally, through a sick call form, or even "on a blank piece of paper."[295]  "Any means of communication" satisfies the initiation of a request for accommodation, and a request may even be made by suggestion of a correctional officer on behalf of an inmate.[296]  This process was explained in detail by the documentary evidence submitted.[297]   Inmates whose accommodations requests are denied are allowed to appeal through the ARP process.[298]

> e.   *Failure to Properly Handle Accommodation Requests*

181.   Although the request for accommodation process is explained in the above manner, Plaintiffs presented evidence that LSP does not comply with the steps set forth in this process; rather, nearly all accommodations requests are initiated through the ARP process.[299]  Defendants' training materials instruct LSP staff to direct inmates to the ARP process to request an accommodation.[300]  Former ADA Coordinator Peabody

---

[292] JX 4-jj at 20:5-15; JX 12-a at 00001.
[293] Rec. Doc. No. 547, Testimony of Otto Barrera, at 49:17-50:22; JX 10-d-1 at 03748.
[294] Rec. Doc. No. 553, Testimony of Falgout at 174:18-175:1; JX 4-jj at 19:18-20:23.
[295] JX 4-jj at 19:18-20:23.
[296] *Id.* at 29:5-18; *see also*, Rec. Doc. No. 553 at 175:2-12.
[297] JX 12-a; JX 7-a (LSP Directive 1.016).
[298] JX 7-a at 8; JX 4-jj at 24:8-13, 28:1-8.
[299] JX 5-d at 0321-22.
[300] JX 12-f at 00313.
Document Number: 52892

acknowledged that "a lot" of requests for accommodations are filed as ARPs.[301]  Despite the prison policy and procedure requiring a specific routing process for accommodation-request ARPs,[302] Warden Peabody testified that, during his time as ADA Coordinator, an ARP involving a request for accommodation would be "treated just like every other administrative remedy procedure,"[303] and he never saw an ARP routed to his office.[304] He admitted that ARPs or other complaints would not come to him unless they included "magic words" such as disability or ADA, even if they might be legitimate accommodation requests.[305]  Indeed, he admitted that there was "no excuse for it, other than we were not coordinating the two efforts together."[306]  When testifying as the DOC's 30(b)(6) witness on ADA implementation, Warden Falgout similarly testified that he was unaware how ARPs were routed to his office, who was responsible for routing them, or whether that person had any familiarity with the ADA.[307]

182.    Trial evidence demonstrated that ADA Coordinators and medical staff routinely fail to recognize when medical issues trigger the ADA.  Warden Peabody admitted that "we're so used to inmates making medical requests for duty status based upon a medical condition that I don't necessarily see it as an ADA issue."[308]  Warden Peabody did not think requests for restricted duty statuses should come to him, even though they "could be" considered requests for accommodations.[309] He stated that "[t]his is a confusing issue

---

[301] JX 4-vv, R. Peabody Depo. at 12:21-24.
[302] JX 12-f at 00313; JX 5-d at 00321-22.
[303] JX 4-ww, R. Peabody Depo. at 62:5-15.
[304] *Id*. at 63:2-4.
[305] *Id*. at 75:23-77:1.
[306] *Id*. at 62:20-24.
[307] JX 4-jj, T. Falgout Depo. at 60:7-16.
[308] JX 4-vv, R. Peabody Depo. at 22:21-24.
[309] JX 4-ww, R. Peabody Depo. at 55:3-12.
Document Number: 52892

23-30825.22460

for me and for staff as determining when something is an ADA request and when it isn't. Generally speaking, it gets treated as an ADA request when the inmate puts in something about ADA in the request and basically says he wants an accommodation."[310]

183.    Even when a screening officer recognizes an ADA issue and routes such a request to the ADA Coordinator, the LSP procedure is not utilized in addressing such a request.[311] Although DOC policies provide that "[s]taff who are aware of or have reason to believe that an offender has a disability for which he may need accommodation are required to advise the unit ADA Coordinator, who will evaluate the circumstances to determine if auxiliary aids and services and reasonable accommodations are required,"[312] Warden Peabody testified that, in over ten years of serving as ADA Coordinator, he was never contacted by a LSP staff member, rather than an inmate, indicating that an inmate had a disability and required assistance.[313]

184.    Although DOC policy requires that an inmate's disability be documented in his medical record,[314] and the ADA Coordinator is responsible for developing an individualized response plan which must be included in the medical record,[315] Plaintiffs' medical experts did not find "clear documentation of disability accommodations" in a single chart they reviewed, or "evaluations or assessments of needs in that respect,"[316]

---

[310] *Id.* at 58:11-17.
[311] JX 4-vv, R. Peabody Depo. at 19:25-20:12 (Warden Peabody was not familiar with Form B-08-010-A); *See, e.g.*, PX 231 (ARP of M.B.) at 2563-72 (denying request to use TTY phone and to have his duty status reinstated); PX 231 (ARP of J.T.) at 2200-11 (rejecting complaint that patient was denied access to TU's "handicap accessible shower" with one-sentence response); PX 231 (ARPs of B.A.) at 2604-40 (denying request for access to TTY phone and television with closed captioning); *id.* at 1832-45 (ARP of T.J.)(patient waited approximately 8 months to receive a first step response to his ARP.).
[312] JX 5-d at 00320.
[313] JX 4-ww, R. Peabody Depo. at 39:5-40:16.
[314] JX 12-f at 00312-13.
[315] JX 7-a at 3-4.
[316] PX 6 at 0059 n.74.
Document Number: 52892

and Warden Falgout testified that he was not familiar with the concept of an individualized response plan.[317]

### f.    Lack of Tracking System

185.    The DOC requires LSP's ADA Coordinator to maintain a tracking system for all accommodation requests[318] and to record such information in a database using Form B-08-010-B.[319]  However, in practice, there appears to be no such tracking system, and the database is severely inadequate to effectively track disabled inmates' ADA needs.[320] After becoming ADA Coordinator, Warden Falgout did not recognize the first part of the list;[321] and he described the second part as "an alphabetized master list of everybody who has requested ADA for one reason or another."[322] He admitted this list does not provide a full picture of each individual's disability and was not really a tracking database for individuals,[323] and he acknowledged one would have no way of knowing whether an individual's needs were being met by looking at the list.[324] Further, staff at DOC headquarters appeared to be either unaware of the database's existence or unable to utilize it to determine the number of patients with various disabilities and accommodations at a given facility.[325]

---

[317] JX 4-jj, T. Falgout Depo. at 58:12-14.
[318] JX 7-a at 3.
[319] JX 5-d at 00324, 00329.
[320] JX 12-b.
[321] JX 4-jj, T. Falgout Depo. at 37:17-38:4.
[322] *Id.* at 40:8-17.
[323] *Id.* at 41:8-42:6.
[324] *Id.* at 44:15-23.
[325] PX 306 at 0002 (June 27, 2014 email from S. Falgout to staff at LSP and other facilities, asking if those facilities "keep up with the number of offenders that are blind, handicapped, in a wheelchair," and if they could provide those numbers).
Document Number: 52892

23-30825.22462

186.   Trial evidence demonstrated that many requests never get recorded into the tracking database. In 2014, DOC audits of LSP indicated that the ADA database was "not being used for offender request[s]."[326]  During his tenure, Warden Peabody noted that the database would not include any ARPs.[327]   Warden Barr admitted that he was not involved in recording information in the database and did not know who was.[328]  Likewise, Warden Falgout acknowledged that an ARP would not be recorded in the database if the screening officer did not recognize the request as indicating an ADA issue.[329]

### g.   Copays

187.   Plaintiffs failed to carry their burden of demonstrating that disabled inmates are required to pay co-pays for accommodation requests to be addressed.  To the extent co-pays are being charged based on LSP staff misidentifying or failing to recognize that a medical issue implicates the ADA, this issue can be addressed during the remedy phase of this matter.

### 4.   Failure to Accommodate

Plaintiffs argue they carried their trial burden of demonstrating that LSP systemically fails to accommodate disabled inmates in the following ways:  (1) providing assistive devices and auxiliary aids ranging from wheelchairs and wheelchair gloves to tapping canes and informational materials in Braille; (2) work assignments; (3) dietary needs (4) when transporting patients; (5) in prison procedures ranging from medication administration to evacuation plans to the filing of ARPs; and (6) when imposing discipline.

---

[326] JX 33 at 0001. The March 25, 2014 report indicates that the failure to utilize the ADA database had been referenced in previous reports, and corrective action was still pending. *Id.*
[327] JX 4-ww, R. Peabody Depo. at 65:10-66:15.
[328] JX 4-z, D. Barr Depo. at 23:20-24:12.
[329] JX 4-jj, T. Falgout Depo. at 65:8-14.
Document Number: 52892

Case 3:16-cv-00158    Document 593    03/31/2022    Page 66 of 124

> a.   *Assistive Devices/Auxiliary Aids*

188.   Plaintiffs failed to establish that LSP systemically fails to provide auxiliary aids and assistive devices to disabled inmates.[330]  Further, Plaintiffs' evidence that LSP does not provide Braille for blind inmates does not satisfy their burden; rather, Plaintiffs must show specific instances where blind inmates required Braille and were not accommodated in this, or another appropriate, manner.

189.   Signs are posted throughout LSP advising that auxiliary aids are available on request.[331]  Inmates are provided adaptive devices on a case-by-case basis.[332]

190.   Inmates suffering with mobility impairment may be provided wheelchairs, walkers, canes, or specialty footwear according to physicians' orders.[333] LSP offers training in the use of adaptive devices.[334]

191.   Hearing-impaired inmates are accommodated through a variety of ways:  onsite hearing tests or referrals to off-site audiologists, where necessary;[335] assistive listening devices, access to closed captioned television, FM radio adapters, and amplified telephone headsets, and TTY phones;[336]  batteries for hearing aids if inmates arrived at LSP with a hearing aid;[337] American Sign Language training by a professional sign

---

[330] Plaintiffs claim that Falgout testified that LSP does not provide hearing aids under any circumstances in JX 4-jj, T. Falgout Depo. at 108:18-20.  However, in this deposition, Falgout testified that an accommodation could be a hearing aid.  *Id.* at 30:7.  Further, LSP is required to accommodate the needs of hearing-impaired inmates, but LSP may choose the manner in which it accommodates, as long as it is effective.

[331] JX 4-jj, T. Falgout Depo. at 29:19-30:8; JX 12-h.

[332] *Id.* at 17:11-18:1.

[333] JX 12-b at 00012-13.

[334] JX 4-ii at 122:23-23:7; JX 11-c at 00261.

[335] JX 4-ii at 110:22- 112:6.

[336] *Id.* at 101:23-102:13, 104:11-14; JX 7-a at 6.

[337] *Id.* at 108:11-13; JX 7-a at 7.

Document Number: 52892

23-30825.22464

language interpreter.[338]

192.    In the majority of inmates' experiences specified by Plaintiffs, the Court finds that the evidence does not demonstrate a failure to accommodate a disability under the ADA; rather, most incidents involve a disagreement by the inmate with the accommodation provided and/or the medical treatment dispensed.

193.    Sampier testified that prison officials refused to provide him the specific paraplegic wheelchair he requested along with specialized gloves to accompany this specific wheelchair.[339]  However, Defendants presented evidence establishing that Sampier was provided a wheelchair and a trapeze bar, and he was able to purchase gloves in the commissary.[340]  Sampier may have disagreed with his accommodation, but LSP is not required to provide an inmate's specific, preferred accommodation.

194.    Francis Brauner testified that LSP initially refused to provide him a wheelchair, but ultimately a wheelchair was provided that was hard to maneuver.[341]  Brauner also complained that he was denied his request for gloves because he was told "it wasn't in the budget."[342]  Again, the evidence reflects that Brauner was dissatisfied with his accommodation, but he was accommodated.

195.    The incidents regarding Karl Clomberg's foot and Michael Johnson's propensity to pass out occurred outside the relevant time period.  Further, the Court finds that the evidence surrounding these inmates' experiences demonstrates a disagreement with

---

[338] *Id.* at 104:20-105:9; Dr. Daniel Burch was under contract to provide sign language training at LSP for the period of August 2015 – August 2018.  *See* JX 12-c at 00166-71.
[339] Rec. Doc. No. 544, Testimony of Farrell Sampier at 81:18-82:11; 59:11-60:2.
[340] *Id.* at 60:4-10, 59:18-20, 81:22-24.
[341] Rec. Doc. No. 546, Testimony of Francis Brauner, at 103:1-104:12.
[342] *Id.* at 104:13-25.
Document Number: 52892

23-30825.22465

medical treatment, not a violation of the ADA.

196.   John Tonubbee, who claims he suffers from bunions, a hammer toe, and knee pain,[343] was provided a pair of Apex shoes rather than the specific shoes he requested.[344] Thus, Tonubbee was accommodated, disagreement notwithstanding.  Further, the Court finds that Tonubbee's complaint constitutes a disagreement with medical treatment rather than a violation of the ADA.

197.   Plaintiffs failed to demonstrate that Derrick Woodberry's hemorrhoids constitute a disability under the ADA.  Further, the evidence demonstrates a disagreement with medical treatment, not a violation of the ADA.

### b.   Work Assignments

198.   Plaintiffs failed to demonstrate that LSP systemically fails to accommodate disabled inmates in work assignments or duty statuses.

199.   At LSP, assignment of duty status begins at intake.[345]  When an inmate arrives at LSP, he is not assigned a duty status until he evaluated by a health care provider.[346]  If an inmate believes his duty status is being violated, he may utilize the ARP process.[347]

200.   Adrian Dunn, who suffers from diabetes and asthma, testified that his out-of-field duty status was revoked after 13 years even though he continues to have asthma attacks exacerbated by dust.[348]  Dunn's medical records were not admitted into evidence in this matter.

---

[343] Rec. Doc. No. 546, Testimony of John Tonubbee, at 147:7-149:13.
[344] JX 10-ddd-3 at 56892.
[345] Rec. Doc. No. 553, Testimony of Falgout at 216:10-14.
[346] *Id.* at 216:14-21; JX 4-ii at 94:1-19.
[347] JX 4-jj at 46:13-17.
[348] JX 4-h, A. Dunn Depo. at 27:5-24, 28:18-29:25.
Document Number: 52892

23-30825.22466

201.   The medical records of Karl Clomberg and Michael Johnson are not in evidence in this matter.  Additionally, the complaints of these inmates fall outside the relevant time period.[349]

202.   Jason Hacker was denied a restricted duty status and assigned field work despite a medical determination that he was blind.[350]  However, Hacker filed a separate lawsuit against these Defendants on the same complaints, and the Fifth Circuit affirmed a jury verdict finding that Hacker was not disabled.[351]

203.   Although Hymel Varnado testified that he was required to lift heavy locker boxes as part of his orderly duties, despite having a duty status restriction of no heavy lifting,[352] Varnado also testified this issue came up in 2010,[353] and he has reported no physical problems with his duty status during the relevant time period.[354]

204.   Anthony Mandigo, who suffers from sickle cell disease causing ulcers to develop on his legs and ankles,[355] testified at trial that he was assigned to be a tier walker, which involved walking up and down a prison tier for 10-hour shifts, despite having a duty status mandating "no prolonged walking."[356]   However, Mandigo's duty status provides for intermittent rest,[357] and he testified that if he complained of pain, "I might get a duty status of no duty, and go see the clinic every day to get a dressing change."[358]  Thus, evidence

---

[349] *See* JX 4-j at 10, 24; JX 4-f at 28 for dates of incidents.
[350] JX 4-i, Hacker Depo., at 55:7-58:11.
[351] *Hacker v. Cain*, 759 Fed. Appx. 212, 216-218 (5th Cir. 2018).
[352] JX 4-s at 21:8-23:23.
[353] *Id.* at 19:8-20:22.
[354] *Id.* at 26:19-25, 29:2-5.
[355] Rec. Doc. No. 550, Testimony of Anthony Mandigo at 82:4-24.
[356] *Id.* at 85:4-19.
[357] *See* JX 6-oo (LSP Directive 13.063) at 00203.
[358] Rec. Doc. No. 550 at 86:1-2.
Document Number: 52892

demonstrates that Mandigo's physical limitations were accommodated in his work assignment.

205.    Charles Butler testified that he was injured while hanging drywall pursuant to his Squad A duty status work assignment, and he was required to hang drywall sheets weighing 20 to 25 pounds, despite a lifting restriction of ten pounds.[359]    However, Defendants presented evidence that a Squad A duty status inmate is restricted to lifting "objects weighing <u>less</u> than 30 pounds."[360]    Thus, evidence demonstrated that Butler's duty status restrictions were not violated by this work assignment, as his lifting restriction was thirty pounds, not ten.

*c.    Dietary Accommodations*

206.    Plaintiffs have failed to carry their burden of demonstrating that LSP systemically fails to accommodate dietary restrictions for disabled inmates.

207.    Plaintiffs offered testimony of four class members who claim their disabilities require dietary accommodations that have not been met by LSP.    Further, it was only established that one class member, Adrian Dunn, would require a dietary accommodation based on a disability – diabetes.[361]    Evidence relating to Clomberg, Brauner, and Barrera[362] failed to connect the purported dietary requirements to a disability as defined by the ADA.

---

[359] Rec. <u>Doc. No. 547</u>, Testimony of Charles Butler at 63:22-64:23.
[360] JX 6-oo (LSP Directive 13.063) at 00205 (emphasis in original).
[361] JX 4-h, A. Dunn Depo. at 22:13-20.
[362] Trial evidence established that Barrera preferred to receive a regular tray and cut up his own food.   JX 10-d-1 at 03971-03972. Further, evidence demonstrated that Barrera was accommodated by receiving Ensure protein drinks 2-3 times a day, *see id.* at 03783; 03779; JX 10-d-4 at 04449, and Barrera routinely ignored doctor's orders regarding his diet by eating freely and taking food off other inmates' trays, eating fried chicken, and purchasing commissary food items inconsistent with his dietary restrictions.   *See* JX 4-pp at 20:20-23:18; JX 10-d-1 at 03966 – 67; Rec. <u>Doc. No. 547</u>, Testimony of Otto Barrera at 42:23-45:18. Document Number: 52892

Further, no evidence was presented that these class members filed ARPs to complain about their dietary needs.

d.    *Lack of Handicapped-Accessible Transportation*

208.    Benny Prine, who is capable of walking but uses a wheelchair due to issues with his left knee and right hip,[363] testified that on two occasions, he was transported to an outside medical appointment in a regular van, which caused him pain due to the inability to keep his bad leg extended.[364]   However, Prine never requested an accommodation and did not answer the question whether he had reported his discomfort to anyone at LSP.[365]

209.    Hymel Varnado testified that he was transported to the hospital in a regular van, handcuffed and shackled, while he suffered from a ruptured spleen and internal bleeding.[366]   Following surgery, Varnado was transported back to LSP in the back of a car.[367]   There is no evidence that Varnado was disabled under the ADA; the evidence demonstrates that LSP provided poor medical care and transportation to a patient in need of surgery.

210.    The transport incidents involving Sampier and Barrera occurred outside of the relevant time period.

211.    Danny Prince, a former health care orderly, testified that, when the handicap van was not available, an inmate with a call-out appointment would "have their trip cancelled

---

[363] JX 4-q, B. Prine Depo. at 12:15-17.
[364] *Id.* at 84:3-85:20.
[365] *Id.* at 85:21-86:6.
[366] JX 4-s at 31:21-33:1.
[367] *Id.* at 33:11-34:13.
Document Number: 52892

23-30825.22469

or rescheduled."[368]   Prince's testimony demonstrates that LSP was mindful of the necessity to provide disabled inmates safe transportation.  This evidence, while probative of the failure to provide adequate care under the Eighth Amendment is not probative of an ADA violation.

212.   Plaintiffs failed to carry their burden of demonstrating a systemic failure to accommodate disabled inmates in providing safe transportation.   Instances described above fail to indicate a disability under the ADA and/or reference circumstantial scenarios where improper care was provided or where substandard or unavailable transportation impeded adequate care.

### e.    *Accommodations in Prison Procedures/Discipline*

213.   Plaintiffs presented no evidence of a disabled inmate who was not accommodated in the prison procedures of pill call, sick call, or head count.[369]

214.   While the LSP evacuation plan does not explicitly set forth a protocol for the safe evacuation of disabled inmates, the plan describes how the evacuation should proceed in all buildings on the property, including those that house disabled inmates.[370]   To the extent architectural barriers, such as ramps and ledges, create an unsafe evacuation plan for disabled inmates, that issue is adequately addressed above regarding physical and architectural barriers to access.

---

[368] Rec. Doc. No. 547, Testimony of Danny Prince at 103:4-8.
[369] Plaintiffs offered testimony of Barr and Falgout that they could not identify a specific accommodation made during these procedures for deaf or blind patients; however, Plaintiffs failed to demonstrate an actual failure to accommodate a deaf or blind inmate in these procedures to the Court's satisfaction.
[370] PX 16.

Document Number: 52892

215.     All disciplinary decisions are left to the sole discretion of security personnel, without oversight by medical staff as to the appropriateness of discipline for disabled inmates.[371]

216.  In the case of one disabled inmate, evidence demonstrated that the inmate suffered from severe mental health issues, including schizophrenia, and total blindness due to glaucoma; however, this inmate was "gassed" for refusing to shave.  The email indicates that the nurse was "looking into this as security should had (sic) checked with MH first."[372] The Court finds that LSP fails to take disability into account in its disciplinary decisions.

217.     Plaintiffs' medical experts noted the case of Patient # 24, a quadriplegic with a tracheostomy tube who was disciplined by being placed in a locked isolation room with no call system.[373]  The experts opined that there was "no way to notify the nurses if his trach tube became clogged and he had trouble breathing.  The solid door is locked and the nurses cannot hear him even if he screams."[374]  The Court finds that isolated housing as a form of discipline fails to accommodate many disabled inmates.

218.     Defendants' evidence that both security and nurses perform rounds every couple of hours, and inmates can (only) verbally scream if they require assistance,[375] fails to persuade the Court that such procedures comply with LSP's ADA obligations.

---

[371] *See* JX 4-ii, T. Falgout Depo. at 123:12-19; JX4-jj, T. Falgout Depo. at 14:20-15:14; JX 4-z, D. Barr Depo. at 40:13-41:24; JX 4-uu, C. Park Depo. at 13:14-21, 14:4-19.
[372] PX 85 at 0002-03.
[373] PX 6 at 0081. The Court overrules Defendants' hearsay objection to this exhibit which was admitted at trial.
[374] *Id.*
[375] *See* JX 4-*ll*, K. Hart Depo. at 34:12-35:23, 40:8-41:9.
Document Number: 52892

23-30825.22471

5.  Exclusionary Policies

       *a.*    *Hobby Craft*

219.   Participation in hobby craft[376] at LSP is a privilege, not a right,[377] and is operated on a "first come/first serve basis" after submission of a written request to participate.[378] Further, LSP maintains a policy of ensuring the safe and secure operation of hobby craft which includes "the <u>temporary</u> interruption of an inmate utilizing the hobbyshop when under medical care and/or treatment, requiring a duty status, until such time as the inmate is returned to regular duty without restrictions."[379]  The policy further provides:  "No inmate receiving medical care and/or treatment requiring a restriction in the inmate's regular duties will be allowed to utilize the hobbyshops, until such time the inmate is returned to regular duty without restrictions."[380]

220.   LSP Directive 13.063 does, however, provide a caveat to this exclusion: "Offenders assigned restrictive duty will not be allowed to participate in sports and/or recreational activities, unless specified by the treating health care provider.  Participation in these activities could worsen or cause a recurrence of an injury or other medical condition.  If medically indicated, the treating provider may also restrict sports activities of an offender on regular duty."[381]

221.   Nurse Cynthia Park, APRN, testified that she "look[s] at the entire picture of the patient" when making her recommendations for duty statuses to Dr. Lavespere.[382]  She

---

[376] The terms "hobby craft" and "hobby shop" are used interchangeably.
[377] JX 4-ii, T. Falgout Depo. at 107:23-108:1.
[378] JX 7-d at 00015.
[379] PX 7-c (LSP Directive 9.036) at 00004 (emphasis in original).
[380] *Id.* at 00005.
[381] JX 6-oo (LSP Directive 13.063) at 00204.
[382] JX 4-uu, C. Park Depo. at 30:8-9.
Document Number: 52892

23-30825.22472

acknowledged that she will sometimes recommend that a hobby craft restriction be waived for an inmate "based on [the] patient's situation."[383]

222.  Dr. Lavespere makes the final decision regarding an inmate's duty status.[384]  In evaluating an inmate's medical condition for purposes of assigning duty status, Dr. Lavespere testified that:  "I try to be as objective as I can without a punitive bone in my body, and try to be fair with every one of them."[385]  Dr. Lavespere emphasized that he considers the safety of the inmate in applying duty status restrictions.[386]

223.  Subclass member Brauner testified that he requested to participate in hobby craft but was denied and "told that anyone that has a duty status is not allowed to participate in hobby craft."[387]  Brauner testified that no other reason was given for this denial.[388]  However, on cross-examination, Brauner admitted that he never asked a doctor to adjust his duty status and never filed an ARP.[389]

224.  Another Subclass member (C.F.) filed an ARP to challenge his exclusion from the hobby shop based on his restricted duty status because he had a work assignment that required him to sweep, mop, scrub, and walk during the day.[390]  Plaintiffs suggest that, upon initial review and appeal, C.F. was summarily denied access to hobby craft based solely on citation to LSP Directive #09.036.[391]

---

[383] *Id.* at 32:12-21.
[384] *Id.* at 31:19-32:3.
[385] JX 4-qq, Lavespere Depo. at 15:12-14.
[386] *Id.* at 15:12-18:25.
[387] Rec. Doc. No. 546 at 107:15-20.
[388] *Id.* at 107:21-22.
[389] *Id.* at 126:10-128:12.
[390] PX 231 at 1462.  It should be noted that this incident occurred well before the designated relevant time period in this case.
[391] *Id.* at 1464, 1513-14.
Document Number: 52892

225.   C.F.'s medical records, reviewed in consideration of his hobby craft ARP, demonstrate that he suffers from "L5-S1 degenerative disc disease.  Moderately large right lateral recess at L5-S1 disc herniation with right S1 nerve root compression."[392] In his initial ARP denial, the First Step Response states:[393]

This is in response to your ARP 2011-2246.  After careful review of the pertinent volumes of your current medical record, I find the following:  The extensive documentation in your medical record indicates that you are followed on a regular basis in the Physician's Clinic and the Neurology Clinic.  You have a history of right sciatica pain with L5-S1 herniated nucleus pulposus and spondylolisthesis, grade 1 at L5-S1.  You had a right L5-S1 microdiskectomy and posterior lateral fusion with a pedicle screw fixation of L5-S1 at MCNO on 1-17-2008.
You were last seen in the Physician's Clinic by Dr. McMurdo on 7-18-2011 and you complained about the "no hobbycraft" restriction.  You continue on medications, Mobic and Parafon Forte for pain and discomfort.

You have failed to provide evidence to substantiate your allegation of discrimination or that your care has not met acceptable standards of care.  I find no evidence to support your claim of a violation of the Disability Act.

According to LSP Directive #09.036, when under medical care and/or treatment, requiring a duty status, an offender utilizing the hobbyshop is interrupted until the offender is returned to regular duty without restrictions.  Therefore, your request to have the "no hobbycraft" removed from your duty status is denied.  If you have job complaints, this matter would better addressed through the Classification Department, which handles job assignments and job changes.

C.F.'s medical records and First Step Response does not demonstrate a blanket denial citing only to the general LSP Directive; it includes a medical evaluation of his medical conditions which resulted in the denial.  That C.F. disagreed with the result does not establish that it was discriminatory.

226.   While the evidence presented demonstrates that medical staff are making individualized assessments to determine eligibility to apply for hobby craft, it also demonstrates that a blanket exclusion exists, and an inmate must challenge their classification via ARP to obtain relief.  However, the Court finds that the hobby craft

---

[392] *Id.* at 1506.
[393] *Id.* at 1512 (interlineation in original).
Document Number: 52892

23-30825.22474

privilege is not the same kind of program/activity/service as the others complained of because all inmates, disabled or not, must apply for hobby craft and are screened prior to allowing participation. Further, evidence demonstrates that when a disabled inmate requests to be permitted to participate in hobby craft, LSP providers give thoughtful consideration to the inmate's medical conditions and/or impairments in determining the safety of participation in hobby craft.[394]

*b.  Duty Status/Work Release Program*

227.  All blind inmates at LSP are placed on "no duty" status.[395]

228.  Inmates on "no duty" are not permitted to work and are unable to earn incentive wages,[396] but they receive no discounts for phone calls or at the canteen.[397]

229.  Inmates with duty status restrictions are excluded from participation in LSP's work release program, which allows inmates with less than two years left on their sentences to work outside the prison as part of their integration back into the community.[398]

230.  Dr. Singh issued a blanket prohibition on approving HIV-positive individuals for work release.[399]

231.  Dr. Lavespere's opinion that the most desirable work assignment at LSP is "no duty status"[400] is irrelevant to this issue and does not justify blanket denials and

---

[394] While LSP's requirement that a disabled inmate file an ARP to apply for hobby craft is not the best policy or practice, the Court does not find that it is a violation of the ADA because all inmates at LSP must apply, are subject to screening, and must gain approval before participation is allowed.
[395] JX 4-z, D. Barr Depo. at 44:6-10; JX 4-ww, R. Peabody Depo. at 53:22-54:7.
[396] JX 4-z, D. Barr Depo. at 44:11-13.
[397] *Id.* at 47:3-6.
[398] JX 4-jj, T. Falgout Depo. at 59:11-25.
[399] PX 99 (June 8, 2010 email from Sonya Bufalo to Amanda Amman).
[400] JX 4-qq at 20.
Document Number: 52892

prohibitions of access to programs that are not based on individualized medical determinations.

232.   Defendants did not refute the evidence presented by Plaintiffs on this issue wherein present and past ADA Coordinators acknowledged blanket denials of access regarding these programs.

## III.   CONCLUSIONS OF LAW

### A.  Eighth Amendment Standard

As expressed by the Supreme Court in *Brown v. Plata*,

> As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "'The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.'"[401]

Prisoners are dependent on the State for necessary medical care, and

> A prison's failure to provide sustenance for inmates "may actually produce physical 'torture or a lingering death.'"[402] Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.[403]

If a State cannot meet this obligation, "the courts have a responsibility to remedy the resulting Eighth Amendment violation."[404] While "[c]ourts must be sensitive to the

---

[401] 563 U.S. 493, 510 (2011)(quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion))).
[402] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890)); *see generally* A. Elsner, Gates of Injustice: The Crisis in America's Prisons (2004)).
[403] *Id.* at 510-511.
[404] *Id.* at 511 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n. 9, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)).
Document Number: 52892

State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals,"[405] courts must "nevertheless … not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.'"[406]   Indeed, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[407]

Deliberate indifference to "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."[408] This inquiry consists of both an objective and a subjective test. The objective test requires showing that the prisoner has "serious medical needs,"[409] and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm.'"[410]   To prove an Eighth Amendment violation, Plaintiffs must prove that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate."[411] An official is not liable for deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[412] To

---

[405] *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 547–548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).
[406] *Id.* (quoting *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam)).
[407] *Id.*
[408] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *see also Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989).
[409] *Estelle*, 429 U.S. at 104.
[410] *Braggs v. Dunn*, 257 F. Supp.3d 1171, 1189 (M.D. Ala. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).
[411] *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. at 833-34).
[412] *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994).
Document Number: 52892

23-30825.22477

meet his burden, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[413]

Whether or not officials knew of the risk is considered the subjective component of the deliberate indifference standard,[414] which requires a state of mind amounting to recklessness as used in criminal law.[415] The subjective test requires a showing that prison officials had requisite knowledge of the risk of harm and either (1) disregarded it or (2) failed to act reasonably to abate it.[416] Willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claim.[417]

Systemic deficiencies in a prison's health-care system can provide the basis for a finding of deliberate indifference at an institutional level.[418] The cumulative effect of different deficiencies can demonstrate the subjective component of deliberate indifference, as the Supreme Court acknowledged in *Wilson v. Seiter*.[419] In class actions challenging systemic health care deficiencies, deliberate indifference to inmates' health

---

[413] *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

[414] *Farmer,* 511 U.S. at 848.

[415] *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer,* 511 U.S. at 839–40); see also *Hacker v. Cain*, No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ("An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown."); *Hall v. Johnson*, No. 12-00099-BAJ-RLB, 2013 WL 870230, at *3 (M.D. La. Mar. 6, 2013).

[416] *Farmer*, 511 U.S. at 844-45; *see also* *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1250 (MD. Ala. 2017)("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.").

[417] *See Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

[418] *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004)("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .").

[419] 501 U.S. 294, 300 (1991) (rejecting a distinction between "one-time" or "short-term" conditions of confinement and "continuing" or "systemic" conditions).

Document Number: 52892

needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[420]

The fact that a risk is obvious is sufficient to allow a fact finder to conclude that prison officials knew of the risk.[421] Plaintiffs may also demonstrate knowledge through inference from circumstantial evidence.[422] If there is proof of a problem that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[423]

Plaintiffs herein have demonstrated that "systemwide deficiencies in the provision of medical . . . care . . . taken as a whole, subject sick prisoners in [LSP] to 'substantial risk of serious harm' and cause the delivery of care in [LSP] to fall below the evolving standards of decency that mark the progress of a maturing society."[424]  To prevail on their Eighth Amendment claim, Plaintiffs proved (1) the existence of serious medical needs among members of the Class and (2) that Defendants were deliberately indifferent to a

---

[420] *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000); *see, e.g., Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977).
[421] *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates*, 376 F.3d at 333; *Robinson v. Babin*, No. 12-00629-BAJ-RLB, 2014 WL 2769099, at *4 (M.D. La. June 18, 2014).
[422] *Farmer*, 511 U.S. at 842.
[423] *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted).
[424] Rec. Doc. No. 573 at 247 (quoting *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011)).
Document Number: 52892

substantial risk of serious harm stemming from the inadequacies in LSP's medical care system.[425]

Turning to the objective test, the Fifth Circuit has defined a "serious medical need" as "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."[426]  Given that this is a class action, Plaintiffs must demonstrate that that serious medical needs exist on a widespread basis, rather than on an individual basis.  Plaintiffs must also show that Defendants acted with deliberate indifference to the serious medical needs of the class and must establish that Defendants exposed the Class to "a substantial risk of serious harm."[427]

To establish a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources."[428]  "[M]ultiple policies or practices that combine to deprive a prisoner of a 'single, identifiable human need,' such as [medical care], can support a finding of Eighth Amendment liability."[429]  Moreover, the Fifth Circuit has long recognized that "the totality of circumstances concerning medical care" may violate the Eighth Amendment.[430]  The Court of Appeals for the Fifth Circuit has defined that a "serious medical need" is one "for which treatment has been recommended or for

---

[425] *Id.* (citing *e.g., Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *Lawson v. Dall. Cty.*, 286 F.3d 257, 262 (5th Cir. 2002); *Braggs*, 257 F. Supp. 3d at 1189.).

[426] *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

[427] *Id.* at 345.

[428] *Farmer,* 511 U.S. at 843; *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise[.]" (emphasis in original)).

[429] *Braggs*, 257 F. Supp. 3d at 1192 (quoting *Gates v. Cook*, 376 F.3d at 333).

[430] *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977).

Document Number: 52892

which the need is so apparent that even laymen would recognize that care is required."[431] The "seriousness" of an inmate's medical need may also be determined by reference to the effects of a delay in treatment.[432] "Serious medical needs" also include conditions that threaten to cause health problems in the future.[433]

As for the subjective test, Plaintiffs must demonstrate that Defendants have a "sufficiently culpable state of mind."[434] "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety."[435] Even in situations where awareness is shown, prison officials will not be liable "if they responded reasonably to the risk."[436] However, prison officials cannot escape liability simply by demonstrating that they eventually took some form of "corrective action" in response to a risk of harm.[437] Efforts to correct systemic deficiencies that "simply do not go far enough," when weighed against the risk of harm, also constitute deliberate indifference[438] because such insufficient efforts are not "reasonable measures to abate" the identified substantial risk of serious harm.[439] Further, "[i]nsisting upon a course of action that has already proven futile is not an objectively reasonable response under the deliberate-indifference standard" and would support a finding of liability under the Eighth Amendment.[440]

---

[431] *Gobert*, 463 F.3d at 345 n. 12 (citing *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir.1994), *abrogated on other grounds by Hope*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

[432] *Hill*, 40 F.3d at 1187.

[433] *See Farmer*, 511 U.S. at 843.

[434] *Id.* at 834 (internal citation and quotation marks omitted).

[435] *Id.* (internal citation and quotation marks omitted).

[436] *Id.* at 844.

[437] *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998).

[438] *Laube v. Haley*, 234 F. Supp.2d 1227, 1251 (M.D. Ala. 2002).

[439] *Farmer*, 511 U.S. at 847.

[440] *Braggs*, 257 F. Supp. 3d at 1260.

Document Number: 52892

23-30825.22481

In this case, deliberate indifference may also be established "by proving that there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."[441] "In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference."[442] "As an evidentiary matter, these systemic deficiencies may be identified by a 'series of incidents closely related in time' or '[r]epeated examples of delayed or denied medical care.'"[443] "[A]lthough one-off negligent treatment is not actionable, . . . frequent negligence, just like a single instance of truly egregious recklessness, may allow the court to infer subjective deliberate indifference."[444] Deliberate indifference may also be "demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them."[445]

The "long duration" of unconstitutional conditions can also demonstrate correctional officials' knowledge of the deficiencies that cause a substantial risk of harm.[446] Thus, if Plaintiffs show that a substantial risk of unreasonable harm was "longstanding, pervasive, well[-]documented, or expressly noted by prison officials in the past" and that "the circumstances suggest that the [prison officials] . . . had been exposed to information concerning the risk . . . , then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."[447]

---

[441] *Id.* at 1251 (internal citation and quotation marks omitted).
[442] *Id.* (citing *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).
[443] *Id.* at 1251-52 (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058-59 (11th Cir. 1986)).
[444] *Dunn v. Dunn*, 219 F. Supp.3d 1100, 1129 (MD. Ala. 2016).
[445] *Id.*
[446] *Alberti v. Sheriff of Harris Cty*., 937 F.2d 984, 998 (5th Cir. 1991).
[447] *Farmer*, 511 U.S. at 842-43; *see also Williams*, 547 F.2d at 1216 (concluding that the Eighth Amendment may be violated on a showing of "evidence of rampant and not isolated deficiencies").
Document Number: 52892

23-30825.22482

Applying the law to the findings of fact set forth above, the Court concludes as a matter of law that Defendants have violated Plaintiffs' Eighth Amendment rights. LSP's deficiencies as to medical health care are widespread; Defendants' manner and means of the delivery of health care to Plaintiffs creates a substantial risk of serious harm to Plaintiffs; and Defendants have been deliberately indifferent to the serious medical needs of Plaintiffs in failing to address and/or correct known deficiencies. As the evidence demonstrates, Defendants have continuously acted with deliberate indifference toward the standards of care "within modern and prudent professional standards" by delaying or denying access to medical attention to serious and urgent medical needs of inmates.[448] The record is replete with instances showing failure by Defendants to take the necessary steps to provide access or avoid delay in access to medical and health care. Specifically, the trial testimony and evidence demonstrate constitutionally inadequate care and/or access to care as it relates to the following: providing timely and adequate access to clinical, inpatient/infirmary, emergency, and specialty care and the lack of medical leadership, administration, and organizational structure. Evidence at trial satisfied both the objective and subjective standards for deliberate indifference.

1. Clinical Care

In *Gates v. Cook*, the Fifth Circuit recognized that a combination of conditions may "have a mutually enforcing effect" that violates the Eighth Amendment.[449] This combination of conditions regarding clinical care is amply demonstrated by the evidence supporting the Court's findings of fact, generally, that: (1) exam rooms lack privacy and

---

[448] *Morales Feliciano v. Rossello Gonzales*, 13 F.Supp.2d 151, 208 (D. Puerto Rico 1998).
[449] 376 F.3d 323, 333 (5th Cir. 2004); *See also, e.g.*, *Williams*, 547 F.2d at 1215; *Braggs*, 257 F. Supp. 3d at 1192.
Document Number: 52892

23-30825.22483

standard medical equipment; (2) there are often no medical records available to the providers making cell side visits; (3) hygiene and spacing issues abound; and (4) physicians/providers treat complaints episodically rather than the underlying state of diseases.  Several specific practices or failings by LSP are identical or similar to matters that have been held to violate the Constitution. These include: (1) the failure to provide adequate facilities and equipment for necessary medical care;[450] (2) the failure to ensure that medical records are available to providers treating the inmate, which permeates numerous aspects of health care delivery;[451] and (3) the use of unqualified or untrained staff or inmate orderlies who provide medical care outside the scope of their qualifications.[452]

---

[450] *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989); *Inmates of Allegheny County Jail v. Wecht*, 874 F.2d 147, 153 (3d Cir.1989) (inadequate space for mental health facilities supported an order closing the jail), *vacated and remanded on other grounds*, 493 U.S. 948, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989); *Newman v. Alabama*, 503 F.2d 1320. 1331 (5th Cir.1974); *Tillery v. Owens*, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (condemning infirmary's lack of space, unsanitary conditions, and deficiencies in equipment and supplies), *aff'd*, 907 F.2d 418 (3d Cir.1990); *Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 887-88 (inmates "receive inadequate medical care in substandard facilities that lack the medical equipment required to conduct routine examinations or afford essential medical treatment").

[451] The record is replete with evidence that Defendants have failed to maintain medical records in a manner that assists in providing constitutionally adequate health care at LSP. In *Newman v. Alabama*, the Fifth Circuit found that, in the prison setting, medical records that are "incomplete, inaccurate and not standardized" contribute to constitutionally inadequate delivery of health care. 503 F.2d 1320, 1323 (5th Cir. 1974)("The consequences of inadequate medical records are manifest in two ways. First, because inmates transferred to and released from Mt. Meigs are accompanied by paltry records, personnel at the receiving institutions are unaware of the diagnosis, treatment previously rendered, and the treatment prescribed for the future. Second, there can be little or no monitoring of whether receiving facilities are complying with a physician's orders. Indeed, the evidence indicates that such noncompliance is rampant.") *Id.* at n 4.  *See also*, *Miranda v. Munoz*, 770 F.2d 255, 261 (1st Cir.1985) (prison officials' knowledge of continuing problem of prisoners arriving at hospital without their medical records cited as a basis for damage liability); *Brown v. Coughlin*, 758 F.Supp. 876, 882 (S.D.N.Y.1991) ( "failure to transfer necessary medical records in a timely fashion" supported a deliberate indifference claim); *see Burks v. Teasdale*, 492 F.Supp. 650, 676 (W.D.Mo.1980) and cases cited (noting that medical records are essential to continuity of medical care).

[452] *Cooper v. City of Cottage Grove*, No. 6:13-cv-551-TC, 2014 WL 4187558, *6 (D. Or. Aug. 21, 2014)("The essential function of EMTs is to stabilize an ill or injured person for transport to the emergency room, not to provide medical diagnosis or treatment. They are not the equivalent of a physician or other medical professional."); *Laaman v. Helgemoe*, 437 F.Supp. 269, 312-313 (D. N.H. 1977)(citations omitted)(" A failure to staff a prison around the clock with qualified personnel trained to identify and cope with medical emergencies and reliance upon unqualified and untrained inmates, civilians and employees of the prison

Document Number: 52892

23-30825.22484

2. Sick Call

The failure to provide a sick call system that ensures that prisoners receive needed care violates the Constitution.[453]  The trial evidence established that Defendants have failed to provide a sick call system that ensures access to care and effectively handles emergencies, which results in the endangerment to the health of inmates by denying or delaying access to health care. Specifically, a combination of the following conditions "have a mutually enforcing effect" that violates the Eighth Amendment: (1) improper use of unqualified EMTs for diagnosis and treatment; (2) multiple requests by numerous inmates for treatment of the same problems; and (3) medical records being unavailable to the providers, which functionally impairs the provider's ability to evaluate and treat underlying conditions and instead promotes a "band-aid" approach to treating complaints episodically.  The Seventh Circuit and D.C. Circuit courts have held that this type of deficiency supports a finding of deliberate indifference.[454]

3. Specialty Care

"A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[455]  This applies to failing to provide referrals to

---

to make medical decisions and to perform medical functions infringe upon the constitutional rights of prisoners.").

[453] *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184–86 (7th Cir.1985) (known deficiencies in sick call system supported a finding of deliberate indifference).

[454] *See id.* at 1186; *see also Inmates of Occoquan v. Barry*, 717 F.Supp. 854, 867 (D.D.C.1989)(deliberate indifference shown by sick call system which relied heavily on medical technical assistants by allowing them to diagnose and dispense medication without proper supervision by trained medical staff).

[455] *Blackstock v. Corrections Corp. of America*, 660 F.Supp.2d 764, 769-70 (W.D. La. 2009)(citing *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir.2006)(citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001); *Chapman v. Johnson*, 339 Fed.Appx. 446, 448, 2009 WL 2391496, *2 (5th Cir. Document Number: 52892

specialty care providers, where medically necessary,[456] failing to implement follow-up treatment instructions of specialists,[457] and the general lack of medical records.  The Fifth Circuit has held that, "'[u]nder certain circumstances, allegations of deliberate indifference may be shown when prison officials deny an inmate recommended treatment by medical professionals.'"[458]

In *Hadix v. Caruso*, a case involving prison inmates' right to constitutionally adequate medical care, the district court for the Western District of Michigan noted that "specialty care referrals are not negligible matters. They relate to care for cancer, cancer diagnosis, HIV treatment, cardiology, ophthalmology and other serious medical conditions as to which a failure to treat timely will contribute toward unnecessary death, disease and suffering."[459]  Further, in *Morales Feliciano v. Rossello Gonzalez*, the court applied Eleventh Circuit jurisprudence and held that the failure to provide access to specialized care required by a prisoner's medical condition violates the Constitution.[460]

---

2009)(fact that defendant was aware that inmate had a serious injury and was instructed to provide pain relieve medication, but did not do so, could demonstrate an Eighth Amendment violation)).

[456] *See Oxendine v. Kaplan*, 241 F.3d 1272, 1277-79 (10th Cir. 2001)(finding the defendant deliberately indifferent where the plaintiff alleged he persistently informed the defendant about his worsening condition and requested a referral to a specialist, but the defendant only referred the plaintiff to a specialist after it was too late).

[457] *See Blackstock*, 660 F.Supp.2d at 770 (failure to follow neurologist's treatment recommendations); *Lewis v. Pacheco*, No. 08-cv-1151, 2010 WL 771227 at *4 (W.D. La. Mar. 2, 2010)(doctor's decision to ignore specialist's orders indicates possible deliberate indifference)(citing *Gil v. Reed*, 381 F.3d 649, 662-64 (7th Cir.2004)(reasonable fact-finder could infer deliberate indifference where prison doctor canceled specialist's prescriptions and substituted medication which specialist had specifically warned was dangerous for persons with plaintiff's condition) and *Jones v. Simek*, 193 F.3d 485, 491 (7th Cir.1999)(allegations that prison doctor refused to provide the specific treatments ordered by specialists alleges facts sufficient to survive a motion for summary judgment)).

[458] *Vanderhoff v. Prentice*, 251 Fed.Appx. 861, 862 (5th Cir. 2007)(quoting *Payne v. Lynaugh*, 843 F.2d 177, 178 (5th Cir.1988).

[459] No. 4:92-cv-110, 2007 WL 710136, * 4 (W.D. Mich., Mar. 6, 2007).

[460] 13 F.Supp.2d 151, 210 (D. P.R.1998)(citing *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir.1991) (failure to provide access to a respiratory therapist could constitute deliberate indifference), *vacated as settled*, 931 F.2d 711 (11th Cir.1991); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989)(non-psychiatrist was not competent to evaluate significance of a prisoner's suicidal gesture; prison officials must "inform competent authorities" of medical or psychiatric needs), *rehearing denied*, 880 F.2d 421 (11th Cir.1989); Tillery v. Document Number: 52892

The Court concludes that Defendants have been deliberately indifferent to the serious risk of harm in failing to provide constitutionally adequate access to specialty care in failing to follow orders of specialty care providers.  The evidence and testimony at trial overwhelmingly demonstrated deficiencies in:  (1) timeliness and adequacy in evaluating the need for specialty care, (2)  scheduling and tracking appointments, (3) timely complying with testing and other diagnostic requirements, (4) executing appropriate follow-up directions from specialty care providers; and (5) general failure to coordinate care.

### 4.    Emergency Care

The Supreme Court has held that access to emergency medical care falls within the "minimal civilized measure of life's necessities."[461]  The Fifth Circuit holds that, when a gatekeeper to emergency care knowingly disregards a prisoner's complaints, he acts with deliberate indifference to that prison's medical needs.[462] The evidence in this case demonstrates that Defendants have been deliberately indifferent to Plaintiffs' care in emergency evaluation and treatment.  As set forth above, Defendants primarily rely on EMTs to staff the ATU and evaluate medical emergencies; they fail to consistently and adequately staff the ATU.  Patients are often not properly evaluated or timely transported to emergency facilities for proper treatment.  The Court observed during its site visit that the ATU is not a properly equipped emergency room capable of treating serious medical

---

Owens, 719 F.Supp. 1256, 1307 (W.D.Pa.1989) (services of cardiologist and dermatologist should be provided), aff'd, 907 F.2d 418 (3d Cir.1990).
[461] See Wilson v. Seiter, 501 U.S. 294, 298 (1991).
[462] See Rodrigue v. Morehouse Det. Ctr., No. 09-985, 2012 WL 4483438, at *6 (W.D. La. 2012), aff'd, 557 Fed.Appx. 341 (5th Cir. 2014) (prison officials were not entitled to qualified immunity where they ignored prisoner's requests for medical care for his obviously dire condition).
Document Number: 52892

emergencies; hence, referral and transport to an off-site emergency room is required but transportation and referral to outside emergency services is irregular and incompetent. Further, Plaintiffs demonstrated that it is the general practice at LSP for EMTs and providers to hold patients in the ATU for observation for several hours instead of transport them off-site immediately, where appropriate. Such practices have inexorably led to preventable deaths and avoidable exacerbation of conditions.

## 5. Inpatient/Infirmary Care

The Court concludes that inpatient/infirmary care at LSP is constitutionally deficient because it provides significantly inadequate staffing, which results in the inappropriate use of inmate orderlies. Courts have held that deliberate indifference to serious medical needs may be shown by proving a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care.[463]

## 6. Medical Leadership/Organizational Structure

The lack of "adequate organization and control in the administration of health services" in a prison can support the finding of an Eighth Amendment violation.[464] The Court concludes that the cumulative effect of the lack of medical leadership and organizational structure of the health care system at LSP meets the subjective component of deliberate indifference based on a combination of the following deficiencies: (1) lack

---

[463] *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir.1985); *see also Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir.1985); *White v. Cooper*, No. 08–CV–1321, 2009 WL 1230008, *4-5 (W.D. La. May 5, 2009)(holding that inmate stated a viable claim under the Eighth Amendment where prison understaffed medical infirmary); *cf Braggs*, 257 F. Supp. 3d at 1212 (noting that understaffing of mental health care workers "created a substantial risk of serious harm," including a "greater risk for continued pain and suffering").

[464] *See DeGidio v. Pung*, 920 F.2d 525, 529 (8th Cir.1990).

Document Number: 52892

of meaningful mortality review, quality control, and quality improvement of care;[465] (2) use of correctional personnel to manage medical decisions;[466] (3) lack of peer review;[467] (4) absence of medical personnel involvement in the development and allocation of medical budget funds;[468] (5) lack of medical supervision by Lavespere;[469] and (6) failure to maintain proper credentialing.[470]

Accordingly, Plaintiffs are entitled to injunctive relief to remedy the Eighth Amendment violations discussed above.

## B.    ADA

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to

---

[465] *See Braggs*, 257 F. Supp. 3d at 1257 (prison's "quality-control process is hopelessly inadequate in implementing corrective actions"); *see also*, *Madrid v. Gomez*, 889 F.Supp. 1146, 1258 (N.D. Cal. 1995)("First, '[a] primary component of a minimally acceptable correctional health care system is the implementation of procedures to review the quality of medical care being provided.' *Lightfoot*, 486 F.Supp. at 517–18. Reviews of records to evaluate the delivery of care are essential. *Capps*, 559 F.Supp. at 912 (lack of chart review is part of violation); *Lightfoot*, 486 F.Supp. at 517 (lack of chart review is element of violation); *Todaro*, 431 F.Supp. at 1160 (failure to audit system part of violation); *see also Palmigiano*, 443 F.Supp. at 975. In addition, peer review and death reviews should be instituted to improve the quality of care. *Capps*, 559 F.Supp. at 912 (lack of peer review part of violation); *Lightfoot*, 486 F.Supp. at 517–18 (noting lack of peer review and expressing court's "alarm[ ]" at the "lack of regular system of review of deaths").

[466] *See Hartman v. Correctional Med. Servs., Inc.*, 960 F. Supp. 1577, 1582-83 (M.D. Fla. 1996)(holding medical provider could be found deliberately indifferent based on evidence that it permitted a person with only a master's degree and no professional licenses to have substantial authority over mental health system); *see also Hernandez v. County of Monterey*, 110 F.Supp.3d 929, 949 (N.D. Cal. 2015)(granting summary judgment and injunctive relief where plaintiffs' expert found it a "major problem" that correctional officers were conducting intake screenings:   "Officers are not trained to identify persons at risk for withdrawal, to evaluate persons who appear to be intoxicated, or to make medical decisions with respect to isolation for this purpose. This should be done by medical professionals[,] not custody officers.").

[467] *See* fn 461, *supra*.

[468] *See Tillery v. Owens*, 719 F.Supp. 1256, 1293 (W.D. Pa. 1989)(the prison staff is not involved in the budgetary process and medical budget is prepared without any input from the hospital administrator).

[469] *See id.* at 1305-06; *Braggs*, 257 F.Supp. at 1257; *Madrid*, 889 F.Supp. at 1258.

[470] *See Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, * 21 (N.D. Ca. Oct. 3, 2005)(high number of incompetent or unqualified doctors is due in part to failure to track physician credentials and board certifications); *Tillery*, 719 F.Supp.3d at 1306 (court recognized need for medical director to provide education and assess credentials for inhouse medical staff); *Laaman v. Helgemoe*, 437 F.Supp. 269, 289 (D. N.H. 1977)(staff of persons with "less than full academic credentials for their positions" contributed to constitutionally inadequate health care).

Document Number: 52892

integrate them into the economic and social mainstream of American life.'"[471] Title II, in particular, "focuses on disability discrimination in the provision of public services."[472] Section 504 of the RA complements Title II by "prohibit[ing] disability discrimination by recipients of federal funding."[473]  These laws "are judged under the same legal standards, and the same remedies are available under both."[474]

As another section of this Court so aptly explained in *George v. Louisiana Department of Public Safety and Corrections*:

> Under well-established precedent, prisoners may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the RA. *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 209-10, 118 S. Ct. 1952, 1954-55, 141 L.Ed. 2d 215 (1998); *see also, e.g., Frame v. City of Arlington*, 657 F.3d 215, 224-25 (5th Cir. 2011). Title II prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state punitive institutions fall squarely within this statutory definition, *Yeskey*, 524 U.S. at 210. Typically, a plaintiff proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity." *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008).
>
> Beyond these general guiding principles, precedent establishes two other cardinal rules. First, while the ADA's reasonable accommodation requirement does not apply under Title II, its "reasonable modifications" requirement—"A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7); 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682, 121 S. Ct. 1879, 1893, 149 L.Ed. 2d 904 (2001)—has been held to apply in the prison context. *Garrett v. Thaler*, 560 Fed.Appx. 375, 382 (5th Cir.

---

[471] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)).

[472] *Id.* at 224.

[473] *Id.*

[474] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citing *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002)). Thus, the Court analyzes the ADA Subclass ADA and RA claims under one rubric.

Document Number: 52892

23-30825.22490

2014). Consequently, while the ADA "does not require prisons to provide new services or programs for disabled prisoners," these same entities "do have an affirmative obligation to make reasonable modifications ... so that a disabled prisoner can have meaningful access to existing public services or programs." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015) (emphasis added). Second, the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA. *See, e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 Fed.Appx. 375, 382 (5th Cir. 2014). A different kind of intent, in other words, governs in ADA cases. *See Garrett*, 560 Fed.Appx. at 385.[475]

In *Pennsylvania Department of Corrections v. Yeskey*, the Supreme Court held that Title II applied to correctional facilities, recognizing that "[m]odern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."[476] In light of *Yeskey*, numerous courts have recognized that:

> [b]ecause of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service, program or activity, including sleeping, eating, showering, toileting, communicating with those outside the jail by mail and telephone, exercising, entertainment, safety and security, the jail's administrative, disciplinary, and classification proceedings, medical, mental health and dental services, the library, educational, vocational, substance abuse and anger management classes and discharge services.[477]

---

[475] No. 3:14-00338-JWD-EWD, 2016 WL 3568109 at *8 -*9 (M.D. La. June 23, 2016).

[476] 524 U.S. 206, 210 (1998).

[477] *Hernandez*, 110 F. Supp. 3d at 935-36; *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (noting that jails provide inmates "with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication"); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) (collecting cases holding that in the prison setting, "services, programs, and activities" include facilities such as showers, toilets, and sinks); *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 672 (7th Cir. 2012) (same); *Arce v. La. State,* 226 F. Supp. 3d 643, 650 n.7 (E.D. La. 2016) (holding that "[t]he use of prison telephones is a service or activity protected by the ADA.")(citing *Spurlock v. Simmons*, 88 F. Supp. 2d 1189, 1195 (D. Kan. 2000)).

Document Number: 52892

Title II implementing regulations note that:

> [D]etention and correctional facilities are unique facilities under Title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particularly when the need is great (e.g., an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.[478]

It is generally undisputed[479] in this matter that the members of the ADA Subclass are qualified individuals with disabilities that substantially limit one or more major life activities and that LSP is a public entity. Thus, the necessary determination for the Court is whether Plaintiffs carried their burden of demonstrating that members of the Subclass are being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of their disabilities. Notably, as the law pertains to a class of disabled inmates, rather than separate individual claims, Plaintiffs' burden is to demonstrate a systemic failure; they are not required to demonstrate a failure of policies applied to each class member individually.[480]

---

[478] 28 C.F.R Part 35, App. A.

[479] Defendants do dispute that certain conditions complained of by specific Plaintiffs in this matter do not constitute disabilities under the ADA. The Court will address those below, where appropriate.

[480] *See P.V. ex rel. Valentin v. School Dist. of Philadelphia*, 289 F.R.D. 227, 233–34 (E.D. Pa. 2013) ("Defendants fail to recognize, however, that the central tenant of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually."); *see also Parsons v. Ryan*, 754 F.3d 657, 680 (9th Cir. 2014)(explaining that plaintiffs sufficiently proved the system-wide policies alleged with "formal [prison] policies, admissions by [prison] officials in discovery documents, declarations by the named plaintiffs ... and [plaintiffs'] expert report"); *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 219 (N.D.Ill.2014) (relying on class members' testimony to find "significant proof of the common question of whether a hostile work environment existed"); *Olson v. Brown*, 284 F.R.D. 398, 400 (N.D.Ind.2012) (finding that the named plaintiff showed that a jail's practices "caused inmates to suffer the same potential injury, which tie[d] all their jail standards claims together").

Document Number: 52892

23-30825.22492

1.   Architectural Barriers/Facilities/Segregation

Under its ADA rulemaking power, the DOJ has promulgated rules requiring public entities such as prisons to comply with certain architectural accessibility standards.[481] Construction or alterations that began after July 26, 1992, but prior to September 15, 2010, must comply with either the 1991 ADA Standards for Accessible Design ("1991 Standards") or the Uniform Federal Accessibility Standards ("UFAS").[482] If physical construction or alterations commenced on or after September 15, 2010, and before March 15, 2012, the new construction or alterations must comply with either the 2010 ADA Standards for Accessible Design ("2010 Standards"), UFAS, or the 1991 Standards.[483] If physical construction or alterations commenced on or after March 15, 2012, the new construction or alterations must comply with the 2010 Standards.[484]

If an existing facility has not been altered since these standards first took effect, it must still operate each service, program, or activity in a manner that, when viewed in its entirety, the service, program, or activity is readily accessible to and usable by individuals with disabilities.[485] A public entity may fulfill this "programmatic access" mandate by constructing new facilities or altering its existing facilities to bring them into compliance with the accessibility requirements of Section 35.151, or through alternative methods such as "redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, [or] delivery of services at

---

[481] *See* 42 U.S.C. § 12134(a).
[482] 28 C.F.R. § 35.151(c)(1). Courts often refer to the 1991 Standards and the ADAAG interchangeably.
[483] 28 C.F.R. § 35.151(c)(2).
[484] *Id.* § 35.151(c)(3).
[485] *Id.* § 35.150(a).
Document Number: 52892

23-30825.22493

alternate accessible sites."[486]

There are, however, exceptions to the general principle of affording existing facilities greater flexibility in providing programmatic access. In choosing among methods of compliance, the facility must give priority to methods that provide program access in the most integrated setting appropriate.[487] Further, the facility must provide "meaningful access" to the programs and services offered.[488] Finally, the facility's programs and services must be "readily accessible."[489]

The implementation of Title II and the construction and access requirements, as it pertains to ensuring public facilities are accessible to individuals with disabilities, are articulated in the ADAAG regulations. These regulations provide the minimum technical requirements for ADA compliance for newly constructed facilities and for alterations made to existing facilities. 28 C.F.R. pt. 36 app. A. In *Greer v. Richardson Independent School Dist.*, the Fifth Circuit explained:

> When enacting the ADA, Congress acknowledged that some public entities operating then-existing buildings and structures would be unable to comply with all technical aspects of the new ADAAG regulations. Accordingly, the

---

[486] *Id.* § 35.150(b)(1).

[487] *Id.*

[488] *See, Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004)("Supreme Court precedent suggests that denial of "meaningful access" is equivalent to a full denial of access under the ADA.")(citing *Choate*, 469 U.S. at 301 (stating in the context of the Rehabilitation Act that a benefit cannot be offered in a way that "effectively denies" otherwise qualified handicapped individuals the "meaningful access" to which they are entitled)); *Wright v. N.Y. State Dep't of Corr. & Cnty. Supervision*, 831 F.3d 64, 73 (2d Cir. 2016) (recognizing that "meaningful access" requires the provision of accommodations that overcome structural impediments limiting access to a prison's services); *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003) (collecting cases holding that ADA requires more than mere physical access, and concluding that barriers to accessible dining, restrooms, and parking prevented "meaningful access" to state fairgrounds, even though wheelchair users were able to attend).

[489] *See Chaffin*, 348 F.3d at 861 (quoting *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001)). In *Chaffin*, the Court held that "the 'individual elements' that [were] not handicap accessible add[ed] up to a wholesale exclusion of disabled individuals from buildings, restrooms, dining areas, and seating areas across the entire fairgrounds." *Id. See also Saunders v. Horn*, 959 F. Supp. 689, 697 (E.D. Pa. 1996) (allegation that prison did not provide "readily accessible bathroom and shower facilities" stated a claim under Title II's program access requirement).

Document Number: 52892

23-30825.22494

regulations promulgated by the United States Attorney General to implement the requirements of Title II differentiate between structures built prior to the Act taking effect in January 1992 ("existing facilities") and facilities built or altered after January 1992. *Tennessee v. Lane*, 541 U.S. 509, 531–32, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); 28 C.F.R. § 35.104. The accessibility requirements for existing facilities are less stringent and more flexible than for new facilities. "[I]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." *Lane*, 541 U.S. at 532, 124 S.Ct. 1978 …

When considering ADA compliance for such existing structures, the touchstone is thus not the facility's technical compliance with the ADAAG, but is instead "program accessibility." "A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). Making a program or activity accessible under this standard does not require a public entity to make all of its existing facilities accessible to disabled individuals nor does it require a public entity to take an action that would place an undue burden on the entity. *Id.* at (a)(1), (3). Furthermore, the regulations do not provide any objective criteria for evaluating program accessibility. While an existing facility's compliance with the ADAAG regulations may be informative, program accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held.[490]

The Court acknowledges the requirement in *Greer* that program accessibility should be viewed in its entirety and not solely by evaluating individual elements of a facility. However, that Mazz did not survey LSP entirely does not undermine his findings and conclusions regarding the medical dormitories that house disabled inmates. Mazz testified that he did not have access to the construction or alteration dates of LSP's facilities; thus, he assumed that all facilities would be subject to the more flexible programmatic access requirement that applies to existing constructions.[491]    Mazz

---

[490] 472 Fed.Appx. 287, 291-92 (5th Cir. 2012).
[491] Rec. Doc. No. 546 at 15:1-7; 12:5-15; 14:15-15:22. *See also* PX 7.
Document Number: 52892

followed the industry-standard methodology for evaluating programmatic access, and Defendants have acknowledged that courts routinely rely on the 1991 Standards for guidance in determining whether a facility's programs are accessible.[492]

Defendants maintain they have overcome architectural barriers in these facilities by way of alternative methods of compliance in the form of using trained health care orderlies to assist disabled inmates with their needs.

The Court rejects Plaintiffs' assertion that providing alternative methods of access to disabled inmates through health care orderlies does not comply with the law "in theory."[493]    As set forth above, "a public entity may comply with Title II by adopting a variety of less costly measures, including … assigning aides to assist persons with disabilities in accessing services.  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes."[494] Further, courts must be "sensitive to the fact that prisons are unique environments with heightened security and safety concerns."[495]   However, "because the ADA and RA 'unmistakably' apply to State prisons and prisoners,[496] [DOC] is statutorily required to ensure that all of their inmates, including [plaintiffs], have the opportunity effectively to access the services and programs [DOC] provides."[497]

Applying this jurisprudence to facts found above, the Court finds that it is a generally acceptable and lawful practice to implement a health care orderly assistance

---

[492] Rec. Doc. No. 497 at 40 (citing Greer, 472 F. App'x at 292 n.3).
[493] Rec. Doc. No. 573 at 272.
[494] Garrett v. Thaler, 560 Fed. Appx. 375, 382 (5th Cir. 2014)(internal citations and quotations omitted).
[495] Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 75 (2d Cir. 2016)(citing  Pierce v. Cty. of Orange, 526 F.3d 1190, 1216–17 (9th Cir. 2008)).
[496] Id. (quoting Yeskey, 524 U.S. at 209).
[497] Id.

Document Number: 52892

program to provide disability access. However, Plaintiffs carried their burden of demonstrating that this program, in practice, is ineffective in achieving accessibility with respect to assistance in the dorms themselves (*i.e.*, bathing, showering, using bathrooms, transfers, and transport). This is largely due to understaffing and the abuse/neglect/misconduct of the orderlies. As to training, the Court finds the training program itself to be adequate in content but finds lacking the "as-needed" explanation for how often training occurs. Further, the Court finds that more oversight of the orderlies in this program is glaringly necessary to prevent the too-often instances of abuse, neglect, and misconduct.

Certainly, where reasonable alternative methods achieve compliance, structural changes to existing facilities need not be made.[498] However, where there is no evidence to conclude that such methods are shown to ameliorate barriers presented by structural deficiencies, alterations must be made.[499] In *Pierce v. County of Orange*, the Ninth Circuit highlighted how the use of deputy or other inmate assistance cannot overcome all physical barriers to access: "Plaintiffs …presented evidence to show that deficiencies were not remedied."[500] Whether there was testimony that witnesses observed "detainees—not deputies—struggling to lift a fellow wheelchair-bound detainee over a foot-high retention wall in one of Ward C's inaccessible showers" and disabled inmates "forced to rely on fellow inmates for assistance when faced with inaccessible bathroom facilities," the court concluded that: "The impediment posed by such a barrier highlights

---

[498] 28 C.F.R. § 35.150(b)(1).
[499] *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008).
[500] *Id.* at 1219.
Document Number: 52892

23-30825.22497

the inadequacy of deputy or other inmate assistance."[501]  In this case, the Court finds that orderly assistance has been inadequate to overcome the structural barriers to access for disabled inmates.

Regarding segregation of disabled inmates, which denies them access to programs and services provided to non-disabled inmates at LSP, the Court finds that the manner in which disabled inmates are segregated violates the ADA.  Along with several other regulations promulgated under Title II of the ADA is the "integration regulation," which provides that: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[502]  "[T]he most integrated setting appropriate" is "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."[503]  Evaluating this regulation, the Supreme Court has concluded that: "Unjustified isolation ... is properly regarded as discrimination based on disability."[504] Many courts thereafter have acknowledged that the unnecessary segregation of the disabled in institutions is a form of illegal discrimination against the disabled under the ADA.[505]  Unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of "discrimination" within meaning of ADA and RA, independent of discrimination that arises when individuals with disabilities receive different services from those provided to individuals without disabilities.[506]  Based on the

---

[501] *Id.* at 1219-20.
[502] *Henderson v. Thomas*, 913 F.Supp.2d 1267, 1287 (M.D. Ala. 2012)(quoting 28 C.F.R. § 35.130(d)).
[503] 28 C.F.R. Pt. 35, App. B (2011).
[504] *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999).
[505] *See, e.g., Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175 (10th Cir. 2003)
[506] *Helen L. v. DiDario*, 46 F.3d 325, 335 (3rd Cir. 1995), *rehearing and rehearing in banc denied, certiorari denied*, 516 U.S. 813.
Document Number: 52892

23-30825.22498

findings of fact above, the Court concludes that Defendants have failed to demonstrate the necessity of, and justify the proffered reasons for, the segregation of disabled inmates in the manner LSP employs. The proximity of the medical dorms to the ATU and purported availability of inmate orderly assistance does not overcome the general denial of access to various programs, activities, and services available to non-disabled inmates.

### 2.   Methods-of-Administration Claim

The Subclass Plaintiffs' methods-of-administration claim is comprised of the following allegations which, analyzed together, operate to deny programmatic access to, and discriminate against, disabled inmates: LSP (1) fails to maintain a qualified and adequately trained ADA Coordinator; (2) fails to maintain and ADA advisory committee as required by its own policies; (3) inadequately trains its staff regarding the ADA; (4) fails to inform patients of their rights and the procedures for requesting accommodations; (5) fails to appropriately process accommodation requests and disability-related grievances; (6) fails to identify and track patients' disabilities and accommodation requests; and (7) charges patients co-pays to evaluate their accommodation requests.[507]  The Court found that Plaintiffs carried their burden on all of the above, except (4) and (7).

"A public entity may not ... utilize criteria or methods of administration ... [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."[508] "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities."[509]  Some of Plaintiffs' complaints regarding methods of

---

[507] Rec. Doc. No. 573 at 283-85.
[508] 28 C.F.R. § 35.130(b)(3)(ii).
[509] *Van Velzor v. City of Burleson*, 43 F.Supp.3d 746, 752 (N.D. Tex. 2014).
Document Number: 52892

administration trigger obligations imposed on LSP by Title II's self-evaluative regulations which, Defendants argue, as a court in the Southern District of Texas held, that "[t]he Fifth Circuit has not specifically ruled on whether there is a private cause of action under"[510] the "self-evaluative procedures required by 28 C.F.R. §§ 35.105-107."[511] While not specifically addressing the numbered regulations at issue herein, the Fifth Circuit did hold, generally, in *Frame*:

> As mentioned, there is no question that Title II and § 504 are enforceable through an implied private right of action. Moreover, to the extent Title II's **implementing regulations** "simply apply" Title II's substantive ban on disability discrimination and do not prohibit conduct that Title II permits, **they too are enforceable through Title II's private right of action**. This is because when Congress intends a statute to be enforced through a private right of action, it also "intends the authoritative interpretation of the statute to be so enforced as well."[512]

In so ruling, the *Frame* court relied on the Supreme Court's decision in *Alexander v. Sandoval*, where it explained:

> Such regulations, if valid and reasonable, authoritatively construe the statute itself, *see NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.[513]

---

[510] Rec. Doc. No. 556 at 183 (quoting *Green v. City of Mission*, No. 7:18-CV-00049, 2018 WL 2200094, at *11 (S.D. Tex. May 14, 2018)).

[511] *Id.*

[512] *Frame*, 657 F.3d at 224 (internal citations omitted)(emphasis added).

[513] *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001)(citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). While this case addressed the implementing regulations for Title VI, the Court cited to cases involving the ADA and RA to support the general principle.

Document Number: 52892

Accordingly, the Court interprets the language in *Frame* to extend a private cause of action under Title II's implementing regulations where the claims relate to a systemic failure to comply with the ADA.

Alternatively, as the court stated in *Dunn v. Dunn*, assuming for the sake of argument that Defendants are correct that these regulations do not create a private right of action:

> This would not, however, have made them irrelevant. They are binding regulations promulgated by the Department of Justice (which would be empowered to bring an enforcement action). When courts have found them not to be privately enforceable, as in *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913–14 (6th Cir.2004) (relying on *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)), they have reasoned that the regulations are designed to facilitate, but do more than merely describe, compliance with the ADA, such that "it is conceivable that a public entity could fully satisfy its obligations to accommodate the disabled while at the same time fail to put forth a suitable transition plan."
>
> All this means is that the Department's failure to implement a transition plan would not have constituted a *per se* violation; plaintiffs could not have shown liability merely by proving that the Department had no transition plan, without showing that the Department had, as a result, failed to accommodate prisoners with disabilities. That said, plaintiffs could have argued, and proven at trial, that the Department's failure to do the things required by these regulations had the effect of discriminating.[514]

Following this reasoning, even if Defendants are correct that no private cause of action exists to enforce the self-evaluation regulations at issue, clearly the violation(s) of such regulations can support a claim of general, system-wide noncompliance, and courts across the country have not been unwilling to order injunctive relief mandating compliance therewith.

---

[514] 318 F.R.D. 652, 663-64 (M.D. Al. 2016)(internal citations omitted).
Document Number: 52892

Furthermore, privately enforceable methods-of-administration regulation would give rise to the claims Plaintiffs have raised.  The *Dunn* court stated:

> Indeed, there is another—privately enforceable—ADA regulation which makes clear that policies and practices (or their absence) which result in discrimination against people with disabilities are actionable under the ADA, even if the policies and practices (such as the three regulations discussed above) are not themselves required by the statute. Under this regulation, plaintiffs in an ADA case can challenge a policy or practice—whether it is one described in another regulation or simply one articulated by the plaintiffs themselves—if it causes the public entity to discriminate against them, including by failing to accommodate them.[515]

Additionally, "an omission as well as a commission can be an actionable method of administration."[516]  The *Dunn* court noted:

> The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating. As Justice Marshall explained in *Alexander v. Choate*, Congress designed the Rehabilitation Act, the predecessor statute to the ADA, to address not only "invidious animus," but also, more commonly, "thoughtlessness and indifference—[ ] benign neglect." 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Courts have consistently explained that "Title II [of the ADA] imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 910 (6th Cir.2004); *see also Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 200–01 (2d Cir.2014); *Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir.2006); *Bennett–Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir.2005); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 488 (4th Cir.2005). Under the ADA, a public entity must be "proactive." *Clemons v. Dart*, 168 F.Supp.3d 1060, 1068–69, 2016 WL 890697, at *6 (N.D.Ill. Mar. 9, 2016) (Tharp, J.).[517]

A prison's failure to follow its own, internal procedures is also relevant to this overall determination.  In *Holmes v. Godinez*, an ADA class challenge brought by handicapped

---

[515] *Id.* at 664.
[516] *Id.* at 665.
[517] *Id.* at 665 n. 12.
Document Number: 52892

inmates against the prison, the plaintiffs alleged violations of the ADA by a system-wide policies and practices, including the prison's failure to follow its own, internal ADA directives and/or policies or failure of those policies to adequately remedy barriers to access: "Whether the ADA Directive—an express and undisputed statement of IDOC system-wide policy—satisfies IDOC's obligations under the ADA is indeed a common question apt to drive resolution of the litigation.[518]

Applying the foregoing law and jurisprudence to the facts found above, the Court finds that the LSP methods of administration at LSP violate the ADA and RA by failing to provide adequate access and accommodations to its disabled inmates due to neglect and/or failure to follow both Title II's implementing regulations and failure to follow some of LSP's own ADA Directives. As the court noted in *Holmes v. Godinez*:

> Plaintiffs present a slew of different programs, activities, and services for which they contend IDOC fails to provide reasonable accommodations under the ADA. These include: (1) reception and classification; (2) orientation; (3) educational and vocational programs; (4) work programs; (5) counselor services; (6) medical, mental health, and rehabilitative services; (7) religious services; (8) telephones; (9) televisions; (10) library services; (11) disciplinary proceedings; (12) emergency and routine notification services; (13) grievance process; and (14) pre-parole services. (*See* Compl. ¶¶ 63–140.) **In conducting our analysis, we consider Plaintiffs' claims as to each one of these programs separately**. *See* Fed. R. Civ. P. 56(g); *Phipps*, 681 F.Supp.2d at 919 (ruling separately on wheelchair-bound plaintiffs' three claims that prison did not provide them shower chairs, shower bars, and accessible sinks). We reiterate that an ADA violation exists only if the defendant's action or inaction prevents the plaintiff from participating in a program, activity or service. Certain of Plaintiffs' complaints, such as IDOC's alleged failure to properly train its employees and centrally track hearing impaired offenders, do not specifically target programs, activities, or services, and thus cannot alone sustain a claim under the ADA. (See SJ Reply at 4, Dkt. 258.) **Despite this limitation, that evidence is still relevant to the extent such inaction contributed to a**

---

[518] 311 F.R.D. 177, 219 (N.D. Ill. 2015).
Document Number: 52892

**widespread denial of access to the programs, activities, and services that Plaintiffs do challenge**.[519]

      a.     *ADA Coordinator/Advisory Committee*

Public prisons are required by ADA implementing regulations to maintain an ADA Coordinator. 28 C.F.R. § 35.107 provides that:

> A public entity that employs 50 or more persons **shall** designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by this part.[520]

Additionally, LSP Directive 01.016 states:

> The ADA coordinator shall possess the educational background, experience and skills necessary to carry out all of the duties and responsibilities of the position, and have knowledge and experience in dealing with the legal rights of persons with disabilities and the obligations of public entities under Federal and State disability laws.[521]

Although it is undisputed that LSP has maintained a designated ADA Coordinator for all time periods relevant to this litigation, the Court finds that the ADA Coordinators are mere "window dressing." They have not been sufficiently trained and educated to effectively carry out their obligations under the ADA; in some instances, this role has been secondary to other roles at LSP, and oversight is lacking. The lack of a qualified ADA Coordinator contributes to LSP's system-wide failure to comply with the ADA. Likewise, the inexplicable ignorance of the LSP Directive requiring an ADA advisory committee, while not violative by itself, demonstrates and contributes to LSP's systemic failure to ensure compliance with the ADA.

---

[519] *Id.* at 226 (emphasis added).
[520] Emphasis added.
[521] JX 7-a at 1.
Document Number: 52892

b.    *Staff Training*

The Court found that LSP staff are not adequately trained to identify ADA issues within the disabled inmate population. This lack of training contributes to the systemic failure to accommodate disable inmates as required by the ADA.  In *Clark v. California*, the court found that staff training, including ADA training similar to the training exhibited in this case, was "essential to the provision of necessary services … and "apparently insufficient on its own to meet the statutory minimal levels of care."[522]  The court also stated that:  "The current training regimen is clearly inadequate to prepare staff members to adequately preserve Plaintiffs' rights," and the court ordered further injunctive relief regarding the training issue.[523]  Similarly, in *Armstrong v. Davis*, the district court found an ADA violation where some staff received a one-hour training that many employees could not recall, while others received "virtually no general training pertaining to the identification and accommodation of disabled prisoners and parolees," because "[w]ithout training, even when staff have sufficient information before them to identify and accommodate disabilities, they do not do so because they lack the necessary skills."[524] The Ninth Circuit affirmed in relevant part the district court's order requiring all personnel with relevant roles to undergo training "in the general requirements of the ADA, disability awareness, the appropriate method of determining whether a prisoner adequately understands written and verbal communications, and other relevant policies and procedures."[525]

---

[522] 739 F.Supp.2d 1168, 1231 (N.D. Cal. 2010).
[523] *Id.* at 1234.
[524] No. 94-2307 CW, 1999 WL 35799705 at *31 (N.D. Cal. Dec. 22, 1999).
[525] 275 F.3d 849, 859 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005)).
Document Number: 52892

23-30825.22505

### c.    Failures of Notice/Processing/Tracking

While Plaintiffs failed to carry their burden of demonstrating that Defendants fail to provide notice of their ADA rights and LSP's procedures in widespread fashion, Plaintiffs did prove that Defendants do not follow their own procedures in practice, fail to appropriately process accommodation requests, and fail to track inmates' disabilities and accommodation requests, all of which contribute to LSP's systemic failure to comply with the ADA.  In *Armstrong v. Brown*, the Ninth Circuit affirmed the district court's finding that class members' ADA rights were violated where they lacked access to "functional and timely grievance procedures at county jails to request and obtain disability accommodations."[526]   Similarly, in *Armstrong v. Davis*, the Ninth Circuit held that the prison's accommodations procedures violated ADA where the practice was "to rely primarily on Department employees untrained in issues of disability to determine whether an individual is disabled or not, what accommodations are appropriate if he is, and whether those accommodations will be provided."[527]   The court also held that: "Because the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled, some form of tracking system is necessary in order to enable the Board to comply with the Act."[528]

### 3.    Failure to Accommodate

"The    ADA    provides    for    reasonable    accommodation,    not    preferred

---

[526] 857 F.Supp.2d 919, 933 (N.D. Ca. 2012).
[527] 275 F.3d at 863.
[528] *Id.* at 876. *See also Hernandez*, 110 F. Supp. 3d at 960 (requiring defendants to propose a remedial plan that would include a "system for identifying and tracking all inmates who are qualified individuals with disabilities," as well as "a system for identifying and tracking the reasonable accommodations necessary for qualified inmates with disabilities to participate in programs, services and activities offered by Defendants at the jail").
Document Number: 52892

accommodation."[529] Even in a prison setting, "[t]he accommodation of the inmate's disability need not be ideal; instead, it need only be reasonable and effective.[530] Further, a correctional facility is afforded deference in its determination of an appropriate accommodation."[531]  However, in evaluating a disability for purposes of the ADA, courts should be cautious not to confuse a disagreement with, or inadequate medical treatment for, a disability with intentional discrimination because of a disability. Indeed, this Court held in *George v. Louisiana Dep't of Pub. Safety & Corr.*, "[g]enerally, the ADA prohibits discrimination because of disability, not inadequate treatment for disability. Thusly interpreted by sundry courts, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners."[532]

### a.    Availability of Assistive Devices and Auxiliary Aids

28 C.F.R. § 35.160(b)(1) requires that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  Indeed, "[t]he ADA does not create a remedy for medical malpractice."[533]

---

[529] *Stafford v. King*, No. 11–242, 2013 WL 4833863, at *2 (S.D. Miss. Sept. 11, 2013) (citing *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)).
[530] *Arce v. Louisiana*, 226 F.Supp.3d 643, 651 (E.D. La. 2016)(citing *Wells v. Thaler*, 460 Fed.Appx. 303, 313 (5th Cir. 2012)).
[531] *Id.* (citing *Wells*, at 313).
[532] No. CV-3:14-00338-JWD-EWD, 2016 WL 3568109, at *10 (M.D. La. June 23, 2016).
[533] *Walker v. LeBlanc*, No. 13-553-JJB-RLB, 2015 WL 1276578, *8 (M.D. La. Mar. 19, 2015)(quoting *Brown v. Wilson*, 2012 WL 6719464, *3 (N.D.Tex. Dec. 27, 2012)(quoting *Moore v. Prison Health Services, Inc.*, 24 F.Supp.2d 1164, 1168 (D.Kan.1998), *affirmed*, 201 F.3d 448 (10th Cir.1999))(internal quotation marks omitted); *see also Nottingham v. Richardson*, 499 Fed. Appx. 368, 377 (5th Cir.2012)(finding that "[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners'"); *Hay v. Thaler*, 470 Fed. Appx. 411, 418 (5th Cir.2012) (finding no ADA violation where the plaintiff complained that prison officials refused to provide him with dentures but where the plaintiff made no showing that the refusal was "by reason of his disabilities"); *Moore v. Prison Health Services, Inc.*, 201 F.3d 448 (5th Cir.1999)(noting that the ADA "afford[s] disabled persons legal rights regarding access to programs
Document Number: 52892

Another section of this Court noted in *Hacker v. Cain* that "'[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability.'"[534] Thus, "neither the RA nor the ADA is violated by a prison's simply failing to attend to the medical needs of its disabled prisoners."[535]  Just like in medical indifference cases, "it 'does not create a remedy for medical malpractice,'"[536] and "'purely medical decisions ... do not ordinarily fall within the scope of the ADA or the Rehabilitation Act.'"[537]  On the other hand, as the Court noted in *Cleveland v. Gautreaux*:

> Despite this body of law, however, a contrary principle controls in accommodations cases: in case after case, "the Fifth Circuit has held that a defendant's failure to make the reasonable modifications necessary to adjust for the unique needs of disabled persons can constitute intentional discrimination under the ADA." *Hacker*, 2016 U.S. Dist. LEXIS 73034, at *40, 2016 WL 3167176, at *13 (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir.2004), and *Garrett v. Thaler*, 560 Fed.Appx. 375, 382 (5th Cir.2014)). As one court explained, "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner." *McCoy v. Tex. Dep't of Crim. Justice*, No. C–05–370, 2006 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006); *see also United States v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 880–81, 163 L.Ed.2d 650, 658 (2006). In fact, "where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 Fed.Appx. 287, 296 (5th Cir.2012); *see also Borum v. Swisher Cnty.*, No.

---

[534] No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *19 (M.D. La. June 6, 2016)(quoting *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010)).

[535] *Id.* (citing *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (as to Section 504); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (as to the ADA); *see also, e.g., Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (emphasizing that "courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care"); *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness [under the Rehabilitation Act] must be framed within some larger theory of disability discrimination.")).

[536] *Id.* (quoting *Bryant,* 84 F.3d at 249).

[537] *Id.* (quoting *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005)).

Document Number: 52892

23-30825.22508

2:14–CV–127–J, 2015 WL 327508, at *9 (N.D.Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F.Supp.2d 840, 843–44 (S.D.Tex.2014).[538]

Plaintiffs failed to carry their burden in proving that LSP systemically fails to accommodate disabled inmates with auxiliary and/or assistive devices.  In light of the Court's findings of fact set forth above, the Court finds that most of the evidence Plaintiffs presented on this issue demonstrates a disagreement with medical treatment and/or dissatisfaction with not receiving a preferred accommodation, rather than blatant failures to accommodate in the provisions of such aids/devices.

### b.    Work Assignments/Duty Status

"A 'duty status' is a written designation assigned by a prison medical doctor indicating an inmate's physical or mental ability to perform hard labor in accordance with his sentence. Duty statuses are generally assigned by physicians following a medical evaluation, and they are subject to change depending on changes in the medical condition of a particular inmate. Duty statuses may range from no duty (indicating a need for bed rest), to light duty or regular duty with restrictions, and finally to regular duty without restrictions (indicating the inmate is capable of performing any and all hard labor)."[539]

Although the inmate testimony and evidence presented by Plaintiffs regarding failures to accommodate disabled inmates in work assignments and duty statuses failed to demonstrate a violation of the ADA, the Court notes that this is not because Plaintiffs failed to establish that certain inmates suffered from a disability, as argued by Defendants regarding diabetes and asthma.  Notably, and contrary to Defendants' contentions and

---

[538] 198 F.Supp.3d 717, 746 (M.D. La. 2016).
[539] *Armant v. Stalder*, 287 Fed. Appx. 351, 352 n. 1 (5th Cir. 2008).
Document Number: 52892

23-30825.22509

outdated jurisprudence, both diabetes and asthma can be considered disabilities under the ADA. "The ADA Amendments Act of 2008 ("ADAAA") essentially broadened the definition of 'disability' to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability.[540] The ADAAA did not alter the definition of disability, but it added provisions 42 U.S.C. § 12102(2)-(4) to supersede cases that interpreted the scope of 'disability' narrowly."[541]  Under these amendments, the term "'disability' now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples include epilepsy, hypertension, **asthma**, **diabetes**, major depression, bipolar disorder, schizophrenia, and cancer."[542]  The Fifth Circuit has noted that diabetes is a qualifying disability affecting the endocrine system.[543]

Nevertheless, pursuant to the facts found above, Plaintiffs failed to demonstrate a systemic ADA violation in the failure to accommodate disabled inmates in work assignments and duty statuses.

### c. Dietary Accommodations

While the ADA clearly requires dietary accommodations where an inmate's disability warrants,[544] Plaintiffs failed to demonstrate more than two instances where such needs at LSP were ostensibly unmet.  Thus, the evidence presented failed to demonstrate

---

[540] *McNeal v. Louisiana Department of Public Safety and Corrections*, No. 20-312-JWD-EWD, 2021 WL 359737, at *13 (M.D. La. Feb. 2, 2021)(citing *Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245–46 (5th Cir. 2013)).

[541] *Id.* (citing *Neely*, 735 F.3d 245).

[542] *Weed v. Sidewinder Drilling, Inc.*, 245 F.Supp.3d 826, 834 (N.D. Tex. 2017)(citing ADA Amendments Act of 2008, §§ 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630(j)(5))(emphasis added).

[543] *Marlowe v. LeBlanc*, No. 18-00063-BAJ-EWD, 2020 WL 6276956, at *10 (M.D. La. Oct. 26, 2020)(citing *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n.15 (5th Cir. 2020)).

[544] *See e.g.*, *id.*, 2020 WL 6276956 at *10-*11.

Document Number: 52892

a general, systemic failure by LSP to accommodate disabled inmates' dietary restrictions. However, the Court rejects Defendants' contention that diabetes is not disability subject to a dietary accommodation as contradicted by the jurisprudence set forth above.

### d. Disability Accessible Transportation

"Because public entities must make modifications that are necessary to avoid discrimination on the basis of disability, liability does not depend on evidence of purposeful discrimination."[545]  Rather, "a plaintiff must simply show that 'but for' his disability, he would not have been deprived of the services or benefits he desired.[546]  In the prison context, failure to accommodate the needs of a disabled prisoner is discrimination if it causes the disabled prisoner to suffer more pain and punishment than non-disabled prisoners."[547]

Defendants misconstrue this Court's holding in *Miller v. Chapman*[548] by arguing that this Court held that "[t]here is no affirmative obligation under the ADA to transport disabled persons in handicap-accessible vehicles."[549]  What the Court actually held was that, at the Rule 12(b)(6) stage, the plaintiff's argument that "LSP has a responsibility under the law to provide a handicapped equipped van to transport handicapped inmates

---

[545] *Coker v. Dallas County Jail*, No. 3:05-CV-005-M (BH), 2009 WL 1953038, at *17 (N.D. Tex. Feb. 25, 2009)(citing *Patterson v. Kerr County*, No. SA-05-CA-0626-RF, 2007 WL 2086671, at *7 (W.D.Tex. July 18, 2007)).
[546] *Id.* (citing *Patterson* at *7)(citing *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir.2006))).
[547] *Id.* (citing *McCoy v. Tex. Dep't of Crim. Justice*, 2007 WL 2331055, at *7 (S.D.Tex. Aug. 9, 2006) (citing *U.S. v. Georgia*, 546 U.S. 151, 157, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate [the inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted 'exclu[sion] from participation in or ... deni[al of] the benefits of' the prison's 'services, programs, or activities.'"))).
[548] No. 13-00367-SDD, 2014 WL 2949287 (M.D. La. June 30, 2014).
[549] Rec. Doc. No. 556 at 167.
Document Number: 52892

23-30825.22511

safely" was "alone [] insufficient to support a claim of discrimination based on Plaintiff's disability arising under the ADA and the RA."[550]  The Court ruled so because the plaintiff failed to plead any supporting factual allegations with this statement; however, the Court granted the plaintiff leave to amend his complaint.[551]  Further, the Court disagrees with the notion that LSP does not have an affirmative obligation to accommodate disabled inmates in safe transportation, particularly when the need for such accommodation is readily known without the need for a request.

In *Reyes v. Razor*, a disabled, wheelchair-bound inmate sued the prison under the ADA and RA alleging he was discriminated against on the basis of his disability by the prison's failure to provide a handicap bus to transport him on one occasion.[552]  The court dismissed the plaintiff's ADA/RA claims, noting that he pled no facts to show that the prison "systemically denies handicap accessible transportation for inmates with disabilities."[553]

In *Allah v. Goord*, the court maintained a claim brought by an inmate against the prison that allegedly violated the ADA by transporting him in an unsafe vehicle.[554]  The plaintiff alleged that the prison knew or should have known of the dangers wheelchair-bound prisoners are exposed to when they are transported in an unsafe vehicle; yet, despite this knowledge, the prison allegedly failed to remedy the unsafe transportation conditions by providing training, supervision or new equipment to prison personnel. The plaintiff further argued that this policy was "motivated by ill will or animus towards

---

[550] *Miller*, 2014 WL 2949287, at * 3.
[551] *Id.*
[552] No. 3:16-CV-0314, 2018 WL 3632100, at *5 (S.D. Tex. July 30, 2018).
[553] *Id.*
[554] 405 F.Supp.2d 265 (S.D. N.Y. 2005).
Document Number: 52892

prisoners with disabilities who require a wheelchair for mobility"[555] because "prisoners who do not require a wheelchair for mobility are transported to outside medical providers in a safe manner."[556]  The court found that the plaintiff stated a claim under the ADA.

Nevertheless, based on the findings of fact set forth above, the Court cannot conclude that Plaintiffs herein carried their burden of demonstrating sufficient evidence to show a systemic denial of transportation accommodations that would support class-wide injunctive relief on this issue.  The Court maintains, however, that LSP does have the obligation under the ADA and RA to accommodate disabled inmates in transportation in instances where the need is readily known or knowable, without a formal request.[557] Danny Prince's testimony reinforces that LSP would not transport inmates in need of the handicap van if it was not available, and the inmates call-out would be rescheduled,[558] resulting in an unconstitutional delay of medical care under the Eighth Amendment but not disability discrimination.

### e.  Discipline Accommodations

The Court acknowledges that "[m]aintenance of prison security is a legitimate function of prison officials, who must be accorded broad discretion in that function."[559]

---

[555] *Id.* at 276.

[556] *Id.* at 279.

[557] The Court understands that this determination still requires evaluation on a case-by-case basis.

[558] The Court acknowledges this testimony cuts both ways – the lack of availability of a handicap van caused inmates in need of care to suffer delays; however, on the issue of accommodating disabled inmates in transportation, it demonstrates an acknowledgment that such an accommodation is mandated for disabled inmates.

[559] *Williamson v. Larpenter*, 2019 WL 3719761, at *12 (E.D. La. July 15, 2019)(citing *Waganfeald v. Gusman*, 674 F.3d 475, 485 (5th Cir. 2012), *petition for cert. filed*, 81 U.S.L.W. 3064 (U.S. July 18, 2012) (No. 12-85) (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986); *Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979))("[S]ecurity considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quotation omitted)).

Document Number: 52892

However, a prison must evaluate a disabled inmate's needs and the accommodations necessary to ensure reasonable access to prison services, and failure to do so violates the ADA and RA as a matter of law.[560]  This obligation to provide accommodations applies to the discipline of disabled inmates, as well:  "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]"[561]

> The Ninth Circuit has held that the second element of this test can be satisfied where a law enforcement officer could have used less force or no force during the performance of his law-enforcement duties with respect to a disabled person. *See Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232-33 (9th Cir. 2014), *rev'd on other grounds sub nom.*, *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015) (holding that a failure to reasonably accommodate a person's disability in the course of an investigation or arrest by using unnecessary force, causing the person to suffer "greater injury or indignity in that process than other arrestees," gives rise to a claim under § 12132, and that a reasonable jury could conclude that a police officer's failure to use less force or no force during an arrest of a person with mental illness could constitute a failure to provide a reasonable accommodation in violation of § 12132); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018), *cert. denied sub nom. City of Newport Beach, Cal. v. Vos*, 139 S. Ct. 2613 (2019) (same). When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person.[562]

From the trial evidence, the Court concludes that the ADA Coordinator and medical staff at LSP employ a completely "hands off" approach to discipline, even as it relates to the discipline of disabled inmates.  In the Court's view, this violates the ADA and RA.  The

---

[560] *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 271–72 (D.D.C. 2015).
[561] *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).
[562] *Id.* at *25.
Document Number: 52892

Court finds that the lack of medical oversight in disciplinary decisions for disabled inmates creates a serious risk that disabled inmates will be disciplined in the same manner as non-disabled inmates, without taking into consideration any accommodations in discipline that may be warranted by a disabled inmate's medical condition(s).

    4.   <u>Exclusionary Policies</u>

Numerous courts have held that prisons must provide disabled inmates access to work assignments and recreational services; they are not to be excluded simply because they are disabled.[563]

    *a.*   *Hobby Craft*

On its face, the hobby craft policy does constitute a blanket denial of access for disabled inmates; however, as applied, disabled inmates can apply for hobby craft, albeit through the ARP process. The Court finds that this process does not violate the ADA because all inmates at LSP must apply for the privilege of hobby craft. Thus, the Court does not find that the hobby craft program is discrimination because of an inmate's disability. Defendants presented credible evidence that exceptions to the exclusionary policy can be made, and are made, where appropriate, after evaluation by medical staff. The two examples Plaintiffs presented are insufficient to carry their burden. As to C.F., the ARP records regarding his request to participate in hobby shop undermine Plaintiffs'

---

[563] *See Holmes*, <u>311 F.R.D. at 227</u> ("Numerous other courts, including in this circuit, have permitted prisoners to bring Title II ADA claims related to job assignments. *See Jaros*, <u>684 F.3d at 673</u> (permitting plaintiff to proceed with his Rehabilitation Act claim that IDOC prevented him from participating in work release program because of his cane); *Hale v. King*, <u>642 F.3d 492, 499</u> (5th Cir.2011) (finding the plaintiff's allegation that the defendant prevented him from working in a prison kitchen because of his disability stated a claim under Title II of the ADA); *Neisler*, <u>2015 WL 998439</u>, at *5 (allowing prisoner to pursue an employment-related claim under Title II of the ADA); *Muhammad v. Randle*, 9 C 1014, <u>2010 WL 2680708</u>, at *2 (S.D.Ill. July 2, 2010) (allowing prisoner to pursue Title II ADA claim related to prison work); *see also Love*, <u>103 F.3d at 560</u> (affirming verdict under the ADA in favor of prisoner who was denied access to the prison's work programs))).
Document Number: 52892

argument that denials are perfunctorily given without medical assessment of safe participation. Rather, the records indicated medical conditions for which it was reasonable for a medical professional to determine whether C.F.'s participation in hobby craft was appropriate, and the records demonstrate that the medical staff evaluated C.F.'s medical conditions when considering his request. Thus, the Court finds that Plaintiffs failed to present sufficient evidence to establish an ADA violation as to access to hobby craft. Further, the Court notes that it is not the role of the Court to second-guess the medical decisions and treatment protocols determined by medical staff for such programs; rather, under the ADA, the Court is only evaluating whether the entire sub class of disabled inmates were systemically denied access to hobby shop because of their disabilities. This was not proven.

### b. Duty Status/Work Release Program

In *Yeskey*, the Supreme Court noted that "[m]odern prisons provide inmates with many recreational activities, medical services, and educational and vocational programs, all of which at least theoretically benefit the prisoners and any of which disabled prisoners could be 'excluded from participation in.'"[564] Another section of this Court denied summary judgment in *Guy v. LeBlanc*, where a hearing-impaired inmate asserted that the prison violated the ADA and RA by prohibiting him from (1) using the teletypewriter phone, (2) obtaining a paying job, (3) participating in sports, (4) participating in hobbycraft, and (5)

---

[564] 524 U.S. at 210 (internal quotation and parenthetical marks omitted). *See also McGuire v. Lafourche Parish Work–Release Facility*, No. 09-6755, 2009 WL 4891914, *6 (E.D.La. Dec. 4, 2009)(deferring for further development the inmate plaintiff's claim regarding an alleged ADA violation arising from denial of participation in a work-release program).
Document Number: 52892

23-30825.22516

participating in rodeo."[565]    The Court noted that "[t]he implementing regulations of the ADA forbid the Department from

> impos[ing] or apply[ing] eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.[566]

In evaluating the plaintiff's complaint about access to the TTY phone, the Court noted that the defendant's policy regarding TTY phones excluded use "unless the prisoner shows 'profound hearing loss that keeps him from utilizing a telephone with an amplified headset.'"[567]    The Court ruled that "a reasonable jury could find that the Department's 'profound hearing loss' standard creates an 'eligibility criteria' that tends to 'screen out' a class of hearing-impaired persons whose impairments do not rise to the level of 'profound hearing loss.'"[568]

As to the plaintiff's exclusion from incentive pay, the Court rejected the defendant's argument that it denied the plaintiff's access to incentive pay jobs based on "classification decision" and not discrimination.[569]    The Court noted that "Louisiana law requires that the Department 'provide employment opportunities and vocational training for all inmates, regardless of gender, consistent with available resources, physical custody, and appropriate classification criteria.'[570] 'Classification of prisoners is a matter left to the

---

[565] 400 F.Supp.3d 536, 543 (M.D. La. 2019).
[566] 28 C.F.R. § 35.130(b)(8).   The Court notes that this section also applies to hobby craft where, on its face, the policy screens out all disabled inmates.   Nonetheless, as set forth above, because hobby craft is a privilege, ostensibly all inmates, disabled or not, must apply and are screened for participation.
[567] Guy, 400 F.Supp.3d at 543.
[568] Id. (quoting 28 C.F.R. § 35.130(b)(8)).
[569] Id. at 543-544.
[570] Id. at 544 (quoting La. Rev. Stat. § 15:832(A)).
Document Number: 52892

discretion of prison officials.'"[571]  The Court rejected the defendants' motion on this issue, finding:

> The record reflects that the Department housed Guy in "working cell blocks" because he received disciplinary violations. (Doc. 19-8 at p. 3). In a "working cell block," offenders are "automatically assigned to the field." (Doc. 19-4 at p. 154). Because of his "no field" duty status, Guy could not perform paying field work. (Doc. 18-10). But his duty status is attributable to his hearing impairment; so it is his impairment—not his history of disciplinary violations—that ultimately made him ineligible for a paying job, despite his undisputed ability to perform some paying work at Angola. (Docs. 21-2 at ¶ 13; 27-1 at ¶ 13).
>
> Accordingly, viewing the facts and drawing all reasonable inferences in Guy's favor, the Court concludes that a reasonable jury could find that the Department violated the ADA and RA by denying Guy incentive pay for a nine-month period from 2016–2017.[572]

Turning to sports, the defendant claimed it did not violate the ADA or RA in denying the plaintiff access to sports "because safety – not discrimination – accounts for the denial."[573]  The Court also rejected this argument, finding:

> As a public entity, the Department may "impose legitimate safety requirements necessary for the safe operation of... services, programs, or activities." 28 C.F.R. § 35.130(h). But it "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*
>
> The testimony of Angola's medical director, Dr. Randy Lavespere, tends to show that the Department's "safety requirements" are based on generalizations and speculation—not an individualized assessment of Guy's hearing impairment. See 28 C.F.R. § 35.130(h). For example, Dr. Lavespere testified, categorically, that he "won't make an adjustment for sports." (Doc. 19-4 at p. 69). Worse, he testified that Guy's hearing impairment places him at an "increased risk" playing the sport of "pickleball"—a non-contact sport he admitted not knowing. (Docs. 19-4 at pp. 71, 90).[574]

---

[571] *Id.* (quoting *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990)).
[572] *Id.*
[573] *Id.*
[574] *Id.*

23-30825.22518

Similarly, the Court rejected the defendant's contention that it did not discriminate against the plaintiff in denying him access to hobbycraft because it argued "its medical director 'would potentially allow' Guy to participate in 'certain' hobbycraft activities."[575] The Court stated: "The contention lacks merit. A public entity's assurance that it will not violate the ADA and RA in the future does not immunize it from liability for past violations."[576]

> Guy testified that he would like to participate in the prison's leather-working program. (Doc. 19-3 at pp. 50). To that end, he requested access to leather-working and other hobbycraft activities. (Doc. 19-7 at pp. 3–4). The Department denied the request without explaining why Guy cannot safely perform these activities. (Id. at p. 5). Angola's medical director, Dr. Lavespere, even testified that certain hobbycraft activities, such as leather work and painting, pose "no inherent danger to [Guy]." (Doc. 19-4 at p. 69). So it is unclear what motive—other than disability discrimination—drove the Department's denial of Guy's request to participate in hobbycraft activities.[577]

What is clear from the *Guy* decision is that a prison's implementation of policies that creates an "eligibility criteria" that tends to "screen out" a class of persons based solely on their medical conditions and/or disabilities is a violation of the ADA's implementing regulations. Defendants cannot automatically exclude disabled inmates from various programs and activities based solely on their disabled or medical status and then justify such exclusion by arguing they will consider exceptions where the inmate makes a request. This practice is the opposite of what the ADA and RA require.

Plaintiffs presented uncontroverted evidence that certain disabled inmates are issued "no duty" status work assignments based solely on their disabilities, which

---

[575] *Id.* at 545.
[576] *Id.* (citing 42 U.S.C. § 12132; 29 U.S.C. § 794(a)).
[577] *Id.*

Document Number: 52892

precludes them from participating in work release, work assignments, hobby craft, and other programs. The Court finds that this is a violation of the ADA and implementing regulations. The Court notes that it is not a violation of the ADA or RA for the prison's medical staff to properly evaluate and determine, on a individualized basis, that certain programs or activities are unsafe for certain inmates; however, a blanket denial or classification turns the regulations on their head and places the burden on disabled inmates to demand access to programs that the prison is obligated to provide in the first place.

## IV. CONCLUSION/INJUNCTIVE RELIEF

For the reasons set forth above, the Court holds that the Defendants, in their official capacities, are violating the Eighth Amendment rights of the Plaintiff Class and the ADA and RA rights of the Plaintiff Subclass. Based on the overwhelming evidence presented at trial, judgment shall be entered in favor of Plaintiffs following the remedy phase. The Court shall order injunctive relief regarding the following deficiencies:

(1) Failing to provide constitutionally adequate clinical care in the following particulars: privacy in examinations; lack of routine medical equipment in exam rooms; lack of adequate medical records management; lack of clinical hygiene and spacing; episodic treatment of complaints;

(2) Failing to provide adequate medical care with qualified providers at sick call;

(3) Failing to provide access to medically necessary specialty care in a timely manner; failure to schedule and track specialty appointments; failure to comply with testing and diagnostic requirements; failure to execute appropriate follow-up care ordered by specialty care providers; and failure to coordinate care;

Document Number: 52892

(4) Failing to provide constitutionally adequate emergency care in the evaluation and assessment of emergencies by qualified providers and failing to timely treat and/or transport to hospital for emergent care;

(5) Failing to provide adequate, qualified staff in infirmary/inpatient care;

(6) Failing to provide medical leadership and organization in the following particulars: lack of meaningful mortality review; use of correctional personnel to manage medical decisions; lack of peer review; lack of medical staff involvement in budgeting; lack of medical supervision by Dr. Lavespere; and failure to maintain proper credentialing records;

(7) Failing to comply with the ADA and RA in providing disabled inmates access to programs and services due to physical and architectural barriers;

(8) Failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications have not been made to provide access; failure to provide proper oversight of health care orderlies;

(9) Failing to comply with LSP's own ADA Directives in maintaining a qualified ADA Coordinator and advisory committee to handle ADA issues;

(10) Failing to make efforts to integrate disabled inmates within the spirit of the ADA implementing regulations;

(11) Failing to adequately train medical staff regarding ADA compliance;

(12) Failing to appropriately evaluate and address ADA accommodation requests and disability-related grievances;

(13) Failing to identify and track disabilities and accommodation requests in a meaningful way;

Document Number: 52892

(14)    Failing to accommodate disabled inmates in applying discipline;

(15)    Maintaining blanket exclusionary policies for disabled inmates regarding access to various services, activities, and programs in violation of the ADA.

By separate notice, the Court will set a Status Conference to discuss proceeding to the remedy phase of this matter.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 31st day of March, 2021.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

Document Number: 52892

23-30825.22522

# TAB 8

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

JOSEPH LEWIS, JR., ET AL.                                    CIVIL DOCKET

VERSUS                                                      15-318-SDD-RLB

BURL CAIN, ET AL.

**RULING**

Before the Court is Defendant's Motion *in Limine* to Exclude Expert Testimony of

of Dr. Dora B. Schriro, Ed.D., J.D. ("Dr. Schriro").[1] Plaintiffs filed an Opposition.[2] The

Court has considered the law and the arguments of the Parties, and the Motion is DENIED

for the following reasons.

Defendants urge exclusion of Dr. Schriro arguing that she lacks the qualifications

to render ADA/RA opinions and that her opinions are unreliable and not supported by

facts. In the alternative, Defendants move to exclude: 1) opinions concerning medical

care, including the training and utilization of health care orderlies at LSP; 2) opinions

reached by reliance on statements of unidentified inmates; and 3) opinions and

recommendations for relief on matters beyond the specific ADA violations found by the

Court in its liability ruling.

**Dr. Schriro's Qualifications**

Plaintiffs retained Dr. Dora Schriro to provide opinions "on compliance with and

administration of the Americans with Disabilities Act (ADA), the ADA Amendments Act

---

[1] Rec. Doc. 699.
[2] Rec. Doc. 701.

1

(ADAAA), and the Rehabilitation Act (RA) at Louisiana State Penitentiary (LSP)."[3] Plaintiffs represent that "Dr. Schriro is an expert in correctional administration."[4] Dr. Schriro testified that "[t]he scope of my expert[ise] is as a correction administrator who has been involved in system-wide reform, and in this case, as it relates to the ADA."[5]

Defendants argue that "Dr. Schriro does not possess the education, training, or past experience necessary to provide a reliable opinion in this case concerning Defendants' compliance with and administration of ADA."[6] She holds a Doctorate in Education and Juris Doctorate in Law.[7] She has held no position that tasked her with direct responsibility for ADA compliance.[8] Defendants assert that Schriro "has *never* previously been qualified as an expert in the area of ADA compliance in any court proceeding," and she has not authored any publications which directly address the ADA.[9]

A review of her report and CV reveals that Dr. Schriro has held several executive level administrative and policy making positions within the corrections industry and related law enforcement and security affiliated fields, which included responsibility "for implementing and ensuring compliance with state and federal law, including the ADA and RA."[10] In support of her qualifications to provide opinion testimony on ADA compliance, Plaintiffs argue that Schriro has experience "creating systems for identifying and assessing individuals with disabilities; creating a centralized, comprehensive tracking system; classifying individuals coming into the system and returning to it; and

---

[3] Rec. Doc. No. 699-2, p. 1.
[4] Rec. Doc. No. 701, p. 1.
[5] Rec Doc. No. 699-3, p. 19, lines 21-23.
[6] Rec. Doc. No. 699-1, p. 4.
[7] Rec. Doc. No. 699-2, p. 26.
[8] Rec. Doc. No. 699-1.
[9] *Id.* at p. 4.
[10] Rec. Doc. No. 699-2, p. 2.

accommodating disabilities."[11] Her CV discloses extensive publication in subjects related to design and administration of correctional facilities in a manner to comply with applicable laws and regulations.[12]

The Court finds that Dr. Schriro possesses the education, experience, and knowledge to provide opinion testimony regarding ADA and RA compliance in a correctional setting and to offer opinions on remedial measures to facilitate and improve ADA and RA compliance.

### Reliability and Bases for Opinions

Defendants argue that Dr. Schriro's opinions are both unreliable and speculative. Defendants claim Dr. Schriro failed to review key evidence "before forming her opinions in this matter – *i.e*., the full 30(b)(6) deposition testimony of Warden Falgout; the deposition testimony of Sharita Spears; the deposition testimony of the two heath care orderlies deposed; and the ADA requests for accommodations for the Relevant Period. These deficiencies seriously undermine the reliability of her report."[13] Plaintiffs counter that "Dr. Schriro personally met with Mr. Hines," one of the health care orderlies, "as confirmed by her site inspection notes" and that, although "first part of the 30(b)(6) deposition [by] Deputy Warden Tracy Falgout was delayed past the deadline for expert reports, . . . Dr. Schriro reviewed both the transcript of Warden Falgout's individual deposition and the available transcript of the second part of his 30(b)(6) deposition."[14]

Defendants further argue that: "For most of the instances in her report where she references statements of purported issues that were communicated to her by inmates or

---

[11] Rec. Doc. No. 701, p. 5.
[12] *See* Rec Doc. No. 699-2, pp. 27-28.
[13] Rec. Doc. No. 699-1, p. 19.
[14] Rec. Doc. No. 701, p. 15.

orderlies, she could not recall the names of any of the people who had provided her this information[,]"[15] which undermines the reliability of Dr. Schriro's opinions. Dr. Schriro made contemporaneous notes of her site visit and her discussions with inmates.[16] She testified that she did not take notes on everybody,[17] but her site visit notes identified many of these Class Members by name.[18]

She conducted a site visit at LSP on April 6, 7, and 8, 2022, and she interviewed inmates and reviewed, among other things, LSP and DOC directives and policies, discovery responses, and deposition testimony.[19] The Court finds that Dr. Schriro used reliable methodology and obtained facts and consulted sufficient data and information to opine on the issue of whether LSP has made significant changes or improvements to be in compliance with the ADA and RA.

Defendants argue that Dr. Schriro's opinions are not helpful to the Court, as the trier of fact, arguing that Dr. Schriro does nothing more that state the obvious. Defendants also argue that she summarizes the Court's ADA and RA findings and then, by referencing depositions of the Defendants' witnesses, concludes that the deficiencies remain unresolved. Defendants claim that "[m]any of Dr. Schriro's 'findings,' . . . were based solely upon the Court's prior findings . . . in conjunction with her noting merely that Defendants recently disclosed that no changes had occurred."[20] Defendants argue that "ADA expertise is not required for the Court to connect those dots," and many of Dr. Schriro's findings merely "parrot" the Court's liability findings.[21] Absent stipulation by the

---

[15] Rec. Doc. No. 699-1, p. 7.
[16] *Id.* at pp. 6-7.
[17] Rec. Doc. No. 699-3, p. 49, lines 1-5.
[18] *See* Rec. Doc. No. 700-1 (SEALED).
[19] Rec. Doc. No. 699-2, pp. 4-5.
[20] Rec. Doc. No. 699-1, p. 9.
[21] *Id.* at p. 5.

parties that no changes have been made to LSP's ADA compliance policies and practices, the interests of efficiency and judicial economy will be served by permitting the testimony.

The Defendants alternative motion to exclude specific opinion testimony is DENIED for the following reasons.

1.  Motion to exclude opinions concerning medical care, including the training and utilization of health care orderlies at LSP:  The Court found that the "[t]he orderly program creates an unnecessary risk of harm to disabled and vulnerable inmates."[22] Accordingly, the Court will permit opinion testimony from Dr. Schriro regarding orderly assistance to inmates with disabilities.

2.  Motion to exclude opinions reached by reliance on statements of unidentified inmates:  For the reasons stated above, the Court denies the Motion to exclude opinions that rely on inmate interviews and will afford these opinions the weight that is appropriate.

3.  Motion to exclude opinions and recommendations for relief on matters beyond the specific ADA violations found by the Court in its liability ruling:  The Court has reviewed the report of Dr. Schriro and finds that it is confined to the specific areas of ADA and RA noncompliance articulated by Court in its liability Ruling.

Accordingly, Defendant's Motion *in Limine* to Exclude Expert Testimony of Dr. Dora B. Schriro, Ed.D., J.D.[23] is DENIED.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 3rd day of June, 2022.

_Shelly D. Dick_

**SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA**

---

[22] Rec. Doc. No. 594, p. 55.
[23] Rec. Doc. No. 699.

## 28 U.S.C. 1746 DECLARATION OF PAUL TOCE, M.D.

Pursuant to 28 U.S.C. 1746, I hereby declare as follows:

1.     My name is Paul Toce, M.D. I am over twenty-one (21) years of age and of sound and disposing mind. I have knowledge of, and am competent to testify about, the matters stated in this Declaration. I am under no legal or other disability. The facts stated herein are true and correct to the best of my knowledge and belief.

2.     I am currently employed as the Medical Director and Laboratory Director at Louisiana State Penitentiary ("LSP") and have personal knowledge of the facts stated herein.

### MEDICAL STAFFING AT LSP

3.     On August 24, 2022, LSP was reaccredited by the American Correctional Association ("ACA"). A letter from Warden Tim Hooper to Governor John Bel Edwards advising of the re-accreditation and a memorandum from Warden Hooper to all staff regarding the ACA audit closing are attached hereto as Exhibit A-1. As noted in Warden Hooper's letter, the ACA audit found that LSP was 100% on 64 Mandatory Standards (one was not applicable) and 98.98% on Non-Mandatory Standards.

4.     On or about September 17, 2022, LSP hired Justin Dillard to work full time as a nurse practitioner at LSP. NP Dillard's employment application and resume are attached hereto as Exhibit A-2. NP Dillard replaced NP Jenny Watson, who moved from LSP to Dixon Correctional Institute.

5.     On October 3, 2022, LSP hired Rebecca Cranford to work full time as a nurse practitioner at LSP. NP Cranford's employment application (with associated documents) and resume are attached hereto as Exhibit A-3.

EXHIBIT "4"

6.      On October 31, 2022, Dr. Robert Cleveland moved from Rayburn Correctional Center to LSP to work full time as a medical doctor at LSP. Dr. Cleveland's resume is attached hereto as Exhibit A-4.

7.      With the additional hires, LSP now has two medical doctors and nine nurse practitioners.

8.      Overall, nurse staffing has increased with the addition of 13 RN positions and 7 NP positions. In 2019, LSP had 14 RN positions filled; today LSP has 27 RN positions filled.

9.      LSP has hired two additional trip nurses to coordinate appointments and care for patients receiving healthcare outside of the DOC system. LPS also hired two additional nurses who are specifically utilized to facilitate specialty telemed clinics with off-site providers.

10.     The increase in providers and nurses at LSP is made more significant by the fact that the number of inmates at LSP has declined. The number of inmates at LSP was 5491 in 2019, 4568 in 2022 and 3890 in 2023.

## ELECTRONIC HEALTH RECORDS

11.     After completing work to upgrade the network infrastructure, on October 3, 2022, LSP began utilizing electronic healthcare records. As of this this time, LSP has fully implemented and is utilizing electronic healthcare records ("EHR").

12.     LSP was one of the last facilities within the DOC system to integrate and implement the new EHR software. Through the pilot program at DCI and staged implementation at other facilities, many of the modifications necessary to tailor the EHR to DOC practices were complete prior to LSP's implementation.

13.     DOC and LSP have modified the EHR to better address the particular needs of the patient population and medical infrastructure at LSP. LSP's large facility population, length of

2

sentence, diverse population demographics, and the number of patients with late-stage disease have driven the need for modifications to the EHR as well as LSP being the only facility with an Emergency Medical Service Department. For example, additional clinics, specialists, and providers were added to clarify the source and context for certain encounters as well as allowing EMS staff to electronically document ambulance run reports consistent with the physical form previously used.

14. DOC has trained all in-house medical staff on the use and functionality of the EHR system. The EHR system is working well at LSP.

15. All authorized users and providers throughout DOC can access medical records of inmates through the EHR.

16. In the EHR, each patient has a "Chart Summary" available to all medical staff. The top of the Chart Summary contains basic health and demographic information, including the patient's name, date of birth, age, DOC number, location (prison and dorm), race, gender, mental health level of care, and medical level of care. The Chart Summary also provides one button access to the list of chronic problems or diagnoses, allergies, directives (such as DNR) and alerts. A sample Chart Summary is attached as Exhibit A-5.

17. Additionally, recent healthcare encounters for the patient are listed in the Documents Section, which can be sorted by encounter type, date, and other criteria. These encounters include all recent events, including, for example, immunizations, lab work, sick calls, clinic appointments, or specialty appointments. Scheduled and upcoming appointments likewise appear in Orders Section. A provider can quickly access all important information about a patient's medical care by reference to the various sections of the EHR, which may even include pop-up notifications for important patient reminders.

3

18. Every health care encounter generates an electronic record of the health care and treatment provided to the patient, including sick call, chronic care clinic, primary care, specialty clinics, labs, EKGs, sleep studies, 6 minute walk tests, pulmonary function tests, physical therapy progress notes, audiology results, x-ray images, radiology, dental, ambulance runs, trips (return from hospitalizations), annual physical exams, imaging reports, ATU care, infirmary care, nursing comments, mental health, infection control, hospice, intake and transfer summaries. and nursing unit care. For each type of encounter, the EHR generates fields necessary to complete that encounter, for example:

    a. A sick call encounter includes fields for vital signs, subjective complaints (primary and secondary), objective examination, assessment, and plan. A sample of the EHR template for a sick call encounter is attached as Exhibit A-6.

    b. For a chronic care encounter, the patient's problem list will appear, and the provider can select which concerns are being addressed and enter relevant information specific to those problems. The following information can be addressed in the note: patient reported complaints, review of systems, education given on disease process, lifestyle therapy (diet and exercise) recommendations, and medication adherence are all addressed at these visits. A sample EHR template used for a chronic care encounter is attached as Exhibit A-7. A sample of the EHR template used for a diabetes chronic care clinic encounter is attached as Exhibit A-8. A sample of the EHR template used for anticoagulation/Coumadin, asthma, cancer, CHF, CAD, COPD, HIV, HLD, HTN is attached as Exhibit A-9. The template has the ability to add other commonly diagnosed chronic illnesses.

84563178.v1

c. The EHR has a separate template to document an ATU encounter. A sample of the EHR forum used for an ATU encounter is attached as Exhibit A-10.

d. Infirmary progress notes have all of the above information available and the most recent patient condition changes with specific treatment responses. Diet and activity and adherence to prescribed treatments like leg elevation and the wearing of braces and active range of motion attempts are evaluated and documented.

e. EHR encounter types include documents that can be used for intake into DOC facility, discharge planning, hospital admission notification, hunger strike, infirmary admission and care, segregation notification and assessment, specialty clinic care, nurse point of care, wound care, and blood glucose.

19.    Orders resulting from clinical encounters are entered into the Orders Section. New onsite clinic appointments go to Health Information staff for scheduling. Offsite appointments go to the trips office. Orders for labs, x-rays, dental. optometry, etc. are forwarded to the appropriate department for fulfillment. Nurses working the specific onsite clinic ensure that the number of patients scheduled is directly proportional to adequate time for comprehensive and thorough evaluation by providers. Supply and demand are closely monitored this way for routine visits and all urgent cases are addressed within one day to one week of their presentation.

20.    Some of LSP's on-site specialty care clinicians utilize LSP's EHR system to document all clinical encounters. LSP continues to train its contract providers on the EHR system to encourage adoption and implementation of the EHR.

21.    For contract clinicians who do not utilize LSP's EHR, notes are scanned into the EHR by the health information management department and attached to an electronic note

5

summarizing the encounter. The same process is followed for off-site providers, hospitals, and any other medical records generated outside of LSP's EHR.

22.     Providers enter orders including follow-up appointments into the EMR. Recommendations from providers that are not DOC staff are evaluated and adapted to the LSP environment by DOC HCP's. Deviations from these recommendations are justified in the EMR. Trip nurses coordinate and schedule follow-up appointments and any additional orders (such as labs or imaging) that an LSP HCP has approved to be completed prior to the next appointment.

23.     Each Order entered in a patient's EHR chart must designate a priority category of stat, urgent or routine and date for the order.

24.     Health information management staff at LSP generate reports using the Order Manager in the EHR to create call-out lists for clinic, specialists, and other follow-up orders and treatment indicated by the Orders module of patients' electronic charts. The lab and other departments run their own reports on all patients with relevant orders to create their own call-out list.

25.     Results from lab tests are automatically integrated into the patient's EHR through synchronicity with LabCorps' electronic records system. Lab results appear in a patient's chart as soon as the results are generated from LabCorp, and a task is created in the EHR for an LSP provider to review, sign, and provide additional orders as indicated. A sample of the LabCorp Requisition Manager used to order labs is attached as Exhibit A-11.

26.     As of May 23, 2022, LSP has fully implemented the electronic medication administration records through the sMARt ("Simple Medical Administration Record Technology") software. The sMARt system creates many reports. A screen shot of the sMARt report page is attached as Exhibit A-12.

6

## SICK CALL

27.     On August 20, 2023, DOC updated its sick call form (HCP 13-a "Request for Medical Treatment"). The updated form includes a location for the patient to provide the date and time of the request.   Upon receipt of the request for medical treatment form, a health care professional initially evaluates all requests to determine if any routine treatment requests should be deemed urgent/emergent care. After a request is deemed urgent/emergent EMS staff initiates immediate face to face contact with the requestor and communicates directly with an LSP HCP regarding their findings.   The evening nurse on duty in the ATU conducts a paper triage of the requests, documenting the time and date of triage on the paper request form. The triage nurse also categorizes request for treatment forms based on the appropriate medical discipline (such as dental or optometry appointments). A copy of the updated sick call form is attached as Exhibit A-13.

28.     Any request for medical treatment determined to be routine or non-emergent received is scheduled for callout the next business day, consistent with ACA standards.   The nurse practitioner conducting the sick call encounter creates an electronic note in the EHR, documenting the complaints, the assessment, and the treatment plan.   The provider can create new orders within the note to request a follow up appointment, refer to a specialist, obtain labs, or prescribe medication.

29.     DOC has once again decreased the copays required for access to medical care. Patients are now charged $1 for a routine sick call and $2 for an emergency sick call. Patients are not charged for management of chronic or preexisting medical problems.  Patients are no longer charged for prescription medication.

7

30. Following each sick call encounter, the health information management department at LSP scans the physical request for medical treatment form, attaches the form to the electronic note created by the provider, and, if necessary, schedules follow up appointments.

## MEDICAL LEADERSHIP, OVERSIGHT, AND QUALITY IMPROVEMENT

31. Medical leadership, providers, and DOC headquarters staff can generate myriad reports using the EHR software. For example, as indicated above, medical records personnel generate reports to create callout lists and schedule patients for clinics. Reports can be created for various quality assurance measures, such as such as aging orders, unsigned verbal orders, frequency of HCP progress notes relative to policy and acuity, the ratio of trips sent out to patients admitted to the hospital and the appropriate timing and completion of documentation of patient management issues.

32. A nurse at DOC headquarters is tasked with continuous monitoring of the EHR system to identify systemic errors or workflow concerns. These concerns are sent to the individual facilities along with recommendations and updated training as needed. While these safeguards largely relate to documentation and do not impact clinical care, the process of continuous improvement is much more streamlined and allows more targeted training, improved data, and more complete and accurate records.

33. I declare under penalty of perjury that the above and foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 17, 2023.

Paul Toce MD

PAUL TOCE, M.D.



## Department of Public Safety & Corrections
### State of Louisiana
Louisiana State Penitentiary

**JOHN BEL EDWARDS**
GOVERNOR

**JAMES M. LE BLANC**
SECRETARY

August 24, 2022

"Alone we can do so little, together we can do so much"- Helen Keller

This profound quote stands out to me as we have now closed out our ACA audit. Without the support, dedication, and camaraderie of everyone employed at Louisiana State Penitentiary this reaccreditation would not have been possible.

I am blown away by the professionalism and hospitality shown to each of our auditors during their visit. For those of you unable to attend our audit closing the audit team had nothing but positive remarks regarding our facility, offenders, and our staff. We all sometimes sit back and take for granted the magnitude of responsibilities and moving parts our 18,000 acre facility requires to maintain safety and security all while still following ACA's best practices. We have exceeded those expectations. I hope that everyone has learned something throughout this process so we can continue to improve and implement our best practices.

During the closing remarks a few comments stood out that I wanted to make sure were shared

"The medical facilities were some of the cleanest I have seen, and you are operating the largest most efficient facility pharmacy I have ever witnessed"

"Coming to this facility and performing an accreditation audit is a bucket list item- something everyone wants to see. I can honestly say this facility has exceeded all of my expectations, and I am blown away"

"Complacency is something we as correctional staff should try to avoid, and maintaining your awareness of your population is vital in your continuum of safety and success"

The outcome of our audit was 100% on 64 Mandatory standards, one being non-applicable and 98.98% on 515 Non-Mandatory Standards. These numbers reflect the success of our entire facility, and statistically supports that "together we can do so much."

My appreciation for your outstanding dedication and service to our facility is beyond words. Congratulations, and THANK YOU!

Tim Hooper
Warden

**EXHIBIT A-1**

## Department of Public Safety & Corrections
### State of Louisiana
Louisiana State Penitentiary

**JOHN BEL EDWARDS**
GOVERNOR



**JAMES M. LE BLANC**
SECRETARY

TO:        All Staff

FROM:    Tim Hooper
            Warden

DATE:    August 24, 2022

RE:        ACA National Audit Closing

All staff is invited to come and observe the ACA National Audit closing for Louisiana State Penitentiary. The closing will be today in the Main Prison Visiting Shed at 11:00AM.

Tim Hooper
Warden

CHART SUMMARY



EXHIBIT
A-5

## SICK CALL-NOTE, WHEN RADIO BUTTONS ARE CLICKED, IT MAY PROVIDE MORE AREAS FOR MORE IN-DEPTH DOCUMENTATION



**EXHIBIT A-6**

## SICK CALL-NOTE, WHEN RADIO BUTTONS ARE CLICKED, IT MAY PROVIDE MORE AREAS FOR MORE IN-DEPTH DOCUMENTATION





**SICK CALL-NOTE, WHEN RADIO BUTTONS ARE CLICKED, IT MAY PROVIDE MORE
AREAS FOR MORE IN-DEPTH DOCUMENTATION**





## CHRONIC CARE





**EXHIBIT**

**A-7**

# CHRONIC CARE





# CHRONIC CARE



# CHRONIC CARE





## <u>CERTIFICATE OF SERVICE</u>

On January 11, 2024, this Record Excerpt was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*/s/ Connell L. Archey*
Connell L. Archey
