No. 23-30825

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

KENTRELL PARKER, on behalf of themselves and all others
similarly situated, *et al.*,

*Plaintiffs-Appellees*,

v.

TIM HOOPER, Warden, Louisiana State Penitentiary, in his official
capacity, *et al.*,

*Defendants-Appellants.*

---

**On Appeal from the United States District Court
for the Middle District of Louisiana
Case No. 3:15-cv-00318**

---

### PLAINTIFFS-APPELLEES' BRIEF

---

Lydia Wright
Samantha Bosalavage
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
lwright@defendla.org
sbosalavage@defendla.org

Jeffrey B. Dubner
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 771-1773
jdubner@democracyforward.org

*Attorneys for Plaintiffs-Appellees*
(Additional counsel on signature page)

## CERTIFICATE OF INTERESTED PERSONS

No. 23-30825

KENTRELL PARKER, on behalf of themselves and all others
similarly situated, *et al.*,

*Plaintiffs-Appellees,*

v.

TIM HOOPER, Warden, Louisiana State Penitentiary, in his official
capacity, *et al.*,

*Defendants-Appellants.*

The undersigned counsel of record certifies that the following listed persons
or entities as described in Rule 28.2.1 have an interest in the outcome of this case.
These representations are made in order that the judges of this Court may evaluate
possible disqualification or recusal.

1. **Plaintiffs-Appellees**: Alton Adams, Otto Barrera, Alton Batiste, Clyde
   Carter, Ian Cazenave, Ricky Davis, Reginald George, Edward Giovanni,
   Shannon Hurd, Kentrell Parker, Farrell Sampier, Lionel Tolbert, John
   Tonubbee, Edward Washington, and Rufus White.

2. **Defendants-Appellants:** Stacye Falgout, Bill Hawkins, Tim Hooper, Randy
   Lavespere, James LeBlanc, Louisiana Department of Public Safety and
   Corrections, Ashli Oliveaux, Cynthia Park, and Paul Toce.

3. **Counsel for Plaintiffs-Appellees:** Lydia Wright, Samantha Bosalavage,
   Nishi Kumar, PROMISE OF JUSTICE INITIATIVE; Jeffrey B. Dubner,
   DEMOCRACY FORWARD FOUNDATION; Emily B. Lubin, Bruce Hamilton,
   SOUTHERN POVERTY LAW CENTER; Daniel A. Small, Brendan Schneiderman,
   COHEN MILSTEIN SELLERS & TOLL PLLC; Nora Ahmed, ACLU FOUNDATION
   OF LOUISIANA; Melanie Bray, DISABILITY RIGHTS LOUISIANA.

i

4. **Counsel for Defendants-Appellants:** Connell Archey, Randal J. Robert, Keith J. Fernandez, Allena W. McCain, Madaline King Rabalais, BUTLER SNOW LLP; Jeffrey K. Cody, Caroline M. Tomeny, and John C. Conine, Jr., SHOWS, CALI & WALSH, L.L.P.; Andrew Blanchfield, KEOGH, COX & WILSON, LTD.

Signed the 1st day of February, 2024, in New Orleans, Louisiana.

/s/ *Lydia Wright*
Lydia Wright, 37926

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument has been set for March 4, 2024.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS.................................................................. iv

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE..............................................................2

    I.    Factual Background............................................................3

    II.    Procedural Background .........................................................6

        A.    District Court Proceedings.....................................6

        B.    Appellate Proceedings .........................................23

SUMMARY OF THE ARGUMENT .....................................................24

STANDARD OF REVIEW ................................................................26

ARGUMENT .................................................................................28

    I.    The District Court Adequately Considered Current Conditions and Did Not Abuse Its Discretion in Enforcing Discovery Cutoffs. .........28

        A.    Trial courts may set and enforce discovery cutoffs..................29

        B.    Even if Defendants had a right to introduce new evidence at any time, they fail to identify any abuse of discretion. ...................33

    II.    The Remedial Order Complies with the PLRA. .................................37

        A.    The Remedial Order satisfies the needs-narrowness-intrusive test. ........................................................................37

        B.    The district court's injunction is a proper exercise of judicial powers. ......................................................................39

C.     The district court's order does not implicate 18 U.S.C. § 3626(f)..................................................................................40

III.   States Lack Due Process Rights. ........................................................43

IV.   The District Court Did Not Clearly Err in Finding Deliberate Indifference to a Substantial and Ongoing Risk of Serious Harm......46

A.     Legal standard ..........................................................................46

B.     The district court did not clearly err in finding a substantial risk of serious harm. ..........................................................49

C.     The district court did not clearly err in finding Defendants subjectively indifferent. ...........................................................61

D.     Defendants have not taken reasonable measures to abate the risk. .........................................................................................65

V.    The District Court's Factual Findings Regarding the ADA and RA Are Not Clearly Erroneous. ...............................................................80

A.     The district court did not manifestly err in remediating the undisputed architectural barriers. ..............................................80

B.     The district court did not clearly err in finding unlawful methods of accommodation. .......................................................84

CONCLUSION ..................................................................................................100

CERTIFICATE OF SERVICE ...........................................................................102

CERTIFICATE OF COMPLIANCE ...................................................................103

# TABLE OF AUTHORITIES

## Cases

*Alberti v. Klevenhagen*,
　　790 F.2d 1220 (5th Cir. 1986) ........................................................ 27, 48, 61

*Already, LLC v. Nike, Inc.*,
　　568 U.S. 85 (2013)............................................................................... 33, 45

*Amos v. Hall*,
　　No. 20-cv-7, 2020 WL 6791516 (N.D. Miss. Jan. 24, 2020)........................42

*Anderson v. City of Bessemer City*,
　　470 U.S. 564 (1985).............................................................................. 26, 46

*Ardoin v. Hartford Acc. & Indem. Co.*,
　　360 So.2d 1331 (La. 1978) ........................................................................57

*Ball v. LeBlanc*,
　　792 F.3d 584 (5th Cir. 2015) ................................................................ 27, 65

*Beard v. Texas*,
　　87 F.3d 1312, 1996 WL 335527 (5th Cir. 1996)..........................................85

*Benjamin v. Fraser*,
　　343 F.3d 35 (2d Cir. 2003) ............................................................ 24, 41, 42

*Bianco v. Globus Med., Inc.*,
　　30 F. Supp. 3d 565 (E.D. Tex. 2014) .........................................................91

*Biziko v. Van Horne*,
　　981 F.3d 418 (5th Cir. 2020) .....................................................................58

*Bradley v. Puckett*,
　　157 F.3d 1022 (5th Cir. 1998) ............................................................. 48, 67

*Braggs v. Dunn*,
　　257 F. Supp. 3d 1171 (M.D. Ala. 2017)................................... 44, 47, 48, 77

*Brauner v. Coody*,
  793 F.3d 493 (5th Cir. 2015) .........................................................64

*Brown v. Offshore Specialty Fabricators, Inc.*,
  663 F.3d 759 (5th Cir. 2011) .........................................................27

*Brown v. Plata*,
  563 U.S. 493 (2011)............................................................... passim

*Carlucci v. Chapa*,
  884 F.3d 534 (5th Cir. 2018) .........................................................64

*Center v. Lampert*,
  726 F. App'x 672 (10th Cir. 2018)................................................42

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1982).........................................................................33

*Colony Creek, Ltd. v. Resol. Trust Corp.*,
  941 F.2d 1323 (5th Cir. 1991) .......................................................36

*Dardar v. Lafourche Realty Co.*,
  55 F.3d 1082 (5th Cir. 1995) .........................................................25

*Def. Distributed v. Grewal*,
  971 F.3d 485 (5th Cir. 2020) .........................................................97

*Degen v. United States*,
  517 U.S. 820 (1996).......................................................................10

*Dietz v. Bouldin*,
  579 U.S. 40 (2016).........................................................................44

*Dockery v. Cain*,
  7 F.4th 375 (5th Cir. 2021) ...........................................................30

*Dockery v. Hall*,
  443 F. Supp. 3d 726 (S.D. Miss. 2019) .........................................70

*Dunn v. Dunn*,
219 F. Supp. 3d 1100 (M.D. Ala. 2016)......................................................61

*EEOC v. Universal Mfg. Corp.*,
914 F.2d 71 (5th Cir. 1990) .......................................................................65

*Estelle v. Gamble*,
429 U.S. 97 (1976)............................................................................... 46, 47

*Farmer v. Brennan*,
511 U.S. 825 (1994)............................................................................ passim

*FDIC v. Mijalis*,
15 F.3d 1314 (5th Cir. 1994) .....................................................................35

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).....................................................................................33

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004) ............................................................. passim

*Green v. Adm'rs of the Tulane Educ. Fund*,
284 F.3d 642 (5th Cir. 2002) .....................................................................27

*Gregg v. Georgia*,
428 U.S. 153 (1976)....................................................................................46

*Grilletta v. Lexington Ins. Co.*,
558 F.3d 359 (5th Cir. 2009) ............................................................. passim

*Guzman v. Hacienda Recs. & Recording Studio, Inc.*,
808 F.3d 1031 (5th Cir. 2015) ........................................................... 26, 56

*Handberry v. Thompson*,
446 F.3d 335 (2d Cir. 2006) ......................................................................41

*Harris v. Thigpen*,
941 F.2d 1495 (11th Cir. 1991) .................................................................48

*In re Luhr Bros., Inc.*,
    157 F.3d 333 (5th Cir. 1998) ..........................................................26

*In re Omega Protein, Inc.*,
    548 F.3d 361 (5th Cir. 2008) ..........................................................26

*In re Vannoy*,
    No. 21-30671 (5th Cir. Nov. 29, 2021) .........................................14

*In re: Taxotere (Docetaxel) Prod. Liab. Litig.*,
    26 F.4th 256 (5th Cir. 2022) ..........................................................95

*Jensen v. Shinn*,
    609 F. Supp. 3d 789 (D. Ariz. 2022) ............................................77

*Kanida v. Gulf Coast Med. Pers. LP*,
    363 F.3d 568 (5th Cir. 2004) .................................................. 24, 27

*Laube v. Campbell*,
    333 F. Supp. 2d 1234 (M.D. Ala. 2004) .......................................41

*Laube v. Haley*,
    234 F. Supp. 2d 1227 (M.D. Ala. 2002) ................................. 49, 67

*Lawson v. Dall. Cnty.*,
    286 F.3d 257 (5th Cir. 2002) ..........................................................64

*Lopez v. Sentrillon Corp.*,
    749 F.3d 347 (5th Cir. 2014) ..........................................................37

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) ..............................................77

*Mendoza v. Lynaugh*,
    989 F.2d 191 (5th Cir. 1992) ..........................................................64

*Norton v. Dimazana*,
    122 F.3d 286 (5th Cir. 1997) ..........................................................64

*Novick v. Shipcom Wireless, Inc.*,
  946 F.3d 735 (5th Cir. 2020) ........................................................... 27, 35, 99

*Porter v. Clarke*,
  923 F.3d 348 (4th Cir. 2019), as amended (May 6, 2019) ...........................45

*Procter & Gamble Co. v. Amway Corp.*,
  376 F.3d 496 (5th Cir. 2004) ........................................................................44

*Raytheon Co. v. Hernandez*,
  540 U.S. 44 (2003)........................................................................................84

*Reck v. Wexford Health Sources, Inc.*,
  27 F.4th 473 (7th Cir. 2022) .........................................................................48

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966)......................................................................................25

*Stewart v. Murphy*,
  174 F.3d 530 (5th Cir. 1999) ........................................................................64

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971)..........................................................................................27

*Tellis v. LeBlanc*,
  No.18-541, 2022 WL 67572 (W.D. La. Jan. 6, 2022)...................................44

*Tex. A&M Rsch. Found. v. Magna Transp., Inc.*,
  338 F.3d 394 (5th Cir. 2003) ........................................................................29

*Tex. Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ........................................................................23

*Tex. Off. of Pub. Util. Couns. v. FCC*,
  183 F.3d 393 (5th Cir. 1999) ........................................................................45

*Thomas v. Bryant*,
  614 F.3d 1288 (11th Cir. 2010) ....................................................................45

*Turner v. Cty. of San Bernardino*,
    2018 WL 6617638 (C.D. Cal., Dec. 14, 2018)....................................... 41, 42

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns., Inc.*,
    761 F.3d 409 (5th Cir. 2014) ........................................................................35

*United States v. Castillo*,
    77 F.3d 1480 (5th Cir. 1996) ........................................................................95

*United States v. Hinds County*,
    No. 16-cv-489, 2022 WL 3022385 (S.D. Miss. July 29, 2022) ...................79

*United States v. Hinds County*,
    No. 16-cv-489, 2023 WL 1116530 (S.D. Miss. Jan. 30, 2023)....................77

*United States v. Okulaja*,
    21 F.4th 338 (5th Cir. 2021) .........................................................................27

*Valentine v. Collier*,
    993 F.3d 270 (5th Cir. 2021) ........................................................... 30, 31, 33

*Valentine v. Collier*,
    No. 20-20525, (5th Cir. Nov. 13, 2020) ......................................................31

*Webb v. Goord*,
    340 F.3d 105 (2d Cir. 2003) .........................................................................42

*Wellman v. Faulkner*,
    715 F.2d 269 (7th Cir. 1983) ........................................................................48

*Wellogix, Inc. v. Accenture, LLP*,
    716 F.3d 867 (5th Cir. 2013) ........................................................................35

*Woods v. Int'l Harvester Co.*,
    697 F.2d 635 (5th Cir. 1983) ........................................................................31

*Yates v. Collier*,
    868 F.3d 354 (5th Cir. 2017) ................................................................. 26, 91

*Yohey v. Collins*,
    985 F.2d 222 (5th Cir. 1993) ...........................................................29

## Statutes

1 U.S.C. § 1 ...................................................................................43

18 U.S.C. § 3626(a)(1)....................................................................37

18 U.S.C. § 3626(b)(1), (3)..............................................................39

18 U.S.C. § 3626(f)................................................... 24, 40, 41, 43

18 U.S.C. § 3626(g)(8)....................................................................40

29 U.S.C. § 794 ...............................................................................6

42 U.S.C. § 12112(b)(3) .................................................................84

42 U.S.C. § 12131 *et seq*................................................................6

## Federal Rules

Federal Rule of Civil Procedure 23(b)(2) ...................................8

Federal Rule of Civil Procedure 26 ...........................................29

Federal Rule of Civil Procedure 26(e)(1) ..................................36

Federal Rule of Civil Procedure 37 .............................. 18, 24, 29

Federal Rule of Civil Procedure 42 ...........................................44

Federal Rule of Civil Procedure 42(b).......................................25

Federal Rule of Civil Procedure 53 ...........................................40

Federal Rule of Evidence 403............................................ 18, 29

Federal Rule of Evidence 706....................................................................................42

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion in enforcing discovery cutoffs and adequately considered current conditions.

2.      Whether the district court abused its discretion in creating a process to appoint special masters to propose remedial plans and report on compliance.

3.      Whether the district court's exercise of its inherent authority to manage its docket violated any fundamental due process rights owed to the State.

4.      Whether the district court committed clear error by finding that Defendants are deliberately indifferent to the substantial risk of serious harm created by the medical system at LSP.

5.      Whether the district court committed clear error by finding ongoing violations of the ADA and RA at LSP.

## STATEMENT OF THE CASE

For decades, the people incarcerated by the Louisiana Department of Public Safety and Corrections (DOC) at the Louisiana State Penitentiary (LSP or Angola) have suffered from systemically inadequate medical care caused by Defendants' ongoing deliberate indifference to their serious medical needs. Since the initiation of this suit, hundreds of Class members, including seven Named Plaintiffs, have died. Many more have suffered needlessly because of Defendant's ongoing failure to provide constitutionally adequate medical care.

After nine years of litigation, two multi-week trials featuring 49 witnesses, and review of tens of thousands of pages of medical records, "the Plaintiffs proved that, rather than receiving medical 'care,' the inmates are instead subjected to cruel and unusual punishment by medical mistreatment." ROA.30558. The district court also found that the violations of the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) identified by Plaintiffs nearly a decade ago "persist at Angola with no indication … that changes are planned or thought to be necessary." ROA.30658. Thus, "Plaintiffs have established their entitlement to permanent injunctive relief by a preponderance of the evidence." ROA.30660.

Defendants' primary contention on appeal is that they should get credit for making small changes before the district court issued a final judgment. But the district court has given Defendants credit for every half-step they took, finding them

to be, at best, "a band-aid on a gaping wound." ROA.30582. Even now, Defendants' practices shock the conscience.

The district court did not abuse its discretion or commit clear error in managing this complex case and twice finding Defendants in violation of the Eighth Amendment and ADA. This Court should affirm on all counts.

### I.     Factual Background

LSP is a maximum-security prison in Angola, Louisiana. ROA.22399. Defendants are responsible for providing healthcare for the thousands of people incarcerated there, including Named Plaintiffs. ROA.22399-400. As prisoners of the State, people incarcerated at LSP are dependent on Defendants for all aspects of their treatment and conditions of confinement. ROA.7434.

The district court's findings of fact are discussed in more detail below. In brief, Plaintiffs proved at the Liability Trial that Defendants had continuously been deliberately indifferent to a substantial risk of serious harm from at least January 1, 2010, through the close of discovery on September 30, 2016. ROA.22406-44; ROA.22483-89. This was supported by expert testimony from Dr. Michael Puisis, Nurse Practitioner Madeleine LaMarre,[1] and Dr. Susi Vassallo, three of the most

---

[1] Several witnesses in this case hold a doctorate but not a medical degree, including Plaintiffs' experts Madeline LaMarre, Angela Goehring, and Dora Schriro; Defendants' expert Michael McMunn; and LSP's Long-Term Hospital Care Administrator Jacob Johnson. To avoid confusion, this brief will reserve the term "Dr." for people licensed as medical doctors.

accomplished correctional and emergency medicine professionals in the country, who collectively had more than 60 years of experience practicing in correctional facilities, reviewing correctional medical operations, or treating incarcerated patients. ROA.1627-28. After interviewing key employees, conducting a four-day site visit, and reviewing tens of thousands of pages of medical records, the experts found "serious and systemic problems with access, timeliness and quality of care at [LSP]," ROA.1629, ultimately concluding that LSP's "delivery of medical care is one of the worst we have ever reviewed." ROA.1631. Their findings were further supported by the testimony of third-party doctors who treated LSP patients sent to University Medical Center for outside care. ROA.22442; ROA.21901-03.

The experts also found in a supplemental report that "Angola continue[d] to deliver inadequate medical care to its patients" from 2016 through 2018. ROA.46742 (Proffer_Pla_1 at 1).

Plaintiffs showed that Defendants had long been subjectively indifferent to the risk their practices posed. Among other things, Defendants received reports detailing deficiencies and were notified by outside providers about problems with care. *E.g.*, ROA.22441-42. Defendants consciously refrained from "dig[ging] too deep" in reviewing patient deaths to avoid liability, leading them to create documents that "misrepresented the facts of … patient[s'] death[s]." ROA.22443 (quoting ROA.2223; ROA.32869).

4

At the Remedial Trial, Plaintiffs' medical experts, now joined by a fourth expert, Nurse Angela Goehring, reviewed an even larger sample of medical records, stretching from 2019 through 2022, together with other documents produced by Defendants. ROA.29474-79. They also conducted a three-day site visit. *Id*. The experts found that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths." ROA.29479.

As to their ADA/RA claims, Plaintiffs proved at the Liability Trial that dozens of architectural barriers at LSP prevented people with mobility impairments from accessing programs or services. ROA.22445-49. This finding was based on a report from Plaintiffs' architectural expert, Mark Mazz, that was explicitly "substantiate[d]" by Defendants' architectural expert, Brian Nolan. ROA.22405-06 (quoting ROA.4254); ROA.1908-2019 (Liability_Pla_7); ROA.4254 (Liability_Pla_18 at 2). And Plaintiffs proved that Defendants maintained a variety of methods of administration that systemically failed to ensure that individuals with disabilities received accommodations appropriately. ROA.22454-76.

Prior to the Remedial Trial, Defendants conceded that most of their practices related to accommodating prisoners with disabilities were unchanged from the Liability Trial. ROA.30161. Plaintiffs additionally showed through documentary evidence, fact witness testimony, and expert testimony from both Mazz and Dora

Schriro, a correctional administrator with decades of experience, that dozens of architectural barriers remained at LSP and Subclass members continued to be subject to discriminatory methods of administration. ROA.30626-47; ROA.30447-57. As the district court noted, Defendants "offered no evidence and no expert testimony that the violations previously found under the ADA and RA have been addressed or remedied." ROA.30627.

## II.    Procedural Background

### A. District Court Proceedings

#### 1.    *Proceedings prior to Defendants' motion to disqualify.*

Plaintiffs filed suit on May 20, 2015. ROA.144. They asserted claims under the Eighth Amendment; Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12131 *et seq*.; and Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794. *See* ROA.199-203. They alleged—and later proved—that systemic failures by Defendants to provide constitutionally adequate medical care for class members violated their Eighth Amendment rights to be free of cruel and unusual punishment. ROA.164-90. They also alleged—and later proved—that Defendants' conduct constituted unlawful disability-based discrimination within the meaning of the ADA and RA. ROA.190-94. Plaintiffs sought declaratory and injunctive relief. ROA.204-05. They filed a superseding amended complaint on July 25, 2016. ROA.963.

The case was assigned to the Honorable Brian Jackson of the Middle District of Louisiana, who set a discovery cutoff of September 30, 2016, and scheduled a bench trial for May 2017. ROA.388-89; ROA.1464-65. Plaintiffs moved for class certification on October 14, 2016, and filed two motions for partial summary judgment on January 6, 2017. ROA.1620; ROA.4224; ROA.4669. In anticipation of the trial, the parties filed a joint pre-trial order on February 27, 2017. ROA.82 at Dkt. Entry 222.

### 2. Shortly before trial, Defendants belatedly moved to disqualify Judge Jackson.

On February 28, 2017—nearly two years into litigation, months after the close of fact discovery, and less than three months before trial—Defendants moved to disqualify Judge Jackson because, while serving as First Assistant United States Attorney in the 1990s, he had signed a filing in a case cited in Plaintiffs' complaint. ROA.7168. Granting the motion, the district court observed that "Defendants should have been aware" of the supposed conflict of interest "from the very *initiation* of this lawsuit" and "offered *no* rationale for their failure—for over one-and-a-half years"—to raise it. ROA.7424. Despite this "dubious lack of diligence" by Defendants, Judge Jackson recused himself because Plaintiffs "deserve *prompt* adjudication of [their] claims," and "delay … would result from Defendants' inevitable interlocutory appeal" if he denied Defendants' motion. ROA.7424-25.

The case was reassigned to the Honorable Shelly Dick and the existing scheduling order vacated, with trial ultimately reset for October 2018. ROA.17912-14.

### 3. *After considering Defendants' untimely disclosed evidence of supposed improvements, the district court certified a class.*

The district court held a class certification hearing on November 1 and 2, 2017. ROA.16969; ROA.9791. Plaintiffs presented significant evidence, including expert testimony, demonstrating that certification was appropriate under Federal Rule of Civil Procedure 23(b)(2). *See, e.g.*, ROA.17000-36; ROA.9795-16966. Defendants' evidence focused on supposed changes to LSP policies and practices that they claimed occurred after the September 2016 discovery deadline but had not been disclosed to Plaintiffs. ROA.17772; *see also* ROA.17783-84; ROA.17790-92.

On February 26, 2018, the district court certified a Class of "all inmates who [are] now, or will be in the future, incarcerated at LSP" and a Subclass of "all qualified individuals with a disability, as defined by the ADA/RA, who are now, or will be in the future, incarcerated at LSP." ROA.17762.

### 4. *Defendants opposed Plaintiffs' motion to reopen certain fact discovery so Plaintiffs could respond to Defendants' claim that care had improved, leading the court to bifurcate liability and remedy.*

While awaiting the court's class certification ruling, Plaintiffs requested that Defendants supplement their discovery responses so Plaintiffs could evaluate

8

Defendants' claims of recent improvements. ROA.17793. To ensure that the upcoming trial would be based on the most current facts possible, they also sought to depose two DOC employees who had assumed the duties of the recently terminated DOC medical director. ROA.17772. Plaintiffs also requested leave to amend their witness list to replace Class members who were no longer at LSP. *See id.*

While Defendants provided supplemental responses to some discovery requests, as they were obligated to do under Federal Rule of Civil Procedure 26(e), they otherwise resisted Plaintiffs' efforts to update the evidence. *See* ROA.17772; ROA.17854. The district court denied Plaintiffs' subsequent motion, reasoning that reopening discovery could result in undue delay or prejudice. ROA.17945.

Instead, the district court determined that "[e]fficient case management and fundamental fairness require that both Parties' evidence be limited to a 'snapshot in time.'" ROA.18117. This was the only way to avoid reopening discovery in full, which would "give[] rise to the potential for discovery motions, expert reports and opinions supplemented, leading to additional expert discovery, all of which would likely result in upsetting the trial date which is now three and a half years post filing." *Id.* Accordingly, citing its inherent power to manage its docket, the district court determined that "bifurcating the issues of merits and remedy" was a "reasonable response to the problems and needs confronting the court's fair administration of

justice." ROA.18118 (quoting *Degen v. United States*, 517 U.S. 820, 823-24 (1996)). The district court therefore limited evidence for the October 9, 2018, bench trial to evidence of conditions at LSP as of the close of discovery on September 30, 2016. *Id*. If Plaintiffs prevailed at the Liability phase, then "evidence of subsequent conditions may be relevant at the remedy stage." *Id.*

### 5. *The district court conducted an 11-day bench trial and a site visit to determine liability.*

The 11-day bench trial, which began on October 9, 2018, involved thousands of exhibits, six expert examinations, and 19 fact witnesses. *See* ROA.21362. Among other evidence, the court considered five medical expert reports from both parties, totaling 429 pages, and reports from each side's architectural expert that both found the same accessibility violations. *See* ROA.1623-2019; ROA.3243-73; ROA.3841-3914; ROA.4253-55.

Defendants did not file a motion to exclude any of Plaintiffs' experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In fact, Defendants' medical experts agreed that Plaintiffs' experts applied the standard methodology for reviewing correctional medical systems. *See* ROA.33601; ROA.33693.

To facilitate appellate review of its decision to limit the evidence in the Liability Trial to information produced during discovery, the court allowed both parties to proffer evidence regarding conditions at LSP since the 2016 discovery

cutoff. *See* ROA.33981-4002. Defendants proffered testimony about specific ADA issues, largely related to LSP's purported efforts to address architectural barriers. ROA.33981-4000. They proffered *no* evidence about putative improvements to their medical care. *Id.* Plaintiffs' proffer included factual evidence and a 2018 supplemental expert report based on medical records from 2016 through 2018, which found that "[n]othing in the new charts suggests that care has improved" and "Angola continues to deliver inadequate medical care to its patients." *See* ROA.34000-03; ROA.46742 (Proffer_Pla_1).

The district court conducted a site visit to LSP on February 5, 2020. ROA.117 at Dkt. Entry 577.

### 6.    *The district court found Defendants liable for ongoing and systemic constitutional and statutory violations.*

On February 21, 2020, the district court notified the parties that it "will find the medical care at Angola State Penitentiary is unconstitutional in some respects and is prepared to Order injunctive relief addressing conditions which the Court finds unconstitutional." ROA.117 at Dkt. Entry 578. The district court ordered the parties to attempt to reach an amicable resolution of the issues. *Id.*  The parties were unable to reach a settlement. ROA.21795.

On March 31, 2021, the district court issued a 124-page Liability Opinion finding, "[b]ased on the overwhelming evidence presented at trial," that Defendants

"are violating the Eighth Amendment rights of the Plaintiff Class and the ADA and RA rights of the Plaintiff Subclass." ROA.22520.

*Eighth Amendment*. In its findings of fact, the district court catalogued myriad examples of constitutionally inadequate clinical care, specialty care, infirmary care, and emergency care at LSP. *See* ROA.22406-34. It further found that "overwhelming deficiencies in the medical leadership and administration of health care at LSP contribute[] to these constitutional violations." ROA.22406. Taken together, the "overwhelming" weight of this evidence established that "LSP lacks the infrastructure necessary to provide a constitutionally adequate health care system for patients with serious medical needs." *Id.*

In reaching this holding, the district court expressly found Plaintiffs' medical experts to be credible. ROA.22405-06; *see also* ROA.26542. The court also noted various ways in which Defendants' experts supported Plaintiffs' experts' conclusions. *See, e.g.*, ROA.22420; ROA.22425; ROA.22428.

The district court also found that Defendants were subjectively aware of and indifferent to the risk to Plaintiffs. ROA.22439-43. It noted that Defendants were on notice of these deficiencies since at least 1998 and had received warnings about their practices from various sources over the years. ROA.22441-43. The court also credited evidence that Defendants deliberately avoided "'dig[ging] too deep'" into patient deaths, frequently creating death summaries that "misrepresented the facts of

12

the patient's death." *See* ROA.22443 (quoting ROA.2223; ROA.32869). Furthermore, the "longstanding, pervasive, [and] well-documented" nature of the deficiencies supported an inference of subjective indifference. ROA.22482 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994)).

The district court concluded that Plaintiffs had not carried their burden as to chronic care, laboratory services, and pain medicine management. *See* ROA.22434-35; ROA.22443-44.

*ADA/RA.* The district court also found that Plaintiffs had proven that Defendants discriminate against Subclass members, in violation of the ADA and RA, by maintaining physical and programmatic barriers that deny them access to programs and services. *See* ROA.22489-520.

First, the district court credited and relied on Plaintiffs' architectural accessibility expert. Mazz found "190 architectural barriers impeding independent access to a range of programs, services, and activities," which Defendants' architectural expert explicitly "substantiate[d]." ROA.22447; ROA.22406 (quoting ROA.4254). The court credited Mazz's findings, which were supported by fact witness testimony and Defendants' own admissions. ROA.22447-49. The court rejected Defendants' arguments that these barriers were overcome by Defendants' program of using inmate orderlies to assist patients with disabilities. ROA.22449-53.

As for Plaintiffs' methods of administration claim, the district court held that LSP's ADA coordinators "all lacked sufficient education, training, and qualifications to carry out the obligations with which the ADA Coordinator is charged." ROA.22454. The district court pointed, *inter alia*, to a lack of an adequate system to resolve and track accommodation requests, ROA.22462, and a failure to train LSP staff to assist with disabled individuals or recognize when a medical issue might trigger Defendants' obligations under the ADA. ROA.22457; ROA.22460. The court found systemic failures in providing accommodations in disciplinary and duty status determinations, but found Plaintiffs failed to prove systematic denials of several other types of accommodations. ROA.22464-70; ROA.22472-75.

### 7. *Defendants refused to meet and confer to facilitate the remedial trial for more than eight months.*

Defendants sought reconsideration of the Liability Opinion on the grounds that the district court improperly granted injunctive relief based on outdated evidence. ROA.22562. The court denied the motion, explaining that it had not granted injunctive relief. *See* ROA.26538-39 ("The [district c]ourt specifically noted that it would not enter injunctive relief until the conclusion of a remedy phase.").

Defendants next petitioned for mandamus in this Court, seeking a remand "for further proceedings based upon current conditions at LSP." *In re Vannoy*, No. 21-30671, ECF No. 2 at 12 (5th Cir. Oct. 28, 2021). The motion was denied. *In re Vannoy*, No. 21-30671, ECF No. 14 (5th Cir. Nov. 29, 2021).

Throughout this time, Defendants refused to meet and confer with Plaintiffs to discuss discovery or other preparations for the Remedial Trial. *See, e.g.*, ROA.26615.

### 8. *The parties stipulated to the relevant time period and the adequacy of Plaintiffs' experts' sample of medical records.*

The district court set the Remedial phase discovery period from December 2021 to April 1, 2022. ROA.26571-72; ROA.126 at Dkt. Entry 652. The parties stipulated that "for the remedy phase of the trial, January 1, 2019 begins the relevant appropriate time period ('Relevant Period') for the Court to assess whether constitutional deficiencies listed in the [Liability Opinion] have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial." ROA.26598.

The bulk of Plaintiffs' discovery requests were for medical records requested by their experts. At Defendants' request, Plaintiffs reduced the number of records they sought, and Defendants stipulated "that they will not at any point make the argument that the number of records reviewed makes Plaintiffs' experts' sample too small to be reliable or representative of Defendants' medical care." ROA.26955.[2] All told, Defendants produced, and the parties' experts reviewed, 60 patients'

---

[2] Defendants reserved the right to challenge the method of selecting individuals for the sample. ROA.26955. They make no such argument on appeal.

15

medical records, even more than during the Liability phase. The records spanned tens of thousands of pages. Remedy_Joint_1_1067 to Remedy_Joint_60_3578.

> **9.     The court allowed Defendants to introduce post-discovery evidence.**

Expecting that Defendants would attempt to introduce unproduced post-discovery evidence, Plaintiffs offered to stipulate to the admissibility of this new evidence, so long as Defendants provided timely supplementation and allowed limited discovery into that evidence. *See* ROA.27197-200. Defendants refused to allow Plaintiffs to take *any* discovery regarding their post-discovery evidence. *Id.*

Six weeks after discovery closed and three weeks before trial began, Defendants sought to introduce six categories of post-discovery evidence, much of which contradicted Defendants' sworn interrogatories and deposition testimony and had never been provided to Plaintiffs. ROA.27298-305; ROA.29450-55. Plaintiffs cross-moved to exclude post-discovery evidence. *See* ROA.27172. The district court granted Defendants' motion and denied Plaintiffs' motion, allowing Defendants to introduce all their post-discovery evidence. ROA.30102-04.

> **10.    The district court conducted a 10-day bench trial on remedy.**

In June 2022, the district court held a second bench trial to determine whether Defendants were likely to continue violating Plaintiffs' constitutional and statutory rights without an injunctive remedy and, if so, what remedy was appropriate. ROA.30563. The court heard from seven medical experts, two ADA experts, and 15

fact witnesses. It also considered hundreds of exhibits, including 972 pages of medical expert reports evaluating 60 medical records from the Relevant Period and other evidence. *See* ROA.29472 (Remedy_Pla_1-a_5053); Remedy_Pla_1-c_5412; Remedy_Pla_5-a_1953; Remedy_Def_35-a_3643; Remedy_Def_35-b_4348; Remedy_Def_35-c_7266.

### 11. *Months after trial, Defendants attempted to supplement the record with previously undisclosed evidence.*

Post-trial briefs were due December 9, 2022. *See* ROA.30259. On November 17, 2022—more than five months after trial ended and just three weeks before the briefing deadline—Defendants moved to supplement the record with previously undisclosed evidence. *See* ROA.30264. By that point, Defendants had already had much of that evidence for months. *See* ROA.30286-87.

Denying the motion, the district court first rejected Defendants' argument that it was obligated to consider post-trial evidence. ROA.30307-11. In the alternative, it found that Defendants' failure to "disclose this 'new' evidence to Plaintiffs until three weeks before post-trial briefs are due [was] considerably prejudicial" to Plaintiffs. ROA.30312. The district court observed that Defendants failed to explain how its delay was substantially justified or harmless. ROA.30312-13. Since Defendants' actions deprived Plaintiffs of any opportunity to "investigate whether Defendants' purported changes remedy or moot certain claims," the dilatory evidence was "more prejudicial than probative." *Id*. Accordingly, it denied the

motion under Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 403. ROA.30313.

> **12.    The district court found "overwhelming" evidence of continuing and systemic unconstitutional healthcare and disability access at LSP.**

On November 6, 2023, the district court held that "the Plaintiffs proved that, rather than receiving medical 'care,' the inmates are instead subjected to cruel and unusual punishment by medical mistreatment." ROA.30558. It further found that "all of the ADA violations identified by the [district c]ourt in the liability ruling persist at LSP with no indication … that changes are planned or thought to be necessary." ROA.30658. In fact, "LSP offered no evidence and no expert testimony that the violations previously found under the ADA and RA have been addressed or remedied." ROA.30627.

*Eighth Amendment.* The district court observed that "the healthcare of inmates at Angola has been the subject of consternation and criticism *since 1989*," when the U.S. Department of Justice (DOJ) found that DOC failed to provide constitutionally adequate medical and psychiatric care at LSP. ROA.3057-58. Against this backdrop, the district court made "detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola. The finding is that the 'care' is not care at all, but abhorrent cruel and unusual punishment that violates the United States Constitution." *Id*.; *see also* ROA.30558-60 (cataloguing examples of

18

"abhorrent" medical care giving rise to an ongoing and systemic constitutional violation).

First, the district court found that Plaintiffs continued to face a serious risk of severe harm when they developed serious medical needs, satisfying the objective prong of the deliberate indifference test. ROA.30649-50. It based this conclusion in significant part on the opinions of Plaintiffs' medical experts, who found that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths." ROA.29479. The court noted that the experts relied on Defendants' own documents and the sample of 60 patients' medical records, "the vast majority of [which] contained multiple examples—typically pervasive—of often grossly substandard medical care." *Id.*

The district court explicitly found Plaintiffs' medical experts to be credible. ROA.30566-67. By contrast, it explicitly found that Defendants' expert Dr. David Mathis's opinions were "ill-supported and unpersuasive"; their expert Nurse Practitioner Michael McMunn's opinions were "entitled to little weight"; and the opinions of their expert Dr. John Morrison, DOC's former Medical Director, were "largely irrelevant." *See* ROA.30569-71.

The district court considered Defendants' claims of improvements since the Liability Trial, including their post-discovery evidence. Although it recognized some improvements, such as to clinical hygiene and privacy in examinations,

ROA.30571, it found these changes to be, at best, "a band-aid on a gaping wound." ROA.30582 (discussing sick call); *see also, e.g.*, ROA.30571 ("Clean rooms and the availability of medical equipment do not solve the constitutionally substandard care."); ROA.30659 ("In the rare instances that Defendants concede necessary changes, evidence suggests that they have taken a 'band-aid' approach to remedies.").

The court also found evidence that Defendants remained indifferent to the continued risk of harm faced by Plaintiffs. The court noted that Defendants' medical leadership dismissed the problems identified in the Liability Opinion; in fact, "[s]everal new leaders at LSP" had neither seen the Liability Opinion nor "ha[d] any idea what specific aspects of healthcare at LSP must be remedied." ROA.30659; *see also* ROA.30647-53 (discussing how the systemic and longstanding nature of the deficiencies, combined with Defendants' failure to respond reasonably to them, establish deliberate indifference). Indeed, the court found that some aspects of the medical care had gotten *worse* since the Liability phase. *See, e.g.*, ROA.30579.

All told, "the overwhelming evidence" demonstrated that any purported improvements at LSP fell short of fixing the serious constitutional deficiencies identified during the Liability and Remedial Trials. *See* ROA.30617. Based on these facts, the district court concluded that Plaintiffs still face a substantial risk of serious

harm, and Defendants have been subjectively indifferent to that risk. *See* ROA.30649.

*ADA/RA*. At the Remedial Trial, "LSP offered no evidence and no expert testimony that the violations previously found under the ADA and RA have been addressed or remedied." ROA.30627. Indeed, in their interrogatory responses and deposition testimony, Defendants largely admitted they had not changed the disability-related practices found to violate the ADA and RA in the Liability Opinion. *See* ROA.29621 (Remedy_Pla_44-c_6170 at 4); ROA.29654-55 (Remedy_Pla_44-d_3399 at 3-4); Remedy_Joint_72-a_6361, T. Falgout Depo. Tr. at 43:22-25. Accordingly, the district court found that "the ADA violations persist and a remedy is required." ROA.30627.

In addition to Defendants' admissions and the testimony of Subclass members, the court relied on Plaintiffs' architectural expert, Mazz, and corrections administration expert, Schriro. According to the court, "Mazz testified credibly at the remedy trial, and his testimony and findings went unrebutted, just as they did at the liability phase trial." ROA.30626. Mazz opined that LSP remained inaccessible to inmates with disabilities. ROA.27486-87 (Remedy_Pla_4_3896 at 3-4). Crediting these findings, the district court found the "architectural barriers which violate the ADA and the RA persist at LSP." ROA.30627-28. The evidence demonstrated that

Defendants had remedied only 20% of the 190 architectural barriers Mazz identified during the Liability phase. ROA.30627-28.

The district court also credited Schriro's opinions. ROA.30626. Schriro conducted a three-day site visit to LSP, where she interviewed about 30 Subclass members and ten inmate orderlies. ROA.30627. Based on this evidence, she confirmed Defendants' admissions that the ADA violations persisted and proposed remedies for improving them. *See* ROA.29242 (Remedy_Pla_3_4058).

Although the court found for Plaintiffs on most aspects of their ADA and RA claims, it found the evidence insufficient to prove systemic abuse or neglect by orderlies, or discrimination in access to duty statuses, work assignments, or hobby activities. *See* ROA.30633-34; ROA.30645.

### 13.   *The district court established a framework for crafting remedial plans.*

Along with their post-trial brief, Plaintiffs proposed a 20-page order that would have imposed specific remedial obligations on Defendants. ROA.30472-92. Defendants made no recommendations regarding a remedial plan. *See* ROA.30314-92; ROA.30498-522. Nor did they respond to Plaintiffs' proposed remedial order. *See id.*

On November 6, 2023, the district court issued a five-page Remedial Order outlining a framework to craft an appropriate remedial plan. ROA.30661. Rather than adopt Plaintiffs' proposal, the Remedial Order directed the parties to propose

potential "special masters," including one physician, one nurse or nurse practitioner, and one disability access expert. *Id.* The district court would appoint these experts to propose and monitor remedial plans in their respective areas of expertise, addressing the specific practices that the court found contributed to the risk of harm or ADA violations. ROA.30661-62. The court provided Defendants an opportunity not only to propose special masters, but also to propose amendments to the remedial plans before their adoption. ROA.30662-64.

### B. Appellate Proceedings

On November 20, 2023, Defendants appealed the district court's order granting class certification,[3] the Liability Opinion, the Remedial Opinion, the Remedial Order, and the Judgment. ROA.30669. Defendants also sought to stay the Remedial Order and Judgment pending appeal. Without deciding the merits of Defendants' arguments, this Court entered an administrative stay. ECF No. 44-2 at 2.

---

[3] In their opening brief, Defendants do not challenge any aspect of the class certification decision. They have therefore abandoned that issue and their appeal of that opinion should be dismissed. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 594 (5th Cir. 2006).

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's orders.

*1.* Trial courts have discretion to set and enforce discovery deadlines by ruling "that evidence of 'changed prison conditions' after [a certain] date would not be admitted." *Brown v. Plata*, 563 U.S. 493, 523 (2011). As a threshold issue, Defendants do not challenge the district court's alternative finding that Defendants' delay in producing post-trial evidence required its exclusion under Federal Rule of Civil Procedure 37. They have thus waived any argument that the district court erroneously excluded their post-trial evidence. In any case, the district court did not err by setting a discovery deadline two months before trial, particularly because it allowed Defendants to introduce *every* piece of post-discovery evidence identified in their motion *in limine*. Defendants fail to identify a single erroneous evidentiary ruling, let alone overcome the harmless error standard. *See Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 581 (5th Cir. 2004).

*2.* The Remedial Order complied with the PLRA. The district court has not entered a remedial plan. Instead, it merely determined that a remedial plan was necessary under the need-narrowness-intrusive test. *See* ROA.30658-60. The appointment of three special masters does not violate 18 U.S.C. § 3626(f), as the appointees will not act as "quasi-judicial officers." *See Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003).

*3.* States do not have due process rights. *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). Even if they did, Defendants identify no due process violation. Federal Rule of Civil Procedure 42(b) explicitly authorizes courts to bifurcate trials, and the district court did not abuse its discretion in doing so.

*4.* The district court's finding that Defendants have violated and continue to violate Plaintiffs' Eighth Amendment rights is not clearly erroneous. A trial judge's factual findings and credibility determinations are entitled to "great deference." *See Dardar v. Lafourche Realty Co.*, 55 F.3d 1082, 1085 (5th Cir. 1995). Defendants present no basis for overruling those findings. Nor can they, as the evidence is clear: for more than a decade, Defendants have been deliberately indifferent to a substantial risk of serious harm. *See Farmer*, 511 U.S. at 842-43. The district court reached this finding after evaluating *every* putative change that Defendants properly introduced at trial, finding that they were not "reasonable measures to abate" the risk. *See id.* at 847.

*5.* The district court did not commit clear error by finding that Defendants continue to violate the ADA and RA. Instead, the court properly exercised its discretion to weigh the evidence and assess the credibility of witnesses. That evidence proved that Defendants continue to discriminate against individuals with disabilities at LSP by failing to remedy architectural barriers or resolve requests for accommodation.

**STANDARD OF REVIEW**

This Court reviews a district court's factual findings for clear error. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). A finding is clearly erroneous only in those rare occasions where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*. So long as the district court's factual findings are "plausible," this Court "may not reverse … even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017) (quoting *In re Omega Protein, Inc.*, 548 F.3d 361, 367 (5th Cir. 2008)).

When the district court has conducted a bench trial, its factual findings are given "great deference." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015). "[T]he clearly erroneous standard of review following a bench trial requires even 'greater deference to the trial court's findings when they are based upon determinations of credibility.'" *Id.* (quoting *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998). "'[W]hen a trial judge's finding is based on his decision to credit the testimony of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)).

Similarly, "this court may not second-guess the district court's … choice of which experts to believe." *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 365 (5th Cir. 2009).

A district court's finding of a substantial risk of serious harm and officials' deliberate indifference to that risk are factual findings reviewed for clear error. *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015); *Gates*, 376 F.3d at 333. The issue of whether the facts constitute a constitutional violation is a question of law to be reviewed *de novo*. *Ball*, 792 F.3d at 592 (citing *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986)). If a constitutional violation is found, this Court reviews the equitable remedy itself for an abuse of discretion. *Gates*, 376 F.3d at 333 (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971)).

A district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *United States v. Okulaja*, 21 F.4th 338, 344 (5th Cir. 2021). So, too, is a district court's management of discovery. *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 767 (5th Cir. 2011). "If an abuse of discretion is found, the harmless error doctrine is applied." *Kanida*, 363 F.3d at 581 (quoting *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 660 (5th Cir. 2002)). "An error does not affect substantial rights if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020) (quoting *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 361 (5th Cir. 1995)).

## ARGUMENT

### I.    The District Court Adequately Considered Current Conditions and Did Not Abuse Its Discretion in Enforcing Discovery Cutoffs.

Defendants argue that the district court committed "legal error" by "fail[ing] to consider current conditions." Br. 33. They argue that prisons, unlike all other litigants in the American court system, must be "given full rein to offer complete evidence of current conditions" at any time—even "after trial and prior to entry of judgment." *Id.* at 36. This entitlement, Defendants suggest, overrides district courts' ability to manage cases or set and enforce discovery deadlines. Even evidence that Defendants never asked the district court to consider is grounds for reversal, according to Defendants. *See id.* at 37.

This argument makes a mockery of fair and orderly trial procedure. The Supreme Court has squarely held that it is "within the sound discretion" of the trial court to enforce discovery deadlines and determine "that evidence of 'changed prison conditions' after [a certain] date would not be admitted." *Plata*, 563 U.S. at 523.

Even if Defendants' argument were correct on the law, it would fail for two independent reasons. First, Defendants do not identify *any* evidence that they were erroneously prevented from offering at either trial, much less argue that any exclusion of evidence was an abuse of discretion or might have changed the result. Indeed, the district court allowed them to proffer *any* evidence that they wanted in

the Liability Trial and then *granted* Defendants' motion to introduce post-discovery evidence in the Remedial Trial. *See* ROA.33982-4000; ROA.30102-04.

Second, Defendants challenge only one of the district court's two grounds for excluding their post-trial evidence, ignoring the fact that the court excluded this evidence under Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 403 due to Defendants' prejudicially untimely disclosure. *See* ROA.30311-13. Defendants' failure to contest this ruling waives any claim against the exclusion of this evidence. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

### A. Trial courts may set and enforce discovery cutoffs.

"Orderly trial management may require discovery deadlines … ." *Plata*, 563 U.S. at 523. Generally, "a party cannot offer, at trial, documents that have not been disclosed in accordance with" Federal Rule of Civil Procedure 26. *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401-02 (5th Cir. 2003). According to Defendants, however, prisons—alone among parties—can submit new evidence of "current conditions" at any time up until judgment. Br. 33-36. This argument is foreclosed by Supreme Court precedent.

In *Plata*, the Supreme Court rejected Defendants' exact argument. The trial court had "established a cutoff date for discovery a few months before trial." *Plata*, 563 U.S. at 523. Pointing to this discovery cutoff, the *Plata* defendants argued that "the [trial] court did not allow it to present evidence of current prison conditions."

*Id.* at 522. The Supreme Court found that the discovery cutoff was "within the sound discretion of the [trial] court" and the court could exclude "evidence of 'changed prison conditions' after that date." *Id.* at 523. This did not thwart the trial court's ability to consider current conditions, because evidence produced a few months before trial *is* "evidence of current conditions." *Id.* at 522-23.

*Plata* merely reaffirmed what even Defendants' own authority says: Trial courts overseeing conditions-of-confinement litigation have discretion to determine how and whether to consider evidence that develops after a case is initiated. *See Farmer*, 511 U.S. at 846 (whether parties "may rely … on developments that postdate the pleadings and the pretrial motions" is "in the district court's discretion"); *accord Dockery v. Cain*, 7 F.4th 375, 379 (5th Cir. 2021).

Ignoring this settled law, Defendants advance an absurd interpretation of *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021). *Valentine* involved a challenge to a prison's COVID-19 response just weeks into the pandemic. The *Valentine* plaintiffs filed suit on March 30, 2020, before COVID-19 hit the prison and just ten days after the defendants had adopted their first COVID-19 policy. *Id.* at 278. The district court held a trial in July 2020 and issued an injunction on September 29, 2020. *Id.* at 279. Throughout that time, Defendants "swiftly looked to the [Centers for Disease Control] for guidance" and "implemented a COVID-19 response policy … based on the agency's guidance." *Id.* at 288. In these circumstances, this Court

found that injunctive relief was inappropriate given "Defendants' response, including actions taken on the eve of and during trial." *Id.* at 289.

From this unusual situation, Defendants infer a blanket rule that prisons must always have "the opportunity to present evidence of important healthcare changes that occurred after trial and prior to entry of judgment." Br. 36. This is not a plausible reading of *Valentine*. In a fluid public health crisis when "[k]nowledge about the disease and how to combat it evolved" throughout the litigation, *Valentine*, 993 F.3d at 288, late-breaking information may be relevant to the question of whether defendants have been deliberately indifferent and whether their future practices are likely to place patients at risk. But nothing in *Valentine* justifies Defendants' leap from that proposition to a rule that every prison defendant is indefeasibly entitled to introduce any evidence they want at any time, with no regard for discovery or trial schedules. Such a rule would directly contradict the Supreme Court's decisions in *Plata* and *Farmer*.[4]

Defendants' rule would have absurd consequences. "One of the purposes of the Federal Rules of Civil Procedure is to eliminate 'trial by ambush.'" *Woods v. Int'l Harvester Co.*, 697 F.2d 635, 639 (5th Cir. 1983). Parties are entitled to test

---

[4] The *Valentine* Court did not even have occasion to consider the rule Defendants claim it adopted, because the *Valentine* defendants were not challenging the exclusion of any evidence. *See* Brief for Appellants, *Valentine v. Collier*, No. 20-20525, ECF No. 68-2 at iii-iv (5th Cir. Nov. 13, 2020).

31

their opponents' evidence. Allowing defendants to introduce evidence that plaintiffs have no opportunity to explore would cause obvious prejudice. To cure that prejudice, the district court would need to allow plaintiffs another round of discovery to determine whether the proposed changes were actually implemented as defendants describe and whether they improved care. Then, of course, the district court would need time to evaluate the new evidence—at which point defendants could proffer new evidence and start the cycle again. Neither the Fifth Circuit nor any other court has ever required such a Sisyphean process, in prison condition cases or any other. As the district court said, "[i]f, as … Defendants suggest, the record remains open to new evidence until the ink is dry on the final judgment, then Title V of the Federal Rules of Civil Procedure is rendered meaningless." ROA.30311.

Moreover, Defendants' rule would incentivize defendants to delay cases wherever possible, to ensure that evidence becomes stale and judgment becomes impossible. Defendants waited nearly two years before moving to disqualify the original trial judge on the basis of a case identified in the original complaint; refused to allow depositions of new officials who would testify to supposed changes; and refused to meet and confer regarding the Remedial Trial for nearly nine months, among other dilatory tactics. *See supra* Part II.A. Now, they seek to benefit from those delays. Rewarding this strategy would make prison litigation entirely unmanageable.

In addition to *Valentine*, Defendants rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1982), and *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013). These cases serve them no better. Neither says anything about parties' ability to supplement the discovery record with new evidence. Instead, they deal with standing and mootness. But Defendants do not (and could not) dispute Plaintiffs' standing, and "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Already*, 568 U.S. at 91 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Defendants have not come close to meeting the "formidable burden" of showing that the post-trial evidence they wish to submit—which touch on just a few of the deficiencies that put Class members at risk—make it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* Indeed, their declarant does not even assert that these putative changes have improved care. *See* ROA.30694-701. *Cf. Valentine*, 978 F.3d at 158 (noting that the trial record in *Valentine* showed that the prison's preventive measures had succeeded in reducing COVID-19 cases from 172 to just four).

### B. Even if Defendants had a right to introduce new evidence at any time, they fail to identify any abuse of discretion.

Even if Defendants' interpretation of *Valentine* were correct, their arguments would still fail. They identify no evidence that was wrongly excluded from either

33

trial, much less prove that any such error was harmful. And they fail to acknowledge the district court's alternative ground for excluding their post-trial evidence: Defendants' unjustified, prejudicial delay in producing the post-trial evidence.

*1.* Defendants focus primarily on the Remedial Trial. *See* Br. 36-38. In the Remedial phase, the district court ordered discovery to conclude by April 1, 2022. *See* ROA.126; ROA.126 at Dkt. Entry 652. On May 16, 2022—six weeks after discovery closed and just three weeks before trial—Defendants filed a "Motion to Admit Additional Evidence" asking the court to admit "certain specified aspects of current and updated conditions at LSP." ROA.27298. They identified six categories of evidence, ROA.27302-05, much of which contradicted their sworn discovery responses or had been withheld from Plaintiffs for weeks or months, ROA.29450-55. Over Plaintiffs' objection, the court allowed Defendants to offer every single item they requested. ROA.30103-04.

In light of the district court's liberal acceptance of even untimely produced evidence, Defendants' claim that they were not "given full rein to offer complete evidence of current conditions," Br. 36, rings hollow. Indeed, their only record citation for this supposed error is the district court's *grant* of their motion. Br. 36 n.70 (citing ROA.30103-04).

Tellingly, Defendants do not identify any improperly excluded evidence, let alone explain how its exclusion affected the outcome. *See, e.g.*, *Novick*, 946 F.3d at

741; *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns., Inc.*, 761 F.3d 409, 431 (5th Cir. 2014) (appellant must "discuss how each specific piece of evidence was likely to affect the outcome of the trial, in light of all the evidence presented"); *Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 882 (5th Cir. 2013) ("The burden of proving substantial prejudice lies with the party asserting error.") (quoting *FDIC v. Mijalis*, 15 F.3d 1314, 1319 (5th Cir. 1994)). Defendants' inability to satisfy this standard is fatal to their argument.

In one throwaway sentence, Defendants also assert that the Liability Trial was based upon stale evidence. Br. 35. Not so. The district court allowed both sides to proffer *any* evidence of current conditions they wanted, and the only evidence that Defendants offered concerned architectural barriers. *See* ROA.33982-34000; ROA.46710 (Proffer_Def_1). They proffered no evidence regarding purported improvements to medical care or non-architectural ADA practices. Without any suggestion of any evidence that could have changed the court's analysis, Defendants' argument must fail. *See also infra* Part III.

*2.* Unable to identify evidence that was wrongly excluded at trial, Defendants rely principally on evidence offered *after* trial. Br. 36-38.[5] On November 16, 2022,

---

[5] Most of the evidence Defendants rely on here is *post-judgment* evidence: a hearsay declaration by LSP's medical director (who declined to testify at trial, *see* ROA.30616), dated 11 days *after* the district court's judgment, which attaches several documents that Defendants never submitted to the district court before

five months after the Remedial Trial and just three weeks before post-trial filings were due, Defendants moved to "supplement the record" with information never produced to Plaintiffs. ROA.30268-71. This information involved events that had purportedly happened as early as August 2022, nearly three months before they filed their motion. ROA.30306.

The district court denied Defendants' motion under *Valentine* and, alternatively, under a straightforward application of the Federal Rules of Civil Procedure. According to the court, Defendants' choice to wait "until three weeks before post-trial briefs are due" to disclose the belated evidence violated their obligation to make timely supplemental disclosures as required by Rule 26(e)(1), rendering that evidence "untimely and inadmissible under Fed. R. Civ. P. 37 and … more prejudicial than probative under … Fed. R. Evid. 403." ROA.30312-13. The court noted that Defendants' failure was not "substantially justified or … harmless," as they failed to explain "how this submission so close to briefing deadlines does not substantially prejudice Plaintiffs." *Id.*

---

judgment. *See* Defs.' Record Excerpts at 426-44. Tellingly, Defendants do not cite the material they actually asked the district court to consider, which was omitted from the record on appeal. *See* ECF Nos. 762-1 to 762-5. Defendants identify no authority for relying on putative evidence that they disclosed for the first time on appeal. Therefore, ROA.30694-701 (Defendant Toce's post-judgment declaration) and ROA.30736-56 (Exhibits A-5 through A-13 to the declaration) are not properly before this Court and should not be considered. *See Colony Creek, Ltd. v. Resol. Trust Corp.*, 941 F.2d 1323, 1326 (5th Cir. 1991) (new issues or evidence introduced after judgment should not be considered on appeal).

Defendants' opening brief makes no mention of this independent ground. *See* Br. 38. "By not briefing any challenge to the district court's alternative … basis" for its decision, Defendants "cannot prevail in [their] challenge to the district court's" first ruling. *Lopez v. Sentrillon Corp.*, 749 F.3d 347, 352 (5th Cir. 2014).

## II.    The Remedial Order Complies with the PLRA.

The district court has not ordered Defendants to take any remedial measures. Instead, it has merely ordered the parties to propose special master candidates. Once appointed, the special masters will recommend a remedial plan for the parties and court to consider. *See supra* Part II.A.13. At this stage, the Remedial Order satisfies the PLRA's needs-narrowness-intrusiveness requirements, and Defendants' arguments are premature. Moreover, the appointment of three special masters is consistent with the PLRA.

### A. The Remedial Order satisfies the needs-narrowness-intrusive test.

The PLRA demands that injunctive relief be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right," a requirement commonly referred to as the needs-narrowness-intrusiveness (NNI) test. 18 U.S.C. § 3626(a)(1). The court need not make "particularized findings … on a provision-by-provision basis" regarding these requirements. *Gates*, 376 F.3d at 336 n.8.

Defendants speculate that the three special masters contemplated in the Remedial Order "will very likely impose best or preferred practices on LSP." Br. 44. Based on this prediction, they declare the district court's order violative of the NNI test. Br. 44. This speculation is without merit and premature.

The Remedial Order requires the parties to submit names to the court for consideration. ROA.30662-63. The court's appointees will then propose remedial plans for the court to consider, and the parties will have the opportunity to propose amendments. ROA.30664. The court spelled out seven subjects that the medical remedial plan should address and five that the ADA remedial plan should address, each tied directly to the deficiencies found in the Liability and Remedial Opinions. ROA.30662-63. Until the court adopts a remedial plan, Defendants are under no obligation to change any of their practices.

In other words, all the district court has done is identify areas where a remedy is needed, while deferring judgment on what specific remedial steps are the narrowest and least intrusive way to provide that remedy. This is far narrower than the remedy requested by Plaintiffs. *See* ROA.30472-91. The only less intrusive measure possible at this stage would have been *no* remedy, and the court explained why that alternative would not suffice. ROA.30658-60.

Defendants do not and could not reasonably assert that appointing special masters to *propose* a remedial plan is intrusive. When the special masters propose a

plan for the court's consideration, the court will have ample opportunity to determine whether that plan is the narrowest and least intrusive possible. Until the district court orders remedial plans with substantive requirements, Defendants have no basis to assert such plans will violate the NNI requirements, or that the district court will fail to make the appropriate findings.

### B. The district court's injunction is a proper exercise of judicial powers.

Citing broad principles of federalism, Defendants suggest that a so-called structural injunction runs afoul of the PLRA, implying that any injunction regulating any aspect of prison operations cannot stand. Br. 39-42. They further argue that using "special masters to craft [a] remedy … is no longer an option" after the PLRA. Br. 44. These claims are contrary to the plain language of the PLRA and Supreme Court authority interpreting it.

The plain language of the PLRA contemplates that an order for prospective relief may last up to two years, or longer if the court makes written findings that there is an ongoing violation of a federal right. 18 U.S.C. § 3626(b)(1), (3). Since the PLRA's enactment, both the Supreme Court and this Court have upheld broad injunctions related to medical care. *See, e.g.*, *Plata*, 563 U.S. at 545; *Gates*, 376 F.3d at 336, 344.

The fact that Congress prescribed detailed procedures that a court must satisfy before entering injunctive relief does not mean that injunctive relief is prohibited.

39

On the contrary: it definitively indicates that Congress anticipated situations in which detailed injunctions *would* be necessary.

As the Supreme Court and this Court have both recognized, a medical system proven to provide unconstitutionally inadequate care is one situation where a structural injunction may be appropriate. *See Plata*, 563 U.S. at 511; *Gates*, 376 F.3d at 336. Contrary to Defendants' suggestion, courts may not decline to remediate constitutional violations "simply because a remedy would involve intrusion into the realm of prison administration." *Plata*, 563 U.S. at 511.

### C. The district court's order does not implicate 18 U.S.C. § 3626(f).

Defendants incorrectly claim that the district court's prospective appointment of three special masters violates 18 U.S.C. § 3626(f). Br. 46-47. But this provision applies only if the appointment is "pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court." *See* 18 U.S.C. § 3626(g)(8).

Federal Rule of Civil Procedure 53 permits a special master to perform duties consented to by the parties; hold trial proceedings and make recommended findings of fact; or address pre-trial and post-trial matters that cannot be effectively and timely addressed by an available district or magistrate judge. Fed. R. Civ. P. 53(a)(1). Section 3626(f) similarly applies to special masters who will "conduct hearings on the record," a quintessentially judicial function. 18 U.S.C.

40

§ 3626(f)(1)(A). It spells out specific requirements the court must follow when employing a special master to perform such judicial functions. *See id.*

However, § 3626(f) applies *only* to court appointees acting as "quasi-judicial officers." *See Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003).[6] Quasi-judicial powers include the ability to "hold hearings, subpoena witnesses, take testimony, or rule upon evidence," "assist in the court's determination of discrete issues of law or fact," or issue "factual findings … legally entitled to deference." *See id.*

Here, the Remedial Order does not assign *any* quasi-judicial functions to the special masters. For instance, the experts will not conduct hearings or make findings of fact in the court's stead. *See* 18 U.S.C. § 3626(f)(1)(A). Instead, the experts will simply propose remedial plans for the court to consider in crafting orders "necessary and appropriate to effect remedies." ROA.30662-64. Then, the experts will assess compliance with the remedial orders at prescribed intervals and submit reports to the court and the parties. ROA.30664. At every stage of this process—from appointment of experts to crafting, implementing, and monitoring the remedial plans—the parties will provide input for the court's consideration. *See* ROA.30664. The district court

---

[6] *See also, e.g.*, *Handberry v. Thompson*, 446 F.3d 335, 351-52 (2d Cir. 2006) (finding "special monitor" in jail education case not governed by Section 3626(f)); *Turner v. Cty. of San Bernardino*, 2018 WL 6617638, at *7 (C.D. Cal., Dec. 14, 2018) (appointing experts under Rule 706 to advise the court concerning compliance with judgment); *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1239 (M.D. Ala. 2004) (finding "healthcare monitor" not governed by Section 3626(f)).

will hold "a conference to review progress and impediments to completion and compliance if needed." *Id*. Thus, the district court has not delegated *any* judicial functions to the special masters.

The district court was well within its authority under Federal Rule of Evidence 706 to appoint experts to advise as to the complex medical and technical matters at issue here. *See* Fed. R. Evid. 706. This method of assigning advising and monitoring functions to appointed experts is not subject to § 3626(f). *See Benjamin*, 343 F.3d at 45; *Turner*, 2018 WL 6617638, at *7 (appointing experts under Rule 706 to advise the court concerning compliance with consent judgment).

Defendants fail to cite any authority indicating otherwise. *See* Br. 44-45. Instead, they point to cases when, unlike here, plaintiffs sought a special master to actually run prison operations. *See Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003) (rejecting request for special master to "essentially administer DOCS"); *Center v. Lampert*, 726 F. App'x 672, 676 (10th Cir. 2018) (rejecting request for "appointment of a court advocate to oversee prison operations"); *Amos v. Hall*, No. 20-cv-7, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020) (rejecting request "to assume control of day-to-day operations"). The Remedial Order confers no comparable authority, and Defendants' § 3626(f) arguments should be rejected in full.

Even if Defendants were correct that § 3626(f)(1)(A) applied, they would be incorrect that it limits courts to a single special master because it uses the singular

phrase "a special master." *See* Br. 47-48. This argument, which is not supported by any caselaw, is foreclosed by the Dictionary Act. *See* 1 U.S.C. § 1 ("[W]ords importing the singular include and apply to several persons, parties, or things" and vice versa). Thus, even if § 3626(f) applied, the only aspects of the Remedial Order that would need to be amended would be the method of proposing candidates and the source of the special masters' compensation. *See* 18 U.S.C. § 3626(f)(2), (f)(4).

### III.    States Lack Due Process Rights.

Defendants argue that the district court's trial management violated the State's right to due process. Br. 49-52. But states have no due process rights. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court."). Defendants cite no legal authority for this frivolous argument. *See* Br. 49-52.[7]

Even if states had due process rights, Defendants' arguments would fail for separate reasons. They lack *any* relevant "legal citations" or "facts" showing

---

[7] Defendants rely only on the purported "denial of due process to the State," rather than on any due process rights of the individual defendants. Br. 49. In any event, the individual defendants are sued only in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

prejudice and are therefore waived. *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004).

They are also plainly wrong. For instance, Defendants' arguments regarding preliminary injunctions, Br. 49, are irrelevant, as the district court issued a permanent injunction after trial, not a preliminary injunction pending further proceedings.

Moreover, Defendants fail to articulate how the district court's case management decisions constitute an abuse of discretion. *See* Br. 49-52. Trial courts are authorized to manage their dockets, including by bifurcating trials into liability and remedial phases. *See, e.g.*, *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (discussing district courts' inherent powers "to manage their own affairs"); *Plata*, 563 U.S. at 523 ("The [trial] court did not abuse its discretion when it also cited findings made in earlier decisions … ."); Fed. R. Civ. P. 42(b) (authorizing federal courts to order separate trials on different issues or claims). Indeed, bifurcation has been used in complex prison conditions cases like this one. *See, e.g.*, *Tellis v. LeBlanc*, No.18-541, 2022 WL 67572, at *2 (W.D. La. Jan. 6, 2022) (bifurcating class action regarding conditions of confinement); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1268 (M.D. Ala. 2017). Similarly, the trial court had discretion at the Remedy stage to defer evidentiary rulings to trial rather than "decide what evidence … is relevant … in a pretrial vacuum," as Defendants preferred. ROA.30105; *see also* ROA.29673-

85. Tellingly, Defendants do not identify *any* inappropriate evidentiary rulings on these subjects at trial. *See* Br. 51. Defendants point to no abuse of discretion, let alone any reversible error. *See United States v. Okulaja*, 21 F.4th 338, 344 (5th Cir. 2021).

Defendants' arguments regarding the burden at the Remedial Trial are similarly mistaken. Br. 51. Defendants—not Plaintiffs—have the burden of showing they changed their practices such that a remedy is no longer necessary. *See, e.g.*, *Already*, 568 U.S. at 91; *accord Thomas v. Bryant*, 614 F.3d 1288, 1320-21 (11th Cir. 2010) (in prison case, "to rely on intervening events occurring after suit has been filed the defendants must satisfy the heavy burden of establishing that these such events have completely and irrevocably eradicated the effects of the alleged violations" (citation omitted).[8]

---

[8] Moreover, the court required Plaintiffs to show deliberate indifference anew at the Remedial Trial, even though they had already proved that Defendants had been deliberately indifferent for many years. ROA.30102. This is inconsistent with the general rule that an injunction remains appropriate unless defendants have, *inter alia*, "completely and irrevocably eradicated the effects of the alleged violation," *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 413-14 (5th Cir. 1999), and has been rejected by several courts in conditions-of-confinement cases, *see, e.g.*, *Thomas*, 614 F.3d at 1320; *Porter v. Clarke*, 923 F.3d 348, 366-68 (4th Cir. 2019), as amended (May 6, 2019); *cf. Plata*, 563 U.S. at 523-24 (at remedy stage, "court was not required to reconsider the merits"); *see also* ROA.27162-63. Because the district court found Defendants subjectively indifferent in the Remedial phase, *see infra* Part IV, the Court need not resolve this legal question. Either way, it renders Defendants' argument moot, since the Court placed the ultimate burden on Plaintiffs.

**IV.    The District Court Did Not Clearly Err in Finding Deliberate Indifference to a Substantial and Ongoing Risk of Serious Harm.**

On the merits, Defendants mostly quibble with the district court's factual findings and credibility determinations. But a trial judge's factual findings based on credibility determinations "can virtually never be clear error" absent "internal[] inconsisten[cy]" in those determinations. *Anderson*, 470 U.S. at 575.

Aside from second-guessing the trial judge, Defendants stake their appeal on the faulty proposition that if they took *any* steps to improve care, they cannot be found deliberately indifferent. The question, though, is not whether Defendants eventually took *some* action, but whether those steps were "reasonable measures to abate" the risk. *Farmer*, 511 U.S. at 847. Defendants never acknowledge that the district court considered every alleged corrective action and found none reasonable in light of the scope and severity of the risk. *See, e.g.*, ROA.30659.

**A. Legal standard**

Deliberate indifference to "serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *accord Farmer*, 511 U.S. at 832 (the Eighth Amendment requires prisons to ensure "adequate … medical care").

A prison official is liable for deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

46

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Thus, establishing an Eighth Amendment violation requires proof that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Gates*, 376 F.3d at 333.

This inquiry consists of an objective and a subjective test. The objective component requires showing that the prisoner has "serious medical needs," *Estelle*, 429 U.S. at 104, and "either has already been harmed or been 'incarcerated under conditions posing a substantial risk of serious harm,'" *Braggs*, 257 F. Supp.3d at 1189 (quoting *Farmer*, 511 U.S. at 834).

The subjective component requires that prison officials had requisite knowledge of the risk of harm and "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 844-47.

"[S]ystemwide deficiencies in the provision of medical … care that, taken as a whole, subject sick … prisoners … to 'substantial risk of serious harm'" can provide the basis for a finding of deliberate indifference at an institutional level. *Plata*, 563 U.S. at 505 n.3 (quoting *Farmer*, 511 U.S. at 842); *see also, e.g.*, *Gates*, 376 F.3d at 333 ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need … ."). Where deficiencies are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and "the circumstances suggest that the [prison officials] … had been exposed to information concerning the risk," a fact-finder may infer the officials' knowledge. *Farmer*, 511 U.S. at 842-43; *see also, e.g.*, *Alberti*, 937 F.2d at 998 (observing that the "long duration" of unconstitutional conditions can demonstrate officials' subjective deliberate indifference).[9]

Once defendants are aware of a substantial risk, they must "respond[] reasonably to the risk." *Farmer*, 511 U.S. at 844. As the district court explained, "prison officials cannot escape liability simply by demonstrating that they eventually took some form of 'corrective action,' in response to a risk of harm." ROA.30651 (quoting *Bradley v. Puckett*, 157 F.3d 1022, 1026 (5th Cir. 1998)). Rather, "[e]fforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm, also constitute deliberate indifference because such insufficient efforts are not 'reasonable measures to abate' the identified substantial

---

[9] *Accord, e.g.*, *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 489 (7th Cir. 2022) ("[D]eliberate indifference' … can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." (quoting *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983))); *Braggs*, 257 F. Supp. 3d. at 1251 ("In challenges to a correctional institution's provision of medical care, evidence of systemic deficiencies can also establish the 'disregard' element of deliberate indifference." (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991))).

48

risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 847, and *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002)).

### B. The district court did not clearly err in finding a substantial risk of serious harm.

The district court did not clearly err in finding that Defendants' medical system places Plaintiffs at a substantial risk of serious harm. That finding was based on extensive expert analysis, largely unchallenged on appeal; the testimony of doctors and others who treat LSP patients, including Defendants' own consultants and employees; shockingly high mortality rates; and Defendants' own records and admissions. The district court's credibility determinations cannot be second-guessed. *See Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 365 (5th Cir. 2009) . Moreover, the evidence showed that the risk to patients continued unchecked from 2010 through 2022, throughout the entire review period, belying any argument that Defendants cured their deficiencies.

Plaintiffs presented evidence from four of the country's most accomplished correctional and emergency medicine professionals. *See* ROA.30566-67 (summarizing credentials); *see also* ROA.29476-77. Applying methods  that even Defendants' liability experts conceded was appropriate, *see* ROA.21848 (citing ROA.33601; ROA.33693), they reviewed medical records from more than 100 patients, including 47 from 2010-2015, 18 from 2016-2018, and 60 from 2019-2022. *See* ROA.22404; ROA.30567; ROA.46742 (Proffer_Pla_1). The experts also

reviewed Defendants' own records and interviewed numerous LSP providers and employees. *See* ROA.1625-26; ROA.1633.

Before the Remedial Trial, Defendants stipulated that the experts' sample was not "too small to be reliable or representative of Defendants' medical care." ROA.29462. They never challenged the medical reports' reliability or admissibility under *Daubert*, nor do they dispute on appeal the reports' reliability, admissibility, or impartiality.[10]

During the Liability phase, Plaintiffs' experts found "serious and systemic problems with access, timeliness and quality of care[.]" ROA.1629 (Liability_Pla_6_284 at 7). They "identified preventable deaths and inadequate care in almost every medical chart [they] reviewed." ROA.1649. They attributed these harms to "systemic inadequacies in the health program," including organizational and procedural deficits that prevented patients from being "provided the most basic … elements of adequate health care access." ROA.1629; ROA.1631; *see also* ROA.22406. Underscoring the severity of their findings, the experts concluded that "[i]n our collective experience of over 60 years in correctional medicine, [LSP's] delivery of medical care is one of the worst we have ever reviewed." ROA.1631. Their conclusion was reinforced by other evidence, such as Louisiana prisons'

---

[10] Their sole challenge to the reports, to the qualifications of and standard applied by Dr. Vassallo, is discussed *infra* Part IV.B.

worst-in-the-nation mortality rate, ROA.1631; ROA.19218 (Liability_Pla_345), and the testimony of independent hospital doctors who repeatedly saw patients from LSP after long delays. ROA.22442; ROA.21901-03.

In their supplemental report based on medical records from 2016 through 2018, the experts found that "[n]othing in the new charts suggests that care has improved" and "Angola continues to deliver inadequate medical care to its patients." ROA.46742 (Proffer_Pla_1 at 1).[11] The experts then issued a Remedy report based on medical records from 2019 through 2022—a period Defendants stipulated was relevant "for the [c]ourt to assess whether constitutional deficiencies listed in the [Liability Opinion] have since been remedied and what (if any) injunctive relief is necessary in light of the findings at trial." ROA.30563; ROA.29479 (Remedy_Pla_1-a_5053). The experts again concluded that "[p]atients at LSP with serious medical needs continue to face a substantial risk of serious harm, including preventable hospitalizations and deaths." ROA.29479.[12] Again, their conclusions

---

[11] The supplemental report was not considered by the district court. Plaintiffs cite it only to refute Defendants' argument that limiting Liability Trial evidence to the discovery period harmed Defendants.

[12] Defendants' conclusory argument that the factual findings were flawed because Defendants' care was hampered by the closure of Earl K. Long Hospital, COVID-19, or unspecified hurricanes, *e.g.*, Br. 32, 36, ignores the fact that the expert reports and the district court found similar care over a nearly 13-year period. *See, e.g.*, ROA.30593; ROA.22014-16.

were corroborated by external evidence, such as the testimony of three third-party doctors who treated patients from LSP. ROA.30593-94.

As explained in the nearly 1,000 pages of expert reports and attachments, Defendants' gross mistreatment includes:

<u>*Delayed Stroke Diagnosis and Care*</u>. Defendants repeatedly failed to timely diagnose obvious strokes, delaying transfer to appropriate levels of care and resulting in long-term disability or death. ROA.22430-31; *see also* ROA.1690-91; ROA.1892-95; ROA.6078-80. These failures were so glaring that the Stroke Program Coordinator at an outside hospital warned DOC's statewide medical director that "patients were arriving at [the hospital] with 'obvious stroke symptoms' based on LSP staff failing to determine or realize that inmates were having strokes," resulting in "'pretty significant deficits' due to the lack of recognition and transport." ROA.22441-42 (quoting ROA.5376-78).

Defendants continued to mistreat stroke symptoms in the Remedial phase. For example, Remedy Patient #55 was returned to his cell after four hours in the ATU and without seeing a doctor despite drooling, hemiparesis, and "slump[ing] to the side." ROA.30604. After 17 hours, LSP sent him to a facility that could not perform a standard stroke workup. ROA.30604. After he lost the ability to walk and developed urinary continence a month later, an LSP nurse practitioner recorded that he had no "signs and symptoms of a new stroke" and discharged him to his cell

without examination. ROA.30605 (quoting ROA.34519-22). When Defendants finally sent him to the hospital a month later, he was left "with a devastating inability to speak properly," "dysphasia, [and] difficulty swallowing." ROA.30605 (quoting ROA.34523-25).

The district court found the care "egregious," crediting Dr. Vassallo's conclusion that "the provider either did not examine the patient or doesn't know anything about how to recognize a stroke." ROA.30606 (quoting ROA.34606). Several other patients with stroke symptoms were treated similarly. *See* ROA.30587-88 (Remedy Patient #10); ROA.29583-85 (Remedy Patients #26 & #52); ROA.29592-94 (Remedy Patient #17).

*Refusal to See or Transport Patients*. In the Liability phase, physicians routinely gave "no transport" orders when EMTs consulted them, resulting in "delay in care, lack of evaluation by a physician and in some cases death." ROA.22425 (citing Liability Pla_6_284 at 63-64); *see also*, *e.g.*, ROA.22426; ROA.1685-86.

This willful refusal to examine patients continued into the Remedial phase. For example, Remedy Patient #6, a 50-year-old man, made "at least seven separate requests for medical attention for escalating back pain" over the last two weeks of his life, "yet no provider ever examined his back." ROA.30606. Providers issued five separate orders prohibiting EMTs from taking him to a doctor, leaving him to be "managed by medics and treated indifferently by providers." ROA.30607. He

died of a spinal cord infection. *Id.* Even Defendants' expert Dr. Mathis acknowledged he should have been presented to a provider. ROA.30569 n. 48. LSP's Medical Director Dr. Toce, by contrast, described his symptoms as "entirely consistent with manipulative behavior," demonstrating what the district court viewed as "a callous disregard of medical symptoms." ROA.30608. The records contain numerous similar examples. *See, e.g.*, ROA.30575-76 (Remedy Patients #20 & #42).

Similarly, even after nurse practitioners (NPs) supposedly began staffing the Acute Treatment Unit (ATU) five days a week and working "on call" on weekends, records reveal numerous examples of patients in the ATU being treated by nurses or medics without any examination by a doctor or NP. *See, e.g.*, ROA.30599-600 (Remedy Patients #35 & #36).

Even in the infirmary, doctors routinely failed to examine patients. For example, Remedy Patient #38 developed increasingly critical symptoms over three days without ever being seen by a provider. ROA.30597-98; ROA.29586. When he went into shock, Dr. Toce declined to examine him or order any care, instead leaving the patient in an isolation room, where he suffered a fatal cardiorespiratory arrest within the hour. ROA.30597-98; ROA.29586. The district court found that the failure to even "examine this patient to substantiate a proper course of action is not mere neglect, it is callous disregard." ROA.30599.

_Failure to Investigate Cancer Symptoms_. Defendants repeatedly failed to timely screen for cancer, decreasing the chance of effective treatment and often resulting in preventable death. _See, e.g._, ROA.22411 (Liability Patient #5); ROA.22413-14 (Liability Patient #7); ROA.22416-17 (Liability Patient #10). Two Named Plaintiffs, Shannon Hurd and Joe Lewis, complained of symptoms consistent with cancer for two years or more before finally being screened, at which point their cancers were terminal. ROA.22424-25; ROA.6084-89. This pattern of delayed diagnoses persisted in the Remedial phase. _See, e.g._, ROA.30560 (Remedy Patient #5); ROA.30558 (Remedy Patient #7); ROA.30591 (Remedy Patient #1).

_Failure to Follow Specialists' Recommendations_. The record also supports the district court's finding of "harmful failure(s) to follow specialty recommendation(s)." ROA.22410-19; _see, e.g._, ROA.22411-12 (Liability Patient #17); ROA.22416 (Liability Patient #6); ROA.22417-18 (Liability Patient #54). The district court also credited the live testimony of Named Plaintiff Otto Barrera, who had to "feed[] himself through a pec[toral] tube" because Defendants failed to provide reconstructive surgery repeatedly recommended by specialists. ROA.22418. Defendant NP Cindy Park admitted that Mr. Barrera had been "lost to follow-up" for nearly two years. _Id._

In the Remedial phase, LSP's medical leadership admitted they were either unaware of or knowingly disregarded their own policy for documenting decisions to

not follow specialists' recommendations. ROA.30585-86. Their failure to comply with specialists' recommendations continued to seriously harm Plaintiffs throughout the Remedial phase. *See, e.g.*, ROA.30589 (Remedy Patient #4); ROA.30408-09 (citing ROA.34752-57) (Remedy Patient #5).

***

The district court found Plaintiffs' experts' conclusions based on these and many other case studies to be credible. It similarly found the third-party hospital physicians who testified at the Remedial Trial "particularly persuasive and credible." ROA.30594. Those determinations are entitled to "great deference," *Guzman*, 808 F.3d at 1036, and cannot be "second-guess[ed]," *Grilletta*, 558 F.3d at 365. Defendants do not argue otherwise. Instead, they simply ignore the district court's credibility determinations. Without any argument that the district court could not credit Plaintiffs' experts' conclusions that the deficiencies went beyond mere negligence and exposed patients to a substantial risk of serious harm, Defendants cannot overturn those findings.

None of Defendants' arguments changes this result. *First*, Defendants argue that Plaintiffs' experts and the district court incorrectly "judged LSP by the community standard of care." Br. 87.[13] This is false. As the district court found, no

---

[13] "Community standard of care" is a term of art used by some states in professional negligence cases. *See generally Ardoin v. Hartford Acc. & Indem. Co.*, 360 So.2d

56

evidence shows that Dr. Vassallo or the district court applied a "community standard of care." *See* ROA.30596. Instead, Plaintiffs' experts used nationally established medical standards to determine that Defendants' practices put patients at substantial risk of severe harm. *See, e.g.*, ROA.34473-74; ROA.34644-47; ROA.34679-80.[14] Defendants have not, and cannot, point to a single example of a deviation from these uncontroversial, nationally accepted medical standards.[15]

Relatedly, Defendants criticize Dr. Vassallo because she has not worked inside a correctional facility. Br. 88. Dr. Vassallo is a nationally recognized emergency physician and toxicologist who has practiced everywhere from Harlingen, Texas to Bellevue Hospital in New York, where she treats dozens of patients housed in correctional facilities each day. ROA.32823-25. She is certified as a correctional health professional by the National Commission for Correctional Healthcare and has been accepted as a correctional medical expert by this Court and several district courts within it. *See Yates v. Collier*, 868 F.3d 354, 363-66 (5th Cir.

---

1331, 1340 n.27 (La. 1978). Defendants cite a handful of out-of-circuit district court cases finding it inapplicable in Eighth Amendment cases, but identify no such Fifth Circuit precedent. Br. 53-57. Regardless, neither the district court nor Plaintiffs' experts applied a "community standard of care."

[14] Each of Plaintiffs' experts testified similarly. *See* ROA.34738; ROA.34851-52; ROA.34281; ROA.35215-16.

[15] The closest Defendants come is a reference to Dr. Mathis's one citation to an article from the medical database UpToDate. Br. 98. Defendants omit that Dr. Mathis cited the wrong article, and that the relevant article contradicted his opinion. ROA.35645-48.

2017) ("[T]his court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony."); ROA.30596. Defendants provide no basis for precluding the district court from crediting her testimony.

*Second*, Defendants suggest that the evidence amounted to a "smattering of isolated patient cases." Br. 32; *see also id.* at 88 ("Nothing in the cases reviewed applies across the prison population as a whole."). Defendants waived this argument at the district court by explicitly stipulating that they would not "at any point make the argument that the number of records reviewed makes Plaintiffs' experts' sample too small to be reliable or representative of Defendants' medical care." ROA.26955; *see Biziko v. Van Horne*, 981 F.3d 418, 420 (5th Cir. 2020) ("Defendants cannot 'admit and stipulate' … and then change their position and attempt to deny that … on appeal."). In any event, Plaintiffs' experts explained why the sample was representative of the risk of harm whenever a patient developed serious medical needs. ROA.29475 (Remedy_Pla_1-a_5053 at 4); ROA.34277. Defendants offer no basis for "second-guess[ing]" the district court's acceptance of the evidence in the sample. *See Grilletta*, 558 F.3d at 365.

*Third*, Defendants attempt to rebut certain factual findings regarding specific patients. Br. 86-98. They discuss just 16 patients—out of more than 100 sampled— that the district court considered in the experts' Liability and Remedy samples,

leaving the remainder of the experts' medical record analysis—all of which the district court found credible—completely unrebutted.

None of those arguments has merit, much less establishes clear error. Often, Defendants simply reallege opinions the district court explicitly rejected. *Compare*, *e.g.*, Br. 95 (citing Dr. Mathis's opinion about Remedy Patient #38) *with* ROA.30598 (calling this opinion "shocking[]" and "uncredible"); Br. 95 (citing McMunn's opinion about Remedy Patient #22) *with* ROA.30614 (rejecting this "flippant[]" opinion); Br. 91-92 (citing Dr. Toce's deposition testimony about Remedy Patient #7 refusing a colonoscopy) *with* ROA.30587 (finding this testimony incredible);[16] Br. 96 *with* ROA.30600-01 (Remedy Patient #36); Br. 97 *with* ROA.30602 (Remedy Patient #29). Defendants' attempt to second-guess the district court's findings must be rejected.

Defendants summarily dismiss other cases as "a single act of medical negligence," Br. 89 (Remedy Patient #13),[17] or a "difference of medical opinion or a misdiagnosis," *id.* at 98 (Remedy Patient #25). But again, they offer no basis to second-guess the district court's contrary conclusion. *See Grilletta*, 558 F.3d at 365.

---

[16] In their brief, Defendants also cite evidence the district court found inadmissible, without raising any challenge to that ruling. *Compare* Br. 91-92 & n. 307 *with* ROA.34938-39.

[17] *See also* Br. 96-97 (Remedy Patients #35 & #29).

Remedy Patient #13 is a prime example. LSP providers "repeatedly failed to administer his HIV medication, provided erroneous information to specialists regarding his medication dosage, and disregarded the prescriptions ordered by specialists, reverting instead to prior, ineffective medications." ROA.30572. LSP providers ultimately prescribed him a medication expressly contraindicated in his chart, ignoring multiple warnings from specialists, resulting in an infection treated with a medication known to be ineffective. *Id.* Patient #13 died of sepsis within a week. ROA.30573.

The district court found this case to be "unrebutted evidence of LSP's failure to follow specialists' orders, callous indifference to medication efficacy, indifference to treatment plans and protocols, and incoherent, disorganized, untrustworthy medical records, all of which contribute to abysmal, unconstitutional medical care." ROA.30574-75. Defendants dismiss the district court's thorough assessment as reflecting instead "a single act of medical negligence," citing only the opinion of one of their discredited experts for support. Br. 89. It is hard to imagine a more deficient challenge to a factual finding.

Regardless, the issue is not whether any individual case would, on its own, constitute deliberate indifference. *See Plata*, 563 U.S. at 505 n.3 (explaining that the totality of the circumstances must be considered in systemic cases). There was ample basis for the trial judge to conclude that these cases reflected pervasive mistreatment

and systemwide deficiencies. *See Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1129 (M.D. Ala. 2016) ("[A]lthough one-off negligent treatment is not actionable, … frequent negligence, just like a single instance of truly egregious recklessness, may allow the court to infer subjective deliberate indifference."). Even Defendants' expert Dr. Mathis acknowledged deficiencies in ten of the 38 charts that he reviewed. ROA.30569.

### C. The district court did not clearly err in finding Defendants subjectively indifferent.

Systemwide deficiencies in medical care can support a finding of deliberate indifference at an institutional level. *See Plata*, 563 U.S. at 505 n.3. Where those deficiencies are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" and "the circumstances suggest that the [prison officials] … had been exposed to information concerning the risk," a fact-finder may infer the officials' knowledge. *Farmer*, 511 U.S. at 842-43; *see also Alberti*, 937 F.2d at 998 ("long duration" of unconstitutional conditions can demonstrate subjective deliberate indifference).

Defendants' failure to provide adequate medical care at LSP is longstanding and pervasive. The U.S. Department of Justice in 1991 criticized LSP for, *inter alia*, excessive and unacceptable delays in treatment, inappropriate reliance on EMTs, absence of policies and procedures for managing infirmary care, and a lack of quality assurance or peer review systems to monitor quality of care. ROA.22439-40

(quoting ROA.4715 (Liability_Pla_239_316)). The DOJ warned that these systemwide deficiencies deprived incarcerated people of their constitutional rights, including by failing to provide adequate medical care. *Id.* Similarly, in 2009, a consulting group retained by LSP to assess medical care issued a report detailing those deficiencies. *See* ROA.22441 (citing ROA.4743 (Liability_Pla_265_547)).

Defendants also received repeated warnings from outside providers. In 2014 alone, outside providers warned of LSP's "inadequate preparation and/or following of instructions," in settings including cardiac catheterization, endoscopy, and surgical procedures; failures to diagnose and respond to strokes, resulting in "pretty significant deficits"; and a high rate of avoidable infections. ROA.22441-42. At the Liability Trial, a University Medical Center doctor who frequently treats patients from LSP testified that she repeatedly contacted Dr. Lavespere—then LSP Medical Director, now DOC Medical Director—to discuss delayed diagnoses of LSP patients, but those calls were often unanswered. ROA.32403.

The lack of meaningful mortality review is further evidence of Defendants' deliberate indifference. Mortality review is essential because, as Dr. Puisis explained, "if you don't look for problems, … you can't fix [them]." ROA.34845. "[N]ot a single Medical Summary Report reviewed by Plaintiffs' experts noted a problem with patients' care, despite the serious errors and delays in treatment discovered in nearly every death these experts reviewed." ROA.22443. In the

decade-plus record, Defendants have *never once* taken corrective action because of a morality review, according to Dr. Lavespere. ROA.30620. Even Dr. Mathis agreed that Defendants' mortality reviews were inadequate. *Id.* This is no inadvertent omission: the evidence revealed that LSP's former medical director Dr. Singh recommended to DOC Secretary LeBlanc that they not "dig too deep" in a death review because "liability is still ours." ROA.22443 (quoting ROA.2223).

Indeed, Defendants' own employees recognized the risk to patients. For example, as early as 2010, Dr. Singh was warned that having correctional officers, rather than qualified medical personnel, administer medication could have "[v]ery serious adverse" and even "life threatening" effects, such that it was "a matter of time before one of these slip through and we have a bad outcome." ROA.5513 (Liability_Pla_266_709). Yet more than a decade later, Defendants have not changed that practice.

Dr. Jason Collins, who resigned as LSP's medical director and was replaced by Dr. Lavespere, summed it up with a devastating metaphor:

> Q. Would you say that the DOC ... didn't really want to change?
>
> A. Well, if you have a cancer patient that's refusing chemo ... what are you going to do?

ROA.22029; *see also* ROA.22018-29.

The Remedial Trial record, similarly, is "replete with instances showing failure by Defendants to take the necessary steps to provide access or avoid delay in

access to medical and health care." ROA.30652-63. Instead of making meaningful changes, Defendants' medical leadership "dismissed [the Liability ruling] out of hand." ROA.30659. The limited changes Defendants made were at best "a band-aid on a gaping wound." ROA.30582; *see* Part IV.D., *infra.*

Defendants also claim they provided "extensive medical care" to some patients, and therefore cannot be found deliberately indifferent. Br. 91 (Remedy Patient #42).[18] This is not the legal standard. This Court has repeatedly held deliberate indifference claims cognizable even when plaintiffs received substantial treatment. *See, e.g.*, *Carlucci v. Chapa*, 884 F.3d 534, 538-40 (5th Cir. 2018); *Lawson v. Dall. Cnty.*, 286 F.3d 257, 262-63 (5th Cir. 2002). Defendants rely entirely on cases about individual patients' conclusory disagreements with treatment decisions. *See Brauner v. Coody*, 793 F.3d 493 (5th Cir. 2015); *Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999); *Norton v. Dimazana*, 122 F.3d 286 (5th Cir. 1997); *Mendoza v. Lynaugh*, 989 F.2d 191 (5th Cir. 1992). None suggests the bold proposition that Defendants can maintain a system that exposes patients to a substantial risk of serious mistreatment, so long as they provide adequate care in some cases.

---

[18] *See also* Br. 89-90 (Remedy Patient #13), 92-93 (Remedy Patients #10, #1, and #48), 98 (Remedy Patient #55).

On this record, the district court's finding of Defendants' deliberate indifference to a substantial risk of serious harm is not clearly erroneous. *See Ball*, 792 F.3d at 592.

### D. Defendants have not taken reasonable measures to abate the risk.

Defendants claim the district court erred by failing to "consider[] the reasonable steps" Defendants supposedly took in response to the Liability Opinion. Br. 14. In fact, the Remedial Opinion evaluated *every single change* Defendants timely asserted. The district court did not fail to consider these steps; it considered them and expressly found them to be unreasonable. "[Q]uestions of reasonableness are best left to the fact finder," *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990), and Defendants present no basis for re-weighing the court's reasonableness determinations.

#### 1.    *Sick call*

An effective sick call system must give providers "the ability to evaluate and treat underlying conditions." ROA.22485. Defendants modified their approach after the Liability Opinion, but their revised system still fails to provide "medical care by qualified providers." *See* ROA.30580. The district court did not clearly err in concluding that the changes were "a band-aid on a gaping wound." ROA.30582.

The district court expressly considered alterations to the sick call system made after the Liability Trial. ROA.30581. It credited Defendants for re-writing the sick

call policy to involve NPs. *See* ROA.30581. But it found that Defendants'
*implementation* of the new policy was deeply flawed. EMTs—not NPs—primarily
handled telehealth appointments, even though such examinations are beyond an
EMT's skill and training. *See* ROA.30581-84. Records postdating the new policy
were "replete with examples of sick calls where vitals were not taken, physical
examinations were not performed, documentation of symptoms/medical history did
not occur, and patients were charged a co-pay despite receiving no examination,
diagnosis, or treatment." ROA.30583. As the district court correctly found, the
changes "have not transformed the level of care." ROA.30582.

Defendants claim that the experts all "agreed that NPs conducting sick call is
above the standard of care." Br. 59. This misrepresents the testimony. Nurse
Goehring testified that NPs conducting *triage* would exceed the standard of care.
ROA.35157. But there was no evidence that triage actually happens at LSP. *See*
ROA.30581-82.

Defendants' remaining arguments are equally flawed. First, Defendants claim
the new sick call process has resulted in fewer emergent calls, but this relies solely
on one witness's self-serving testimony, ostensibly based on data Defendants refused
to produce. *See* Br. 59; ROA.36139-40. Defendants provide no basis for reversing
the district court's decision not to rely on this testimony.

Second, Defendants allege that they updated their sick call form months after the Remedial Trial to include a place to note the request's date and time. Br. 60. The district court did not abuse its discretion in declining to consider this untimely evidence. *See supra* Part I. Even if it had, Defendants offered no evidence that the change actually improved the quality of care. Simply "demonstrating that [prison officials] eventually took some form of 'corrective action' in response to a risk of harm" is not enough, if it leaves a known substantial risk of serious harm in place. ROA.30651 (quoting *Bradley*, 157 F.3d at 1026); *see also Laube*, 234 F. Supp. 2d at 1251 (explaining that efforts to correct systemic deficiencies that "simply do not go far enough," when weighed against the risk of harm, may constitute deliberate indifference). Here, Defendants cite no evidence indicating that the new form affects the quality of care, much less that the district court could not have concluded otherwise.

### 2. *Clinical care*

Over the course of this litigation, Defendants started to provide patients with privacy during examinations, stock examination rooms with necessary equipment, and maintain clinical hygiene. ROA.30571. But "[c]lean rooms and the availability of medical equipment do not solve the constitutionally substandard care." *Id.* The district court did not clearly err in finding that the actual clinical care delivered— including how medical complaints were treated and patients were followed, as well

as medical records management and medication administration—at LSP remains constitutionally deficient. *See id.*

*Episodic Treatment.* The Liability Opinion concluded that "LSP physicians routinely fail to identify patient diseases and are focused on episodic complaints rather than the underlying state of disease." ROA.22407. Defendants failed to establish any improvements to the actual quality of this care. ROA.30571 ("[T]he episodic treatment of complaints persist[s] in LSP's delivery of clinical care.").

Defendants assert that they have hired additional NPs. Br. 61. They fail to mention that they simultaneously *reduced* the number of physicians from five to one, ROA.22403; ROA.30617, or that LSP is not complying with state law regarding NP supervision, ROA.30423-24. Most importantly, they fail to identify *any* evidence that care itself has improved, or any changes to the content and conduct of their clinical appointments.

Defendants also imply they have changed their practices by introducing morning meetings to discuss patient care and by acquiring a standard medical resource called UpToDate. Br. 62. In fact, both were in place throughout the Liability phase. *See* ROA.4998 (Liability_Joint 2-a_95 at 222) (describing morning meeting in 2011); ROA.29620-21 (Remedy_Pla_44-c_6170 at 3-5) (interrogatory response not identifying UpToDate as a change). Indeed, the evidence shows that Defendants have been using the same boilerplate paragraph about morning meetings for more

than a decade. *Compare* ROA.4998 *with* Remedy_Pla_29-b_4076 at 309 (using identical language to summarize morning meetings in 2011 and 2021). Defendants similarly misrepresent the evidence by asserting that "[e]veryone agrees the morning meetings … are good." Br. 62. In reality, Plaintiffs' experts opined that the concept of morning meetings was good, not that *these* morning meetings were good— because Defendants barred them from observing the meetings during their site visit. ROA.29496; ROA.34651.

*Medication Administration.* Contrary to Defendants' repeated assertions, Br. 62-63, the district court expressly held in the Liability Opinion that "LSP's failure to monitor and manage medications contributed to constitutionally inadequate clinical care." ROA.30572; *see also, e.g.*, ROA.22428 (finding that correctional officers improperly supervise the delivery of medications by other correctional officers).

In the Remedial Opinion, the district court observed, "Defendants admit no changes have been made to medication management, other than the reduction in the frequency of administration." ROA.30579. In reaching its findings of fact, the district court relied on Plaintiffs' expert LaMarre, who "credibly opined that the 'medication management system is completely broken, from ordering the meds, to getting them to the pharmacy, to timely dispensing the meds, to administering the meds, to documenting the meds in the medication administration record.'" ROA.30579 (quoting ROA.34282); *see generally* Remedy_Pla_5-a_1953.

69

Defendants do not suggest any inaccuracies in LaMarre's and Goehring's review of the medication administration records. Instead, Defendants falsely claim that American Correctional Association (ACA) standards establish there is no "legal prohibition" on correctional officers administering medication. *See* Br. 64 (citing Remedy_Def_11_1433 at 24). Even if the ACA standards actually said that (they do not, *see* Remedy Def_11_1433 at 24-25), "compliance with ACA standards … is not *per se* evidence of constitutionality." *Gates*, 376 F.3d at 337.

Defendants' reliance on *Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019), is also misplaced. *See* Br. 64. There, the trial court noted that "missed doses and untimely administration of medication … could, *arguendo*, rise to a class-wide harm." *Dockery*, 443 F. Supp. 3d at 740. However, defendants proved they had improved the medication administration practices criticized by plaintiffs' experts. *Id.* Accordingly, the district court held that prison officials "have not acted with deliberate indifference to the harms that could result because medications are not given as prescribed." *Id.*

Here, in contrast, the record clearly supports the district court's findings that medication administration at LSP is "abysmal." ROA.30578. More than a decade after Dr. Singh was warned that having correctional officers administer medication risked "[v]ery serious adverse" and even "life threatening" outcomes, ROA.5513, Defendants retained the practice.

*Medical Records Management*. Defendants do not attempt to defend the medical record system that they maintained from the beginning of this case through the end of the Remedial Trial. Instead, they argue the district court was obligated to allow them to supplement their evidence four months *after* the Remedial Trial to consider a hearsay declaration asserting a new electronic medical record system was in place—and to conclude it eliminated any problems with Defendants' record management and their practitioners' inadequate recordkeeping. Br. 36-37, 43-44. The district court did not abuse its discretion in excluding this evidence. *See supra* Part I. Even if it did, Defendants presented no evidence about how their practitioners were using the records, let alone that the change improved clinical care. The district court was not obligated to take Defendants' word that the step they took was reasonable. *See Farmer*, 511 U.S. at 847.

Similarly, Defendants assert that they implemented a new medication administration recordkeeping system. Br. 37-38. Yet again, Defendants offer no proof that it has actually improved medication administration or anything else. ROA.35468-70.

### 3.    *Specialty care*

A decade of evidence demonstrates Defendants' consistent failure to timely refer patients to specialists, follow specialists' recommendations, or coordinate specialty care. *See* ROA.22410-19; ROA.30584-94. Before the Remedial Trial,

Defendants stipulated that "LSP's policies or practices have not changed regarding recommending, authorizing, and scheduling specialty health care services; getting people to appointments or making sure patients have all necessary tests, paperwork, and fasting; or ensuring that specialists' recommendations are implemented or the decision not to implement them is documented." ROA.30152. It is unsurprising, then, that the district court found that "specialty care at LSP continues to be constitutionally inadequate." ROA.30584.

Defendants do not dispute the district court's Liability findings regarding specialty care, nor do they attempt to escape their stipulation. *See* Br. 64-65. Instead, they claim to have cured the constitutional deficiency by contracting with some specialists to come to LSP, implementing telemedicine visits, and increasing off-site trips to specialists. *Id.* at 65. As a threshold issue, the first two practices were introduced to cut costs, not improve care. *See* ROA.21993. Furthermore, Defendants fail to acknowledge that the district court weighed the purported changes during the Remedial Trial and concluded that "the evidence demonstrates that these changes have not resolved the constitutional deficiencies in the delivery of specialty care." ROA.30585. Again, Defendants provide no basis for reversing this finding.

### 4.    *Infirmary/inpatient care*

Infirmary and inpatient care at LSP remains unconstitutionally deficient.  *See* ROA.30608 ("[A]n appropriate number of qualified, adequate staff remains lacking

in the infirmary, and inmate orderlies are still utilized to provide care beyond the scope of the medically accepted use of orderlies.").

Defendants contend they cured this constitutional defect by increasing the nurse-to-patient ratio in their acute and long-term care units. Br. 69. In fact, Defendants' own witnesses testified that this ratio was a goal, not reality. *See* ROA.30608-09. While the district court "commend[ed] the *efforts* to improve staffing levels," it found that "the evidence … shows that constitutional inadequacies in infirmary care persist." ROA.30609 (emphasis added). This evidence included "egregious" and "dumbfound[ing]" mistreatment in the nursing unit. ROA.30597-99; ROA.30613-14.

The district court also made extensive findings that inmate orderlies "continue to perform tasks outside the scope of their appropriate use." ROA.30612. Defendants admitted that "[o]rderlies are utilized the same today as they were at the close of liability discovery." ROA.30611 (quoting ROA.29655 (Remedy_Pla_44-d_3399 at 4)). Plaintiffs' experts "observed inmate orderlies in the infirmary provide direct patient care," including wound care, taking x-rays, and providing physical therapy. ROA.30613; *see also* ROA.29483.

This was confirmed by Defendants' own witnesses, Bruce Hines and Donald Murray, who work as inmate orderlies. Mr. Hines testified that "orderlies 'are the ones that are going to be more hands-on than the nurses[,]' and 'it seems like I'm

doing their job as well.'" ROA.30612 (quoting Remedy_Joint_75-a_1427 at 10-11, 18). Similarly, Mr. Murray testified that orderlies "'fill the gaps in' for the nurses and are very important because 'by it being a shortage of nurses, they couldn't do all that work that needs to be done.'" ROA.30613 (quoting Remedy_Joint_76-a_3805 at 5, 17, 23). Defendants rely on their experts' approval, Br. 56, but one expert was demonstrably mistaken about the standards he cited, ROA.35629, while the other could only say he did not "personally" observe orderlies filling inappropriate functions, ROA.35701-02.

Defendants' reliance on their orderly training particularly illustrates their inappropriate definition of "current conditions." *See* Br. 72. The undisputed evidence shows that LSP employed incarcerated people as infirmary orderlies for years without *any* training. ROA.30612. That Defendants finally provided a training the week before an orderly's deposition does not compel the conclusion that their training or use of orderlies is adequate. To the contrary, it shows they have no problem with employing untrained orderlies to care for the most medically acute patients. The district court was well within its discretion in concluding that Defendants would use untrained orderlies without a remedy.

### 5. *Emergency care*

In both the Liability and Remedial phases, the evidence showed numerous failures to respond appropriately to critical emergency symptoms, often resulting in

74

preventable death or other harm. ROA.30599-608; ROA.22429-34. In the ATU, the evidence showed that Defendants' new staffing plan was frequently illusory, with patients often going unseen even when NPs were supposedly staffing the ATU. *See supra* Part IV.B. Defendants kept patients in the ATU or nursing unit when their care plainly required transfer to an emergency room. *See, e.g.*, ROA.30598-601; ROA.30604-05. During self-declared emergencies, providers continued to refuse to see patients in life-or-death situations. *See supra* Part IV.B. Even in the clearest emergencies, like cardiac arrest, Defendants failed to respond timely under their own policies, ROA.30603-04, or even had inmate orderlies provide medical care while medical personnel stood by, ROA.30614 (noting that an inmate orderly administered CPR to Remedy Patient #22, not infirmary staff).

In the face of this evidence, the district court was not obligated to treat Defendants' efforts as "*reasonable* measures to abate" the risk to patients with emergent medical needs. *Farmer*, 511 U.S. at 847 (emphasis added). The court could reasonably conclude that replacing EMTs with registered nurses (RNs) or licensed practical nurses (LPNs)[19] in the ATU could not seriously be expected to eliminate the risk of harm, given how Defendants use the ATU. *See* ROA.30595 ("[T]he ATU

---

[19] The Remedial Opinion states that an RN is present in the ATU at all times, ROA.30595, but unrebutted documentary evidence showed that less qualified LPNs staff the ATU most nights of the week. *See, e.g.*, Remedy_Joint_67-b_6571 at 60, 65, 73, 79; Remedy_Joint_67-a_1135 at 2.

must be sufficiently staffed with providers capable of properly assessing emergent situations for which transport to an [emergency room] may be warranted … ."); ROA.34534 (explaining that RNs and LPNs are not trained to diagnose medical conditions).

The last-minute change to Defendants' self-declared emergency (SDE) policy provides even less reason to overturn the district court's factual findings. Defendants' expert Dr. Mathis admitted that EMTs were practicing medicine without a license under the previous policy. ROA.30594. Yet LSP's own EMT Director testified that the "new" policy simply streamlined the old policy, and "doesn't change, really, the process," or limit EMTs' practice. Remedy_Pla_79_3286 at 11; *see* ROA.30594-95. The only change is that EMTs may now call a provider via FaceTime, rather than phone. Remedy_Pla_79_3286 at 10-11. The policy "still require[s] EMTs to make diagnoses, which is outside their scope of practice." ROA.30595.

In short, the "new" SDE policy is emblematic of Defendants' "current conditions" evidence: insubstantial upon closer examination, and unaccompanied by any evidence of improved care or reduced risk.

### 6.    *Medical leadership*

Finally, the district court soundly rejected Defendants' assertion that their medical leadership and administration was now reasonable. ROA.30615-25.

As a threshold issue, Defendants cite no legal authority for the proposition that failures of medical leadership and quality control "do not implicate constitutional issues[.]" *See* Br. 77. Quite the opposite: courts have held that such failures *can* contribute to a finding of deliberate indifference.[20] The question is not whether patients have a freestanding right to quality medical leadership; the question is whether systemwide deficiencies put patients at substantial risk of serious harm and, if so, what aspects of the system must be fixed for that risk to abate.

In *United States v. Hinds County*, one of Defendants' featured cases, Br. 81, the district court found that a variety of administrative requirements were required under the PLRA to prevent harm to the plaintiffs, including "a qualified Jail Administrator and … leadership team"; "adequate supervisory oversight"; various training and reporting requirements, such as "accurate and detailed" incident reports; and more. No. 16-cv-489, 2023 WL 1116530, at *7-8 (S.D. Miss. Jan. 30, 2023).

Here, the district court's conclusion that the risk will not abate without improvements in administrative structures and processes was amply supported by

---

[20] *See, e.g.*, *Jensen v. Shinn*, 609 F. Supp. 3d 789, 823 (D. Ariz. 2022) (noting that absence of meaningful mortality reviews and subsequent corrective action contribute to "systemic conscious disregard of the risk prisoners face"); *Braggs*, 257 F. Supp. 3d at 1257 (finding lack of medical supervision and quality control was "clearly unreasonable and therefore amount to deliberate indifference"); *Madrid v. Gomez*, 889 F. Supp. 1146, 1208 (N.D. Cal. 1995) (finding that "[c]ertain procedures are … all but indispensable to providing adequate care," including peer review, death reviews, and organized medical records).

expert testimony. *See, e.g.*, ROA.34825-51; ROA.35097-100; ROA.35183-84. Defendants fail to identify any reversible error in the district court's factual findings.

Instead, Defendants mischaracterize the district court's findings related to their one new administrative hire, Jacob Johnson, and their current ADA coordinator, Deputy Warden Ashli Oliveaux. *See* Br. 78. The district court held that, while Johnson's hiring was a positive development, "his presence has had little impact on the delivery of medical care at LSP." ROA.30617. Indeed, Defendants failed to cite any evidence indicating that Johnson had improved conditions at LSP. ROA.30615-16. Instead, the record showed an admitted "'lack of oversight and a lack of leadership' in the departments he supervises.'" ROA.30618 (quoting ROA.36220). So, too, with Warden Oliveaux. *See* ROA.30617 ("[T]here is no evidence that … Oliveaux … ha[s] significantly impacted the medical care provided by LSP."). In fact, Oliveaux has "less medical training than her predecessor Tracy Falgout." ROA.30616.

Defendants next argue that their discredited expert, Dr. Mathis, established that LSP's mortality review process is consistent with the applicable standard of care. Br. 79. But "[e]ven Dr. Mathis criticized LSP's mortality review. He agreed that LSP's mortality reviews were not 'particularly critical,' did not document any problems in patient care that should be corrected, did not document standard of care violations that Dr. Mathis himself identified, and were generally inadequate."

ROA.30620 (quoting ROA.35636). Defendants' statewide medical director acknowledged that their mortality review process had *never* led to corrective action. ROA.30620. The district court could readily find that "inadequate mortality review at LSP contributes to an unconstitutional system of healthcare." *Id.*

The same is true for peer review, where LSP does not even follow department-wide policy. ROA.30622. Dr. Puisis credibly testified that LSP's peer review failed to evaluate individual providers' clinical work, consider a sufficient sample, or address whether patients were adequately referred. *Id.* The district court could reasonably conclude that "[t]hese failures caused repeated errors that contributed to the risk of serious harm to patients." *Id.* So, too, with LSP's defective quality assessment and quality improvement program. ROA.30633.[21] Defendants' main evidence to the contrary is the testimony of McMunn, who the court specifically found was "entitled to little weight." ROA.30570.

---

[21] Defendants point to *Hinds County*'s deletion of a provision regarding quality improvement programs to suggest that courts *cannot* include such provisions in a remedial injunction. Br. 81. But that opinion concerned a motion to terminate a consent decree, which requires courts to "make particularized findings, on a provision-by-provision basis"; as the Fifth Circuit has explained, that standard does not apply when entering prospective relief in the first place. *Gates*, 376 F.3d at 336 n.8. Moreover, unlike here, there was no record evidence that quality improvement or similar programs were necessary to eliminate the substantive constitutional violations. *See, e.g.*, *United States v. Hinds County*, No. 16-cv-489, 2022 WL 3022385, at *11 (S.D. Miss. July 29, 2022).

Finally, Defendants claim that Plaintiffs presented no "evidence that budget has negatively influenced any medical decision at LSP." Br. 81. This is simply false. *See* ROA.21993-96.

In summary, the district court had ample basis to conclude that Defendants' changes were unreasonable, and that care would not meaningfully improve without injunctive relief.

## V.    The District Court's Factual Findings Regarding the ADA and RA Are Not Clearly Erroneous.

The district court found that Defendants discriminated against individuals with disabilities, in violation of the ADA and RA, through architectural barriers and methods of administration. *See* ROA.22445-49; ROA.22454-76. On appeal, Defendants challenge two aspects of that decision. First, Defendants claim the court committed reversible error by crediting the expert opinion of Dora Schriro. Br. 99-104. Second, Defendants assert that as to several—though not all—of the violations identified, the district court weighed the evidence incorrectly. Br. 104-14. Neither argument has merit.

### A. The district court did not manifestly err in remediating the undisputed architectural barriers.

In the Liability phase, Plaintiffs' expert Mark Mazz found nearly 200 architectural barriers in the areas of LSP that Plaintiffs use to access LSP's programs, services, and activities. *See* ROA.30627-28. Defendants do not dispute this finding.

In fact, their own architectural expert expressly "substantiate[d] the items recorded" in Mazz's report "as being violations of the 1991 and 2010 ADA Standards for Accessible Design." ROA.22406; ROA.4254 (Liability_Pla_18_507 at 2).

Likewise, Defendants do not dispute Mazz's finding during the Remedial phase that "only 19-20% of the barriers identified in his 2016 report have been remediated by LSP." ROA.30628. The district court explicitly credited this conclusion over Defendants' unsupported claim that they remedied "141 of the 190 barriers identified in Mazz's 2016 report," ROA.30628, and Defendants do not challenge this credibility determination.

Instead, Defendants contend that a 2017 settlement agreement with the U.S. DOJ renders an architectural remedy unnecessary. Br. 105-107. Defendants proffered that agreement at the Liability Trial, *see* ROA.33986-93, and the district court considered it in the Liability Opinion*, see* ROA.22444-45. At the Remedial Trial, Defendants failed to offer the settlement agreement or any documentary evidence of LSP's purported compliance with it. Even so, the district court considered its effect in the Remedial Opinion. *See* ROA.30627. Without a shred of evidence showing that Defendants remedied *any* of the architectural barriers identified in the settlement, the district court correctly rejected Defendants' argument that the mere existence of the settlement mooted any need for a remedy. *See* ROA.30627.

Defendants next argue that the district court erred in ordering a remedy for Mazz's findings because the DOJ's 2010 assessment was "more expansive." Br. 106. But whether the DOJ found ADA violations in areas of LSP unrelated to medical services—like the museum and rodeo arena—in 2010 has no bearing on whether Mazz correctly found architectural barriers in the places he visited in 2022. *See* ROA.32521; ROA.30626.[22] Indeed, the settlement explicitly stated that it "do[es] not impact any potential ADA violations identified at LSP" in this case. ROA.46717 (Proffer_Def_1 at 8). In any event, Defendants' own architectural expert found "little overlap—at most, 11 items out of 190" between the violations in the areas DOJ assessed and the areas Mazz assessed. ROA.22444-45 (quoting ROA.32541-42); *see also* Liability_Pla_18_507. Thus, fully implementing the DOJ settlement would leave most of the undisputed barriers unremedied.

Defendants also argue that the LSP orderly program compensates for the architectural barriers to programmatic access. Br. 107-10. The district court considered and rejected this argument. *See* ROA.30630-31.

Defendants mischaracterize the Liability Opinion and the Remedial Trial testimony. They first suggest that the Liability Opinion's only adverse finding pertained to orderly abuse. Br. 108. But the district court's finding was also based on

---

[22] There is a stark inconsistency between Defendants' argument that this Court should ignore a 2022 assessment in favor of one from 2010, and their argument that the district court should have ignored all but the most recent evidence.

82

understaffing, LSP's failure to follow its own training policies, the infrequency of training, and the lack of supervision. *See* ROA.22421; ROA.22497. And on these fronts, Defendants provided no evidence of changes at the Remedial Trial—instead *conceding* that they had not changed. *See, e.g.*, ROA.30161; ROA.30633. Thus, the district court's finding in its Remedial Opinion that the lack of supervision of orderlies "contributes to violations of the ADA and RA" did not exceed the scope of the Liability Opinion. ROA.30634.

Second, Defendants mischaracterize the testimony of three disabled Subclass members. Br. 109-10. As the district court said, "[a]lthough Defendants characterized the testimony of three disabled inmates … as essentially having no accessibility issues in the Ash dorms, the actual testimony from these inmates reveals otherwise." ROA.30629-30. Defendants cherry-pick limited portions of two depositions where these witnesses acknowledged one thing that they can access, and then simply ignore all testimony adverse to them. *Compare* Br. 109-10 *with* ROA.30629-30. Similarly, Defendants note the third Subclass member has "reported no accessibility issues" in his current dorm, but they omit the fact that he was housed in a non-accessible dormitory, where he and other Subclass members had significant accessibility issues, until Defendants relocated him after his deposition. *See* Remedy_Joint_#77-c_6689 at 1-2.

Defendants also ignore a fundamental point about orderly assistance: there are services where orderlies simply cannot overcome architectural barriers. Many of the undisputed barriers involve bathrooms—toilets or showers that lack proper grab bars or are otherwise configured so that they cannot be used safely by people with mobility or balance impairments. *See, e.g.*, ROA.32497-32501. Orderlies cannot use the toilet or shower instead of individuals with disabilities, nor can they hold faulty grab bars for people who cannot reach them. *See* ROA.32517-18. Thus, even if Defendants had offered evidence that compelled a finding that orderly assistance mitigated *some* accessibility barriers (and they did not), it would cure only a limited set.

## B. The district court did not clearly err in finding unlawful methods of accommodation.

Several of the district court's findings fall under the umbrella of "methods of administration." *See* 42 U.S.C. § 12112(b)(3) (prohibiting public entities from utilizing "methods of administration … that have the effect of discrimination on the basis of disability"); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (construing "methods of administration" to include "[b]oth disparate-treatment and disparate-impact claims"). These generally broke down into three categories: handling and tracking accommodation requests; policy compliance and training; and the use of inmate orderlies "beyond their training and knowledge to compensate for the serious

lack of medical staff that should be assessing and assisting the medical needs of the disabled." ROA.30632. Defendants challenge only the first two. Br. 110-17.

Defendants' challenges rely on misunderstandings of the district court's reasoning and mischaracterizations of the evidentiary record. They fail to establish the district court erred at all, let alone that it manifestly erred.

### 1. The district court properly relied on Defendants' sworn statements that little had changed at LSP regarding ADA compliance between the Liability and Remedial Trials.

During the Remedial Trial, Defendants conceded that they had not changed their "practices, policies, or procedures related to ADA accommodations" since the Liability phase. ROA.30161. By their own account, Defendants did not change—let alone improve—their ADA Tracking Database; their "training materials or practices related to ADA accommodations"; or the way they trained or used inmate orderlies. *Id.*; ROA.29654 (Remedy_Pla_44-d_3399 at 3). The district court did not commit clear error by crediting Defendants' sworn statements. *See Beard v. Texas*, 87 F.3d 1312, 1996 WL 335527, at *1 (5th Cir. 1996) (a party's "contention that the district court erred by relying on his answers to interrogatories has no arguable merit"). This alone was sufficient evidence to support the Remedial Opinion's finding regarding methods of administration.

### 2. Accommodations

The district court made three core findings regarding accommodations and tracking. None constitutes reversible error.

*First*, the district court found that LSP "failed to properly handle accommodation requests," in that it inappropriately required Subclass members to use the administrative grievance process (ARP) to request an accommodation, despite their policy requiring staff to consider requests for accommodation regardless of form. ROA.22459-60. This resulted in staff failing to recognize or respond to requests for accommodation, and accommodations not being properly recorded. ROA.22460-62. In the Remedial phase, Defendants conceded that they had made "no changes to the practices, procedures, or polices related to ADA accommodations." ROA.29621 (Remedy_Pla_44-c_6170 at 4). The district court accordingly found "the evaluation and resolution of accommodation requests and/or disability grievances remain unchanged and violate the ADA and RA." ROA.30642.

*Second*, the Liability Opinion found that LSP lacked a functional "tracking system for all accommodation requests," again violating its policy, and that its database was "severely inadequate to effectively track disabled inmates' ADA needs." ROA.22462. Here again, Defendants conceded in the Remedial phase that "there have been no changes in the way documents and/or databases are compiled, collected, or maintained with respect to … the ADA Tracking Database."

ROA.30641 (quoting ROA.29623 (Remedy_Pla_44-c_6170 at 6)). Accordingly, the Remedial Opinion found that "LSP continues to fail to identify and track disabilities and accommodations" and "LSP's tracking system does not provide meaningful identification and tracking of disability grievances or ADA accommodation requests." ROA.30641.

*Third*, the Liability Opinion found that "LSP fails to take disability into account in its disciplinary decisions." ROA.22471. At the Remedial phase, the evidence again "established that LSP has no process for considering the propriety of accommodation requests" and that "Defendants fail to consider the need for appropriate accommodations when disciplining disabled inmates[,] in violation of the ADA and RA." ROA.30643-45. The district court cited various evidence to reach this conclusion. For instance, the court credited evidence that a Subclass member with quadriplegia was disciplined via solitary confinement in a room where he was unable to reach the call button, as well as evidence of a sign explicitly instructing patients not to request accommodations from black-box restraints used during medical trips. ROA.30644-45.[23]

Defendants fail to show reversible error as to any of these factual findings. Defendants claim that the only respect in which LSP fails to accommodate Subclass

---

[23] Black-box restraints contort the hands in an unnatural position and are particularly painful for individuals in wheelchairs. ROA.32700-01; ROA.34698-99; Remedy_Joint_77-c_6689 at 5.

members is in disciplinary procedures. Br. 110. This is false: the district court found that LSP's failure to follow its own policies resulted in "ADA Coordinators and medical staff routinely fail[ing] to recognize when medical issues trigger the ADA." ROA.22460.[24] As a result, patients with disabilities do not receive the individualized response plans necessary to ensure they receive accommodations. ROA.30642. Defendants do not even attempt to dispute these findings, let alone explain how the district court could have clearly erred by crediting Defendants' own admission that these practices were unchanged. *See* ROA.30161; ROA.29621 (Remedy_Pla_44-c_6170 at 4).

Similarly, Defendants do not challenge the Liability Opinion's finding that their tracking system is "severely inadequate to effectively track disabled inmates' ADA needs." ROA.22462. Nor do they explain their concession that they made "no changes in the way documents and/or databases are compiled, collected, or maintained with respect to … the ADA Tracking Database." ROA.30641. This should be dispositive of any challenge to the district court's finding regarding tracking.

---

[24] To be sure, the district court found that disciplinary accommodations were the only type of accommodation that was *categorically* mishandled. *See* ROA.22463-71. But this is separate from the procedural deficiencies the court found in how LSP handles all requests for accommodation.

*Disciplinary Accommodations*. Defendants reject the district court's findings regarding disciplinary accommodations. They cite one employee's unsubstantiated testimony regarding security personnel's training about how to contact the ADA Coordinator, Br. 92-93, without acknowledging the district court's finding that this does not happen in practice. ROA.30643. Indeed, the evidence showed that "[r]ather than preemptively ensure that an inmate's disability is considered when creating proper discipline, … he must endure the discipline and seek an appeal." ROA.30644. Furthermore, a system wherein security contacts the ADA Coordinator regarding accommodations is meaningless where, as the district court determined is the case at LSP, both the ADA Coordinator and LSP staff receive inadequate ADA training. *See, e.g.*, ROA.30644.

So, too, with black-box restraints. Contrary to Defendants' assertions, Br. 111, the district court considered the testimony of several Subclass members who requested and were denied accommodations related to those restraints. *See, e.g.*, ROA.34698-99; ROA.34183; Remedy_Joint_77-c_6689 at 5; ROA.30645. During the Remedial Trial, Defendants ignored a court order to transport Subclass member Dennis Mischler to court with side restraints, instead of black-box restraints, causing him to arrive for his testimony in visible pain. ROA.34183. The trial evidence included additional instances of individuals being transported without necessary accommodations—even in the exhibits Defendants cite for support. *See, e.g.*,

Remedy_Joint_01_1067 at 40-41; Remedy_Joint_04_5564 at 303, 311; *compare* Br. 111 n.414.

Ignoring this evidence, Defendants incorrectly state that there are "only three instances of inmates who allegedly were not accommodated in discipline[,]" referring to two cases identified in the Liability Opinion and one in the Remedial Opinion. Br. 111 (citing ROA.22471; ROA.30644). Setting aside that the district court never suggested these three examples were an exhaustive list, Defendants fail to show why reliance on these cases was reversible error.

Defendants challenge the first case solely because it "dates back to 2012." Br. 111. But, again, the district court found—*and Defendants conceded*—that LSP's procedures had not changed since the Liability Trial. ROA.30641 (quoting ROA.29623 (Remedy_Pla_44-c_6170 at 6)). The second case involved a quadriplegic person with a tracheostomy tube who was disciplined by being placed in a locked isolation room with no call system. ROA.22471. Defendants failed to preserve their hearsay objection, *see* ROA.31852, and cannot now raise that objection for the first time on appeal. *See, e.g.*, *Thomas v. Ameritas Life Ins. Corp.*, 34 F.4th 395, 402 (5th Cir. 2022) ("A party forfeits an argument by failing to raise it in the first instance in the district court"). The expert report was admitted into evidence without objection. *See* ROA.33218 (admitting report into evidence); *see*

*also* Fed. R. Evid. 703 (experts may rely on hearsay).[25] For the third case, Defendants simply ask this Court to ignore the district court's discretion to weigh conflicting evidence. *Compare* Br. 112 *with* ROA.30644. That argument should be rejected. *See Yates*, 868 F.3d at 363.

### 3.   *Policy Compliance and Training*

The district court made two findings regarding LSP's ADA administration aside from those involving tracking and accommodations.

First, "LSP continues to fail to meaningfully comply with its own ADA Policy Directives, which contributes to violating the ADA and RA rights of disabled inmates." ROA.30636. In the Liability Opinion, the district court found that "LSP has systemically failed to provide access and accommodations to disabled inmates by failing to follow both Title II's implementing regulations and its own policies and procedures relating to ADA compliance." ROA.22454. This included employing a series of undertrained and overworked ADA coordinators, ROA.22454-56, a non-existent ADA Advisory Committee, ROA.22457, and inadequately trained staff,

---

[25] The Liability Opinion stated that it overruled Defendants' objection to the expert report, ROA.22471, but Defendants made no such objection. *See* ROA.31852-53 (admitting, *inter alia*, Plaintiffs' Exhibit 6, the medical expert report). Moreover, Defendants' only case states that expert hearsay concerns are "overcome[]" where the expert "incorporated his pretrial reports by reference" under oath. *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014). That is exactly what happened here. ROA.31947-48.

ROA.22457-58. This directly contributed to the failure to properly handle accommodation requests. ROA.22459-62.

In response, "[r]ather than address[ing] policy compliance," LSP amended its policies to eliminate the requirements of an ADA Advisory Committee and a qualified ADA Coordinator. ROA.30637. Far from improving ADA leadership, the new ADA Coordinator was "perhaps *less* qualified than her predecessor," but "juggl[ed] just as many responsibilities" and received "just as lacking" training. ROA.30637-38 (emphasis in original). Indeed, the ADA is such an afterthought that she was not even aware that her job duties would include serving as the ADA Coordinator until starting the job. ROA.30638.

Second, "ADA training for medical and correction staff is essentially unchanged since the Liability Opinion and, thus, remains unlawful." ROA.30640-41. In its Liability Opinion, the district court found "LSP staff are inadequately trained to assist with disabled inmates," based on testimony from the former ADA Coordinator and others that staff received an hour of training per year that was focused on "special needs offenders" and focused primarily on instructions relating to illegal drug use. ROA.22457. In the Remedial phase, Defendants conceded ADA training was unchanged. ROA.30640-41. Troublingly, the only change to training was that LSP removed from one of its directives the requirement that all employees

receive comprehensive annual training on "access to programs, and activities available to individuals with disabilities." ROA.30640.

Defendants' primary response to these charges is that the district court failed to identify how the above failures result in specific programs, services, or activities in which Plaintiffs are prevented from participating. Br. 113-15. This argument misconstrues the Remedial Opinion. Defendants argue only that improper training and administrative oversight do not "constitute standalone violations of the ADA[.]" Br. 114. But the court did not find them to be standalone violations; it found them to contribute to a systematic failure to respond to requests for and track accommodations appropriately, leading (among other problems) to the omission of accommodation plans from medical records, disciplinary decisions made without accommodation for disability, and requests not being treated as requests in the first place. *See, e.g.*, ROA.22505-06; ROA.22457. Because Defendants do not acknowledge the district court's actual findings, they fail to rebut them.

Defendants' only other argument is that, while they have not changed their practices, policies, and procedures, they have changed some of their personnel. Br. 115-17. But as with the putative changes to medical care discussed in Part IV.D., the district court considered and rejected these arguments. ROA.30636-40. Defendants offer no argument whatsoever for why the district court's assessment of them was manifestly erroneous. A fact-finder is not obligated to find that problems have been

fixed just because personnel have changed. This is especially the case when the new officeholders have no experience in the relevant fields. *See* ROA.30637-39.

Indeed, even the limited steps that Defendants claim their new hires have taken are more modest than Defendants make them out to be. Defendants tout a new training, Br. 116, but do not dispute the district court's finding that it is "flawed and directly against LSP policy," and "could lead LSP leadership and employees to apply the policy incorrectly." ROA.30639-40.

More troublingly, Defendants claim that the DOC ADA Coordinator "engaged the services of Accessology—an independent ADA consulting firm—to create an [ADA] transition plan," Br. 117, but this flatly misstates the testimony. As of the last day of trial, Defendants had not engaged Accessology or even given it a request for proposal. ROA.36104; ROA.36123. They had merely met with Accessology to discuss the possibility of engaging it. ROA.36123. Indeed, the ADA Coordinator admitted that the Liability Opinion's findings were not even part of Defendants' discussions with Accessology. ROA.36122. Perhaps most tellingly, Defendants' post-trial submission—indeed, even their post-*judgment* submission— is completely silent about Accessology, presumably because they have yet to engage them 18 months later. *See* Defs.' Record Excerpts 426-33. Nothing could more clearly confirm the propriety of the district court's conclusion that it could not simply accept Defendants' "promise of future remedies." ROA.30640.

94

**4.   *The district court did not clearly err in relying on Schriro's opinions.***

The district court's decision to credit Schriro's testimony does not present the "unusual and exceptional case[]" where a district court's rulings on expert admissibility or credibility is "manifestly erroneous." *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 264 (5th Cir. 2022). The court properly used Schriro's testimony to "connect[] the dots between what the [c]ourt found as deficiencies [in its Liability Opinion] and what the current conditions are." ROA.34135; *see United States v. Castillo*, 77 F.3d 1480, 1499 (5th Cir. 1996) (explaining the propriety of an "expert summary witness").

a) Schriro was properly qualified as an expert on correctional administration.

The district court accepted Schriro as an expert in correctional administration. ROA.34119; ROA.34140. As the court observed, Schriro "has held several executive level administrative and policy making positions within the corrections industry and related law enforcement and security affiliated fields, which included responsibility 'for implementing and ensuring compliance with state and federal law, including the ADA and RA.'" ROA.30215. Among other roles, Schriro spent more than 25 years running correctional facilities or departments in Missouri, Arizona, and New York. ROA.29242.

Defendants do not and cannot establish that the district court abused its discretion in finding Schriro qualified to testify as an expert in correctional administration. *See* Br. 99-104. Instead, Defendants challenge her admission as an expert "on compliance with and administration of the [ADA]," because she has never "*directly* overseen ADA compliance." *Id.* at 101 (emphasis added).

As a threshold issue, Schriro was not tendered or admitted for that purpose. *See* ROA.30626; ROA.34140. Even if she had been, Defendants cite no authority suggesting that an expert must have *directly* administered an area in order to opine on it. Schriro had "oversight of all the activities of the department[s]" she led, including "ensur[ing] … that the [ADA] program operated as it should." ROA.34123-24. That Schriro also oversaw other programs does not somehow diminish her expertise.

Defendants imply that the district court relied on Schriro's testimony to determine whether the ADA was violated. Br. 104. But the district court relied on Schriro not for *whether* LSP complied with the ADA, but for "how corrections administration maybe should … be changed or not changed to address those compliance issues." ROA.34140. This was appropriate given Defendants' concessions that they made "no changes to [their] practices, procedures, or policies related to ADA accommodations" since the Liability phase. ROA.30161.

b) <u>Schriro's opinions were based on sound data, methodology, and analysis.</u>

None of Defendants' remaining critiques of Schriro saves their argument.

*Number of wheelchair pushers.* Defendants challenge Schriro's testimony that 22 wheelchair pushers were insufficient to serve the population of wheelchair users. Br. 102. They contend that Schriro failed to "analyze" the number of wheelchair users or provide "insight" as to the appropriate number of pushers. *See id.*

Neither Schriro nor the district court needed the exact number of wheelchair users to opine that 22 pushers were insufficient. *See* ROA.30631 (describing Schriro's familiarity with large prison populations). In any event, Defendants could have cross-examined Schriro about this determination, but elected not to. *See* ROA.34191-220. Nor did they criticize it in their post-trial briefing. *See* ROA.30372-82. Accordingly, neither Schriro nor the court had reason to expand on this point.[26]

*Orderly training.* Defendants contend that Schriro is unqualified to opine about orderly training. Br. 102-03. This is unsupported by the record. *See* ROA.34166 (discussing Schriro's experience with orderly training).

---

[26] Defendants argue for the first time that Schriro's testimony exceeded the scope of her report. Br. 102. They failed to raise this argument before the district court, *see* ROA.34171, and therefore have not preserved the issue for appeal. *See Def. Distributed v. Grewal*, 971 F.3d 485, 496 (5th Cir. 2020) ("[A]rguments not raised before the district court are waived and will not be considered on appeal.").

*Oversight of orderlies.* Defendants object to the district court's reliance on the fact that, "during her site visit, [Schriro] observed orderlies routinely exceed the scope of their duties," ROA.30635, because Schriro is not a medical doctor, Br. 103. But Defendants identify no reason that Schriro needed to be a doctor to recognize when orderlies were performing tasks beyond those specified in the orderly training that she reviewed.

*Orderly staffing levels.* Defendants fault Schriro for concluding that "there was no rationale to [LSP's] orderly staffing levels," ROA.30636, without identifying "the optimal number of orderlies," Br.103. In fact, Schriro was criticizing Defendants' arbitrary *method* of determining staffing levels, not purporting to identify the specific number necessary. ROA.30636. Here, again, Defendants passed up the opportunity to cross-examine Schriro on this point.

*ADA tracking system.* The district court did not commit reversible error, as Defendants claim, by crediting Schriro's conclusion "that LSP's [ADA] tracking system is undercounting accommodation requests." Br. 103. With decades of expertise in correctional administration, Schriro is well-qualified to estimate the number of accommodation requests a prison would receive for a given population. Her methodology included reviewing internal LSP documents, which were inconsistent with the actual requests for accommodation. *See* ROA.34203-05.

*Accommodation requests*. Defendants claim Schriro failed to identify disabled individuals who received no response to their requests for accommodation, or to review those particular requests.  Br. 103. But unlike Defendants' experts, Schriro's notes were entered into evidence, allowing the district court to verify her testimony. *Compare* ROA.46478-97 *with* ROA.30570; ROA.9372-76; ROA.33594. Moreover, Schriro could not review the individual requests because LSP refused to disclose them. ROA.29364. Instead, Schriro reviewed other requests for accommodation and responses to those requests. ROA.34152; ROA.34144.

> c) Defendants ignore myriad other evidence relied upon by the district court.

Even if Defendants established that the district court abused its discretion in relying on Schriro's findings (and they have not), that error would at most have had "a very slight effect on [the] verdict," and reversal is therefore unwarranted. *See Novick*, 946 F.3d at 741. Defendants do not even attempt to carry their burden of proving otherwise. *See* Br. 99-104.

In each case, Defendants challenge factual findings that are supported by multiple sources of evidence. *See* ROA.30612; ROA.30632-33; ROA.30634-35; ROA.3041-42. The district court never suggested that Schriro's testimony was determinative, and Defendants largely leave the other evidence—including their admissions—unchallenged.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court.

Dated: February 1, 2024

/s/ *Lydia Wright*
Lydia Wright, 37926
Samantha Bosalavage, 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Email: lwright@defendla.org
Email: sbosalavage@defendla.org

Jeffrey B. Dubner
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 771-1773
Email: jdubner@democracyforward.org

Emily B. Lubin, 38823
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170
Telephone: (504) 486-8982
Email: emily.lubin@splcenter.org

Brendan Schneiderman
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Email: bschneiderman@cohenmilstein.com

Melanie A. Bray, 37049
Disability Rights Louisiana
8325 Oak Street

New Orleans, LA 70118
Telephone: (504) 208-4151
Email: mbray@disabilityrightsla.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

On February 1, 2024, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of Webroot Endpoint Protection CE 23.4 and is free of viruses.

/s/ *Lydia Wright*
Lydia Wright

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 21,975 words, according to the count of Microsoft Word.

/s/ *Lydia Wright*
Lydia Wright