No. 23-30825

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

KENTRELL PARKER, on behalf of themselves and all others similarly situated; FARRELL SAMPIER, on behalf of themselves and all others similarly situated; REGINALD GEORGE; JOHN TONUBBEE, on behalf of themselves and all others similarly situated; OTTO BARRERA, on behalf of themselves and all others similarly situated; CLYDE CARTER, on behalf of themselves and all others similarly situated; EDWARD GIOVANNI, on behalf of themselves and all others similarly situated; RICKY D. DAVIS, on behalf of themselves and all others similarly situated; LIONEL TOLBERT, on behalf of themselves and all others similarly situated; RUFUS WHITE, on behalf of themselves and all others similarly situated; SHANNON HURD; ALTON ADAMS; IAN CAZENAVE; EDWARD WASHINGTON; ALTON BATISTE,

*Plaintiffs-Appellees*

v.

TIM HOOPER, Warden, Louisiana State Penitentiary, in His Official Capacity; ASHLI OLIVEAUX, Assistant Warden for Health Services, in Her Official Capacity; JAMES M. LEBLANC, Secretary Of The Louisiana Department Of Public Safety And Corrections, in His Official Capacity; RANDY LAVESPERE, Medical Doctor; STACYE FALGOUT; PAUL TOCE; BILL HAWKINS; CYNTHIA PARK, ACNP; THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Middle District of Louisiana

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

Elizabeth B. Murrill
Attorney General
J. Benjamin Aguiñaga
Solicitor General
Morgan Brungard
Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov
AguinagaB@ag.louisiana.gov
BrungardM@ag.louisiana.gov

Connell Archey
Randal J. Robert
Keith J. Fernandez
Allena W. McCain
Madaline King Rabalais
BUTLER SNOW LLP
Special Assistant Attorneys General
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge, LA 70821-2997
Telephone:　(225) 325-8700
Facsimile:　 (225) 325-8800
Connell.Archey@butlersnow.com
Randy.Robert@butlersnow.com
Keith.Fernandez@butlersnow.com
Allena.McCain@butlersnow.com
Madaline.Rabalais@butlersnow.com

Jeffrey K. Cody
Caroline M. Tomeny
John C. Conine, Jr.
SHOWS, CALI & WALSH, L.L.P.
Special Assistant Attorneys General
628 St. Louis Street (70802)
P.O. Drawer 4425
Baton Rouge, LA 70821

i

Telephone:   (225) 346-1461
Facsimile:    (225) 346-1467
jeffreyc@scwllp.com
caroline@scwllp.com
coninej@scwllp.com

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.......................................................................... iii

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ...................................................................................1

ARGUMENT ...........................................................................................3

I.     The District Court's Procedural Errors Warrant, at a Minimum, Vacatur and Remand. ...................................................................................3

    A.     The District Court Wrongly Refused to Consider Evidence of Current Conditions. .............................................................3

    B.     The District Court's Remedial Order Violates the PLRA. ...................8

    C.     The District Court's Conduct Reflects Either Unawareness About, or Disdain for, States' Sovereignty. ........................................13

II.    The District Court's Substantive Errors Warrant Outright Reversal. ...........13

    A.     There Is No Eighth Amendment Violation. ........................................13

    B.     The District Court's ADA Analysis Is Flawed. ..................................25

CONCLUSION......................................................................................28

CERTIFICATE OF SERVICE .............................................................31

CERTIFICATE OF COMPLIANCE.....................................................31

# <u>TABLE OF AUTHORITIES</u>

***Cases***

*Ball v. LeBlanc*,
   792 F.3d 584 (5th Cir. 2015) ..............................................................14

*Brown v. Plata*,
   563 U.S. 493 (2011)......................................................................4, 5

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)...........................................................................19

*Cleveland v. Bell*,
   938 F.3d 672 (5th Cir. 2019) ..............................................................19

*Dayton Bd. of Ed. v. Brinkman*,
   433 U.S. 406 (1977)...........................................................................19

*Dockery v. Cain*,
   7 F.4th 375 (5th Cir. 2021) ...................................................... 3, 5, 8, 16

*Dockery v. Hall*,
   443 F. Supp. 3d 726 (S.D. Miss. 2019) ............................................5, 7

*Domino v. Tex. Dep't of Crim. Justice*,
   239 F.3d 752 (5th Cir. 2001) ..............................................................15

*Farmer v. Brennan*,
   511 U.S. 825 (1994)........................................... 3, 5, 6, 15, 16, 19, 23

*Gates v. Cook*,
   376 F.3d 323 (5th Cir. 2004) ..............................................................22

*Gobert v. Caldwell*,
   463 F.3d 339 (5th Cir. 2006) ............................ 15, 16, 18, 19, 20, 21, 23, 24, 25

*Hallett v. Morgan*,
   296 F.3d 732 (9th Cir. 2002) .............................................................8, 9

*Hare v. City of Corinth*,
   74 F.3d 633 (5th Cir. 1996) ....................................................... 15, 19

*LaMarca v. Turner*,
   995 F.2d 1526 (11th Cir. 1993) ...................................... 15, 16, 20, 21, 23, 24, 25

*Missouri v. Jenkins*,
   515 U.S. 70 (1995) .........................................................................24

*Monroe v. Meeks*,
   2021 WL 5882129 (S.D. Ill. Dec. 13, 2021) ......................................12

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) ......................................................................12

*Palmer v. Johnson*,
   193 F.3d 346 (5th Cir. 1999) .............................................. 14, 15, 21

*Roberts v. Cnty. of Mahoning*,
   495 F. Supp. 2d 694 (N.D. Ohio 2006) ................................................12

*Rogers v. Boatright*,
   709 F.3d 403 (5th Cir. 2013) .............................................. 14, 15, 21

*Valentine v. Collier*,
   993 F.3d 270 (5th Cir. 2021) ...................................... 1, 2, 3, 4, 6, 8, 13

*Wilson v. Seiter*,
   501 U.S. 294 (1991) .......................................................................22

## Statutes

1 U.S.C. § 1 ...................................................................................12

18 U.S.C. § 3626(a)(1)(A) ..................................................................9

18 U.S.C. § 3626(f) ................................................................... 11, 12

18 U.S.C. § 3626(f)(1)(B) .......................................................... 10, 11

18 U.S.C. § 3626(f)(2)(C), (3), (4), (5)..................................................12

18 U.S.C. § 3626(f)(6)(A)...................................................................12

18 U.S.C. § 3626(f)(6)(C)...................................................................12

*Rules*

Fed. R. Civ. P. 37 ...................................................................................6

Fed. R. Civ. P. 65 .................................................................................24

Fed. R. Evid. 403 ..................................................................................6

Fed. R. Evid. 706 ................................................................................11

# INTRODUCTION

"[T]he district court's handling of this case … [is] reminiscent of the pre-PLRA world" when "federal supervision of state prisons was normal." *Valentine v. Collier*, 993 F.3d 270, 291 (5th Cir. 2021) (Oldham, J., concurring in the judgment). Such supervision "is not normal today"—not least because Congress enacted the PLRA in 1996, which "stripped courts" of the power to supplant state sovereignty with their policy preferences. *Id.* at 291, 293–94. But that has not stopped the district court in this case from trying to reclaim that power.

This litigation has been pending for nearly ten years. During that time, the district court has repeatedly tried to force Defendants to settle. *E.g.*, ROA.33310–16; ROA.21441–42. The district court also bifurcated the liability and remedy phases and then issued delayed adjudications that did not (and could not) account for conditions at the time of issuance: a Liability Opinion more than two years after the liability trial; and a Remedy Opinion and Remedial Order five years after the liability trial (and more than a year after the remedy trial).

Now nearly a decade into this litigation, the district court's Remedial Order announces that three Special Masters will assume oversight of Louisiana State Penitentiary ("LSP"). They will "propose[]," and "monitor implementation of," "remedial plans" "to cure and eliminate the violations found in the Court's Liability Ruling" (based on a 2018 trial) and "Remedial Ruling" (based on a 2022 trial).

ROA.30661. The so-called "remedial plans" will cover everything from "Standards and Procedures for Clinical Care," to "medical records management," and so on. ROA.30662. Not only that, but the Special Masters also "shall have access" to LSP, its inmates, and "all records and documents appropriate and necessary for their tasks." ROA.30663. This oversight will be indefinite "until further Order of this Court," and all oversight costs "shall be paid by the Defendants." ROA.30664.

This is the stuff of "yesteryear," not post-PLRA prison litigation. *Valentine*, 993 F.3d at 291 (Oldham, J., concurring in the judgment). And it is fraught with legal errors that require this Court's correction. Most obvious is the district court's outright refusal—contrary to binding Supreme Court and Fifth Circuit precedent—to consider evidence of current conditions *a year before the district court even entered its Remedy Opinion and Remedial Order*. Similarly obvious is the district court's complete disregard for the PLRA's constraints, basic Eighth Amendment principles, and even the standard for expert qualifications. The district court's conduct is "th[e] sort of federal-court intervention [that] is unlawful." *Id.* The Court should admonish the district court accordingly and reverse, or vacate and remand.

## ARGUMENT

### I. The District Court's Procedural Errors Warrant, at a Minimum, Vacatur and Remand.

If nothing else, the Court should vacate and remand the district court's Liability Opinion, Remedy Opinion, and Remedial Order based on plain procedural errors for which Plaintiffs have no defense.

#### A. The District Court Wrongly Refused to Consider Evidence of Current Conditions.

**1.** Start with the district court's refusal to consider current-conditions evidence in violation of *Valentine* and *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021). This Court's instruction is clear: "[I]n a prison injunction case, we consider the evidence from the time suit is filed *to the judgment*." *Valentine*, 993 F.3d at 282 (emphasis added). That is because, "to establish eligibility for an injunction, [an] inmate must demonstrate the continuance of [deliberate indifference] *during the remainder of the litigation and into the future*." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994) (emphasis added). And so this Court has faithfully considered such evidence. *See Valentine*, 993 F.3d at 278, 289 (changed conditions "after suit was filed and during the pendency of the litigation," including "on the eve of and during trial"); *Dockery*, 7 F.4th at 379 (changed conditions by "the time of judgment").

But not the district court. It is undisputed that Defendants advised the district court of significantly changed conditions—weeks before the parties' post-trial briefs were even due, *and a year before the district court released its Remedy Opinion and*

*Remedial Order*. *See* ROA.30268–72; ROA.46500–35 (sealed exhibits). The district court nonetheless refused to consider that evidence. Indeed, it bristled at the notion of considering evidence "until the ink is dry on the final judgment." ROA.30311. But that is this Court's exact instruction: "[W]e consider the evidence from the time suit is filed *to the judgment*." *Valentine*, 993 F.3d at 282 (emphasis added).

**2.** Plaintiffs' attempts to downplay the district court's error go nowhere. *First*, Plaintiffs claim (at 30–31) that *Valentine*'s instruction is confined to the facts in *Valentine*—prison conditions amid the COVID-19 pandemic. Nonsense. The black-letter principles in *Valentine* reproduced above had nothing to do with COVID-19, just as *Dockery* (which Plaintiffs do not even try to distinguish) and *Farmer* themselves had nothing to do with COVID-19.

*Second*, Plaintiffs invoke (at 29–30) *Brown v. Plata*, 563 U.S. 493 (2011), but *Brown* does not help them. That case involved a three-month discovery "cutoff date … before trial," which the Supreme Court deemed "within the sound discretion of the three-judge court." 563 U.S. at 523. But that was because California had effectively waived any objection to the cutoff: It told the three-judge court that such a cutoff "would be 'appropriate,'" and it forfeited any argument that "there was no longer a violation" by failing to challenge the formation of the three-judge court. *Id.* at 523–24. Not only that, but California also "d[id] not point to any significant evidence that it was unable to present and that would have changed the outcome of

4

the proceedings." *Id.* at 524. Just the opposite here: Defendants urged the district court that it would be legal error to *refuse* to consider evidence of current conditions after the Remedy Trial—and Defendants identified specific evidence that cuts through the heart of the district court's Remedy Opinion and Remedial Order. *See* ROA.30268–72; ROA.46500–35; *infra* at 7–8. *Brown* this is not.

*Third*, Plaintiffs worry (at 31–32) that following *Valentine* and *Dockery* would lead to "trial by ambush" and "make prison litigation entirely unmanageable" due to defendants' purported incentives to delay litigation. No. For one thing, Plaintiffs' professed policy concerns—even if they were well-founded—could not overcome the square holdings in *Valentine* and *Dockery*. For another thing, Plaintiffs' concerns are not well-founded to begin with. The district court in *Dockery* confronted an identical situation where "many changes [had] been made at the subject prison." *Dockery v. Hall*, 443 F. Supp. 3d 726, 732 (S.D. Miss. 2019). But the district court did not simply shrug its shoulders and ignore the changes. Instead, it "stayed [the litigation] to allow the parties to conduct additional post-trial discovery"—including through prison inspections and additional expert reports—and "submit post-trial briefs." *Id.* at 736. Far from trial-by-ambush, that straightforward accommodation of all parties gives full effect to the Supreme Court's directive that an Eighth Amendment injunction may issue only if the plaintiff proves deliberate indifference "during the remainder of the litigation and into the future." *Farmer*, 511 U.S. at 846.

*Fourth*, Plaintiffs try to sidestep these precedents altogether by claiming (at 36) that Federal Rule of Civil Procedure 37 and Federal Rule of Evidence 403 somehow independently permitted the district court to ignore current conditions by citing "prejudice" and "delay." As the brevity of Plaintiffs' claim suggests, this is nonsense three times over.

One, these discovery and trial rules cannot displace the substantive rule for Eighth Amendment liability established in *Farmer*: "[T]he inmate must demonstrate the continuance of [deliberate indifference] *during the remainder of the litigation and into the future*." 511 U.S. at 846 (emphasis added). Two, by its very nature, "evidence from the time suit is filed *to the judgment*," *Valentine*, 993 F.3d at 282 (emphasis added), that is favorable to the State will *always* come later in the litigation and be prejudicial to a plaintiff—and thus, it would make zero sense to allow a plaintiff (or district court) to circumvent *Farmer* and *Valentine* by claiming "prejudice" and "delay." Three, even if Rules 37 and 403 applied, Plaintiffs have no actual prejudice argument: They protested, for example, that Defendants "waited a month and a half to inform Plaintiffs of the electronic medical records." ROA.30286. Setting aside that the electronic system was still hot off the press, Plaintiffs undisputedly had another three weeks before they had to file any post-trial brief (they filed six days later, ROA.30290); they could have easily asked the district court to extend any briefing deadlines (they did not); they could have easily asked to reopen

6

discovery and otherwise test the current-conditions evidence (they did not), *cf. Dockery*, 443 F. Supp. 3d at 736 (allowing post-trial discovery); and in all events, the district court did not even issue its Remedy Opinion and Remedial Order for another year. The only prejudice here is *to Defendants* because of the district court's refusal to consider current conditions.

*Fifth*, when Plaintiffs finally get around (at 35–36 & n.5) to the evidence the district court refused to consider, they acknowledge its existence but downplay it. For good reason: That evidence plows a gaping hole through the Remedy Opinion and Remedial Order.

Although examples abound, the most striking is this: The Remedy Opinion traces all purported legal deficiencies to LSP's medical records, which the court deemed "incoherent, disorganized, [and] untrustworthy." ROA.30575; *see, e.g.*, ROA.30574 ("egregious" and "in shambles"); ROA.30576 ("utter disarray"); ROA.30578 ("unreliable and disorganized"); ROA.30580 ("seriously flawed"). For that reason, virtually every aspect of the Remedial Order demands injunctive relief dictating standards and procedures as to medical records. *See, e.g.*, ROA.30662 (II.A(1): "documentation and/or charting"; II.A(2): "medical charting," "documentation protocols," and "medication charting"; II.A(6): "medical records management, including electronic medical records and protocols"). But that demand—particularly a demand for electronic health records that would globally

7

solve the district court's concerns—is nonsensical now because LSP (a) integrated electronic health record software which transformed record management at LSP and (b) had operated under an electronic health records regime for over a year by the time the district court entered its Remedy Opinion and Remedial Order—and October 2024 will mark *two years* with that transformative system in place. ROA.30271; *see also* ROA.30695–99 (expounding on the transformation).[1] By Plaintiffs' and the district court's lights, however, none of that matters.

*Valentine*, *Dockery*, and *Farmer* say otherwise. Just as no one would call the fire department to put out a fire at a house that had already been rebuilt post-fire, these precedents squarely foreclose the district court from ordering injunctive relief while refusing to consider whether any such relief is even warranted now.

## B.    The District Court's Remedial Order Violates the PLRA.

Separately, the district court's disregard for the PLRA warrants vacatur and remand. The Remedial Order violates the PLRA in at least three respects.

*First*, the PLRA bars the district court from ordering injunctive relief against alleged constitutional violations that are not "current and ongoing." *E.g.*, *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002); *see also Dockery*, 7 F.4th at 380 n.4

---

[1] Plaintiffs urge (at 35–36 n.5) the Court to turn a blind eye to additional post-judgment evidence of changed conditions lodged with this Court, which has accumulated as even more time has passed. But this evidence only underscores the folly in the district court's own blind eye to changed conditions. And if the Court vacates the district court's judgment (and it should if it does not reverse outright), this evidence will fall squarely within the category of evidence "to the judgment" that "we consider." *Valentine*, 993 F.3d at 282.

(noting that "[c]ourts are split" on this issue but declining to decide it). Indeed, the PLRA's plain text permits injunctive relief only to address "*the* violation of the Federal right"—*i.e.*, a then-existing violation. 18 U.S.C. § 3626(a)(1)(A) (emphasis added). "[I]f a violation no longer exists, the statute does not permit the court to order prospective relief." *Hallett*, 296 F.3d at 743. And that is the case here: The district court's refusal to acknowledge that current-conditions evidence directly undermines the claimed violations allegedly requiring the Remedial Order—and thus the district court runs headlong into the PLRA's bar on injunctive relief for non-existent violations.

*Second*, the district court did not even try to comply with the PLRA's prerequisites for prospective relief. The Remedy Opinion acknowledged that the PLRA requires a "find[ing] that [any] injunctive relief 'is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least instructive means necessary to correct the violation of the Federal right.'" ROA.30658 (quoting 18 U.S.C. § 3626(a)(1)(A)). But the district court never applied that standard. The Remedy Opinion simply announced that the court "will enter Permanent Injunctive relief by separate order," ROA.30660, and the Remedial Order simply "ordered" the appointment of three Special Masters along with various conditions and requirements, ROA.30661. Plaintiffs immediately recognized the PLRA problem and, after Defendants appealed, urged the district court to actually

make the required "findings" in an indicative ruling. ROA.30783. The district court "decline[d]." ROA.30830.

Now, Plaintiffs pretend (at 37–39) that all is well because Special Masters have not yet been appointed, remedial plans have not yet been proposed, and amendments have not yet been proposed—voilà: There is no injunctive relief that could violate the PLRA's "needs-narrowness-intrusiveness" requirement. Wrong. The Remedial Order orders, *as of now*, Defendants to: (a) participate in a Special Master appointment process; (b) give the Special Masters complete access to LSP, including its inmates and "any and all records and documents appropriate and necessary for their tasks"; (c) dedicate three different prison officials, including a warden, "to coordinate and facilitate the work of the Special Masters"; and (d) pay all costs "associated with the work and reporting of the Special Masters." ROA.30662–64. Again, the district court did not even try to satisfy the PLRA's needs-narrowness-intrusiveness requirement as to these onerous burdens, much less as to the remedial plans the Special Masters are purportedly authorized to establish.

*Third*, and finally, the district court's attempt to install "Special Masters" (plural) over LSP ignores the PLRA's process for, and limitations on, the appointment of a "special master" (singular). The PLRA permits the appointment of a special master "only upon a finding that the remedial phase will be sufficiently complex to warrant the appointment." 18 U.S.C. § 3626(f)(1)(B). It precisely

articulates the appointment process. *Id.* § 3626(f)(2). And it requires the special master's compensation to be "paid with funds appropriated to the Judiciary." *Id.* § 3626(f)(4).

Where to start with the violations? *One*, the Remedial Order purports to authorize *three* Special Masters, not one; *two*, it never claims to make a finding that the remedial phase is "sufficiently complex" to warrant the three-Special Master regime; *three*, its appointment provisions ignore the PLRA-established appointment process; and *four*, it orders Defendants, not the Judiciary, to pay the Special Masters. ROA.30661–64.

Here too, Plaintiffs recognized the fatal problem: After Defendants appealed, they urged the district court to bypass the PLRA by appointing the Special Masters "under Rule 706 of the Federal Rules of Evidence, not the PLRA." ROA.30783. Again, the district court "decline[d]." ROA.30830.

Now, Plaintiffs try to salvage the Remedial Order. They ignore the "complexity" finding error; they also give up on the appointment-process and compensation errors, admitting (at 42) that, if the PLRA governs, these are obvious errors. Instead, they try to avoid the PLRA altogether. They say (at 41) that "§ 3626(f) applies *only* to court appointees acting as 'quasi-judicial officers,'"—*i.e.*, those who "'hold hearings, subpoena witnesses, take testimony, or rule upon evidence,'" and the like—which the Special Masters would not be, according to

11

Plaintiffs. The statutory text easily disposes of that argument because it provides that a court "may" authorize a special master to conduct hearings and make fact findings, § 3626(f)(6)(A), *and also* "assist in the development of remedial plans," § 3626(f)(6)(C). In other words, § 3626(f) squarely contemplates (and thus governs the appointment of) a special master who, if nothing else, is authorized *only to* assist in the development of remedial plans—as is the case here. *See, e.g.*, *Roberts v. Cnty. of Mahoning*, 495 F. Supp. 2d 694, 695 (N.D. Ohio 2006) (noting appointment of special master under § 3626(f) to develop remedial plan); *Monroe v. Meeks*, 2021 WL 5882129, at *3 (S.D. Ill. Dec. 13, 2021) (same).

Plaintiffs also reject (at 42–43) the PLRA's limitation to a single "special master," invoking the Dictionary Act's default rule that the singular words include the plural. But Plaintiffs commit the same error the Supreme Court identified in *Niz-Chavez v. Garland*, 593 U.S. 155 (2021): "The Dictionary Act does not transform every use of the singular 'a' into the plural 'several.' Instead, it tells us only that a statute using the singular 'a' can apply to multiple persons, parties, or things." *Id.* at 164. Here, contrary to Plaintiffs' suggestion, that means the PLRA's reference to "a special master" does *not* imply "several special masters." And indeed, "the context indicates" as much, 1 U.S.C. § 1, by repeatedly referring to *the* master in the singular. 18 U.S.C. § 3626(f)(2)(C), (3), (4), (5). The district court's attempt to set up a tri-partite Special Master regime is thus another PLRA violation.

### C.    The District Court's Conduct Reflects Either Unawareness About, or Disdain for, States' Sovereignty.

Finally, "the district court's handling of this case" "harkens back to the institutional-reform litigation of yesteryear—back before the [PLRA], when federal supervision of state prisons was normal." *Valentine*, 993 F.3d at 291, 294 (Oldham, J., concurring in the judgment). The court has embroiled Defendants in nearly a decade of prison litigation, with trials and rulings spread out over years. Never mind due process for the prison-official defendants. And the court's most recent egregious errors—refusing to consider evidence of current conditions and ignoring the PLRA in ordering Special Master oversight of LSP—are precisely the "sort of federal-court intervention [that] is unlawful" after the PLRA. *Id.* at 291. Indeed, it "imposes grave federalism costs that should be avoided not celebrated." *Id.* "Federal judges are particularly ill-equipped to manage state prisons," *id.* at 294—and this district court is no exception. Defendants thus respectfully ask this Court to admonish the district court accordingly.

## II.    The District Court's Substantive Errors Warrant Outright Reversal.

But the Court can and should do more—by ending this unduly protracted litigation outright.

### A.    There Is No Eighth Amendment Violation.

**1.** Plaintiffs' Eighth Amendment defense falters from the start because they invoke the wrong standard of review. They argue repeatedly that "the district court

did not clearly err" in its Eighth Amendment findings. *E.g.*, Red Br. 46. But that is no response to Defendants' challenge to the district court's *legal conclusion* that such findings establish an Eighth Amendment violation. *E.g.*, Blue Br. 35, 40, 42. *That* conclusion is subject to de novo review. *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015); Blue Br. 40. And Defendants' argument—under de novo review—is that, even assuming the district court's factual findings are correct, they do not establish cruel and unusual punishment in violation of the Eighth Amendment.

**2.** Properly framed, the question presented is whether Defendants' many improvements in response to the Liability Opinion themselves establish deliberate indifference. In particular, although Defendants strongly disagree that conditions at LSP ever presented an Eighth Amendment violation, Defendants nonetheless answered the Liability Opinion by working to remedy the alleged violations. Importantly, these improvements shift the focus of the legal analysis from the state of affairs pre-Liability Opinion to the nature of the improvements themselves post-Liability Opinion—but the district court (and Plaintiffs) failed to make that shift.

"Under the Eighth Amendment, conditions of confinement in state prisons must be 'humane' and 'must not involve the wanton and unnecessary infliction of pain.'" *Rogers v. Boatright*, 709 F.3d 403, 407 (5th Cir. 2013) (quoting *Palmer v. Johnson*, 193 F.3d 346, 351–52 (5th Cir. 1999)). A prison official denies humane conditions of confinement "only if he knows that inmates face a substantial risk of

serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

That standard has objective and subjective components. The conditions of confinement "must be 'objectively, sufficiently serious,' and the prison official sued must have a sufficiently culpable state of mind—that is, the official must have been deliberately indifferent to the prisoner's health and safety." *Rogers*, 709 F.3d at 407 (quoting *Palmer*, 193 F.3d at 352). Where (as here) officials undertake a response to alleged violations, the second prong—that is, the subjective component that requires deliberate indifference—focuses on the response itself. *See Hare v. City of Corinth*, 74 F.3d 633, 649 n.5 (5th Cir. 1996) ("the second, subjective prong (state of mind more blameworthy than lack of due care)" "can be satisfied only in respect to the response itself"); s*ee also LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993) ("[I]f an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he knows of, but disregards, an appropriate and sufficient alternative.").

Put otherwise, the response *itself* must show "deliberate indifference"— "a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). And that makes good sense because, as emphasized above, *Farmer* compels a plaintiff to prove deliberate indifference "during the remainder of

the litigation," 511 U.S. at 846—and *Farmer* recognizes prison officials "could prevent issuance of an injunction" by showing "during the litigation" that they are "no longer" deliberately indifferent, *id.* n.9; *accord Dockery*, 7 F.4th at 380.

**3.** Whether Defendants' response to the Liability Opinion shows deliberate indifference is a purely legal question that is easily answered here: No. Even though Defendants firmly disagreed with the Liability Opinion, they did not sit on their hands. They instead took immediate (and still ongoing) action to remedy the alleged violations identified by the district court. That cannot possibly show a *subjective* "wanton disregard" for inmates' "serious medical needs," *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536. Indeed, if an official who "fail[s] to alleviate a significant risk that he should have perceived but did not" does not run afoul of the Eighth Amendment, *Farmer*, 511 U.S. at 838, so too for an official who does not believe there is a significant health care risk yet improves health care anyway. And Plaintiffs did not even try to offer evidence that Defendants disregarded a known, appropriate, and sufficient alternative. *See LaMarca*, 995 F.2d at 1536. Rather, Plaintiffs try to survive scrutiny by (a) passing the burden to Defendants to (b) show that the improvements actually improved the quality of care. That tack is unavailing. "[D]eliberate indifference exists wholly independent of an optimal standard of care." *Gobert*, 463 F.3d at 349. Now to the particulars.

*First: sick call*. The district court found that "LSP's sick call policy was constitutionally inadequate because it failed to provide patients with medical care by qualified providers." ROA.30580 (Remedy Opinion); ROA.22423–28 (Liability Opinion). Even assuming that were true, Defendants proactively responded by revamping their policy. Inmates now can "request access to health care, routine and emergent, on a daily basis" and are seen by a nurse practitioner "either in person or through Telemed, the next day Monday through Friday." Def_8aaa_2925, pp. 001, 003.

The district court quibbled with the way these improvements are "implemented," concluding that the "sick call process remains [] constitutionally inadequate." ROA.30580–82. In particular, the district court found fault with minor things like:

- LSP reviewed request forms 5 days a week;

- request forms did not provide a box for the date and time;

- requests' priority levels were not noted in inmates' charts;

- sometimes during an exam, "vitals were not taken, physical examinations were not performed, documentation of symptoms/medical history did not occur, and patients were charged a co-pay despite receiving no examination, diagnosis, or treatment";

- EMTs, not nurse practitioners, were physically present with inmates during telemed visits;

- resolution of telemed cameras was poor,

- sometimes the telemed equipment did not work; and

- inmates' medical records were not "necessarily" reviewed during visits.

ROA.30581–84. But these minor issues do not rise to the level of even negligence or medical malpractice, let alone cruel and unusual punishment—nor do they suggest that Defendants' improvements themselves show deliberate indifference. *See Gobert*, 463 F.3d at 346 (explaining that "acts of negligence, or medical malpractice do not constitute deliberate indifference").

*Second: clinical care.* Plaintiffs contend that Defendants' clinical care improvements do not go far enough. The district court found, and Plaintiffs "concede," that Defendants "properly remedied" three out of the five deficiencies in LSP's clinical care. ROA.30571; *see also* ROA.22487 (concluding Defendants were "deliberately indifferent" to "constitutionally adequate access to specialty care" in five areas).

Medical administration—aka "pill call"—was not one of those five violations, and so Defendants were not on notice that they were constitutionally required to change how they distribute medication. *See* Blue Br. 44–45. But they proactively decided to improve that system anyway by implementing the sMARt system. *Id.* at

18

46. Even assuming the original system showed "a wanton disregard" for inmates' "serious medical needs," *Gobert*, 463 F.3d at 346, Defendants' proactive improvement of that system does not, *see Hare*, 74 F.3d at 649 n.5. Plaintiffs have not shown that Defendants implemented the sMARt improvement with deliberate indifference. *See Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("[A] plaintiff must show that the defendant . . . disregarded the risk [of serious harm]." (quoting *Farmer*, 511 U.S. at 837)). Nor are Defendants required to prove that sMARt "actually improved medication administration or anything else." *See* Red Br. 71.

Plaintiffs make the same mistake in claiming that Defendants must show that they improved the overall quality of clinical care in addition to remedying the two remaining deficiencies. Red Br. 67–68. But specific violations are what take the standard of care below the constitutional minimum, and thus fixing those alleged deficiencies fixes any constitutional problem. Moreover, a defendant is not required to do more than remedy specific violations. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977) ("[I]nstead of tailoring a remedy commensurate with the three specific violations, the Court of Appeals imposed a systemwide remedy going beyond their scope.").

Of the remaining two clinical care violations—"lack of adequate medical records management" and the "episodic treatment of complaints," ROA.22520;

ROA.30571—Plaintiffs cannot show that Defendants acted with deliberate indifference when they proactively made improvements in those two areas.

Start with medical records. The question is not the level to which practitioners choose to use the new electronic records or whether such records actually improve clinical care. *Cf.* Red Br. 71 ("Defendants presented no evidence about how their practitioners were using the [electronic] records, let alone that the change improved clinical care."). Instead, the question is whether Defendants' pro-active decision to implement electronic records—and thereby cut through the heart of both the Liability Opinion and the Remedy Opinion—shows "a wanton disregard" for inmate safety, *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536. It plainly does not.

So-called episodic treatment of complaints comes next and fails for the same reason. *See* Red Br. 68 ("Defendants failed to establish any improvements to the actual quality of this care."). Defendants proactively responded to the liability opinion by hiring more nurse practitioners. *See* Blue Br. 61. Plaintiffs criticize that improvement, saying Defendants simultaneously reduced the number of physicians and failed to adequately supervise nurse practitioners and to meet with them every morning. *See* Red Br. 68–69. To the extent Plaintiffs' criticism is that hiring more nurse practitioners was an unreasonable response, Plaintiffs still have to show that Defendants took this remedial path with "wanton disregard," *Gobert*, 463 F.3d at

346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536. Again, they cannot do so.

Plaintiffs (at 52) parrot the Liability Opinion's criticism that potential stroke patients weren't transferred quickly enough. What Plaintiffs don't say is that the Remedy Opinion excluded the issue entirely as there were no post-liability instances.

*Third: specialty care*. Plaintiffs commit the same legal errors as to specialty care, again flipping the burden. Defendants improved specialty care by bringing a total of twelve specialists to LSP, thirteen telemedicine clinics to LSP, increasing off-site trips to specialists, and never denying a request for specialty care. Blue Br. 47–50. Plaintiffs discount the first two improvements because they were intended to "cut costs, not improve care." Red Br. 72. But a desire for fiscal responsibility is not "a sufficiently culpable state of mind." *Rogers*, 709 F.3d at 407 (quoting *Palmer*, 193 F.3d at 352).

Moreover, Plaintiffs affirmatively needed to show that Defendants increased inmates' onsite, off-site, and virtual access to specialists because they had a "wanton disregard," *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536. Of course, increasing access to specialists is not being "deliberately indifferent to the prisoner's health and safety." *Rogers*, 709 F.3d at 407 (quoting *Palmer*, 193 F.3d at 352).

21

Finally, Plaintiffs claim that Defendants failed to "provide a basis" for reversing the district court's factual finding that "the evidence demonstrates that these changes have not resolved the constitutional deficiencies in the delivery of specialty care." Red Br. 72. But the *legal* question subject to de novo review is whether the district court wrongly found deliberate indifference notwithstanding the stated facts. It did.

*Fourth: infirmary/inpatient care*. Post-Liability Opinion, Defendants improved this area of care by lowering nurse-to-patient ratios, installing call lights, improving orderly training, instituting single bunking, and installing air conditioning. Blue Br. 51–57. Plaintiffs try to knock each down one-by-one, claiming that they are all inadequate. Red Br. 72–74. But Plaintiffs built their case on the claim that "systemwide deficiencies" in LSP's medical care, "taken as a whole," violate the Eighth Amendment. ROA.22479; *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need …." (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991))). Defendants' multiple responses to that purported "in combination" violation *also* should be taken as a whole. And together, the improvements do not show that Defendants made these numerous improvements with "a wanton disregard" for

22

inmate safety, *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536.

Plaintiffs' critique of improved orderly training warrants an individual response. Based on timing alone, they disparage that improvement as a litigation tactic. Red Br. 74. But *Farmer* itself acknowledges that defendants may solve Eighth Amendment issues mid-litigation. *See* 511 U.S. at 846 & n.9. Moreover, the fact remains that orderlies receive better training, and Plaintiffs have not affirmatively satisfied *Gobert*, 463 F.3d at 346, or *LaMarca*, 995 F.2d at 1536.

*Fifth: Assessment and Triage Unit (ATU).* The district court criticized Defendants for staffing the ATU with EMTs. The district court recognized that the ATU is more like an ambulance in that it "is not a properly equipped emergency room capable of treating serious medical emergencies; hence, referral and transport to an off-site emergency room is required." ROA.22487–88. And yet, the court concluded that "Defendants have been deliberately indifferent to Plaintiffs' care in emergency evaluation and treatment" because, among other reasons, "Defendants primarily rely on EMTs to staff the ATU and evaluate medical emergencies." ROA.22487. But outside prison walls, EMTs riding in ambulances routinely evaluate emergencies, provide treatment, and refer and transport patients to emergency rooms.

In any event, Defendants proactively responded by replacing EMTs with nurse practitioners in the ATU and improving the treatment of self-declared emergencies (SDEs). Blue Br. 57–59. In fact, the district court found that now one "RN is present in the ATU at all times." ROA.30595. Plaintiffs claim that finding is erroneous because the evidence actually shows "LPNs staff the ATU on most weeknights." Red Br. 75 n.19. They also contend that Defendants' improvements to the ATU were not reasonable because "the evidence showed numerous failures to respond appropriately to critical emergency symptoms, often resulting in preventable death or other harm." Red Br. 74–75. But a defendant need only remedy specific constitutional violations, not guarantee that the remedies will produce a desired outcome. *See* Fed. R. Civ. P. 65(d) (injunctions require narrow tailoring to remedy only a plaintiff's specific harms); *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) ("nature" of remedy must be "determined by the nature and the scope of the constitutional violation"). At bottom, Defendants' ATU improvements do not show "wanton disregard," *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536.

*Sixth: medical leadership*. The district court found six specific violations in this area. *See* ROA.22488–89. Defendants disagreed that those deficiencies amounted to cruel and unusual punishment and yet made improvements anyway. Blue Br. 59. Defendants hired new leadership, implemented a weekly backlog

tracker to identify issues and respond efficiently, and started holding morning meetings to discuss patient status. ROA.30616–17. Rather than considering whether these improvements themselves show deliberate indifference, the district court dismissed them as "form" over "function." ROA.30617. That was wrong. Even assuming (wrongly) that these improvements "were unreasonable," Red Br. 80, they do not show "wanton disregard," *Gobert*, 463 F.3d at 346, or a knowing disregard of "an appropriate and sufficient alternative," *LaMarca*, 995 F.2d at 1536.

The bottom-line point is a straightforward one: Even assuming the district court's factual findings are correct, Defendants' many improvements to LSP's medical system eliminate any alleged Eighth Amendment violation. That is because the improvements—and LSP's extensive, proactive efforts to remedy the perceived violations—do not show deliberate indifference.

## B.    The District Court's ADA Analysis Is Flawed.

**1.** Turning to the ADA, reversal is principally warranted because, once the Court strips out Schriro's impermissible "expert" ADA opinions, the district court's ADA analysis falls apart. As Defendants explained (Blue Br. 81–86), the district court relied on Schriro's opinions to write the ADA compliance portion of the Remedy Opinion. And that was so even though Schriro—*by her own admission*—has never received any ADA training, administered such training to others, or even directly overseen ADA compliance. ROA.34133; ROA.34123. Her only (potential)

affiliation with the ADA was that, as a former commissioner or director of various prisons and jails, she had to "compl[y] with state and federal law." ROA.30626–27 n.406. But that did not stop Schriro from "provid[ing] my expert opinion on [ADA] compliance" to the parties, ROA.29242, nor did it stop the district court from "credit[ing] her opinions" at the Remedy Trial on "the inadequacies of LSP's ADA administration," "including problems with the ADA coordinator, the ADA advisory committee, staff training, orderly assistance, accommodation requests, the ADA tracking system, and disciplinary accommodations," ROA.30627. This is a quintessential Rule 702 violation. Blue Br. 81–86.

Perhaps recognizing the seriousness of this error, Plaintiffs tuck their response away in the very back of their ADA discussion in the very back of their brief. And even then, they offer no serious response. They primarily urge (at 95–96) that Schriro was "properly qualified as an expert on correctional administration"—but that just *underscores* the error. Just as business owners do not automatically become experts on Title VII (by virtue of their responsibility to hire and fire employees in compliance with state and federal law) and the Internal Revenue Code (by virtue of their responsibility to pay taxes in compliance with state and federal law), so too Schriro's "I oversaw prisons" rationale does not make her an ADA compliance expert. Plaintiffs also detour (at 97–99) into a puzzling defense of Schriro's opinions on things like whether 22 wheelchair pushers complies with the ADA—but again,

that just *underscores* the error. How could Schriro expertly testify about the ADA-required number of wheelchair pushers when she is not even an expert on the ADA? Finally, Plaintiffs insist (at 99) that "Schriro's testimony was not determinative" even if the district court erred in relying on it. But the district court's *extensive* reliance on Schriro speaks for itself. *See, e.g.*, ROA.30626, 30627, 30631, 30633, 30636, 30637, 30642; Blue Br. 84–85 (cataloguing examples). Deleting Schriro's testimony would gut the ADA compliance portion of the Remedy Opinion, which requires outright reversal.

**2.** Even if the Court thought it necessary to proceed to the merits, Plaintiffs miss the forest for the trees. Plaintiffs repeat again and again a mantra that Defendants "ha[ve] not changed their 'practices, policies, or procedures related to ADA accommodation,'" *e.g.*, Red Br. 85, as if that magically establishes ADA liability. Yet, their "burden [was] to demonstrate a *systemic* failure" to comply with the ADA. ROA.22492 (emphasis added). And in this context, "a violation of the ADA" is "[a] failure to provide a reasonable accommodation, or discrimination by reason of disability." ROA.30658; *see also* ROA.30657 (admitting that "LSP has the authority to determine whether an accommodation is appropriate at all and, if so, what accommodation is reasonable when balanced against the security and others interests of the prison").

27

One of many defects (preserved in the opening brief), however, is that the district court never identified a systemic failure to provide reasonable accommodations, *i.e.*, to discriminate based on disability. To their credit, Plaintiffs do not defend the alleged deficiencies in ADA "training and administrative oversight" as standalone violations, seemingly acknowledging that these allegedly deficient practices or policies do not themselves have discriminatory effect. Red Br. 93. Instead, Plaintiffs push hard on the only two contexts in which the district court found alleged discrimination—*i.e.*, architectural barriers (at 80–84) and discipline procedures (at 89–91). But those do not amount to *systemic* failures in violation of the ADA. And even those examples have their own deficiencies. *See, e.g.*, ROA.30654 (district court indicating lack of knowledge about whether, or how many, architectural barriers remain: "Part of the Court's injunctive relief will include the appointment of a monitor to determine what structural barriers have not been effectively ameliorated by alternative means of access."); Red Br. 89—91 (identifying only a handful of instances of alleged discrimination in discipline). Reversal is thus in order even on the merits.

## CONCLUSION

The district court's Liability Opinion, Remedy Opinion, and Remedial Order should be reversed, or else vacated and remanded.

Dated: February 15, 2024.

28

Respectfully submitted,

BY: */s/ Connell L. Archey*　　　　　

　　　Connell L. Archey
　　　Randal J. Robert
　　　Keith J. Fernandez
　　　Allena W. McCain
　　　Madaline King Rabalais
　　　BUTLER SNOW LLP
　　　Special Assistant Attorneys General
　　　445 North Boulevard, Suite 300 (70802)
　　　P.O. Box 2997
　　　Baton Rouge, LA 70821-2997
　　　Telephone:　(225) 325-8700
　　　Facsimile:　(225) 325-8800
　　　Connell.Archey@butlersnow.com
　　　Randy.Robert@butlersnow.com
　　　Keith.Fernandez@butlersnow.com
　　　Allena.McCain@butlersnow.com
　　　Madaline.Rabalais@butlersnow.com

　　　Jeffrey K. Cody
　　　Caroline M. Tomeny
　　　John C. Conine, Jr.
　　　SHOWS, CALI & WALSH, L.L.P.
　　　Special Assistant Attorneys General
　　　628 St. Louis Street (70802)
　　　P.O. Drawer 4425
　　　Baton Rouge, LA 70821
　　　Telephone:　(225) 346-1461
　　　Facsimile:　(225) 346-1467
　　　jeffreyc@scwllp.com
　　　caroline@scwllp.com
　　　coninej@scwllp.com

　　　Elizabeth B. Murrill
　　　Attorney General
　　　J. Benjamin Aguiñaga
　　　Solicitor General
　　　Morgan Brungard

Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
1885 N. Third St.
Baton Rouge, LA 70802
(225) 326-6766
MurrillE@ag.louisiana.gov
AguinagaB@ag.louisiana.gov
BrungardM@ag.louisiana.gov

*Counsel for Defendants-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

On February 15, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Connell L. Archey*
Connell L. Archey

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Connell L. Archey*
Connell L. Archey

85985606.v1

31