## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

ANTHONY TELLIS, ET AL.        CIVIL ACTION NO. 18-541

VERSUS        JUDGE ELIZABETH E. FOOTE

JAMES M. LEBLANC, ET AL.        MAGISTRATE JUDGE HORNSBY

### OPINION
### Table of Contents

I.    **Introduction** ........................................................................ 1

II.    **Procedural Background** ..................................................... 2

III.   **Burden of Proof** ................................................................. 6

IV.   **Background Facts** .............................................................. 7

     **A. Important Terms** ............................................................ 7

     **B. DWCC Overview** .......................................................... 9

        i.    N-1 ......................................................................... 9

        ii.   N-2A, N-2B, N-3, and N-4 ................................. 10

        iii.   N-2C .................................................................. 11

        iv.   N-2D .................................................................. 12

     **C. Corrections Officials** .................................................. 13

     **D. Expert Witnesses** ....................................................... 25

        i.    Dan Pacholke ..................................................... 25

        ii.   Dr. Craig Haney .................................................. 26

        iii.   Dr. Kathryn Burns .............................................. 28

        iv.   Dr. John Thompson ............................................ 29

        v.    James Upchurch ................................................. 32

V.    **Eighth Amendment Claims** ........................................... 34

     **A. Eighth Amendment Standard** ................................... 34

     **B. Conditions of Confinement** ...................................... 37

        i.    Substantial Risk of Serious Harm ..................... 37

        1.    *Psychological Harms of Solitary Confinement* .......................... 39

        2.    *Conditions on the South Compound* ............................ 41

        3.    *Manifestation of Harm at DWCC* ................................ 65

    ii.    Deliberate Indifference ............................................ 66

    iii.   Conclusion as to Conditions of Confinement ........................ 68

**C. Delivery of Mental Health Services** ........................ 69

    i.    Substantial Risk of Harm ........................................ 70

        1.    *Screening and Evaluation* ........................................ 71

        2.    *Mental Health Treatment* ........................................ 87

        3.    *Staffing of the Mental Health Department* ............................. 105

        4.    *Administration of Psychotropic Medication* ........................... 110

        5.    *Lack of Accurate and Adequate Records* ................................ 116

        6.    *Suicide Prevention Program* ..................................... 117

        7.    *Manifestations of Harm* ............................................. 135

    ii.    Deliberate Indifference ............................................. 144

        1.    *Failure to Comply with Policy* ..................................... 145

        2.    *Wanton Disregard for Inmate Health and Safety* ..................... 147

    iii.   Conclusion as to the Delivery of Mental Health Services ............. 151

**D. Conclusion as to the Eighth Amendment Claims** ................................. 152

**VI.**    **ADA and RA Claims** ................................................ 152

**A. ADA and RA Standard** ........................................ 153

**B. Failure to Accommodate** ........................................ 155

    i.    Affirmative Modifications ......................................... 156

    ii.    Discipline ...................................................... 159

**C. Methods of Administration** ......................................... 164

    i.    Under-inclusive Definition of Serious Mental Illness ................... 166

    ii.    Inadequate Process for Requesting Reasonable Accommodations……………………………………………167

**D. Conclusion as to ADA and RA Claims** ................................. 169

**VII.**    **Conclusion** ........................................ 169

## I.    **Introduction**

Inmates at David Wade Correctional Center ("DWCC") filed this class action suit for injunctive and declaratory relief, challenging the conditions of confinement and delivery of mental health services on extended lockdown.[1] Defendants are correctional officials at DWCC and the Louisiana Department of Public Safety and Corrections ("DOC"). Plaintiffs allege that the policies and practices in place at DWCC violate the Eighth Amendment of the United States Constitution,[2] Title II of the Americans with Disabilities Act ("ADA"),[3] and Section 504 of the Rehabilitation Act of 1973 ("RA").[4]

The Court bifurcated the trial of this matter into a liability phase and a remedy phase. The Court issued an opinion on the liability phase, holding that: 1) Defendants violated the Eighth Amendment by housing inmates—including those with a diagnosed mental illness–in inhumane conditions while on extended lockdown and by failing to provide those inmates adequate mental health care; and 2) Defendants have violated the ADA and RA by failing to make reasonable accommodations for inmates with mental disabilities and by employing unlawful methods of administration.

---

[1] The Court defines "extended lockdown" below. *See supra* pp. 7-8.

[2] The Eighth Amendment claim is brought pursuant to 42 U.S.C. § 1983. Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. Qualified immunity is not at issue in this case because Plaintiffs only seek prospective equitable relief—i.e., injunctive and declaratory relief and not monetary relief—and because Plaintiffs have sued Defendants only in their official capacities. *Singleton v. Cannizzaro*, 956 F.3d 773, 778 n.3 (5th Cir. 2020).

[3] 42 U.S.C. § 12131, *et seq.*

[4] 29 U.S.C. § 794.

1

This opinion addresses the remedy phase of the litigation. The Court's task in this phase was to determine whether the violations identified in the liability phase were still occurring and would continue to occur into the future, and what remedies would eliminate these violations to the extent practicable.

For the reasons below and considering the credible testimony and evidence at trial, the pre- and post-trial briefs, and the stipulations of the parties, the Court finds that Plaintiffs have satisfied their burden of proving by a preponderance of the evidence that the Eighth Amendment, ADA, and RA violations for which they seek protection have continued since the liability phase of trial and will continue into the future.

## II.    <u>Procedural Background[5]</u>

As a reminder, Plaintiffs are Disability Rights Louisiana ("Disability Rights") (formerly known as Advocacy Center of Louisiana) and a group of inmate representatives who were housed on extended lockdown at DWCC at the time of the lawsuit's filing— Bruce Charles, Carlton Turner, Larry Jones, and Ronald Brooks—(collectively, "Plaintiffs"). *See* Record Document 316. Defendants are Secretary James LeBlanc ("Secretary LeBlanc"), Warden Jerry Goodwin ("Warden Goodwin"), Dr. Gregory Seal ("Dr. Seal"), Deputy Warden Deborah Dauzat ("Deputy Warden Dauzat"), Steve Hayden ("Hayden"), Aerial Robinson ("Robinson"), Johnie Adkins ("Adkins"),[6] Vincent Coleman ("Coleman"), all in their official capacities; and the DOC.

---

[5] All of the Court's findings of fact discussed in the liability phase opinion not explicitly discussed herein are incorporated.

[6] During the liability phase of trial, Adkins testified via deposition in lieu of live testimony. *See* Ex. P-YYY-3 [Record Document 564-258]. At the time, Adkins was the prison

Previously, the Court granted Plaintiffs' motion for class certification. Record Document 462. In doing so, it certified a class of all prisoners who are or will be subjected to extended lockdown at DWCC that will pursue the Eighth Amendment claims (the "Class") and a subclass consisting of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health—as defined by the ADA—that will pursue the ADA and RA claims (the "Subclass"). *Id.* The Class and the Subclass are represented by the Named Plaintiffs, though the Named Plaintiffs did not testify at either phase of trial.

As stated above, considering the nature and extent of Plaintiffs' claims, the Court bifurcated the matter into two separate phases: liability and remedy. The liability phase came before the Court during a seventeen-day bench trial beginning January 10, 2022. The Court views the liability phase as capturing a snapshot in time during which Eighth Amendment, ADA, and RA violations were found to have taken place up through March 15, 2020. The remedy phase came before the Court during a fourteen-day trial beginning January 17, 2023.[7] During the remedy phase of trial, the Court heard from twenty-six witnesses—including corrections officials, expert witnesses, and inmates—who testified

---

chaplain who provided mental health services from a pastoral background and who would sometimes conduct the initial intake screening and evaluate inmates on suicide watch. *Id.* at 11:23-12:24, 27:7-16. Adkins did not testify during the remedy phase of trial. Furthermore, none of the parties moved to terminate Adkins as a party, nor did they offer any facts or legal arguments about Adkins, his role at DWCC, or the services he may provide to inmates. Plaintiffs have not met their burden in showing that they require injunctive relief from Adkins. Accordingly, all claims against Adkins are **DISMISSED WITH PREJUDICE**. The Court of Clerk is ordered to terminate Adkins as a party.

[7] Due to the COVID-19 pandemic and other logistical issues, the trial was held by Zoom video conference.

regarding the conditions of confinement on extended lockdown at DWCC between March 15, 2020 (the cut-off date for prison conditions at the liability phase of trial), and August 30, 2022, and regarding the remedies required to cure those conditions. After trial, the Court permitted the parties to submit post-trial briefs after which the Court took the matter under advisement.

In its liability phase ruling, the Court found not just sporadic instances where the constitutional rights of a particular inmate were violated, but rather systemic deficiencies in the policies and procedures that affect all inmates housed on extended lockdown at DWCC during that snapshot in time. Specifically, the Court determined that Plaintiffs satisfied their burden of proving that Defendants violated the Eighth Amendment. First, the Court held that the conditions, policies, and practices on extended lockdown—which included the deprivation of basic psychological needs, social isolation, enforced idleness, and conditions of confinement—constituted cruel and unusual punishment. Additionally, Defendants were deliberately indifferent in the ways in which they house these inmates, in violation of the Eighth Amendment. Record Document 641 at 60. Second, the Court found there to be systemic deficiencies and deliberate indifference in six areas of mental health care at DWCC—screening and evaluations, mental health treatment, staffing, the prescription and distribution of psychotropic medications, record keeping, and the suicide prevention program. *Id.* at 118-124.

The Court also held that Plaintiffs proved that DWCC violated the ADA and RA because it failed to: 1) consider an inmate's mental illness before placing him on extended lockdown for an indefinite period of time or before employing discipline; 2) modify

existing policies or practices for inmates with a mental illness on the South Compound, resulting in those inmates' exclusion from various programs, activities, and services; and 3) maintain an adequate system by which an inmate may request and obtain reasonable accommodations for his qualifying mental illness.[8] *Id.* at 144. In some instances, for those inmates in confinement, the Court's findings as to Plaintiffs' Eighth Amendment claims overlapped with its findings as to Plaintiffs' ADA and RA claims.

During the remedy phase of trial, the Court evaluated the current conditions at DWCC, which it defined as the time period from March 15, 2020 (the cut-off date for prison conditions at the liability phase of trial), through August 30, 2022. *See* Ex. JR-60 at ¶ 2; *see also* Record Document 675 at 3-4. Trial began on January 17, 2023. Thus, only four and a half months elapsed between the August 30, 2022, discovery cut-off date and the beginning of trial. Defendants objected to this time frame and filed four separate motions to supplement the record with evidence of current conditions. *See* Record Documents 447, 645, 738, 745. These motions were filed before and after the remedy phase of trial. As the Court explained to the parties, allowing Defendants to introduce evidence of new conditions which allegedly remedied the constitutional and statutory deficiencies would necessitate additional discovery and trial testimony, leading to an endless cycle of defense assertions, Plaintiffs' discovery, and new trial testimony. The Court made it clear

---

[8] Lastly, the Court found that Plaintiffs failed to meet their burden in proving that Defendants opened their outgoing and incoming legal mail or retaliated against them as a result of the information contained therein, in violation of their First Amendment Rights. *Id.* at 163. Those claims are therefore **DISMISSED WITH PREJUDICE**.

that any improvements made by Defendants after the August 30, 2022, cutoff date will not be ignored by the Court but will serve as evidence of the fulfillment of the injunctive relief ordered by the Court in its remedial order, which is forthcoming.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets out its findings of fact and conclusions of law below. If a fact was controverted, the Court weighed the evidence accordingly.

### III. <u>Burden of Proof</u>

The Court will briefly address the issue of the burden of proof at the remedy phase of trial. In a prison injunction case, the jurisprudence instructs that a plaintiff must establish that the defendant officials "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the future." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994); *see also Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021).

As discussed during the pretrial conference before the remedy phase of trial, "[t]he jurisprudence provides no guidance as to who has this burden when there is a bifurcated trial where the Court has already found constitutional and ADA/RA violations." Record Document 675 at 5. As such, the Court had to determine which party had the burden of proving that the harms alleged by the Plaintiff—and found by the Court during the liability phase—existed during the remedy phase of trial and would continue to exist into the future without the Court's intervention.

The Court relied upon the Supreme Court's holding in *Farmer*, 511 U.S. at 845-46, along with guidance from Judge Dick in *Lewis v. Cain,* No. 3:15-CV-318 (M.D. La. May

6

20, 2015). In *Farmer*, the Supreme Court held that in demonstrating that harm is likely to continue and persist in the future, "the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction." 511 U.S. at 846. In applying *Farmer* to the present case, the Court determined that Defendants had the burden of showing that the deficiencies in DWCC's policies and procedures had been remedied since the liability phase. At the same time, Plaintiffs had the ultimate burden of demonstrating that Defendants' remedies were insufficient and failed to cure the constitutional and statutory violations that exist and will continue to exist into the future.

This standard is similar to the burden of proof employed in *Lewis*, a class action prisoner civil rights case regarding the provision of adequate medical care at the Louisiana State Penitentiary. In that case, which was also bifurcated into liability and remedy phases, Judge Dick held that plaintiffs must "prov[e] the need for equitable relief by demonstrating that the unlawful and unconstitutional conditions found following the liability trial persist and are likely to persist in the future. To the extent that Defendants have implemented new policies, procedures, or other remedial measures, the Defendants bear the burden of proof." *Lewis*, No. 3:15-CV-318 (M.D. La. May 20, 2015), Record Document 713, p.3.

## IV. <u>Background Facts</u>

### A. **Important Terms**

In its liability phase opinion, the Court defined restrictive housing, extended lockdown, segregation, and solitary confinement. *See id.* at 8. Because those terms are used inconsistently and interchangeably even within the prison industry, the Court will use the

7

terminology in accordance with the stipulations and witness testimony, as it did in the liability phase opinion. During the first phase of trial, the parties stipulated that restrictive housing refers to housing prisoners separately from the general population of a correctional institution and imposing restrictions on their movement, behavior, and privileges. Record Document 524 at ¶ 21. Extended lockdown is a subset of restrictive housing. *Id*. Extended lockdown refers to housing prisoners separately from the general population for twenty-two or more hours per day in a cell. *Id*. at ¶ 22. The testimony was not always consistent with regard to the use of this terminology. To clarify, the Court treats solitary confinement as a synonym for extended lockdown and segregated housing as a synonym for restrictive housing.

The Court also provided an in-depth explanation regarding the level of care ("LOC") designations in its liability phase opinion. *See* Record Document 641 at 15-18. Because these LOC designations play such a significant role in the provision of mental health services to inmates on the South Compound, the Court will recount its prior explanation below:

> Inmates designated LOC-1 have a significant disability primarily due to their mental health condition. These inmates must be housed in a special mental health housing unit with constant monitoring by mental health staff. DWCC does not have the capabilities to house inmates classified as LOC-1.
>
> Inmates classified as LOC-2 have been diagnosed with a serious mental illness and are presently unstable—that is, inmates with a diagnosed serious mental illness who have been in remission for less than six months or have displayed a pattern of instability. One example is an inmate on forced medication. Although LOC-2s can be housed at DWCC per policy, the DOC avoids assigning LOC-2s to DWCC because DWCC lacks the necessary resources to safely care for those inmates.
>
> Inmates who have been designated as LOC-3 have a diagnosed serious mental illness but have been in remission or stable for at least six

months. Stable means "there are not symptoms that are disrupting your
functioning at that point in time." In other words, the inmate can function
despite having some symptoms—potentially by developing coping skills. Dr.
Gregory Seal ("Dr. Seal"), DWCC's contract psychiatrist, described stable
as meaning "unchanging," which indicates that the treatment is working.

LOC-4 is assigned to inmates who are diagnosed with mental illness
and may be taking medication but are not diagnosed with a serious mental
illness. . . . LOC-5 simply means the inmate does not have mental health
issues. . . . DWCC typically only houses inmates designated as LOC-3, -4,
or -5. LOC-3s and -4s comprise most of the mental health caseload at
DWCC.

*Id.* at 15-17 (internal citations omitted). When the Court discusses a LOC designation, the

Court is relying upon this description.

## B. DWCC Overview

DWCC is a maximum-security institution located in Claiborne Parish, Louisiana.

*Id.* at ¶ 26. The South Compound is comprised of five buildings, four of which—N-1, N-

2, N-3, and N-4—are the subject of this litigation. Ex. JR-60 at ¶ 6 [Record Document 715-

54]. Each building is made up of four tiers—A, B, C, and D. *Id.* Each tier has sixteen cells,

the first two of which are camera cells that allow for the observation of inmates on suicide

watch. *Id.* All of the cells located in N-4C are also camera cells. *Id.* All inmates housed in

N-1D, N-2D, and N-4 are housed in single bunked cells; every tier contains cells that can

double bunk inmates. *Id.* There have been some changes to the overall structure of the tiers

at DWCC, which the Court will briefly enumerate below.

i. <u>N-1</u>

Prisoners in the N-1 tier are classified as "medium custody," though as will be

discussed in greater depth, there are conflicting expert opinions regarding whether the

DWCC inmates housed in those dorms are living a true medium custody lifestyle. Pacholke

9

Liability Trial Tr. vol. VIII at 609:23-610:1 [Record Document 542]. It could be regarded as a transitional unit. Burns Remedy Trial Tr. vol. VII at 1611:15-19 [Record Document 710]. As of August 30, 2022, N-1 housed sixty-four beds, Ex. JR-60 at ¶ 13 [Record Document 715-54], a fifty percent reduction from the liability phase of trial because the prison no longer double bunks the cells, Ex. J-21 at 9 [Record Document 565-49]. There are televisions on the tier, and prisoners are allowed to maintain personal possessions in their cell, including tablets. Ex. JR-60 at ¶ 16 [Record Document 715-54]. The tablets can be used to make phone calls; prisoners without a tablet are allowed at least sixteen calls per month. *Id.* at ¶ 22. In the afternoons, Plaintiffs are allowed to attend group programming, eat their meals in the dining area, and are allowed two hours of exercise per day on the yard.

### ii. N-2A, N-2B, N-3, and N-4

Inmates housed in the N-2A, N-2B, N-3, and N-4 tiers are classified in one of the following "maximum custody" groups:[9] investigative segregation, disciplinary

---

[9] Inmates on investigative segregation are held in segregated housing for approximately seventy-two hours as they await a disciplinary hearing for a rule infraction. Record Document 641 at 13 (citing Baird Liability Trial Tr. vol. XIV at 1059:13-19 [Record Document 555]). If they are found to be guilty, inmates should be sentenced to disciplinary segregation for a period prescribed by the disciplinary matrix. *Id*. As the Court will describe in greater depth, the disciplinary matrix is a new implementation by DWCC as of July 2022. After an inmate completes his sentence on disciplinary segregation, he may nonetheless remain on extended lockdown in preventative segregation, an indefinite assignment without objective criteria for removal. *Id.* (citing Baird Liability Trial Tr. vol. XIV at 1065:19-1066:11 [Record Document 555]; Goodwin Liability Trial Tr. vol. XVIII at 4415:14-20 [Record Document 562]).

segregation, or non-CCR protective segregation.[10] Ex. JR-60 at ¶ 7 [Record Document 715-54]. Inmates housed in these tiers are confined to their cells for twenty-three hours per day during the week and twenty-four hours per day during the weekend. *Id.* at ¶ 9. There are 128 single bunked dorms in N-3[11] and N-4; N-2A and N-2B also have the capacity to be double bunked. Ex. JR-60 at ¶ 6, 10 [Record Document 715-54]. Inmates housed in these tiers are allowed to spend ten dollars per week at the canteen and do not have access to televisions, radios, radio cassettes, CD players, or AM/FM tuners. Ex. JR-25 at 6-7 [Record Document 715-20]; *see also*, Ex. JR-26 at 3 [Record Document 715-21]. They are allowed four, fifteen-minute phone calls per month, Ex. JR-60 at ¶ 20 [Record Document 715-54], and one hour of exercise in the restrictive recreational area five times per week, *id.* at ¶ 9. Inmates are permitted no-contact visits on the weekends. *Id.* at ¶ 19.

      iii.   <u>N-2C</u>

Inmates housed in the N-2C tier are assigned to working segregation, typically for a period of forty-five to ninety days. Ex. JR-60 at ¶¶ 13, 15 [Record Document 715-54]. Working segregation is a new inmate classification at DWCC that has been implemented since the liability phase of trial. *Id.* at ¶ 4. It could also be considered a transitional program to general population. Burns Remedy Trial Tr. vol. VII at 1580:5-20 [Record Document 710]. There are thirty-two beds in this tier. Ex. JR-60 at ¶11 [Record Document 715-54].

---

[10] The classifications have not changed since the liability phase of trial. As the Court explained in its first opinion, DWCC implemented a new classification policy, which altered some of the terminology used in restrictive housing.

[11] Though N-3 has the capacity to be double bunked, the parties stipulated that the dorms are now single bunked. Ex. JR-60 at ¶¶ 6-10 [Record Document 715-54].

Individuals on this tier are permitted to possess radios, cassette tape players, or CD players and may purchase receivers to listen to the television on the tier. *Id.* at ¶ 15. Inmates here are permitted to eat in the dining hall, exercise in the non-restrictive recreational area for two hours per day, and attend group programming Mondays, Wednesdays, and Fridays for two hours and forty-five minutes. *Id.* Inmates assigned to working segregation are not actually assigned a job; instead, they attend their group programming and enjoy increased access to yard time. Coleman Remedy Trial Tr. vol. I at 24:16-20 [Record Document 704]. They are also permitted to attend religious services. *Id.* Inmates on working segregation may spend forty dollars per week at the canteen. *Id.*

iv.   N-2D

Inmates housed in the N-2D tier are assigned to CCR protective segregation. Ex. JR-60 at ¶ 7 [Record Document 715-54]. Protective segregation is a non-punitive classification that is meant to protect inmates for health or safety reasons. Record Document 641 at 11 (citing Ex. J-3 at 8 [Record Document 564-285]). There are sixteen beds in N-2D. *Id.* at ¶ 12. Inmates on CCR are in their cells for over twenty-two hours per day. Record Document 641 at 11. Inmates who are housed in N-2D for more than ninety days are allowed one contact visit per month. Ex. JR-60 at ¶ 19 [Record Document 715-54]. Inmates on CCR are permitted to possess a radio, cassette tape player, or a CD player. Ex. JR-26 at 6 [Record Document 715-21]. Inmates in CCR are permitted to possess tablets. Goodwin Remedy Trial Tr. vol. XI at 2588:6-9 [Record Document 717]. However, as of the remedy phase of trial, the N-2D tier did not possess wireless internet, making the

12

tablets not functional. *Id.* at 2588:6-25. They are also permitted to own a "reasonable amount" of photographs, six books, six magazines, and religious materials. *Id.* at 6-7.

## C. Corrections Officials

Secretary LeBlanc serves as the Secretary of the DOC, a position he has held since 2008. Secretary LeBlanc Remedy Trial Tr. vol. X at 2128:24-2129:2 [Record Document 713]; Secretary LeBlanc Liability Trial Tr. vol. XI at 2560:20-21 [Record Document 545]. Secretary LeBlanc has been working within the DOC for approximately fifty years, having begun his career at a state women's facility in 1973. *Id.* at 2559:6-9. As the Court mentioned in the liability opinion, Secretary LeBlanc is the final policy maker for the DOC and is responsible for establishing policies and practices related to the mental health care services provided to prisoners in its custody. Record Document 641 at 18-19 (citing Record Document 524 ¶ 144; Secretary LeBlanc Liability Trial Tr. vol. XI at 2562:18-22 [Record Document 545]). Secretary LeBlanc was polished and politic.

Seth Smith ("Chief Smith") serves as the Chief of Operations for the DOC and reports to Secretary LeBlanc. Smith Remedy Trial Tr. vol. VII at 1431:24-1432:5 [Record Document 710]; Secretary LeBlanc Remedy Trial Tr. vol. X at 2129:3-5 [Record Document 713]. Chief Smith has held this position since 2014 and has worked at the DOC in some capacity since 2000. Smith Liability Trial Tr. vol. XI at 2482:22-2483:1, 2533:8-10 [Record Document 545]. Chief Smith directly supervises Blake LeBlanc and Warden Goodwin. Smith Remedy Trial Tr. vol. VII at 1433:7-11 [Record Document 710]. As Chief of Operations, Chief Smith oversees all of the DOC's adult facilities, mental health departments, and medical departments, among other departments and functions within the

DOC. *Id.* at 1432:20-1433:3.[12] The Court found Chief Smith to be forthcoming in his testimony. He was professional and demonstrated a genuine concern for the well-being of inmates.

Blake LeBlanc[13] is the Mental Health Director for the DOC and has served in that capacity since March 2020. Blake LeBlanc Remedy Trial Tr. vol. VI at 1311:7-10, 1313:13-16 [Record Document 709]. He has his undergraduate degree in psychology, a master's degree in social work, is a licensed clinical social worker, and is a board approved clinical supervisor. *Id.* at 1311:13-1312:14. His job responsibilities include reviewing departmental mental health policies and procedures to ensure compliance with the American Correctional Association's ("ACA") standards; coordinating inmate transfers for mental health purposes; consulting with facilities on "difficult cases;" reviewing parts of a facility's C-05 reporting;[14] hosting quarterly meetings with mental health directors from the DOC's facilities; and serving on the Governor's drug policy advisory board. *Id.* at 1314:6-1315:8. Blake LeBlanc's credibility was hurt by his defense of the DOC even in the face of obvious systemic deficiencies. For example, he insisted that Hayden—who has a master's degree in industrial and organizational psychology, and who lacks any mental

---

[12] Chief Smith assumed oversight responsibility over the DOC's medical and mental health departments around May 2022. Smith Remedy Trial Tr. vol. VII at 1432:25-1433:3 [Record Document 710]. Prior to May 2022, Natalie LaBorde oversaw the DOC's medical and mental health departments. *Id.* at 1433:4-6.

[13] To prevent confusion with Secretary LeBlanc, the Court will refer to Blake LeBlanc using his full name. Secretary LeBlanc and Blake LeBlanc do not appear to be related to one another.

[14] As the Court will explain further, a C-05 report is a monthly report, submitted to the DOC by its institutions' wardens, that summarizes activity and other unusual occurrences at their institutions. *See e.g.,* Ex. PR-E-5 [Record Document 716-54].

health degrees, licenses, or certifications—is qualified to determine whether an individual is having a psychotic episode. *See id.* at 1380:4-1382:23.

At the time relevant to the remedy phase, Warden Goodwin was the Warden of DWCC, a role he assumed in 2008.[15] Goodwin Remedy Trial Tr. vol. VIII at 1745:15-16 [Record Document 722]; Goodwin Liability Trial Tr. vol. X at 2192:3-4 [Record Document 544]. He also serves as Regional Warden, overseeing the wardens at Raymond Laborde Correctional Center, B.B. Rayburn Correctional Center, Allen Correctional Center, and the Louisiana Correctional Institute for Women. Goodwin Remedy Trial Tr. vol. VIII at 1747:14-1748:10 [Record Document 722]. Warden Goodwin is supervised by Chief Smith and has never received any corrective actions nor a negative performance review from the DOC. *Id.* at 1745:18-1746:4. Goodwin Liability Trial Tr. vol. X at 2192:9-15 [Record Document 544]. He oversees Deputy Warden Dauzat, Deputy Warden Baird, Executive Management Officer Tommy Garrett, and his assistant Shannon Smith. Goodwin Remedy Trial Tr. vol. VIII at 1746:12-1747:10 [Record Document 722]. Warden Goodwin is a long-time DWCC employee ensconced in the DOC system. His testimony was well-prepared and coached by counsel. Nevertheless, the Court was surprised by Warden Goodwin's lack of general knowledge on the processes and policies at DWCC.[16]

---

[15] The Court learned from another case before it that Warden Goodwin is no longer the warden at DWCC. *See Labit, et al., v. LeBlanc, et al.*, No. 5:22-cv-00371.

[16] The Court notes that during twenty-four distinct lines of questioning, Warden Goodwin responded that he did not know the answer to a question asked by counsel. *See* Goodwin Remedy Trial Tr. vol. VIII at 1753:6, 1769:1, 1773:14, 1826:21, 1851:24, 1864:1 [Record Document 722]; Goodwin Remedy Trial Tr. vol. IX at 1893:16, 1897:7, 1900:18, 1902:6, 1911:1, 1912:15, 1929:5 [Record Document 712]; Goodwin Remedy Trial Tr. vol. XI at 2520:2, 2530:10, 2534:11, 2544:1, 2549:8, 2565:8, 2596:18 [Record Document 717];

Furthermore, Warden Goodwin tried to present DWCC in the best light possible to the point of obfuscating facts. For example, Warden Goodwin did not disclose the existence of this litigation to the ACA during its April 2022 audit of DWCC. *See* Goodwin Remedy Trial Tr. vol. IX at 1932:8-1935:16 [Record Document 712]. Indeed, in response to a direct question during the audit as to whether there was ongoing litigation involving DWCC, Warden Goodwin answered that there had been no hearings, despite the four-week liability phase trial having taken place only a few months before. *Id.* Warden Goodwin's lack of candor with the ACA undercuts not only his own credibility, but also the credibility of DWCC's ACA certification.

Deputy Warden Dauzat has served as deputy warden over the operations of mental health since January 2020 and has worked with the DOC since 1999.[17] Dauzat Liability Trial Tr. vol. XV at 3305:20-3306:14 [Record Document 556]. She is supervised by Warden Goodwin and oversees Hayden, Johnie Adkins, Michelle Norris, Kayla Fall, Assistant Warden Brenda Acklin ("Assistant Warden Acklin"), and Assistant Warden Kayla Sherman ("Assistant Warden Sherman"). Dauzat Remedy Trial Tr. vol. VI at 1182:18-25 [Record Document 726]. Deputy Warden Dauzat holds a bachelor's degree in human ecology, family, and child life studies from Louisiana Tech University and a master's degree in social work from Louisiana State University. She is also a licensed clinical social worker and a board approved clinical supervisor through the Louisiana

---

Goodwin Remedy Trial Tr. vol. XII at 2627:24-2628:1, 2629:9, 2642:7-13, 2682:21 [Record Document 719].

[17] The Court also learned from *Labit*, No. 5:22-cv-00371, that Deputy Warden Dauzat has replaced Warden Goodwin as the Warden of DWCC.

Board of Social Work. Dauzat Liability Trial Tr. vol. XV at 3304:21-3305:3 [Record Document 556]. The Court found Deputy Warden Dauzat to be very professional. She attempted to answer the questions to the best of her ability. She was a credible witness—though at times not fully informed of the processes at DWCC—and demonstrated a genuine willingness to learn and grow from this process.

Assistant Warden Sherman has served as the Assistant Warden over the classification, education, and re-entry departments since March 2020. Sherman Remedy Trial Tr. vol. II at 333:13-340:7 [Record Document 705]. She supervises the ARDC specialists, or classification officers. *Id.* at 333:22-24. Assistant Warden Sherman holds a bachelor's degree in psychology and a master's degree in counseling. *Id.* at 339:12-13. Before assuming her current role, Assistant Warden Sherman worked in DWCC's mental health department, served on a central risk review panel and a sex offender assessment panel, and was responsible for re-entry services. *Id.* at 339:25-340:8. Assistant Warden Sherman answered the questions honestly and to the best of her ability, but she seemed to lack knowledge of material components of her role. For example, although she supervises the ARDC specialists, Assistant Warden Sherman could not enunciate what ARDC stands for. *Id.* at 333:25-334:2.

Assistant Warden Acklin oversees records, pre-classification, and human resources, and she serves as the ADA Coordinator.[18] Ex. PR-BB-1 at 6:25-7:4 [Record Document

---

[18] Assistant Warden Acklin testified via deposition in lieu of live testimony and is not a party to this case. Her testimony is located at Ex. PR-BB-1 [Record Document 714-1].

714-1]. She was promoted to the assistant warden position in March 2020,[19] having previously served as an ARDC manager for eight years. *Id.* at 7:5-14. Assistant Warden Acklin currently reports to Assistant Warden Sherman. *Id.* at 11:5-6. She has worked at DWCC for over twenty-nine years. *Id.* at 7:10-11. Assistant Warden Acklin's responsibilities as ADA Coordinator include "receiv[ing] any concerns an offender may have or an employee may have concerning any accommodations that they think may be needed for them to live or work [at DWCC]." *Id.* at 11:13-17. While the Court found some of her contextual testimony to be helpful, Assistant Warden Acklin lacked knowledge of the ADA-required policies and procedures.

Assistant Warden Tyrone Mays ("Assistant Warden Mays") oversees security at DWCC. Ex. PR-BB-4 at 5:9-11, 6:4-7. [Record Document 714-4].[20] He has occupied this role since March 2020. *Id.* at 7:3-7. Deputy Warden Baird is his direct supervisor. *Id.* at 7:10-11. Assistant Warden Mays directly supervises the security unit managers, including Vincent Coleman. *Id.* at 6:11-13; Coleman Remedy Trial Tr. vol. I at 16:8-10 [Record Document 704].

Hayden is a Corrections Program Manager at DWCC and has held that position since before the liability phase. Hayden Remedy Trial Tr. vol. V at 959:13-17 [Record Document 708]. Hayden has a master's degree in industrial and organizational psychology but does not hold any professional licenses. Hayden Liability Trial Tr. vol. II at 315:20-

---

[19] Before her retirement, Assistant Warden Huff was the ADA Coordinator until Assistant Warden Acklin took over the position. Ex. PR-BB-1 at 11:8-9 [Record Document 714-1].
[20] Assistant Warden Mays testified via deposition in lieu of live testimony and is not a party to this case. His testimony is located at Ex. PR-BB-4 [Record Document 714-4].

316:8 [Record Document 534]. He is supervised by Deputy Warden Dauzat, and he supervises James Burgos, Aerial Robinson, Julia Spivey, and Lisa Wells. Hayden Remedy Trial Tr. vol. V at 959:21-960:1 [Record Document 708]. Hayden was slightly more responsive in his testimony during this phase of the proceedings than he was in the first, *see* Record Document 641 at 22 nn. 22-25, but was still defensive, evasive in his responses, and had to be admonished to answer questions.[21]

James Burgos ("Burgos") is a professional counselor at DWCC, having served in that capacity since before March 2020. Burgos Remedy Trial Tr. vol. III at 687:21-24 [Record Document 706]. He began working at DWCC in early 2019. Burgos Liability Trial Tr. vol. XVI at 3779:24-3780:2 [Record Document 560]. Burgos is a licensed professional counselor. Burgos Remedy Trial Tr. vol. III at 687:25-688:2 [Record Document 706]; *see also* Ex. PR-F-2 [Record Document 716-79].[22] Burgos holds a master's degree in guidance and counseling from Louisiana Tech University. Burgos Liability Trial Tr. vol. XVI at 3778:10-17 [Record Document 560]. Burgos is supervised by Hayden. Burgos Remedy Trial Tr. vol. III at 689:5-689:9. [Record Document 706]. Burgos was responsible for two

---

[21] There were eight instances where Hayden stated that he did not know basic information related to his role. *See* Hayden Remedy Trial Tr. vol. V at 962:18-963:8, 991:14-16, 1055:16-19, 1098:20-21 [Record Document 708]; Hayden Remedy Trial Tr. vol. VI at 1140:16-22, 1146:14-25, 1147:3-10, 1158:8 [Record Document 709]. Furthermore, Hayden's testimony contradicted his deposition two times. *See* Hayden Remedy Trial Tr. vol. V at 1009:9-1010:15, 1072:23-1074:11 [Record Document 708]. Hayden was admonished to answer a question six times. *See* Hayden Remedy Trial Tr. vol. V at 1019:4-8, 1028:2-12, 1083:13-14, 1102:18-21 [Record Document 708]; Hayden Remedy Trial Tr. vol. VI at 1164:5-11, 1171:8-1172:8. [Record Document 709].
[22] Burgos also acquired a license to "supervise trainees as they graduate school," in November 2022, after the discovery cutoff date. Burgos Remedy Trial Tr. vol. III at 688:5-9 [Record Document 706].

tiers on the North Compound, H-1 and H-2,[23] as well as the N-1, and N-2 tiers from March 2020 through June 2022; in June 2022, his workload was adjusted, and he was responsible for only the N-1 and N-2 tiers. *Id.* at 689:10-25. Since September 2022—after the discovery cutoff date—Burgos became responsible for N-3 and N-4 tiers. *Id.* at 690. Burgos was professional and demonstrated a genuine care for the inmates and a willingness to learn from this process but the Court determined that he does not challenge status quo policies and procedures that are below the requisite standard.

Robinson is a social worker at DWCC, where she has worked since September 2016. Robinson Remedy Trial Tr. vol. IX at 2026:23-2027:11 [Record Document 712]. Robinson holds bachelor's and master's degrees in social work and is a licensed clinical social worker. *Id.* at 2027:5-9. Robinson is primarily responsible for H-1, H-2, and H-5, and is available to provide support on the South Compound as needed. *Id.* at 2028:6-16. She also is responsible for creating the heat duty status lists, LOC-3 lists, and she compiles an inmate's medical records ahead of his psychiatric appointment with Dr. Seal. *Id.* at 2029:13-19, 2031:11-2032:3, 2036:8-15. Hayden directly supervises Robinson. *Id.* at 2027:14-15. Robinson was professional and demonstrated a genuine care for DWCC's inmates. For example, Robinson seems to demonstrate a higher caliber of documenting inmate interactions. However, like Burgos, Robinson appears to focus solely on complying with current policies and procedures as to DWCC's provision of mental health care without any challenge to those status quo policies and procedures that are below the requisite

---

[23] The "H" tiers are located on the North Compound, which is not at issue in the present action.

standard. She also seems unaware of how her actions and responsibilities affect the prisoners. For example, even though she creates the lists for those on heat duty status and for those classified as LOC-3 and provides those lists to the key room officers, she did not know how these lists were used, if at all.

Dr. Seal is the contract psychiatrist for DWCC. Seal Remedy Trial Tr. vol. III at 617:18-20 [Record Document 706]. Dr. Seal is board-certified in general psychiatry, having received his medical degree from Louisiana State University School of Medicine in Shreveport and completed his residency at the United States Air Force's Wilford Hall Medical Center. Seal Liability Trial Tr. vol. XVII at 3844:6-25 [Record Document 561]. Dr. Seal has been performing contract psychiatry for the DOC since 2009. *Id.* at 3848:25-3849:3. In early 2021, Dr. Seal's contracted hours increased from eight in-person hours every other week to four hours of telemedicine twice a week. Seal Remedy Trial Tr. vol. III at 618:19-620:25 [Record Document 706]. The Court finds that Dr. Seal's credibility was called into question after he falsely testified about his schedule and how many days he works. The evidence showed that he had failed to fulfill the terms of his contract and had not worked the requisite shifts and/or hours per week. *See ex. id.* at 621:3-622:14, 631:7-632:5. Dr. Seal perceives his duties as limited to seeing the inmates for their brief appointments with him in which he only prescribes medicine. He does not take any initiative or responsibility for areas outside of these visits that would impact his patients' quality of care. For example, as this Court will enunciate in greater depth, he had no knowledge of the conditions of segregated housing nor of the conditions of treatment

segregation. Moreover, he did not know what other modalities of mental health treatment, if any, were available to his inmate patients.

Coleman is the security colonel for the South Compound at DWCC, having assumed that role in May 2020. Coleman Remedy Trial Tr. vol. I at 15:22-16:3 [Record Document 704]. He has worked at DWCC since 2002, working himself up to the position of security colonel from cadet. *Id*. at 1539:20-22. In his capacity as security colonel, Coleman oversees all security personnel in the N-1, N-2, N-3, and N-4 buildings; he is supervised by Assistant Warden Mays. Coleman Remedy Trial Tr. vol. I at 16:4-10 [Record Document 704]. During trial, Coleman's responses were focused on his responsibilities as they relate to DWCC's security and operations to the point that he appeared to actively ignore what else may be going on around him. In his view, his responsibility is limited solely to security operations; any issues of how security affects those inmates experiencing mental health issues are not his responsibility or concern. Additionally, he failed to appreciate the impact of mental illness on an inmate's behavior. He exhibited a greater amount of knowledge of the mental health department during his remedy phase testimony than his liability phase testimony. Coleman was well-prepared by counsel and relied on stock/conclusory answers to many questions. One example of this was Coleman's repeated use of the phrase "safety and stability of the institution" in replying to questioning without any further context or explanation. *Id.* at 121:10-11.

Ryan Kimball ("Kimball") is an ARDC specialist and classification officer for all prisoners housed in the N-1, N-2, N-3, and N-4 buildings, having served in that position since October 2020. Kimball Remedy Trial Tr. vol. I at 189:2-20 [Record Document 704].

Assistant Warden Sherman is his direct supervisor. *Id.* at 189:15-17. ARDC specialists are primarily responsible for "assist[ing] in the stability of the institution through proper placement of prison housing jobs and custody status." *Id.* at 189:11-13. Kimball appeared to have a genuine concern for inmate well-being. However, he did not challenge the status quo when it fell below the requisite standards. His testimony was couched in statements of what he specifically does or what "could happen," but he was unable to enunciate the required processes as outlined by policy or what standard procedure is at DWCC. For example, Kimball testified that during a meeting before the classification review board, he typically does not look past one year's worth of rule violations reports ("RVRs") when considering an inmate's assignment; however, he was not able to point to a specific written policy governing this process. Kimball Remedy Trial Tr. vol. II at 287:5-288:1 [Record Document 705].

Lonnie Nail ("Nail") is a lieutenant-colonel at DWCC in charge of internal affairs investigations, a position he has held since April 2021. Nail Remedy Trial Tr. vol. I at 142:19-143:2 [Record Document 704]. He reports directly to Warden Goodwin, who assigns Nail the matters to be investigated. *Id.* at 143:3-144:21. Prior to assuming his current role, Nail served as the colonel over the South Compound.[24] *Id.* at 143:5-7. In total, Nail has been employed at DWCC for over thirty years in different capacities. But, during his testimony, Nail demonstrated an unfamiliarity with DWCC policies and procedures,

---

[24] Nail explained that he worked for DWCC from 1991 to 2019, when he left the DOC. Nail Remedy Trial Tr. vol. I at 143:15-17. He began working for DWCC again in March 2020, coming back in a "worked as employed" capacity. *Id.* at 143:23-155:2.

such as the policies governing suicide and the disciplinary matrix. The Court found Nail's testimony to be illustrative of the culture of DWCC's long-time employees—he was defensive, evasive in his responses, and was admonished by the Court to answer questions.[25]

Michelle Norris ("Norris") is the Director of Nursing at DWCC and has occupied that role since late 2020.[26] Ex. PR-BB-5 at 6:5-11. [Record Document 714-5]. Prior to assuming the role as Director of Nursing, Norris's title was RN Supervisor B. *Id.* at 6:14-16. She currently oversees the Assistant Director of Nursing and RN Supervisors on the North and South Compounds. *Id.* at 11:21-12:5.

Austin Burns[27] and Cody Rimmer ("Rimmer") are the Pill Call Officers for the South Compound.[28] Ex. PR-BB-2 at 8:14-16 [Record Document 714-2]; Ex. PR-BB-3 at 8:7-8 [Record Document 714-3]. They are security officers and report to Coleman. Ex. PR-BB-2 at 8:23-24 [Record Document 714-2]; Ex. PR-BB-3 at 8:13-14 [Record Document 714-3]. The men are assigned opposite schedules wherein one Pill Call Officer will work from 4:45 a.m. until 5:00 p.m. two days a week the first week and from 4:45 a.m. until 5:00 p.m. five days a week the second week, while the other Pill Call Officer works the opposite

---

[25] The Court notes ten instances where Nail acted evasively or failed to answer a question. *See* Nail Remedy Trial Transcript vol. I at 145:4, 145:10, 153:8, 155:19-20, 157:19, 157:25, 162:19-22, 163:6-7, 169:1-13, and 181:7-182:22 [Record Document 704].

[26] Norris testified via deposition in lieu of live testimony and is not a party to this case. Her testimony is located at Ex. PR-BB-5 [Record Document 714-5].

[27] To prevent confusion with Dr. Burns, the Court will refer to Austin Burns by his full name. Dr. Burns and Austin Burns are not related to one another.

[28] Austin Burns and Rimmer testified via deposition in lieu of live testimony and are not parties to this case. Austin Burns's testimony is located at Ex. PR-BB-2 [Record Document 714-2]. Rimmer's testimony is located at Ex. PR-BB-3 [Record Document 714-3].

schedule. Ex. PR-BB-3 at 24:24-25:22. [Record Document 714-3]. Austin Burns has an associate degree in criminal justice and has worked at DWCC for the past three years. Ex. PR-BB-2 at 7:13-21 [Record Document 714-2]. Rimmer has worked at DWCC for approximately seven years and has been a Pill Call Officer on the South Compound since October 2020. Ex. PR-BB-3 at 7:14-8:12 [Record Document 714-3]. These officers are new to their roles since the liability phase of trial.

### D. Expert Witnesses

The Court was aided by the testimony of the same five expert witnesses who testified at the liability phase of trial: Dan Pacholke, Dr. Craig Haney, and Dr. Kathryn Burns served as Plaintiffs' experts, while Dr. John Thompson and James Upchurch served as Defendants' experts.[29] This section provides a brief introduction to each expert, their methodology, and the Court's impressions of their testimony.

#### i. Dan Pacholke

Dan Pacholke ("Secretary Pacholke") appeared as an expert for Plaintiffs. Secretary Pacholke's qualifications and curriculum vitae have not materially changed since the liability phase of trial. Secretary Pacholke worked in prison operations with the Washington State Department of Corrections for over thirty-three years, serving in various capacities including Superintendent, Director of the Prisons Fivision, and even Secretary of the Washington State Department of Corrections. Pacholke Liability Trial Tr. vol. XI at

---

[29] As was the case during the liability phase of trial, Dr. Seal was permitted to testify as a "treating physician." However, he did provide the Court with information as to the limited duties of the treating psychiatrist as well as how he fulfilled those duties.

2601:6-2603:16 [Record Document 545]. The Court certified Secretary Pacholke as an expert in corrections operations during both phases of trial. *Id.* at 2613:12-17; Pacholke Remedy Trial Tr. vol. II at 451:6-8 [Record Document 705].

In preparing his remedy phase expert report, Secretary Pacholke reviewed a "wide range" of documents, including institutional and departmental policies on segregation, DWCC post orders, C-05 reports, classification review board forms, inmate records, training documents, and new inmate orientation materials. Pacholke Remedy Trial Tr. vol. II at 454:18-455:4 [Record Document 705]. He also conducted a three-day site visit to DWCC in June 2022. *Id.* at 455:5-18. During that visit, Secretary Pacholke visited "all places where an inmate in segregation might be." *Id.* at 455:19-23. Those places include the visiting area, infirmary, cells, recreation area, and almost all tiers on the N-1, N-2, N-3, and N-4 units. *Id.* at 455:23-456:6. Secretary Pacholke testified that he spoke to forty-two inmates at the cell-front and twelve inmates in a one-on-one setting; these inmates were chosen from "all types of segregated housing." *Id.* at 456:7-15.

The Court found Secretary Pacholke to be a credible expert witness. He was forthright, did not shy away from or attempt to avoid answering questions, and demonstrated extensive knowledge and expertise regarding a wide breadth of authorities in his designated area.

ii. Dr. Craig Haney

Craig Haney, Ph.D., J.D., ("Dr. Haney"), appeared as an expert for Plaintiffs. At both the liability and remedy phases of trial, the Court accepted Dr. Haney as an expert in

social psychology[30] and solitary confinement. Haney Liability Trial Tr. vol. XII at 2853:24-

2854:3 [Record Document 553]; Haney Remedy Trial Tr. vol. X at 2172:14-2173:1

[Record Document 713]. Dr. Haney's qualifications have not materially changed since the

liability phase of trial. Dr. Haney holds a Ph.D. in psychology from Stanford University

and a J.D. from Stanford Law School.[31] Haney Liability Trial Tr. vol. XII at 2846:16-23

[Record Document 553]. He has been a Professor of Psychology at the University of

California at Santa Cruz for over forty years, specializing in the intersection of psychology

and law, and has published articles on the topics of solitary confinement and imprisonment

throughout his career. *Id.* at 2847:24-2851:7.

Dr. Haney visited DWCC in late June 2022 to assist in the preparation of his expert

report. He visited the South Compound units—including N-1, N-2, N-3, and N-4—the

visiting area, and the infirmary. Haney Remedy Trial Tr. vol. X at 2178:25-2179:15

[Record Document 713]. Dr. Haney conducted thirty-four cell-front interviews with

inmates chosen at random, *id.* at 2179:19-25, and eleven confidential, individual

interviews, *see* PR-AA-1 ¶¶ 87-102 [Record Document 716-159]. Of those eleven

individuals, three were follow-up interviews with inmates Dr. Haney had seen in 2019 and

eight were chosen from the cell-front interviews. *Id.* at ¶¶ 87, 91; *see also*, Haney Remedy

---

[30] As explained in the liability phase opinion, social psychology "is the study of how people
are changed and affected by the settings or the situations or the environments in which they
find themselves, and we study a range of different kinds of environments." *See* Record
Document 641 at 25-26 (citing Haney Liability Trial Tr. vol. XII at 2847:5-8 [Record
Document 553]).

[31] It is important to reiterate that Dr. Haney is not a clinical psychiatrist and cannot
diagnose. Haney Liability Trial Tr. vol. XII at 2851:25-2852:4 [Record Document 553].

Trial Tr. vol. X at 2181:16-2183:24 [Record Document 713]. Dr. Haney stated that he also reviewed depositions, institutional and departmental policies, inmate master prison records, inmate medical and mental health records, unusual occurrence reports ("UORs"), body camera videos, the C-05 reports, staff licenses, classification review board documents, death reports, training materials, meeting minutes, continuous confinement reports, administrative remedy procedures, requests for accommodations, prisoner orientation materials, strip cell status documentation, investigative records, treatment segregation records, prisoner education workbooks, tier books, logbooks, LOC and heat duty lists, and the ACA's audit report of DWCC. *See* PR-AA-2 at 159-187 [Record Document 716-159]. The Court found Dr. Haney's testimony to be credible and compelling, and the Court relied upon his testimony to the same extent that it did during the liability phase of trial.

      iii.  <u>Dr. Kathryn Burns</u>

Kathryn Burns, M.D. ("Dr. Burns"), appeared as an expert for Plaintiffs. At both phases of trial, the Court accepted Dr. Burns as an expert in clinical psychiatry and corrections systems. Burns Liability Trial Tr. vol. V at 1260:2-6 [Record Document 539]; Burns Remedy Trial Tr. vol. VII at 1521:18-24 [Record Document 710]. Dr. Burns's qualifications have not materially changed since the liability phase of trial. Burns Remedy Trial Tr. vol. VII at 1522:1-14 [Record Document 710]. She is a board-certified psychiatrist, the former chief psychiatrist for the Ohio Department of Corrections, and has served as a corrections consultant, expert witness, and monitor in multiple prison litigation

suits. Burns Liability Trial Tr. vol. V at 1239:22-25, 1248:1-20, 1250:3-1251:10 [Record Document 539].

In preparing her opinion, Dr. Burns made a site visit to DWCC in June 2022, during which time she visited the working segregation tier, as well as N-2C, N-4C, and N-4D. Burns Remedy Trial Tr. vol. VII at 1527:13-16 [Record Document 710]. Dr. Burns spoke to eighteen inmates at cell-front. *Id.* at 1527:2-14; *see also* Ex. PR-AA-1 at 4 [Record Document 716-155]. She was able to interview eleven individuals in a one-on-one setting: she met with three individuals whom she had interviewed during her liability phase visit; two whom she selected from cell-front interviews; two inmates who were referred by Secretary Pacholke and Dr. Haney; and four who were selected using a random generator. *Id.* at 1530:3-18. She also testified that she reviewed policies, medical records, death records, staff trainings, body camera videos, progress notes, staff qualifications, mental health forms, treatment forms, the Court's liability opinion, depositions, and Defendants' expert reports. Ex. PR-AA-1 at 4 [Record Document 716-155].

Out of all the experts, Dr. Burns possesses the most credentials and experience to allow her to opine on the intersection of prison systems and mental health issues. Although her opinions were attacked by the Defendants, her expertise was not. Burns Remedy Trial Tr. vol. VII at 1521:18-23 [Record Document 710]. Her testimony was helpful to the Court in its findings in this phase, as it was during the liability phase.

                    iv.  <u>Dr. John Thompson</u>

John Thompson, M.D. ("Dr. Thompson"), appeared as an expert for Defendants. Dr. Thompson's qualifications and curriculum vitae have not materially changed since the

liability phase of trial. The Court certified Dr. Thompson as an expert in forensic psychiatry.[32] Thompson Liability Trial Tr. vol. XVII at 3962:6-7 [Record Document 561]; Thompson Remedy Trial Tr. vol. XIII at 2827:2-9 [Record Document 720]. Dr. Thompson is board-certified in general psychiatry and serves as the Chief of Staff at East Louisiana Mental Health System and the chairman of the Department of Psychiatry at Tulane University. Thompson Liability Trial Tr. vol. XVII at 3944:14-3946:25 [Record Document 561].

In preparing his expert report for the remedy phase, Dr. Thompson and his associate, Dr. Sankep Vyas, visited DWCC in late June 2022. Thompson Remedy Trial Tr. vol. XIII at 2827:25-2828:5 [Record Document 720]. During that tour, Dr. Thompson and Dr. Vyas interviewed twenty-five inmates who had been interviewed during a previous visit to DWCC. *Id.* at 2828:6-14. They also toured the South Compound—including the cells dedicated to suicide watch—observed an intake screening process and an initial classification review board, and reviewed all of the LOC-3 evaluations from June 2022, copies of the most recent inmate interactions with Dr. Seal, inmate medical records, depositions, departmental and institutional policies, the Prison Rape Elimination Act ("PREA") audit report, the ACA's audit report, and other documents produced during the remedy phase. *See id.* at 2830:10-2831:11; Ex. DR-17 at 2-3 [Record Document 718-14].

---

[32] Dr. Thompson defined forensic psychiatry as the point at which psychiatry interfaces with the law and can include commenting on rules and regulations to legislators, correctional psychiatry, inpatient state hospital psychiatric care, or medical malpractice. Thompson Liability Trial Tr. vol. XVII at 3944:1-13 [Record Document 561].

Dr. Thompson's credibility as an expert was diminished by his own—and those of his two associates'—current and prior associations with the DOC. Specifically, Dr. Thompson's employer, Tulane University, contracts with the DOC to provide psychiatric services at various DOC facilities. *Id.* at 2840:9-13. Although Dr. Thompson is not paid directly by the DOC, Tulane University (who does pay and employ him) is paid by the DOC for Dr. Thompson's services as the Chief of Staff at the East Louisiana Mental Health System. *Id.* at 2839:18-20. Dr. Herman Soong, who assisted Dr. Thompson during the liability phase by helping to conduct offender interviews, was hired by the DOC after the liability phase of trial to provide general consulting services on the "psychiatric conditions" at various facilities and to provide recommendations to those facilities on any changes that could be made to improve those conditions. *Id.* at 2836:12-25; *accord* Blake LeBlanc Remedy Trial Tr. vol. VI at 1348:17-1350:11 [Record Document 709]. Dr. Vyas, who assisted Dr. Thompson during both phases of trial in conducting inmate interviews, contracts with the DOC to provide psychiatric services at the Orleans Justice Center. *Id.* at 2839:8-11.

As the Court noted in its liability phase opinion, Dr. Thompson's experience in prison systems pales in comparison to Plaintiffs' experts. Record Document 641 at 31. For example, he does not provide services in a prison setting. Thompson Liability Trial Tr. vol. at 3958:10-21 [Record Document 561]. East Louisiana Mental Health System is a medical facility, not a prison. The Court notes the absence of any publications by Dr. Thompson on the effects of solitary confinement on mental health. *Id.* at 3961:10-17. Certainly, the Court does not doubt Dr. Thompson's expertise in the areas in which he has practiced or

researched. However, his practice in prison settings has been very limited, and he has not performed personal research on the questions at issue in this lawsuit.

In this remedy phase of trial, Dr. Thompson spent most of his testimony quarrelling with the Court's fact findings from the liability phase ruling. Specifically, during the liability phase of trial, Dr. Thompson took the position that long-term stays on extended lockdown do not have any adverse psychological effects on prisoners, whether or not they suffer from a mental illness. In its liability phase opinion, the Court weighed the expert and fact testimony and found to the contrary. But Dr. Thompson's testimony in the remedy phase continued to argue his prior position. He had to be reminded by the Court that the issue had been decided. These considerations, as well as Dr. Thompson's lack of expertise and experience as compared with Plaintiffs' experts, affected the weight that the Court could afford his testimony in this case.

v.  <u>James Upchurch</u>

James Upchurch ("Upchurch") appeared as an expert for Defendants. Upchurch's qualifications and curriculum vitae have not materially changed since the liability phase of trial. The Court certified Upchurch as an expert in prison operations and security during both phases of trial.[33] *See* Upchurch Liability Trial Tr. vol. XIV at 3178:12-18 [Record Document 555]; Upchurch Remedy Trial Tr. vol. XII at 2701:15-20 [Record Document 719]. Upchurch has over forty years of experience in corrections, mainly in the areas of

---

[33] During the liability phase, the Court declined to certify Upchurch as an expert in segregated housing. Upchurch Liability Trial Tr. Upchurch Liability Trial Tr. vol. XIV at 3192:3-10 [Record Document 555]

security and operations, across institutions in Arizona, Mississippi, and Florida. Record Document 641 at 32. Most recently, Upchurch was the Director of Operations and Support Deputy Assistant Secretary for the Florida Department of Corrections. *Id.* He holds a master's degree in interdisciplinary sciences, along with public administration and management certifications from Arizona State University, the National Institute of Corrections, and the University of Southern California. Upchurch Liability Trial Tr. vol. XIV at 3178:12-23 [Record Document 555].

Upchurch conducted a site visit to DWCC on June 20-21, 2022, in preparation for the remedy phase of litigation. Upchurch Remedy Trial Tr. vol. XII at 2713:11-15 [Record Document 719]. During that visit, Upchurch spent much of his time on the South Compound, touring the N-1, N-2, N-3, and N-4 tiers and their exercise areas, and testified that he was able to observe Hayden's mental health intake process, a meeting of the classification review board, and a meeting of the multi-disciplinary review board. *Id.* at 2713:16-2714:10, 2721:19. He reviewed various institutional and departmental policies, the ACA's audit report, institutional and departmental information about the inmate population, ACA standards, the PREA report, the orientation manual, the segregated housing handbook, department meeting minutes, inmate death reports, classification and multi-disciplinary review boards, continuous confinement reports, and other secondary literature on prison operations and segregated housing. Ex. DR-7 at 3-6 [Record Document 718-3].

The Court did not find Upchurch to be a reliable expert witness. Upchurch stumbled through testimony, rambled, could not locate pages within his own report, and gave the

overall impression that he was unfamiliar with basic processes and procedures at DWCC. For example, Upchurch indicated that he attended what he thought could have been the initial classification boards for inmates, though he was not sure of the nature of those meetings he attended and thought they were perhaps a meet-and-greet with Warden Goodwin. *See* Upchurch Remedy Trial Tr. vol. XII at 2729:2-2731:18 15 [Record Document 719]. As such, the Court was unable to determine what kind of meeting Upchurch attended. Certainly, there was no testimony by any other witness—for the Plaintiffs or the Defendants—that there is a meet-and-greet with Warden Goodwin as part of the intake process. Upchurch's testimony is telling as to both his lack of understanding of the procedures at DWCC and as to the unstructured nature of the initial classification board meetings. The Court also notes that Upchurch's background is highly centered upon prison operations, and more specifically, prison security, and as a result, the Court found that he had little insight into the mental health aspect of this case.

## V. __Eighth Amendment Claims__

### A. Eighth Amendment Standard

Plaintiffs bring their Eighth Amendment claims pursuant to 42 U.S.C. § 1983.[34] "Central to all other corrections goals is the institutional consideration of internal security

---

[34] Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not create substantive rights but provides remedies to the rights established in the United States Constitution and other federal laws. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985). To assert a claim for damages under this statute, a plaintiff must demonstrate "(1) a deprivation of a right secured by federal

within the corrections facilities themselves." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979)

(quoting *Pell v. Procunier* 417 U.S. 817, 823 (1974)). Prison officials are afforded wide

discretion "in the application of policies and practices designed to maintain security and

preserve internal order." *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990). This

includes separating inmates from other inmates, imposing discipline, and using reasonable

force. *See id.*; *see also Turner v. Lynaugh*, 1994 WL 652587, at *4 (5th Cir. 1994) (per

curiam).

At the same time, the Eighth Amendment grants all persons the right to be free from

"cruel and unusual punishments." U.S. Const. amend. VIII ("Excessive bail shall not be

required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

Although the Eighth Amendment "does not mandate comfortable prisons," *Rhodes v.

Chapman*, 452 U.S. 337, 349 (1981), "[p]rison officials must provide humane conditions

of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and

medical care, and must take reasonable measure to ensure the safety of the inmates," *Gates

v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). "[M]ental health needs are no less serious than

physical needs." *Id.* "While the prison administration may punish, it may not do so in a

manner that threatens the physical and *mental health* of prisoners." *Young v. Quinlan*, 960

F.2d 351, 364 (3d Cir. 1992) (cleaned up) (emphasis added).

As stated above, the Eighth Amendment mandates inmates be housed in humane

conditions, though not necessarily comfortable ones. *Rhodes*, 452 U.S. at 349; *Cook*, 376

---

law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria
W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

F.3d at 332. In determining whether prison officials have violated the Eighth Amendment, courts must apply a two-part test. The first part is an objective test; courts must consider whether the alleged constitutional deprivation is of a "sufficiently serious" nature. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (summarizing the objective component as asking whether the deprivation was "sufficiently serious"). To be sufficiently serious, the alleged deprivation must result in the denial of the "minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 347, or result in inmates being housed under conditions that pose a substantial risk of serious harm, *Farmer*, 511 U.S. at 834. *See also Helling v. McKinney*, 509 U.S. 25, 35 (1993). The United States Supreme Court has made clear that these standards are not static but should be based on "the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)); *see also Farmer*, 511 U.S. at 833-34.

The second part of the test is subjective; the fact finder must determine whether the defendants were deliberately indifferent to an inmate's health and safety. "A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'" *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). An obvious risk could be sufficient to allow a fact finder to conclude that prison officials knew of the risk. *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) (citing *Cook*, 376 F.3d at 340); *see Farmer*, 511 U.S. at 842; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Willful blindness is not a defense. *See Farmer*, 511 U.S. at 843 n.8 (stating a defendant "would not escape liability if the

36

evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"). "The long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent . . ." *Wilson*, 501 U.S. at 300.

### B. Conditions of Confinement

In its prior ruling, the Court determined that Plaintiffs were able to meet their burden in proving that the conditions, policies, and practices in place on the South Compound constituted cruel and unusual punishment and that Defendants were deliberately indifferent in housing inmates under such conditions without taking any reasonable steps to alleviate those conditions. Moreover, the Court held that Defendants' actions violated the Eighth Amendment. Specifically, the Court found that DWCC confined its inmates in extremely small cells for twenty-three to twenty-four hours per day with little to no meaningful human contact, mental stimulation, and exercise, sometimes for years at a time. This practice, combined with DWCC's use of strip cell status, subjected inmates to extreme psychological pain and suffering. Additionally, for inmates diagnosed with a mental illness, the conditions of extended lockdown and assignment to strip cell status only exacerbated their mental health symptoms. As a result, Defendants showed a wanton disregard for the mental health of the inmates on the South Compound.

### i. Substantial Risk of Serious Harm

The Court turns first to the objective test to determine whether DWCC's treatment of inmates housed on extended lockdown continues to constitute cruel and unusual punishment and will continue to constitute cruel and unusual punishment into the future.

37

"There is a line where solitary confinement conditions become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment." *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974). "[A] remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33. "Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Cook*, 376 F.3d at 333 (citation omitted). "It goes without question that an incarceration that inflicts daily, permanently damaging, physical injury and pain is unconstitutional. . . . [T]he same standards that protect against physical torture prohibit mental torture as well—including the mental torture of excessive deprivation." *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999), *rev'd on other grounds*, *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001) (citation omitted). "Mental health, just as much as physical health, is a mainstay of life. Indeed, it is beyond any serious dispute that mental health is a need as essential to a meaningful human existence as other basic physical demands our bodies may make for shelter, warmth or sanitation." *Madrid v. Gomez*, 889 F. Supp. 1146, 1264 (N.D. Cal. 1995). If "the particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture." *Id.* at 1264.

38

1. *Psychological Harms of Solitary Confinement*

In its liability phase opinion, the Court concluded that the severity of the conditions and length of time an inmate spends on extended lockdown put that inmate at a serious risk of harm. Record Document 641 at 38-43. During that trial, Dr. Haney—who spent over forty years of his career studying the psychological effects of solitary confinement—opined that a lack of meaningful human contact and social isolation for extended periods of time could result in permanent psychological and physical harm. *Id.* at 39-40. Dr. Burns testified regarding a consensus within the field of correctional psychiatry that inmates with mental illness are at a greater risk of decompensation because the conditions of restrictive housing can exacerbate their mental illness. *Id.* at 40-41. Dr. Thompson challenged Plaintiffs' experts' opinions by citing to the Colorado Study, a one-year study into Colorado's prison system. *Id.* at 41-42. Ultimately, the Court was not convinced by the Colorado Study's applicability to conditions of confinement at DWCC, finding that inmates in Colorado were allowed various privileges that inmates at DWCC were not. *Id.* at 42.

During the remedy phase of trial, Defendants, however, maintained their position that long-term incarceration on extended lockdown does not result in psychological harm to inmates with or without a mental illness. The Court permitted the parties to present additional evidence of the psychological harms of solitary confinement. The experts' testimony on the psychological harms of solitary confinement mainly consisted of reiterations of the same literature and studies discussed during the liability phase of trial. As such, the Court sees no reason to depart from its prior finding that solitary confinement

39

can have permanent, long-lasting effects on inmates, especially those suffering from mental illness.

Although not offered into evidence by the parties, the Court's own experience with federal prisons allows it to take judicial notice of the Federal Bureau of Prison's ("BOP") position on restrictive housing. This position is reflected in a recent joint statement by Colette Peters, Director of the BOP, and Nancy La Vigne, Director of the National Institute of Justice:

> Our decades-long experience as a correctional leader and policy researcher have made us keenly aware of the harms that restrictive housing may cause to a person's mental, emotional, and physical well-being. NIJ-sponsored research on restrictive housing has found that it is not an effective deterrent, with studies yielding mixed results on its impact on misconduct and recidivism and generally finding that it does not reduce institutional-level misconduct or violence. In fact, two studies sponsored by NIJ found evidence of an increased likelihood of recidivism after release from incarceration that involved restrictive housing compared to those who did not experience restrictive housing.

Colette Peters, Nancy La Vigne, *Restrictive Housing Practices Statement of Work*, FEDERAL BUREAU OF PRISONS (May 5, 2023), https://www.bop.gov/resources/news/20230505_research_on_restrictive_housing.jsp (last visited June 11, 2024).

For these reasons, the Court's opinion regarding the harmful effect of both the length of time and the conditions of segregated housing on inmates, especially on those with mental illness, is unchanged. The Court finds in general that this harm, which Defendants have been unable to remedy, continues and will continue to persist into the future.

40

2. *Conditions on the South Compound*

In its liability phase opinion, the Court held that the physical composition of the cells on extended lockdown, the social isolation and enforced idleness, the length of time that inmates spend on extended lockdown, and the available disciplinary sanctions all put inmates on extended lockdown at a substantial risk of physical and emotional harm. The Court will evaluate whether Defendants were able to remedy the deficiencies in each of these areas in turn.

a. Physical Composition and Environment

Previously, the Court found that the physical composition of the tiers on the South Compound were "designed to reduce activity and positive stimulation," noting the small size of the cells, the double bunking of cells, the lack of visual stimulation, the fluctuating noise levels, and the lack of adequate climate controls. Record Document 641 at 43-46. The Court will address each below.

i. Size of the Cell

Previously, the Court determined that the cells in restrictive housing were too small and non-compliant with ACA standards. *Id.* at 43. Specifically, the Court held that:

> The cells in buildings N-1 through N-4 are stark and extremely small—approximately fifty-six square feet, which is non-compliant with the American Correctional Association standards for cell size and substantially smaller than other isolation units throughout the country. . . . The cells have either a single or a double built-in bunk, a toilet-sink unit, a mirror, and a metal footlocker for storing items.

*Id.* (internal citations omitted). The parties stipulated that the size of the cells on extended lockdown have not changed since the liability phase of trial. *See* Ex. JR-60 at ¶ 8 [Record

Document 715-54]. As such, the Court finds that Defendants have failed to remedy this deficient condition. Plaintiffs were able to prove that the deficient condition persists and will continue to persist into the future.

ii. Double Bunking

The Court also held that the practice of double bunking inmates in one small cell contributed to the physical restrictions of inmates on the tiers. Specifically, the practice of housing two or more inmates in such tight quarters had a negative impact on inmates' mental health. *Id.* at 44 n.35. As Dr. Haney previously explained, "unavoidably close contact is potentially very dangerous in a different way because of the possibility that conflict will arise between people who are housed under those conditions with virtually nothing to do and virtually no opportunity to get away from one another." Haney Liability Trial Tr. vol. XIII at 2989:1-5 [Record Document 553].

Defendants contend that they have drastically reduced the practice of double bunking in the tiers, an assertion that Plaintiffs did not dispute. During his testimony, Warden Goodwin stated that all the cells in the N-3 and N-4 tiers are now single bunked, Goodwin Remedy Trial Tr. vol. XI at 2569:14-17 [Record Document 717], a practice which both parties' experts concluded to be an improvement, *see* Haney Remedy Trial Tr. vol. X at 2289:1-13 [Record Document 713]; Haney Remedy Trial Tr. vol. XIII at 2863:4-2865:14 [Record Document 720]. Warden Goodwin also testified that it was DWCC's intent to completely eliminate the practice of double bunking in the N-2A and N-2B tiers, and yet, there were still approximately four double bunked cells in those tiers at the time

42

of his testimony. *Id.* at 2571:15-19. While double bunking has not been eliminated completely, the Court does find that the practice has been reduced on extended lockdown.[35]

While it may not be feasible for the prison to reconfigure all the cells on extended lockdown to meet the ACA's standards relating to the physical size of the cell itself, DWCC's decision to reduce the number of double bunked cells in some extended lockdown tiers proves that it is not only feasible but easy to eliminate double bunking across all cells. Thus, Defendants have not carried their burden in proving that the issue of crowding in the cells has been eliminated. Plaintiffs were able to prove that the double bunking of cells is a deficient practice that continues to persist and will continue to persist in the future.

### iii. Lack of Visual Stimulation

During the liability phase of trial, the Court held that inmates lacked visual stimulation, noting that "[a]ll cells on the South Compound are open front cells that face concrete walls and the outer windows; the cell doors are made of perforated metal, which significantly blocks vision out of the cell." Record Document 641 at 44. Contributing to this lack of visual stimulation is the enforced idleness, discussed in more detail below.

---

[35] Upchurch opined that the number of inmates in segregated housing has decreased by twenty-eight percent since the liability phase of trial. Upchurch Remedy Trial Tr. vol. XII at 2740:5-8 [Record Document 719]. However, the Court is not satisfied with the methodology that he used to arrive at that number. In coming to twenty-eight percent, Upchurch simply compared the number of inmates in segregated housing in February 2021 to the number of inmates in segregated housing in August 2022. *Id.* at 2741:5-19. However, he did not compare the percentage of inmates in segregated housing to the percentage of inmates in general population for these two dates. *Id.* at 2741:24-25. In other words, Upchurch was unable to conclusively answer whether the population of segregated housing was actually reduced because of efforts taken by DWCC to decrease the number of inmates in restrictive housing or if there was a general decrease in DWCC's inmate population that then resulted in an overall reduction in these numbers.

Basically, inmates are stuck in these small cells with nothing to do and nothing to look at. The parties stipulated that the physical makeup and layout of the cell has not changed since the liability phase of trial. *See* Ex. JR-60 at ¶ 8 [Record Document 715-54]. The persistence of enforced idleness is discussed below. As a result, Defendants have failed to remedy the lack of visual stimulation in the cells. Plaintiffs have proved that the lack of visual stimulation continues to persist and will continue to persist into the future.

iv.    Fluctuating Noise Levels

During the liability phase of trial, the Court determined that the noise levels on the tiers fluctuate between "complete silence and loud chaos." *Id.* This is because inmates would consistently scream and shout, despite DWCC policy mandating that the inmates speak to one another in low conversational tones. *See* Ex. P-JJJ-24 at 2 [Record Document 564-203]. The only evidence that the parties advanced on this topic pertained to the addition of more fans on the tiers. However, the testimony on this issue was conflicting. Secretary Pacholke opined that the fans increased the noise level on the tier. Pacholke Remedy Trial Tr. vol. III at 509:2-19 [Record Document 706]. One inmate testified that the fans did not affect the sound level on the tier, Belton Remedy Trial Tr. vol. II at 427:18-428:1 [Record Document 705], whereas a different inmate testified that the fans did make the noise level on the tier louder, but not too loud to disturb a phone conversation, Dempster Remedy Trial Tr. vol. at 1494:10-16, 1500:10-17 [Record Document 710]. Considering the foregoing information, the Court finds that Defendants were unable to establish that they remedied the issue of the fluctuating noise levels on the tier. Plaintiffs have proved that the condition continues to persist and will continue to persist into the future.

v.  Lack of Adequate Climate Controls

The South Compound contains no air conditioning or central heating. Record Document 641 at 45-46. During the liability phase of trial, the Court held that officials at DWCC subject inmates on restricted housing to both excruciatingly hot and extremely cold temperatures. *Id*. During that trial, inmates testified about the extreme measures they took to cool off during the summer, including sticking their feet into their toilets, laying on the floor, and removing their jumpsuits. *Id.* Inmates testified that the oscillating fans provided little to no relief from the cruel Louisiana heat. *Id.* They also testified that during the winter it was so cold that they could see their own breath. *Id.* at 46. Yet, without any blankets, they were forced to live in cells that had open and/or broken windows. *Id.* at 46.

Defendants contend that they have remedied the lack of climate controls on the tiers. Specifically, they argue that they have increased the number of oscillating fans on each tier from four to eight. *See* Record Document 733 at 18; *see also* Belton Remedy Trial Tr. vol. II at 426:24-427:7 [Record Document 705]; Dempster Remedy Trial Tr. vol. VII at 1500:7-9 [Record Document 710]. Plaintiffs argue that Defendants were unable to provide any evidence that these additional fans have provided the inmates with any respite from the heat. Record Document 732 at ¶ 29.

The Court acknowledges that the number of fans on the tiers increased from four to eight. However, Defendants were unable to prove that the fans remedied the issue of the high temperatures on the tiers. Defendants did not provide any data or evidence to establish that those fans have been effective in remedying the issue. Further, Defendants did not even address the issue of the cold temperatures during the winter. In sum, the Court finds

45

that Defendants were unable to prove that they have remedied the extreme temperatures on the tiers throughout the year.

### b. Social Isolation and Enforced Idleness

During the liability phase of trial, the Court determined that DWCC's policies and procedures resulted in inmates being deprived of any meaningful human contact and opportunities for mental stimulation. Record Document 641 at 46. Defendants contend that they have implemented changes at DWCC that have remedied the social isolation and idleness on extended lockdown. Record Document 733 at 17. Plaintiffs maintain that inmate isolation and idleness have not been remedied. Record Document 732 at ¶ 25.

### i. Social Isolation

In its liability phase opinion, the Court held that inmates on extended lockdown spent anywhere between twenty-three to twenty-four hours per day locked in their cells. Record Document 641 at 46. Specifically, the Court found that: 1) inmates were only afforded approximately one hour outside of their cell to shower and/or use the recreation cages; 2) inmates ate every meal in their cells; 3) inmates were denied attendance to any out-of-cell programming or classes; 4) inmates were permitted only non-contact visitation through a telephone; and 5) inmates were permitted only one ten-minute phone call per month. *Id.* at 46-47.

First, as to recreation, the Court previously determined that DWCC did not provide inmates with an adequate amount of time for recreation. *Id.* at 46. During the remedy phase of trial, the Court reviewed Offender Posted Policy #35, implemented on April 13, 2022, and which details the privileges and restrictions in place for inmates housed in maximum

46

custody. *See* Ex. JR-25 [Record Document 715-20]. According to the policy, inmates in the N-2A, N-2B, N-3, and N-4 tiers—investigative, preventative, and disciplinary segregation—are allowed one hour of recreation per day, five days a week. *Id.* at 3. Dr. Haney observed that no modifications to the recreation area were made since his first visit; in other words, DWCC still utilized exercise cages that lacked weather protection, exercise equipment, or any areas for seating. Haney Remedy Trial Tr. vol. X at 2217:11-2218:17 [Record Document 713]. The only improvement is that Defendants no longer take away an inmate's recreation time as a behavioral sanction.[36] Pacholke Remedy Trial Tr. vol. III at 578:21-24 [Record Document 706].

Inmates housed in N-1, N-2C (working segregation), and N-2D (CCR) are permitted two hours of recreational time in the yard. *See* Ex. JR-25 at 3 [Record Document 715-20]. While this is certainly an improvement for inmates housed in those tiers, Defendants have failed to prove that they have remedied the issue of the insufficient amount and quality of recreational privileges for inmates in N-2A, N-2B, N-3, and N-4.

Second, inmates in investigative, disciplinary, and preventative segregation continue to eat their meals alone in their cells. Ex. JR-60 at ¶ 9 [Record Document 715-54]. This has not been remedied. However, inmates in N-1 and working segregation are permitted to eat their meals in the dining hall, which is an improvement. *Id.* at ¶¶ 15-16. The parties did not offer any evidence regarding where inmates on CCR eat their meals.

---

[36] However, per Department Regulation IS-B-4, the termination of an inmate's access to recreational privileges is an approved sanction for behavioral issues. *See* Ex. JR-1 at 12 [Record Document 715-1].

47

Third, inmates in investigative, disciplinary, and preventative segregation are still not permitted to attend religious services, *id.* at ¶ 9, or attend any out-of-cell classes or group programming, Burgos Remedy Trial Tr. vol. IV at 832:11-22 [Record Document 707]. Inmates housed in these tiers are still only permitted to partake in correspondence courses[37] or receive tutoring[38] through the cell door. Sherman Remedy Trial Tr. vol. II at 375:9-13 [Record Document 705]. This has not changed since the liability phase of trial.

However, there have been some changes regarding the provision of group programming and classes on N-1, N-2C (working segregation) and N-2D (CCR). In June 2022, inmates housed in working segregation became eligible to attend out-of-cell classes. Burgos Remedy Trial Tr. vol. IV at 830:12-14, 831:7-11 [Record Document 707]. Inmates in working segregation attend classes in the North Compound's chapel from 8:30 a.m. to 10:00 a.m. on Mondays, Wednesdays, and Fridays. *Id.* at 830:15-20. Inmates in working segregation may participate in programming on topics like anger management, victim

---

[37] Secretary Pacholke testified regarding the benefits of in-person classes and programming on this segment of DWCC's inmate population. First, Secretary Pacholke opined that in-person programming provides a more effective means for an inmate to learn the material, reduces social isolation, and gives prison officials an opportunity to determine which inmates continue to pose a threat to the prison and inmate population. Pacholke Remedy Trial Tr. vol. III at 522:5-22 [Record Document 706].

[38] Assistant Warden Sherman testified that inmate tutors—who are certified by the education department—have been available for private tutoring since the liability phase of trial. Sherman Remedy Trial Tr. vol. II at 376:8-19 [Record Document 705]. However, the parties did not present any evidence to support this assertion. These tutors help inmates as they study for their High School Equivalency Test, which an inmate can take after he is reclassified into general population. *Id.* at 376:20-377:2. The tutors do not go inside the cell with the inmate but rather conduct any tutoring from the cell front. *Id.* at 377:3-11. Inmate tutors are available upon request, though Assistant Warden Sherman indicated that it is not a frequently utilized resource. *Id.* at 377:12-23.

awareness, and problem solving. *Id.* 830:21-24. In August 2020, group programming became available to inmates housed in CCR, *id.* at 822:1-3, although the only curriculum available is victim awareness.[39] *Id.* at 825:7-9. Inmates on the N-1 tier can access group programming in the afternoon. Ex. JR-60 at ¶ 16 [Record Document 715-54].

Fourth, the Court previously found that inmates on extended lockdown were allowed noncontact visitation by a telephone and through a glass window with other inmates sitting next to them in that room for their own visitations. Record Document 641 at 47. The parties stipulate that the availability and procedures for visitation have not materially changed since the liability phase of trial. Inmates in the N-2A, N-2B, N-3, and N-4 tiers are only permitted noncontact visits on the weekend. Ex. JR-60 at ¶ 19 [Record Document 715-54]. An inmate housed in CCR is permitted one contact visit per month if he has been housed there for at least three months, while an inmate in working segregation is allowed two contact visits per month. *Id.*

Fifth, the Court previously found that inmates housed on extended lockdown were permitted only a single phone call every month for ten minutes, available to them at irregular intervals. Record Document 641 at 47. Since March 2020, DWCC has increased the number of phone calls permitted to inmates housed on extended lockdown. According to Offender Posted Policy #35, inmates in investigative, disciplinary, preventative, and working segregation are now able to use the phones two times per month for fifteen minutes

---

[39] Victim awareness teaches inmates about the "potential consequences their actions have on . . . victims, whether it be other family members or actual victims of their crimes . . . ." Burgos Remedy Trial Tr. vol. IV at 825:15-19 [Record Document 707].

each. Ex. JR-25 at 2 [Record Document 715-20]. Inmates in CCR are permitted three thirty-minute phone calls per week, *id.,* and inmates in N-1 are permitted sixteen calls per month, Ex. JR-60 at 5 [Record Document 715-54]. Additionally, inmates are now afforded a phone call upon initial placement into extended lockdown so that they can inform their families that their communication will be reduced. Pacholke Remedy Trial Tr. vol. II at 458:22-24 [Record Document 705].

Dr. Haney testified that inmates on extended lockdown should be provided with more phone privileges because "they have no other or very little other normal meaningful social contact with people." Haney Remedy Trial Tr. vol. X at 2225:20-2226:15 [Record Document 713]. As a result, Dr. Haney suggested that inmates on extended lockdown be granted the same amount of phone privileges as those in N-1—four times per week. *Id.* at 2228:11-18.

Additionally, conversations between an inmate and his loved one are not private. To use the phone, a DWCC official will roll a phone cart down the tier and will leave the cart outside of the inmate's cell. Pacholke Remedy Trial Tr. vol. II at 471:19-472:7 [Record Document 705]. Secretary Pacholke argued that it is imperative that inmates be permitted to have private conversations because it allows them:

> . . . to talk about . . . [their] struggles, I guess, with [their] family or [their] loved ones, talk about, you know, what is going on with [them], whether it is concerning [their] release, whether it could be medication. It could be, you know, visits with mental health staff. It could be perceptions around, you know, what they might perceive as abusive conditions or abusive treatment. You know, they simply might want to have a conversation confidentially with a family member or a loved one that is not subject to being heard by, you know, everyone on that tier. And it may restrict their conversation to a certain degree.

*Id.* at 472:10-20. Secretary Pacholke ultimately opined that the rolling carts—while not ideal—were an improvement over inmates having to be escorted to the front of the tier for phone conversations. Pacholke Remedy Trial Tr. vol. II at 471:19-472:7 [Record Document 705]; Haney Remedy Trial Tr. vol. X at 2227:4-2228:7 [Record Document 713].

### ii.  Enforced Idleness

During the liability phase of trial, the Court found that inmates on extended lockdown were permitted only "minimal" personal belongings. Record Document 641 at 48. Specifically, the Court found that inmates were permitted "one religious book, three other books or magazines, [] some legal work for mental stimulation. . . . [And] very limited access to the canteen—otherwise known as the commissary—for personal care items, paper, flex pens, envelopes, and stamps." *Id.* Additionally, the Court found that inmates on extended lockdown were not permitted to use televisions, radios, or crafts. *Id.*

As the parties stipulated, the policies surrounding possessions have not changed since the liability phase of trial for inmates housed in investigative, disciplinary, and preventative segregation. Ex. JR-60 at ¶ 18 [Record Document 715-54]. These inmates are still only permitted to spend ten dollars at the canteen once a week; possess a single book or magazine at once; and have no access to televisions, radios, or crafts. *Id*

Inmates on N-1 are permitted the same possessions as those inmates in medium custody, including a tablet and access to a television on the tier. *Id.* at ¶ 16. Inmates in CCR and working segregation are permitted a radio, CD player, or a CD player that can access the radio. Ex. JR-26 at 6 [Record Document 715-21]. They are also allowed to possess up to six books or magazines, *id.*, and have access to televisions on the tiers, Ex. JR-25 at 3

[Record Document 715-20]. Inmates in CCR may also access crafts but are limited to those crafts that are "non-toxic/non-flammable." *Id.*

Overall, the Court finds that the conditions of confinement on extended lockdown continue to expose inmates to a substantial risk of harm. Inmates are confined to incredibly small spaces with no visual or mental stimulation and with inadequate opportunities for physical activity. And, as discussed in the next section, these conditions persist not just for a day or two, but for indefinite time periods which may be months or, for some inmates, years. While some effort was made as detailed above, Defendants were unable to remedy the social isolation and enforced idleness imposed upon inmates housed on extended lockdown. Plaintiffs have proven that the conditions of confinement on extended lockdown continue to persist and will continue to persist into the future.

### c. Length of Time on Extended Lockdown

In *Hutto v. Finney,* the Supreme Court held that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for a few weeks or months." 437 U.S. 678, 686-687 (1978), *abrogated on other grounds by Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024). Other factors that a court may consider include diet, overcrowding, violence, or a "lack of professionalism and good judgment on the part of maximum security personnel." *Id.* at 687 (citation omitted). Additionally, in the due process context, the Fifth Circuit has found that a "prisoner has no liberty interest in his custodial classification" and that "prison officials should be accorded the widest possible deference in classifying prisoners' custodial status

as necessary to maintain security and preserve internal order." *See Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (quoting *Hernandez v. Velasquez*, 522 F.3d 556, 562 (5th Cir. 2008)). However, in cases of "atypical and significant hardship," the Fifth Circuit considers the "duration of the solitary confinement, the severity of the restrictions, and their effectively indefinite nature" in assessing whether a prison is violating the due process rights of an inmate for confining them on extended lockdown for an indefinite period of time. *Id.* at 853-55.

The Court interprets the jurisprudence as allowing a district court to consider the length of time that an inmate spends on extended lockdown, along with any other conditions of confinement that may result in the violation of the inmate's constitutional rights. In other words, in cases where a plaintiff alleges that his Eighth Amendment rights are being violated, a court may consider the indefinite nature of an inmate's stay on extended lockdown as a condition of his overall confinement.

During the liability phase of trial, the Court found that DWCC subjects its inmates to extended lockdown for an indefinite length of time. Record Document 641 at 49. This fact has not changed. In its liability phase opinion, the Court noted that a September 2019 report showed that over 200 inmates had been housed on extended lockdown for over thirty days. *Id.* at 50. The Court also cited to several examples of inmates who had been housed on extended lockdown for years, including Damion Williams, Jackie Sampson, and Theron Nelson, each of whom had been housed on extended lockdown for almost five years; Matthew Carrol, who had been housed there for over three years; and Tyler Blanchard and Carlton Turner who had spent just under three years on extended lockdown. *Id.* Defendants

claim that inmates are housed on extended lockdown only for as long as they "pose a direct threat to the safety of people or a clear threat to the safe and secure operations of the facility." Record Document 733 at 13. Plaintiffs contend that "Defendants continue to house prisoners in solitary confinement conditions for months and . . . years." Record Document 733 at 6.

During the remedy phase of trial, Plaintiffs presented evidence in support of their position, including testimony regarding the continuous confinement reports that track how long each inmate has been housed on extended lockdown. During his testimony, Kimball walked the Court through three of the continuous confinement reports that were drafted for Warden Goodwin.[40] *See* Kimball Remedy Trial Tr. vol. I at 232:10-239:17 [Record Document 704]. The first report showed that 174 inmates had been housed on extended lockdown for over 30 days, 1 of whom had been on extended lockdown for approximately 3.5 years, 2 for nearly 3 years, 1 for approximately 2.5, 3 for 2 years, 3 for nearly a year and a half, and 1 for approximately a year. *See* Record Document PR-L-1 at 5 [Record Document 716-97]. A second report, dated November 4, 2020, demonstrated that 176 inmates had been housed on extended lockdown for over 30 days, 1 inmate had been on extended lockdown for almost 4 years, 1 inmate for over 3.5 years, 3 inmates for over 2.5 years, 2 inmates for over 1.5 years, and 28 inmates for about a year. *See* Record Document PR-L-9 at 5 [Record Document 716-105]. A third report, dated June 6, 2022, showed that

---

[40] Kimball's predecessor, Rodney Long, drafted the first report. Kimball Remedy Trial Tr. vol. I at 233:2-10 [Record Document 704]. Kimball drafted the other two reports. *Id.* at 233:16-235:12.

142 inmates were housed on extended lockdown for longer than 30 days, 1 of whom had been housed on extended lockdown for 5.5 years, 4 for approximately 2.5 years, 5 for nearly 2 years, 7 for approximately a year and a half, and 19 for at least a year. *See* Record Document PR-L-28 at 5 [Record Document 716-124].[41]

The numbers reflect that DWCC did reduce the population of inmates on extended lockdown for longer than thirty days by twenty-nine percent. This is certainly an improvement. However, because no evidence was presented regarding the total inmate population at DWCC, the Court cannot independently determine whether this decrease was the result of efforts made by officials to reduce the length of an inmate's assignment to extended housing or whether the overall population at DWCC had decreased as a result of the COVID-19 pandemic. In other words, the Court cannot ascertain the scale, proportionality, or basis for the decrease in the extended lockdown population. The Court also observes that from March 2020 to June 2022, the percentage of inmates housed on extended lockdown for a period of approximately one year or more increased from approximately six percent to approximately twenty-five percent.

Furthermore, DWCC has not remedied the policy statements and practices which allow for an inmate to be housed on extended lockdown for a potentially indefinite amount of time. As the Court learned during the remedy phase, when an inmate commits an infraction, he is housed in disciplinary segregation for up to seventy-two hours, at which

---

[41] These numbers do not include those inmates who were housed on extended lockdown for refusing a tuberculosis test. *See* Kimball Remedy Trial Tr. vol. I at 237:11-238:7 [Record Document 704].

point he will go before the disciplinary court. Kimball Remedy Trial Tr. vol. I at 209:11-22 [Record Document 704]; Ex. JR-11 at 9 [Record Document 715-11]. If an inmate is found guilty of having committed that infraction, he is sentenced to disciplinary segregation for a period of time determined by the disciplinary matrix, a new implementation since the liability phase of trial. Kimball Remedy Trial Tr. vol. I at 209:22-210:2 [Record Document 704]. For example, the disciplinary matrix specifies that an inmate who committed a first-time property destruction offense can be sentenced to a period of zero to ten days in disciplinary segregation. *See* Ex. JR-2 at 18 [Record Document 715-2]. The disciplinary matrix—which the Court will further discuss below—is an improvement on these generalized criteria, but the decision for placement still remains the subjective decision of the security guard.

At the end of his sentence in disciplinary segregation, the inmate appears before the multi-disciplinary review board. The board can either return the inmate to extended lockdown in preventative segregation or transfer him to the working segregation tier. Kimball Remedy Trial Tr. vol. I at 210:3-20 [Record Document 704]. However, this decision is governed by the most general of criteria. The policy provides that an inmate will be placed in preventative segregation if his "continued presence in general population is a danger to the good order and discipline of the facility and/or whose presence poses a danger to himself, other offenders, staff, or the general public." Ex. JR-10 at 10-11 [Record Document 715-10].

In March 2020, a mental health clinician was added to the multi-disciplinary review board, which is certainly an improvement. Coleman Remedy Trial Tr. vol. I at 44:17-45:4

[Record Document 704]. Kimball testified that the multi-disciplinary review board has access to an offender's classification records—minus those from Dr. Seal—from the past year. *See* Kimball Remedy Trial Tr. vol. II at 286:288:13 [Record Document 705]. However, the multi-disciplinary review board does not consult these documents for guidance or insight on an inmate's mental health. In fact, Kimball testified that an inmate's mental health diagnosis "wouldn't change our decision for placement in a less restrictive housing." *Id.* at 288:19-21.

After an inmate goes before the multi-disciplinary review board, he is provided with a copy of the final classification decision. Kimball Remedy Trial Tr. vol. I at 231:5-8 [Record Document 704]. The form provided to the inmate lists the type of review, the date, the housing assignment, and has check boxes where a clinician can indicate whether the inmate is eligible for review. *See ex.* Ex. PR-G-2 [Record Document 716-83]. There are six entirely subjective and broad reasons why an inmate may be deemed ineligible for reassignment, which include: "1. Poor Attitude[;] 2. Serious nature of past offenses[;] 3. Disciplinary reports received during current confinement[;] 4. Pending street charges[;] 5. Length/number of times on Extended Lockdown[;] [and] 6. Other" *Id.* The Court deems these reasons to be inappropriate and/or subjective. There are no written policies or guidelines informing the multi-disciplinary review board what criteria they are to consider in making these decisions. These deficiencies result in a misuse and overuse of preventative segregation.

The form filled out by the multi-disciplinary review board to reflect its decision is deficient. It provides check boxes by a listing of the subjective and broad criteria listed

57

above and also provides a few lines for comments. But, the comment sections are rarely filled out by a member of the board. In fact, the multi-disciplinary review board provides an inmate with no insight, guidance, or information regarding the behaviors or actions he could take if he wanted to qualify for reassignment, nor do they explain what specific actions or offenses led him to be ineligible for reassignment. This failure thwarts and discourages any improvement in the inmate's behavior. Kimball testified that the inmates are told of the multi-disciplinary board's decision "right then and there," but there was no evidence to confirm that this practice occurs. Kimball Remedy Trial Tr. vol. II at 293:16-294:21 [Record Document 705].

The lack of specific policies and practices outlining the decision-making processes and criteria by which inmates are assigned to segregated housing; the failure to provide inmates with any specific explanation regarding their assignment or reassignment to preventative segregation; and the failure to provide inmates with any formal or written guidance explaining the steps required for them to matriculate out of extended lockdown collectively result in the housing of inmates on extended lockdown for an indefinite period of time. There is no policy which caps the amount of time an inmate may spend on extended lockdown, nor is there any meaningful review or audit of the multi-disciplinary board's decisions at the administrative level.

Defendants did not prove that they have remedied their practice of housing inmates on extended lockdown for an indefinite period of time. Moreover, Plaintiffs met their burden in proving that the practice of housing inmates indefinitely on extended lockdown continues and will continue into the future.

d. Discipline

During the liability phase of trial, Plaintiffs presented evidence regarding a disciplinary practice employed at DWCC known as "strip cell status." This practice continues at DWCC, with only the slightest of review requirements added since the liability phase. Tellingly, DWCC is the only Louisiana DOC prison that employs such a practice. Smith Remedy Trial Tr. vol. VII at 1447:19-23 [Record Document 710]. Strip cell status is an institutional practice wherein an inmate is subjected to solitary confinement with nothing but a paper gown and no possessions in his cell. Record Document 641 at 52. This may include the removal of an inmate's mattress and bedding. *Id.* During the liability phase of trial, inmates testified about the profound impact that strip cell status had on their physical and mental health, including increased feelings of depression and bruising from sleeping on a concrete floor. *Id.* at 56. The experts agreed that the use of strip cell status violated modern correctional practices and minimum standards. *Id.* The Court found that DWCC's use of strip cell status—the informality of the institution of strip cell status, the length of time an inmate can remain on strip cell status, the lack of possessions, the lack of proper attire, the removal of bedding, the use of the restraint chair, and the lack of mental health reviews by mental health staff—constituted cruel and unusual punishment. *Id.* at 57. During the remedy phase of trial, the Court learned that DWCC still maintains strip cell status. Coleman Remedy Trial Tr. vol. I at 71:25-72:1 [Record Document 704]. The Court will address each deficient aspect of strip cell status below in turn.

First, the Court previously found that inmates could be placed on strip cell status without going through the typical disciplinary processes. *Id.* at 52. During the remedy

phase of trial, the Court learned that this practice has changed. Since July 24, 2022, the disciplinary court must consult the disciplinary matrix to sanction or punish an inmate for his behavior. Smith Remedy Trial Tr. vol. VII at 1466:25-1467:8 [Record Document 710]. Department Regulation OP-C-1, known as the "disciplinary matrix," is "the department's disciplinary rules and procedures for adult offenders" and was implemented to promote consistency in disciplinary sanctions across the DOC's prisons. *Id.* at 1466:9-1468:25. So, for example, if an inmate is written up for the first time for possessing a cell phone, he may be sentenced for up to sixty days in disciplinary segregation. *Id.* at 1469:5-13; *see also* Ex. JR-2 at 5 [Record 715-2].

However, strip cell status is not a sanctioned discipline under the disciplinary matrix, despite some of the qualifying behaviors for strip cell status being listed as an offense on the matrix for other punishments. The behaviors that can result in the imposition of strip cell status—which have not changed since the liability phase—include: throwing human waste and bodily fluids (including spit); storing weapons, human feces, and urine in a container; throwing "any item" outside of the cell; throwing items that may cause a safety hazard, including soap and water; creating barricades; threatening violence to someone while in possession of an item that can be used as a weapon; intentionally flooding the cell; violence; and contributing to a "major disturbance."[42] Ex. JR-24 at 3 [Record

---

[42] As the policy explains, strip cell status is meant to be a "last resort" and only employed to "prevent violence, protect lives and property." *See* Ex. JR-24 at 3 [Record Document 715-19]. If this were true, then strip cell status should only be employed with defined time limits against inmates who have committed an egregious rule violation. Some of the potential behaviors that can result in the imposition of strip cell status are not consistent

Document 715-19]. As mentioned above, several of the rule infractions on the disciplinary matrix for which there are specified non-strip cell punishments are also actions that could land an inmate in strip cell, such as: aggravated fighting, battery of a correctional officer, and aggravated sex offenses to name a few. Ex. JR-2 at 5 [Record Document 715-2]. The decision to not include strip cells status as a possible sanction in the disciplinary matrix means that there is no way to ensure that strip cell status is being consistently and uniformly applied against inmates. Likewise, the overlap of offenses that are included on the disciplinary matrix with offenses that can result in strip cell status illustrates the lack of consistency and uniformity of DWCC's policies and their enforcement. And, as Secretary Pacholke highlighted during his testimony, there are no checks and balances governing the process. Pacholke Remedy Trial Tr. vol. III at 550:24-25 [Record Document 706].

During the liability phase of trial, the Court found that prison officials could keep an inmate with a "documented pattern of behavior" on strip cell status for an undetermined length of time. Record Document 641 at 52. The Court learned that most inmates' strip cell status was reviewed every four hours by a shift supervisor. *See* Ex. P-JJJ-13 at 5 [Record Document 565-47]. However, an inmate who was determined to have a "documented pattern of behavior" could remain under strip cell status for an undetermined amount of time to be reviewed by the unit manager and a classification officer every thirty days. *Id.* The Court found that mental health staff did not play a role in the process of placing an inmate on strip cell status or in these reviews. Record Document 641 at 52.

---

with the policy's purpose. For example, the Court wonders how throwing water or a bar of soap warrants the imposition of strip cell status.

61

During the remedy phase of trial, the Court learned that inmates continue to have their strip cell status reviewed every four hours by a shift supervisor, who then documents his findings in a UOR. *See* Ex. JR-24 at 5 [Record Document 715-19]. To keep an inmate on strip cell status for more than twenty-four hours requires the approval of a unit manager and a UOR that outlines the "clear reasons and justification for continuing this status." *Id.* However, inmates with a "documented pattern of behavior"—a term which remains undefined by the policy—are still subject to strip cell status for an indeterminate amount of time. According to the latest version of Offender Posted Policy #34, which was implemented on August 5, 2021, an inmate's strip cell status is now reviewed every seven days. *Id.* at 5. Despite a more frequent review period, the policy explicitly warns that "[c]ontinued violent behavior as outlined in this policy[] may result in the offender remaining in this status." *Id.* The unit manager and the classification officer are tasked with reviewing the imposition of strip cell status. This has not changed. *Id.* Mental health clinicians still do not play a role in the process of putting an inmate on strip cell status nor in the reviews. Thus, there are no mechanisms by which officials can gauge an inmate's mental status. As Secretary Pacholke opined, inmates typically do not throw feces or urine in general population and "oftentimes it is a sign of some broader form of mental decompensation." Pacholke Remedy Trial Tr. vol. III at 551:23-552:3 [Record Document 706]. Upchurch opined that strip cell status is only used for "as long as necessary to diffuse or make the situation to where it is not a danger to the staff, inmate, or so forth." Upchurch Remedy Trial Tr. vol. XII at 2775:9-12 [Record Document 719]. Despite this, Upchurch

62

still agreed that, as written, the policy permits the use of strip cell status for extended periods of time. *Id.* at 2775:16-18.

During the liability phase of trial, the Court learned that inmates on strip cell status are deprived of their limited possessions—including their clothing—and their recreation time. Record Document 641 at 52. Inmates are placed on strip cell status in nothing but a paper gown. *Id.* Inmates on strip cell status with a "documented pattern of behavior" lost their mattresses from 5 a.m. to 9 p.m. and were frequently required to sleep on the concrete bunk or metal rack because the mattresses were not returned timely. *Id.* One improvement since the liability phase of trial is that Policy #34 now places more checks on the removal of an inmate's mattress. Specifically, the policy states that mattresses will only be removed if they are being used as a barricade or shield. *See* Ex. JR-24 at 4 [Record Document 715-19]. A shift supervisor will review the inmate's conduct every four hours to determine whether the mattress can be returned to the inmate. *Id.* This must be documented in an UOR. However, if a mattress must remain out of the cell for more than eight hours, the shift supervisor must receive "concurrence from the Unit Manager." *Id.* The policy does not provide a maximum time for which an inmate can be without a mattress.

Secretary Pacholke—who reviewed the changes DWCC has made to its strip cell status policy—opined that the practice still constitutes torture.[43] Pacholke Remedy Trial

---

[43] Secretary Pacholke expressed that it was difficult for him to discuss strip cell status because of how dehumanizing the practice is. Pacholke Remedy Trial Tr. vol. III at 550:19-21 [Record Document 706].

Tr. vol. III at 548:2-5 [Record Document 706]. Specifically, Secretary Pacholke testified that

> I think it is cruel and it is torture, and I can't imagine any one of us sitting here today that would be in a concrete bunker with a steel bunk with nothing on but a paper gown, and be asked to stand there with nothing. And somehow this is supposed to communicate that I am going to get better in this environment, this is going to fix my underlying issue if you leave me in a cell naked with a paper gown on a concrete floor. It is a throw-back to probably before I started my career in 1982. I have never seen anything like it except for now I have seen it in two systems. But this is cruel. This is dehumanizing. This is treating people in a way in which they are subhuman. It is -- it is a terrible practice, and it does not -- this kind of practice goes directly against what makes institutions safe. This kind of illegitimate practice potentially compromises the safety of your staff as well as the offender population.

*Id.* at 548:5-21.

The Court is convinced by Secretary Pacholke's assessment of strip cell status. It would also note that Warden Goodwin testified that in 2021, there were discussions regarding the elimination of strip cell status altogether. Goodwin Remedy Trial Tr. vol. IX at 1922:19-23 [Record Document 712]. Chief Smith also testified that DWCC was the only DOC prison that employs such a practice. Smith Remedy Trial Tr. vol. VII at 1447:19-23. [Record Document 710]. Taking this evidence and testimony into consideration, and despite the small improvements made, Defendants have failed to prove that they have remedied the prior deficiencies regarding strip cell status. Additionally, Plaintiffs met their burden in proving that the deficiencies continue to persist and will continue to persist into the future.

3. *Manifestation of Harm at DWCC*

During the liability phase of trial, Plaintiffs presented evidence that the harms suffered by inmates are more than theoretical. Defendants could not rebut this evidence. Record Document 641 at 57-58. The Court specifically cited to Dr. Haney's observations during his first visit to DWCC of signs of mental anguish and potential decompensation. *Id.*

The Court heard similar testimony by the experts during the remedy trial. During his second visit, Dr. Haney observed several inmates housed on extended lockdown who were "utterly incoherent and in a severe state of mental deterioration" and required intervention. Haney Remedy Trial Tr. vol. X at 2242:10-16 [Record Document 713]. Dr. Burns also observed inmates who were experiencing hallucinations, manic symptoms, self-injurious behavior, and suicidal tendencies, all of whom required mental health intervention. Burns Remedy Trial Tr. vol. VII at 1551:7-1558:4 [Record Document 710].

Defendants did not present any testimony or evidence to prove that they have remedied some of the ways in which harm manifests itself in inmates placed on extended lockdown. In fact, DWCC's own policies on required mental health evaluations and suicide prevention for inmates in restrictive housing explicitly acknowledged that inmates are at a substantial risk of harm when they are placed in restrictive housing. Despite Defendants' continuing position that extended lockdown does not lead to harm, these policies belie that position. For example, DWCC policy mandates segregated housing evaluations for inmates with a mental illness who have been assigned to segregated housing for a period greater than thirty days. *See* Ex. J-7 at 8-9 [Record Document 565-13]. The suicide prevention

policy twice warns DWCC staff of the harms caused by social isolation. First, DWCC requires that "[i]f an offender is placed in a single man cell, *frequent conversation with the offender shall be attempted by security to reduce possible suicide attempts due to the lack of a cellmate . . . .*" Ex. JR-14 at 5 [Record Document 715-14] (emphasis added). Further in the policy, DWCC staff are instructed that "offenders who are suicidal should be placed in the least restrictive setting possible and *should not be isolated* unless their behavior indicates otherwise." *Id.* at 6 (emphasis added).

In summary, the evidence presented at trial—including DWCC's own policies and the expert testimony—demonstrated that the unconstitutional conditions of confinement that are imposed upon inmates on extended lockdown continue to subject inmates to physical and mental torture and will continue to subject inmates to physical and mental torture into the future to which, as the Court will further enunciate, DWCC and Defendants have shown themselves to be deliberately indifferent.

ii. Deliberate Indifference

As stated previously, in addition to proving that Defendants' actions put inmates at substantial risk of serious harm, Plaintiffs must also demonstrate that correction officials had a subjectively culpable state of mind—that is, they were deliberately indifferent. Plaintiffs can carry that burden by showing that Defendants had subjective knowledge of the risk of harm and then failed to take reasonable steps to abate such harm. Additionally, the mere fact that a risk was obvious is sufficient to infer deliberate indifference. *Cook*, 376 F.3d at 340. Deliberate indifference can be established if evidence is presented that proves that the substantial risk of a particular action was "longstanding, pervasive, well-

documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it . . ." *Farmer,* 511 U.S. at 842-43 (internal quotation marks and citations omitted).

During the liability phase of trial, the Court found that correctional officials—from the institutional level up to the departmental level—were aware of the conditions on the South Compound and the extent of harm to which inmates housed in those tiers were exposed. Record Document 641 at 59. The Court's opinion highlighted testimony by Secretary LeBlanc, where he admitted that the DOC had intended to cease the practice of restrictive housing before the COVID-19 pandemic hit. *Id.*

During the remedy phase of trial, Secretary LeBlanc acknowledged the DOC's awareness of the extent of harm posed by extended lockdown. Secretary LeBlanc again conceded that the DOC had intended to eliminate the practice of restrictive housing at DWCC. Secretary LeBlanc Remedy Trial Tr. vol. X at 2166:11-14 [Record Document 713]. He also testified that the DOC had made changes to the conditions of extended lockdown at different DOC prisons across the state. *Id.* at 2148:1-2149:9. Among those changes include the closing of the restrictive housing unit, "Camp J," at the Louisiana State Penitentiary (also referred to as "Angola"); improvements in the conditions of confinement for death row inmates housed at Angola, including congregated exercise time; and changes to the types of in-person programming available to inmates on restrictive housing at Elayn Hunt Correctional Center ("EHCC"). *Id.* at 2137:8-2139:6. In fact, Secretary LeBlanc admitted that it is better to allow inmates more time out of the cell than less. *Id.* at 2137:4-

7. Despite this, DWCC has made no significant effort to remedy the constitutional violations that were outlined in the Court's prior ruling, nor have there been any attempts to introduce any of these pilot programs or policies at DWCC.

Ultimately, officials at the DOC and DWCC still draft, amend, implement, and enforce the policies and practices that govern restrictive housing at DWCC. And yet, despite their knowledge of the harms caused by these policies, DWCC has made no effort to change or remedy them.

### iii. Conclusion as to Conditions of Confinement

In summary, the Court finds that Plaintiffs have met their burden in proving that Defendants continue to subject inmates to mental torture and will continue to subject inmates to mental torture into the future by housing them in unconstitutional conditions on extended lockdown. In so doing, Plaintiffs have satisfied both the objective and subjective components of the Eighth Amendment inquiry. As to the objective component, the Court holds that Plaintiffs have proven that Defendants failed to remedy the policies, practices, and procedures that subject inmates to cruel and unusual punishment. Moreover, the Court finds that Defendants have failed to make any substantive changes to improve or mitigate the psychological harms of extended lockdown, the harsh conditions of confinement, the indefinite length of time on extended lockdown, and the unconstitutional disciplinary procedures in practice. These policies, practices, and procedures—which include: double bunking; the deprivation of any meaningful social interaction; the confinement of inmates to their cells for twenty-three to twenty-four hours a day; the lack of meaningful recreational activity; the lack of mental stimulation; the indefinite periods of assignment to

68

extended housing; and the use of strip cell status—cause inmates, and especially those already suffering from mental illness, to experience psychological pain and put them at risk of mental decompensation. By failing to remedy these policies, practices, and procedures, officials at DWCC have demonstrated a wanton disregard for inmate health and safety.

The Court finds that Plaintiffs are entitled to injunctive relief to remedy these unconstitutional conditions of confinement.

### C. Delivery of Mental Health Services

In the liability phase ruling, the Court determined that Plaintiffs proved that DWCC provided inmates housed on the South Compound with a constitutionally deficient level of mental health care and services. The Court held that DWCC failed to provide mental health care that reached even a basic level of care, and identified systemic deficiencies in six areas of the mental health program: 1) screening and evaluations; 2) mental health treatment; 3) the staffing of the mental health department; 4) the prescription of psychotropic medications; 5) the record keeping practices; and 6) the suicide prevention program. The Court also found that Defendants exhibited a wanton disregard for the mental health of inmates housed on the South Compound.

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983" because it "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104-05 (1976) (internal quotation marks and citation omitted). The inquiry is whether Defendants were "deliberate[ly] indifferen[t] to serious medical needs." *Id.* at 104.

69

"Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Arenas*, 922 F.3d at 620 (internal quotation marks and citations omitted). "Rather, an inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* at 620-21 (internal quotation marks and citations omitted).

Systemic deficiencies in a prison's mental healthcare system could support a finding of deliberate indifference at the institutional level. *See Cook*, 376 F.3d at 333 ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . ." (citation omitted)). Plaintiffs can meet their burden by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff . . . or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted).

### i. Substantial Risk of Harm

The Court turns first to the objective test to determine whether DWCC's deficient mental health services continue to constitute cruel and unusual punishment, and if so, whether these constitutional violations are likely to continue into the future. "The components of a minimally adequate mental health treatment program may be ascertained

by resort to judicial precedent in previous prison cases, by consideration of the expert testimony in the instant case, and by applying the basic principles of minimally adequate care to the specific problem of mental health care." *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980), *aff'd in part, rev'd in part on other grounds,* 679 F.2d 1115 (5th Cir. 1982). *Ruiz* identified the minimum criteria required for mental health care as: systematic screening and evaluation; treatment that is more than mere seclusion or close supervision; participation by trained mental health professionals in appropriate numbers; safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered; accurate, complete, and confidential records; and a suicide prevention program. *Id.* As has already been discussed, the Court has identified systemic deficiencies in all of these areas in DWCC's mental health program. The Court will address whether those deficiencies have been remedied below.

### 1. *Screening and Evaluation*

In its liability phase opinion, the Court identified systemic deficiencies in the three different categories of screening and evaluations available to inmates in segregated housing: 1) intake screenings; 2) screenings during mental health rounds; and 3) screenings during periodic evaluations, which include the mental health evaluations for inmates with a LOC-2, -3, and -4 designation and the segregated housing interviews. Record Document 641 at 63-64. After considering the evidence and testimony presented during the remedy phase of trial, the Court finds that DWCC failed to remedy the previously enunciated deficiencies identified with each type of screening or evaluation. Plaintiffs proved that these deficiencies continue to persist and will continue to persist into the future.

a. Screening and Evaluation During Intake

During the liability phase of trial, the Court held that there were "severe systemic deficiencies" in the intake screening and evaluations conducted at DWCC because: 1) Hayden lacked the training and certification to complete the screenings; 2) Deputy Warden Dauzat failed to conduct routine, timely, and thorough audits of Hayden's screenings; 3) the were no discussions or investigations into the discrepancies between the records from EHCC and the information that was self-reported by the inmates; 4) the referrals to Dr. Seal were inconsistent; and 5) inmates' needs were not individually considered upon intake, especially those whose mental health conditions may have exacerbated without proper attention. *Id.* at 74.

As the Court detailed in its liability phase opinion, both the inter-system[44] and intra-system transfer inmates must receive a mental health screening upon arrival at DWCC. *Id.* at 64. During the remedy phase of trial, the parties stipulated that the processes and procedures to complete the intra-system intake screening were the same as those described during the liability phase. Ex. JR-60 at ¶ 50. As the Court outlined in that opinion,

> The process begins with Hayden observing the inmates as they get off the bus that transported them to DWCC. Intra-system transfers arrive at the facility with their records, which are directly loaded into "medical." Hayden then individually observes each inmate as they make it through the security process. At the top of an intra-system inmate's mental health screening form is a series of pre-populated background information from the CAJUN

---

[44] The parties did not present any evidence or testimony regarding the inter-system intake screenings at DWCC. However, inter-system transfers and intra-system transfers are provided with the same mental health screening upon their immediate arrival at DWCC. *See* Record Document 641 at 64. As such, the Court finds that the deficiencies in the inter-system screening exist to the same extent they exist in the intra-system intake screening process.

database, including the "Mental Health Code Upon Arrival." Those codes are
"SH" or suicidal history, "DD" or developmental disability, "SA" or
substance abuse, "SX" or designation as an adjudicated sex offender, "AX"
or Axis I diagnosis (which means a diagnosis of a mental health condition that
may be treated by medication), "PM" or current prescription of psychotropic
medications, and "LOC" to designate which Level of Care this individual was
identified as requiring. There is also a label after those codes to indicate their
applicability to the inmate. "P" stands for present, indicating that the
individual has that classification, "d" stands for dependency, and "x" stands
for "none indicated." Hayden testified that he then notes any observations
regarding behavior and intelligence and will conduct a "verbal interview,"
where he asks questions about past and present suicidal ideation/behavior and
current mental health symptoms. The answers to those specific questions are
self-reported, and there is no way for Hayden to verify the information for
accuracy. Hayden then testified that he will only refer an inmate to Dr. Seal
for further consultation if he finds that there are "red flags," like a present
mental health diagnosis or prescription of psychotropic medications. Hayden
generally refers all patients to general population, regardless of their level of
care; however, it is the classification review board, a group with no mental
health staff involvement, that ultimately decides where an inmate is housed.

Record Document 641 at 66-67 (internal citations omitted).

The only change made to the intake process is that the medical and mental health
records from the inmate's previous institution and/or from the receiving/diagnostic
institution are available to the mental health clinician before the inmate's intake screening.
Hayden Remedy Trial Tr. vol. V at 993:18-994:7 [Record Document 708]. Otherwise,
there have been no other changes made to the intake process. *Id.* at 994:17-19; Burgos
Remedy Trial Tr. vol. III at 698:7-12 [Record Document 706]. Hayden continues to be the
primary individual tasked with the intake process, despite his lack of credentials or
licensing to be qualified to do so. Hayden Remedy Trial Tr. vol. V at 993:14-17 [Record
Document 708]. Burgos will conduct intake interviews "as needed." Burgos Remedy Trial
Tr. vol. III at 698:7-10 [Record Document 706].

73

Previously, the Court found that Hayden lacked the training and certification to complete the initial intake screenings. Specifically, the Court determined that Hayden's degree in industrial psychology was irrelevant to his role at DWCC. *Id.* at 67-68. Hayden testified that he has not acquired any new licenses or certifications or earned any additional degrees since the liability phase of trial. Hayden Remedy Trial Tr. vol. V at 960:20-25 [Record Document 708]. As such, Plaintiffs proved that Hayden is still unqualified to conduct the intake interviews. DWCC has not remedied this issue.[45]

The Court also found that the actual screening process itself, as well as the corresponding documentation, were "wholly inadequate." Record Document 641 at 70. Specifically, Dr. Burns credibly established that there were defects in: the form used by Hayden to document the intake screening; the manner in which Hayden filled out the form; and the adequacy of the screening's assessment. *Id.* Hayden testified that there have been no changes to the actual form that he fills out during an intake screening.[46] Hayden Remedy

---

[45] In its liability phase opinion, the Court identified several instances in which it was obvious that Hayden's lack of training and education impacted his ability to adequately complete intake screenings. The first was when he misdiagnosed an offender with major depressive disorder, as opposed to Dr. Seal's diagnosis of schizoaffective disorder. Record Document 641 at 68. Hayden was also unable to properly identify the "oriented x" designations. *Id.* at 70. Dr. Burns opined that the misdiagnosis was emblematic of Hayden's lack of understanding of medical convention, psychiatric symptoms and diagnoses, and treatment. *Id.* at 68-70.

[46] Plaintiffs did not contest this assertion; however, the Court questions whether there was a change made to the form in 2018, a change that was not addressed during the liability phase of trial. Only a single mental health screening form was admitted into evidence during the remedy phase of trial, a form that appears different from any other that the Court had reviewed during the liability phase of trial. The previous iteration of the form that the Court reviewed—which appears to have been enacted in February 2003—prompts the intake officer to note an inmate's sentence length; LOC; education; whether he is experiencing hallucinations or delusions; his speech; his intelligence; and the inmate's

Trial Tr. vol. V at 995:17-19 [Record Document 708]. Defendants have failed to cure the deficient form used during intake and that Plaintiffs proved that the deficiencies with the form continue to persist and will continue to persist into the future.

The Court also finds that Hayden has not remedied the deficient manner in which he fills out the intake forms. Previously, the Court determined that Hayden's input on the forms was inconsistent with the information prepopulated from the CAJUN database and that Hayden would not ask any follow-up questions to probe into the discrepancies between the information provided by the CAJUN system and the inmate's own responses. Record Document 641 at 71. During the remedy phase of trial, Plaintiffs offered an intake form filled out by Hayden on October 26, 2020. The form indicates that inmate B.H.[47] was diagnosed with a "mood disorder" in 2020 at EHCC and was prescribed Buspar to treat it. Ex. PR-B-16 [Record Document 716-25]. The form also indicates that B.H. had a history of attention-deficit/hyperactivity disorder (ADHD), with which he was diagnosed in 1995 and was prescribed Ritalin. *Id.* However, Hayden did not provide any additional information regarding the nature of B.H.'s "mood disorder," any further context about these diagnoses, any indication that the inmate sought or received therapy or counseling to

---

mental health code upon arrival (e.g., whether an inmate is experiencing or has had a history of substance abuse, etc.). *See* Ex. P-DD-01 [Record Document 564-108]. The form that the Court reviewed during the remedy phase of trial does not include those questions. *Compare id., with* Ex. PR-B-16 [Record Document 716-25]. The Court observes that the mental health screening it reviewed during the remedy phase of trial was less thorough and asked less questions about the inmate's mental health than the forms it evaluated during the liability phase of trial.

[47] Out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed here.

mitigate symptoms, or any information as to the effectiveness of the medication he was prescribed to treat his mood disorder.

In its liability phase opinion, the Court determined that a qualified official at DWCC, namely, Deputy Warden Dauzat, needed to timely and routinely audit Hayden's intake screenings because he lacked the requisite training and certification to complete them. Record Document 641 at 68. Despite this, the Court found that no official at DWCC conducted a thorough audit of Hayden's work. *Id.* Instead, the Court found that Deputy Warden Dauzat simply wrote "follow up per policy" on each and every one of Hayden's intake screenings. *Id.* at 73.

During the remedy phase of trial, the Court observed that Deputy Warden Dauzat continued to simply mark "follow up per policy" on Hayden's intake forms. *See* Ex. PR-B-16 [Record Document 716-25]. This failure to audit an unqualified mental health practitioner's work puts inmates—especially those who are already exhibiting signs of mental decompensation—at a significant risk of harm.

### b. Evaluation During Weekly Mental Health Rounds

During the liability phase of trial, the Court learned that DWCC did not conduct or document its weekly mental health rounds as required by policy. This blatant disregard of written policy can put an inmate and those around him at risk and demonstrates deliberate indifference to the mental health needs of the inmates on extended lockdown. Record Document 641 at 78. The Court held that weekly rounds and the evaluation process that occurred during those weekly rounds were systemically deficient. Specifically, the Court found that mental health staff did not individually visit with each LOC-3 or LOC-4 inmate

at least once a week through weekly rounds as required by policy and held that the practice of merely walking through the tier did not satisfy this requirement.

During the remedy phase of trial, the Court learned that the process by which the mental health clinicians conduct their weekly rounds has not materially changed. As Burgos explained, every week he conducts weekly rounds on the tiers to which he is assigned. Burgos Remedy Trial Tr. vol. V at 918:11-919:13 [Record Document 708]. He only documents when he has "a specific conversation with an individual." *Id.* at 919:14-19. If this occurs, Burgos will fill out a Form 350.[48] *Id.* at 919:20-22. If an inmate requests privacy, or if Burgos gets the impression that the subject is sensitive in nature, he might have the discussion in a private setting; otherwise, all conversations take place cell front. *Id.* at 920:17-921:6. Burgos stated that the new badge swipe system will record his presence on the tier if he does not speak to any inmate during a round that would require any documentation.[49] *Id.* at 919:9-13.

Dr. Burns testified that inmates saw mental health staff on the tiers "more consistently" since the liability phase of trial. Burns Remedy Trial Tr. vol. VII at 1640:18-23 [Record Document 710]. However, as Burgos's testimony highlights, there is no indication or documentation that mental health clinicians take the time to stop at every cell

---

[48] The mental health department began utilizing a new form, known as the Form 350, in June 2022. Hayden Remedy Trial Tr. vol. V at 1061:14-23 [Record Document 708]. The Court will discuss the Form 350 in greater depth in a later section.

[49] The badge system, known as BadgePass, is new to DWCC since the liability phase of trial. Goodwin Remedy Trial Tr. vol. IX at 1896:18-1897:11. However, as the Court will further enunciate, the mere fact that it electronically records when the mental health clinicians are on the tiers is insufficient to prove that the deficiencies with the weekly rounds has been cured.

and/or attempt to engage, even briefly, with each inmate. As Dr. Burns testified, DWCC officials "did not describe stopping at every cell to check in with every inmate. They stopped when someone called them over to talk with them as opposed to stopping at every cell, inquiring how people were doing, making eye contact, looking at the contents of the cell, et cetera." *Id.* 1544:11-15. According to Dr. Burns, mental health staff should be stopping at every cell because

> . . . when people who have a serious mental illness are decompensating, sometimes they take less care about their personal appearance, their hygiene. They become withdrawn. They're not taking care of their property. And so the condition of the cell, particularly if something changes, like all along the cells look fine, and then suddenly there is leftover food in there, there is a paper on the floor, the bed is not made, everything is dirty, it . . . can be an indication of some social withdrawal and isolation and a manifestation of a serious mental illness. You would also ask about whether the person is routinely going out for recreation, whether they are participating in groups. You often spend time with the tier officer to ask if people are sleeping, if anybody's up all night keeping other people up. So you want to try and get a picture of how the person is doing from the records that are kept and maintained by the department, the observations of the officers, as well as your own observations about how the person is taking care of [himself].

*Id.* at 1544:18-1545:12.

In summary, the Court finds that Defendants have failed to meet their burden in proving that the previously enunciated deficiencies with the weekly rounds have been remedied. In fact, the only evidence that Defendants presented was proof of a newly implemented badge system, which merely tracks who is on the tier. It does not record the nature of the visit or with whom the individual actually met. Plaintiffs successfully demonstrated that the deficient conditions continue to persist and will continue to persist into the future.

### c. Periodic Evaluations

During the liability phase of trial, the Court found there to be systemic deficiencies in the ways in which DWCC conducts its periodic evaluations of inmates in restrictive housing. Record Document 641 at 78-86. There are two types of periodic evaluations that mental health clinicians at DWCC must conduct: 1) mandatory mental health evaluations for inmates designated as LOC-2, -3, or -4; and 2) mandatory segregated housing evaluations for inmates who have been assigned to segregated housing for a period greater than thirty days. The Court will address each in turn below.

### i. Mandatory Mental Health Evaluations

In its liability phase opinion, the Court held that DWCC did not conduct the mandatory mental health evaluations of its inmates with a LOC-2, LOC-3, and LOC-4 classification. Record Document 641 at 78. DWCC policy required that mental health staff make individualized contact with inmates designated as LOC-2, -3, or -4 every 30, 90, and 180 days, respectively. *Id.* at 79. These mental health assessments were supposed to be conducted separate and apart from the mandatory periodic segregated housing interviews. Impeding the ability to conduct these mandatory mental health evaluations was the fact that DWCC failed to maintain a list or roster of inmates on the mental health caseload to track the tier to which the inmate was assigned. *Id.*

During the remedy phase of trial, the Court learned that mental health staff are still required to make individualized contact with LOC-2, -3, and -4 inmates every 30, 90, and 180 days, respectively. *See* Ex. JR-15 at 6-7 [Record Document 715-15]. Defendants claim that inmates are provided with these individual contacts within the prescribed period.

In June 2022, the mental health staff began documenting all meetings with inmates, regardless of their purpose, on a new version of the Form 350. Hayden Remedy Trial Tr. vol. V at 1061:14-23 [Record Document 708]. That is, the same form is used for both the mandatory mental health evaluations for those inmates assigned to a LOC-2, -3, and -4, and for those inmates who are in segregated housing for more than thirty days. The Form 350 offers a primary and secondary purpose for the meeting which the mental health clinician can choose from a drop-down list. *See e.g..,* Ex. PR-S-1 at 535 [Record Document 716-132]. The clinician can then provide a summary of the purpose of the visit. *Id.* The form then gives the clinician a list to check off his objective findings, before providing a spot for the assessment and plan. *Id.*

However, as the Court learned, mental health clinicians use one meeting with an inmate to claim that several types of mandatory evaluations or assessments took place during that contact without any narrative or documentation to reflect or support this assertion. When asked by the Court whether a Form 350 reflected that a segregated housing interview or a LOC follow-up interview took place, Hayden simply responded that "it was both" that had taken place. Hayden Remedy Trial Tr. vol. V at 1063:17-21 [Record Document 708]. This practice of using one visit by a mental health clinician to complete two different, required sessions is also one that is reflected in the Form 350s themselves. *See e.g.,* Ex. PR-S-1 at 485, 518, 519, 535, 581, 593, 625, 699 [Record Documents 716-132 and 716-134]. Not only do the forms indicate that the meeting served multiple purposes, but the narrative notes also leave it unclear whether there were specific questions asked pertaining to the inmate's level of care. In fact, the only indication that a LOC or

segregated housing evaluation took place would be on the drop-down menu or under the "plan." Otherwise, the forms are non-specific and do not provide any substantive information other than the inmate's immediate appearance and general disposition. They do not indicate whether the level of care is appropriate; they do not document whether there are any signs of decompensation as a result of segregated housing status; and they do not mention progress towards the completion of treatment plan goals. In summary, while the Form 350s certainly memorialize that *an* interaction took place, the actual notes and documentation of those meetings do not clarify the true substance or nature of the meetings.

Dr. Burns opined that documenting all inmate contacts on the Form 350s is "problematic because not all contacts are the same." Burns Remedy Trial Tr. vol. VII at 1546:7-14 [Record Document 710]. For example, Dr. Burns testified that "if you are doing an individual counseling session, you would expect there would be some detail about what the counseling session was about, as opposed to just that form with those check-off boxes." *Id.* at 1547:5-8. In other words, because different types of evaluations and inmate meetings involve different assessments and levels of documentation, to rely upon a universal form for documentation will necessarily mean that the questions and assessments that are required for each individual meeting will not be included in the form. *Id.* at 1546:14-1547:21. As such, the Court does not find that the implementation of the Form 350 proves that the mandatory mental health evaluations actually take place.

The Court was not provided with any evidence that the LOC interviews took place prior to the implementation of the Form 350 in June 2022. There was no mention of the individualized interviews on the mental health form nor did the summaries of the meetings

allude to any questions or conversations that would indicate that the meeting was meant to serve the purpose of a mental health evaluation. *See e.g.,* Ex. PR-S-1 at 392 [Record Document 716-133]. In other words, prior to the implementation of the Form 350s in June 2022, there was still no indication that these LOC interviews were taking place.

Next, the Court will turn to the LOC lists.[50] During the remedy phase of trial, the Court learned that Robinson provided the key officer with a "LOC list." To compile the list, Robinson generates a list of inmates from the face sheets on the Lotus Notes database. Robinson Remedy Trial Tr. vol. IX at 2031:19-24, 2032:8-20 [Record Document 712]. Robinson then distributes the list weekly. *Id.* at 2032:6-7. However, in their remedy trial testimony, Deputy Warden Dauzat and Robinson disagreed as to which LOC designations should be included on that list. Deputy Warden Dauzat was unable to conclusively articulate which LOC classifications needed to be included in the list provided to security staff. For example, she first testified that a list of all individuals classified as LOC-3 and LOC-4 needed to be sent to security staff every Monday; however, she later testified that only those inmates with a LOC-3 designation are included on the list. *Compare* Dauzat Remedy Trial Tr. vol. VI at 1279:8-11 [Record Document 709], *with* Dauzat Remedy Trial Tr. vol. VI at 2468:2-10 [Record Document 717]. Meanwhile, Robinson testified that she only provided security and medical staff with a list of those inmates classified as LOC-3. Robinson Remedy Trial Tr. vol. IX at 2031:11-16 [Record Document 712].

---

[50] As a reminder, the LOC lists are different from the heat pathology lists provided to security personnel, which the Court will address in greater depth in a later section of this opinion.

The evidence supports Defendants' assertion that it is now providing security staff with a list of inmates who are classified as LOC-3; however, the testimony also made it clear that security staff are not provided with a list of inmates on LOC-4. There is also not an adequate level of oversight over that process. As such, the Court finds that DWCC has failed to remedy this issue as it pertains to the inmates with a LOC-4 designation.

In summary, the Court does not find that Defendants have met their burden in proving that they have remedied the lack of individualized mental health evaluations for inmates who are classified as LOC-2, -3, and -4. First, the Court finds that DWCC does not provide security staff with a list of inmates classified as LOC-4. Additionally, it is not clear that the individualized contacts actually take place as mandated by policy. Certainly, as of June 2022, the mental health clinicians were checking a drop-down menu to show that a meeting served that purpose; however, none of the actual narratives showed any discussions pertaining to level of care or otherwise indicated that these meetings actually took place. Instead, it appears as though the mental health staff were using one meeting with an inmate to essentially check off any meetings required within that same period. Prior to that, there is no documentation to reflect that these meetings were taking place. In other words, Defendants were not able to produce any evidence that these mental health evaluations actually take place other than them being a selectable option in the drop-down menu. It is clear that the meetings are not serving any therapeutic or evaluative function. As noted above, the Court had identified these deficiencies in its liability opinion. Despite these findings, the only change that was made was the creation of a new multi-purpose form. Thus, the Court finds that Defendants have failed to remedy these systemic

deficiencies. And importantly, Defendants; failure illustrates a lack of commitment to the true provision of mental health services mandated by its own policies. Instead, Defendants have concentrated their efforts on documentation, and have failed at this task as well with an inadequate, multi-purpose form. Moreover, Plaintiffs successfully demonstrated that these deficiencies continue to persist and will continue to persist into the future.

ii. Mandatory Segregated Housing Evaluations

As to the second type of periodic evaluation, the mandatory segregated housing evaluation, the Court previously identified systemic deficiencies in the following three areas: 1) Hayden's lack of qualification to conduct the interviews and the lack of audit and/or oversight over his work; 2) the non-confidential nature of the cell-front interviews; and 3) the inadequacy of the assessments themselves and their corresponding documentation. Record Document 641 at 80-86. Inmates on extended lockdown with a "diagnosed behavioral health disorder" will receive a "behavioral health assessment" at least every thirty days. *Id.* at 10. Inmates without a diagnosed behavioral health disorder will receive a behavioral health assessment every ninety days.[51] *Id.*

As it mentioned, the Court previously found that Hayden lacked the qualifications to conduct the segregated inmate interviews; additionally, his work was not supervised or overseen by a qualified mental health clinician. As evidenced by the Form 350s reviewed

---

[51] The Court finds that the existence of this policy belies Defendants' continued assertion that a prolonged stay in segregated housing does not adversely impact an inmate's mental health. If this was the case, then why would DWCC require routine mental health evaluations for inmates in segregated housing, both for those with and those without a diagnosed mental illness.

by the Court, Hayden still conducts segregated housing interviews. *See e.g.,* Ex. PR-S-1 at 32, 155, 233, 381, 535-36, 593-94, and 625-26 [Record Document 716-132]. There is no indication that Burgos or Deputy Warden Dauzat—individuals who are certified to supervise other mental health clinicians—signed off on Hayden's work, nor was there any testimony to show that his work is audited. As such, Defendants have failed to remedy this issue.

The Court also identified the non-confidential nature of the segregated housing interviews as a practice that precludes an inmate from obtaining mental health treatment. During the liability phase, the Court learned that the segregated housing interviews took place cell-front. Record Document 641 at 82-83. The Court agreed with Dr. Burns's opinion that these interviews would be better suited in a confidential environment to ensure that the inmate is free to discuss the state of his mental health without revealing private information and/or without fear of retaliation. *Id.* at 82.

Defendants did not offer any evidence to prove that they have remedied the issue of the non-confidential nature of the segregated housing interviews. As Dr. Burns testified, the forms do not make it clear where the contacts are taking place. Burns Remedy Trial Tr. vol. VII at 1549:3-1550:3 [Record Document 710]. She further opined that something could easily be implemented on a form to demonstrate whether the meetings are confidential, such as a "check-off box about why it was in cell or out of cell, and if it is in cell, the rationale for why it was in cell should be provided." *Id.* at 1549:20-22. From an operations and security standpoint, this would help security staff know the number of staff required to accompany mental health clinicians during their sessions. *Id.* at 1549:22-

1550:03. From a mental health treatment standpoint, this gives inmates an "opportunity for privacy in their mental health contacts and treatment interventions." *Id*. The Court was persuaded by Dr. Burns's opinion. Certainly, there was no mention of the confidential nature of the interviews on the Form 350s or prior versions of the interview forms. Nor did the clinicians indicate that they were only holding sessions in a confidential environment. As such, the Court finds that Defendants were unable to prove that they have remedied this deficiency. Plaintiffs proved that the deficiency persists and is likely to persist into the future.

Finally, the Court turns to the adequacy of the assessments themselves and the corresponding documentation. These deficiencies exist in addition to the already enumerated systemic problems. *See supra* pp. 75-76. During the liability phase of trial, the Court determined that there was no documented evidence of any actual mental health status examination having taken place during the thirty- and ninety-day segregated housing interviews. Record Document 641 at 83. Specifically, the Court found the periodic assessments occurred en masse, with clinicians completing dozens of assessments on the same date. Record Document 641 at 85. Moreover, the assessments lacked any substantive information about the inmates' conditions or mental health status. *Id.* at 83-84.

The Court holds that, as of the close of the August 2022 discovery period, the segregated housing assessments were still being completed en masse. That is, clinicians continue to fill out a large number of forms on many different inmates in one day, as opposed to filling out the forms to document a specific evaluation. This evidence confirms that the evaluations are not taking place as required. For example, on March 2, 2022,

Burgos completed fifty-three segregated housing assessments. *See* Record Document PR-S-1 at 392-444 [Record Document 716-133]. As Dr. Burns testified during the liability phase of trial, each of these assessments should take at least ten to fifteen minutes in order to ask all the required questions and complete all the requisite assessments, excluding the time it would take an inmate to be escorted to and from a confidential setting. Burns Liability Trial Tr. vol. V at 1320:1-6 [Record Document 539]. Clearly, Burgos is not spending this amount of time with the inmates; if so, he would have spent over eight hours completing ten-minute segregated housing assessments, excluding how long it would take to then document every interaction. The forms from these visits are also nearly identical, if not identical.  The almost identical nature of the content from one inmate's assessment to another belies Defendants' assertion that these assessments are individualized.

In summary, the Court finds that Defendants failed to remedy the previously identified systemic deficiencies pertaining to the segregated housing. Conversely, Plaintiffs have met their burden in demonstrating that these systemic deficiencies with regard to the screenings and evaluations at DWCC continue to persist and will continue to persist into the future.

### 2. *Mental Health Treatment*

#### a. Individualization of Treatment

During the liability phase, the Court found that DWCC failed to create meaningful, individualized treatment plans for its inmates with a diagnosed mental illness. Record Document 641 at 89. Specifically, the Court learned that DWCC did not create

individualized treatment plans for its inmates, despite DWCC policy requiring their implementation. *Id.* at 88.

During the remedy phase of trial, Defendants presented evidence that they claimed proved that treatment plans have been individualized since 2021. *See e.g.,* Burgos Remedy Trial Tr. vol. III at 700:7-9 [Record Document 706]. According to Burgos, a mental health provider is tasked with creating the mental health treatment plans for the inmates classified as a LOC-3 or -4 on his caseload. Burgos Remedy Trial Tr. vol. III at 698:16-699:1 [Record Document 706]. Individualized treatment plans must list the inmate's diagnosis, outline goals, list any prescribed medication(s), and indicate whether there are any issues with medication non-compliance. *Id.* at 699:21-700:6.

The Court finds that the implementation and use of these treatment plans are certainly an improvement. However, as it will further explain below, the Court does not believe that the current versions of the treatment plans are adequate and have remedied the deficiencies that were enunciated in the liability phase of trial. Instead, the Court finds that this implementation of those treatment plans is another example of DWCC's tendency to simply "go through the motions."

First, the Court finds that the treatment plans are not sufficiently individualized. The Court reviewed several treatment plans. The top of the plan lists the inmate's name, diagnostic impression, LOC classification, and service code. *See e.g.,* Ex. PR-B-1 at 74 [Record Document 716-11]. The plans contain four columns, wherein a need area is identified, goals are created to treat that need area, an action plan is implemented to attain those goals, and the staff members who are relevant to that action plan are identified. *Id.*

88

At the bottom of the page is a place to notate the implementation date, the date of the next review, a signature line for the inmate, the name and signature from the assigned mental health clinician, and a signature from the supervisor who reviewed the plan. *Id.*

Inmate B.A.'s mental health records provide an example of these inadequate mental health treatment plans. On May 20, 2021, Burgos created the mental health treatment plan for B.A. *Id.* B.A. was identified as having schizoaffective disorder and was classified as a LOC-3. *Id.* The plan then lists B.A.'s need areas, goals, action plans, and the responsible DWCC staff members who—apart from the mental health clinician—did not provide any feedback or opinion regarding the inmate's treatment plan. *Id.* To better illustrate its findings, the Court includes a portion of the mental health treatment plan below:

| NEED AREA | GOALS | ACTION PLAN | STAFF |
|---|---|---|---|
| A/V Hallucinations Depressed Mood Elevated/Manic Mood | Identify stressors relating to psychosis Control response behavior Maintain independent level of functioning with little or no assistance | Routinely meet with mental health and PRN as needed Report changes in symptoms to mental health staff Develop the insight to recognize symptoms of psychosis and significant changes in mood Educated on the importance of maintaining a stable daily routine | Mental Health |
| Medication compliance | Take psychiatric medications as prescribed Be alert and prompt for pill call Promptly report refusal of psychiatric medication to MH | Report any adverse reactions to medications Routinely meet with psychiatrist for assessment Medication compliance checks | Mental Health Medical |
| Treatment plan compliance | Will attend all mental health callouts LOC F/U Psychiatric F/U Medication compliance F/U PRN | Participate in the level of care interview Attend psychiatric assessment and follow up Discuss concerns pertaining to medication compliance | Mental Health |
| Maintain compliance with institutional rules | Strive to transition to a less restrictive housing unit Improve positive social interaction Identify environmental stressors | Display appropriate behavior according to institutional regulations Participate in self-help programming Report environmental stressors to correctional staff | Mental Health Classification Security |

*Id.* The treatment plan was signed by B.A., reviewed by Hayden, and sets a review date of May 20, 2022. *Id.*

On December 16, 2021, Burgos implemented a second treatment plan for inmate B.A. *See* Ex. PR-B-1 at 1 [Record Document 718-21]. On this plan, inmate B.A. is diagnosed with panic disorder—not schizoaffective disorder—and is classified as a LOC-4. *Id.* According to Burgos, changes to treatment plans outside of the one-year review period occur when there has been a change in diagnosis, symptomatic behaviors, or medication compliance, to name a few. Burgos Remedy Trial Tr. vol V at 933:4-14 [Record Document 708]. In B.A.'s case, the second treatment plan was created when Dr. Seal changed B.A.'s diagnosis from schizoaffective disorder to panic disorder. *Id.* at 935:8-936:4. The Court includes the same portion of B.A.'s changed treatment plan below:

| NEED AREA | GOALS | ACTION PLAN | STAFF |
|---|---|---|---|
| Feeling of impending doom or danger Fear of Loss or Death Shortness of Breath, Rapid Heart Rate, Sweating, Trembling Inability to concentrate | Limit triggers that aggravate panic attacks Control response behavior Maintain day to day functioning with little or no assistance Practice mindfulness and controlled breathing techniques | Routinely meet with mental health and PRN as needed Report changes in symptoms to mental health staff Educate on mindfulness techniques | Mental Health |
| Medication compliance | Take psychiatric medications as prescribed Be alert and prompt for pill call Promptly report refusal of psychiatric medication to MH | Report any adverse reactions to medications Routinely meet with psychiatrist for assessment Medication compliance checks | Mental Health Medical |
| Treatment plan compliance | Will attend all mental health callouts LOC F/U Psychiatric F/U Medication compliance F/U PRN | Participate in the level of care interview Attend psychiatric assessment and follow up Discuss concerns pertaining to medication compliance | Mental Health |
| Maintain compliance with institutional rules | Strive to transition to a less restrictive housing unit Improve positive social interaction Identify environmental stressors | Display appropriate behavior according to institutional regulations Participate in self-help programming Report environmental stressors to correctional staff | Mental Health Classification Security |

*See* Ex. PR-B-1 at 1 [Record Document 718-21]. The only changes between the May and December treatment plans pertain to B.A.'s change in diagnosis. And even then, a majority of the goals and the action plans remained the same.

The Court was also provided with the treatment plan for inmate D.O. *See* Ex. PR-B-27 at 1 [Record Document 716-34]. At the time, inmate D.O. was diagnosed with schizophrenia disorder and was classified as LOC-3. *Id.* The plan, implemented on April 13, 2022, was signed by D.O. and Burgos, and was reviewed by Hayden. *Id.* The Court includes a portion of D.O.'s treatment plan below:

| NEED AREA | GOALS | ACTION PLAN | STAFF |
|---|---|---|---|
| Paranoia Delusions A/V Hallucinations | Maintain independent level of functioning with little or no assistance Identify stressors relating to schizophrenia Develop the insight to recognize hallucination and delusional symptoms | Routinely meet with mental health and PRN as needed Report changes in symptoms to mental health staff Educate on the symptoms of schizophrenia Actively identify and report thoughts of self-harm | Mental Health |
| Medication compliance | Take psychiatric medications as prescribed Report to assigned pill call Promptly report refusal of psychiatric medication to MH | Report any adverse reactions to medications Routinely meet with psychiatrist for assessment Medication compliance checks | Mental Health Medical |
| Treatment plan compliance | Will attend all mental health callouts LOC F/U Psychiatric F/U Medication compliance F/U PRN | Attend individual sessions according to MH LOC or sooner if symptoms increase Attend psychiatric assessment and follow up Attend individual session to discuss medication compliance | Mental Health |
| Maintain compliance with institutional rules | Maintain current custody level Improve positive social interaction Identify environmental stressors | Display appropriate behavior according to institutional regulations Participate in self-help programming Report environmental stressors to correctional staff | Mental Health Classification Security |

*Id.* In comparing the May 2021 goals from B.A.'s treatment plan to D.O.'s April 2022 treatment plan, the Court observes that many of the need areas, goals, and action plans are similar to one another. Many of the goals are copy and paste and use almost identical language and abbreviations. The Court doubts the extent to which an inmate's input is truly considered or how individualized these plans are to the needs of each inmate.

The Court also learned that members of the mental health department were not provided any training on these treatment plans. Dauzat Remedy Trial Tr. vol. VI at 1199:9-12 [Record Document 709]. As such, there is no written or formalized documentation that enunciates how the treatment plans should be filled out or that standardizes the content of the meetings with inmates. This is not just an issue at the institutional level, but at the

departmental level as well. According to Deputy Warden Dauzat, the DOC has not implemented a standard form across all facilities that mandates how treatment plans are created. *Id.* at 1198:14-21. In summary, DWCC does not implement base-level standards governing their treatment plans, which can result in variations between different inmates' care, nor is there a mechanism by which the DOC is able to audit or regulate the treatment plans in place at the institutional level.

Furthermore, despite multiple prison officials being listed as responsible staff, and despite the necessary diagnosis from Dr. Seal, the only two individuals that take part in crafting the treatment plan are the mental health clinician and the inmate. Nor does Dr. Seal review the treatment plans in preparation for an appointment with an inmate. Seal Remedy Trial Tr. vol. III at 669:11-13 [Record Document 706]. There was no evidence presented that would prove that Dr. Seal has ever reviewed a treatment plan. Dr. Burns recommended that all members of that inmate's treatment team—including Dr. Seal—be involved in the development of his treatment plan. Burns Remedy Trial Tr. vol. VII at 1582:7-15 [Record Document 710]. In other words, the treatment plans do not contain the most comprehensive input regarding the goals that would best promote an inmate's success.

Additionally, as this Court has already observed, Hayden signs off as the supervisor approving the mental health treatment plans. In fact, despite being head of the mental health department, Deputy Warden Dauzat does not sign off on any of the treatment plans and has not since 2021. Dauzat Remedy Trial Tr. vol. VI at 1197:7-17 [Record Document 709]. However, as this Court has already enunciated, Hayden is not qualified to supervise the other clinicians' work.

Finally, the treatment plans fail to include any metrics or key performance indicators to measure an inmate's success in meeting the goals or action plans that are listed on the treatment plan. The lack of these metrics and/or basic data collection does not allow an inmate to know the extent to which he has progressed in his treatment plans, nor is an inmate made aware when he has failed to make progress towards his treatment plan's goals and action plans. In other words, the annual review is the only mechanism by which the inmate is guaranteed a meeting regarding the status of his treatment plan, and even so, an inmate may not receive any substantive feedback on his progress. This is another example of how inmates are oftentimes left unaware and uninformed of the requirements needed to be completed so that they may transition out of segregated housing. Certainly, the Court could envision that an inmate who is compliant with his treatment plan would be eligible to transition out of segregated housing, and yet, there is no evidence that this is the case.

Dr. Burns also opined that the treatment plans do not include measurable or achievable goals. Burns Remedy Trial Tr. vol. VII at 1584:12-18 [Record Document 710]. Nor did she observe any follow-up by a mental health clinician when an inmate's "general goals" were not attained. *Id.* at 1584:19-1585:5. For example, an inmate may have a general goal of "medication compliance," a goal for any inmate taking medication. But his treatment plan will not indicate whether an inmate has refused medication and at what frequency; whether medication compliance counseling is provided in instances of non-compliance; or whether there were specific objectives to help an inmate attain that goal. *Id.* In conclusion, the treatment plans lack any means by which the mental health clinicians

can meaningfully and substantively determine an inmate's disciplinary and mental health progress.

In summary, the Court finds that Defendants failed to prove that they remedied the lack of individualized treatment plans since the liability phase of trial. However, Plaintiffs proved that there are deficiencies with inmate treatment plans that continue to exist and will continue to exist into the future. The treatment plans are devoid of any: 1) true individualization; 2) input from institutional stakeholders; 3) meaningful audit or review by a qualified mental health professional; 4) metrics to measure inmate growth, decline, or success; and 5) standards, with accompanying staff training, of this standard to ensure that treatment plans are compliant with departmental policy and are consistent across the institution.

### b. Types of Treatment Available to Inmates

Previously, the Court held that the only mental health treatment provided to inmates was the prescription of psychotropic medication, which only further proved the deficiencies in the institution's provision of mental health care. Record Document 641 at 89. DWCC did not offer individual therapy. *Id.* at 90. The Court finds that DWCC still relies upon the prescription of medication as the sole therapeutic service to inmates with mental health issues on the South Compound.

Defendants contend that they have remedied the limited treatment afforded through the provision of counseling services to inmates in restrictive housing. Towards the end of 2021, DWCC employed psychologist Dr. Julia Wood to provide clinical services to individuals on the North and South Compound. Burgos Remedy Trial Tr. vol IV at 804:12-

22 [Record Document 707]. Hayden was Dr. Wood's supervisor;[52] despite this, he did not

know the dates when she was employed at DWCC. Hayden Remedy Trial Tr. vol. V at

975:13-976:10, 982:24-25 [Record Document 708]. Dr. Wood left DWCC after only a few

months because "the environment at [DWCC] was not right for her . . . ." *Id.* at 976:16-19;

Burgos Remedy Trial Tr. vol IV at 804:12-22 [Record Document 707]. As of August 2022,

Dr. Wood's position had not been filled. Dauzat Remedy Trial Tr. vol. VI at 1190:11-13

[Record Document 709]. Deputy Warden Dauzat testified that DWCC was advertising for

the position, as well as for another part-time psychologist position, but had not received

any applications for those roles. *Id.* at 1192:10-1193:12.

When she began her role at DWCC, Dr. Wood requested to use the format that she

typically used to take notes in practice. *Id.* at 1190:1-4. DWCC did not provide her with

any guidance as to the content or format of her notes. *Id.* at 1189:23-25. Dauzat did not

review all of Dr. Wood's clinician notes. *Id.* at 1191:18-23. If Dr. Wood listed

recommendations in her notes, it would be up to her to report that information and any

other relevant findings to the appropriate mental health clinician. *Id.* at 1193:12-23. If that

recommendation involved a referral to Dr. Seal, then the mental health clinician would

need to follow up with Dr. Seal. *Id.* at 1193:23-1194:1.

Dr. Burns opined that Dr. Wood's notes provide an example of what a clinician's

notes *should* look like after a counseling session with an inmate. Burns Remedy Trial Tr.

vol. VII at 1566:1-10. Dr. Burns found that the notes provided a reason for a referral,

---

[52] Again, the Court notes that Hayden would not have been qualified to supervise Dr.
Wood.

"background of the person, what they focused on [in their session], [and] what their condition was. She gave them some homework, and then they came back and followed up with those types of things. That is what you would expect to see in a counseling type note." *Id.*

The Court reviewed Dr. Wood's clinician notes and agrees that her counseling sessions with inmates are a clear-cut example of the types of mental health services that should be offered to inmates in restrictive housing. For example, the Court was provided with psychological service notes summarizing three of Dr. Wood's meetings with inmate D.H. *See* Ex. PR-U-1 at 1-3 [Record Document 716-137]. At the top of the page, Dr. Wood explains why she met with that inmate. The notes indicate that D.H. was initially referred to Dr. Wood "due to repeated need for segregation." *Id.* at 3. He subsequently requested two follow-up appointments. Dr. Wood then explained what the inmate reported, provided her own narrative of the session and her observations, and then created a plan for subsequent sessions. *Id.* at 1-3. In inmate D.H.'s case, Dr. Wood provided homework and discussed her observations as to his physical appearance and emotional state in a detailed, meticulous manner and in such a way that the Court could understand and picture the inmate when reading her narrative. This appeared to be consistent throughout her clinician notes. While some sentences were copy and pasted, such as "[i]mpulse control was limited," *compare id.* at 3, with *id.* at 4, she also incorporated direct quotes from the inmates during their sessions.

Certainly, if Dr. Wood had continued working at DWCC, or if DWCC had been able to find a similarly qualified mental health professional, then the Court would have

found that Defendants had made major strides in remedying the deficiencies in the mental health services provided to segregated inmates. However, this is not the case. DWCC no longer employs a psychologist for counseling sessions. And, even when Dr. Wood was employed, she still was not employed for enough hours to serve the entire mental health caseload on the South Compound. Nonetheless, Dr. Wood's brief stint at DWCC demonstrates what is not only possible but what is feasible in the area of mental health services.

Defendants further argue that they have remedied the limited treatment afforded to inmates through the creation of treatment segregation. Treatment segregation is a new type of segregation classification implemented at DWCC since the liability phase of trial. Sherman Remedy Trial Tr. vol. II at 342:17-23 [Record Document 705]. Per DOC policy IS-B-4, inmates who are "actively psychotic or who need to be segregated from the general population for medical purposes may be placed in treatment segregation by the appropriate staff." Ex. JR-1 at 8 [Record Document 715-1]. This does not include inmates who are displaying depressive symptoms; rather, only those inmates who are unable to perform day-to-day functions can be assigned to treatment segregation. Burgos Remedy Trial Tr. vol. IV at 745:17-746:3 [Record Document 707]. An inmate can only be assigned to treatment segregation at the order of a "physician or other appropriate healthcare practitioner/provider." Ex. JR-1 at 8 [Record Document 715-1]. The DOC does not consider treatment segregation to be a type of restrictive housing. *Id.* Inmates may be assigned to treatment segregation "only for as long as a medical or mental health risk continues," at which point "[t]he physician or appropriate clinical staff shall discontinue

treatment segregation." *Id.* As understood by DWCC personnel, in treatment segregation, the inmate receives twenty-four-hour supervision by medical staff in the infirmary. Sherman Remedy Trial Tr. vol. II at 347:3-11 [Record Document 705]. The main goal of treatment segregation is to ensure that an inmate "gets his proper medications so that [DWCC] can get him back to where he needs to be." *Id.* at 347:9-11. Mental health staff visit inmates in segregated housing at least once every twenty-four hours. Burgos Remedy Trial Tr. vol. IV at 875:11-17 [Record Document 707].

As of August 2022, only two individuals had been assigned to treatment segregation. *Id.* at 876:13-16. Inmate D.O. was housed in treatment segregation for approximately three weeks after having lost the ability to perform his daily functions; he stopped consuming water and food and would not respond to prison officials. *Id.* at 876:24-877:9. After the three weeks in treatment segregation, D.O. was reassigned to H-4 on the North Compound. *Id.* 877:13-21. The second individual, inmate A.E., was transferred from N-4 to treatment segregation for about a week after exhibiting signs of active psychosis. Dauzat Remedy Trial Tr. vol. VI at 1251:16-1252:16 [Record Document 709].

Dr. Burns called treatment segregation an "oxymoron because a person is still held in a cell by themselves, so it is not really treatment. It is still segregation. . . . [And] they're kind of opposite of each other." Burns Remedy Trial Tr. vol. VII at 1573:19-23 [Record Document 710]. She further observed that:

> [t]hey don't get out for recreation. They have someone come and stand at the cell door. . . . [I]t's only been used in two instances, as of the end of August. And in those two instances, it was not clear at all that either of them saw Dr. Seal, that he had any involvement in the decision to place them there, that he had any involvement in the decision of when they left, that there was any

other intervention beyond mental health staff stopping by twice a day to check on the person. Nursing staff did keep an eye on people. I understand that there [are] big windows to be able to see the person. But that is not really treatment. It's monitoring. I think it is an improvement if it is where you are held while you are waiting to go to Elayn[] Hunt for actual treatment.

*Id.* at 1573:19-1574:13.

The Court was convinced by Dr. Burns's assessment of treatment segregation. First, Dr. Seal admitted that he had no knowledge or meaningful understanding of treatment segregation: he does not know where treatment segregation is located; he does not know the criteria for placing an inmate on treatment segregation; he has not recommended that an inmate be placed on treatment segregation; he has not been asked to opine as to an individual's placement on treatment segregation; he does not know the services available to an inmate in treatment segregation; he does not know how many inmates have been placed in treatment segregation since its implementation; and he only learns of an inmate's prior placement in treatment segregation when and if a mental health clinician informs him of that information during an appointment. Seal Remedy Trial Transcript vol. III at 674:6-675:4 [Record Document 706].

Additionally, Hayden was unable to provide the Court with any information pertaining to treatment segregation, despite the fact that he and those he supervises are able to refer someone for placement in treatment segregation. For example, Hayden could not remember the only inmate whom he referred for placement; whether inmates in treatment segregation are allowed any out-of-cell or recreational time; where inmates in treatment segregation eat their meals; or the differences in mental health services to be offered to

inmates on treatment segregation and those offered in regular segregation. Hayden Remedy Trial Tr. vol. V at 1098:17-1105:18 [Record Document 708].

The Court finds that the very fact that neither the prison psychiatrist nor the supervising mental health clinician could enunciate any specifics regarding the requirements and conditions of treatment segregation proves that its purpose is not to provide inmates with mental health treatment, but rather, to medically monitor the inmate and to ensure his medication compliance. In this way, treatment segregation is merely an extension of DWCC's policy and focus on medication as the only available treatment for an inmate's mental health treatment.

In summary, the Court finds that DWCC still relies upon prescription medication as the sole treatment for inmates with mental illness on the South Compound. Defendants do not provide meaningful individual or group counseling sessions. Furthermore, treatment segregation is merely a mechanism to ensure that an inmate in active psychosis is monitored as his medication is administered to him. Defendants failed to meet their burden in proving that DWCC has remedied the deficiencies in the mental health treatment provided to inmates on extended lockdown. Plaintiffs proved that these deficiencies continue to exist and will continue to exist into the future.

### c. Appointments with Dr. Seal

The Court previously held that the manner in which Dr. Seal conducted his appointments prevented inmates from receiving adequate treatment at DWCC. *See* Record Document 641 at 91-93. The Court determined that the location of the meetings—the

courtroom that is used for disciplinary proceedings—and the lack of privacy represented the antithesis of what proper therapy and treatment require. *Id.* at 92.

As will be explained in-depth further below, in 2020, Dr. Seal began to offer his appointments exclusively through Zoom videoconference. Seal Remedy Trial Tr. vol. III at 621:14 [Record Document 706]. Despite this, Dr. Seal's telehealth appointments are still conducted in the courtroom and a member of the mental health department attends the appointment.[53] *See* Burgos Remedy Trial Tr. vol. IV at 798:21-799:18 [Record Document 707]. But, the provision of psychiatric services solely by videoconference has increased the deficiencies in the provision of psychiatric services at DWCC as discussed below. DWCC has made no provisions for increasing the confidentiality of the psychiatric visits if and when they return to in-person.

Additionally, Dr. Seal's psychiatric notes continue to be illegible. *See* Ex. PR-T-3 [Record Documents 716-167, 716-168, and 716-169]. Because the mental health staff cannot read Dr. Seal's notes, a mental health clinician still attends the psychiatric appointments and creates a second progress note from that meeting. Burgos Remedy Trial Tr. vol. IV at 799:13-24 [Record Document 707]. Dr. Seal will then scan and send his notes

_____

[53] During the liability phase of trial, the Court learned that a security officer is present in the room for the psychiatric appointments. Record Document 641 at 92-93. Defendants averred that an inmate could request that the security officer leave; however, there was no evidence presented at trial that would indicate that this actually took place. During the remedy phase of trial, the Court was not presented with any evidence regarding whether this practice continues. Regardless, because the provision of psychiatric services solely by video conference is inadequate and because DWCC has not determined what would happen if the services were provided in person, the Court finds that DWCC has not remedied the lack of confidentiality.

back to the mental health department. *Id.* at 799:25-800:2. Dr. Burns opined that Dr. Seal should either type or dictate his appointment notes to ensure that they are accessible to mental health and medical staff at DWCC. Burns Remedy Trial Tr. vol. VII at 1571:1-4 [Record Document 710]. According to Dr. Burns,

> [i]t's important that the mental health staff be able to read them. It's important that the mental health staff who might be covering a suicide watch or something be able to read what the doctor said about it. The nurses need to be able to read it who are covering on the weekends. The physician, the medical director needs to be -- everybody needs to be able to read his notes. That is why it is written down. If it was not important, it would not have to be written down. It is important for continuity of care and to communicate across shifts, days, and people.

*Id.* at 1571:4-14.

Accordingly, the Court finds that Defendants failed to meet their burden in proving that they remedied the deficiencies concerning the appointments with Dr. Seal, which include the lack of confidentiality during appointments, the lack of legible records from appointments, and—as will be discussed in further depth—the overall inadequacies of the provision of psychiatric services which are exacerbated by Dr. Seal's failure to comply with the terms of his contract and his lack of knowledge pertaining to the conditions of confinement. Plaintiffs proved that these deficiencies continue to exist and will continue to exist into the future.

### d. Therapeutic Materials

As the Court has already mentioned, inmates assigned to investigative, disciplinary, and preventative segregation do not attend group classes or programming. During the liability phase of trial, the Court found that DWCC failed to provide inmates with

"meaningful and helpful therapeutic materials." Record Document 641 at 93. In fact, the only evidence to support Defendants' assertion that they provide inmates with therapeutic materials was a curriculum for an anger management course, which was appropriate for a counselor but not an inmate. *Id.* Not only did Defendants fail to offer any additional evidence that they provide inmates housed on the South Compound with therapeutic materials, but the one document they did introduce proved to be of negligible value to an inmate unless he possessed a certain level of education or had experience working in a mental health setting. *Id.* at 93-94.

During the remedy phase of trial, Kimball testified that in 2022, inmates housed in preventative, disciplinary, and investigative segregation were given correspondence access to therapeutic programming by the mental health department.[54] Kimball Remedy Trial Tr. vol. II at 291:10-20 [Record Document 705]. Those therapeutic correspondence classes are comprised of handouts that are provided to inmates on the North Compound as part of the in-person classes that they attend. Robinson Remedy Trial Tr. vol. IX at 2055:4-10 [Record Document 712]. According to Burgos, inmates on the South Compound can be provided with the handouts, which they can complete on their own in their cell and mail back to the mental health department for any feedback. Burgos Remedy Trial Tr. vol. III at 707:10-710:17 [Record Document 706]; Robinson Remedy Trial Tr. vol. IX at 2053:9-2054:7 [Record Document 712].

---

[54] This is different than the educational correspondence courses offered by external parties, which have been available for over thirty years to "everybody" willing to pay the requisite enrollment fee. Sherman Remedy Trial tr. vol. II at 380:11-21 [Record Document 705].

However, Dr. Burns did not personally witness an inmate with any such materials during her visit. Burns Remedy Trial Tr. vol. VII at 1568:11-12 [Record Document 710]. She also opined that some inmates would not benefit from correspondence courses because they lacked the focus or skills to individually complete the work. *Id.* at 1556:11-16. She also noted that there is no evidence that a mental health clinician performs a follow up session with the inmate to discuss the materials or to discuss the results of their assignments. *Id.* at 1568:2-10. Furthermore, an inmate's completion of these correspondence courses is not noted in his individual treatment plan. *Id.*

The Court finds that Defendants failed to prove that they have remedied the previously enunciated deficiencies with regard to the provision of therapeutic materials. Defendants have been able to prove that there are a variety of correspondence classes of which inmates are able to take advantage. This is certainly an improvement. However, these correspondence classes are still inaccessible to much of the segregated housing population and require a trained professional to either counsel or teach them the materials presented therein. *See* Exs. JR-28-JR-60 [Record Documents 715-23-54]. These correspondence courses would be difficult for any layperson to understand without professional guidance. Without proper follow-up or guidance, inmates who complete these correspondence courses are not able to independently digest the key takeaways or derive any benefit. In summary, Defendants have failed to prove that they have remedied this deficiency since the liability phase of trial. Plaintiffs proved that these deficiencies continue to exist and will continue to exist into the future.

3.  *Staffing of the Mental Health Department*

During the liability phase of trial, the Court found that inadequate staffing at DWCC contributed to the facility's inability to provide adequate mental health care to inmates. Record Document 641 at 94. The inadequate staffing included the lack of access to the prison psychiatrist and the lack of mental health clinicians. *Id.*

As to access to Dr. Seal, during the liability phase of trial, the Court learned that DWCC contracted with Dr. Seal to provide eighteen hours of psychiatric services per month, time which included his travel from Shreveport to Homer. *Id.* The Court found this amount of time to be below the standard of constitutional care and insufficient considering the number of inmates requiring psychiatric intervention at DWCC. *Id.* at 95. Likewise, based on Dr. Burns's testimony, the Court found that the amount of time that Dr. Seal spent with each patient (three to five minutes for a check-up and ten minutes for new patients) was inadequate. *Id.*

During the remedy phase of trial, the Court learned that there was no improvement in the amount of time spent by Dr. Seal with inmates, despite a change in his contract to attempt to increase the provision of psychiatric services. Additionally, the Court finds that Defendants and Dr. Seal misrepresented the amount of time Dr. Seal spent in service to the inmates. As the Court has already explained, Dr. Seal began to provide telepsychiatry in 2020. Seal Remedy Trial Tr. vol. III at 618:13-621:14 [Record Document 706]. Dr. Seal testified that from March 2020 through early 2021, he conducted those Zoom appointments two Thursdays per month for the entire facility. The evidence submitted by Plaintiffs—a compilation of all dates on which Dr. Seal had a documented psychiatric appointment at

DWCC—showed that in 2020, Dr. Seal worked a single, four-hour shift at DWCC in January, three shifts in June, and two shifts each month during the remaining ten months. *See* PR-T-2 at 1 [Record Document 716-136].

In early 2021, DWCC expanded the terms of its contract with Dr. Seal to include two, four-hour shifts via Zoom video conference per week. Seal Remedy Trial Tr. vol. III at 621:14 [Record Document 706]. Under the extended contract hours, Dr. Seal would host his psychiatric clinic for inmates on the North Compound on Wednesday and on the South Compound on Thursdays. *Id.* at 623:1-7. Dr. Seal reported that on Thursdays, he typically met with six to twenty inmates during his four-hour shift. *Id.* at 623:24-624:2. Thus, according to the contract and Dr. Seal's own testimony, he would conduct eight to nine four-hour sessions per month beginning in 2021. While the contract and his testimony might suggest an increase in the time available for psychiatric services to inmates, the evidence at trial showed that Dr. Seal did not fulfill the contract terms and that the time he actually spent with inmates was much less than his contract required. In fact, in 2021, Dr. Seal worked the following number of shifts for the months listed: January (2); February (2); March (3); April (2); May (2); June (2); July (3); August (3); September (5); October (7); November (2); and December (4). *Id.* at 2. In 2022, Dr. Seal worked the following number of shifts for the months listed: January (3); February (3); March (2); April (6); May (6); June (9). *Id.* at 3. In enumerating Dr. Seal's shifts at DWCC since the liability phase of trial, the Court aims to demonstrate that Dr. Seal's contractual duties are rarely fulfilled. The infrequency of his visits results in a lack of mental health services to inmates, especially when the provision of psychotropic medication continues to be the sole

treatment provided to inmates at DWCC. These facts also point out not only Dr. Seal's deliberate indifference to his duties but a disturbing lack of administrative oversight over the sole provision of treatment available to inmates on the South Compound.

A further deficiency in the provision of psychiatric services is that all visits with Dr. Seal are by video conference. The Court understands that this practice might have been necessary as an emergency measure in 2020 and early 2021 due to the COVID-19 pandemic, but the practice continued as of August 30, 2022. There was no testimony from anyone at DWCC that there were any plans to change this practice. Dr. Burns enunciated her concerns about Dr. Seal's conducting all psychiatric appointments via Zoom. During the liability phase of trial, when Dr. Seal was conducting his visits in person at the facility, the Court learned that Dr. Seal did not know anything about the conditions of strip cell status, standard suicide watch, or extreme suicide watch. Record Document 641 at 96. Referencing his lack of understanding and knowledge, Dr. Burns opined that the Zoom nature of Dr. Seal's psychiatric visits further limited Dr. Seal's ability to understand the conditions of confinement that may be impacting the inmate. Burns Remedy Trial Tr. vol. VII at 1568:22-1569:8 [Record Document 710]. Specifically, Dr. Burns testified that it is helpful for the practitioner to know about his client's environment because it helps to "solidify [his] thinking about the environment and the conditions and . . . where the person lived [and] . . . what it was like for them." *Id.* at 1569:16-18. Without understanding the conditions of confinement that his inmates experience, Dr. Seal is unable to fully grasp the impacts to and cause of inmates' mental health status in restricted housing.

While the spread of the COVID-19 virus during 2020 and 2021 may have necessitated the use of Zoom for these psychiatric visits, the Defendants offered no reason why in-person visits have not resumed. The Court is persuaded by Dr. Burns's testimony that the continuation of Zoom visits exacerbates Dr. Seal's lack of understanding of the conditions of confinement that directly affect the mental health of his patients.

In its liability phase opinion, the Court determined that the mental health department at DWCC was inadequately staffed. Record Document 641 at 97. At the time, Hayden and Burgos were the primary mental health practitioners responsible for delivering mental health services to inmates on the South Compound. *Id.* at 98. The Court deemed the staffing at DWCC to be inadequate because of Hayden's lack of qualifications; the approximate size of the South Compound's mental health case load; and the substantial number of responsibilities on the North Compound that each man had concurrent with his South Compound responsibilities. *Id.*

During the remedy phase of trial, the Court learned that DWCC hired two new social workers, Julia Spivey and Lisa Wells, to provide care to inmates housed on the North Compound. Ex. JR-60 at ¶ 38 [Record Document 715-54]. This allows Burgos and Hayden to "focus on the South Compound." *Id.* Robinson primarily supports the North Compound, *id.*, although she testified that will assist Burgos and Hayden with their South Compound responsibilities as needed, Robinson Remedy Trial Tr. vol. IX at 2028:13-16 [Record Document 728]. It is worth noting, however, that Burgos and Hayden do not work weekends, resulting in an inmate having to wait through the weekend to speak with a mental health practitioner should he experience mental health problems.

DWCC appears to acknowledge that it is severely understaffed. From August to December 2021, as mentioned above, DWCC employed a psychologist named Dr. Julia Wood. Dauzat Remedy Trial Tr. vol. VI at 1190:5-7 [Record Document 709]. Dr. Wood primarily worked with inmates housed on the South Compound. *Id.* at 1189:17-19. However, Dr. Wood left DWCC because she did not find it to be a comfortable working environment. *Id.* at 1190:8-10. DWCC has been unable to fill her position in the year since she left. *Id.* at 1190:11-13. According to Deputy Warden Dauzat, as of August 2022, DWCC was seeking to hire two new psychologists. *Id.* at 1192:10-1193:11. One would be a full-time, contract psychologist, while the other would be a part-time civil service psychologist whose time would be split with another DOC program. *Id.* However, these two positions are still vacant and therefore the South Compound inmates are still suffering from inadequate staffing. Thus, considering Hayden's lack of qualifications and the inability of DWCC to hire extra staff, the Court finds that DWCC has been unable remedy this inadequate staffing.

Considering the evidence presented by the parties at trial, the Court finds that Defendants failed to remedy the inadequate staffing at DWCC, with respect to both the psychiatric services as well as the mental health department. This inadequate staffing further demonstrates the systemic deficiencies in the mental health program available to inmates housed on the South Compound. Plaintiffs were able to prove that these deficiencies in staffing continue to exist and will continue to exist into the future.

4. *Administration of Psychotropic Medication*

During the liability phase of trial, the Court found that there were widespread systemic deficiencies with respect to the administration of psychotropic medication that rose to the level of a constitutional violation, including: the lack of adequate training provided to Pill Call Officers; the failure to provide Pill Call Officers with adequate written guidance or other written materials; the absence of reporting systems; the lack of follow-up for medication non-compliance; the failure to audit or provide quality assurance of the Pill Call Officers' job performance; and the failure to provide the prison psychiatrist, Dr. Seal, with access to the Electronic Medication Administration Records ("E-MAR") system. Record Document 641 at 98. The Court will address each issue in turn.

Previously, DWCC employed Sgt. Paul Pitts ("Pitts") as the Pill Call Officer for the South Compound. Record Document 641 at 99. Prior to beginning the role, Pitts received one to two days of training from a DWCC nurse on the "Pill Pass Policy," which was a brief PowerPoint Presentation that detailed the procedures for administering medication and the reasons why those procedures were important. *Id.* Since the liability phase of trial, Pitts was replaced with Austin Burns and Rimmer, both of whom serve as Pill Call Officers on the South Compound. Ex. JR-60 at ¶ 58 [Record Document 669]. Austin Burns's testimony highlighted a similar training experience to that outlined by Pitts. Specifically, Burns testified that he received hands-on training by the medical staff on the intricacies of medication administration, including the time that medication is dispensed, procedures for dispensing the medications, and which medications an offender was prescribed. Ex. PR-BB-2 at 9:5-20 [Record Document 714-2]. Rimmer, however, testified that his hands-on

110

training was conducted by "the previous [P]ill [C]all [O]fficer, Matt Wiese," and the training on the E-MAR was conducted by Austin Burns—notably, not medical staff. Ex. PR-BB-3 at 9:9-10:1 [Record Document 714-3]. Both men testified that they receive annual training every February by medical staff and that the PowerPoint displayed during that training is provided to them for reference. *See id.* at 9:16-23; *see also* Ex. PR-BB-2 at 9:5-20 [Record Document 714-2]. This annual training was in effect during the liability phase of trial. As will become apparent in this section, the Court finds that DWCC has failed to remedy the previously enunciated deficiencies in its administration of psychotropic medication.

As the Court previously mentioned, Austin Burns has a criminal justice background. Defendants did not introduce any evidence to suggest that he has any medical training or education. Yet, DWCC tasked Austin Burns—who had only assumed the Pill Call Officer role a few months prior to Rimmer—with providing Rimmer the requisite "hands-on" training relating to sensitive topics such as proper procedures for medication administration and the effects of medication non-compliance. Austin Burns was not qualified to provide Rimmer with that training and could not properly advise Rimmer of what medical side effects or symptoms might warrant intervention by the medical staff, especially considering his tenure in the position at the time. Only a medical professional would have been qualified to provide that training.

Dr. Burns recommended that medication administration be completed by nursing staff, as is the common practice in general population. Burns Remedy Trial Tr. vol. VII at 1565:3-6 [Record Document 710]. Defendants had no explanation for why less qualified

individuals were tasked with medication administration on the South Compound, a population with a greater overall percentage of inmates who are diagnosed with mental health issues and more complicated medication administration issues.

Austin Burns and Rimmer also testified regarding the processes for administering medication on the South Compound, which are the same as those outlined by Pitts during the liability phase of trial with a few significant exceptions. *Compare* Ex. PR-BB-3 at 11:16-14:3 [Record Document 714-3], *and* Ex. PR-BB-2 at 13:4-14:23 [Record Document 714-2], *with* Record Document 641 at 99-100. First, Austin Burns and Rimmer conduct their morning, lunch time, and evening rounds at 6:00 a.m., 12:00 p.m., and 2:00 p.m., respectively, despite the policy dictating that the evening round should be conducted at 4:00 p.m. *Id.* at 20:22-21:1; Ex. PR-BB-2 at 19:2-21 [Record Document 714-2]. The Pill Call Officers testified that they have been administering the evening medication at 2:00 p.m. since they assumed their duties. *Id*. at 19:19-21 [Record Document 714-2]; Ex. PR-BB-3 at 21:2-3 [Record Document 714-3].

Dr. Burns testified this is a direct violation of DWCC policy.[55] Burns Remedy Trial Tr. vol. VII at 1559:15-17 [Record Document 710]. Dr. Burns further opined that administering an evening medication at 2:00 p.m. negatively impacts an inmate. *Id.* at 1559:24. First, taking the medication at 2:00 p.m. will result in the inmate being unable to experience the effects of that medication later in the evening. *Id.* at 1559:19-24. Additionally, the early administration of medication means that inmates who are prescribed

---

[55] The parties did not offer this policy into evidence for the Court to review independently.

psychotropic medications that require blood monitoring—like lithium—will not have an accurate reading because their blood is not drawn at the correct time. *Id.* at 1560:6-21. As Dr. Burns explained,

> [There are] ramifications, as we talked about before, where things like lithium, the level is supposed to be drawn 12 hours after the last dose. If they get their evening dose at 2 p.m., that means their blood level should be drawn at 2 a.m, in the morning. But it is not. It's drawn later. And it might even be drawn after 5:00 when they have their morning dose. So the level is going to look either really low, because it is now 15 hours or 16 hours after the last dose, or elevated because they got another dose in the meantime before the level was drawn. And most medicines are measured at their -- or their low level. And so it has ramifications, not only for the impact on the person for whom you are prescribing something to help them sleep, but also in managing blood levels and interpreting them correctly, and then adjusting medicine based on that interpretation.

*Id.* The Court is persuaded by Dr. Burns's opinion regarding the potential harms that are posed by administering the evening medication at 2:00 p.m. and finds that the practice displays further evidence of the deliberate indifference that DWCC displays towards this risk of harm.

During the liability phase of trial, the Court heard testimony regarding the process that the Pill Call Officer took to record medication non-compliance. Prior to March 2020, the Pill Call Officer would record an inmate's consumption of medication in the E-MAR system after each round. Record Document 641 at 100. If an inmate refused the medication, the Pill Call Officer would input an "R" in the E-MAR system; if the medication was not requested, he would input an "N" in the system. *Id.* However, after reviewing a group of E-MAR sheets, the Court found there to be widespread inaccuracies in the records kept by the Pill Call Officers and no follow-up by medical or mental health staff regarding

medication non-compliance. *Id.* at 103-104. For example, as is discussed in more detail below, Dr. Seal did not have access to the E-MAR and did not know whether a printed copy of the E-MAR (known as a "MAR") was in each relevant inmate's chart. Instead, he had access to older records printed off at the end of each prior month. He also testified that he did not know what the "N" and "R" in the MARs indicated. *Id.* at 104. In a situation where medication administration is the *only* treatment being afforded to inmates with mental illness, it is startling that such inadequacies existed around its administration.

During the remedy phase of trial, the Court learned that the Pill Call Officers continue to use that same process to indicate whether an inmate has refused his medication.[56] Ex. PR-BB-2 at 24:5-28:1 [Record Document 714-2]; Ex. PR-BB-3 at 27:4-29 :7 [Record Document 714-3]. Dr. Burns testified that DWCC "reported that they were more closely monitoring" medication non-compliance. Burns Remedy Trial Tr. vol. VII at 1564:16-19 [Record Document 710]. But it was not clear from the testimony exactly what that meant. Deputy Warden Dauzat testified that she reviews the E-MAR for medication compliance at irregular intervals; however, those reviews have never triggered any follow-up or changes to DWCC policy. Dauzat Remedy Trial Tr. vol. VI at 1264:1-12 [Record

---

[56] During the remedy phase of trial, the Court heard testimony about a new medication administration system that DWCC was attempting to implement, known as the sMARt system. Burgos Remedy Trial Tr. vol. IV at 815:24-817:7 [Record Document 707]. However, even as of January 2023, the system was not operational because of system failures and inaccuracies. *Id.* Dr. Burns opined that, so long as DWCC could ensure that its data was reliable, the sMARt system would be a positive change because it allows for the contemporaneous administration and documentation of medication. Burns Remedy Trial Tr. vol. VII at 1563:4-1564:2 [Record Document 710]. She argued that this automated documentation could ensure a more efficient and accurate way of administering and recording medication administration and non-compliance. *Id.*

Document 709]. The parties did not offer any MARs into evidence for the Court to independently review. Considering this information, the Court finds that the medication administration is being handled by improperly trained and credentialed individuals, is being administered at improper times, and is not properly reviewed by the administration or by medical staff for medication non-compliance. As it highlighted in its liability phase opinion, the Court found that these inadequacies put inmates at risk of further mental health decompensation. Record Document 641 at 104.

During the liability phase of trial, as noted above, Dr. Seal testified that he did not have access to the E-MAR and did not know whether a physical copy of the MAR was in an inmate's chart. *Id.* He also did not understand what the "N" and "R" designations on the MAR printouts indicated. *Id.* During the remedy phase of trial, the Court learned that Dr. Seal still does not have access to the E-MAR and is not provided a physical copy of an inmate's MAR for his appointments. Robinson Remedy Trial Tr. vol. IX at 2038:11-15 [Record Document 712]. Instead, Robinson testified that Dr. Seal must rely upon a staff member to tell him that an inmate has not been taking his medication. *Id.* at 2038:15-18. Robinson explained that it was her own practice to speak with an inmate before his psychiatric appointment regarding his medication non-compliance, but no evidence was presented to confirm that these conversations actually take place. *Id.* at 2038:22-2039:3. Neither Burgos nor Hayden testified that they follow these same procedures. Nor was the Court presented with any testimony that Robinson or Hayden reviewed the E-MAR prior to appointments with Dr. Seal. Burgos testified only that he reviewed the E-MAR more

115

frequently for medication compliance than he had previously. Burgos Remedy Trial Tr. vol. IV at 817:8-25 [Record Document 707].

The Court finds that officials at DWCC have not remedied the deficiencies in the administration of psychotropic medication, including: the lack of adequate guidance and training; the absence of reporting systems; the unqualified Pill Call Officers tasked with administering the inmates' medication; the lack of processes or procedures to review a Pill Call Officer's documentation of medication non-compliance; the inadequate administration of medications including administration at the wrong times; and the lack of follow-up for medication non-compliance including the fact that Dr. Seal is not notified of and his inability to review an inmate's medication non-compliance. Again, in a system where the only treatment for mental illness is medication, such deficiencies show a deliberate indifference as to the health and safety of inmates with mental illness. Plaintiffs proved that these systemic deficiencies persist and will continue to persist into the future.

### 5. *Lack of Accurate and Adequate Records*

During the liability phase of trial, the Court found there to be deficiencies in DWCC's record keeping practices and procedures. In addition to the issues with record keeping that have already been addressed—including duplicate records, the lack of detail and attention in maintaining medical and mental health records, inconsistencies between reporting procedures and records, and illegible writing—the Court held that Dr. Seal did not maintain the requisite quality and quantity of record keeping that his role requires to protect and treat inmates. Record Document 641 at 105-06. Additionally, the medical records were devoid of any indication that inmates sign consent forms or receive any

documentation outlining the risks and benefits of the medications that Dr. Seal prescribes. *Id.* at 106. During the remedy phase of trial, Defendants did not provide any evidence to prove that these deficiencies have been remedied.

In its liability phase opinion, the Court held that that the inmates' records lack any documentation that would show that Dr. Seal actively participated in treatment team meetings or intervention development, which Dr. Burns claimed was a responsibility of a prison psychologist. *Id.* During the remedy phase of trial, the Court learned that this had not been remedied. First, there is no prison psychologist. In such absence, not only did Dr. Seal not participate in the creation of an inmate's treatment plan, but he also was not involved in the development of the treatment plan form, nor did he review an inmate's treatment plan prior to a clinical visit. Seal Remedy Trial Tr. vol III at 669:3-20 [Record Document 706]. However, his diagnoses are used by the mental health clinicians when creating the plan. *Id.* at 669:19-20. In sum, Dr. Seal's records do not show that he plays any active role in an inmate's treatment plan, other than to indicate whether an inmate has been diagnosed with a mental illness.

### 6. *Suicide Prevention Program*

Courts have held that prisons must have adequate suicide prevention policies to provide constitutional care. *Ruiz*, 503 F. Supp. at 1339; *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1219 (M.D. Ala. 2017); *Madrid*, 889 F. Supp. at 1258. "[T]he identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program." *Ruiz*, 503 F. Supp. at 1339. During the liability phase, the Court found that the suicide prevention program at DWCC failed to provide

inmates with the requisite level of care, especially because the policies resulted in a failure to identify, treat, and supervise inmates with suicidal tendencies. Record Document 641 at 107. As will be elaborated upon further, the Court finds that Defendants have failed to remedy the constitutionally inadequate policies and processes governing the suicide prevention program at DWCC.

### a. Punitive Nature of the Suicide Prevention Program

As the Court discussed in depth in its liability phase opinion, an inmate may be assigned to two different types of suicide watch: standard and extreme. *Id.* Specifically, the Court learned that "standard suicide watch is for the management of offenders who are at risk for suicide but do not present a clear and continual risk of self-injurious behavior(s)," whereas extreme suicide watch is for "the management of offenders who present a clear and continual risk of self-injurious behavior." *Id.* (quotation marks and citations omitted). Those definitions have not changed since the liability phase of trial.

In that opinion, the Court found that the conditions of standard suicide watch mirror the conditions of strip cell status because inmates were deprived of all personal property— including clothing and mattresses—and were only permitted to wear paper gowns. *Id.* at 108. DWCC also informally placed some inmates on "manipulative suicide watch," which occurred when an inmate displayed self-injurious behavior because he was "looking for a cell move" or was aggravated with the staff. *Id.* According to Hayden, an inmate placed on manipulative suicide watch was stripped of his property, while those who were deemed legitimately suicidal were allowed to keep a few possessions. *Id.* This demonstrated to the

Court that inmates were not stripped of their personal belongings to ensure their security or the security of the facility but rather to impose a punitive sanction on the individual. *Id.*

During the remedy phase of trial, the Court learned that a new policy governing the suicide prevention program at DWCC went into effect on March 21, 2022. *See* Record Document JR-14 at 1 [Record Document 715-14]. The policy itself does not represent any change to the actual conditions of standard suicide watch, despite instructing DWCC's staff to use the least restrictive measures necessary to ensure that the inmate does not harm himself. *Id.* at 8. Nor did testimony from DWCC officials indicate that the conditions of standard suicide watch have been remedied. *See ex.* Hayden Remedy Trial Tr. vol. V at 1035:21-24 [Record Document 708]. Hayden testified that it must be specifically documented in a management order that an inmate on suicide watch may receive a suicide mattress or remain with any of his property. *Id.* at 1033:10-16. Hayden further represented to the Court that it was his general practice to ensure that inmates on suicide watch were provided with mattresses. *Id.* at 1033:17-19. However, the Court reviewed only a single management order wherein Hayden explicitly permitted an inmate on suicide watch to possess any belongings or a mattress. *See* Ex. PR-B-4 at 182 [Record Document 716-154 at 8]. In summary, DWCC has failed to remedy this deficiency in its suicide prevention program.

The Court also finds that Plaintiffs were able to carry their burden in proving that suicide watch continues to be used to punish inmates. The strongest example of this was

119

exhibited in an interaction between security staff and inmate J.B.[57] According to an UOR, filed in conjunction with this incident, J.B. was pepper sprayed and placed in leg shackles by security staff for refusing to drop to his knees at his cell front and for subsequently biting a security officer. Ex. PR-C at 4 [Record Document 716-40]. After being escorted to the courtroom to speak with Assistant Warden Mays, Coleman, Hayden, and a member of the nursing staff, J.B. was placed on standard suicide watch. *Id.* After removal from standard suicide watch, Hayden ordered that the inmate be placed on strip cell status. *Id.* None of the UORs relating to this incident provide a reason why J.B. was placed on standard suicide watch and then strip cell status. *See generally id.* Certainly, the narrative does not demonstrate that J.B. made any concerning statements or engaged in self-injurious behavior during his meeting with staff, as it is reported several times that J.B. refused to speak. *Id.* at 4, 13.

Considering this, the Court finds Hayden's assignment of J.B. to standard suicide watch was punitive—and not preventative—in nature. First, there was no indication that J.B. had threatened to commit suicide; additionally, there is no record that J.B. was engaging in self-injurious behavior. Certainly, the narrative of events indicates that J.B. was not following the directives given by security staff. However, mere non-compliance— though perhaps a security concern—does not mean that J.B. was suicidal. This finding is supported by the fact that J.B. was assigned to strip cell status immediately thereafter.

---

[57] Out of respect for the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed. This J.B. is different from the inmate previously discussed. *See infra* p. 135.

In another example discussed during the remedy phase of trial, on March 22, 2021, inmate T.D. submitted a complaint through the Administrative Remedy Procedure ("ARP") reporting that he was pepper sprayed while placed on extreme suicide watch in a black box with handcuffs, waist chains, and shackles for engaging in self-injurious behavior. Ex. PR-M-1 at 1 [Record Document 716-125-1]. In the ARP, the inmate recounts the following narrative:

> I was on suicide watch (extreme watch) placed in full alternative restraints . . . due to self-mutilation apx. 2 hours before [the] [] incident . . . I notified them that I wasn't in my right state of mind, due to not consistently taking my mental health medication and that I wanted to see the social worker. He told me that I wasn't seeing anybody and deployed chemical agent while I was fully restrained and in a suicide gown in the cell. I then continued to notify them that I wanted to see somebody. Chemical agent was deployed a second time. . . . I was forced to sit in the cell fully restrained, with the same suicide gown on full of mace, never given a shower or mattress either, until apx. 12 hours later when the next shift came on.

*Id.*

Danny Henshaw's UOR relating to the incident confirms, in part, T.D.'s narrative of events. According to Henshaw's UOR, Henshaw was dispatched to an incident in N-1, where it was reported that T.D., who was on extreme suicide watch in "alternative restraints," was "banging his head on the wall and on the top bunk." *Id.* at 9. Because he was banging his head, a chemical agent was deployed. *Id.* A second burst of chemical agent was deployed after T.D. continued to scream and failed to comply with the officer's orders. *Id.* Henshaw claims that T.D. was escorted to the lobby to visit with a nurse, where he was offered, but refused, an eye wash, given a clean paper gown, and placed back in his cleansed cell in restraints. *Id.* This incident highlights the punitive nature of suicide watch

at DWCC. Certainly, pepper spraying an inmate for exhibiting self-injurious behavior—one who is already in restraints for cutting himself—is not going to remedy the situation or improve his mental health, and clearly, this is not an instance where security staff utilized the least amount of force necessary for terminating the behavior.

During the liability phase of trial, the Court learned that inmates assigned to extreme suicide watch were subjected to the same conditions as standard suicide watch, with the exception that those on extreme suicide watch could be placed in restraints. Those restraints included:

> (1) four-point restraints, which consist of both hands being cuffed with the chain for the cuffs connected to a box at the mid-section, designed to prevent movement or tampering, a belly chain connected to the handcuff chain, and shackles on the ankles; (2) placing a prisoner in a restraint chair, which attaches each limb to the chair; or (3) the placing of the prisoner in a restraint chair, as above, with a helmet to prevent spitting and head banging.

Record Document 641 at 109 (citation omitted).

Considering the compelling testimony by both parties' experts, the Court found that the policies and practices surrounding the use of restraints on inmates housed on extreme suicide watch rose to the level of an Eighth Amendment violation. *Id.* at 111. First, the Court found that the use of the restraint chair for indefinite periods of time and without constant supervision was a deviation from DWCC's own policies, was a practice that fell well below the minimum standard of mental health care, and put inmates at risk of serious medical complications, including death. *Id.* at 110-111.

Despite Hayden's testimony to the contrary, *see* Hayden Remedy Trial Tr. vol. V at 1014:5-1021:23, Plaintiffs presented evidence during the remedy phase of trial that DWCC

continues to utilize the restraint chair, *see* Ex. PR-B-33 at 313 [Record Document 716-37]; PR-C-1 at 719 [Record Document 716-43]. The Court reviewed a UOR detailing another example entered into evidence of cruel and unusual punishment in the suicide prevention program. On August 21, 2021, inmate N.B. was placed on extreme suicide watch by Hayden and a physician. Ex. PR-C-1 at 719 [Record Document 716-43]. According to the UOR, inmate N.B. was in the restraint chair in the lobby being seen by a nurse for a self-inflicted cut to his inner thigh. *Id.* As a reminder, inmates in the restraint chair are shackled at their wrists and feet. The officer claims that N.B. became "combative and violent" as the nurse attempted to treat the wound. *Id.* The officer claims that N.B. was given "several direct verbal orders" to discontinue his actions, which N.B. disregarded. *Id.* As a result, N.B. was pepper sprayed, while restrained in the chair. *Id.* The narrative then describes that N.B. was unstrapped from the restraint chair and restrained for a shower, at which time it was discovered that he had a razor blade in his mouth. *Id.*

Since the liability phase of trial, DWCC purchased a restraint bed to be used for inmates on extreme suicide watch. Coleman Remedy Trial Tr. vol. I at 100:12-15 [Record Document 704]. Though procured in early September of 2021, the bed did not become operational until October of that year. Dauzat Remedy Trial Tr. vol. VI at 1204:6-20 [Record Document 709]. DWCC utilizes leather restraints to secure an inmate to the bed. Coleman Remedy Trial Tr. vol. I at 101:1-4 [Record Document 704]. When utilized, the restraint bed is placed in the inmate's cell. Burgos Remedy Trial Tr. vol. IV at 750:14-19 [Record Document 707]. Nail provided staff with training on the proper use of the restraint bed. Dauzat Remedy Trial Tr. vol. VI at 1211:1-3 [Record Document 709].

Body camera footage dated December 11, 2021, shows the restraint bed in use with inmate N.B. *See* Ex. PR-D-46 [Record Document 48]. The video, which is one minute and ten seconds in length, shows N.B. laying on the restraint bed in his cell. *Id.* The bed is placed in a slightly diagonal position, with N.B.'s head towards the entrance of his cell and his feet down by the toilet and sink. *Id.* The diagonal positioning suggests that the restraint bed is too long to fit into the cell. Despite being called a restraint bed, there appears to be no mattress on the fixture, which has a solid, plastic-type appearance. *Id.* N.B. is restrained at his ankles and wrists with the leather restraints. *Id.* In the video, a nurse converses with N.B. and checks what appears to be a leg wound. *Id.* N.B. appears to struggle against the restraints a bit but is only able to lift his head into a half-crunch position and only slightly bend his knees. *Id.*

Dr. Burns opined that the restraint bed is an improvement over the metal restraints previously used but stated that the restraint bed's appropriate use is "in a health care setting." Burns Remedy Trial Tr. vol. VIII at 1679:13-21 [Record Document 722]. However, as the Court's summary of the video demonstrates, the bed is not utilized in a healthcare setting but in the inmate's own cell. In fact, in all six instances where the restraint bed had been used, the inmate was left in his cell. Dauzat Remedy Trial Tr. vol. XI at 2396:1-10 [Record Document 717]. As Plaintiffs' experts testified during the liability phase of trial, an inmate should only be placed in full restraints in a health care setting because he requires monitoring by the requisite health care professionals. *See* Record Document 641 at 110-111 (citing Burns Liability Trial Tr. vol. V at 1371:14-1372:17

[Record Document 539]; Pacholke Liability Trial Tr. vol. XII at 2750:11-2751:16 [Record Document 553]).

The Court finds that DWCC has continued to employ practices and procedures against inmates on standard and extreme suicide watch that subject some of its most vulnerable inmates to mental and emotional torture. Officials at DWCC continue to use suicide watch to punish inmates. This is explicitly demonstrated by the fact that inmates are deprived of their personal property for extended periods of time without proper justification; inmates are assigned to suicide watch for misbehaving or exhibiting signs of mental decompensation; inmates are pepper sprayed while in restraints; and restraints are used on extreme suicide watch outside of a heath care setting. Because it has been established that DWCC continues to use standard and extreme suicide watch as a means of punishing—not protecting—its inmates, the Court has determined that Defendants failed to remedy the deficiencies enunciated in its previous ruling. Plaintiffs proved that the deficiencies continue to persist and will continue to persist into the future.

### b. Lack of Meaningful Treatment

The Court previously held that there were no meaningful opportunities for treatment available to inmates housed on suicide watch; that inmates were not assessed before being placed on suicide watch; that inmates were not provided with treatment while on suicide watch; that inmates were not provided with a mental health evaluation prior to assignment to suicide watch; and that there is no treatment or assessment provided to inmates removed from suicide watch. *See* Record Document 641 at 111.

First, the Court found that DWCC failed to conduct a suicide risk assessment gauging the inmate's needs and mental health history before placing him on suicide watch. *Id.* Defendants failed to provide any evidence proving that they have remedied this deficiency. Instead, Plaintiffs provided evidence demonstrating that officials at DWCC do not conduct these assessments. The Court reviewed mental health management orders where a mental health professional ordered that an inmate be placed on suicide watch. *See e.g.,* Ex. PR-B-10 at 38, 104. The Court did not see any mention of or reference to any assessment made before those mental health management orders occurred, nor do these orders indicate that an assessment was conducted. In short, Defendants have failed to provide evidence that they have remedied this issue.

Second, during the liability phase of trial, the Court learned that inmates were not provided treatment while on suicide watch. Record Document 641 at 113. Specifically, the Court found that the only treatment available to inmates on suicide watch was the provision of psychotropic medication. *Id.* Dr. Seal was not involved in an inmate's placement on suicide watch. *Id.* And inmates on suicide watch were not given an opportunity to participate in individual or group programming or therapy. *Id.* Defendants did not present any evidence that proved these issues have been remedied since the liability phase of trial or that inmates receive any additional treatment other than the prescription of psychotropic medications.

During the liability phase of trial, the Court learned that Dr. Seal "did not make any decisions regarding the conditions on suicide watch, did not decide when an inmate should be removed from suicide watch, and did not know the differences between standard and

126

extreme suicide watch." *Id.* Defendants did not provide any evidence to suggest that Dr. Seal now plays an active role in the decision regarding whether to place an inmate on suicide watch. Dr. Seal did testify that it was his "understanding" that inmates on suicide watch are "sometimes" assigned to his next clinic. Seal Remedy Trial Tr. vol. III at 643:2-16 [Record Document 706]. Thus, an inmate on suicide watch gets no other psychiatric evaluation of his current condition, past mental health symptoms, or help unless he just happens to be assigned to Dr. Seal's next clinic. However, at that clinic visit, Dr. Seal is not provided records that would give a narrative of the events that led to the inmate's assignment to suicide watch. In other words, as Dr. Seal testified, during the clinic he is only "verbally" informed by the mental health personnel that the inmate is on suicide watch. *Id.* at 643:17-644:13. Dr. Seal could not enunciate a date when this practice of oral reporting began. *See id.* at 644:14-17. The Court also learned during Dr. Seal's testimony that it is not his typical practice to make a note in his record of whether an inmate he is seeing has been on suicide watch. *See id.* at 641:14-642:1. In summary, it appears as though Dr. Seal's claim during the liability phase of trial—that his "job is only to diagnose and to provide medication"—continues to be true in the present day. *See* Record Document 641 at 113. Furthermore, the lack of information about an inmate's status on suicide watch calls into question Dr. Seal's ability to effectively diagnose and treat an inmate's mental illness.

Defendants reference language in the suicide prevention policy that requires that an inmate on standard and/or extreme suicide watch be evaluated every twenty-four and twelve hours, respectively. Ex. JR-14 at 8 [Record Document 715-14]. The fact that an evaluation is conducted does not mean that an inmate is actually receiving any form of

therapy with a qualified mental health clinician, only that the policy requires that an inmate be visited by a mental health clinician within a prescribed period. The Court did not review any documentation to indicate that an inmate on suicide watch received any substantive therapy or treatment, either individually or in a group setting. Nor did Defendants provide any evidence to suggest that inmates on suicide watch were allowed to attend any group programming. As in the liability phase, the DWCC policy and procedures center on "checking boxes" rather than providing treatment.

There was also an absence of evidence regarding any specific evaluation administered and documented to remove an inmate from suicide watch. During the liability phase of trial, Hayden testified that inmates were removed from suicide watch when they told him that they were no longer suicidal. Record Document 641 at 116 (citing Hayden Liability Trial Tr. vol. III at 581:6-18 [Record Document 536]). This practice continues.

Finally, Defendants did not provide any evidence to suggest that inmates are assessed after they are removed from suicide watch. The suicide prevention policy requires that "follow-up contact" be made with the inmate by a member of the mental health staff within seven days of suicide watch being discontinued "to assess the offender's current mental status and suicide intent." Ex. JR-14 at 7. However, Defendants did not present any testimony to prove whether this "follow-up contact" takes place and if it does, what that assessment is comprised of.

In short, the Court finds that officials at DWCC continue to provide inadequate mental health treatment to inmates on standard and extreme suicide watch. Defendants do not conduct a risk assessment of inmates prior to their assignment to suicide watch; Dr.

Seal is not notified that his patient is assigned to suicide watch; inmates are not automatically seen by Dr. Seal immediately upon their assignment to suicide watch or even during his next clinic; inmates are not provided any individual or group therapy or allowed to attend any group programming during or after placement on suicide watch; and there are no evaluations or assessments conducted to remove an inmate from suicide watch or after he is removed from suicide watch. In short—in continuing to rely on psychotropic medication without any sort of treatment or therapy—Defendants failed to remedy these deficiencies. Plaintiffs proved that inmates continue to be put at substantial risk of harm and will continue to be at risk of harm into the future.

c. Failures in Observing Inmates on Suicide Watch

In its liability phase opinion, the Court held that there were failures in the observation of inmates on suicide watch that rose to the level of a constitutional violation. Record Document 641 at 116. Specifically, the Court identified issues with DWCC's processes in monitoring inmates on suicide watch. *Id.* at 116-118. During the liability phase of trial, the Court learned that DWCC policy mandated that inmates either received constant monitoring via the surveillance camera or through in-person rounds by a tier officer every fifteen minutes. *Id.* at 117. Despite this policy, the Court learned that the cameras on these tiers were frequently inoperable, and the cameras that were functional were not angled to capture a proper vantage point of the cell. Further, expert testimony from the liability phase showed that even if the cameras were operable, they should only be used as a supplement to face-to-face observations. *Id.* at 117.

129

Since the liability phase of trial, there have been no changes to the camera surveillance used at DWCC or the frequency with which a security team member conducts his rounds. However, since the liability phase of trial—specifically, sometime after October 2021—DWCC began to utilize inmate tier walkers to monitor individuals who are on suicide watch.[58] Ex. JR-60 at ¶ 72 [Record Document 715-54]. Tier walkers are inmates who observe the inmates housed on suicide watch. Ex. JR-18 at 3 [Record Document 715-17]. Tier walkers are utilized twenty-four hours a day while an inmate is on suicide watch. Ex. JR-60 at ¶ 72 [Record Document 715-54]. Characterized as another tool of security—and not of the mental health department—the tier walkers sit in a chair close to the inmates on suicide watch. Sherman Remedy Trial Tr. vol. II at 399:4-16 [Record Document 705]. Should an inmate begin to engage in self-injurious behavior, the tier walker is advised to alert security "within [the security's] 15-minute round." *Id.*

Assistant Warden Sherman oversees the tier walker program at DWCC and the selection of inmate participants, though other prison personnel typically complete the first step in recommending an inmate for the program. *Id.* at 397:15-24 [Record Document 705]. A mental health clinician will perform a records review on a recommended inmate and then Assistant Warden Sherman determines whether that inmate meets the criteria enumerated in the tier walker policy, titled Employee Policy Memorandum #03-02-010. *Id.* at 398:3-11. To qualify as a tier walker under EPM #03-02-010, an inmate must either

---

[58] Although the implementation of a tier walker program did not take place until late 2021, DWCC's policy on suicide prevention dated May 17, 2019—formally, Employee Policy Memorandum #03-02-010—allowed for the utilization of tier walkers "to supplement staff observation." Ex. J-10 at 1-5 [Record Document 565-17].

be designated as a LOC-4 or -5, must not have been under a mental health management order in the past three years, must not pose a security concern, must be deemed "medically appropriate," must have no enemy concerns, and must not have been reviewed for a PREA designation. Ex. JR-18 at 7 [Record Document 715-17]. An inmate who meets all of the criteria and passes the record review is then offered an interview with Assistant Warden Sherman. Sherman Remedy Trial Tr. vol. II at 397:21-3989:11 [Record Document 705].

Inmates who are hired as tier walkers must then complete tier walker training. Ex. JR-18 at 2-3 [Record Document 715-17]. A mental health clinician and a member of the nursing staff train the inmate. *Id.* at 3. As of August 2022, Burgos was the primary person conducting the training, though Robinson was able and available to conduct the training in his absence. Burgos Remedy Trial Tr. vol IV at 774:7-12 [Record Document 707]. The mental health component of the training includes: 1) a discussion wherein the inmate is informed of his clearance for the role; 2) the expectations and responsibilities of the role, which encompass observing and reporting potentially harmful activity and changes in the observed inmate's physical status and providing peer support; 3) the potential manipulation tactics of a monitored inmate and how to avoid "risky situations"; 4) the importance of the tier walker to a monitored inmate's "team plan"; and 5) the liabilities the inmate may incur in this role—there are none. Ex. JR-18 at 5-6 [Record Document 715-17]. A member of nursing staff will then train the inmate on communicable diseases and the importance of taking any necessary protections; the proper use of personal protective equipment; and how to clean up or dispose of human waste, including blood and/or other bodily fluids. *Id.* at 6.

Dr. Burns opined that—although a useful and helpful supplementary tool at security staff's disposal—tier walkers should not act as a substitute for security staff's observation of an inmate on suicide watch. Burns Remedy Trial Tr. vol. VIII at 1682:8-1683:21 [Record Document 722]. Specifically, Dr. Burns testified that:

> So having someone right there on-site who has been trained to basically get help if the person is engaging in self-harm or attempting self-harm sooner than that 15-minute round by the officer, when the key room officer is preoccupied with doing the other things that the key room officer has to do, that is a supplement to staff supervision, but it doesn't totally replace it because the tier walker still has to get the attention of the correctional staff to do anything. I mean, he can yell and shout and tell the guy to stop it, but - - but he still has to either run over to the key room if the door is open or pound on the door. So there is still some delay[].

*Id.* at 1683:7-18. In fact, DWCC's own suicide policy echoes Dr. Burns's assessment that tier walkers are only a supplemental aid to the prison's obligation to monitor inmates on suicide watch. Specifically, the policy states that tier walkers may be used to "*supplement* staff observation. . . . [The] use of tier walkers shall not relieve security officers of their obligation to observe and document offender behaviors at regular intervals." Ex. JR-14 at 7 [Record Document 715-14].

Additionally, Dr. Burns testified that she would expect tier walkers to be trained on the importance of confidentiality in their role. Burns Remedy Trial Tr. vol. VII at 1595:19-1596:4 [Record Document 710]. Moreover, a mentoring program would assist a tier walker because the job can be "overwhelming," and it would be useful for the inmate to be able to ask a fellow tier walker about the role and to discuss any concerns. *Id.* at 1596:5-10. Ultimately, Dr. Burns opined that the use of tier walkers does not remedy the issues she identified during the liability phase concerning DWCC's failure to observe its inmates on

132

suicide watch. She reurged her opinion that these inmates should be placed in a health care setting with medical monitoring systems. *Id.* at 1595:2-3.

Despite the implementation of the tier walker program, the Court finds that the continued use of suicide watch without adequate monitoring is a continuing systemic deficiency that Defendants have failed to remedy. Plaintiffs proved that this deficiency continues to exist and will continue to exist into the future.

### d. Inadequate Reporting Mechanisms

During the remedy phase, the Court learned of the inadequate systems of reporting data regarding suicidal behavior to the DOC. Warden Goodwin submits monthly C-05 Reports to the DOC. Goodwin Remedy Trial Tr. vol. VIII at 1768:13-15 [Record Document 722]. C-05 reports document three categories of incidents that occur at DWCC. "Category A" incidents include escapes, deaths that occur as a result of something other than a natural cause, and assaults resulting in a life-threatening injury. These Category A incidents must be reported with appropriate documentation to Chief Smith within twenty-four hours. *Id.* at 1768:16-1769:10. "Category B" incidents include assaults resulting in a "significant injury," hunger strikes, and suicide attempts. *Id* at 1769:11-14; *see* PR-E-1 at 3. Those incidents must be reported with the relevant documentation to Chief Smith within seventy-two hours. *Id.* at 1769:15-20. Finally, "Category C" incidents include sex offenses, assaults resulting in a minor injury, and suicidal gestures. *See* PR-E-1 at 3.

According to the C-05 reports submitted by Warden Goodwin, there were no suicide attempts or suicidal gestures at DWCC between March 2020 and May 2022. *See* Ex. PR-E-28 at 1-2. If these reports are accurate, than the Court wonders why anyone was placed

on suicide watch during this time period. But these reports are not accurate. The reports are inconsistent with the UORs and inmate mental health records that the Court reviewed. For example, on November 4, 2021, inmate J.W. was placed on suicide watch after he tied his sheet to the bars of his cell and wrapped it around his neck. *See* PR-B-17 at 438-439, 479 [Record Document 716-27]. In a UOR, Officer Need detailed that a "Hoffman knife" was required to remove the sheet from inmate J.W.'s neck and from the bars. *Id.* at 479. Despite this, the incident was not recorded on the C-05 reporting for the month of November. Warden Goodwin acknowledged *eleven* other suicidal-type incidents that he failed to report as required in the C-05 reports, despite DWCC's internal records "documenting the incidents." *See* Goodwin Remedy Trial Tr. vol. VIII at 1798:5-1848:16 [Record Document 722].

This testimony makes it clear that DWCC underreported the number of suicidal attempts and gestures that occur at its facility. Warden Goodwin claimed that Deputy Warden Dauzat reviews the documents with a member of the medical staff to determine whether an incident constitutes a suicidal attempt or gesture. *Id.* at 802:3-7. He further asserted that there is no benefit to underreporting or underestimating the numbers of incidents in the C-05 reports. *Id.* at 1844:23-1845:18.

The Court will not speculate as to why DWCC has underestimated and underreported the number of suicidal gestures and attempts in these C-05 reports. Certainly, the Court has reviewed enough records over the course of the past two trials to conclude that this data is inaccurate and flawed. It is immaterial whether this is intentional or simply another example of DWCC's inability to adequately report and document

pertinent inmate information. Simply put, DWCC fails to report these serious incidents to the DOC. The DOC needs accurate information to support its institutions. Certainly, the Court would hope that the DOC would provide DWCC with resources and institutional support if it recognized that DWCC had a high volume of suicide attempts and gestures over the course of several months. At a minimum, it would at least give DWCC important data points to track the effectiveness of the mental health programs that are offered to inmates.

In summary, DWCC has exhibited, yet again, a blatant disregard for the health and well-being of its inmates. Defendants have failed to remedy its inadequate reporting mechanisms. Plaintiffs proved that this deficiency continues to exist and will continue to exist into the future.

### 7.  *Manifestations of Harm*

For the above reasons, the Court has already found that DWCC puts its inmates at risk of substantial risk of harm. However, this harm is not merely theoretical. The Court finds that, in addition to all of the previously enunciated examples wherein an inmate's physical and mental health has been harmed while in DWCC's care, the two completed suicides at DWCC are representative of the extent of the severe risk of harm in which these deficient policies and procedures place victims. These two suicides are illustrative of the deficient policies and procedures discussed above.

a.  J.B.[59]

The first inmate to commit suicide since the liability phase of trial was J.B. The Court will provide a synopsis of what J.B.'s medical, mental health, and prison records revealed about the weeks leading up to his death. On December 13, 2021, J.B. was placed in investigative segregation after receiving a series of rule infractions. Ex. PR-B-4 at 79 [Record Document 716-13 at 1]. According to the disciplinary report, J.B. got into a physical altercation with another inmate while in the North Compound's kitchen. *Id.* at 81. Despite being placed in restraints, J.B. continued to act belligerently by screaming profanities, threatening individuals, striking an officer, making sexual gestures, and claiming to be high. *Id.* Alma Burns, the officer who separated the inmates, stated that J.B. appeared to be "in a daze," was unable to articulate where he was, and had "redness in his eyes." *Id.* Coleman and Nail responded to the altercation. *Id.* at 79. At several points, Nail placed his hand on J.B.'s shoulder to escort him out of the office, and J.B. jerked away. *Id.* Chemical spray was then employed in order to help the officers "regain[] compliance" of J.B. because "[n]o offender shall obstruct or resist staff in the performance of their duties." *Id.* From this incident, J.B. received three rule violations: one infraction for intoxication and two for defiance. *Id.* at 79-81.

Hayden visited J.B. that same day. On the mental health progress note documenting that interaction, Hayden noted that J.B. was angry, hostile, aggressive, spoke at a loud

---

[59] Out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed. This J.B. is different from the inmate previously discussed. *See supra* p. 120.

136

volume, and exhibited poor judgment. Ex. PR-B-4 at 181-82 [Record Document 716-14 at 7-8]. Hayden did not check any of the boxes indicating that J.B. vocalized or exhibited any suicidal ideations or behaviors. *Id.* at 182. Nevertheless, Hayden assigned J.B. to standard suicide watch for "voicing suicidal ideations." *Id.*

Although placed on standard suicide watch, J.B. was not seen by Dr. Seal until December 22, 2021, nine days after the incident. *Id.* at 164. The accompanying mental health progress note by Hayden, who was present for the psychiatric appointment, explained that J.B. had been on standard suicide watch for nine days. *Id.* at 165. Hayden also indicated that J.B. claimed to be "alright;" that he was "alert, oriented, and actively participated in the interview showing no signs indicative of psychiatric distress;" that he denied "thoughts of self-harm or harm to others and no evidence to the contrary was observed;" and that "[J.B.'s] recent suicide watch placement was due to an adverse reaction to 'Mojo' and [J.B.] request[ed] to be removed [from suicide watch]." *Id.* Dr. Seal's progress notes from that appointment are completely illegible. *See* Ex. PR-T-3 at 378 [Record Document 716-169 at 78].

On December 23, 2021, J.B. pled guilty to four rule infractions in DWCC's disciplinary court.[60] Ex. PR-B-4 at 159 [Record Document 716-14 at 1]. For these violations, J.B. was sentenced to disciplinary segregation. *Id.* On his mental health restrictive housing appraisal, J.B. was classified as LOC-5, with no noted mental health

---

[60] There are no disciplinary reports that explain the origin of the fourth violation, which was listed as a Rule 10 violation.

problems, concerns, complaints, or symptoms. *Id.* His behavior was deemed "within normal limits." *Id.* at 159-160. In the additional comments section, Hayden wrote:

> His grooming was appropriate and he appeared to be adequately nourished. He actively engaged in our conversation though his overall mood was dysphoric. His thought process was positive and goal oriented as evidenced by his voicing plans to, '[j]ust put all this bullshit behind me and get back here.' He denies thoughts of harm to himself or others and refused the recommendation for a follow up visit with Dr. Seal.

*Id.* at 160. Under the follow up plan, Hayden wrote "[o]ffender was informed that a follow up appointment with Dr. Seal is available upon his request. He was instructed to report emerging symptoms or distress to mental health staff." *Id.* Hayden then described J.B. as being "dysphoric," positive, and goal oriented. Dysphoria is commonly recognized as a symptom of mental illness and signifies that an individual is feeling unhappy or unwell. Hayden gave no explanation for his contradictory findings.[61]

On December 29, 2021, Hayden had a follow up visit with J.B. Ex. PR-B-4 at 161 [Record Document 716-14 at 3]. On the mental health progress note for that visit, Hayden again selected the box to indicate "dysphoric" mood, but also selected the box to indicate a positive attitude and being within normal limits of other behavioral indicators. *Id.* at 162. In the clinical notes section, Hayden wrote:

> Offender was seen while standing at his cell bars peering onto the tier in which he was housed. His grooming was appropriate and he appeared to be adequately nourished. He actively engaged in our conversation though his overall mood was dysphoric. His thought process was positive and goal oriented as evidenced by his voicing plans to, '[j]ust put all this bullshit behind me and get back here.' He did express remorse for his actions that

---

[61] During the remedy phase of trial, Hayden was able to accurately define "dysphoric" as "unpleasant, just not happy with the situation," Hayden Remedy Trial Tr. vol. VI at 1165:22-1166:6 [Record Document 709].

warranted his segregation placement. Particularly the treatment of his friend in which he attacked. He denies thoughts of harm to himself or others and refused the recommendation for a follow up visit with Dr. Seal. Offender was informed that a follow up appointment with Dr. Seal is available upon his request. He was instructed to report emerging symptoms or distress to mental health.

*Id.* In comparing Hayden's notes from December 23 and 29, it is clear that Hayden did not partake in a meaningful visit with J.B. Hayden's notes on December 29 are merely a copy and paste recitation from the visit the week prior, but with a few sentences added. This is further demonstrated by the continued misuse of the word "dysphoric," as well as the exact same "quote" from J.B. There are no further documented interactions between J.B. and mental health or security staff between December 29, 2021, and January 6, 2022.

On January 6, 2022, J.B. committed suicide. *See* PR-H-2 at 1 [Record Document 716-85]. According to the death report, on the morning of his death, J.B. made a sick call for "twitching and feeling bad." *Id.* The death report does not indicate the time the sick call was made or whether J.B. was able to visit with medical staff to address his sick call prior to his death. At 9:24 p.m., J.B. was "found with a ligature around his neck and had hanged himself." *Id.* Body camera footage from when J.B. was discovered shows that he hung himself with a rope or similar material. *See* Ex. PR-D-05 at 01:28. As the officer arrives at J.B.'s cell, J.B. is seen on his knees with his body and face pressed up against the cell front. *Id.* at 0:00-0:06. An officer kicks the cell door twice and screams "hey!" *Id.* For over a minute, the two officers stand outside of J.B.'s cell, communicating on their radios and yelling to other officers off-camera that an inmate has hung himself. After one minute and eleven seconds, a third officer is finally able to open J.B.'s cell. *Id.* at 0:00-1:11. It is worth

139

noting that none of the men appear to be in any sort of rush or acting with any urgency during this time. From the time J.B. was discovered, it takes one minute and forty-nine seconds for one of the officers to call for a medic. *Id.* at 1:11-1:49. Once in the cell, it takes officers an additional forty-seven seconds to cut the rope from J.B.'s neck. *Id.* at 1:11-1:58. And, it takes a total of two minutes from the start of the video before an officer begins chest compressions. *Id.* at 2:00. J.B. was pronounced dead at 10:00 p.m. *See* PR-H-2 at 1 [Record Document 716-85].

Colonel Nail was tasked with investigating J.B.'s suicide, which is one of his job responsibilities as the internal affairs investigations officer. Nail Remedy Trial Tr. vol. I at 151:25-152:2 [Record Document 704]. Despite this, Nail testified at the remedy phase trial that he was only "somewhat familiar" with DWCC's suicide prevention policy, and he would be unable to identify it if shown.[62] *Id.* at 153:1-3; 154:14-156:16. Nail's investigation identified only a single deficiency: an officer was late in conducting his rounds. *Id.* Nail concluded that the officer was two minutes late in conducting his rounds on J.B.'s tier because he was assisting a nurse on a different tier. *Id.* at 180:2-10. Policy mandated that another officer in the unit should have made that round if the officer was late; however, this did not occur. *Id.* at 180:11-17. Officers did not receive any additional training as a result of Nail's findings, other than the standard annual training. *Id.* at 180:18-

---

[62] Although he is the internal affairs investigations officer whose job is to determine if employees have violated policy, he testified that he was not familiar with the disciplinary matrix. Nail Remedy Trial Tr. vol. I at 151:9-10 [Record Document 704].

24. Nail did not review the forensic pathologist's report while conducting his investigation. *Id.* at 165:16-21.

Plaintiffs presented the Court with evidence regarding J.B.'s death that demonstrates how the previously enunciated systemic deficiencies place inmates at an actual and substantial risk of harm—a harm that is not merely speculative or theoretical. The Court identifies the following non-exhaustive list of deficiencies which are visible in a review of J.B.'s record: 1) Hayden's lack of qualifications and training; 2) the lack of a psychiatric evaluation before admission to suicide watch; 3) the lack of meaningful evaluation by Hayden before placing J.B. on suicide watch; 4) the lack of treatment while on suicide watch; 5) the punitive assignment to suicide watch; 6) the lack of adequate reporting processes; 7) the lack of mental health consultation during the disciplinary process; and 8) the inadequacy of the investigation process, both as it pertained to the mental health department and security.

b. J.D.[63]

J.D. committed suicide on October 28, 2020. Ex. PR-H-1 at 1 [Record Document 716-84]. Plaintiffs presented evidence[64] that in the months leading up to his suicide, he was treated by Dr. Seal for his mental illness, while the medical staff was tasked with treating his "seizure disorder." Seal Remedy Trial Tr. vol. IX at 2007:5-21 [Record Document 712]. According to his mental health records, J.D. was struggling with his mental health for

---

[63] Out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed.

[64] The Court was forced to rely upon the reports and witness testimony from this incident because there was no body camera footage offered into evidence.

months prior to his suicide. The earliest record provided to the Court, dated April 21, 2020,

is an individual progress note by Burgos. *See* PR-B-38 at 110-111 [Record Document 716-

39]. Burgos saw J.D. "per staff request" after he "expressed suicidal ideations while

making rounds." *Id.* at 111. Burgos explained that J.D. "stated he felt extremely anxious

and stated he felt his medication was ineffective. In plain view were bedsheets torn into

strips, however, offender denied suicidal ideation. Security removed the torn bedsheets

prior to my departure of the area. Will follow-up per policy." *Id.* Despite displaying a

suicidal gesture, Burgos did not assign J.D. to suicide watch. There was no documentation

admitted into evidence, nor was there testimony at trial to indicate whether mental health

staff followed up with J.D. "per policy," or if he was referred to or seen by Dr. Seal after

complaining about his medication.

The next records are two requests for mental health services addressed to the mental

health department and Hayden, dated May 22, 2020, and May 26, 2020, respectively. *See*

PR-B-38 at 107, 109 [Record Document 716-38]. These requests were sent by medical

staff at DWCC. *Id.* The first request states that "[o]ffender requests to be seen by mental

health staff due to having numerous episodes of anxiety." *Id.* at 109. The second request

states "C/O ANXIETY MEDS ARE NOT WORKIN[G]. C/O SLEEPING ALL DAY

AND NOT ABLE TO SLEEP AT NIGHT. C/O A BUZZING NOISE IN HIS HEAD." *Id.*

at 107. Both referrals were received by Hayden on May 26, 2020, who summarized the

complaints as "[o]ffender reports daily seizures causing him blackouts and stress." *Id.* at

107, 109. Defendants offered no evidence to explain the inconsistency between J.D.'s

complaints and Hayden's summary. The follow-up plan for both of those requests was to

"[r]efer to medical and follow up per policy." *Id.* Again, there was no evidence or testimony that would signify that mental health staff followed up with J.D., or that he was referred to or seen by Dr. Seal during Dr. Seal's next shift at DWCC, or that he was seen by other medical staff.

Indeed, the records show that it was not until several weeks later, on June 18, 2020, that Dr. Seal saw J.D. *Id.* at 114. However, Dr. Seal's offender progress note is almost completely illegible. In fact, the Court was only able to independently ascertain the date, the phrase "2 weeks," and a diagnosis of "Bipolar I."[65] *Id.* There is also an incomplete progress note by Hayden appearing to have been filled out during an appointment with Dr. Seal; however, there is no date listed to indicate when this appointment took place. *Id.* at 106.

The final record admitted into evidence[66] is a July 16, 2020, note from J.D. requesting medical treatment. *Id.* at 78. In the note, J.D., who was assigned to N-4-D-5 at the time, writes, "can I be put back on my crazy mental health medicine I don't know the name. It's a tan, football pill I have been out of my medicine almost a month I need it." *Id.* The member of medical staff referred J.D. to the mental health department, noting that his medications were "stopped a month ago." *Id.* Again, there was no evidence presented to indicate that a mental health clinician ever followed up with J.D. or that his request for

---

[65] The Court has already discussed the issues with Dr. Seal's illegible notes. *See supra* pp. 101-02; *accord* Record Document 641 at 106.

[66] Not all of J.D.'s medical or mental health records were offered into evidence. The Court only relied upon the records admitted into evidence when making its factual findings.

medication was fulfilled. There was also no explanation provided regarding why his medication was discontinued despite a diagnosis of Bipolar I.

J.D. died by suicide on October 28, 2020, while still in custody at DWCC. According to Warden Goodwin, the institutional investigation into J.D.'s suicide found no wrongdoing. Goodwin Remedy Trial Tr. vol. IX at 1916:19-22 [Record Document 712].

The Court identifies the following non-exhaustive list of previously enunciated deficiencies visible in a review of J.D.'s record: 1) the illegibility of Dr. Seal's records; 2) medication non-compliance; 3) inadequate administration of medication; 4) inadequate record keeping practices; 4) the lack of mental health treatment; 5) the lack of psychiatric treatment; 6) Hayden's lack of qualifications and training; and 7) the failure of the institution to accurately investigate and assess its own actions.

### ii. Deliberate Indifference

The Court turns next to the deliberate indifference of the Eighth Amendment inquiry, having determined that Plaintiffs met their burden in proving that systemic deficiencies continue to exist in the policies and procedures in all six areas of mental health treatment at DWCC, including: screening and evaluations; effective and individualized treatment; staffing; safeguards to the administration of psychotropic medications; accurate record keeping; and the maintenance of an effective suicide prevention program. In applying *Ruiz*, the Court finds that correctional officials at DWCC continue to demonstrate non-compliance with DWCC's own policies and have demonstrated a clear and wanton disregard of inmates' mental health status and treatment.

1. *Failure to Comply with Policy*

During the liability phase of trial, the Court held that Defendants and other staff at DWCC "consciously decided not to comply with its policies." Record Document 641 at 119. First, the Court determined that mental health staff did not comply with Employee Policy Memorandum #03-02-003 ("EPM #03-02-003"). *Id.* This policy requires DWCC staff to complete weekly rounds; provide inmates classified as LOC-2, -3, or -4 with a mental health evaluation every 30, 90, and 180 days; create and annually review individualized mental health treatment plan for inmates with those LOC designations; and provide mental health services to inmates upon request. *Id.*

EPM #03-02-003 was updated on March 22, 2022. *See* Ex. JR-15 at 1 [Record Document 715-15]. The policy added provisions for treatment segregation and made changes to the requirements for assigning an inmate to segregated housing. *Compare id.,* *with* Ex. J-7 [Record Document 565-13]. However, the requirements regarding weekly rounds, mental health evaluations, treatment plans, and the provision of mental health services remain the same. And, as the Court has already discussed in depth, Defendants have not remedied the previously enunciated deficiencies in these areas. As such, Defendants are still not compliant with EPM #03-02-003.

Additionally, during the liability phase, the Court found that Defendants failed to comply with Employee Policy Memorandum #03-02-001 ("EPM #03-02-001"), which required that mental health staff "utiliz[e] the least restrictive management necessary to prevent an inmate's self-harm," provide inmates in the restraint chair with the requisite

145

number of breaks, and observe offenders who are housed on suicide watch. Record Document 641 at 120 (citing Ex. J-10 at 6-8 [Record Document 565-17]).

EPM #03-02-001 was updated on March 21, 2022. *See* Ex. JR-14 at 1 [Record Document 715-14]. The policy added a provision for treatment segregation and the tier walker program. *Compare id., with* Ex. J-10 at 6-8 [Record Document 565-17]. Plaintiffs did not provide the Court with any evidence that the restraint chair is being utilized without affording inmates the requisite number of breaks. As such, there is no indication that Defendants are violating this aspect of the policy. However, Defendants have not remedied the previously enunciated deficiencies regarding the use of least restrictive management necessary or the observation of inmates on suicide watch. As such, the Court finds that Defendants continue to act in non-compliance with EPM #03-02-001.

DWCC fails to comply with Employee Policy Memorandum #03-01-001 ("EPM #03-01-001"). EMP #03-01-001 states that inmates with "serious mental illness shall not be placed in segregate housing . . . unless . . . [they are] [c]leared by appropriate [m]ental [h]ealth professional and reviewed by a psychiatrist/psychologist at earliest possible date." Ex. JR-10 at 4-5. However, as the Court has already discussed, there was no evidence presented that would prove that an inmate's mental health considered before he is placed in segregated housing, despite the presence of a mental health clinician on the multi-disciplinary review board. *See supra* pp. 56-58. Additionally, Dr. Seal admitted that his sole function at DWCC is to diagnose inmates with mental illness and to manage an inmate's prescription of psychotropic medication. In other words, Dr. Seal does not review

146

an inmate's placement into segregated housing, as required by policy. As such, DWCC does not comply with EPM #03-01-001.

Finally, in the liability phase, the Court found that Defendants disregarded the risks and harms outlined in its training for medication administration, entitled the *Pill Call Training for Correctional Employees*. Record Document 641 at 121. Specifically, the Court noted that "[t]he policy acknowledges those risks and cautions employees of medication non-compliance, and yet, the policy itself shows that there is no procedure or process in place to further avoid or to mitigate these harms." *Id.* Defendants have not remedied the previously articulated issues with the administration of medication, and as a result, are still not compliant with their own policy.

In summary, the Court finds that the evidence presented at trial demonstrates that officials at DWCC continue to act with deliberate indifference toward inmate mental health by failing to comply with DWCC's own policies that govern its practices and procedures.

### 2. *Wanton Disregard for Inmate Health and Safety*

During the liability phase of trial, the Court held that the mental health staff at DWCC exhibits a wanton disregard for inmate health and safety in each of the six *Ruiz* criteria, Record Document 641 at 121, which, as a reminder, include: systematic screening and evaluation; treatment that is more than mere seclusion or close supervision; participation by trained mental health professionals in appropriate numbers; safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered; accurate, complete, and confidential records; and a suicide prevention program. *Ruiz*, 503 F. Supp. at 1339.

As to the first *Ruiz* factor, screening and evaluation, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) Hayden's lack of qualifications to conduct the initial assessments required by the intake process; 2) the inadequacy of the initial intake forms; 3) the failure to ask meaningful questions during intake evaluations; 4) the lack of meaningful review of intake evaluations by a qualified mental health professional; 5) the lack of timely and meaningful follow-up of intake evaluations by mental health staff; 6) the failure of mental health staff to address an inmate's individual needs at intake; 7) the failure of the mental health staff to conduct and/or sufficiently document weekly rounds; 8) Hayden's lack of qualifications to conduct the thirty- and ninety-day segregated housing interviews and the lack of supervision and audit of his assessments; 9) the failure to conduct and/or the untimely nature of the segregated housing interviews; 10) the failure to conduct the evaluation of LOC-2, -3, and -4 inmates; 11) the cell-front, non-confidential nature of the segregated housing interviews; 12) the implementation of a deficient form, the Form 350; and 13) the inadequate evaluation and documentation of mental health status during segregated housing and LOC-2, -3, and -4 interviews.

As to the second *Ruiz* factor, the provision of mental health treatment, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) the lack of meaningful or substantive individualized treatment plans for inmates diagnosed with mental illness; 2) the lack of staff training on the mental health treatment plans; 3) the failure to consult all relevant stakeholders, including the prison psychiatrist, when crafting any treatment plans; 4)

Hayden's lack of qualifications to sign-off on all treatment plans; 5) the absence of any metrics to measure an inmate's progress towards the completion of his treatment plan; 6) the reliance on psychotropic medication as the sole mental health therapy; 7) the lack of any individual or group therapy or counseling; 8) the deficiencies in the psychiatric services, including the lack of provisions that would ensure inmate confidentiality during any future, in-person psychiatric appointments and the insufficient time spent with inmates during those appointments; 9) the illegibility of Dr. Seal's notes; and 10) the inadequate correspondence courses and therapeutic materials offered to inmates.

As to the third *Ruiz* factor, staffing, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) Dr. Seal's failure to comply with the provisions of his contract and the job responsibilities outlined therein; 2) DWCC's failure to adequately staff the mental health department; and 3) DWCC's failure to hold its staff accountable for policy violations.

As to the fourth *Ruiz* factor, administration of psychotropic medication, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) the failure to create or maintain processes by which an inmate's missed medication can be accurately recorded and tracked; 2) the lack of oversight of the Pill Call Officers; 3) the use of security personnel instead of medical personnel for medication administration; 4) the failure to create or maintain processes by which an inmate's missed medication can be addressed or remedied; 5) the improper administration of psychotropic medications, including at the wrong time intervals; and 6) the treating psychiatrist's lack of training on and access to the E-MAR system.

As to the fifth *Ruiz* factor, an adequate record keeping process, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) the practice of duplicating inmate mental health records en masse; 2) Dr. Seal's illegible notes; 3) inaccuracies in various inmate forms and mental health evaluations; and 4) the failure to maintain a list of inmates on the mental health caseload, specifically those designated as LOC-4.

As to the sixth *Ruiz* factor, the implementation of an adequate suicide prevention program, the Court finds that DWCC continues to exhibit a wanton disregard of inmate health and safety. In support of this conclusion, the Court points to: 1) the punitive nature of suicide watch; 2) the conditions of standard and extreme suicide watch, including but not limited to the lack of a mattress and the use of restraints; 3) the failure to develop a specific treatment plan for inmates on suicide watch; 4) the lack of an assessment by a qualified mental health provider immediately when someone is placed on suicide watch; 5) the lack of mental health treatment during an inmate's stay on suicide watch; 6) the lack of an assessment by a qualified mental health provider when someone is taken off suicide watch; 7) the failure to routinely notify the treating psychiatrist of the inmate's placement on suicide watch, including the facts surrounding the placement and its duration; 8) the failure to observe an inmate at the required intervals as required per policy; 9) the failure to adequately investigate UORs which lead to suicide watch; and 10) the failure to adequately report suicide attempts or gestures to the DOC.

In summary, the Court finds that Plaintiffs met their burden in proving that DWCC and the DOC continue to act with deliberate indifference to inmate mental health care and

treatment at DWCC, and that they will continue to act with this deliberate indifference into the future. Conversely, Defendants failed to present evidence that they no longer act with deliberate indifference to inmate health and safety. Plaintiffs have satisfied the second prong of the Eighth Amendment analysis and proved that, absent any injunctive relief, Defendants will continue to violate the constitutional rights of inmates housed on the South Compound, especially those with a diagnosed mental illness.

### iii. Conclusion as to Delivery of Mental Health Services

During the liability phase of trial, the Court identified the systemic deficiencies in the six areas of DWCC's mental health program, which result in the systemic failure to provide inmates on the South Compound, especially those with mental illness, with adequate mental health care and treatment. In implementing these deficient policies, practices, and procedures in its mental health program, officials at DWCC exhibit a wanton disregard for inmate health and safety.

The Court finds that Plaintiffs have met their burden in proving that these systemic failures continue to exist, and without injunctive relief, will continue to exist in the future. In other words, without intervention, inmates at DWCC will continue to be placed at a substantial risk of harm and will continue to have their Eighth Amendment rights violated. For these reasons, the Court finds that the two-pronged Eighth Amendment inquiry has been satisfied. Plaintiffs are entitled to injunctive relief to remedy the unconstitutional mental health program at DWCC.

### D. Conclusion as to the Eight Amendment Claims

Plaintiffs have met their burden in proving that Defendants presently and will continue to violate the Eighth Amendment rights of its inmates assigned to extended lockdown on DWCC's South Compound, many of whom suffer from severe mental illness. Defendants violate those inmates' Eighth Amendment rights by confining them in inhumane and torturous conditions in segregated housing and by failing to deliver those inmates with the requisite level of mental health care. In meeting their burden, Plaintiffs have proven that they are entitled to relief to alleviate the following constitutional violations:

> (1) The current conditions of confinement on the South Compound, as detailed above, have the mutually enforcing effect of exposing inmates on extended lockdown—the Class—to a substantial risk of severe psychological pain and suffering and depriving those inmates of their sanity in violation of the Eighth Amendment.
>
> (2) DWCC's systemic failure to deliver adequate mental health services to inmates on the South Compound, as detailed above, constitutes cruel and unusual punishment.
>
> (3) Separately from above, DWCC violated the Eighth Amendment rights of inmates with mental illness housed on the South Compound's extended lockdown tiers because the conditions of confinement expose those inmates with mental illness to a substantial likelihood of even more psychological pain and suffering, including the exacerbation of their already diagnosed mental illness.

### VI.    ADA and RA Claims

During the liability phase of trial, the Court found there to be systemic failures regarding DWCC's compliance with the ADA and RA. Record Document 641 at 144-145. First, the Court held that DWCC did not consider an inmate's mental illness before placing

him on extended lockdown for an indefinite period of time, nor does it consider his mental health before employing various disciplinary tactics. *Id.* at 145. Moreover, Defendants failed to modify any of DWCC's policies or practices as to inmates with a mental illness, resulting in these inmates' exclusion from programs, activities, and services. *Id.* Finally, the Court found that, in using an under-inclusive definition of serious mental illness, DWCC did not maintain an adequate system for inmates to request and receive reasonable accommodations. *Id.* As the Court has already mentioned, for inmates in confinement, Plaintiffs' Eighth Amendment claims at times overlap with their ADA and RA claims.

### A. ADA and RA Standard

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It defines a person with a disability as one who has "a physical or mental impairment that substantially limits one or more major life activities . . . ." 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105. This includes individuals with historical, but not present, impairments and those who are regarded as having an impairment regardless of actual disability. 42 U.S.C. § 12102(1)(B)-(C). The RA states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). It defines disability in the same way as the ADA. *Kemp v. Holder*, 610

F.3d 231, 234 (5th Cir. 2010). "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (citations omitted).

To prevail on an ADA claim, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a claim under the RA are the same, except that the public entity in question must be one which receives federal financial assistance.[67] *See Kemp*, 610 F.3d at 234. Plaintiffs have established, and Defendants do not dispute, that the ADA and RA apply to DWCC.

Additionally, the Court has already found that the Subclass is comprised of "qualified individuals with disabilities that substantially limit one or more life activities, as defined by the ADA." Record Document 641 at 128. The Court need not reevaluate this finding in the remedy phase of trial.

A defendant's failure to make reasonable modifications for the unique needs of disabled inmates can qualify as intentional discrimination. *See, e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). Mental health services have been recognized as "services" that "benefit" prisoners. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and

---

[67] The RA has certain exceptions that are not applicable to the present case.

educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in').");  *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 935-36 (N.D. Cal. 2015) (listing mental health services).

During the liability phase of trial, the Court grouped Plaintiffs' ADA and RA claims into two categories: 1) the failure to accommodate inmates with mental illness and 2) the adoption of methods of administration that discriminate against inmates with mental illness. Record Document 641 at 129. The Court will address each category in turn below.

## B. Failure to Accommodate

During the liability phase of trial, the Court found that DWCC did not make any reasonable modifications or accommodations for inmates diagnosed with mental illness. Additionally, DWCC failed to make any reasonable accommodations to the disciplinary or use of force practices as applied to inmates with mental illness.[68] Record Document 641 at 130-37.

"In addition to their respective prohibitions of disability-based discrimination, both the ADA and the [RA] impose upon public entities an affirmative obligation to make

---

[68] During the liability phase, the Court held that the evidence at trial did not support a finding that DWCC disregards recommendations from the mental health staff that inmates diagnosed with a serious mental illness be placed in general population as opposed to restrictive housing. Record Document 641 at 137. This is because the mental health department played no actual role in an inmate's housing assignment. As such, this claim is **DISMISSED WITH PREJUDICE.** However, as is discussed in more detail in the body of this opinion, the failure of the mental health department to play a role in an inmate's housing assignment, both initially and when an inmate is assigned to segregated housing, is a separate issue.

155

reasonable accommodations for disabled individuals." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (citations omitted); *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (internal quotations marks and citations omitted). Although the ADA "does not require prisons to provide new services or programs for disabled prisoners," prisons "do have an affirmative obligation to make reasonable modifications . . . so that a disabled prisoner can have meaningful access to existing public services or programs." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015).

Below, the Court will address each finding in the context of the remedy phase.

### i. Affirmative Modifications

During the liability phase of trial, the Court found that officials at DWCC failed to make modifications as to the appropriateness of housing individuals with mental illness on the South Compound, nor did they make any modifications to the conditions of confinement for those individuals. Record Document 641 at 130-131. Considering the risks that solitary confinement poses on inmates' mental health and safety, the Court found that "[e]ven if some inmates' active mental illness prohibits them from being safely integrated into general population, DWCC's policies and practices of failing to treat those inmates in a way that accommodates their mental illness have the effect of excluding those inmates from many services, activities, and programs." *Id.* at 132.

The ADA requires that "[p]ublic entities . . . ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2). Similarly, the RA requires that "[a] public entity . . . make reasonable modifications in policies, practices, or procedures when the

modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006). "[A] person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) (citation omitted). "[T]he purpose of the ADA's reasonable accommodation requirement is to guard against the facade of equal treatment when particular accommodations are necessary to level the playing field." *Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, 439 F. Supp. 3d 801, 808 (E.D. La. 2020) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004)) (internal quotation marks omitted).

During the remedy phase of trial, Defendants asserted that DWCC "screens for ADA issues and accommodates them." Record Document 733 at 62. They represented that the disciplinary board has the ability to "refer cases to mental health rather than prosecute rules violations" and that mental health staff can "intervene in disciplinary cases as appropriate." *Id.* However, Defendants failed to provide any evidence to prove that any of these positive actions actually occurred. The Court reviewed no disciplinary review board forms, Form 350s, or interviews with a segregated inmate to indicate that mental health

staff intervened or offered any suggestions for modifications in disciplinary cases. Instead, as indicated above, Plaintiffs presented evidence that inmates displaying symptomatic behavior—behavior that even a layperson could interpret as a mental health crisis—were subject to punishment with no intervention by a mental health clinician.

DWCC also claimed that it provides two lists to the key officers: one for inmates with a "serious mental illness" and one identifying the inmates who are on heat duty status. Defendants claim that these lists are ways in which DWCC accommodates inmates with mental illness. The Court has already enunciated the deficiencies with the LOC lists, namely, that they do not include those inmates diagnosed as LOC-4.

As to the heat duty status lists, from May to October of each year, Robinson creates a list of inmates on heat duty status in the same manner in which she creates the list of inmates classified as LOC-3. Robinson Remedy Trial Tr. vol. IX at 2029:13-2030:6 [Record Document 712]. This is important because inmates who take psychotropic medications are more susceptible to complications from exposure to high temperatures, and as a result, per written policy, precautions must be taken for those inmates. These heat duty status lists are provided to the unit managers, lieutenant colonels, administration, and the nursing staff supervisors. *Id.* at 2030:9-12. Robinson emails the list weekly but does not know how those individuals maintain the list. *Id.* at 2030:14-2031:3. Defendants did not provide any evidence to suggest that those lists are consulted by security staff or any other official at DWCC before taking specific actions. In other words, just because these lists are created does not necessarily mean that they are used to make reasonable accommodations. Other than the provision of the heat duty status lists, DWCC has adopted

no other process or procedure to ensure that officers are aware of which inmates on their units require additional climate protections.

Additionally, Defendants have not made any alterations to the conditions of confinement for inmates with mental illness when they are assigned to restrictive housing. DWCC does not permit the Subclass to participate in the group programming, classes, and out-of-cell programming that are offered to inmates housed in general population, nor does it create specialized group programming or classes for inmates in segregated housing. Inmates with mental illness are deprived of their personal property; of access to the common eating, recreation yard, and contact visitation; and are forced to live in solitude and idleness for twenty-three to twenty-four hours per day.

Accordingly, the Court finds that Plaintiffs met their burden in proving that DWCC continues to violate the ADA and RA with respect to affirmative modifications and will continue to violate the ADA and RA in this manner into the future.

ii.  Discipline

During the liability phase of trial, the Court found that DWCC failed to consider an inmate's mental illness before disciplining or using force against those who are not posing an immediate safety threat. Record Document 641 at 134-37.

Other courts have held that the "obligation to provide accommodations applies to the discipline of disabled inmates, as well . . . ." *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021) (citation omitted). In the prison context, the ADA and RA are violated "where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled

person." *Id.* at *56 (quoting *Armstrong v. Newsom*, No. 94-CV-02307 CW, 2021 WL 933106, at *25 (N.D. Cal. Mar. 11, 2021)). A "lack of medical oversight in disciplinary decisions for disabled inmates" could support a failure-to-accommodate claim under the ADA and RA. *Id.*

The Court previously found a "concerning disconnect between security staff and the mental health department" and determined that security staff were not concerned with inmates' mental health and routinely employed discipline and/or force without considering an inmate's mental health. Record Document 641 at 135. For example, DWCC enacted a policy which states that a mental health clinician must be called before deploying a chemical agent on an inmate on the mental health list—if the inmate is not a security concern—and yet, there was no evidence to prove that security staff has ever done so. Furthermore, some underlying "security concerns" justifying the deployment of a chemical agent without first calling a mental health clinician include noise levels and kicking a cell door. *Id.* Additionally, the Court was presented with evidence that security deployed mace on inmates in restraints and on suicide watch. *Id.*

The Court finds that this has not been remedied since the liability phase of trial. Security staff are still not concerned with inmate mental health, and mental health staff still employ a completely hands-off approach to discipline. First, as Coleman testified, the only thing that changed regarding the use of force as it relates to *Employee Policy Memorandum #02-01*-005—DWCC's use of force policy—is that security staff are now provided with a list of inmates with a diagnosed mental illness. Coleman Remedy Trial Tr. vol. I at 28:18-23. But, this testimony is not entirely correct. As stated above, security staff are only

160

provided with a list of inmates classified as LOC-3, which is not inclusive of all inmates on the mental health list. Moreover, Defendants did not provide any evidence to prove that these lists were actually consulted before security staff disciplines or uses force against an inmate. To the contrary, Plaintiffs presented evidence as outlined above that a mental health clinician was not consulted.

Plaintiffs provided the Court with several incidents where security staff disciplined and/or used force against inmates with a mental illness where there was no immediate safety threat and without having first consulted a member of mental health staff. *See e.g.,* PR-M-1 [Record Document 716-125] (where inmate T.D. alleged that pepper spray was employed against him while he was on extreme suicide watch); PR-C at 820-825 [Record Document 716-44] (where a chemical agent was employed against an inmate for "being loud and disruptive" and for throwing his breakfast tray against the cell bars); PR-C- at 303-316 [Record Document 716-40] (where security used chemical spray against and subsequently placed on suicide watch an inmate who refused to come to the cell bars).

An egregious example of security staff's disregard of inmate mental health and its practice of employing force against an inmate who is not posing an immediate safety concern is visible in the treatment of inmate J.G. The video, dated March 15, 2022, begins with three officers talking to the camera, one of whom explains that they were asked to respond to the N-4 tier after an inmate was unresponsive to orders. Ex. PR-D-31 at 0:00-00:41. The three officers then walk up to the cell, where a naked J.G. appears in the frame. *Id.* at 00:41-00:50. In the video, officers order J.G. to put on his jumpsuit and walk to the bars to be restrained. *Id.* at 00:50-01:13. Importantly, J.G. is naked but is otherwise causing

no disturbance. He does not speak or show any resistance to the orders. Officers repeat these orders as J.G. paces around his cell, attempting to put on his jumpsuit but clearly struggling with the mechanics of how to do so. J.G. is obviously confused and suffering from some sort of mental decompensation. *Id.* at 01:13-03:03. The struggle to dress himself lasts for a couple of minutes. *Id.* J.G. does not appear to be maliciously non-compliant but rather fully incapable of putting on his jumpsuit, despite attempting to do so several times. *Id.*

After about two minutes, a chemical agent is deployed against J.G. for approximately two seconds without a mental health clinician being called, against DWCC policy. *Id.* at 03:07-03:09. At that time, J.G. was not making any noise, was not acting violently towards the officers, and was still simply trying to put on his jumpsuit. The Court did not observe J.G. to be a security threat at the time; instead, he appears disoriented and fearful. J.G. gags and attempts to put on his jumpsuit. *Id.* at 03:09-03:24. As a reminder, officers claim that they do not consult the mental health department before deploying force in instances where the health and safety of the institution is at risk, and yet, the officers are able to sit back and watch J.G. suffer without any clear or visible threat. J.G. then begins to rock in a fetal position on his concrete bed while holding his jumpsuit. *Id.* at 03:54-04:53. He shakes his leg as he lays in the upright fetal position.

As the officers again order him to approach the bars to be restrained, J.G. stands up and begins pacing in a disoriented manner. *Id.* at 04:55-05:00. J.G. returns to his bed, where he remains for a minute until an officer again asks him to approach the bars to be restrained. *Id.* at 06:17. J.G. does not comply, and the officer simply watches him from the outside of

162

the cell for minutes. *Id.* at 06:17-13:38. Officers then deploy chemical agent a second time, again without first consulting a mental health clinician. At this time, J.G. is simply sitting on his bed staring ahead, not making any movement. *Id.* at 13:40. The spray lasts approximately two seconds. *Id.* at 13:40-13:42. J.G. shakes in a ball huddled in the corner of his room, before he stands up and proceeds to jump. *Id.* at 13:42-15:00. Eventually, other DWCC security officers arrive and enter his cell. Ex. PR-D-33 at 08:17-08:20. J.G. is transferred out of his cell, with two officers carrying him out by his arms and another carrying his feet. *Id.* at 09:05-09:22.

The mental health progress note from the incident—filled out by Hayden—did not indicate that a mental status exam was given to J.G., and simply provided the following narrative:

> Upon arrival to offenders cell he was on the floor and had removed his issued jumpsuit and boxer shorts. When attempting conversation, he refused to make eye contact or acknowledge my presence. Multiple attempts were made to gain his attention and eye contact, which he refused to acknowledge. Further conversation was not attempted. Offender's appearance and grooming were disheveled. A visual scan of his cell showed it to be unkempt with urine and feces spread around, his hygiene was poor. In order to gain compliance security staff used chemical agent and a cell extraction. He was placed on standard suicide watch for evaluation until seen in psychiatric clinic by Dr. Seal.

Ex. DR-12 at 1-2 [Record Document 718-8]. Although Hayden's mental health progress note purports to describe events that he witnessed *before* the chemical agent was deployed, the video shows that Hayden did not arrive to speak with J.G. until *after* the chemical agent was deployed. Ex. PR-D-33 at 01:52.

163

There is no documentation of any medical or mental health evaluation before J.G. is placed on suicide watch. He had an appointment with Dr. Seal two days later, but Dr. Seal's notes are illegible. *Id.* at 3. J.G. was subsequently transferred to EHCC for treatment, his condition requiring mental health resources beyond those available at DWCC. Seal Remedy Trial Tr. vol. IX at 1993:12-17.

J.G. did not pose a security threat to the officers, himself, or his fellow inmates. Instead, it was clear to even a lay person that he was suffering from a mental health episode and was unable to function and care for himself. This is confirmed by the ultimate decision to transfer J.G. to EHCC for treatment. However, instead of calling a mental health clinician, he was pepper sprayed and placed on suicide watch. This one incident is illustrative of the disconnect between security and mental health staff. It also typifies the systemic practice that the Court saw throughout the trial: that an inmate's mental health is not considered before disciplining or employing force against him.

Accordingly, Plaintiffs met their burden in proving that DWCC continues to violate the ADA and RA with respect to accommodations to the disciplinary processes and will continue to violate the ADA and RA in this manner into the future.[69]

### C. Methods of Administration

In its liability phase opinion, the Court held that Plaintiffs were able to prove that Defendants violated the ADA by utilizing methods of administration that had the effect of discriminating against disabled inmates. Record Document 641 at 137-145. Specifically,

---

[69] For individuals in confinement, these inappropriate disciplinary practices also rise to the level of a constitutional violation.

the Court found that DWCC violates the ADA by using an under-inclusive definition of serious mental illness and by failing to maintain an adequate system for inmates to request and obtain reasonable accommodations regarding mental illness.[70] *Id.* at 144-145. The ADA also recognizes a "methods of administration" claim that prohibits public entities from using "criteria or methods of administration . . . [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3); *see Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016).

> A public entity may not . . . utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability . . . [or] [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3)(i) & (ii). "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities." *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 752 (N.D. Tex. 2014). "[A]n omission as well as a commission can be an actionable method of administration." *Dunn*, 318 F.R.D. at 665. "The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when

---

[70] The Court did not find that Plaintiffs were able to meet their burden with respect to a third claim—that DWCC violates the ADA by failing to identify and track inmates with a serious mental illness but who are in remission. *Id.* at 141-42. The Court found that Plaintiff's only example of an inmate who lost his serious mental illness designation because he was in a period of remission was not sufficient to prove that a widespread violation of the ADA and RA exists. As such, Plaintiffs' claim as to that issue is **DISMISSED WITH PREJUDICE**. The Court points out that inmates in remission are different than chronic illness, which is addressed previously in this opinion.

plaintiffs can show that it has the effect of discriminating." *Id.* at 665 n.12. Under the ADA, prisons must be "proactive." *Id.*

The Court will address below whether Defendants have remedied the under-inclusive definition of serious mental illness and the failure to maintain an adequate system by which inmates may request accommodations regarding mental illness.

i.  Under-inclusive Definition of Serious Mental Illness

During the liability phase, the Court held that the DOC utilizes an under-inclusive definition of disability "by excluding inmates with debilitating mental illnesses by way of functional impairment from the definition of serious illness." Record Document 641 at 141. In so doing, the Court determined that there was a "substantial likelihood that inmates with serious mental illnesses by way of functional impairment will fall through the cracks and will not be treated accordingly," which in turn could result in these inmates not being provided with adequate mental health care or appropriate accommodations. *Id.* The Court thus found that Defendants violated the ADA and RA by adopting this under-inclusive definition of serious mental illness.

Defendants did not provide the Court with any evidence that this definition has changed since the liability phase of trial. Plaintiffs, conversely, were able to prove that this definition has not changed since the liability phase of trial. As Dr. Burns testified, the DOC's definition of serious mental illness ("SMI") had not changed since March 2020 and was inclusive of only the six same diagnoses previously identified. Burns Remedy Trial Tr. vol. VII at 1539:9-15 [Record Document 710]. Those six diagnoses were: major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified

schizophrenia spectrum, and severe anxiety disorder. Ex. P-JJJ-25 at 2 [Record Document 564-204].

Accordingly, the Court finds that Plaintiffs met their burden in proving that DWCC continues to violate the ADA and RA with respect to its under-inclusive definition of serious mental illness and will continue to violate the ADA and RA in this manner into the future.

ii.  Inadequate Process for Requesting Reasonable Accommodations

During the liability phase of trial, the Court found there to be systemic deficiencies "in the ways that DWCC identifies, screens, and tracks ADA requests." Record Document 641 at 144. Under the ADA, "employing no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation" can be an unlawful method of administration. *Dunn*, 318 F.R.D. at 665; see *Lewis*, 2021 WL 1219988, at *48-50, 52; *Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012) (finding a violation of the ADA because the county jail lacked "functional and timely grievance procedures . . . to request and obtain disability accommodations").

First, the Court found that Deputy Warden Huff—who preceded Assistant Warden Acklin—failed to document any ADA interviews that she had with an inmate who utilized the ARP process. Record Document 641 at 142-143. Additionally, only those complaints specifically labeled "ADA complaints" or specifically using the magic words "a request for accommodations" were reviewed by Deputy Warden Huff. *Id.* at 143. In the preceding five years, she could not recall ever granting a request for accommodations or even reviewing a request for accommodations based on mental illness. *Id.*

According to Assistant Warden Acklin, the process by which an inmate can request an accommodation has not materially changed since the liability phase of trial. Ex. PR-BB-1 at 14:20-15:7 [Record Document 714-1]. Assistant Warden Acklin has never distributed information to inmates on the South Compound regarding the process by which they can seek accommodations. *Id.* at 16:1-8. She testified that intake is the only time an inmate is informed of the process by which he may make a request for a reasonable accommodation. *Id.* at 16:9-17. However, Defendants did not provide any evidence to support their assertion that these conversations actually take place. *Id.* Despite being the ADA Coordinator, Assistant Warden Acklin showed a surprising lack of knowledge of her job responsibilities. For example, she testified that she did not provide inmates with any information about reasonable accommodations upon intake and was unable to identify the DWCC staff member responsible for doing so. *Id.* at 17:7-15. She could not enunciate how it is determined that an ARP contains a request for a reasonable accommodation. *Id.* 17:24-18:9. She was unaware of any list kept by DWCC tracking the inmates diagnosed with a disability or those who may qualify for reasonable accommodations. *Id.* at 23:8-16. Assistant Warden Acklin was also unable to articulate whether an inmate needed to be diagnosed with a mental illness to receive reasonable accommodations, a process that is outlined in Department Regulation IS-B-4. Assistant Warden Acklin testified that since March 2020, she had not approved even one prisoner's request for a reasonable accommodation. *Id.* at 21:8-15.

As is apparent from Assistant Warden Acklin's testimony, DWCC has not remedied the process for requesting reasonable accommodations. Her lack of knowledge about the

168

process by which an inmate should request accommodations, as well as who would qualify for reasonable accommodations, proves that there is no true system by which an inmate can functionally and timely request accommodations for his disability. Accordingly, the Court finds that Plaintiffs met their burden in proving that DWCC continues to violate the ADA and RA with respect to its inadequate process for requesting accommodations and will continue to violate the ADA and RA in this manner into the future.

### D. Conclusion as to ADA and RA Claims

In conclusion, Plaintiffs met their burden in proving that there are widespread, systemic violations of the ADA and RA that continue to occur and will continue to occur into the future without the Court's intervention. DWCC has not remedied its failure to accommodate inmates with mental illness before housing them on the South Compound or before employing force or using discipline against them. Moreover, DWCC violates the ADA in its methods of administration through its adoption of an under-inclusive definition of mental illness and by failing to maintain and implement an adequate system by which inmates can request and receive reasonable accommodations for their mental illness. Defendants failed to provide any evidence that they have remedied these deficiencies since the liability phase of trial. Plaintiffs are entitled to injunctive relief to remedy the violations of their protections under the ADA and RA.

### VII.  Conclusion

For the foregoing reasons, the Court holds that Defendants, in their official capacities, are violating the Eighth Amendment rights of the Class and the ADA and RA rights of the Subclass.

169

For the reasons previously enunciated by the Court, Defendants are hereby **ENJOINED** from the following: 1) continuing to violate the Eighth Amendment rights of all inmates in extended lockdown—the Class—through the unconstitutional conditions of confinement and provision of deficient mental health services; and 2) continuing to violate the ADA and RA rights of inmates with a qualifying mental illness—the Subclass. Additionally, Defendants are **ORDERED** to remedy the constitutional and ADA and RA violations as previously enumerated.

The Court incorporates in this opinion the injunctive and declaratory relief outlined in the remedial order and filed in connection with this opinion [Record Document 755].

**THUS DONE AND SIGNED** this 18th day of July, 2024.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE

170