No. 23-30825

# In the United States Court of Appeals for the Fifth Circuit

KENTRELL PARKER, ET AL.,
*Plaintiffs-Appellees*

v.

TIM HOOPER, ET AL.,
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:15-CV-318, Hon. Shelly Dick

---

## APPELLANTS' SUPPLEMENTAL EN BANC BRIEF

---

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

*J. Benjamin Aguiñaga*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION ................................................................ 1

STATEMENT REGARDING ORAL ARGUMENT ................................. 7

JURISDICTIONAL STATEMENT ............................................. 8

ISSUES PRESENTED ......................................................... 9

STATEMENT OF THE CASE ................................................ 10

A.  The District Court Enters Its 2021 Liability Opinion
     Following a 2018 Liability Trial. ........................................ 11

B.  The District Court Enters Its 2023 Remedy Opinion
     Following a 2022 Remedy Trial. ....................................... 17

C.  The District Court Simultaneously Enters Its 2023
     Remedial Order and Final Judgment. ................................. 34

D.  The State Immediately Appeals, Citing Eighth Amendment
     and PLRA Problems. .................................................... 39

SUMMARY OF ARGUMENT ................................................. 42

LEGAL STANDARD .......................................................... 45

ARGUMENT ................................................................... 46

I.  THIS COURT HAS APPELLATE JURISDICTION. ...................... 46

     A.  The District Court's Orders, Culminating in Its Final
          Judgment, Are Appealable Under § 1291. ......................... 47

1. The district court identified myriad specific violations that the Special Masters must "cure and eliminate"— that is finality........................................................................ 48

2. Plaintiffs' arguments otherwise are wrong...........................54

B. Alternatively, the District Court's Orders Are Appealable Under § 1292(a)(1)....................................................56

1. The precise and mandatory nature of the district court's injunction confirms jurisdiction. ..............................57

2. Plaintiffs' responses are unavailing. ....................................63

II. THE COURT SHOULD VACATE AND REMAND FOR FURTHER PROCEEDINGS..............................................................................67

CONCLUSION ....................................................................................69

CERTIFICATE OF SERVICE...................................................................71

CERTIFICATE OF COMPLIANCE .......................................................72

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga,*
    __ F.4th __, 2025 WL 1420220 (5th Cir. May 16, 2025) ................. 4, 67

*Anderson v. Hutson,*
    114 F.4th 408 (5th Cir. 2024) ............................................................. 56

*Armstrong v. Wilson,*
    124 F.3d 1019 (9th Cir. 1997) .................................................... *passim*

*Bd. of Pub. Instruction of Duval Cnty. v. Braxton,*
    326 F.2d 616 (5th Cir. 1964) ...................................................... *passim*

*Charles v. Westcott,*
    No. 24-30484 (5th Cir.) ............................................................... 5

*Dickerson v. Lexington Ins.,*
    556 F.3d 290 (5th Cir. 2009) ............................................................. 45

*Dockery v. Cain,*
    7 F.4th 375 (5th Cir. 2021) .............................................................. 40

*Frederick L. v. Thomas,*
    557 F.2d 373 (3d Cir. 1977) ......................................................... 57, 58

*Hallett v. Morgan,*
    296 F.3d 732 (9th Cir. 2002) ............................................................. 40

*J.W. ex rel. Tammy Williams v. Birmingham Bd. of Educ.,*
    904 F.3d 1248 (11th Cir. 2018) ......................................................... 49

*Mejia-Alvarenga v. Garland,*
    95 F.4th 319 (5th Cir. 2024) ............................................................. 67

iv

*Morales v. Turman,*
　535 F.2d 864 (5th Cir. 1976), *rev'd on other grounds,*
　430 U.S. 322 (1977) (per curiam) ................................................ *passim*

*New York v. United States,*
　505 U.S. 144 (1992) ............................................................................ 62

*Parker v. Hooper,*
　128 F.4th 691 (5th Cir. 2025), *vacated by* 134 F.4th 867 ........... *passim*

*Printz v. United States,*
　521 U.S. 898 (1997) ............................................................................ 62

*United States v. Alabama,*
　828 F.2d 1532 (11th Cir. 1987) ......................................................... 49

*United States v. Hinds Cnty. Bd. of Supervisors,*
　128 F.4th 616 (5th Cir. 2025) ......................................................... 5, 63

*Valentine v. Collier,*
　956 F.3d 797 (5th Cir. 2020) .......................................................... 1, 5,

*Valentine v. Collier,*
　978 F.3d 154 (5th Cir. 2020) ............................................................... 5

*Valentine v. Collier,*
　993 F.3d 270 (5th Cir. 2021) ...................................................... *passim*

*Voice of the Experienced v. LeBlanc,*
　No. 25-30322 (5th Cir. June 4, 2025) ................................................. 5

## Statutes

18 U.S.C. § 3626(a)(1)(A) ................................................................ 40, 41

28 U.S.C. § 1291 ........................................................................... *passim*

28 U.S.C. § 1292(a)(1) ..................................................................... *passim*

28 U.S.C. § 1331 ..................................................................................... 8

## INTRODUCTION

The history of this prison-conditions case regarding medical care at the Louisiana State Penitentiary (LSP) is worlds away from "reflect[ing] the principles of comity" required by the Eighth Amendment and the Prison Litigation Reform Act (PLRA). *Valentine v. Collier*, 956 F.3d 797, 806 (5th Cir. 2020). This case has been pending for a decade. The district court issued a "Liability Opinion" three years after a 2018 liability trial. Then, the district court issued a "Remedy Opinion" a year and a half after a 2022 remedy trial.

In November 2023, the district court entered final judgment, closing the case and ordering Plaintiffs to request attorney's fees as "prevailing parties." (They have demanded at least $8 million for now.) In addition, the district court issued a Remedial Order directing Louisiana to immediately open up LSP, its prisoners, and its records to three Special Masters (paid by the State and assisted by three State employees, per the district court's order), who will create plans carrying out the district court's directives. Specifically, the district court directed that the Special Masters' plans "cure and eliminate" each alleged violation of law identified in the Liability Opinion and Remedy Opinion.

1

So Louisiana appealed—and vacatur, if not reversal, is plainly warranted. By its own admission, the district court refused to consider evidence of current conditions and conduct up to the judgment. *Contra Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) ("[W]e consider the evidence from the time suit is filed *to the judgment*." (emphasis added)). Moreover, as even Plaintiffs have conceded, the district court's Remedial Order squarely violates the PLRA (if the PLRA applies, which Plaintiffs oddly dispute). *See Parker v. Hooper*, 128 F.4th 691, 712–13 (5th Cir. 2025), *vacated by* 134 F.4th 867 (Jones, J., dissenting) (cataloguing Plaintiffs' concessions). And all that says nothing of the district court's extraordinarily wrong determination that LSP is violating the Eighth Amendment, ADA, and RA. (For example, according to the district court, that no medical professional has an "appreciable role" in developing LSP's budget is an Eighth Amendment violation.)

The Panel Majority, however, determined that it lacks appellate jurisdiction to hear Louisiana's appeal. In the Panel Majority's view, the district court's final judgment and related orders are neither sufficiently "final," 28 U.S.C. § 1291, nor sufficiently "injunctive," *id.* § 1292(a)(1), to establish appellate jurisdiction in this Court. That is because (says the

2

Panel Majority) the Special Masters have not yet been named or created their plans, so who knows what "final" relief the district court may permit against LSP.

Respectfully, this reasoning has no basis in the record or the law. By ordering the forthcoming Special Masters to "cure and eliminate" quite literally dozens of specific alleged violations of law, the district court "made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its [Liability Opinion and Remedy Opinion]." *Morales v. Turman*, 535 F.2d 864, 867 n.6 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322 (1977) (per curiam). That is a "final decision" for purposes of § 1291. *Id.* And "[i]n any event," this Special Master scheme—which is "a mandatory injunction" requiring LSP to immediately allow the Special Masters full access to LSP, its prisoners, and its records; to pay for the Special Masters; and to dedicate *three State employees* to facilitating the Special Masters' activities—is at least appealable under § 1292(a)(1). *Id.* Either way, therefore, this appeal is properly before this Court.

Because the Court has jurisdiction, the only remaining question is how to dispose of this appeal. The Court's ordinary practice is to remand

the case to the panel "to resolve the remaining issues." *Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*, __ F.4th __, 2025 WL 1420220, at *9 (5th Cir. May 16, 2025) (en banc). Here, however, a remand to the panel is unnecessary because everyone appears to agree on at least the Eighth Amendment principle that requires vacatur and remand. As the Panel Majority put it, "the law requires" the district court to "consider[] ... prison officials' 'current attitudes and conduct.'" *Parker*, 128 F.4th at 701; *see id.* at 716 & n.18 (Jones, J., dissenting) (reiterating this point under both the Eighth Amendment and the PLRA). The district court, however, refused to consider evidence of current conditions and conduct up to the judgment. In fact, it did not consider post-2016 evidence before issuing its 2021 Liability Opinion, or post-2022 evidence before issuing its 2023 Remedy Opinion.

Accordingly, in the interests of judicial efficiency, the en banc Court need only vacate the district court's underlying orders and remand with instructions to "consider[] ... prison officials' 'current attitudes and conduct,'" *Parker*, 128 F.4th at 701, if the district court intends to issue another final judgment against the State.

\* \* \*

4

One final note: This case is one of many recent examples where a federal court is engaged in the very "micromanagement" of state prisons that the PLRA was designed to prohibit. *Valentine*, 956 F.3d at 806; *see, e.g.*, *Charles v. Westcott*, No. 24-30484 (5th Cir.) (appeal involving virtually identical orders issued by a different district court regarding a different facility; stayed pending the outcome in this case); Appellants' Br., *Voice of the Experienced v. LeBlanc*, No. 25-30322 (5th Cir. June 4, 2025), ECF 32 (appealing district court injunction that identifies Eighth Amendment violations in the fact that LSP checks temperatures every hour (rather than every half hour) and issues heat alerts at 91 degrees (rather than 88 degrees)).

With due respect to our district courts, "[t]he Constitution charges federal judges with deciding cases and controversies, not with running state prisons." *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020) (citation omitted). Indeed, as Judges Clement and Southwick recently emphasized, "'federalism concerns are particularly acute in the context of prison management' and '[f]ederal judges are particularly ill-equipped to manage state prisons.'" *United States v. Hinds Cnty. Bd. of*

5

*Supervisors*, 128 F.4th 616, 637 (5th Cir. 2025) (quoting *Valentine*, 993 F.3d at 294 (Oldham, J., concurring)).

Yet the district courts continue to disregard these clear pronouncements. The State thus respectfully suggests that an admonishment regarding these basic principles may be warranted.

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set oral argument for its September 2025 en banc

sitting.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over this Eighth Amendment, ADA, and RA lawsuit under 28 U.S.C. § 1331. The district court entered its final judgment on November 6, 2023, which the State timely appealed on November 20, 2023. ECF 1. This Court has jurisdiction under 28 U.S.C. § 1291 and, alternatively, 28 U.S.C. § 1292(a)(1). *See infra* Argument Section I.

## ISSUES PRESENTED

1.     Whether this Court has appellate jurisdiction.

2.     Whether, upon determining that it has appellate jurisdiction, the Court should vacate and remand, directing the district court to conduct further proceedings consistent with the Eighth Amendment and the Prison Litigation Reform Act.

## STATEMENT OF THE CASE

Because this case has been pending since 2015, the record on appeal spans tens of thousands of pages. A holistic statement of that record is unnecessary for present purposes. Suffice it to say that Plaintiffs represent an entire class of prisoners "who are now, or will be in the future," imprisoned at LSP. ROA.22400. They generally challenge the medical care at LSP as a violation of the Eighth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). ROA.22399. The district court ruled for Plaintiffs (in 2021) after a 2018 liability trial. The district court ruled again for Plaintiffs (in 2023) after a 2022 remedy trial, and then entered final judgment and closed the case.

This en banc proceeding principally turns on just four documents: the March 31, 2021 Liability Opinion (ROA.22399–522); the November 6, 2023 Remedy Opinion (ROA.30557–660); the November 6, 2023 Remedial Order (ROA.30661–65); and the November 6, 2023 Final Judgment (ROA.30666). The key portions of those documents are highlighted below. These documents are—by the district court's design— expressly interrelated. The Liability Opinion makes the first pass at identifying alleged violations. The Remedy Opinion makes the second

10

pass, amending the initial findings. And then, the Remedial Order directs the appointment of Special Masters who will create and implement remedial plans that "cure and eliminate the violations found in the Court's Liability [Opinion] and Remed[y] [Opinion]." ROA.30661; *accord id.* ("a remedial plan to address and rectify the ADA and RA violations found by the Court"). Accordingly, the statement of the case below focuses on specifically identifying those alleged violations.

## A.    The District Court Enters Its 2021 Liability Opinion Following a 2018 Liability Trial.

The district court's bifurcated approach to this lawsuit led first to a liability trial in October 2018. ROA.21441. The district court concluded that trial by both ordering post-trial briefing and directing the parties to go to mediation (including specifically directing then-Secretary of the Louisiana Department of Public Safety and Corrections, James LeBlanc, "to be present at the mediation"). ROA.21442; *see* ROA.30562–63 (district court later stating that it "telegraphed" its liability decision to the parties to facilitate settlement). The magistrate judge twice informed the district court that the case would not settle. ROA.21795; ROA.22394.

In March 2021, the district court issued its 124-page Liability Opinion. By the district court's own admission, it refused to consider any

evidence of current conditions or conduct past September 2016—*i.e.*, two years before the trial, and five years before the district court issued its Liability Opinion. ROA.22399 n.1; ROA.22444. Two aspects of the Liability Opinion are key here. *First*, the Liability Opinion concludes that "the Court shall order injunctive relief regarding [15 specific] deficiencies." ROA.22520. *Second*, the body of the Liability Opinion expounds on those alleged deficiencies.

**1.** The Liability Opinion concludes that "Defendants, in their official capacities, are violating the Eighth Amendment rights of the Plaintiff Class and the ADA and RA rights of the Plaintiff Subclass." ROA.22520. Thus, "judgment shall be entered in favor of Plaintiffs following the remedy phase." *Id.* To that end, the Liability Opinion provides that "[t]he Court shall order injunctive relief regarding the following [15] deficiencies" (the following list is a direct quote):

1)   Failing to provide constitutionally adequate clinical care in the following particulars: privacy in examinations; lack of routine medical equipment in exam rooms; lack of adequate medical records management; lack of clinical hygiene and spacing; episodic treatment of complaints; [*see* ROA.22407–10 ("clinical care" findings)]

2)    Failing to provide adequate medical care with qualified providers at sick call; [*see* ROA.22423–28 ("sick call" findings)]

3)    Failing to provide access to medically necessary specialty care in a timely manner; failure to schedule and track specialty appointments; failure to comply with testing and diagnostic requirements; failure to execute appropriate follow-up care ordered by specialty care providers; and failure to coordinate care; [*see* ROA.22410–19 ("specialty care" findings)]

4)    Failing to provide constitutionally adequate emergency care in the evaluation and assessment of emergencies by qualified providers and failing to timely treat and/or transport to hospital for emergent care; [*see* ROA.22429–34 ("emergency care" findings)]

5)    Failing to provide adequate, qualified staff in infirmary/inpatient care; [*see* ROA.22419–23 ("infirmary/inpatient care" findings)]

6)    Failing to provide medical leadership and organization in the following particulars: lack of meaningful mortality review; use of correctional personnel to manage medical decisions; lack of peer review; lack of medical staff involvement in budgeting; lack of medical supervision by Dr. Lavespere; and failure to maintain proper credentialing records; [*see* ROA.22435–39 ("medical leadership and organizational structure" findings)]

7)    Failing to comply with the ADA and RA in providing disabled inmates access to programs and services due to physical and architectural barriers; [*see* ROA.22445–49 ("architectural barriers" findings")]

8)    Failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications have not been made to provide access; failure to provide

13

proper oversight of health care orderlies; [*see* ROA.22449–53 ("orderly" findings)]

9) Failing to comply with LSP's own ADA Directives in maintaining a qualified ADA Coordinator and advisory committee to handle ADA issues; [*see* ROA.22454–57 ("methods of administration" findings)]

10) Failing to make efforts to integrate disabled inmates within the spirit of the ADA implementing regulations; [this appears to be a mistake as the district court made no corresponding findings, and the district court subsequently excluded any discussion of it from the Remedy Opinion]

11) Failing to adequately train medical staff regarding ADA compliance; [*see* ROA.22457–58 ("training" findings)]

12) Failing to appropriately evaluate and address ADA accommodation requests and disability-related grievances; [*see* ROA.22459–61 ("accommodation" findings)]

13) Failing to identify and track disabilities and accommodation requests in a meaningful way; [*see* ROA.22462–63 ("tracking" findings)]

14) Failing to accommodate disabled inmates in applying discipline; [*see* ROA.22470–71 ("discipline" findings)]

15) Maintaining blanket exclusionary policies for disabled inmates regarding access to various services, activities, and programs in violation of the ADA. [*see* ROA.22475–76 ("blanket exclusionary" findings)]

ROA.22520–22.

As that summary suggests, while the entirety of the 124-page Liability Opinion provides helpful context, the crucial piece of the

14

Liability Provision is those three pages—under the heading "Conclusion/Injunctive Relief"—which reflect the 15 alleged deficiencies that injunctive relief must reverse.

**2.** The injunctive remedies for virtually all of the alleged deficiencies above are self-explanatory. For example, LSP's supposed "[f]ail[ure] to provide ... privacy in examinations" (Alleged Deficiency 1) means, well, an injunction requiring privacy in examinations. Similarly, LSP's supposed "lack of medical staff involvement in budgeting" (Alleged Deficiency 6) means an injunction *mandating* medical staff involvement in budgeting. But the Liability Opinion is even more precise, because each of these 15 bulleted violations (save one flagged above) is a cursory description of a corresponding, broader discussion in the Liability Opinion. In the list above, the State has bracketed citations of the portions of the Liability Opinion that match up with specific violations. Space constraints prevent a full catalogue, but here are a few examples.

On the issue of clinical care (Alleged Deficiency 1), the district court's "Conclusion/Injunctive Relief" section identifies as unlawful, among other things, a "lack of routine medical equipment in exam rooms" and a "lack of clinical hygiene and spacing." ROA.22521. By those general

terms, the district court was referring back to its finding of an absence of "standardized, typically required, equipment, *i.e.* blood pressure cuffs and glucometers." ROA.22407. The district court also was referring to its finding that "[c]linic spaces are [] cluttered with microwaves, refrigerators, and food items"—as well as "a lack of usable handwashing facilities in clinic rooms and a lack of paper covering on exam tables." *Id.* (footnotes omitted).

As another example, when the "Conclusion/Injunctive Relief" section refers to LSP's alleged failure "to provide adequate, qualified staff in infirmary/inpatient care" (Alleged Deficiency 5), ROA.22521, the district court is calling back to its finding that LSP improperly uses orderlies (prisoners) "beyond the scope of the medical accepted use of orderlies." ROA.22420. It also recalls the district court's finding that some rooms in the infirmaries have "solid locking doors and no call system to reach nurses." *Id.*

One last example: The "Conclusion/Injunctive Relief" section identifies as unlawful LSP's failure to "provid[e] disabled inmates access to programs and services due to physical and architectural barriers" (Alleged Deficiency 7). ROA.22521. That is a direct reference back to the

16

district court's wholesale "adopt[ion] [of] the findings of violations as detailed in [Plaintiffs' expert] Mazz's report"—that is, "190 architectural barriers impeding independent access to a range of programs, services, and activities, including housing, toilets, showers, phones, JPay stations, common areas, drinking fountains, recreation areas, transportation, the law library, visiting areas, medication administration, meals, medical services, and mail services." ROA.2247.

## B.    The District Court Enters Its 2023 Remedy Opinion Following a 2022 Remedy Trial.

The district court then proceeded to a remedy trial in June 2022. And in the interim, LSP undertook extensive measures to remedy the alleged violations identified by the district court. After the 2022 remedy trial, the district court again attempted to force a settlement, which the court later described as "fruitless." ROA.30564.

So on November 6, 2023, the district court issued its 104-page Remedy Opinion. By the district court's own admission, it refused to consider evidence of current conditions and conduct past May 2022—*i.e.*, two months before the trial, and a year and a half before the district court issued its Remedy Opinion. ROA.30563 n.24; ROA.30103 (permitting evidence submitted until May 27, 2022). The Remedy Opinion separates

17

out Eighth Amendment violations and ADA/RA violations. Because each alleged violation is key to the en banc Court's consideration—and although the work is tedious—the discussion below identifies each one, matching them up with the original list in the Liability Opinion.

**1. Eighth Amendment.** *Clinical Care (Alleged Deficiency 1 in the Liability Opinion).* ROA.30571–80. The district court conceded that "LSP [] properly remedied [] privacy in examinations," "lack of routine medical equipment in exam rooms," and "lack of clinical hygiene and spacing." ROA.30571. The district court further found it "[l]audabl[e]" that "LSP hired additional nurse practitioners and utilizes them in clinical care." ROA.30572. Nevertheless, the district court held that "the lack of adequate medical records management and the episodic treatment of complaints persist in LSP's delivery of clinical care." ROA.30571. Specifically, the district court claimed that "LSP's medical records remain in shambles" and "are disorganized and incoherent." ROA.30574; *accord* ROA.30576 ("utter disarray"). The district court included in that finding a subsidiary finding that, "like the general medical records, the medication administration records remain unreliable and disorganized." ROA.30578. The district court thus summed up: "The evidence

demonstrates that patients continue to be treated episodically, and medical records management and medication administration are still seriously flawed." ROA.30580; *see id.* ("The medical records remain a significant impairment to delivering minimally adequate clinical care."). (One of the pieces of evidence—offered more than a year before the district court issued the Remedy Opinion—the district court refused to consider is "LSP's implementation of electronic healthcare records," transforming LSP's record management system. ROA.30304.)

*Sick Call (Alleged Deficiency 2 in the Liability Opinion).* ROA.30580–84. The district court was "encouraged by some changes made to sick call." ROA.30580. Those changes, the district court recognized, included LSP's "new sick call policy," which ensures that "inmates who submit a sick call request received by noon Sunday through Thursday are seen by a nurse practitioner via telemedicine on the following day." *Id.* Those changes also included the fact that "LSP secured telemedicine equipment and acquired portable buildings so patients could be seen via telemed by nurse practitioners from their dorms or cell blocks." *Id.*

19

Nonetheless, the district court held that "LSP's sick call process remains a constitutionally inadequate component of clinical care." ROA.30580. The supposed Eighth Amendment violation? National Commission on Correctional Heath Care "standards require daily sick call triage," while "LSP's sick call policy has complaints reviewed the next day" and "sick call requests are only reviewed five days of the week." ROA.30581. Further, the district court complained that it was unable to confirm whether "triage actually occurs within the timeline set forth in the policy." *Id.* The district court also complained about an alleged "lack of physical examinations," as well as "poor resolution quality" of the telemedicine equipment that "contributes to the lack of an adequate physical exam." ROA.30582. Finally, the district court asserted that a nurse practitioner, rather than an emergency medical technician (EMT), "should be directing the hands-on examination." *Id.* "An ounce of prevention is worth a pound of cure," the district court said. ROA.30584.

*Specialty Care (Alleged Deficiency 3 in the Liability Opinion).* ROA.30584–94. On the issue of specialty care, too, the district court recognized "some improvement in this area." ROA.30584. Indeed, among other changes, the district court recognized that LSP—in response to the

Liability Opinion—"has installed monitors in the Ash dorms to notify inmates of their appointments, replacing the previous method of inmates reviewing paper print outs to determine if they had appointments." ROA.30585. The district court even called "[t]hese changes" "a framework for constitutionally adequate health care." *Id.*

Yet the district court held that LSP "has not resolved failures in timely scheduling and tracking adherence to specialty provider orders and follow-up." *Id.* For that finding, the district court cited several alleged examples of failures to provide, or delays in providing, specialty care to particular prisoners—*e.g.*, missing the need for a colonoscopy, a referral to a neurologist, a pulmonologist, an oncologist, etc. ROA.30586–93. The district court also cited as unlawful "treatment and referral delays," "late-stage, undiagnosed diseases despite extended periods of symptoms," and third-parties' "difficulties obtaining follow-up appointments for patients from LSP or ensuring that follow-up care occurs." ROA.30593–94.

*Emergency Care (Alleged Deficiency 4 in the Liability Opinion).* ROA.30594–608. Although the district court "previously held that LSP failed to provide constitutionally adequate emergency care in the

21

evaluation and assessment of emergencies by qualified providers and failed to timely treat and/or transport patients to the hospital for emergency," the district court recognized that LSP "improved staffing in the [Acute Treatment Unit]" and adopted "a new policy for responding to [self-declared emergencies]." ROA.30594. (Despite its name, the Unit "is not an emergency room." ROA.30595.) LSP also "improved staffing in the [Acute Treatment Unit] by having a RN and an EMT present twenty-four hours a day, seven days a week." *Id.*

Here too, however, the district court concluded that "the emergency care provided by LSP remains constitutionally deficient." ROA.30597. The district court reached this conclusion by identifying alleged constitutional defects in how LSP treated particular prisoners. For example, LSP should have had a "health care provider" conduct a "physical examination" of one prisoner. ROA.30599. It should have treated another prisoner's high fever and confusion "like an emergency" and required an examination by a nurse practitioner in the Acute Treatment Unit. *Id.* Although LSP "appropriately treated" a third prisoner in the Unit, "[g]iven the speed with which [he] expired," LSP "should have [given him] emergency care." ROA.30600–01. For another,

22

the district court again returned to the claim that he "was given no physical exam and did not see a provider." ROA.30602. And for yet another—a prisoner experiencing cardiac arrest—the district court complained that LSP administered an automatic external defibrillator within six to ten minutes, rather than within four minutes. ROA.30603.

*Infirmary/Inpatient Care (Alleged Deficiency 5 in the Liability Opinion)*. ROA.30608–15. Although the Liability Opinion determined that "LSP failed to provide adequate, qualified staff in infirmary/inpatient care," ROA.30608, the district court subsequently "commend[ed] [LSP's] efforts to improve staffing levels." ROA.30609. Specifically, the district court acknowledged LSP's representation that it "increased the ratio of nurses to patients in the nursing units with one registered nurse for every ten patients in acute care (NU1) and one registered nurse for every 15 patients in long-term care (NU2)." ROA.30608. The district court also acknowledged that, whereas the court had previously complained of prisoners' inability to call nurses from locked rooms, LSP has now "addressed the issue of patients being in locked rooms by installing a red call light outside the door of these rooms with an activation switch located at the patient's bedside." ROA.30609.

23

(The district court added that "[p]aralyzed patients are still inexplicably placed in locked rooms." *Id.* This is, after all, a prison. And the district court conceded that such prisoners "appear to be positioned within reach of the call light switch." *Id.*) And LSP has now ensured "that the nursing units are clean and not in disarray." ROA.30609.

Again, however, the district court was not satisfied, principally concluding that "an appropriate number of qualified, adequate staff remains lacking in the infirmary." ROA.30608. The district court's cited reasons do not squarely match up with that conclusion, but here they are. For one, "evidence shows that patients continue to be outside of sight or sound of nurses." ROA.30609. For another, Plaintiffs' experts (the district court recounted) "never observed a nurse rounding patients." ROA.30610. They also did not observe a "'head-to-toe' physical assessment of a patient by nursing staff." *Id.* The nurses' infirmary forms also "are inadequate as they fail to provide a space for date and time, and vital sign flowsheets do not allow for documentation of the time vitals were taken." *Id.* "[T]he LSP infirmary" itself likewise "fails to provide adequate equipment and supplies for effective patient care"—specifically, the district court said, "Plaintiffs' experts observed several instances where patients were not

24

timely provided crutches, walkers, or bedside commodes until after patient injury had occurred." *Id.* Again, it is unclear how any of this relates to the conclusion that LSP does not have enough staff. (It bears noting, moreover, that one of the pieces of evidence—offered more than a year before the district court issued the Remedy Opinion—the district court refused to consider is "LSP's hiring additional medical providers." ROA.30304.)

Last, the district court reiterated its complaint that LSP improperly uses orderlies in the infirmary. In particular, the district court claimed that "orderlies continue to perform tasks outside the scope of their appropriate use." ROA.30612. That is, while they "can assist with activities of daily living," they allegedly "are performing tasks that should only be performed by medical staff"—such as (purportedly) "performing wound care, handling patient lab reports, and taking x-rays." ROA.30613. That, said the district court, violates standards from the National Commission on Correctional Health Care and the American Correctional Association. *Id.*

In the end (and slightly modifying its assessment), the district court concluded that "the barriers to sight and sound between patients and

25

nurses, coupled with admitted staffing shortages and the resulting improper use of inmate orderlies, demonstrates unconstitutionally deficient infirmary care." ROA.30615.

*Medical Leadership/Organization (Alleged Deficiency 6 in the Liability Opinion).* As to the alleged "combination of inadequacies in ... medical leadership and organization at LSP," the district court concluded that "none of th[e] inadequacies [identified in the Liability Opinion] have been remedied." ROA.30615. And "[t]he lack of leadership, supervision, and organization ... is the sin qua non [sic] to the unconstitutional care." ROA.30618.

In particular, the district court stated that "LSP's mortality reviews contain 'no critical analysis, so there's no critical review; there's no identification of the deficiencies.' Not a single review contains identification of anything in the patient's care that could have been improved, even where fatal errors occurred." ROA.30619 (footnote omitted). "Meaningful mortality review is a tool for improving medical care," and this "opportunity [] is being squandered by the medical leadership," warned the district court. ROA.30620.

The district court also reprised its complaint about the "use of correctional personnel to manage medical decisions," but identified only two alleged issues. ROA.30615. One, "[a]lthough now a shared duty with nurses, security staff continues to supervise inmate orderlies." ROA.30621. Two, "it appears that [medical staff] still defer[] to security's opinion regarding the need for restraints"—citing an LSP doctor's testimony that absent "a really good reason, you don't let them out of appropriate restraints." *Id.* Again, this is a prison. To the district court, however, these are examples of unconstitutional "deference to and reliance upon security opinions in medical decisions." *Id.*

Turning next to the "lack of necessary peer review at LSP," the district court found "that LSP's inadequate peer review process persists." ROA.30622. As for LSP's updated "quality improvement" program, the district court acknowledged its existence but complained that LSP "presented no empirical evidence that this program has been effective in remedying constitutional deficiencies." ROA.30623. So "LSP continues to lack an adequate quality improvement program aimed at critical analysis and corrective efforts." *Id.*

Next is the district court's holding "that the lack of medical staff involvement in budgeting contributed to a constitutionally deficient healthcare system at LSP." ROA.30623. The district court again found an Eighth Amendment violation in the fact that "LSP's medical budget is determined at a departmental and legislative level and is fixed based on the prior year's spending." ROA.30624. The "problem[]," in the district court's view, is that LSP medical staff have no "appreciable role in setting the budget." *Id.* So "the lack of medical leadership involvement in LSP's budgeting process continues to negatively impact the adequacy of medical care received by inmates at LSP." *Id.*

Finally, the Liability Opinion determined that "LSP's failure to maintain proper credentialing records contributed to the constitutionally inadequate medical leadership and organization at LSP." ROA.30624. Finding no changes on this issue, the district court determined in the Remedy Opinion that the issue "persists and contributes to the overall constitutionally deficient medical leadership and organization at LSP." ROA.30625. (Here too, it is notable that one of the pieces of evidence— offered more than a year before the district court issued its Remedy

Opinion—that the district court refused to consider is "LSP's re-accreditation by the American Correctional Association." ROA.30304.)

**2. ADA/RA.** That leaves Alleged Deficiencies 7 through 15 from the Liability Opinion, which address ADA/RA issues.

*Architectural Barriers (Alleged Deficiency 7 in the Liability Opinion)*. ROA.30627–31. The district court repeated its finding, based on the Mazz report, that "190 architectural barriers at LSP [] required remediation to be ADA compliant." ROA.30627. The district court credited a subsequent Mazz report stating that "only 19-20% of the barriers identified in his 2016 report have been remediated by LSP." ROA.30628. Accordingly, the district court found that the remaining "physical barriers to program access necessitate injunctive relief to bring LSP's facilities into compliance." ROA.30631.

*Orderly Program (Alleged Deficiency 8)*. ROA.30632–36. In the Liability Opinion, the district court "held that LSP violated the ADA and RA by failing to provide adequately trained, staffed, and safe orderly assistance where physical modifications were not made and by failing to provide proper oversight of health care orderlies." ROA.30632. The district court repeated that finding in the Remedy Opinion, specifically

claiming that LSP fails to sufficiently train orderlies "before they are assigned to work with disabled inmates." *Id.* For example, LSP "fails to address myriad [] disabilities, such as blindness, respiratory problems, diabetes, or dementia/mental illness, to name a few." ROA.30632–33.

In addition, the district court cited "a serious lack of supervision or oversight of inmate orderlies by both medical staff and security personnel." ROA.30634. Contrary to the court's finding above, the court here "reject[ed] any assertion that that [sic] security should have no role in supervising inmate orderlies.... It is appropriate for security to supervise the conduct of orderlies, which the Court finds is a prophylactic against potential abuse of an inmate patient by an inmate orderly." ROA.30635; *cf.* ROA.30621 (complaining that "security staff continues to supervise inmate orderlies"). But only "[q]ualified medical staff," not security, may "supervise whether inmate orderlies are complying with their duties to assist inmates with health care needs and/or disabilities." ROA.30635. And in all events, the district court concluded that there is no "supervision of orderlies by either medical staff or security personnel." ROA.30636.

*ADA Directives/Coordinator (Alleged Deficiency 9 in the Liability Opinion).* ROA.30636–40. The district court likewise found "that LSP continues to fail to meaningfully comply with its own ADA Policy Directives, which contributes to violating the ADA and RA rights of disabled inmates." *Id.* The district court believed that LSP's ADA coordinator is unqualified "to oversee and administrate LSP's ADA compliance" because she is "juggling [too] many responsibilities" and her ADA training and knowledge is "lacking." ROA.30637–38. The district court dismissed that LSP hired a new Department-wide ADA coordinator, notwithstanding that she "appears committed to and invested in her role." ROA.30639. In particular, the court explained that it "cannot discern" whether she would appropriately apply (and train others on) the ADA's requirements for accommodation requests. ROA.30639–40.

*Staff Training (Alleged Deficiency 11 in the Liability Opinion).* ROA.30640–41. According to the district court, "ADA training for medical and correction staff is essentially unchanged since the liability ruling and, thus, remains unlawful." ROA.30640. That brief paragraph is as cursory as the district court's initial determination that "LSP staff are

31

not adequately trained to identify ADA issues within the disabled inmate population." ROA.22505.

*Identifying/Tracking Accommodation Requests (Alleged Deficiency 13 in the Liability Opinion)*. ROA.30641–42. As in the Liability Opinion, the district court found that "LSP continues to fail to identify and track disabilities and accommodations"—and that "LSP's tracking system does not provide meaningful identification and tracking of disability grievances or ADA accommodation requests." ROA.30641.

*Addressing Accommodation Requests (Alleged Deficiency 12 in the Liability Opinion)*. ROA.30642–43. Here too, the district court repeated its claim that "the evaluation and resolution of accommodation requests and/or disability grievances remain unchanged and violate the ADA and RA." ROA.30642. The only support the district court offered is that "individualized response plans ... are not created for disabled patients"; some prisoners allegedly "file[d] accommodation requests via ARP" but "receive[d] no response"; and one class member testified that "LSP has tried to take away his wheelchair." ROA.30642–43.

*Discipline Accommodations (Alleged Deficiency 14 in the Liability Opinion)*. ROA.30643–45. (Heading "H" in this section of the Remedy

Opinion is wrong, as the district court appears to have mistakenly copied and pasted an earlier heading.) According to the district court, LSP does not follow its own policy "allow[ing] any disabled inmate to request an accommodation of any LSP employee at any time," including in the disciplinary context. ROA.30645. "The law requires" determinations regarding accommodations "to be made on a case-by-case basis"—but "[t]his is not occurring at LSP," the district court believed. *Id.*

*Exclusionary Policies (Alleged Deficiency 15 in the Liability Opinion).* ROA.30645–47. In its sole ruling for the State, the district court concluded that "Plaintiffs have failed to carry their burden of demonstrating that LSP continues to violate the ADA/RA by uniformly excluding disabled inmates form [sic] certain duty statuses, work assignments, or hobby craft." ROA.30645.

\*     \*     \*

With apologies for the painful violation-by-violation analysis, the above discussion is key in this case because it illuminates the dozens of alleged legal violations that the district court identified. As explained in the next section, that is important because the district court's Remedial Order specifically incorporates each of those violations by reference.

33

###### C.    The District Court Simultaneously Enters Its 2023 Remedial Order and Final Judgment.

The district court's Remedy Opinion concludes by announcing that "the Court will enter Permanent Injunctive relief by separate order." ROA.30659. It also announces that "[t]he Court will enter judgment in favor of Plaintiffs and against Defendants." ROA.30660. The district court did so by issuing both orders on the same day.

*First*, the district court issued its Remedial Order. ROA.30661–65. The Remedial Order is sweeping. It "Orders the appointment of 3 Special Masters to develop proposed remedial plans, make recommendations regarding implementation and monitor implementation of remedial plans ('Remedial Plans') *to cure and eliminate the violations found in the Court's Liability Ruling and Remedial Ruling*." ROA.30661 (emphasis added). The Remedial Order further states that the court will appoint a physician and nurse/nurse practitioner (and perhaps another Special Master?) "to develop, make recommendations regarding implementation and monitor implementation of a remedial plan *to address and rectify the ADA and RA violations found by the Court*." *Id.* (emphasis added).

The Remedial Order further directs that, "[n]o later than 30 days after their appointment, the Special Masters shall have access to [LSP]

to conduct reviews of the facility, the health care and ADA operations." ROA.30663.[1] That means they "shall have access to any and all records and documents appropriate and necessary for their tasks and the Department of Corrections shall provide any records and documents requested without delay and in no event later than 14 days following the request." *Id.* More, "Special Masters' visits to LSP shall be facilitated by the DOC on 24 hours written notice by the Special Master(s)" and they "shall be given reasonable access to class members" (*i.e.*, every current and future prisoner at LSP). Still more: "The Department of Corrections shall designate, in writing, one headquarters employee, one or more Wardens and one or more security employee(s) to coordinate and facilitate the work of the Special Masters." *Id.*

Within 90 or 120 days of their appointment, the Special Masters will then submit their plans to the district court and the parties—and

---

[1] The State is obligated to repeat one clarification that it offered at the en banc stage. The Panel Majority stated that "Defendants' only current obligation under the Remedial Order would be to propose names of potential special masters." *Parker*, 128 F.4th at 696; *id.* at 700 (the Remedial Order "merely directs Defendants to submit to the court names of proposed special masters"). That is only half true. For, upon the Middle District's selection of the Special Masters, all the requirements detailed above will immediately spring into effect. It is thus misleading to suggest that the "only" issue here is whether the State must be forced to "propose names of potential special masters." *Id.* at 696. Indeed, the State already proposed names because the deadline for doing so arrived before a panel of this Court entered a stay; so, focusing only on that requirement makes no sense.

after disposing of any requests for amendment, the district court "will enter Orders necessary and appropriate to effect remedies." ROA.30661–64. Every six months after such Orders, the district, the Special Masters, and the parties will, if necessary, reconvene "to review progress and impediments to completion and compliance." ROA.30664. Meanwhile "[a]ll costs associated with the work and reporting of the Special Masters shall be paid by the Defendants." ROA.30664. Moreover, "[t]he Special [M]asters shall continue to have access to LSP, class members, and records and documents." *Id.* And Plaintiffs "may file Supplemental Motions for Attorneys' Fees and Costs" every three months for their role in overseeing LSP. ROA.30665. (Speaking of attorney's fees, the Remedial Order concludes by "direct[ing]" Plaintiffs "to file a Motion to Award Attorneys' Fees and Costs within 30 days of this Order." *Id.* They did, seeking over $8 million. ROA.30838.)

Finally, the Remedial Order specifically identifies what the Special Masters' plans shall "address[]." ROA.30662. The "Medical Care Remedial Plan" must address seven items that map directly onto the Eighth Amendment findings in the Liability Opinion and Remedy Opinion:

36

1. Standards and Procedures for Sick Call, including but not limited to, the sick call request process, evaluation by a provider, and documentation and/or charting and follow-up.

2. Standards and Procedures for Clinical Care, including but not limited to, protocols pertaining to obtaining and documenting patient history, medical charting, examination and diagnostic protocols, treatment protocols, including review and recommendations of existing 'Individual Treatment Orders,' medication administration, documentation protocols, and medication charting and follow-up.

3. Standards and Procedures for Specialty Care, including but not limited to protocols pertaining to referrals, tracking, follow-up, review, and implementation of specialists' orders and charting.

4. Standards and Procedures for Infirmary and In-Patient Care, including but not limited to, protocols pertaining to admission, level of care determinations, rounding and assessments, care planning, medication administration and documentation, charting, and the protocols for the appropriate use and training of inmate orderlies.

5. Standards and Procedures for Emergency Care, including but not limited to, staffing numbers and disciplines in the ATU, standards and protocols for transfer to outside hospitals, and protocols for the appropriate use and training of EMTs.

6. Standards and Procedures for medical records management, including electronic medical records and protocols for providing real time or contemporaneous access to medical records by outside providers, specialists, and related disciplines.

7. Standards and Procedures for medical management and administration, including but not limited to,

recommendations for medical management policies and procedures, recommendations regarding medical administrative organization, staffing levels, credentialing, performance reviews, peer reviews, mortality reviews, quality control and quality improvement.

ROA.30662–63. The "ADA Remedial Plan" must address five items that likewise directly map onto the ADA/RA findings in the Liability Opinion and Remedy Opinion:

1. Identification of architectural barriers to be remedied as set forth in Mark Mazz's expert report, a determination of the appropriate remedies, and a schedule for such remediation.

2. Standards and procedures for Methods of Administration, including but not limited to, the appointment of a qualified, properly trained ADA Coordinator and a determination regarding the necessity of an ADA Advisory Committee as previously contemplated by Directive 1.016.

3. Standards and procedures for receiving, tracking, and appropriately responding to accommodation requests.

4. Standards and procedures pertaining to the appropriate ADA training for LSP staff and inmate orderlies.

5. Standards and Procedures for the appropriate consideration of disabled status when imposing discipline and training related thereto.

ROA.30663.

*Second*, the district court entered its Final Judgment. ROA.30666. To be specific, the district court said "Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against

Defendants, the current Warden of the Louisiana State Penitentiary, et al." *Id.* The district court continued on to say that "[t]his matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto." *Id.*

### D. The State Immediately Appeals, Citing Eighth Amendment and PLRA Problems.

After being stuck for nearly a decade in the district court, the State immediately seized its opportunity to appeal. The State's grounds for appeal are exhaustively catalogued in its panel-stage reply brief, ECF 136, and Judge Jones' dissent. Because this en banc proceeding principally involves the threshold jurisdictional question, the State here provides only a brief overview of the most prominent merits issues.

*First*, the Liability Opinion, the Remedy Opinion, and the Remedial Order all rest on plainly erroneous Eighth Amendment analysis. This Court's rule on the evidentiary record is clear: "[W]e consider the evidence from the time suit is filed *to the judgment*." *Valentine*, 993 F.3d at 282 (emphasis added). The district court refused to comply. By the court's own admission, the 2021 Liability Opinion excluded post-September 2016 evidence. ROA.22399 n.1; ROA.22444. And by the

39

court's own admission, the 2023 Remedy Opinion excluded post-May 2022 evidence, ROA.30563 n.24; ROA.30103—including evidence that LSP engaged in sweeping remedial measures, such as implementing electronic medical records, that directly addressed the Liability Opinion, ROA.30304. So, did the district court "consider the evidence from the time suit is filed to the judgment" entered on November 6, 2023? *Valentine*, 993 F.3d at 292. No.

*Second*, the PLRA bars the district court from ordering injunctive relief against alleged violations of federal law that are not "current and ongoing." *E.g.*, *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002); *see also Dockery v. Cain*, 7 F.4th 375, 380 n.4 (5th Cir. 2021) (noting that "[c]ourts are split" on this issue but declining to decide it). Indeed, the PLRA's plain text permits injunctive relief only to address "*the* violation of the Federal right"—*i.e.*, a then-existing violation. 18 U.S.C. § 3626(a)(1)(A) (emphasis added). "[I]f a violation no longer exists, the statute does not permit the court to order prospective relief." *Hallett*, 296 F.3d at 743. And that is the case here: The district court refused to acknowledge that current-conditions evidence directly undermines the claimed violations allegedly requiring the Remedial Order—and thus the

40

district court runs headlong into the PLRA's bar on injunctive relief for non-existent violations.

*Third*, the Remedial Order itself is a walking PLRA violation. It does not even try to comply with the PLRA's prerequisite for prospective relief—*i.e.*, a finding that the relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). And as Judge Jones cogently explained, the Remedial Order also violates just about every rule the PLRA establishes for Special Masters. *Parker*, 128 F.4th at 710–14. (Plaintiffs urged the district court to issue an "indicative ruling" to try to solve all of these problems—the district court declined. ROA.30830.)

Any of these errors requires, at a minimum, vacatur and remand of the Liability Opinion, Remedy Opinion, Remedial Order, and Final Judgment. Moreover, these errors do not even touch the district court's erroneous substantive findings of Eighth Amendment and ADA/RA violations—which amount to achieving the district court's own vision for LSP's medical care, not something federal law requires. As the State emphasized at the panel stage, the Court need not reach those merits

41

errors, however, since the district court's procedural errors are enough to warrant vacatur and remand.

## SUMMARY OF ARGUMENT

**I.** This Court has appellate jurisdiction.

**A.** That is principally so under § 1291 because the State has appealed a final decision—the district court has entered final judgment and closed the case. That the district court's Special Master scheme is poised to ramp up does not change the analysis. As this Court made clear in *Morales*, so long as the district court clearly sets the minimum requirements for what any subsequent remedial plan must include, the district court's order is appealable as a final decision. And that is the case here: By directing the Special Masters to "cure and eliminate" dozens of specific violations identified in the Liability Opinion and Remedy Opinion, the district court clearly set the minimum standards the Special Masters must meet.

Plaintiffs have no response. They insisted at the en banc stage that it was impossible to know what relief the Special Masters' forthcoming plan might require. That is just wrong. Plaintiffs never acknowledge the district court's directive that the Special Masters cure and eliminate

specific problems—nor can Plaintiffs, for that would destroy their narrative against appellate jurisdiction. Plaintiffs also complain that the district court has not actually "disassociated" itself from this case, because the court still must approve (and monitor the implementation of) the Special Masters' plan. In institutional-reform litigation, however, *no* district court actually disassociates itself—for every district court remains involved in overseeing a permanent injunction or consent decree. Plaintiffs thus have no serious challenge to appellate jurisdiction under § 1291.

**B.** Even if the Court lacked jurisdiction under § 1291, however, it would have jurisdiction under § 1292(a)(1). That is principally because of the precise nature of the district court's directive to the Special Masters. Numerous courts, including this one, have recognized § 1292(a)(1) jurisdiction where a district court order, despite not granting injunctive relief, at least specifically articulates the requirements of any remedial plan. Moreover, numerous courts have independently recognized § 1292(a)(1) jurisdiction where, as here, any forthcoming remedial plan would not actually affect the purely legal issues on appeal. Here, for example, whatever the Special Masters concoct has no bearing on the fact

43

that the district court failed to comply with *Valentine*'s "current conditions" requirement in ordering prospective relief and entering final judgment. Those two bases are independently sufficient for jurisdiction.

It bears noting, moreover, that jurisdiction also is secure by virtue of the plainly mandatory nature of the district court's Remedial Order. It directs LSP to open up its premises, prisoners, and records to the Special Masters for months; it orders LSP to pay the Special Masters; and it orders the State to dedicate three State employees (including a warden and a "headquarters" employee) to "coordinate and facilitate" the Special Masters' work. That is a quintessential mandatory injunction, which independently ensures jurisdiction.

In response, Plaintiffs' best shot is that the district court's directives are no different than "discovery procedures," which are not appealable injunctions. With all due respect, that argument is not serious. If a district court ordered you to give an investigator full access to your house for months, to pay him, and to designate specific family members to assist in his work, no reasonable person would prevent you from appealing on the ground that this is "just a discovery measure." That is a mandatory injunction. This appeal is properly before this Court.

**II.** Because this Court has jurisdiction, the only remaining question is how to dispose of this appeal. While the Court's ordinary practice is to remand remaining issues to the panel, that ordinary practice would be somewhat misplaced here, since no one appears to dispute the core Eighth Amendment principle at issue: Specifically, the district court was required to consider evidence up to the November 2023 judgment, and no one disputes that the district court refused to do so. For that reason, and in the interests of judicial efficiency, the State respectfully suggests that the Court simply vacate the underlying orders and remand with instructions for the district court to conduct further proceedings consistent with the Eighth Amendment and the PLRA. And because this case exemplifies a fundamentally mistaken approach in post-PLRA litigation, an admonishment to that effect may be warranted.

## LEGAL STANDARD

This Court reviews findings of fact for clear error and conclusions of law (and mixed question of law and fact) *de novo*. *E.g.*, *Dickerson v. Lexington Ins.*, 556 F.3d 290 (5th Cir. 2009).

# ARGUMENT

## I.    THIS COURT HAS APPELLATE JURISDICTION.

The appellate-jurisdiction question in this case is straightforward. In fact, a careful understanding of the factual record detailed above all but resolves the legal question. As that record reveals, the district court ordered the forthcoming Special Masters to "cure and eliminate" dozens of specific alleged violations of law—ranging from fixing nearly 200 particular barriers to access identified by Plaintiffs' expert, to removing sight-and-sound barriers in infirmaries, to prohibiting orderlies from engaging in medical work such as wound care, to giving medical staff an "appreciable role" in budget development, to requiring LSP to engage in peer review, to changing LSP's sick call policy to require daily triage. And the list goes on.

These facts render the Panel Majority's assessment—that "the district court has not specifically determined 'the minimal content'" of any injunctive relief—just wrong. *Parker*, 128 F.4th at 699. Indeed, it would likely come as a surprise to the district court to learn that it had not, in fact, ordered the Special Masters to "cure and eliminate" the

46

violations identified above. That squarely secures appellate jurisdiction under § 1291. *See Morales*, 535 F.2d at 867 n.6.

But, even if the Court thought otherwise, the injunctive nature of the Remedial Order would easily secure appellate jurisdiction under § 1292(a)(1). That is principally because the precise nature of the district court's "cure and eliminate" directive would fall within a long line of cases recognizing § 1292(a)(1) jurisdiction. *See Armstrong v. Wilson*, 124 F.3d 1019, 1022 (9th Cir. 1997) (collecting cases). But, more fundamentally, the Remedial Order "is itself a mandatory injunction"—requiring LSP to immediately allow the Special Masters full access to LSP, its prisoners, and its records; to pay for the Special Masters; and to dedicate *three State employees* to facilitating the Special Masters' activities for months— "which is appealable under 28 U.S.C. § 1292(a)(1)." *Morales*, 535 F.2d at 867 n.6 (citing *Bd. of Pub. Instruction of Duval Cnty. v. Braxton*, 326 F.2d 616 (5th Cir. 1964)). Either way, therefore, jurisdiction would be equally sound under § 1292(a)(1) if there were no appealable final decision.

## A.    The District Court's Orders, Culminating in Its Final Judgment, Are Appealable Under § 1291.

This Court need do no more than take the district court's final "Judgment" at its word: "Judgment is hereby entered in favor of Class

47

Plaintiffs ... and against Defendants," and "[t]his matter shall be closed." ROA.30666. That is an appealable "final decision[]," 28 U.S.C. § 1291, as cases like *Morales*, 535 F.2d 864, make clear. The Panel Majority held— and Plaintiffs argue—otherwise on the ground that the "district court has not specifically determined 'the minimal content'" of any injunction. *Parker*, 128 F.4th at 699. That is wrong. The Remedial Order expressly requires the Special Masters to "cure and eliminate" every specified violation in the Liability Opinion and Remedy Opinion—and that is a "final adjudication." *Morales*, 535 F.2d at 867 n.6. With that misapprehension corrected, there can be no dispute that appellate jurisdiction exists in this case under § 1291.

> **1.    The district court identified myriad specific violations that the Special Masters must "cure and eliminate"—that is finality.**

This case is remarkably straightforward on the correct view of the record. Everyone agrees that, as the Supreme Court has long held, "the requirement of finality must be given a practical construction," *Morales*, 535 F.2d at 867 n.6—not applied with "wooden formality," *Parker*, 128 F.4th at 704 (Jones, J., dissenting). Everyone also agrees—per this Court's *Morales* decision—that a district court order requiring the

submission of a remedial plan is appealable as a final decision if "the District Court made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its opinion." *Morales*, 535 F.2d at 867 n.6. As the Panel Majority agreed, finality thus exists so long as "the district court has [] specifically determined 'the minimal content that must be'" included in an injunctive plan to remedy the "violations" of a plaintiff's rights. *Parker*, 128 F.4th at 699.[2] The only question is whether that legal standard is met here. It is.

That conclusion flows from two straightforward facts: (i) the district court has expressly ordered the forthcoming Special Masters "to cure and eliminate the violations found in the Court's Liability [Opinion] and Remed[y] [Opinion]," ROA.30661; and (ii) the district court expressly identified specific violations in the Liability Opinion and Remedy

---

[2] Particularly relevant here, the Eleventh Circuit has its own parallel body of precedent likewise built on *Morales*. *See United States v. Alabama*, 828 F.2d 1532, 1537 (11th Cir. 1987) ("Our decision follows the reasoning of this court's predecessor in *Morales*[.]"). Recently, for example, the Eleventh Circuit determined that it had appellate jurisdiction under § 1291, notwithstanding that the district court "declined to issue permanent injunctive relief" and instead "ordered the parties to meet, confer, and submit a proposed training and procedure plan that would remedy the constitutional problems identified in its order." *J.W. ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1255 (11th Cir. 2018). Key to the Eleventh Circuit's decision was the fact that the district court "listed a series of 'general practices' ... to guide the parties in formulating" the plan. *Id.* As discussed below, that is on all fours here given the district court's precise articulation of dozens of supposed violations that must be cured.

Opinion. Put in this Court's words, the district court "made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its opinion[s]." *Morales*, 535 F.2d at 867 n.6.

It is important to be precise about what these alleged violations are, which the Special Masters must cure and eliminate. By the State's count, in just the abbreviated statement of the case above, the district court articulated approximately 36 specific violations that the Special Masters must cure and eliminate:

- Failure to maintain adequate medical records management, ROA.30571;

- Failure to prevent episodic treatment of complaints in delivery of clinical care, *id.*;

- Failure to conduct daily sick call triage, ROA.30580;

- Failure to conduct sick call request review every day of the week, ROA.30581;

- Failure to require physical examinations in sick call, ROA.30582;

- Failure to require better resolution quality for telemedicine equipment, *id.*;

- Improper use of EMT, rather than nurse practitioner, to conduct physical examination, *id.*;

- Failure to timely schedule specialty care, ROA.30585;

- Failure to track adherence to specialty provider orders, *id.*;

50

- Failure to track specialty follow-ups, *id.*;

- Failure to have health care providers conduct physical examination of prisoners in emergency care, ROA.30599;

- Failure to perform automatic external defibrillator administration within four minutes, ROA.30603;

- Failure to eliminate sight-and-sound barriers between prisoners and nurses, ROA.30609;

- Failure to have nurses "round" prisoners, ROA.30610;

- Failure to have nursing staff conduct "head-to-toe physical assessment[s]" of prisoners, *id.*;

- Failure to include space for date and time on infirmary forms, *id.*;

- Failure to permit documentation of time vitals are taken, *id.*;

- Failure to timely provide crutches, walkers, and bedside commodes to prisoners, *id.*;

- Failure to prevent orderlies from "performing tasks that should only be performed by medical staff," such as "wound care, handling patient lab reports, and taking x-rays," ROA.30613;

- Failure to have sufficient nursing staff in the infirmary, ROA.30615;

- Failure to engage in "[m]eaningful mortality review," which includes "identification of anything in the patient's care that could have been improved," ROA.30619–20;

- Failure to prevent "security staff [from] continu[ing] to supervise inmate orderlies," ROA.30621;

- Failure to prevent medical staff from "defer[ring] to security's opinion regarding the need for restraints," *id.*;

- Failure to engage in "necessary peer review," ROA.30622;

- Failure to maintain "an adequate quality improvement program aimed at critical analysis and corrective efforts," ROA.30623;

- Failure to give medical staff an "appreciable role in setting the budget," ROA.30624;

- Failure to "maintain proper credentialing records," *id.*;

- Failure to fix nearly 200 "architectural barriers" identified by Plaintiffs' expert, ROA.30627, 30628, 30631;

- Failure to sufficiently train orderlies "before they are assigned to work with disabled inmates," including by "address[ing] myriad [] disabilities, such as blindness, respiratory problems, diabetes, or dementia/mental illness, to name a few," ROA.30632–33;

- Failure to adequately supervise orderlies (by both medical staff and security personnel), ROA.30636;

- Failure to hire a qualified ADA Coordinator who is not "juggling [too] many responsibilities" and has ADA training and knowledge, ROA.30637–38;

- Failure to maintain clear, Department-wide policy on how to apply (and train others on) the ADA's requirements for accommodation requests, ROA.30639–40;

- Failure to sufficiently train "medical and correction staff" on ADA issues "within the disabled inmate population," ROA.22505, 30640;

- Failure to "identify and track disabilities and accommodations" as well as "disability grievances or ADA accommodation requests," ROA.30641;

- Failure to evaluate and resolve accommodation requests and/or disability grievances as required by ADA, ROA.30642; and

- Failure to consider accommodations "on a case-by-case basis" in the disciplinary context, ROA.30645.

For virtually all of these alleged violations, there is only one way to "cure and eliminate" them. LSP's failure to conduct daily sick call triage? A plan requiring LSP to conduct daily sick call triage. The sight-and-sound barriers between nurses and prisoners? A plan requiring their removal. The failure to include space for a date and time on infirmary forms? A plan requiring such space. The failure to give medical staff an "appreciable role" in budget development? A plan requiring medical staff to have such a role. The failure to train orderlies on diseases such as diabetes and dementia? A plan requiring such training. The failure to limit orderlies to non-medical activities? A plan requiring such a limitation. On and on.

There is no mystery here, nor is any guesswork necessary, about what the Special Master's plan will say. For the district court has constructed a 200-plus page framework making "perfectly clear,"

*Morales*, 535 F.2d at 867 n.6, what the forthcoming Special Masters' plan must "cure and eliminate," ROA.30661. Those "minimum standards" are not "subject to further negotiation by the parties." *Morales*, 535 F.2d at 867 n.6. The State has thus appealed a "final decision." *Id.*

### 2.    Plaintiffs' arguments otherwise are wrong.

It is difficult to understand Plaintiffs' objections to this straightforward argument. Take their position that "the Remedial Order here does not detail *any* of the injunctive relief Defendants may ultimately be ordered to provide." ECF 205 at 9 (emphasis in original); *accord Parker*, 128 F.4th at 699 ("[T]he district court has not specifically determined 'the minimal content that must be given' to Plaintiffs' right to be free from Eighth Amendment, Rehabilitation Act, or ADA violations as it applies to their confinement at LSP."). Indeed, at the en banc stage, Plaintiffs went so far as to represent that the district court "[s]imply sa[id] that plans should include standards and procedures for medical care." ECF 205 at 9.

That blinks reality. Remember the key language in the Remedial Order, which Plaintiffs never acknowledge: The district court ordered the Special Masters "to cure and eliminate the violations found in the Court's

Liability [Opinion] and Remed[y] [Opinion]." ROA.30661. In other words, as explained above, the Special Masters' plan must reverse every specific violation identified by the district court—whether that is requiring daily sick call triage, or requiring the removal of sight-and-sound barriers, or giving medical staff an "appreciable role" in developing the budget, or requiring more nursing staff in the infirmary, or requiring LSP to conduct meaningful mortality review, or prohibiting orderlies from engaging in medical activities. Myriad such examples abound. And that is direct and precise injunctive relief that Plaintiffs remarkably claim does not exist.

In addition, recycling the Panel Majority's reasoning, Plaintiffs repeated the general principle that "a final judgment exists only when a [sic] 'a district court disassociates itself from a case,' indicating its intention 'to have nothing further to do' with it." ECF 205 at 7 (citations omitted). Given that principle, Plaintiffs point (*id.* at 7–8) to the district court's note that it "retains jurisdiction," ROA.30666, over the implementation and monitoring process of its Special Master scheme— that, Plaintiffs say, is not a district court disassociating itself from a case and having nothing more to do with it.

55

Plaintiffs' argument proves too much. In institutional-reform cases such as this one, a district court virtually *never* disassociates itself from a case—because it is consistently monitoring the implementation of the prospective relief, whether a permanent injunction or a consent decree. Indeed, this Court recently saw an example of that heavy-handed, post-judgment activity in *Anderson v. Hutson*, 114 F.4th 408 (5th Cir. 2024). So Plaintiffs' professed concern about the district court's lingering involvement does not move the ball for them. It is worth noting also that the district court "disassociated" itself from this case in exactly the way district courts do when a case is in a post-judgment remedial phase. It entered final judgment, it closed the case, and it ordered Plaintiffs to seek attorney's fees. This is not "[p]urporting to close the case in a document labeled 'Judgment'" without actually reaching finality, ECF 205 at 7 (citation omitted)—this is run-of-the-mill finality in institutional-reform cases. The Court has jurisdiction under § 1291.

## B.    Alternatively, the District Court's Orders Are Appealable Under § 1292(a)(1).

Even if the Court believed there were no appealable final decision, however, jurisdiction still would be sound because the district court has, at the least, "grant[ed] ... an injunction[]." 28 U.S.C. § 1292(a)(1). That

jurisdictional basis is clear both from the precise nature of the district court's "cure and eliminate" directive and from the mandatory nature of the injunction itself vis-à-vis the State defendants. And again, Plaintiffs and the Panel Majority offer no serious argument to the contrary.

### 1. The precise and mandatory nature of the district court's injunction confirms jurisdiction.

Start with the two independent reasons why § 1292(a)(1) is easily satisfied here.

**a.** To start, appeals of this sort have long been permitted across the country. "[A] number of [] circuits," to be sure, "have held that an order requiring submission of a remedial plan is generally not an injunction that is reviewable interlocutorily under § 1292(a)(1)." *Armstrong*, 124 F.3d at 1021–22. But even those courts recognize two well-settled exceptions. One, "a normally non-appealable order to submit a plan may be appealable when the order sufficiently specifies the content of the plan to be submitted." *Id.* at 1022 (collecting cases). Two, such an order is appealable "where delaying the appeal would not 'clarify the questions on appeal' and where the exact specifications of the plan would not 'alter in a material manner the issues that would be presented to the court of appeals.'" *Id.* (quoting *Frederick L. v. Thomas*, 557 F.2d 373, 380 (3d Cir.

1977)). On that latter view, "an appeal is not premature if the plan ultimately submitted will not change the 'appellate perspective.'" *Id.* (quoting *Frederick L.*, 557 F.2d at 381). Both exceptions are plainly satisfied here.

*First*, as painstakingly detailed above, "the district court prescribed the contents of the [Special Masters'] plan with some specificity." *Id.* To illustrate the point, the *Armstrong* court found it sufficient that the district court there "directed that the plan address specific substantive concerns of the disabled inmates such as disability grievance procedures, reception center processing times, accommodations for emergency situations, assistive aids, accessibility of new construction, criteria for medical disabilities, and school and job assignments for disabled prisoners." *Id.* The district court's directive here likewise reflects a similar—and in fact, a far more specific and sweeping—mandate: cure and eliminate every specified violation in the over 200 pages' worth of Liability Opinion and Remedy Opinion. Just as in *Armstrong*, therefore, "[a]lthough the precise contours of the final plan may be unknown," "the district court's order makes the content and scope of the remedial scheme sufficiently clear to enable appellate review." *Id.*; *see Frederick L.*, 557

F.2d at 381 ("The precise ingredients of the plan ... will have no ... metamorphosizing effect on our understanding of this case.").

As the State explained at the en banc stage, this Court's decision in *Braxton* likewise illustrates the point. There, the Court asserted § 1292(a)(1) jurisdiction over a district court order that outlined desegregation obligations but, rather than enter permanent injunctive relief, directed the parties to come up with "a detailed and comprehensive plan" implementing the court's order. 326 F.2d at 619. Specifically, that order barred (this is a direct quote):

A. Continuing to operate a compulsory biracial school system in Duval County, Florida;

B. Continuing to maintain a dual scheme or pattern of attendance areas based upon race or color;

C. Assigning pupils to schools on the basis of race and color of the pupils;

D. Approving budgets, making available funds, approving employment contracts and construction programs, and approving policies, curricula and programs designed to perpetuate, maintain or support a school system operated on a racially segregated basis;

E. Assigning teachers, principals, and other supervising or supporting personnel to schools on the basis of the race and color of the persons to be assigned and/or the race and color of the pupils attending the schools to which the personnel are assigned[.]

*Id.* at 617 n.1. Although the district court did not actually enter an injunction, this Court recognized that it "positively and affirmatively directed that a plan be submitted that would provide for carrying out the[se] paragraphs." *Id.* at 619. And the Court "conclude[d] that the ordering of the plan dealing expressly with these prohibited acts amounts to a mandatory injunction" appealable under § 1292(a)(1). *Id.*

That is the case here. The Remedial Order requires a "plan dealing expressly with [] prohibited acts" specified in the Liability Opinion and the Remedy Opinion. *Id.* Whether the prohibited conduct is the nearly 200 alleged barriers to access that must be fixed, the orderlies who allegedly are engaged in medical care, the medical staff who have no role in budget development, or any of the other myriad legal violations the district court identified, the district court's Remedial Order emphatically requires the Special Masters to "cure and eliminate" them. Under the *Braxton/Armstrong* line of cases, therefore, jurisdiction is sound.

*Second*, even if that were not so, "the specific plan" the Special Masters "ultimately submit will in no way alter [the Court's] 'appellate perspective' on the [] issue[s] the defendants raise in this appeal of the [R]emedial [O]rder." *Armstrong*, 124 F.3d at 1022. For example, the

60

question whether the district court erred by refusing to consider evidence of current conditions and conduct is a "purely legal question" that may be answered "whether or not a detailed remedial scheme has been formulated." *Id.* So is the question whether the PLRA bars relief absent a finding of an ongoing violation. So is the question whether the Remedial Order facially violates just about every PLRA rule for Special Masters. None of these questions have anything to do with whatever remedial plan the Special Masters come up with—for the simple reason that they all go to an antecedent question: whether the Judgment and Remedial Order entered against the State are lawful to begin with. If they are not (and they are not), then the nature of any Special Master plan is a moot point.

Under either or both of these exceptions, therefore, appellate jurisdiction under § 1292(a)(1) would be sound.

**b.** This Court's precedents also establish jurisdiction under § 1292(a)(1) in a second way. As the State explained at the en banc stage, *Morales* has an alternative holding—that, even if the district court decision in that case were not final, the court's "order requiring that the parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable" under § 1292(a)(1). *Morales*,

535 F.2d at 867 n.6. That holding is slightly distinct from *Braxton*'s reasoning in that it suggests that the mandatory nature of an injunction itself—separate from how detailed the injunction is—suffices for jurisdictional purposes. In *Morales*, the mandatory feature was the requirement that "the parties meet and negotiate a plan," *Morales*, 535 F.2d at 867 n.6, which gave rise to jurisdiction under § 1292(a)(1).

Other circuits have taken a different view, as illustrated by those who say "an order requiring submission of a remedial plan is generally not an injunction that is reviewable interlocutorily under § 1292(a)(1)." *Armstrong*, 124 F.3d at 1021–22. That conflict is not implicated here, however, because the Remedial Order goes far beyond requiring the creation of a remedial plan. Specifically, the Remedial Order requires the State to give Special Masters full access to LSP, its prisoners, and its records. ROA.30663. It requires the State to "designate" three State employees—including "one headquarters employee," "one or more Wardens," and "one or more security employee(s)"—"to coordinate and facilitate the work of the Special Masters" (for months, remember). *Id.*; *cf. Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992). And it requires the State to pay "[a]ll costs

62

associated with the work and reporting of the Special Masters."
ROA.30664.

There can be no serious debate that this is not an appealable mandatory injunction. To illustrate, just slightly change the facts: Suppose a federal court ordered you to provide full access of your home and personal records to an investigator for months on end; to pay for his work; and to designate three family members "to facilitate and coordinate" his assessment of your house and records. No reasonable person would bar you from seeking immediate appellate review of that quintessential mandatory injunction. Just so here for a sovereign State whose officials have been sued in their official capacities on behalf of the State. *See Hinds Cnty. Bd. of Supervisors*, 128 F.4th at 637 ("'federalism concerns are particularly acute in the context of prison management' and '[f]ederal judges are particularly ill-equipped to manage state prisons'" (Oldham, J., concurring)).

### 2. Plaintiffs' responses are unavailing.

Plaintiffs have offered no persuasive responses, instead misreading both *Braxton* and *Morales* at the en banc stage.

***Braxton.*** They tried to distinguish *Braxton* on the ground that "there was no question that the [*Braxton* defendants] were under an injunction." ECF 205 at 11. That is not correct—indeed, that was the whole jurisdictional problem in *Braxton*. The district court in that case had "deferred the date on which the injunction should go into effect" (as to the enumerated list reproduced above). *Braxton*, 326 F.2d at 619. And so the question was whether, in the absence of any live injunction, the district court's directive that the parties submit a remedial plan implementing that list was itself appealable. *See id.*

Turning to that question, Plaintiffs argued that, unlike here, the district court in *Braxton* "'positively and affirmatively directed' defendants to devise and submit a plan explaining how they intended to comply." ECF 205 at 12 (quoting *Braxton*, 326 F.2d at 619). By Plaintiffs' telling, "[a]ll the parties know is that the district court expects to implement a plan that may obligate Defendants to provide relief in the future." *Id.*

That telling has no basis in reality—indeed, it rewrites the district court's own orders. It bears repeating that, at the en banc stage, Plaintiffs (like the Panel Majority opinion) refused to acknowledge that the district

court has ordered Special Masters "to cure and eliminate the violations found in the Court's Liability [Opinion] and Remed[y] [Opinion]." ROA.30661. That is because it drives a dagger through this false narrative that no one knows what the Special Masters might come up with since the district court has not actually decided anything. That is dead wrong. As highlighted above, the district court has "positively and affirmatively directed," *Braxton*, 326 F.2d at 619, the forthcoming Special Masters to "cure and eliminate" the specific violations identified in the Liability Opinion and Remedy Opinion.

Next, Plaintiffs remarkably claimed that the situation here is *better* for the State than it was for the defendants in *Braxton* because, "[u]nlike in *Braxton*, Defendants are not required to take the affirmative step of drafting a compliance plan; their only obligations until the court issues an actual injunction are effectively discovery procedures and further briefing." ECF 205 at 12. This is not a serious argument. The burdens on the State here are *far worse* than the burdens on the defendants in *Braxton*—the *Braxton* defendants were not required to open an 18,000-acre prison, its records, and its thousands of prisoners up to Special Masters for months. Nor were they required to pay for Special Masters.

65

Nor were they required to designate high-level officials (including a "headquarters" employee) to "facilitate and coordinate" the Special Masters' work.

The same points address Plaintiffs' representation that the orders below are tantamount to "discovery procedures." *Accord Parker*, 128 F.4th at 696 ("Just as parties are routinely ordered to participate in discovery to advance litigation toward trial, Defendants here will be ordered to cooperate in certain respects with the special master to advance the litigation toward a conclusion."). This is not "discovery" time, and there is no "litigation" to "advance" to a "conclusion"—the district court is done, judgment is entered, the case is closed. But the "discovery procedures" euphemism is especially inappropriate because everyone knows that the district court has not merely ordered the State "to turn over papers." *Id.* (citation omitted). (To reprise the hypothetical above, no reasonable person would deny your appeal of a federal court's order directing an investigator into your house—on your dime and facilitated by your family members—on the ground that "this is just a discovery procedure.") The Court should reject this line of argument out of hand.

***Morales.*** As for *Morales*, Plaintiffs dismissed its § 1292(a)(1) alternative holding as "dicta." ECF 205 at 12 n.1. They are wrong: "Alternative holdings are not dicta and are binding in this circuit." *Mejia-Alvarenga v. Garland*, 95 F.4th 319, 327 n.3 (5th Cir. 2024). That thus leaves only a half-hearted reprise of their earlier argument—that, unlike in *Braxton* and *Morales*, the State defendants here "are not" themselves obligated to generate a remedial plan. ECF 205 at 12 n.1. That argument is misguided for the reasons expressed above.

## II.  THE COURT SHOULD VACATE AND REMAND FOR FURTHER PROCEEDINGS.

Because the Court has appellate jurisdiction, the only remaining question is how to dispose of this case. The State respectfully suggests that the most efficient path forward is to (a) vacate the district court's Liability Opinion, Remedy Opinion, Remedial Order, and Final Judgment and (b) remand with instructions to conduct any further proceedings consistent with the Eighth Amendment and the PLRA.

The State is mindful of the Court's ordinary en banc practice, that is, to remand the case to the panel "to resolve the remaining issues." *Festeryga*, 2025 WL 1420220, at *9. The State also has no objection to such a remand here. At the same time, however, the Court's ordinary

practice—which generally accounts for remaining disputed legal issues—
would be slightly misplaced here given that there appears to be no
dispute on at least one core Eighth Amendment issue.

As the Panel Majority explained, "the law requires" the district
court to "consider[] ... prison officials' 'current attitudes and conduct.'"
*Parker*, 128 F.4th at 701; *see id.* at 716 & n.18 (Jones, J., dissenting)
(reiterating this point under both the Eighth Amendment and the PLRA).
Or, as the Court said in *Valentine*, "[w]e consider the evidence from the
time suit is filed *to the judgment*." 993 F.3d at 282 (emphasis added).

The district court refused to comply with this basic principle. By the
court's own admission, the 2021 Liability Opinion was based on *pre-
September 2016* evidence. ROA.22399 n.1; ROA.22444. And by the court's
own admission, the 2023 Remedy Opinion was based on *pre-May 2022*
evidence, ROA.30563 n.24; ROA.30103—including evidence that LSP
engaged in sweeping remedial measures, such as implementing
electronic medical records, that directly addressed the Liability Opinion,
ROA.30304.

By the time this Court hears oral argument, we will be two years
beyond the district court's final judgment. As a result, review of that

judgment—which already rests on an unlawfully narrow universe of evidence—will be complicated by the increasingly outdated nature of the record evidence. For that reason, the State respectfully submits that vacatur—of the Liability Opinion, the Remedy Opinion, the Remedial Order, and the Final Judgment—and remand is the most efficient disposition of this appeal. If the Court does so, the State requests that the Court instruct the district court to conduct further proceedings consistent with the Eighth Amendment and the PLRA—specifically, *Valentine*'s "current conditions" requirement and the basic PLRA principles discussed in the State's panel-stage reply brief and Judge Jones' dissent.

## CONCLUSION

The Court should confirm that it has appellate jurisdiction and vacate and remand to the district court for proceedings consistent with the Eighth Amendment and the PLRA.

Respectfully submitted,

Dated:    June 12, 2025

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

_/s/ J. Benjamin Aguiñaga_
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,900 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:   June 12, 2025