# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 12, 2025

Lyle W. Cayce
Clerk

No. 23-30825

———————————

Kentrell Parker, *on behalf of themselves and all others similarly situated*; Farrell Sampier, *on behalf of themselves and all others similarly situated*; Reginald George; John Tonubbee, *on behalf of themselves and all others similarly situated*; Otto Barrera, *on behalf of themselves and all others similarly situated*; Clyde Carter, *on behalf of themselves and all others similarly situated*; Edward Giovanni, *on behalf of themselves and all others similarly situated*; Ricky D. Davis, *on behalf of themselves and all others similarly situated*; Lionel Tolbert, *on behalf of themselves and all others similarly situated*; Rufus White, *on behalf of themselves and all others similarly situated*; Shannon Hurd; Alton Adams; Ian Cazenave; Edward Washington; Alton Batiste,

*Plaintiffs—Appellees*,

*versus*

Tim Hooper, *Warden, Louisiana State Penitentiary, in his official capacity*; Ashli Oliveaux, *Assistant Warden for Health Services, in her official capacity*; Gary Westcott, *Secretary, Louisiana Department of Public Safety and Corrections*; Randy Lavespere, *Medical Doctor*; Stacye Falgout; Paul Toce; Bill Hawkins; Cynthia Park, ACNP; The Louisiana Department of Public Safety and Corrections,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:15-CV-318

Before JONES, HAYNES, and DOUGLAS, *Circuit Judges*.

PER CURIAM:

This is a case regarding allegedly unconstitutional conditions for prisoners at the Louisiana State Penitentiary ("LSP"). The district court held two trials—one on liability and the other on remedies—and concluded that Defendants violated the Eighth Amendment, the Rehabilitation Act of 1973, and the Americans with Disabilities Act ("ADA"). Although the district court has yet to provide any remedy sought by Plaintiffs, the district court purported to close the case and enter a "Judgment." The district court also entered a "Remedial Order" that contemplates further proceedings to determine ultimate relief. This appeal followed, and we stayed the Remedial Order.

In their brief, Defendants asserted that we have appellate jurisdiction over the Judgment and Remedial Order pursuant to 28 U.S.C. § 1291. At oral argument, Defendants suggested that our jurisdiction instead lies under 28 U.S.C. § 1292(a)(1). Seeking clarification, we ordered supplemental briefing on whether we have jurisdiction over Defendants' appeal.

Having reviewed the record and the parties' supplemental briefs, we conclude that the district court has not yet entered a final decision appealable under 28 U.S.C. § 1291, nor has it entered an injunction appealable pursuant to 28 U.S.C. § 1292(a)(1). We therefore DISMISS this appeal for lack of jurisdiction and VACATE the stay of the Remedial Order.[1]

---

[1] The stay in this case will be vacated once the mandate is issued.

No. 23-30825

# I

We briefly provide the relevant facts. Plaintiffs are inmates at LSP. They filed this class action in 2015 against the warden of LSP, the Louisiana Department of Public Safety and Corrections, and others. The district court bifurcated the action into liability and remedy phases. After an eleven-day bench trial on liability, the district court found in a 124-page opinion (the "Liability Opinion") that Defendants had been deliberately indifferent to the inmates' serious medical needs in violation of the Eighth Amendment. *See Lewis v. Cain* (*Lewis I*), No. 3:15-CV-318, 2021 WL 1219988, at \*59 (M.D. La. Mar. 31, 2021).[2] The court also found that Defendants violated the Rehabilitation Act and the ADA. *Id.* The district court then held a ten-day trial on remedies and concluded, in a 104-page opinion dated November 6, 2023 (the "Remedial Opinion"), that Plaintiffs had established entitlement to permanent injunctive relief. *See Lewis v. Cain* (*Lewis II*), 701 F. Supp. 3d 361, 441 (M.D. La. 2023). The district court wrote that it "will enter Permanent Injunctive relief by separate order." *Id.*

The district court entered two other documents on November 6, 2023. One was the Remedial Order. The Remedial Order said the district court would appoint three special masters to develop proposed "Remedial Plans" (a "Medical Care Remedial Plan" and an "ADA/RA Remedial Plan") and monitor the plans' implementation. The Remedial Order directed the parties to submit names of proposed special masters within thirty days. It further directed the special masters, once appointed, to submit the proposed Remedial Plans within a designated amount of time. The Remedial Order lists seven subjects to be addressed by the Medical Care

---

[2] On appeal, the caption of this case was changed from *Lewis v. Cain* to *Parker v. Hooper*.

Remedial Plan and five to be addressed by the ADA/RA Remedial Plan, each tied to deficiencies identified in the Liability and Remedial Opinions. The district court said it would review the proposed Remedial Plans and enter orders "necessary and appropriate to effect remedies." The Remedial Order also contemplated that LSP and the Department of Corrections would be required to cooperate with the special masters by, among other things, allowing the special masters access to LSP, access to "records and documents appropriate and necessary for their tasks," and "reasonable access" to class members.

The other document was the "Judgment." The Judgment awards no relief; it merely states that judgment "is hereby entered in favor of Class Plaintiffs" and "against Defendants." The district court purported to close the case but said it would retain jurisdiction "over the procedures set forth" in the Remedial Order "and any issues pertaining thereto." Defendants appealed from the Remedial Order and Judgment.

## II

We have a duty to confirm our appellate jurisdiction, regardless of whether the parties have raised the issue. *Castaneda v. Falcon*, 166 F.3d 799, 801 (5th Cir. 1999) (stating that this court "must address" appellate jurisdiction, "*sua sponte* if necessary"). Defendants initially invoked our jurisdiction pursuant to 28 U.S.C. § 1291, which provides circuit courts jurisdiction over "appeals from all final decisions of the district courts of the United States." At oral argument, however, Defendants suggested that our jurisdiction instead lies under 28 U.S.C. § 1292(a)(1), which allows appeals from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." In their supplemental brief, Defendants return to arguing that appellate

jurisdiction exists under § 1291, using § 1292(a)(1) as a backup.[3] We discuss these two potential bases for appellate jurisdiction in turn.

## A

We start with § 1291, under which "a final judgment is normally deemed not to have occurred until there has been a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989) (internal quotation marks and citation omitted). "A final decision is one by which a district court disassociates itself from a case." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015) (internal quotation marks and citation omitted). The test for finality under § 1291 is "whether the district court intended that its order be effective immediately." *Ueckert v. Guerra*, 38 F.4th 446, 450 (5th Cir. 2022) (internal quotation marks and citation omitted). "Said another way, a court's ruling is only final if the judge intends to have nothing further to do—with the motion (if an interlocutory appeal) or the case (if a conventional appeal)." *Id.* (internal quotation marks and citation omitted).

Here, there is no final decision sufficient to create appellate jurisdiction under § 1291. The Remedial Order makes plain that the district court did not "intend[] to have nothing further to do." *Id.* (citation omitted). The order expressly contemplates future district court action, providing that the district court "*will* appoint three Special Masters to prepare proposed Remedial Plans" after submission by the parties within thirty days of "potential Special Masters with the qualifications set forth herein"

---

[3] Plaintiffs' supplemental brief argues that we lack appellate jurisdiction under § 1291. Plaintiffs do not discuss § 1292(a)(1), but Plaintiffs' silence does not mean we must accept Defendants' contentions regarding § 1292(a)(1). *See Castaneda*, 166 F.3d at 801.

No. 23-30825

(emphasis added).  The Remedial Order also provides that the district court "*will* review the proposed Remedial Plans and any requests for amendment and *will* enter Orders necessary and appropriate to effect remedies" (emphasis added).    In short, the district court has certainly not "disassociate[d] itself from [this] case." *Gelboim*, 574 U.S. at 408 (citation omitted); *see also Ueckert*, 38 F.4th at 450 ("[W]e noted . . . that a district court's memorandum saying that a preliminary injunction *will be* issued did not reflect the district court's intent that the opinion act as an operable judgment." (cleaned up)).

Defendants rely on the "Judgment" entered by the district court, but they do not satisfactorily explain how that document, which awards no relief, "ends the litigation on the merits." *Midland Asphalt*, 489 U.S. at 798 (citation omitted).  Purporting to close the case in a document labeled "Judgment" is insufficient to create appellate jurisdiction where it is clear that the case is not actually finished and no substantive relief has been entered. *See Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956) ("The District Court *cannot*, in the exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of § 1291."); *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 816 (5th Cir. 2002) (same).  We thus conclude that we lack appellate jurisdiction under § 1291.[4]

---

[4] We do not agree with Defendants' arguments that there is "no other 'final decision' in sight" and that they will thus be "indefinitely barred" from challenging on appeal the district court's Liability Opinion.  The Remedial Order makes clear that the district court "will review the proposed Remedial Plans and any requests for amendment and will enter Orders necessary and appropriate to effect remedies."  In other words, once the district court approves the Remedial Plans and thereby awards substantive relief, there will be an appealable final decision, at which point Defendants can challenge that decision and any preceding interlocutory orders.

No. 23-30825

**B**

We turn next to § 1292(a)(1), which allows appeals from interlocutory injunctions. The Supreme Court has made clear that a court order "relat[ing] only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988). Where an order "is merely a step in the litigation process and is in no way directed to the merits of the underlying action," the order "is not appealable under § 1292(a)(1)." *S. Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1206 (10th Cir. 2009) (quoting *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 973 (4th Cir. 1979)).

Defendants contend that the Remedial Order, together with the Judgment and the Remedial Opinion, is an injunction appealable under § 1292(a)(1), but we disagree. As an initial matter, Defendants admitted in their opening brief that the Remedial Order "does not identify the injunctive relief to be granted." Now, Defendants complain that the Remedial Order's provisions requiring them to cooperate with the special masters are injunctive in nature. But Defendants fail to mention that the district court has not yet appointed a special master.[5] Absent the current stay, Defendants' only current obligation under the Remedial Order would be to propose names of potential special masters to the district court. That is not an injunction; it

---

[5] The Remedial Order indicates that the district court plans to appoint three special masters. Defendants contend that the designation of three special masters violates the Prison Litigation Reform Act because, under the provisions of the Act, the district court may only appoint "a" special master, not multiple special masters. 18 U.S.C. § 3626(f)(1)(A). Because we lack appellate jurisdiction at this time to review the Remedial Order, we do not reach the merits of this argument.

is a typical court directive advancing the litigation. *See Gulfstream*, 485 U.S. at 279.

The Remedial Order's requirements regarding cooperation with the special master, even if they were currently in effect, are not injunctive, either. Just as parties are routinely ordered to participate in discovery to advance litigation toward trial, Defendants here will be ordered to cooperate in certain respects with the special master to advance the litigation toward a conclusion. *See S. Ute Indian Tribe*, 564 F.3d at 1207 (stating that although an order "may be characterized as an order to do something, it is no more an 'injunction' than is an order to turn over papers in discovery or submit to a physical examination" (quoting *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994))). Indeed, the Remedial Order does not impose, nor by its own force will it impose in the future, any substantive obligation upon Defendants regarding medical care, the ADA, or the Rehabilitation Act. We therefore conclude that we lack jurisdiction under § 1292(a)(1).

The Remedial Order's identification of subjects to be addressed by the Remedial Plans merely establishes a framework for the parties to create a solution to any ongoing constitutional violations. This alone does not render the Remedial Order reviewable. The district court has deferred judgment on the steps, if any, that will be required to remedy constitutional violations in the narrowest and least intrusive way. In the meantime, Defendants are under no obligation to change any of their practices. Indeed, the Remedial Order does not "specif[y] the content of the plan to be submitted such that the content and scope of the remedial scheme is sufficiently clear to enable appellate review." *Parsons v. Ryan*, 949 F.3d 443, 473 (9th Cir. 2020) (internal quotation marks and citation omitted) (holding that court lacked jurisdiction under §§ 1291 and 1292(a)(1) over post-settlement orders, including orders requiring briefing on "what procedures were necessary to compel compliance with" a stipulation and requiring defendants "to file a

No. 23-30825

plan to implement the recommendations made by an expert"); *see id.* (stating that "[a]n order requiring a prison to submit a plan is not a final order under § 1291" and that "an order requiring submission of a remedial plan is generally not an injunction reviewable interlocutorily under § 1292(a)(1)" (internal quotation marks and citation omitted)); *Balla v. Idaho State Bd. Of Corr.*, 869 F.2d 461, 464–65 (9th Cir. 1989) (collecting cases across judicial circuits); 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3922.2 (3d ed., June 2024 update) ("Orders that the parties prepare plans for injunctive relief have figured in many attempted appeals. Jurisdiction ordinarily is denied, despite . . . substantial burdens that may be involved . . . . Even orders that direct affirmative action out of court to aid in making remedial decisions have been held not injunctions.").

Defendants' reliance on *Brumfield v. Louisiana State Board of Education*, 806 F.3d 289 (5th Cir. 2015), is misplaced. *Brumfield* was an appeal following a district court order creating an oversight regime that would be "repeated annually and indefinitely." *Id.* at 297. In holding that appellate jurisdiction existed, we concluded that the oversight regime was "unlikely to lead to further judicial proceedings" and created an "endless [oversight] process." *Id.* Here, the Remedial Order expressly contemplates "further judicial proceedings" and is not "endless": the special master in this case will have only 120 days, at most,[6] to submit Remedial Plans for the district court's approval. *Brumfield* therefore does not control this case.

Nor do we believe *Borel ex rel. AL v. School Board Saint Martin Parish*, 44 F.4th 307 (5th Cir. 2022), provides appellate jurisdiction here. As

---

[6] The Remedial Order appears internally inconsistent on this front, designating a 90-day deadline on page 4 and a 120-day deadline on pages 2 and 3.

No. 23-30825

Defendants point out, in that case we set forth the principle that in the school desegregation context, appellate courts have jurisdiction over orders that impose a continuing supervisory function on the court. *Id.* at 312. The appeal in *Borel* met that standard because the defendant school board had been subject to an earlier injunction for nearly fifty years, and the order underlying the appeal awarded further equitable relief, including the closure of an elementary school. *Id.* at 311–12; *see also Moore v. Tangipahoa Par. Sch. Bd.*, 843 F.3d 198, 200–01 (5th Cir. 2016) (stating that in school desegregation context, appellate courts can exercise jurisdiction over "subsequent injunction[s]" flowing from initial equitable decrees). In other words, there were at least two district court injunctions in *Borel*. Here, there are none.[7]

## III

We conclude by explaining why the cases cited in the dissenting opinion do not establish that appellate jurisdiction exists here.

---

[7] Our conclusion that we lack jurisdiction is also not inconsistent with *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004). *Gates* was an appeal from an injunction entered by the district court to alleviate Eighth Amendment violations at the Mississippi State Penitentiary. *Id.* at 327. We concluded we had jurisdiction under § 1292(a)(1) because the district court's "Final Judgment" imposed "ten detailed injunctive requirements" on the Mississippi Department of Corrections. *Id.* at 327 n.1. Unlike the Remedial Order here, the underlying "Final Judgment" in *Gates* imposed substantive "remedial action by the defendants to correct the Eighth Amendment violations." *Russell v. Johnson*, No. 1:02-CV-261, 2003 WL 22208029, at *6–8 (N.D. Miss. May 21, 2003), *aff'd in part, vacated in part sub nom. Gates*, 376 F.3d at 344. These obligations included, among others, cleaning a prison cell before moving an inmate to the cell; providing adequate cleaning supplies and equipment to inmates; providing fans, ice water, and daily showers to prisoners when the heat index reached a certain level; repairing cell windows; and upgrading lighting. *Id.* The requirements took effect immediately. *See generally id.*; *see also Ueckert*, 38 F.4th at 450 (stating that interlocutory appeal is only valid if district judge intended order to be "effective immediately" and "intend[ed] to have nothing further to do" with the underlying request for relief (citations omitted)). The Remedial Order imposes no comparable obligation on Defendants here.

No. 23-30825

## A

Seeking to establish that the district court has entered an appealable final decision under § 1291, the dissenting opinion cites *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), and *Morales v. Turman* (*Morales III*), 535 F.2d 864 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322 (1977) (per curiam). In *Brown Shoe Co.*, a Clayton Act challenge to a contemplated merger between the Brown Shoe Co. and the G. R. Kinney Co., the district court ordered Brown "to divest itself completely of all stock, share capital, assets or other interests it held in Kinney" and "to file with the court within 90 days a plan for carrying into effect the divestiture decreed." 370 U.S. at 304. During oral argument, the Supreme Court sua sponte raised the issue of appellate jurisdiction, asking whether the district court's failure to mandate a specific dissolution plan and its solicitation of "suggested plans for implementing divestiture" rendered its judgment insufficiently "final." *Id.* at 305. The Supreme Court held that there was jurisdiction under § 1291, noting that "[f]ull divestiture by Brown of Kinney's stock and assets was expressly required" and that Brown "was permanently enjoined from acquiring or having any further interest in the business, stock or assets" of Kinney. *Id.* at 308.

In *Morales*, the district court preliminarily enjoined a facility for juvenile offenders from, among other things, using physical force against inmates or segregating inmates based on race and ordered it to make 24-hour nursing care available. *See Morales v. Turman* (*Morales I*), 364 F. Supp. 166, 175–81 (E.D. Tex. 1973). The district court later issued a decision extending the effect of the preliminary injunction and setting forth detailed minimum standards for the operation of the facility, including administering specific types of IQ tests, enlisting a language pathologist to assess each student, providing a coeducational living environment, and hiring psychologists with master's or doctorate degrees. *See generally Morales v. Turman* (*Morales II*),

No. 23-30825

383 F. Supp. 53 (E.D. Tex. 1974); *see also Morales v. Turman* (*Morales IV*), 562 F.2d 993, 997 (5th Cir. 1977) (recounting district court proceedings on remand from Supreme Court). The district court did not issue permanent injunctive relief and ordered the parties to submit a comprehensive plan that would satisfy the minimum standards. *Morales III*, 535 F.2d at 867 n.6. In a footnote, we held that we had appellate jurisdiction under § 1291 because the district court had finally determined "the minimal content that must be given to the 'right to treatment' as it applies to virtually every aspect of [the facility's] operations." *Id.*

The district court decisions in these cases contained a crucial ingredient that is not present here: a substantive remedial holding that ends the dispute on the merits and serves to guide the court and the parties as they move into a "post-closure" phase of the case, in which the holding is merely implemented (rather than contested) and subject to oversight. In *Brown Shoe Co.*, the court gave very specific directions to Brown: it had to divest itself completely of all interests in Kinney. 370 U.S. at 304. The court solicited a plan for carrying out the divestiture, but the substantive decision (i.e., the decision that divestiture was necessary) had been made. *See id.* Similarly, in *Morales*, the district court set forth "extremely detailed minimum standards," *Morales IV*, 562 F.2d at 997, determining "the minimal content that must be given to the 'right to treatment'" as applied to the operations of the relevant facility, *Morales III*, 535 F.2d at 867 n.6. The parties had to submit a plan satisfying the minimum standards, but the district court had already decided what those standards were. *See Morales III*, 535 F.2d at 867 n.6. The dissenting opinion points to no similar holding, in the Remedial Opinion or elsewhere, by the district court here.[8]

---

[8] The dissenting opinion cites to portions of the Remedial Opinion identifying deficiencies in the care provided to LSP inmates. *Post*, at 21 n.3, 24 n.6. Identifying a

No. 23-30825

Indeed, "Remedial Opinion" is somewhat of a misnomer; the Remedial Opinion reads more like a second Liability Opinion, as it focuses mostly on whether the constitutional violations identified in 2021 in the Liability Opinion continued into 2022. *See generally Lewis II*, 701 F. Supp. 3d at 377–440; *accord Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (stating that in prison litigation, inmate can obtain injunction only if inmate demonstrates that deliberate indifference to medical needs continued up to time of judgment and will continue into the future). The "Remedy" section of the Remedial Opinion constitutes three paragraphs of a 104-page opinion and merely concludes that the district court "will" enter permanent injunctive relief separately. *Lewis II*, 701 F. Supp. 3d at 440–41. Further, as mentioned above, Defendants in their opening brief admitted that the district court has "not identif[ied] the injunctive relief to be granted." To sum up, the district court has not specifically determined "the minimal content that must be given" to Plaintiffs' right to be free from Eighth Amendment, Rehabilitation Act, or ADA violations as it applies to their confinement at LSP. *Morales III*, 535 F.2d at 867 n.6.

---

problem is obviously much different than setting forth a minimum standard of conduct, let alone ordering compliance with such a standard. The distinction becomes clear upon a close look at the dissenting opinion's comparison between *Morales II* and the Remedial Order here. *See post*, at 23 n.5. In *Morales II*, the court held that juvenile offenders were "entitled to care *that conforms to the following minimally acceptable professional standards*" and went on to identify those standards, eight in total, which included, inter alia, "[a] psychiatric staff[] consisting of psychiatrists certified by the American Board of Psychiatry and Neurology" and "[a] psychological staff" consisting of "psychologists holding either Master's degrees or Doctorates in psychology and experienced in work with adolescents." 383 F. Supp. at 105 (emphasis added). The Remedial Order here, on the other hand, directs that the proposed Medical Care Remedial Plan merely "*address*[]" standards and procedures for, inter alia, sick call (emphasis added). The Remedial Order does not set forth any "minimally acceptable professional standard[]" that the Medical Care Remedial Plan must satisfy with respect to sick call. *Morales II*, 383 F. Supp. at 105.

13

No. 23-30825

**B**

Similar logic distinguishes the cases cited by the dissenting opinion under § 1292(a)(1). In each of those cases, the district court entered an injunction (or a *de facto* injunction) forbidding or ordering specific behavior implicating the merits of the litigation. For example, in *Board of Public Instruction of Duval County v. Braxton*, the district court ordered a school board to desegregate its schools, forbade it from making funds or facilities available for the maintenance of a segregated school system, and prohibited it from assigning staff to schools on the basis of race. 326 F.2d 616, 617–18 & n.1 (5th Cir. 1964). The district court postponed the effect of much of the injunction and ordered the parties to meanwhile submit a plan for effectuating the desegregation decree. *Id.* We held that there was appellate jurisdiction under § 1292(a)(1) because the "ordering of the plan *dealing expressly with these prohibited acts* amount[ed] to a mandatory injunction." *Id.* at 619 (emphasis added).[9]

Similarly, in *Johnson v. Gambrinus Co./Spoetzl Brewery*, the district court entered an injunction ordering the defendant brewery to ensure that disabled persons with guide dogs or other service animals "have the broadest feasible access" to a public tour of the brewery. 116 F.3d 1052, 1056 (5th Cir. 1997). In *Abbott v. Perez*, moreover, the Supreme Court held that a lower court order was an appealable injunction because the court effectively held

---

[9] It is true that, as the dissenting opinion notes, our approach in cases like *Braxton* and *Morales III* has been grouped with cases adopting "a more expansive approach to appeals from orders to submit proposed injunction decrees." *Post*, at 27 n.8 (quoting 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3922.2 (3d ed., June 2024 update)); *see also id.* at 24–25 (discussing the Ninth Circuit's decision in *Balla*). But, as we explain, the approach of the dissenting opinion would expand the reach of our appellate jurisdiction well beyond the bounds of even *Braxton* or *Morales III*.

No. 23-30825

that upcoming elections could not proceed under redistricting plans then in effect. 585 U.S. 579, 598–99 (2018).

As Defendants acknowledged in their opening brief, the district court here has entered no such injunctive relief. There are not yet any specific "prohibited acts," *Braxton*, 326 F.2d at 619, associated with the Remedial Order, which (absent the current stay) merely directs Defendants to submit to the court names of proposed special masters. The district court's order in *Braxton* directing the parties to submit a desegregation plan did not by itself create appellate jurisdiction; that order was undisputedly connected to an injunction "prohibit[ing]" specific "acts" implicating the merits of the litigation, i.e., desegregation of a school system. *Id.*[10]

Finally, the dissenting opinion doubts that the district court will reconsider its findings in the Liability Opinion and Remedial Opinion. The dissenting opinion urges us not to "wait until the ink is dry on every minute point in a comprehensive institutional reform plan before permitting appellate review." *Post*, at 31.

The dissenting opinion's worries illustrate why appellate review is premature. The possibility remains that there will be no "comprehensive institutional reform plan" at all. The special master—considering, as the law

---

[10] The dissenting opinion raises the possibility of a contempt citation for failure to comply with the Remedial Order, but such a possibility does not automatically create immediate appellate jurisdiction. *See A-Mark Auction Galleries, Inc. v. Am. Numismatic Ass'n*, 233 F.3d 895, 899 (5th Cir. 2000) (holding that discovery orders are not appealable under the collateral order doctrine because the subject of the order "may resist that order, be cited for contempt, and then challenge the propriety of the discovery order in the course of appealing the contempt citation" (quoting *MDK, Inc. v. Mike's Train House, Inc.*, 27 F.3d 116, 121 (4th Cir. 1994))); *S. Ute Indian Tribe*, 564 F.3d at 1207 (stating that although an order "may be characterized as an order to do something, it is no more an 'injunction' than is an order to turn over papers in discovery or submit to a physical examination" (quoting *Mercer*, 40 F.3d at 896)).

No. 23-30825

requires, prison officials' "current attitudes and conduct" as of the date any Remedial Plan is submitted for the district court's approval, *Valentine*, 993 F.3d at 282 (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994))—may well conclude that LSP has already remedied any preexisting constitutional and statutory violations and that a permanent injunction is no longer necessary. We trust that on remand, the special master and district court will conduct the appropriate inquiry and design final relief, if any, appropriate to the circumstances existing as of the date it is entered.

## IV

Accordingly, we DISMISS this appeal and VACATE the stay of the Remedial Order.

No. 23-30825

Edith Hollan Jones, *Circuit Judge*, dissenting:

I respectfully dissent from the panel's improper dismissal of this appeal. This litigation concerning allegedly unconstitutional medical care at the Louisiana State Penitentiary ("LSP") has been pending for ten years. In late 2023, the district court assumed control of LSP's medical and disabled care. The court's opinions, Remedial Order, and Final Judgment just ignored the requirements of the Prison Litigation Reform Act ("PLRA") governing remedial decrees. 18 U.S.C. §§ 3626(a), 3626(f). Thus, *inter alia*, the court appointed three "special masters" in lieu of one allowed by the PLRA; it ignored the statutory selection process for a single special master; it required the state to pay for the "special masters," though the federal courts bear that cost under the PLRA; and it omitted any discussion about how the multitude of changes required of LSP satisfy the PLRA's needs-narrowness-intrusiveness limitations on equitable relief.

Yet my colleagues in the majority assert that the district court's Remedial Order and Final Judgment,[1] incorporating its previous 124-page Liability Opinion and later 104-page Remedial Opinion, are not sufficiently "final" nor sufficiently "injunctive" to support an appeal under 28 U.S.C. §§ 1291 or 1292(a)(1), respectively. Both holdings are very wrong. If the dismissal is upheld, the Defendants will bear enormous costs to comply with orders that plainly defy the PLRA. The violations are so obvious that the panel majority, while claiming to have no jurisdiction, hint and smuggle in

---

[1] The Judgment states: "Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs . . . . This matter shall be closed . . . ; however, the Court retains jurisdiction *over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto*." (emphasis added). The "substance" of liability and relief have been decided, only the details of "procedures" remain for the court to supervise. *See* Appendix.

No. 23-30825

notes about what the district court must change to comply with the PLRA.[2] In the meantime, until the majority's view of finality obtains, the Defendants must play a remedial game contrary to the rules prescribed by Congress. The PLRA's rules were enacted precisely to curtail intrusive court oversight of penal institutions. Ignoring those rules mandates appellate review now.

To discuss the errors in the decision to dismiss, I survey the litigation's background and attach as an Appendix the district court's Remedial Order and Final Judgment. Next, I address the Supreme Court's and this court's precedents explaining "finality" and "injunctions" in regard to institutional reform litigation in the federal courts. The majority elide important details in the district court's orders to reach their preferred result, and they fail to discuss the most relevant case law. Finally, because appellate jurisdiction exists on either statutory ground, it is imperative to explain how the Remedial Order and Final Judgment violate the PLRA, and why the Remedial Opinion fails to properly apply the deliberate indifference standard.

I.

The plaintiff prisoner class sued the Defendants in 2015 in the Middle District of Louisiana seeking redress for claims that the prison's medical care was constitutionally inadequate, and its facilities violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). The case was tried for several weeks in October 2018, but the court rendered a Liability Opinion on March 31, 2021. The Liability Opinion contained extensive findings about LSP's systemic failure to provide constitutionally adequate inmate medical care and comply with the ADA/RA. The court held the defendants liable under the Eighth Amendment and federal disability

---

[2] *Ante* at 7 n.5, 7–8.

No. 23-30825

statutes. In June 2022, three and a half years after the liability trial, the court held another trial to consider the scope and nature of remedies required of the prison. Its Remedial Opinion was issued more than a year later on November 6, 2023.

The Liability Opinion dwelt on evidence from years before the district court's formal rulings. The Remedial Opinion rested on somewhat updated evidence from early 2019 but ignored material developments near the date of Judgment. Yet the Defendants, conscious of the court's oversight, had been taking important strides to improve LSP's inmate medical care. For instance, LSP fully introduced electronic medical records management in October 2022, an innovation critical to the court's liability and remedy findings. But although the court was apprised of this development—and others—the court refused to consider them. Instead, it found the Defendants culpable for obsolete practices. *Lewis v. Cain (Remedial Opinion)*, 701 F. Supp. 3d 361, 389 (M.D. La. 2023) ("The utter and complete disarray of the medical records is emblematic of indifference.").

Concurrent with the Remedial Opinion, in November 2023 the court issued a Remedial Order and Final Judgment. The Judgment stated:

> Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against Defendants, the current Warden of the Louisiana State Penitentiary, et al. This matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto.

Further, the Remedial Order stated, in pertinent part:

> For the reasons set forth in the court's Rulings, dated March 31, 2021 ('Liability Ruling') and November 6, 2023, ('Remedial Ruling'):
> IT IS HEREBY ORDERED: . . . .

No. 23-30825

Six decretal sections of the Remedial Order followed, concerning Special Masters; Remedial Plans for Medical Care and the ADA; Cooperation and Access to require the Defendants' coordination with Special Masters or their representatives; Reporting, a timetable for reporting to the court; Monitoring Implementation of Remedial Plans and Periodic Reports to the Court; and Fees and Costs. Each of these sections has numerous subsections regarding particular deficiencies to be corrected. The details of these sections and subsections will be referenced as appropriate. Notably, under the Fees provision, the court required "all costs associated with the work and reporting of the Special Masters" to be "paid by the Defendants." The Fees provision also authorized Plaintiffs' counsel to file fee applications for the initial litigation as "prevailing parties" plus fee requests at 90-day intervals in the future. The Remedial Order is attached hereto as an Appendix.

Upon entry of the Judgment, the court administratively closed the case.

## II.

This court's jurisdiction to hear appeals is ordinarily governed by 28 U.S.C. §§ 1291 and 1292. "Finality" is the touchstone for § 1291, which permits "appeals from all final decisions of the district courts[.]" 28 U.S.C. § 1291. Section 1292(a)(1) permits appeals from "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions[.]" 28 U.S.C. § 1292(a)(1). Under either section, this court has jurisdiction to hear the present appeal. At the very least, exercising appellate jurisdiction is imperative to prevent the district court from forcing the state to engage in actions not required by the PLRA.

No. 23-30825

### A.

The Remedial Order is a final judgment under § 1291 because it intended to end the litigation regarding LSP's liability and specify a detailed framework for the remedy going forward. The Final Judgment retains jurisdiction in the district court only over "*procedures* set forth in the Remedial Order and any issues pertaining thereto" (emphasis added). The concurrent Remedial Opinion "enter[ed] *judgment* in favor of Plaintiffs and against Defendants." *Remedial Opinion*, 701 F. Supp. 3d at 441 (emphasis added). These are clear indicia of the district court's intent to issue a *final* judgment.

Further exhibiting its intent of finality, the Remedial Order describes the Plaintiffs as "prevailing parties" entitled to file a fee request. Despite the Remedial Order's provision for the appointment of special masters, the district court carefully articulates how unconstitutional medical care conditions must be cured. The section titled, "Remedial Plans for Medical Care and the ADA" identifies seven areas of "standards and procedures" that must be upgraded: sick call, clinical care, specialty care, infirmary and in-patient care, emergency care, medical records management, and medical management and administration. Further, the Remedial Opinion, incorporated in the Remedial Order, identifies with even greater specificity the allegedly deficient care LSP provided.[3] Labels alone cannot make a non-

---

[3] For example, as to infirmary and in-patient care, "patients continue to be outside of sight or sound of nurses due to the positioning of nurses and black coverings over windows," nurses do not round patients every two hours, "head-to-toe" physical assessments of patients by nursing staff are not performed sufficiently, infirmary forms do not provide a space for date and time, vital sign flowsheets do not allow for documentation of the time vitals were taken, the infirmary does not provide adequate equipment and supplies including "crutches, walkers, or bedside commodes," and inmate orderlies perform tasks outside the scope of their appropriate use. *Remedial Opinion*, 701 F. Supp. 3d. at 410–11.

No. 23-30825

final order final. *Riley v. Kennedy*, 553 U.S. 406, 419, 128 S. Ct. 1970, 1981 (2008). Yet the district court's framing of the litigation as complete, and the level of detail contained in the Remedial Order and incorporated Remedial Opinion, demonstrate that the court resolved the substantive issues in litigation.

The majority recites the general rule that "[a] final decision is one by which a district court disassociates itself from a case," but it overlooks that § 1291 should be applied without wooden formality. *Ante* at 5. "A pragmatic approach to the question of finality has been considered essential to the achievement of the just, speedy, and inexpensive determination of every action: the touchstones of federal procedure." *Brown Shoe Co. v. United States*, 370 U.S. 294, 306, 82 S. Ct. 1502, 1513 (1962) (internal quotation marks and citation omitted). In *Brown Shoe*, the judgment required the defendant "to propose in the immediate future a plan for carrying into effect the court's order." *Id.* at 308, 82 S. Ct. at 1514. But the Supreme Court held that the administration of the plan was "sufficiently independent of, and subordinate to, the issues presented by th[e] appeal to make the case in its present posture a proper one for review now." *Id.* Likewise in this case, as in *Brown Shoe* and many cases involving institutional reforms, the provision for the appointment of special masters should not detract from the judgment's overwhelming specificity that justifies appellate review.

To be clear, the court has finally (1) decided on remedial measures that flatly violate the PLRA; (2) misapplied the Eighth Amendment standards governing the extent of LSP's liability and permissible judicial remedial orders; and (3) inaccurately determined that LSP's conditions and procedures violate the ADA/RA. These issues are fully independent of further "procedures" that, according to the Remedial Order, may arise as special masters enforce the remedial framework already created by the district court.

No. 23-30825

This court has deemed similar judgments final and appealable. In a case with substantially the same posture, a district court determined that practices at Texas's juvenile correctional facilities constituted cruel and unusual punishment under the Eighth Amendment. *Morales v. Turman*, 535 F.2d 864, 867 (5th Cir. 1976), *rev'd on other grounds*, 430 U.S. 322, 97 S. Ct. 1189 (1977). The plaintiffs maintained there was no final order because "the judge withheld issuance of permanent injunctive relief pending submission of a comprehensive plan to be drawn up by the parties." *Id.* at 867 n.6. This court had no problem rejecting plaintiffs' argument. "The difficulty with this contention is that while some flexibility was left to the parties in determining precisely how compliance with the minimum standards would be structured, the District Court made it perfectly clear that any plan submitted must be consistent with the minimum requirements laid out in its opinion."[4] *Id.* The minimum standards constituted a "final adjudication" for purposes of § 1291. *Id.*

Similarly, in *J W by and through Tammy Williams v. Birmingham Board of Education*, the district court's order was final and appealable because it included detailed factual findings and legal conclusions that constitutional rights had been violated, but ordered the parties to "submit a proposed training and procedure plan that would remedy the constitutional problems identified in its order" and included as guidance a series of "general practices." 904 F.3d 1248, 1254–56 (11th Cir. 2018).

Contrary to the majority's contention, *see ante* at 11–12, the minimum standards in the Remedial Order are, in large part, *more* detailed than the

---

[4] On further appeal, the Supreme Court simply stated that the district court's "judgment is reviewable on the merits in the Court of Appeals." *Morales v. Turman*, 430 U.S. 322, 324, 97 S. Ct. 1189, 1190 (1977) (citing 28 U.S.C. § 1291).

No. 23-30825

minimum standards deemed sufficient for appellate jurisdiction in *Morales*.[5] In *Morales*, the legally relevant elements of decretal terms like "adequate infirmary facilities" became clear in light of the court's opinion. Here, the legally relevant elements of the already specific Remedial Order are abundantly clear in light of the Remedial Opinion's granular explication of LSP's constitutional shortcomings. [6] *See Morales*, 535 F.2d at 867 n.6.

The majority muster only out-of-circuit, non-binding case law to support their position. *Ante* at 8–9 (quoting *Parsons v. Ryan*, 949 F.3d 443, 473 (9th Cir. 2020); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 464–65 (9th Cir. 1989)). It should come as no surprise that the scope of appellate jurisdiction in Fifth Circuit institutional reform litigation differs from Ninth Circuit rulings. This circuit had significant experience in reviewing such rulings during the period that schools and public facilities were desegregated from the 1960s on. *See* Frank T. Read, *The Bloodless Revolution: The Role of*

---

[5] *Compare* Appendix (plan must address Sick Call standards such as "the sick call request process, evaluation by a provider, and documentation," Emergency Care standards including "protocols for the appropriate use and training of EMTs," and "the appointment of a qualified, properly trained ADA Coordinator"), *with Morales v. Turman*, 383 F. Supp. 53, 105 (E.D. Tex. 1974) (plan must address "[a]dequate infirmary facilities" and "[a]ccess to medical staff without delay or interference").

[6] Take, for example, the Remedial Order's and Opinion's specific dictates with respect to sick call standards. The Opinion held that LSP's sick call is constitutionally inadequate because LSP does not review complaints daily, the sick call request form provides no place for the patient to time and date their request or time and date when the request was received, the triage process is not explained and is not noted in patient charts, physical examinations are performed by EMTs rather than by Nurse Practitioners, and sick calls are at times conducted via telemedicine rather than in-person. *Remedial Opinion*, 701 F. Supp. 3d. at 392–95. These are not "mere guidelines subject to further negotiation," but clear constitutional deficiencies the remedial plan "must be consistent with" and remedy. *See Morales*, 535 F.2d at 867 n.6. The Remedial Opinion and Order establish the requirements LSP must satisfy to pass constitutional muster with sufficient specificity to permit appellate review.

No. 23-30825

*the Fifth Circuit in the Integration of the Deep South*, 32 MERCER L. REV. 1149 (1981).

The Ninth Circuit views "orders requiring the submission of detailed plans" as "not final orders appealable" under § 1291. *Parsons*, 949 F.3d 443 (citation omitted); *Balla*, 869 F.2d at 464–65. That is incompatible with our holding in *Morales* that "while some flexibility was left to the parties in determining precisely how compliance with the minimum standard would be structured," the required submission of a plan is appealable under § 1291 because "[i]n circumstances such as these, the requirement of finality must be given a practical construction." 535 F.2d at 867 n.6.; *see also Abbott v. Perez*, 585 U.S. 579, 601, 138 S. Ct. 2305, 2323 (2018). In fact, the *Balla* court explicitly distinguished its view of § 1291 from this circuit's approach. 869 F.2d at 465 (citing *United States v. Alabama*, 828 F.2d 1532, 1536–38 (11th Cir. 1987) ("Our decision follows the reasoning of this court's predecessor in *Morales v. Turman*.")). The law of this circuit, not that of the Ninth, controls our decision.

In this case, neither the appointment of special masters nor the federal court's future supervision of the details of compliance deprives the Final Judgment of its finality. The district court "made perfectly clear" that any remedial plan must be consistent with the "minimum requirements" of the Eighth Amendment, ADA, and RA; it defined those requirements in its 104-page Remedial Opinion; and it reiterated their scope in the Remedial Order. *See Morales*, 535 F.2d at 867 n.6. The district court's already-specific opinion and judgment may not be enlarged by the special masters' recommendations. The concrete issues raised and fully briefed before us are ripe for appellate review. Accordingly, the Remedial Order and accompanying Remedial Opinion and Liability Opinion constitute a final judgment pursuant to § 1291.

No. 23-30825

## B.

Even if the Remedial Order is not "final" under § 1291, it is sufficiently injunctive to support an appeal under § 1292(a)(1), which grants courts of appeals jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions[.]" When "an order has the practical effect of granting or denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott*, 585 U.S. at 594, 138 S. Ct. at 2319 (quotation marks and citation omitted). In the context of institutional reform litigation, this court does not delay our review until the minutiae of a remedial plan are memorialized. Doing so would undermine the very purpose of § 1292(a)(1). *Id.* at 595, 138 S. Ct. at 2319 ("Much harm can occur before the final decision in the district court," and "[l]awful and important conduct may be barred, and unlawful and harmful conduct may be allowed to continue."). In this case, the "unlawful and harmful conduct" is the district court's insistence on a Remedial Order that plainly violates the PLRA and exceeds the court's lawful authority.

The majority posit several reasons why the Remedial Order's provisions are insufficiently injunctive under § 1292(a)(1). Preliminarily, the majority repeatedly quote the Defendants' refusals to rest on § 1292(a)(1) as a jurisdictional basis—until this court required supplemental briefing. Of course, we are not bound by the parties' assertions about jurisdiction, and neither party questioned appellate jurisdiction before this court raised the issue. Tellingly, in their supplemental briefing, the Plaintiffs challenge only the Remedial Order's "finality" under § 1291. The Plaintiffs do not deny that it is injunctive within § 1292(a)(1). The Defendants' claimed admission is a red herring.

No. 23-30825

The majority also contend that the Remedial Order's requirements are too general and indefinite to constitute injunctive relief. They assert that provisions, *e.g.*, to "meet and confer" to select three special masters and to accommodate plaintiffs' requests for documents within twenty-four hours, are merely steps on the road toward finality.[7] Finally, because the Remedial Order allegedly lacks definitive requirements,[8] the majority see no prospect that LSP's failure to comply could garner appealable contempt citations. These contentions reflect general appellate review principles that might apply—were it not for our precedent and the facts.

As a matter of precedent, this court has routinely found appellate jurisdiction in institutional reform cases. For instance, a district court order that the parties submit a "detailed and comprehensive plan" at a future date, to enforce generally outlined prohibitions on racial discrimination in the public schools, was appealable as an injunction. *Bd. of Pub. Instruction of Duval Cnty. v. Braxton*, 326 F.2d 616, 617 (5th Cir. 1964). In *Duval County*,

---

[7] The majority's few but inapt citations, *see ante* at 7–8, include *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 273–79, 108 S. Ct. 1133, 1135–38 (1988) (denying a motion to exercise *Colorado River* abstention), and *Lewis v. Bloomsburg Mills, Inc.*, 608 F.2d 971, 972–73 (4th Cir. 1979) (order prohibiting post-certification communications among class members). The majority further cite two cases that are distinguishable on the facts. *Mercer v. Magnant*, 40 F.3d 893, 897 (7th Cir. 1994), found no appellate jurisdiction where the parties' disagreement about the calculation of an unknown amount of tax refunds required further district court effort to render a remedy. And in *S. Ute Indian Tribe v. Leavitt*, 564 F.3d 1198, 1200 (10th Cir. 2009), an order requiring the parties to negotiate a "self determination contract" with no parameters was held non-final because the scope of future litigation and any remedy were unknowable.

[8] The majority again cite *Parsons*, 949 F.3d at 473, and *Balla*, 869 F.2d at 464-65. *Ante* at 8–9. *But see* 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3921.2 (3d ed. 2024) (citing Fifth Circuit precedent adopting "a more expansive approach to appeals from orders to submit proposed injunction decrees") (citing *Abbott*, 585 U.S. at 594–603, 138 S. Ct. at 2319–24; *Morales*, 535 F.2d at 867 n.6; *Bd. of Pub. Instruction of Duval Cnty., Fla. v. Braxton*, 326 F.2d 616, 617 (5th Cir. 1964), *cert. denied*, 377 U.S. 924, 84 S. Ct. 1223 (1964)).

No. 23-30825

this court cited previous supporting precedents and noted, "the [district] Court positively and affirmatively directed that a plan be submitted that would provide for carrying out the [order] that [was] to be later effectuated." *Id.* at 619. As a result, "the ordering of the plan dealing expressly with these prohibited acts amounts to a mandatory injunction." *Id.*

In *Morales, supra*, this court alternatively held that, "[i]n any event, the order requiring that the parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable" under § 1292(a)(1). 535 F.2d at 867 n.6.

Applying our precedents, this court concluded that an order requiring the parties to meet and negotiate a plan to bring a business into compliance with the ADA was an injunction. *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1056–57 (5th Cir. 1997). The district court determined that the defendant's "no animals" policy during brewery tours violated the ADA and ordered the defendant to "submit a written policy incorporating . . . guidance" from the government. *Id.* at 1057. The order "in effect" required the defendant to consult the government about the modifications, submit a policy to the district court incorporating such consultation, and make the modifications in the future. *Id.* This was sufficient to establish appellate jurisdiction pursuant to § 1292(a)(1). *Id.*

More recently, this court held that an order requiring Louisiana to report to the federal government racial data and test scores for each of its public schools constituted an appealable injunction under § 1292(a)(1). *Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015). Although the order involved only information sharing, it was far from an unappealable interlocutory order. "The content of the [order] ma[de] clear that it is not for discovery." *Id.* at 297.

No. 23-30825

This series of authorities refutes each of the majority's grounds for denying that the Remedial Order is an appealable injunction. The fact that details of administration may need to be worked out is no different from the future implementation of detailed school desegregation plans that this court routinely reviewed on appeal. *See Duval Cnty.*, 326 F.2d at 617. The orders to "meet and confer," provide documents and LSP personnel at the masters' request, pay for special masters, and redress the innumerable shortcomings listed in the Remedial Opinion and incorporated in the Remedial Order are on point with appellate review decisions in *Morales*, 535 F.2d at 867 n.6, and *Johnson*, 116 F.3d at 1056-57. And as in *Brumfield*, these provisions "make clear" that they are not interim orders subject to alteration by the district court, but an outline of the essential parts of the district court's remedial framework. Further echoing *Brumfield*, the *current* requirements of the Remedial Order will subject LSP to a "burdensome, costly, and endless process," and the Remedial Order contemplates a "new and different . . . regime." 806 F.3d at 297. *See* Appendix (requiring special master reports "at recurring intervals every six months").

The Supreme Court's recent decision in *Abbott v. Perez* confirms what this circuit's binding law has been for sixty years: "whether any particular remedies would have ultimately been ordered by the District Court" does not deprive this court of appellate jurisdiction. 585 U.S. at 601, 138 S. Ct. at 2323. In *Abbott*, a three-judge court held that (1) Texas's legislative plans "violate § 2 and the Fourteenth Amendment," and (2) these violations "must be remedied." *Id.* at 598, 138 S. Ct. at 2321. If Texas did not intend to adopt new plans, the court would hold a subsequent remedial hearing. *Id.* The order did nothing more. The Supreme Court recognized that the "court intended to have new plans ready for use," and Texas risked "deleterious consequences" if it attempted to implement redistricting plans the court had just found unconstitutional. *Id.* at 599, 138 S. Ct. at 2322. The three-judge

No. 23-30825

court's rejection of the status quo was sufficiently injunctive to establish jurisdiction. *Id.* at 601, 138 S. Ct. at 2323. The Court explicitly rejected the notion "that appellate jurisdiction is lacking . . . because we do not know at this point what a remedy would entail, who it would affect, and when it would be implemented." *Id.* (quotation marks and citation omitted).

As in *Abbott*, here "[n]othing in the record even hints that the court contemplated the possibility of allowing" the status quo ante at LSP to continue. *See id.* at 599, 138 S. Ct. at 2322. That the Remedial Order provides a clear outline about required changes is sufficient to establish appellate jurisdiction under the "practical effect" given to § 1292(a)(1). *See id.* at 595, 138 S. Ct. at 2320.

Not only is the law contrary to the majority's suppositions, but the facts equally undermine their reasoning. Although the majority fail to analyze its contents, the Remedial Order places specific commands on the state Defendants.[9] If the state does not abide by these provisions—*inter alia*, to meet and confer, to agree to three special masters, to pay costs of special masters, to make available personnel, documents, and even prisoners on short notice—who would doubt that plaintiffs would seek to hold it in contempt? *See Abbott*, 585 U.S. at 599, 138 S. Ct. at 2322 (appellate jurisdiction lay when "Texas had reason to believe that it would risk deleterious consequences if it defied the court"). Does the appointment of

---

[9] The Remedial Order's requirements include the following:

- The parties are "hereby Ordered to meet and confer" to appoint three Special Masters.
- The state must pay "[a]ll costs associated with the work and reporting of the Special Masters[.]"
- The Special Masters "shall have access" to any and all relevant records and the Department of Corrections "shall provide any records or documents requested without delay[.]"
- The state must designate personnel to work with the Special Masters.

No. 23-30825

special masters mean that the district court's liability and remedial findings are somehow subject to alteration? Of course not. The masters are tasked with enforcing the court's conclusions, a task subject to arguable details but plainly under the umbrella of the Remedial Order and the incorporated Remedial Opinion's itemized findings. *See Morales*, 535 F.2d at 867 n.6 (appellate jurisdiction existed where the district court "require[ed] that the parties meet and negotiate a plan complying with the decision" "consistent with the minimum requirements laid out in its opinion").

As in *Abbott*, *Brumfield*, *Johnson*, *Morales*, and *Duval County*, the Remedial Order here changes the state's permissible conduct and alters its ability to manage LSP. To the district court, the status quo at LSP is unconstitutional and in violation of federal law. The court "intend[s] to have new plans ready for use," and Louisiana's noncompliance would risk "deleterious consequences." *Abbott*, 585 U.S. at 601, 138 S. Ct. at 2323. The Remedial Order, furthermore, mandates Defendants' cooperation with and footing the bill for three special masters, regardless of what plans are yet to come. *See Johnson*, 116 F.3d at 1057. This court has not required public entities subjected to broad, compulsory remedial decrees to wait until the ink is dry on every minute point in a comprehensive institutional reform plan before permitting appellate review. We have jurisdiction to review the Remedial Order pursuant to § 1292(a)(1).

Concomitantly, we have jurisdiction to review the Remedial and Liability Opinions as briefed by both parties. Our jurisdiction extends to "determining whether there is any insuperable objection, in point of jurisdiction *or merits*" to the injunction. *Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136, 33 S. Ct. 657, 663 (1913) (emphasis added). Our review, furthermore, "properly extends to all matters inextricably bound up with the injunction decision." 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3921.1 (3d ed.

2024); *Abbott*, 585 U.S. at 603–07, 138 S. Ct. at 2324–26 (examining merits of district court judgment supporting injunction); *see also Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96 (2d Cir. 2012). Whether the district court's decree systemically violates the PLRA is plainly cognizable. It is a threshold inquiry necessary to determine the lawfulness of the district court's Remedial Order. Also cognizable are issues surrounding the Remedial Opinion's findings of continued deliberate indifference to prisoners' constitutional right to adequate medical care and LSP's compliance with ADA/RA requirements. Finally, the district court's liability determination may be reviewed in light of the Defendants' arguments that the court repeatedly failed to apply proper Eighth Amendment and statutory standards under the aegis of Supreme Court interpretations.[10]

To repeat, the law of this circuit and the Supreme Court bind this court. *Abbott*, *Brumfield*, *Johnson*, *Morales*, and *Duval County* control. Those opinions make unmistakably clear that (1) an "order requiring that the parties meet and negotiate a plan complying with the decision is itself a mandatory injunction which is appealable under 28 U.S.C. § 1292(a)(1)," *Morales*, 535 F.2d at 867 n.6 (citing *Duval Cnty.*, 326 F.2d at 618–19), and (2) appellate jurisdiction is not lacking even if (contrary to the facts here) "we do not know at this point what a remedy would entail, who it would affect, and when it would be implemented." *Abbott*, 585 U.S. at 601, 138 S. Ct. at 2323. The Remedial Order and related Remedial Opinion are appealable under § 1292(a)(1).

---

[10] This dissent opts to cover only the Remedial Order and Opinion, intertwined with PLRA noncompliance. Although the district court's liability findings are dubious, appellate review is immediately necessary to cabin the district court's unauthorized imposition on prison management during the period that this appeal proceeds.

No. 23-30825

I turn to the Remedial Order's failure to abide by the PLRA, then to the district court's Remedial Opinion.

## III.

The district court's "Remedial Order" violates the PLRA, 18 U.S.C. §§ 3626, *et seq.* Specifically, the Remedial Order (1) constitutes injunctive relief regulated by the PLRA, § 3626(g)(7); (2) violates the PLRA's procedures for appointment of "a"—not three—special master(s), § 3626(f)(1); (3) illegally requires the state to pay the expenses of the masters, § 3626(f)(4); and (4) ignores the PLRA's "needs-narrowness-intrusiveness" criteria for remedial orders, § 3626(a)(1). The majority *know* about these violations, which were fully briefed before us. Yet they prefer to avoid calling out the violations. Indeed, to shield the district court from later reversal, even though they claim we lack jurisdiction, they telegraph the punches that "a" special master, "not multiple," is required and that "intrusive[ness]" must be evaluated. *Ante at* 7 n.5, 7–8. How preposterous. And unauthorized. The Supreme Court condemned the exercise of hypothetical jurisdiction decades ago. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S. Ct. 1003, 1016 (1998) (citing *Muskrat v. United States*, 219 U.S. 346, 362, 31 S. Ct. 250, 256 (1911); *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792)).

Overturning the district court's Remedial Order for violating the PLRA should have been easy. In 1996, Congress passed the PLRA to limit the oversight of state prisons by federal courts. *See* Pub. L. No. 104-134, 110 Stat. 1321. The law was enacted "in the wake of a sharp rise in prisoner litigation in the federal courts," and "contains a variety of provisions designed to bring this litigation under control." *Woodford v. Ngo*, 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *see also Valentine v. Collier*, 993 F.3d 270, 292–93 (5th Cir. 2021) (Oldham, J., concurring) (observing that in 1984, 24%

of state prisons were subject to federal structural injunctions). To eliminate federal court interference with state and local prison management, the PLRA "established standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331, 120 S. Ct. 2246, 2251 (2000). The PLRA reinforced the Supreme Court's recognition fifty years ago that "[i]t is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S. Ct. 1827, 1837 (1973). Still today, the Court acknowledges "sensitive federalism concerns" when federal court decrees usurp a state's sovereignty and authority over its prisons. *Horne v. Flores*, 557 U.S. 443, 448, 129 S. Ct. 2579, 2593 (2009).

In appropriate cases, federal courts must intervene to redress ongoing constitutional violations of the conditions of prisoner confinement. *See, e.g.*, *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004). But federal courts are bound to apply the law Congress enacted, and the PLRA strictly limits federal court jurisdiction and remedial power. This court cannot be party to the district court's refusal to abide by the PLRA.

## A.

Under the PLRA, "prospective relief" in prison conditions cases is defined as "all relief other than compensatory money damages." 18 U.S.C. § 3626(g)(7). It is not debatable that the district court's Remedial Order constituted "prospective relief." Viewed most narrowly, the Remedial Order requires the Defendants to take the following steps: expeditiously cooperate with the court's appointment of three special masters; designate several contact persons between the masters and the prison officials to "coordinate and facilitate" the special masters' work; make any prison facilities available to the special masters on 24 hours' notice; make all records

No. 23-30825

and documents available "without delay" and within 14 days of request; and secure "reasonable access to" prisoners.[11]   And by the way, the Remedial Order requires the state of Louisiana to pay for the special masters' services. All of these requirements are immediately effective.   The special masters' report, which will address the subjects identified in the Remedial Order and Opinion, just fills in details.   This Remedial Order constituted "prospective relief" and had to follow the PLRA's procedural and substantive requirements.

## B.

In the course of prescribing prospective relief, however, the district court paid no attention to the PLRA's procedures for the selection of special masters.   18 U.S.C. § 3626(f).   This was the source of critical errors in the appointment process, the excessive number of special masters, and the shifting of costs to the Defendants.   Each must be addressed.

A "special master" is "*any* person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court."   *Id.* § 3626(g)(8) (emphasis added).   Under the PLRA, the special master "may be authorized by a court to conduct hearings" or "to assist in the development of remedial plans." *Id.* §§ 3626(f)(6)(A), (f)(6)(C).[12]

---

[11] Insofar as it also outlines with specificity the type of defects the court found in enumerated areas of prison healthcare, the Defendants are on notice to "cure" the violations.

[12] In pertinent part, the relevant provisions state:
(f) Special masters.—
    (1) In general.—
        (A) In any civil action in a Federal court with respect to prison conditions, the court may appoint a special master . . . .
    (2) Appointment.—

No. 23-30825

The Plaintiffs contend that the three special masters to be named by the district court are not subject to the PLRA because they will not exercise "quasi-judicial power." *See Benjamin v. Fraser*, 343 F.3d 35, 39–40 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009).[13] I disagree. The Second Circuit may have a different view of the roles that special masters play under the PLRA. In that case it concluded

---

> (A) If the court determines that the appointment of a special master is necessary, the court shall request that the defendant institution and the plaintiff each submit a list of not more than 5 persons to serve as a special master.
> (B) Each party shall have the opportunity to remove up to 3 persons from the opposing party's list.
> (C) The court shall select the master from the persons remaining on the list after the operation of subparagraph (B).
> (4) Compensation.—
> The compensation to be allowed to a special master under this section . . . shall be paid with funds appropriated to the Judiciary.
> (6) Limitations on powers and duties.—A special master appointed under this subsection—
> (A) may be authorized by a court to conduct hearings and prepare proposed findings of act, which shall be made on the record;
> (B) shall not make any findings or communications ex parte;
> (C) may be authorized by a court to assist in the development of remedial plans; and
> (D) may be removed at any time, but shall be relieved of the appointment upon the termination of relief.
> (g) Definitions.—As used in this section— . . .
> (8) the term "special master" means any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court[.]

18 U.S.C. § 3626 (emphases removed) ("Special Master Provisions").

[13] The Plaintiffs additionally cite to a Middle District of Alabama case, *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1239 (M.D. Ala. 2004). But in that case "all parties concur[red] that the PLRA's requirements [were] met" and agreed to a settlement. *Id.* Here, the State vigorously argues that the PLRA's requirements were not met and has not agreed to settle.

No. 23-30825

that a consultant appointed by the district court was not subject to the PLRA because the position "serves a monitoring function; it does not exercise quasi-judicial power." *Id.* at 45; *see also Handberry v. Thompson*, 446 F.3d 335, 352 (2d Cir. 2006) (the "special monitor" appointed by the court was not a "special master" because she had not "been given a mandate to exercise quasi-judicial powers"). But a special master under the PLRA need not exercise "quasi-judicial powers." The scope of that office is at the court's discretion and may specifically include "assist[ing] in the development of remedial plans." 18 U.S.C. § 3626(f)(6)(C). That is exactly what the court ordered here. Congress plainly did not want district courts to creatively define court-ordered consultants' or monitors' positions in order to evade the PLRA.[14] The district court's "special masters," "regardless of the title or description given by the court," § 3626(g)(8), should have been selected in accordance with the PLRA.

But even the plaintiffs concede that the Remedial Order does not follow the PLRA's selection process:

> (A) [T]he court shall request that the defendant institution and the plaintiff each submit a list of not more than 5 persons to serve as a special master.

> (B) Each party shall have the opportunity to remove up to 3 persons from the opposing party's list.

> (C) The court shall select the master from the persons remaining on the list . . . .

---

[14] Plaintiffs' additional effort to recharacterize the special masters as "experts" appointed under Federal Rule of Evidence 706 is misguided, because federal court rules are subvervient to Acts of Congress. The district court in any event refused the Plaintiffs' motion to recharacterize the special masters, in an attempt to remedy the Remedial Order's PLRA violation, after Defendants appealed.

No. 23-30825

18 U.S.C. § 3626(f)(2).  In other words, courts must accept a list from the parties of at most five candidates each, whittled down by them to at least two each, and the court will finally select the master.  Here, the district court ordered the parties to "meet and confer" to agree on one candidate for each position, but if they are unable to agree, to "submit up to three proposed names for each position."  The district court's order has no relationship to the governing statute.

Second, the Remedial Order authorizes three special masters, but the PLRA authorizes a court to appoint "a" special master.  18 U.S.C. § 3626(f)(1)(A).  Plaintiffs attempt to defend the power to appoint three special masters because the statutory reference to "a" special master should enable the court to appoint three under the Dictionary Act.  1 U.S.C. § 1 ("[W]ords importing the singular include and apply to several persons, parties, or things" "unless the context indicates otherwise[.]").  But the Supreme Court cautioned in *Niz-Chavez* that "[t]he Dictionary Act does not transform every use of the singular 'a' into the plural 'several.'  Instead, it tells us only that a statute using the singular 'a' can apply to multiple persons, parties or things."  *Niz-Chavez v. Garland*, 593 U.S. 155, 164, 141 S. Ct. 1474, 1482 (2021).  As with all matters of statutory interpretation, context is paramount.

The Plaintiffs contend that each special master contemplated by the district court may be "a" separate special master under the PLRA, because the statute does not limit how many such persons a court may appoint.  Again, "the context indicates otherwise."  *See* 1 U.S.C. § 1.  As explained, the PLRA's elaborate appointment procedures for "the" special master require the parties to start from a list of ten and whittle down to one selected by the court.  Applying these procedures, even if the district court had done so, to select each of three masters would range far from the singular statutory reference.  Moreover, seven paragraphs in § 3626(f) refer to "a" or "the"

No. 23-30825

special master.  18 U.S.C. §§ 3626(f)(1)(A), (f)(1)(B), (f)(2)(A), (f)(3)–(6). Changing all of these references to embrace multiple special masters is fundamentally at odds with the PLRA's structure that cabins district court discretion in handling institutional prison litigation.  In sum, the PLRA authorizes only one special master.

Plaintiffs also concede that the Remedial Order violates the PLRA by requiring the State to pay the fees of the three special masters.  This is incomprehensible.  The PLRA squarely places the burden of compensating the special master on federal funds appropriated to the Judiciary.  18 U.S.C. § 3626(f)(4).  In fact, the special master's hourly rate may "not [be] greater than the hourly rates established under section 3006A for payment of court-appointed special counsel," together with reasonable costs.  *Id.*  But the district court required the Louisiana Department of Corrections to pay "[a]ll" their costs, without limitation.[15]  Appellee's Br. at 43 (conceding that "the source of the special masters' compensation" would need to be changed).

Finally, and critically, the Remedial Order fails to acknowledge substantive limitations that the PLRA imposes on the district court's remedial discretion.  That is,

> [p]rospective relief . . . shall extend no further than necessary to correct the violation of a Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve prospective relief unless the court finds that such relief is narrowly drawn,

---

[15] The State also contends that the Remedial Order violates the PLRA because it calls for *ex parte* communications.  This complaint may refer to a Remedial Order provision that designates a "Clerk" to "assist the Special Masters in retrieval of documents from the record if necessary."  Remedial Order par. III.F.  Any *ex parte* communications between a special master and the court are dubious.  But the State's argument on this point seems premature.

No. 23-30825

extends no further than to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1). This threshold limitation on equitable relief has been deemed the needs-narrowness-intrusiveness standard. Its application to "prospective relief" means "relief" defined in the PLRA, which is "*all relief in any form* that may be granted or approved by the court . . . ." *Id.* § 3626(g)(9) (emphasis added). Accordingly, all of the Remedial Order's terms had to be justified by needs-narrowness-intrusiveness findings required by § 3626(a)(1). *United States v. Hinds Cnty. Bd. of Supervisors*, 120 F.4th 1246, 1269–70 (5th Cir. 2024). And, as with the attempt to recharacterize the special masters as Rule 706 experts, *see supra* n.14, the district court was requested by Plaintiffs, after the Defendants appealed, to include such findings, but it refused.

Another substantive limit is implicit because the PLRA requires that injunctive relief may be ordered only to address "*the* violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A) (emphasis added). One court has construed this language to require a violation existing at the date relief is ordered. *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002); *compare Dockery v. Cain*, 7 F.4th 375, 380 n.4 (5th Cir. 2021) (acknowledging courts are split on this interpretation). The district court here, in any event, refused to consider the extremely important adoption of electronic medical recordkeeping, which LSP implemented after the remedial hearing but more than a year before the court's Remedial Order was entered. As will be seen below, the availability of electronic medical records throughout LSP is a watershed occurrence that remedied numerous violations found by the district court. Yet the court refused to adapt its proposed remedies, or the scope of work by special masters, to this and other ongoing reforms instituted by LSP.

No. 23-30825

The district court's violations of the PLRA are inexcusable.  Absent prompt action by the en banc court, the majority's narrow approach to appellate finality will subject LSP to a sweeping federal intrusion into the prison's management in direct violation of a binding federal statute.  And the consequence of the majority's opinion is not limited to LSP.  Other currently pending cases exactly replicate the district court's illegal orders in this case.  The majority's denial of appellate review makes unmistakably clear that if a state or local entity in the Fifth Circuit becomes subject to a sweeping and illegally broad prison reform decree, this court's doors will be closed until it is all but too late.

IV.

Appellate review, whether predicated on a final judgment or the injunctive relief ordered by the court, encompasses the entirety of the district court's Liability and Remedial opinions.  At this juncture, however, I will not address flaws in the district court's Liability Opinion, though the Defendants have briefed their position extensively.  It is more immediately critical to recount the district court's grave errors in addressing the remedial phase of the case.  The errors are of three types.  First, the Remedial Opinion and Remedial Order wholly fail to apply the needs-narrowness-intrusiveness standards for injunctive relief prescribed by § 3626(a)(1) of the PLRA.  This default alone ought to require reversal.

The second and third grounds of error pertain to constitutional standards for remedial relief articulated by the Supreme Court.  Second, the court refused to update its remedial analysis with evidence of critical reforms that were made before the Remedial Order was entered in late 2023.  This is contrary to governing Supreme Court and Fifth Circuit law.  Third, the court applied the wrong standard to evaluate watershed improvements in every aspect of LSP's medical and disabled care after the Liability Opinion issued.

No. 23-30825

Instead, the court repeatedly held that whatever the Defendants had accomplished might be "robust" or partially corrective, but it was "not enough" to cleanse them of deliberate indifference or remove the threat of Defendants' backsliding from the improvements made. The district court's approach reflects a fundamental misunderstanding of the purpose of institutional reform injunctive relief.

After the Defendants were found liable for Eighth Amendment violations in every aspect of medical and disabled care provided to LSP inmates, they began systematically to upgrade the system. The court acknowledged ongoing improvements by allowing LSP to offer evidence from January 1, 2019, to May 31, 2022, before the ten-day remedial hearing in June 2022.

Another seventeen months elapsed until the Remedial Order issued. During that interval, the Defendants continued to upgrade medical care. They moved to supplement the record in November 2022, a year before the court's Remedial Order, to reflect that (1) LSP implemented electronic healthcare records; (2) LSP was re-accredited by the American Correctional Association; and (3) LSP hired an additional physician, doubling the number of physicians, and significantly raised the number of nurse practitioners. Reasoning that its pre-hearing discovery cutoff was just an ordinary exercise of trial court discretion, the court refused to consider this vital information. As a result, many provisions of the Remedial Order had become obsolete as soon as it was entered.

The court's overarching error lay in this failure to evaluate whether prison medical and disabled care required federal court injunctive relief despite continuously improved conditions. Since the 1970s, the Supreme Court has held that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain."

No. 23-30825

*Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976) (citation omitted). Such mistreatment amounts to unconstitutional "punishment" under the Eighth Amendment. *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc). To effectuate liability based on "punishment," *Williams* noted, the Supreme Court's test for deliberate indifference adopted a criminal standard of recklessness. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 925, 839–40, 114 S. Ct. 1970, 1979–80 (1994)). The test has two parts: plaintiffs' "objective exposure to a substantial risk of serious harm"; and "that prison officials acted or failed to act with [subjective] deliberate indifference to that risk." *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018). But, as the Supreme Court[16] and this court have consistently held, this quasi-criminal standard is not met for mere negligence or a failure to meet a standard of community care or even gross negligence.[17] In essence, when prison officials have attempted to care for a prisoner's medical needs, even if the care falls short, they have not exhibited subjective deliberate indifference.

---

[16] *Estelle*, 429 U.S. at 105–06, 97 S. Ct. at 292 ("inadvertent failure to provide medical care" or negligent diagnoses do not establish a constitutional violation); *Wilson v. Seiter*, 501 U.S. 294, 305, 111 S. Ct. 2321, 2328 (1991) ("mere negligence" does not establish a constitutional violation); *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83 (officials are not deliberately indifferent if they "responded reasonably to the risk" of serious harm).

[17] *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference."); *Brauner v. Coody*, 793 F.3d 493, 498 (5th Cir. 2015) ("Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials.'") (citation omitted); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("Deliberate indifference 'is an extremely high standard to meet.'") (citation omitted); *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) ("Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference.") (citation omitted); *Mendoza v. Lynaugh*, 989 F.2d 191, 192 (5th Cir. 1993) ("delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference"); *see also Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

No. 23-30825

Just as important, a federal court, after initially finding liability, may not simply order remedial injunctive relief that supplants prison management with federal oversight. The Supreme Court has made this abundantly clear for decades. Thus, deliberate indifference "'should be determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845, 114 S. Ct. at 1983 (quoting *Helling v. Mckinney*, 509 U.S. 25, 36, 113 S. Ct. 2475, 2482 (1993)); *see also Bell v. Wolfish*, 441 U.S. 520, 547–48, 562, 99 S. Ct. 1861, 1878–79, 1886 (1979). Further, "to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Id.* at 846. Both sides may rely on ongoing developments in the prison to establish that the inmate is not entitled to an injunction. *Id.*

Citing *Farmer*, this court held that "[w]hen there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the evidence from the time suit is filed *to the judgment*." *Valentine v. Collier*, 993 F.3d 270, 282 (5th Cir. 2021) (emphasis added). *Valentine* concluded that "[i]njunctive relief is forward looking, and given the Defendants' response [to the Covid pandemic] including actions taken on the eve of and during trial, the permanent injunction is not warranted." *Id.* at 289. Even more pointedly, this court held that a district court properly considered conditions after trial when it refused to impose injunctive relief in a Mississippi prison case where extensive improvements had been made in the interim. *Dockery v. Cain*, 7 F.4th 375, 379 (5th Cir. 2021). This court quoted *Farmer*'s admonishment that a court "should approach issuance of injunctive orders with the usual caution" and "may . . . exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." *Id.* (quoting *Farmer*, 511 U.S. at 846–47, 114 S. Ct. at 1984). And we emphasized *Farmer*'s

No. 23-30825

"restrained approach" "to prevent federal courts from 'becoming enmeshed in the minutiae of prison operations.'" *Id.* (quoting *Farmer*, 511 U.S. at 847, 114 S. Ct. at 1984 (citation omitted)). Finally, *Dockery* rejected plaintiffs' position that district courts must make a risk-of-recurrence finding. 7 F.4th at 380.[18]

The district court's failure to apply these principles is unjustified. To begin, the court's refusal to update remedial conditions from May 2022 to the date of its Remedial Order in November 2023 violated *Farmer*, *Valentine*, and *Dockery*. The district court asserted its right to manage its docket, set deadlines, and protect the Plaintiffs from an endless loop of evidence. In so doing, it relied on the foregoing authorities' acknowledgement of district court discretion. Particularly, the court relied on the Supreme Court's decision in *Brown v. Plata*. 563 U.S. 493, 131 S. Ct. 1910 (2011). *Plata*, a case about prison overcrowding, refused to require that the state of California's request to update remedial evidence be accepted where (1) the state had agreed to a pretrial discovery deadline that the lower court enforced; (2) the state failed to show what additional evidence it would have submitted; and (3) the state's prison medical care had been in receivership under a court decree for over a decade. *Id.* at 522–24, 131 S. Ct. at 1935–36. None of the facts relevant in *Plata* obtains in this case. On the contrary, in this case, there was an extended delay between the remedial hearing and the Remedial Order that could easily have supported supplemental briefing by both parties. The

---

[18] *See also Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002) ("[I]n the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation. In other words, if a violation no longer exists, the statute [PLRA] does not permit the court to order prospective relief.") (citing 18 U.S.C. § 3626(a)(1)(A)). *But cf. Porter v. Clarke*, 923 F.3d 348, 366–68 (4th Cir. 2019); *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010). Both *Porter* and *Thomas* disagreed with *Hallett*'s reading of the PLRA.

No. 23-30825

Defendants explained exactly what post-hearing remedial measures had been taken, had never agreed to an evidentiary cutoff date, and LSP had not been subjected to court oversight prior to the remedial hearing.

As a result, the court's Remedial Opinion completely ignored that as of autumn 2022 LSP had fully installed its electronic health records system, and by January 2023, the Defendants hired an additional staff physician and increased the number of Nurse Practitioners from seven to nine. These indisputable facts related directly to deficiencies that the court found in its Liability Opinion and continued to assert in the Remedial Opinion. Indeed, deficiencies in staffing and recordkeeping underlie a large number of the court's liability findings. If the district court's current injunctive order takes effect and requires special masters to address the issues listed in the Remedial Orders, a significant portion of those issues were dealt with even before the Remedial Order issued. Any court-appointed masters will be striking at straw men, needlessly interfering with prison authorities' duties, and running up bills for no constitutional remedial purpose. The court's failure to incorporate significant medical care improvements into its Remedial Opinion and Remedial Order violated this court's precedents and constituted an abuse of discretion.

The court also fatally erred by finding ongoing subjective deliberate indifference in support of its broad injunction. As noted above, "deliberate indifference is an 'extremely high' standard to meet." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). Remedial efforts may prove insufficient to cure all the identified institutional problems, but they indicate concern and sincerity on the part of prison officials that negates subjective indifference. *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83 ("[P]rison officials . . . may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*.") (emphasis added); *Hinds Cnty.*, 120 F.4th at 1261

No. 23-30825

("A reasonable response to inadequate prison conditions is indeed sufficient to prevent a deliberate-indifference finding even if the County's attempts were unsuccessful or if the County did not choose the optimal approach to the problem."). Yet the district court relied heavily on outdated and out-of-circuit district court cases[19] rather than this court's multiple authorities in concluding that none of LSP's remedial measures sufficed to narrow, much less eliminate the need for broad ongoing injunctive relief. In the Remedial Opinion, the court repeatedly acknowledged, then discounted improvements in the following areas of prison medical care.[20]

1. Clinical care. The court found that LSP had remedied three out of five deficiencies noted in the Liability Order, but the medical records were still "in shambles." This problem, of course, was solved after the remedial hearing by electronic health records but went unacknowledged by the court. The court criticized the "episodic treatment" of medical complaints, despite the hiring of an additional Nurse Practitioner and adoption of a web-based medical service. The court illustrated "constitutionally substandard care" by means of three examples of delayed care, "medical errors," and a holding

---

[19] The court quoted *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002), and cited *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1260 (M.D. Ala. 2017), for the proposition that "efforts to correct systemic deficiencies that 'simply do not go far enough,' when weighed against the risk of harm" constitute deliberate indifference." *Remedial Opinion*, 701 F. Supp. 3d at 435–36. *But see Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer*, 511 U.S. at 844, 114 S. Ct. at 1982–83) (The subjective inquiry must leave room for the possibility that prison officials "responded reasonably to the risk, even if the harm ultimately was not averted.").

[20] The court made the same kind of mistakes in regard to LSP's alleged violations of the ADA/RA. The court's analysis of "failure to accommodate" and "programmatic accommodations" repeatedly substitutes its view of prison management for the statutory standard, which allows some institutional flexibility in providing for disabled prisoners' needs. I omit this discussion only for the sake of brevity, not to inferentially approve the district court's conclusions.

No. 23-30825

that a "mere encounter with a medical health care provider is not evidence of medical care or treatment." These findings ignore the very high bar required to establish ongoing deliberate indifference of the Defendants. *See Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001); *Valentine*, 993 F.3d at 281; *see also Mendoza v. Lynaugh*, 989 F.2d 191, 192 (5th Cir. 1993).

2. Sick call. After the Liability Opinion issued, LSP completely overhauled its sick call procedures to address the Opinion. As the evidence shows, each patient is being seen within one day by an EMT, nurse practitioners became available through telemedicine, and medical records were available. Nonetheless, the court held the changes had not "transformed the system" and, in the case of telemedicine, were "not optimal." This analysis is unmoored to the rigorous Eighth Amendment standard, particularly because it disregarded that substantial improvements should have eliminated any finding of ongoing deliberate indifference. *See Hinds Cnty.*, 120 F.4th at 1261 (citing *Farmer*, 511 U.S. at 844–45, 114 S. Ct. at 1982–83); *Rasho v. Jeffreys*, 22 F.4th 703, 711 (7th Cir. 2022) (Even if a prison "could have done more," corrective efforts "demonstrate a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment Claim.").

3. Specialty care. LSP expanded its onsite specialty clinics from four to thirteen; made telemedicine consultations available; substantially increased the number of specialty referrals and appointments and reduced the number of missed appointments; took steps to schedule and track appointments more closely; installed monitors in the disabled dorms to notify inmates of upcoming appointments; and worked to coordinate care and provide adequate follow-up patient care after specialty workups. This "framework for constitutionally adequate health care," as the district court described it, was still not enough. The court instead focused on a handful of

No. 23-30825

specific cases in which allegedly poor medical treatment occurred. But the fact that some improvements may not have provided "optimal care" does not detract from the important advances that were made by Defendants, which negated a legitimate finding of ongoing deliberate indifference. *See Gobert*, 463 F.3d at 349.

4. Emergency care. The Liability Opinion found staffing in LSP's emergency care unit was constitutionally inadequate, after which LSP revised its staffing. A RN and EMT are now present 24/7, with a nurse practitioner either present in the unit or on-call on prison grounds 24/7. LSP also altered the policy for self-declared emergencies and limited EMTs' discretion to ensure proper oversight. The court acknowledged "improved staffing in the [emergency unit]" but continued to find constitutionally deficient care based on seven patient files. Again, the court failed to consider that LSP's response may be less than "transformative" but sufficient to dispel the notion of deliberate indifference. *See Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016). Nor did it apply the case law that disagreements over medical judgment or isolated negligence may constitute medical malpractice but do not rise to the level of quasi-criminal deliberate indifference. *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292; *Williams*, 797 F.3d at 281; *Domino*, 239 F.3d at 756.

5. Inpatient/Infirmary care. The district court "commended" Defendants for upgrading staffing in the acute care unit to one RN for every ten patients and one RN for every fifteen long-term care patients. Staffing shortages, which led to the misuse of orderlies for nursing tasks, was the court's concern in the Liability Opinion. But again, the court found the integration of additional trained nurses inadequate due to occasional lapses. LSP also installed red call buttons outside the door of each prisoner's locked room to improve communications with nursing staff, and national guidelines prescribe that patients be within sight *or sound* of nurses. But the court

No. 23-30825

nonetheless found the call buttons inadequate to satisfy its erroneous view of constitutional standards. *See Jeffreys*, 22 F.4th at 711.

6. Medical Leadership/Organizational Structure. It seems a dubious proposition that a federal court may hold that a state institution's governing organizational structure—as opposed to actions of identified leaders in the structure—is unconstitutional. *See Wilson*, 501 U.S. at 305, 111 S. Ct. at 2327. But that was the import of the district court's Liability Opinion. Responding to those concerns, however, LSP fired old leaders, hired new leaders, and instituted new oversight procedures for prison medical care. The new healthcare administrator meets regularly with the new Deputy Warden, a licensed practical nurse. LSP implemented a weekly back log tracker to identify delays, and the doctors meet daily with nurse practitioners and LSP's medical department heads. The court discounted these developments because, it claimed, understaffing persists, the improvements "simply do not go far enough," and leadership "disagreed with several of the Court's liability findings." The court disagreed with LSP's protocol for conducting mortality reviews. The court also discounted changes that were made to the quality assurance/quality improvement ("QA/QI") programming due to the Liability Opinion's criticism; the court held that LSP lacks "empirical evidence" that the program is effective. Finally, the court found the QA/QI programming lacked attention to "remedying constitutional deficiencies." Nonsense. A layman may "disagree" with any court's ruling yet not be deliberately indifferent to the patients' needs. And nothing in the court's vague critique of the QA/QI programming identified exactly which "constitutional deficiencies" had to be addressed by means of a bureaucratic program. None of these Remedial Opinion complaints rises to the level of showing ongoing deliberate indifference by the Defendants. *See Gobert*, 463 F.3d at 346.

No. 23-30825

For all these reasons, the district court was made aware of a substantial risk of serious legal error that could arise from discounting the Defendants' innovations and improvements to prison medical care that were made during the remedial phase and post-trial, but it chose to ignore the risk. Likewise, it chose to ignore that ongoing improvements and innovations gave rise to a strong legal likelihood that the Defendants were not guilty of continued deliberate indifference. The court, in sum, was deliberately indifferent to both the evidentiary and legal framework that bound it. This court, following the Supreme Court, has maintained a delicate balance between the prerogatives of public institutions and the judiciary's limited remedial role. The court's Remedial Order fails as a matter of law.

V.

For these reasons, I vigorously contend that we have appellate jurisdiction; we must reverse the district court's Remedial Order for manifest disregard of the PLRA and governing precedent; we must seriously reconsider the district court's liability findings.

# APPENDIX

# "A"

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| JOSEPH LEWIS, JR., *et al.*, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BURL CAIN, Warden of the Louisiana State Penitentiary, in his official capacity, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-00318<br><br><br>JUDGE SDD<br><br><br>MAGISTRATE RLB |

<u>**REMEDIAL ORDER**</u>

For the reasons set forth in the Court's Rulings, dated March 31, 2021,[1] ("Liability Ruling") and November 6, 2023,[2] ("Remedial Ruling"):

**IT IS HEREBY ORDERED**:

I.     **SPECIAL MASTERS**

   A.  The Court hereby Orders the appointment of 3 Special Masters to develop proposed remedial plans, make recommendations regarding implementation and monitor implementation of remedial plans ("Remedial Plans") to cure and eliminate the violations found in the Court's Liability Ruling and Remedial Ruling.

   B.  The Court will appoint one physician and one nurse or nurse practitioner to develop, make recommendations regarding implementation, and monitor implementation of a medical care remedial plan and one Special Master with knowledge and expertise in handicap and disability access and accommodations to develop, make recommendations regarding implementation and monitor implementation of a remedial plan to address and rectify the ADA and RA violations found by the Court.

---

[1] Rec. Doc. 594.
[2] Rec. Doc. 778.

1

C. The parties are hereby Ordered to meet and confer within 14 days of this Order to identify and discuss potential Special Masters with the qualifications set forth herein. Within 30 days of this Order, the parties shall submit names of proposed Special Masters for each position. If the parties are unable to agree on proposed Special Masters, each party will submit up to three proposed names for each position.

D. The Court will appoint three Special Masters to prepare proposed Remedial Plans and monitor and report on implementation and compliance.

## II.   REMEDIAL PLANS

### A.  Medical Care Remedial Plan

A proposed Remedial Plan addressing the following shall be submitted to the Court within 120 days after the appointment of the Special Master.

1. Standards and Procedures for Sick Call, including but not limited to, the sick call request process, evaluation by a provider, and documentation and/or charting and follow-up.

2. Standards and Procedures for Clinical Care, including but not limited to, protocols pertaining to obtaining and documenting patient history, medical charting, examination and diagnostic protocols, treatment protocols, including review and recommendations of existing "Individual Treatment Orders," medication administration, documentation protocols, and medication charting and follow-up.

3. Standards and Procedures for Specialty Care, including but not limited to, protocols pertaining to referrals, tracking, follow-up, review, and implementation of specialists' orders and charting.

4. Standards and Procedures for Infirmary and In-Patient Care, including but not limited to, protocols pertaining to admission, level of care determinations, rounding and assessments, care planning, medication administration and documentation, charting, and the protocols for the appropriate use and training of inmate orderlies.

5. Standards and Procedures for Emergency Care, including but not limited to, staffing numbers and disciplines in the ATU, standards and protocols for transfer to outside hospitals, and protocols for the appropriate use and training of EMTs.

6. Standards and Procedures for medical records management, including electronic medical records and protocols for providing real time or contemporaneous access to medical records by outside providers, specialists, and related disciplines.

7. Standards and Procedures for medical management and administration, including but not limited to, recommendations for medical management policies and procedures, recommendations regarding medical

2

administrative organization, staffing levels, credentialing, performance reviews, peer reviews, mortality reviews, quality control and quality improvement.

## B. ADA REMEDIAL PLAN

A proposed Remedial Plan addressing the following shall be submitted to the Court within 120 days after the appointment of the Special Master.

1. Identification of architectural barriers to be remedied as set forth in Mark Mazz's expert report, a determination of the appropriate remedies, and a schedule for such remediation.

2. Standards and procedures for Methods of Administration, including but not limited to, the appointment of a qualified, properly trained ADA Coordinator and a determination regarding the necessity of an ADA Advisory Committee as previously contemplated by Directive 1.016.

3. Standards and procedures for receiving, tracking, and appropriately responding to accommodation requests.

4. Standards and procedures pertaining to the appropriate ADA training for LSP staff and inmate orderlies.

5. Standards and Procedures for the appropriate consideration of disabled status when imposing discipline and training related thereto.

## III.   COOPERATION AND ACCESS

A. No later than 30 days after their appointment, the Special Masters shall have access to Louisiana State Penitentiary ("LSP") to conduct reviews of the facility, the health care and ADA operations.

B. The Special Masters shall have access to any and all records and documents appropriate and necessary for their tasks and the Department of Corrections shall provide any records and documents requested without delay and in no event later than 14 days following the request. Oral requests for records and documents should be confirmed by electronic mail.

C. The Department of Corrections shall designate, in writing, employees to whom records requests should be directed by the Special Masters.

D. The Department of Corrections shall designate, in writing, one headquarters employee, one or more Wardens and one or more security employee(s) to coordinate and facilitate the work of the Special Masters.

E. Special Masters' visits to LSP shall be facilitated by the DOC on 24 hours written notice by the Special Master(s). The Special Masters shall be given reasonable access to class members.

3

F.  The Special Masters shall be provided electronic access to the record of these proceedings and the Court shall designate a Clerk to assist the Special Masters in retrieval of documents from the record if necessary.

## IV.  REPORTING

A.  Within 90 days of appointment, the Special Masters shall submit a proposed Medical Care Remedial Plan and a proposed ADA/RA Remedial Plan to the Court and the parties.

B.  The Remedial Plans should include recommended steps for implementation and proposed timelines for completion and compliance.

C.  Within 30 days of the Special Masters' submission of the proposed Remedial Plans, either party may submit proposed amendments to the proposed Remedial Plans. If either party intends to submit proposed amendments, the parties shall meet and confer no less than 14 days after the Monitors' submission in an effort to agree upon proposed amendments. The parties shall discuss any proposed amendments with the Special Masters no less than 7 days before submission of proposed amendments to the Court.

D.  The Court will review the proposed Remedial Plans and any requests for amendment and will enter Orders necessary and appropriate to effect remedies.

## V.  MONITORING IMPLEMENTATION OF REMEDIAL PLANS AND PERIODIC REPORTS TO COURT

A.  Beginning six months after the Court enters Orders effectuating the Remedial Plans, and at recurring intervals every six months thereafter, the Special Masters shall submit a comprehensive report advising the Court of the implementation status of each component of the Plan and any non-compliance or concerns regarding whether completion deadlines will be met. The parties shall have 14 days to comment on any periodic report and the Court will schedule a conference to review progress and impediments to completion and compliance if needed.

B.  Monitoring of progress and compliance with Court's Remedial Order(s) shall continue until further Order of this Court.

C.  The Special masters shall continue to have access to LSP, class members, and records and documents during the monitoring period under the terms set forth above.

## VI.  FEES AND COSTS

All costs associated with the work and reporting of the Special Masters shall be paid by the Defendants.

23-30825.30664

As the prevailing parties, Plaintiffs are directed to file a Motion to Award Attorneys' Fees and Costs within 30 days of this Order. Oppositions, if any shall be filed by the Defendants within 14 days thereafter.

Plaintiffs may file Supplemental Motions for Attorneys' Fees and Costs during the implementation and monitoring period, but in any event, no more frequently than 90-day intervals. Oppositions, if any, to Motions for Supplemental fees and Costs shall be filed within 14 days of the filing of the Motion.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.

_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

23-30825.30665

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

JOSEPH LEWIS, JR., ET AL.                                   CIVIL DOCKET

VERSUS                                                      15-318-SDD-RLB

BURL CAIN, ET AL.

## JUDGMENT

For the written reasons assigned:

Judgment is hereby entered in favor of Class Plaintiffs and the ADA Sub-Class Plaintiffs and against Defendants, the current Warden of the Louisiana State Penitentiary, et al.  This matter shall be closed by the Clerk of Court; however, the Court retains jurisdiction over the procedures set forth in the Court's Remedial Order and any issues pertaining thereto.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 6th day of November, 2023.


_____

**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**